## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS - AUSTIN DIVISION

| | | |
|---|---|---|
| **JEREMY STORY and DUSTIN CLARK,** | § | |
| *Plaintiffs,* | § | |
| *v.* | § | **Civil Action No.** |
| | § | **1:22-cv-448** |
| **SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES** | § | |
| **AMBER FELLER, TIFFANIE HARRISON, AMY** | § | |
| **WEIR, JUN XIAO, CORY VESSA; OFFICERS** | § | |
| **JEFFREY YARBROUGH, JAMES WILLIBY,** | § | |
| **DEBORAH GRIFFITH, MILTON POPE, FRANK** | § | **JURY** |
| **PONTILLO, SAMUEL CHAVEZ, individually, and** | § | **DEMANDED** |
| **ROUND ROCK INDEP'T SCHOOL DISTRICT** | § | |
| *Defendants.* | § | |

## PLAINTIFFS' VERIFIED ORIGINAL COMPLAINT and APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

COME NOW, Jeremy Story and Dustin Clark to complain of five RRISD trustees, its superintendent, and RRISD police who conspired to deprive Story and Clark of constitutional rights when they tried to: a) reveal Defendants' illegal hiring of Superintendent Azaiez; b) expose Azaiez's assault of his pregnant extramarital girlfriend after she refused to abort his unborn child, and c) object to a tax rate during an effectively closed meeting that violated the Texas Open Meetings Act.

Story and Clark seek damages from Defendants for conspiring to illegally eject Story and Clark from board meetings, retaliatory arrests and jailing, which are unconstitutional efforts to preserve an unquestioned fiefdom. Plaintiffs also ask the Court to enjoin the RRISD meeting rules on speech and spacing, as well as its Azaiez contract and tax expenditures until it conducts a proper tax hike meeting.

## I. JURISDICTION

1.      This Court has jurisdiction over this action, as Plaintiffs present a federal question as they seek redress for claims for deprivations of rights protected under the United States Constitution, the Constitution of the State of Texas, 42 U.S.C. §§ 1983 *et seq.*, and 28 U.S.C. §§ 1331 and 1343(a)(3), (4).

2.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear Plaintiffs' claims under the Texas Open Meetings Act and Texas Education Code, in that these claims form part of the same case or controversy as the federal claims.

3.      Plaintiffs' claims for declaratory and injunctive relief are brought pursuant to 28 U.S.C. §§ 2201-2202, by Federal Rules of Civil Procedure 57 and 65, and the general legal and equitable powers of this court.

## II.      VENUE

4.      Venue is proper in the Western District of Texas under 28 U.S.C. § 1391(b) because: a) events giving rise to Plaintiffs' claims occurred in the Western District; and b) Defendants reside in Williamson County, Texas, also in the Western District.

## III.      PARTIES

5.      Plaintiff Jeremy Story is a resident of Round Rock, Texas, and may be contacted at the address of his legal counsel, the undersigned.

6.      Plaintiff Dustin Clark is a resident of Round Rock, Texas, and may likewise be contacted at the address of his legal counsel, the undersigned.

7.      Defendant Round Rock Independent School District ("RRISD") is an

incorporated political subdivision of the State of Texas which may be served through its superintendent, Hafedh Azaiez (or his replacement), at 1311 Round Rock Ave, Round Rock, Texas 78681 ("RRISD Offices"), or wherever he may be found. It is charged with overseeing, administering, implementing, and financing educational objectives for the K-12 students who attend its classes.

8.      Defendant Hafedh Azaiez is the current superintendent of Defendant RRISD, and may be served at his office at 1311 Round Rock Ave, Round Rock, TX 78681, or wherever found. He is charged with providing educational leadership, demonstrating district management, and maintaining positive Board and community relations; while the Superintendent may delegate responsibilities to other employees of the District, he shall remain accountable to the Board for the performance of all duties, delegated or otherwise.

9.      Defendants Amber Feller, Tiffanie Harrison, Amy Weir, Jun Xiao, and Cory Vessa ("Defendant Trustees") are elected trustee members of the RRISD Board of Trustees and may be served at the RRISD Offices or wherever they may be found. (The phrase "Defendant Trustees" includes only these five trustees; the other two trustees, Mary Bone and Danielle Weston, are not defendants.) The Board constitutes a body corporate and has the exclusive power to govern and oversee the management of the public schools of the District. *See* TEX. EDUC. CODE 11.051(a)-11.151(b). The board members, in addition to other powers and duties imposed by

law, are a deliberative body with the Superintendent operating in the best interest of the District and of the children of the District schools upon the basis of the best available evidence. They must review, with the Superintendent, effectiveness and efficiency of District operations. The Board has final authority to determine and interpret the policies that govern the schools and, subject to the mandates and limits imposed by state and federal authorities, has complete and full control of the District. Board action shall be taken only in meetings that comply with the Open Meetings Act. Except for appropriate duties and functions of the Board President, an individual member may act on behalf of the Board only with the express authorization of the Board. Without such authorization, no individual member may commit the Board on any issue. Further, the board shall determine the law enforcement duties of peace officers, school resource officers, and security personnel. Board members shall not be involved with District investigations or any official investigation involving a District Trustee. Involvement includes, but is not limited to, contacting individuals involved in an active investigation. Local policies may be adopted or amended by a majority of the Board at any regular or special meeting, provided that Board members have had advance written notice of the proposed change and that it has been placed on the agenda for such meeting.

10.    As Board President, Defendant Amy Weir is responsible to ensure that all Board members are equally informed regarding the pertinent issues of the District.

11.     Officer Defendants are law enforcement officers working in Round Rock Independent School District, and include: Jeffrey Yarbrough, former Chief of Police; James Williby, Asst. Chief of Police; Detective Sgt. Deborah Griffith; Sgt. Milton Pope; Sgt. Samuel Chavez; and Officer Frank Pontillo. Each is sued in his individual capacity based on the deprivation of rights of which each officer was well aware; all can be served at the RRISD Offices or wherever they may be found. The chief of police of a district police department shall be accountable to the superintendent and shall report to the superintendent. District police officers shall be supervised by the district chief of police or the chief's designee. A school resource officer or district peace officer may refuse to allow a person to enter on or may eject a person from a district's property in accordance with Texas Education Code § 37.105.

## IV.     FACTUAL BACKGROUND

### A.     Defendants' illegal hiring practice leads to massive controversy.

12.     Plaintiffs Jeremy Story and Dustin Clark are taxpaying residents of the Round Rock Independent School District who have school-age children. They are actively involved in the community and take an interest in the decisions affecting the public school system in Round Rock ISD, which their taxes support.

13.     On June 14, 2021,[1] the RRISD Board of Trustees voted 5-2 to hire Hafedh Azaiez as the new Superintendent during a special board meeting, in spite of many

---

[1] All dates in this document are from 2021 unless otherwise indicated. Additionally, Plaintiffs' Proposed Preliminary Injunction Order is attached as Exhibit 1.

community members urging a delay to answer their inquiries regarding his recent performance in Donna ISD, including but not limited to his abuse of district resources to issue a criminal trespass notice to protect a non-working employee.

14.    The two trustees who voted against the hiring pointed out various troubling issues concerning the hiring process, which appeared to be already decided before it began. Both supportive trustees and some district employees had privately communicated with Azaiez while others were told not to communicate with him. Other attendant facts show the five Trustee Defendants, in conspiracy between themselves and others, illegally deliberated and illegally involved other school employees and private citizens to "arrive" at the predetermined decision to hire Azaiez; these facts include:

a.  the five Defendant Trustees maintained an illegal "walking quorum" over Azaiez's hiring while excluding the two other trustees, Mary Bone and Danielle Weston;

b.  Board President Amy Weir and RRISD's Public Affairs & Communications Chief Jenny Caputo secretly planned for Azaiez to wait in a back room prior to the vote for his hire, from which he dramatically emerged upon the 5-2 vote in favor of his employment;

c.  Azaiez sent text messages to his local girlfriend[2] in June prior to the public

---

[2] Azaiez has been a married man for decades, apparently marrying for immigration purposes.

vote indicating he was meeting privately with Amy Weir prior to his hire;

d.  Caputo and Weir, in conspiracy, helped coordinate and expend unauthorized funds to pay for Azaiez's travel and lodging for his surprise post-vote appearance;

e.  Observers saw Ms. Caputo, while sitting in the audience, editing an acceptance video for Azaiez, prior to the vote being taken;

f.  Former board member Diane Cox illegally provided the final interview questions for the superintendent position to Azaiez but not to the only other job candidate, a conspiratorial act involving one or more of the board member Defendants; and

g.  The PTA president already had a pre-planned gift for Azaiez the night of the vote before the vote was even taken or the decision announced.

15.    In July, Plaintiff Story learned that Azaiez, a married man, had assaulted his extra-marital girlfriend, Vanessa Aldrich, because she refused to obtain an abortion after becoming pregnant with his child.

16.    On June 17, the Round Rock ISD Board of Trustees held a regular board meeting. The next three meetings were special meetings, including June 19, July 15, and August 16. No regular meetings were held in July when Story would have been allowed to speak about Azaiez's assault on Aldrich, his pregnant girlfriend, who Azaiez assaulted when she refused to abort the child resulting from the affair.

17.   The RRISD Board has adopted policy BED (Local) to govern public participation, which restricts such participation during special or "called" meetings, stating that "public comment shall be limited to items on the agenda posted with notice of the meeting" ("Limited Public Comment Rule").[3]

18.   In July, Plaintiff Story and other members of the public contacted the members of Round Rock ISD's Board of Trustees through email and social media to inform them of the allegations against Azaiez. Story offered to provide evidence regarding the issue, as he was personally in contact with Aldrich.

19.   On July 20, Azaiez frivolously attempted to obtain a protective order against Aldrich. His attempt failed in part because the supporting affidavit lacked evidence of family violence by Aldrich against Azaiez. In his supporting affidavit, Azaiez testified that the RRISD board president told him that Aldrich had contacted her, and all board members had received an email with details about his "fathering her child."

20.   After Azaiez failed in his preemptive and deceptive effort to obtain his own protective order, and in stark contrast to Azaiez's frivolous filing, Aldrich filed an application for a protective order against Azaiez based on (1) allegations of family violence by Azaiez and (2) a likelihood of family violence by Azaiez, against Aldrich, to occur in the future. Judge Karin Crump of the 53rd District Court promptly issued the order.

---

[3] Exhibit 2, Board Policy BED (Local).

21.    Story sent emails to the RRISD Trustees on July 30 and August 2 after Azaiez was served this protective order, informing the Trustees and offering video evidence of the order being served at the District's offices against Azaiez.[4]

22.    Story sent emails to the RRISD Trustees on July 30 and August 2 after Azaiez was served this protective order issued pursuant to a criminal complaint filed by Aldrich for assault, informing the Trustees of these events.[5]

### 1. *Defendants' illegally refuse to address their illegal hire's bad acts.*

23.    Trustees Weston and Bone requested a special meeting to discuss the allegations against Azaiez regarding his extra-marital and illegal behavior, but RRISD Board President Trustee Weir refused to call a special meeting, rejecting her duty under RRISD's Local Policy BE, which specifically requires its board president to call a special meeting whenever any two trustees make such a request.[6]

24.    On August 3, Trustees Weston and Bone issued a press release regarding the five other board members attempts to prohibit them from placing on the board agenda any item related to the allegations against Azaiez.[7]

---

[4] Exhibit 3, Application for Protective Order and Order (July 30th) and associated documents.
[5] Exhibit 6, Story's emails sent to RRISD Board of Trustees
[6] See Exhibit 4, RRISD's Legal Policy (BED): "The Board President may call special meetings. The Board President shall call a special meeting at the request of two members of the Board. Special meetings shall be called when, due to the requirements of action by the Board, it does not appear that a matter requiring action may be dealt with in a regular Board meeting. Special meetings may also be called for the convenience of the public in order to allow the Board to decide specific items in a timely manner." *Id.* at 1.
[7] See Exhibit 5, Press Release of Trustees Weston and Bone.

25.    On August 6, RRISD Trustees Feller, Harrison, and Weir conspired and issued a statement to the online news outlet *Texas Scorecard* in which the three denied that the RRISD board had received any credible information about the accusations about Azaiez.

26.    However, before Feller, Harrison, and Weir issued their "we know nothing" statement, all RRISD Trustees received emails from Plaintiff Story on July 23, July 30, and August 2, which offered credible information about the matter.[8] In particular, the August 2 email included Story's eyewitness account of watching Azaiez receive the protective order resulting from the criminal complaint made by Aldrich.

27.    On August 5, Story and Aldrich spoke, and Story learned the following:

  a.  Aldrich was privy to a speakerphone conversation between Azaiez and Weir wherein Weir illegally planned with Azaiez to bring him to an RRISD board meeting *before* the board voted to hire him.

  b.  Wier used RRISD's Public Affairs & Communications Chief, Jenny Caputo, to plan for *unauthorized expenditures to cover* Azaiez's hotel lodging in advance of the meeting.

  c.  Aldrich had an SMS message from June in which Azaiez stated that he was meeting with Weir alone.

  d.  Aldrich has a text message from the day that Azaiez was hired, where he indicated RRISD was paying for the hotel for his stay.

  e.  Aldrich and Azaiez discussed issues of his past, including a previous protective order and immigration fraud concerning his naturalization

---

[8] Exhibit 6.

process (which also excused the need for him to remain married) and other past extra-marital affairs.

f. Over SMS messaging, Azaiez asked Aldrich to review his resume, which discusses his sons, but not his wife, and Azaiez explained by asserting that he planned to divorce his wife in six months after he was hired by RRISD.

g. Diane Cox, a former board member, had collaborated with current board members to give interview questions and other unfair advantages in the interview process to Azaiez. [9]

28.     On August 13, Story sent a fourth email that included a copy of the first page of the protective order and the last page of Azaiez's affidavit in which he attempted to obtain a protective order against Aldrich.

29.     On August 16, the board of trustees held a specially called board meeting with two items on the agenda: (1) COVID-19 Employee Leave and (2) Fall 2021 COVID-19 Health and Safety Protocols.[10]

30.     Because it was a specially called meeting, and not a regular one, the RRISD claimed that the Limited Public Comment Rule governed the meeting.

    *2.   Defendants unconstitutionally silence opposing viewpoints.*

31.     On August 16, RRISD Police Det. Sgt. Lauren Griffith was in the parking lot outside the location of the scheduled RRISD board meeting and had been informed,

---

[9] Exhibit 6, Emails sent to RRISD Board of Trustees.
[10] Exhibit 8, Agenda for the August 16 RRISD Called Meeting.

in conspiracy with other Board Defendants and by officers stationed outside the building, specifically that Story was approaching, complete with a description of his clothing.[11]

32.     Before Story began to speak during the public comment part of the meeting, RRISD Chief of Police Yarbrough, in plain clothes and part of the conspiracy to target and deny Story his civil rights, privately approached Story.

33.     Yarborough approached Story and demanded that he leave the room so they could speak alone outside. Story refused multiple times, and then Yarborough unconstitutionally threatened Story in furtherance of the conspiracy. Story denied causing any problems and attempted to inform Yarborough of others who had yelled and threatened people without attracting Yarborough's personal attention.

34.     Unlike any other speaker that night, Story's not-yet-uttered comments were unconstitutionally predetermined to be non-germane. However, Story asserted that his comments *were* going to be germane to the agenda, specifically agenda item 2 about Fall 2021 COVID-19 policies and the choice by Round Rock ISD to violate Executive Order GA-38 issued by Governor Greg Abbott, prohibiting local governments from requiring masks.[12]

35.     Weir, in furtherance of this conspiracy, unconstitutionally continued to try to

---

[11] Exhibit 9, Story Incident Report at 6.
[12] The entire meeting is online at https://roundrockisdtx.new.swagit.com/videos/130528.

stop Story from beginning his lawfully allowed speech and even asserted at one point that in an exercise of prior restraint she did not want to allow him to even demonstrate whether his comments were going to be germane.

36.    Story began speaking and was the only speaker that night to read out loud portions of the resolutions on the Agenda. He questioned the authenticity of the Board's concerns about safety and oversight of the Superintendent as stated in the resolution, as many others had already questioned the same that night. Story boldly presented as a counterexample the fact that the board knew about the protective order for family violence against Azaiez but was suppressing discussion on the matter.

37.    As soon as Story mentioned this protective order, he was interrupted again by Weir and then by RRISD Police Officers Milton Pope and Frank Pontillo, who, in conspiracy with Weir, approached Story from behind, grabbed both of his arms, and unlawfully dragged him away from the microphone and out of the meeting room.

38.    Other speakers during the meeting were treated unequally and with more privilege than Story. They made broad comments about the superintendent, about the board leadership, complimenting certain members of the board while criticizing others as believing in conspiracy theories. Some ventured far off-topic, mentioning Ted Cruz's politics and his children; still others name-called and spoke derisively about those who had a different opinion concerning masks. None of these speakers were treated poorly like Story; none were dragged from the podium by police even

though many of the comments could easily be deemed "not germane" to the agenda items. Only Story, whose comments actually were germane, was treated in this fashion.

39.    On August 17 and 18, John McKinney, chief investigator for the Williamson County Attorney's Office, interviewed Story and accepted a complaint made by Story based upon the unconstitutional violation of Story's civil rights at the August 16th meeting.[13]

40.    On August 18, Story tried to file a report with the Round Rock Police and the Williamson County Sheriff's Office; both refused to accept a report, stating the RRISD Police Dept. had the duty to investigate itself. Story also filed a complaint with Jim Williby, RRISD Asst. Chief of Police, and the Texas Education Agency ("TEA").[14]

41.    Also, on August 19, while the Trustees met in closed session, Story asked questions of Yarbrough regarding his threats at the August 16th meeting:

> 00:07:16 - 00:07:32, Yarbrough: The actions that caused you to be removed from the board room was because of the meeting that was being held. It wasn't a regular board meeting. The information on the board and the public comments said you can only speak to the items that were on the board.
> Story: Which I was doing.
> Yarbrough: When you deviated from that.
> Story: I didn't.
> Yarbrough: Okay. You asked for it.

---

[13] Exhibit 9 Story's complaint filed with the Williamson County Attorney's Office.
[14] Exhibit 10 Story's RRISD Complaint, Exhibit 11 Story's TEA Complaint, respectively.

Story: <u>So, you're saying that the Round Rock police force has the authority to determine whether what I said was germane and then remove me from a building if you don't feel like it was? So, you determined that I was not making germane comments and you thought it would be appropriate to use force to drag me out of the building? Is that Round Rock police protocol? . . .</u> Point me to where that's protocol that the police have the authority to determine whether it's germane and then basically yank someone out of the building when they believe it's not.

Yarbrough: <u>Texas Educ. Code 37.105, 38.13, Texas Penal Code 42.05.</u>

Story: That gives you the authority to determine what is germane and then pull me out of the building?

Yarbrough: <u>I encourage you to go and look those up.</u>

Story: <u>I have. I mean, it doesn't give you the authority to determine what's germane it doesn't.</u>[15]

### 3. Trustee Defendants refuse to acknowledging Azaiez's immoral acts.

42.    When RRISD police had done nothing in response to Story's August 19 complaint which he had filed with Assistant Chief Williby, who in writing confirmed receipt, Story submitted a legal grievance to RRISD's legal department.[16]

43.    On August 23, the RRISD Board held a called meeting. The initial published agenda for this meeting included an option to act regarding Azaiez's challenged actions. That agenda, however, was unlawfully changed and the option to act removed, in violation of the Open Meetings Act, about an hour before the meeting began.[17]

44.    On September 4, Story submitted a legal grievance to the RRISD district legal

---

[15] Story's up-close video recording of his conversation with Chief Yarbrough on August 19, 2021 (emphasis added).

[16] Exhibit 12, Story's Legal Grievance.

[17] Compare Exhibits 13 and 14, the August  23 Original and Amended Agendas, respectively.

department over the events of August 16 due to no response from RRISD police. Mysteriously, Assistant Chief Williby suddenly responded outside of normal hours of operation that same Friday night to let Story know that the department's internal investigation had led its leadership to conclude they are unable to handle the complaint because the complaint was against high-ranking officials that included the RRISD Police Chief, School Board Trustees, and Superintendent. Williby instructed Story to try Round Rock Police; Williamson County Sheriff, County and District Attorneys; and the Texas Rangers.

45.     On September 9, the TEA confirmed the receipt of Story's complaint and informed him that his complaint was referred to the educator misconduct division.

**B.     Defendants fail to allow the public into their Sept. 14th board meeting.**

   *1. The Trustee Defendants unconstitutionally threaten free speech.*

46.     On September 14, the RRISD Board met at a regular meeting. Among those matters considered was a vote on a new mask matrix tied to Austin Public Health's and Williamson County and Cities Health Department's "COVID stages."

47.     According to the relevant fire code, the meeting room has a capacity of 375, but all chairs in this auditorium were removed except for 18 chairs set up at least six feet apart. Attendees were unconstitutionally told that unless they sat in one of these government-approved chairs they could not participate in the meeting, even if they spaced out similarly but sat in chairs they personally brought. Defendant Trustees

used RRISD police officers to unconstitutionally prevent parents from entering the open meeting room arbitrarily and capriciously.

48.     No action was formally taken regarding the District's mask policy because, as the Board President asserted, a public disruption occurred "outside" of the room.[18]

49.     Board President Weir called the September 14 meeting to order at 5:31 p.m., opening with these speech-chilling verbal instructions:

> Before we start, the rule of the meeting tonight, based on the administration's rules, is the number of seats in here are the number of seats, you are not allowed to bring your own seat, you are not allowed to sit on the floor. I'm going to give you one warning, and then we will have to escort you out.

50.     Weir then unconstitutionally threatened attendees that mere disagreement with these "rules" would constitute a "meeting disruption" – a criminal offense under the Texas Penal Code cited repeatedly by Trustee Weir who referenced said statute as authority to have public participants removed at whim by RRISD Police Officers.

51.     When Trustee Bone rightly asserted that arbitrary rules may not be made up, and insisted on knowing who, if not the Board of which she is a part, made the rule, Azaiez wrongly responded that, "There were no rules, it was a decision we made… I made ... and we had this setup for like several meetings now . . . ."

52.     The Board then improperly voted 5-2 to adopt the "administration rules" of

---

[18] The meeting was captured on video by the district, and the recording constitutes an official record of the district, a government agency. The Court is hereby requested to take judicial notice of the recording at https://roundrockisdtx.new.swagit.com/videos/139574 (beginning at 46:59), as well as the other public documents and videos within this Complaint.

arbitrarily limiting seating as described above. Trustee Weir stated, "it passes, Officer Williby, can we please have those without… can we remove those not in the chairs provided by the administrators" to the objections of members of the public who came to speak and asserted that the Board was violating the Open Meetings Act. No such vote was on the agenda.

53.    Trustee Harrison requested that the Board go into executive session, implying that action would allow the Board to clear the room, but its legal counsel rightly stated that the Board cannot enter executive session in such a manner.

54.    After a recess, Trustees Weston and Bone left the meeting, expressing concerns over Open Meetings violations to which they did not wish to contribute.

### 2. *The Trustees Defendant unconstitutionally prohibited free speech outside the meeting room.*

55.    During the September 14 meeting, seats in the 375-person lecture hall were removed, leaving only 18 seats for parents; those who attempted to bring in their own seats were threatened with arrest.

56.    This impromptu rule was enforced nowhere else in RRISD and created only for this specific meeting. For example, approximately fifty students simultaneously meeting directly across the hall from the board meeting were not required to have spacing or reduce their meeting capacity below room capacity. In addition, a board meeting was held a few days later in an auditorium with no spacing or seating restrictions being enforced, demonstrating the rule was a pretext to limit speech.

57.   Two district police, Officers Pope and Pontillo, kept Jeremy Story and many other parents from entering the room during the board meeting. COVID was mentioned as an excuse, but no COVID-restrictions were in place – the limitations were enforced by police who remained silent, surfed the internet on their mobile devices while pretending to ignore community members, refused to answer questions, and refused to explain (1) why the restrictions were in place, (2) what rule had been implemented, (3) what authority even made the rule, or (4) who had instructed them to stand in the room's entry and unconstitutionally block its access.

58.   Jeremy Story, Dustin Clark, Michelle Evans, and others asked the RRISD police officers to identify who was instructing them to restrict access to the boardroom, arguing that, as the published location for the meeting, it should be open. For most of the more than a 45-minute period of questioning, the officers remained silent and refused to answer.

59.   RRISD Asst. Superintendent Daniel Presley came out of the board room and attempted to browbeat the crowd in the hall into quieting. After realizing that the crowd would not be intimidated, he went back inside the meeting room.

60.   While the police continued to refuse to identify (1) who gave them authority to act in this manner or (2) who told them to block doors, one police officer nodded in what might have been an indication that RRISD Police Chief Jeffrey Yarbrough told them to block the doors.

61.    As the board meeting started, the police allowed some people in solely based on the officers' personal judgment, e.g., one person stated that she was speaking first. Others were prohibited without any discernible reason.

62.    During this period, Jeremy Story attempted to enter multiple times, each time stating that (1) he was no threat, and (2) he was simply attempting to enter the room, with no success.

63.    Also during this time, individuals identified pictures of the room's set-up during severe periods of district COVID restrictions, which contradictorily showed more people allowed to be in the room during that time than the current Sept. 14 meeting.

64.    Officer Samuel Chavez was hastily instructed by Assistant RRISD Police Chief, Jim Williby to reference a penal code statute. With Williby watching from behind the door window, Chavez left the meeting room and, while standing between Pontillo and Pope, announced:

> "This is what we are operating under - the Texas Education Code section 37.105:
>
>> 'A school administrator, school resource officer, or school district peace officer of a school district may refuse [to] allow a person to enter on or may eject a person from property under the district's control if the person refuses to leave peaceably on request.'"

65.     Chavez's reading of the statute was deceptive and knowingly so because he did not read the entire section. By reading only a part of the statute, he misrepresented Texas law, which states in full:

> A school administrator, school resource officer, or school district peace officer of a school district may refuse to allow a person to enter on or may eject a person from property under the district's control if the person refuses to leave peaceably on request, and: (1) the person ***poses a substantial risk of harm to any person***; or (2) the person ***behaves in a manner that is inappropriate for a school setting*** and: (A) the administrator, resource officer, or peace officer ***issues a verbal warning to the person that the person's behavior is inappropriate and may result in the person's refusal of entry or ejection***; and (B) the person ***persists in that behavior.***

TEX. EDUC. CODE § 37.105(A) (emphasis added).

66.     The Officer Defendants, both directly and in concert with other Defendants, consistently misrepresented and willingly misapplied § 37.105(A), as Defendant Police Chief Yarbrough cited § 37.105(A) on August 19th to Story in the hallway when the two of them were discussing meeting ejections. (See ¶¶ 40-41, *supra*.)

67.     As Story and others pointed out to Officer Defendants Pope and Pontillo, who were guarding the doors to the board meeting auditorium, no one had even the opportunity to enter the room, and no one who wanted to enter the room showed any indicia that he might be a "substantial risk of harm to any person."

68.     After Chavez attempted to excuse his misuse of the Texas Education Code § 37.105, another person in the area read the text of the Texas Education Code § 26.007 to Officer Defendants Pope and Pontillo:

Sec. 26.007. ACCESS TO BOARD MEETINGS. (a) A parent is entitled to complete access to any meeting of the board of trustees of the school district, other than a closed meeting held in compliance with Subchapters D and E, Chapter 551, Government Code.

TEX. EDUC. CODE § 26.007(a).

69.     The one-way conversation about the law continued between the officers and others who were refused entry into the public meeting, with the officers wholly unable or unwilling to explain why § 37.105 applied to the situation, and how § 26.007 did not.[19]

70.     During these events, Assistant Chief Williby was inside the room and looked through the door windows to observe the officers under his charge (1) using force against Jeremy Story by bear-hugging him around a pole, cutting his back, and slamming him to the ground and (2) prohibiting the public from entering the board meeting. None of these actions were in keeping with their public duties but appeared to be intended to physically intimidate and humiliate Story. Had the officers intended to remove him from the area, their actions were inconsistent.

71.     Williby, supervisor to these officers, did nothing to protect Story's civil rights, as he should have intervened, as a reasonable officer should have known that Story's and others' civil rights to attend the board meeting in person and speak under federal and Texas law, obvious and clearly established at the time, were being violated.

---

[19] All of the events described outside the board room were recorded and those recordings are available for examination.

### 3. The Trustee Defendants unconstitutionally prohibited Free Speech inside the meeting room.

72.   A later review of the meeting's video kept by RRISD[20] revealed that Board President Weir announced that the 18-seats-in-a-375-seat lecture hall policy, instead of the much greater number allowed during COVID-19, was a decision by Azaiez.

73.   When challenged by Trustees Bone and Weston, Board President Weir accepted the decision of Superintendent Azaiez as controlling, failing to recognize that creating board meeting rules are the province of the Board, and not its employee.

74.   After Trustee Weir refused to recognize Board authority over its own proceedings, Weir militantly announced an unconstitutionally vague policy regarding conduct and mentioned specifically Texas Penal Code § 38.13 (Hindering Proceedings by Disorderly Conduct) and § 42.05 (Disrupting Meetings or Processions) as laws which Weir, in conspiracy with RRISD police officers, would be using RRISD police to enforce.

75.   In a discussion between Defendant Weir and Trustees Bone and Weston, Weir arbitrarily decided to enforce an 18-chair limit and deny admission to all other prospective attendees, based in part on an unannounced, non-agenda 5-2 vote to support the restriction, irrespective of the Open Meetings Act, with the blessing of its counsel, Doug Poneck. Poneck apparently, yet wrongly, approved that an ISD

---

[20] **RRISD** maintains the video at https://roundrockisdtx.new.swagit.com/videos/139574, judicial notice of which is requested at this time.

board president has unbridled discretion to change the seating rules of an open meeting to disallow the public from attending the meeting on such pretext.

76.     This was not on the agenda, listed as an action item, or otherwise published to the public. At no point did any member of the RRISD state any reason why the Texas Open Meetings Act was not being followed or describe an emergency that would warrant off-agenda votes.

77.     Trustee Xiao recognized publicly that the 18-chair limitation vote was not on the agenda and President Weir agreed, but the vote did occur and was unconstitutionally followed. Both Xiao and Weir showed an intentional willingness in the face of obvious unlawful and unconstitutional actions to deny the community access to an open public meeting, knowing they are clearly violating Texas law, particularly when a tax rate vote was scheduled.

78.     Trustees Weston and Bone left the meeting over Open Meetings concerns, as Weir continued to enforce an unconstitutionally arbitrary rule reducing seating from 375 to 18, acting as if such rule was inviolate and could not be changed because the Board voted to affirm the rule.

79.     Weir's fervor in her conspiratorial crusade to silence Story and Clark grew to such a hostile extent that she threatened a young girl, sitting quietly on the floor next to the chair where her mother was seated, with removal by police if she did not leave the meeting.

80.    Although President Weir alluded to the sometimes heeded, sometimes not, rule not to "criticize" individuals, she wielded it with unbridled discretion and unequal treatment, not enforcing that rule when citizen commentator Doug McLean accusingly announced during his period at the public microphone, "First of all, I do want to recognize Trustee Weston and Bone who have endangered everyone in here by not wearing masks."

81.    During this meeting, Dustin Clark attempted to instruct the Board that (1) it was violating the Texas Open Meetings Act multiple times in its votes on unannounced topics and arbitrary seating rules, (2) the Board had failed to allow even the 18 chairs to be filled by those who wished to attend the meeting, and (3) the Board was prohibited by law from raising taxes without allowing public participation in the meeting.

82.    In retaliation, Weir instructed Williby to unconstitutionally remove Clark from the meeting.

83.    The Board of five then seized this opportunity to unlawfully vote to set a tax rate, though many who live in the district were unlawfully prevented from any meaningful participation in the hearing.[21]

84.    Pleas from outside the artificially-limited meeting room of "Let us in!" can be

---

[21] See Exhibit 15 Minutes of the September 14 Meeting. With regard to tax rate hearings, Tex. Educ. Code § 44.004(f) states, "The board of trustees, at the meeting called for that purpose, shall adopt a budget to cover all expenditures for the school district for the next succeeding fiscal year. Any taxpayer of the district may be present and participate in the meeting."

heard many times in the video of this meeting, coming from residents denied access to this public meeting.

85.    After the vote, Defendant Weir in her arbitrary, capricious, overly broad, unbridled, and unequally applied discretion, allowed Mr. McCullough, another public speaker, to directly criticize Trustee Bone without enforcing the "no criticism" rule.

86.    The Board went to a closed meeting after unlawfully passing the tax increase, hearing McCullough's statement, and another minor vote. After the Board came back from its closed meeting, the Board voted to make public a TEA letter referred to as the "TEA Corrective Action Plan".[22] The Board then adjourned.

87.    The Board later issued a misleading press release blaming its lack of ability to accomplish its business on public disruption.[23] However, the Board had not attempted to dismiss the meeting over disruption, irrespective of activities in the hall, until the Board learned that Round Rock City police had agreed to come to the meeting. They had been summoned by Story who, after being pushed to the floor by RRISD police officers while Asst. Police Chief Jim Williby approvingly watched, called 911 and cited a letter he had received from Williby himself which encouraged Story to seek help from other agencies.

---

[22] Exhibit 16 TEA Corrective Active Plan.
[23] Exhibit 17 Trustees Weston and Bone Press Release and TRO.

### 4. Defendants cause arrest of Plaintiffs with trumped-up charges.

88.    Jeremy Story attempted to file reports regarding his ejections from board meetings with RRISD Police, RR Police Department, Williamson County Sheriff's Office, Williamson County District Attorney's Office.

89.    Plaintiffs also filed a report with the TEA.

90.    The TEA did react to a complaint by former RRISD Board of Trustees member, Terri Remore, as she raised concerns about violations of educational ethics with regard to Azaiez.

91.    In November the TEA announced it was sending a monitor to RRISD, and in December the TEA announced it was investigating Superintendent Azaiez. The TEA Monitor also made strong recommendations that the school board hire an independent investigator and put the Superintendent on leave.

92.    During conversations with County and District agents, Story conversed by email with the Round Rock Police Chief after itspolice refused to move forward with the investigation into what the RRISD police did to him, understanding that the Williamson County Attorney would resolve Story's complaint. This background action moved very quickly: Story filed the report with Round Rock City Police on September 14 late at night, and by 10 a.m. the next morning the Round Rock Police Department had decided not to investigate RRISD Police actions as per the request of County Attorney Dee Hobbs.

93.    On September 16, Story spoke again with Vanessa Aldrich, who informed Story that Azaiez's immigration case was delaying Travis County's criminal investigation. Aldrich also informed Story that Azaiez: (1) wanted to negotiate; (2) had admitted paternity, but; (3) was demanding all visitation rights including being present at delivery despite previously telling her that he wanted nothing to do with the child and demanded it be aborted, apparently using this as leverage to scare her into negotiating. She also said that Azaiez had told her that he would be able to keep his job if they mediated amicably.

94.    On September 17, Jeremy Story made another follow up call to County Attorney Hobbs early in the day and spoke with Blake Plueckhahn. During their conversation, Plueckhahn stated his unit is not typically an "investigative unit."

95.    Story informed Plueckhahn he had a second assault/incident to report and had more information to share. Plueckhahn replied he would call Story back to get the second report, claiming that he was not 'qualified' to discuss where the investigation was going and that his "chief" was telling him to tell Story to leave a message with John McKinney, Deputy Chief investigator for the Williamson County Attorney.

96.    Story called John McKinney[24] telling him he had new information to report about the new assault by police on September 14; to date, John McKinney has never returned Jeremy Story's call.

---

[24] 16:15 mark on the audio file.

97.    On the morning of September 17th, to further the conspiracy against Story and Clark, unlawful RRISD-originated warrants were issued for Story and Clark for "Hindering Proceedings by Disorderly Conduct," a Class A misdemeanor.[25] They were simultaneously arrested by coordinated tactics of multiple Sheriff's agents that same day by the Williamson County Sheriff's Department.

98.    No record shows Dustin Clark as cited for this crime; he is only cited for "Hindering Proceedings by Disorderly Conduct", but only the Class B misdemeanor of violating Texas Penal Code § 42.05. Not until the warrant process was carried out by Griffith were Clark's actions associated with Texas Penal Code § 38.13.

99.    During the arrest and release of Story and Clark, Williamson County jail departed from its COVID-19 rule against jailing individuals for minor offenses, making a targeted and harassing special exception just for them. Plaintiffs are aware that at least one other person asked to be jailed after traveling from another city under judicial order to turn himself in but was told to leave by authorities at the jail.[26]

## V.      PROPOSITIONS OF LAW FOR PLAINTIFFS' § 1983 CLAIMS

100.   42 U.S.C. § 1983 provides a private cause of action against those who, under color of law, deprive a citizen of the United States of "any rights, privileges, or immunities secured by the Constitution and laws."

101.   To state a claim under § 1983, a plaintiff must (1) allege a violation of a right

---

[25] TEX. PEN. CODE § 38.13.
[26] Exhibit 18 WILCO Jailing Policy and Plaintiffs' Arrest Documents.

secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

102.    Put another way, to state a cause of action under § 1983 for violation of the Due Process Clause, plaintiffs must show that they have asserted a recognized liberty or property interest within the purview of the Fourteenth Amendment, and that they were intentionally or recklessly deprived of that interest, even temporarily, under color of state law. *Griffith v. Johnston,* 899 F.2d 1427, 1435 (5th Cir. 1990).

## A.    School Districts are liable under § 1983 for constitutional violations.

103.    Municipal entities, including independent school districts, qualify as "persons" under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). As such, school districts can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. *Id.* at 690-91.

104.    Under Texas law, the final policymaking authority in an independent school district rests with the district's board of trustees. *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); Tex. Educ. Code § 11.151(b).

105.    A school district is liable for its policy makers' unconstitutional actions, including actions by those to whom it has delegated policymaking authority in

certain areas. *Id.* at 694; *see also Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377, 380 (5th Cir. 2007).

106.   To invoke municipal (or school district) liability, a plaintiff must identify (1) an official policy, of which (2) a policy maker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy. *Pineda v. Houston*, 291 F.3d 325, 328 (5th Cir. 2002) (quoting *Piotrowski* at 578).

**B.    Supervisors may be held liable for their own actions under § 1983.**

107.   In *Bowen v. Watkins*, 669 F.2d 979, 988 (5th Cir.1982), the Fifth Circuit observed that supervisory officials cannot be held liable solely on the basis of their employer-employee relationship with a tortfeasor *but* may be liable when their own action or inaction, including a failure to supervise that amounts to gross negligence or deliberate indifference, is a proximate cause of the constitutional violation.

**C.    Police may be held individually liable under § 1983.**

108.   Recovering monetary damages from individual police officers requires overcoming their defense of qualified immunity, but qualified immunity is not provided to officials who knew or reasonably should have known that their actions would violate constitutional rights of others, or when actions are taken with the malicious intention to cause a deprivation of constitutional rights or other injury. *Harlow v. Fitzgerald*, 457 U.S. 800, 815, 102 S. Ct. 2727, 2737 (1982).

**D.    Defendants found liable for violations of § 1983 may be found to have engaged in civil conspiracy under 42 U.S.C. § 1985.**

109.   42 U.S.C. § 1985 provides civil liability for those conspiring to deprive a person of federally protected civil rights. Specifically, § 1985(2)-(3) states:

> [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;
>      . . .
> [I]f one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

110.   Plaintiffs recognize that the typical rule is that all individuals working under a common firm (or school district) may not be liable for conspiracy because courts presume that all of those working for a single entity are only one person and the element of "two persons" necessary for a conspiracy is missing. However, Plaintiffs contend that the typical case is distinguishable from the case at bar, because previous cases had no fact pattern of individuals working together, each one directly acting toward the conspiracy, *to the detriment of the entity* represented.

111.   Defendants attempted to further their conspiratorial acts against Story and Clark to deprive Story and Clark of their civil rights based on Plaintiffs' determined efforts to hold Defendants publicly accountable to Texas law.

112.   Story and Clark have been injured by the Defendants' conspiratorial acts, and each Defendant acted separately and in view of the constitutional deprivation. These actions are damaging to the District.

113.   Just as several employees of a company could be held liable for their conspiracy to defraud the company's customers while they are also embezzling from the company, the Individual Defendants herein sued should be liable for their individual actions in furtherance of the goal of hiring and maintaining unquestioned power and authority that is not checked by state or federal law.

## VI.   COMMON FACTS AND LEGAL BASIS FOR CLAIMS

114.   The phrase "Individual Defendants" herein refers to all of the defendants except the Round Rock Independent School District.

115.   At all times relevant, Defendants were acting under color of state law because they were employed by and performing official duties.

116.   The five Trustee Defendants were acting as school board members, voting and discussing in civil conspiracy, to support restrictions that prevented Story and Clark from participating in their public board meetings and supporting retaliatory arrests.

117.   The Trustee Defendants' unconstitutional and illegal acts were obvious violations of Plaintiffs' protected rights under federal and state law.

118.   As RRISD Superintendent, Defendant Hafedh Azaiez selectively created the restrictive public meeting purposefully in conspiracy and with the support of the five

Trustee Defendants to silence public opposition, while not enforcing these rules even in adjacent rooms where assemblies of others were occurring, or the entry corridor where people were gathering.

119.   Defendant RRISD Police Chief Yarbrough, as part of the civil conspiracy, received instructions from both Azaiez and the Trustee Defendants to restrict public participation and use unreasonable force to keep Story out of the meeting room, instructing the other Officer Defendants to prevent Plaintiffs' participation.

120.   Defendants Weir and Williby, in conspiratorial agreement, also restricted Clark's ability to participate in the meeting when he attempted to hold the board publicly accountable to the law prohibiting a tax increase without lawful public participation and an actual public meeting.

121.   Each of the Individual Defendants are aware that RRISD board meetings are open meetings of the RRISD where individuals petition the District and exercise free speech and equal public rights as citizens.

122.   Based on the individual actions taken by the Individual Defendants, each one is liable for his own actions, separate and apart from all other Defendants.

123.   The Individual Defendants' actions described here were under color of policy or custom of RRISD, a local government, where each defendant acted independently to support the restrictive and unequal participation under the pretext of COVID-19 mitigation measures, in spite of the fact that each individual defendant obviously

knew of the unequal treatment given to Plaintiffs and the rest of the public because the same building housed other events with people who were not so restricted which they would have seen or been aware of that same day.

124.   Additionally, the Officer Defendants knew that they needed a legal pretext to keep Story out, as they discussed the issue and decided to read half of a law in a way that might fool an unsuspecting lay person who is not reading the statute, and deliberately misrepresenting Texas law.

125.   In reading only half of Texas Education Code § 37.105, Defendant Officer Chavez demonstrated that he obviously knew what the rest of the unread portion stated, or he would have not stopped reading the statute *mid-sentence*. When Story and others brought this to his attention immediately, showing that the rest of the statute made the law inapplicable, the Officer Defendants did not apologize, admit that they were in the wrong, nor change their mind and let Story in.

126.   Plaintiffs allege that their claims are based on obvious and clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

127.   Defendants knew or should have known that they were violating Plaintiffs' constitutional rights by prohibiting their speech, assembly, and petition, and by arresting them in retaliation for their views and the lawful expression thereof, which are protected under federal and state law.

128.   Plaintiffs have suffered and are suffering irreparable harm from the Individual Defendants' retaliatory and discriminatory actions challenged here, as they were forcibly manhandled unnecessarily, prevented from publicly participating in RRISD events designed for petitioning the RRISD board, and then arrested without cause.

129.   Plaintiffs have no way to know that these same events will not happen the next time that they wish to address the RRISD Board of Trustees, as none of the Individual Defendants have indicated that they understand their duties better now or admitted that they were wrong in any way. If anything, Defendants have leaned into their deliberately abusive approach, and have telegraphed that they will repeat their previous actions again if irritated, irrespective of whether any legitimate COVID-19 danger exists.

130.   Thus, Plaintiffs have no adequate remedy at law to correct the deprivation of their rights while these unconstitutional policies and tactics remain.

131.   Unless the Limited Public Comment Rule and board meeting limited seating policy are enjoined, Plaintiffs will continue to suffer irreparable injury and chilled exercise of fundamental rights whenever the RRISD board wants to railroad an agenda item without bothering with pesky public participation.

132.   At all times relevant to this Complaint, Individual Defendant Officers, Azaiez, and Defendant Trustees acted in concert and conspiracy, and were jointly and severally responsible for the constitutional harms caused to Plaintiffs.

## VII.    CAUSES OF ACTION[27]

**A.    Defendants violated rights protected by the First Amendment, enforced through the 14th Amendment and 42 USCS § 1983.**

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. CONST. amend. 1.

### *1.    Defendants Violated Plaintiffs' Right to Petition*

133.    The First Amendment to the United States Constitution guarantees the right of United States citizens to petition their government for redress, which includes the right to do so without the government retaliating against the petitioner. The First Amendment applies to the states via the Fourteenth Amendment's due process clause. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334 (1995); *Rolf v. City of San Antonio*, 77 F.3d 823, 827 n. 18 (5th Cir. 1996).

134.    All of the Individual Defendants (but not the District), in various levels of conspiracy with other defendants, retaliated against Plaintiffs for exercising their right to petition by cooperating in the illegal ejections from public meetings and subsequent arrest based on false charges, as well as unequal treatment they received in comparison with other individuals present at these meetings.

---

[27] All causes of action are brought as both facial and as applied challenges against Defendants' policies to the extent either approach applies.

135.   Additionally, Defendants' Limited Public Comment Rule and other policies are facially unconstitutional as they are inexcusable viewpoint-based restrictions without a compelling underlying reason. These policies violate Plaintiffs' right to petition, which is guaranteed by the First Amendment and 42 U.S.C. §1983.

136.   Plaintiffs seek economic damages and injunctive relief to prevent such behavior by Defendants going forward, including RRISD itself.

137.   Public comment periods at school board meetings exist in large part to enable people to exercise their fundamental First Amendment right of petition. Defendants' speech policies and practice that prohibit speech deemed not "germane" or "critical" facially violate the First Amendment right to petition by impermissibly limiting petitions on the basis of content and viewpoint.

138.   In the alternative, Defendants' speech policies and practice that prohibit speech deemed not "germane" or "critical" violate the First Amendment right of petition on their face because they are not reasonable regulations that advance the meetings' purposes and are an overbroad means to suppress disfavored petitions. By enforcing these provisions, Defendants, under color of state law, deprived Plaintiffs of the right to petition, violating the First and Fourteenth Amendments.

139.   These prohibitions are not designed to confine the forum to the limited and legitimate purposes for which it was created, but rather provide a method for Defendants to suppress petitions for redress that concern matters properly before the

RRISD Board if Defendants disagree with the petitions and do not wish to have their authority or judgment challenged, and do not wish to have aired any dissenting viewpoints to their rule.

### 2. *Defendants Violated Plaintiffs' Right to Free Speech – Limited Public Comment Rule*

140.   Similarly, the Individual Defendants violated Plaintiffs' right to exercise free speech based on content and viewpoint discrimination as enshrined in Defendants' Limited Public Comment Rule and other policies, which are facially unconstitutional because viewpoint-based restrictions require a compelling reason to be acceptable. These policies violate Plaintiffs' rights of free speech, which is guaranteed and protected by the First Amendment and 42 U.S.C. § 1983.

141.   Viewpoint-based restrictions in public fora are unconstitutional, and even in a limited public forum must be content-neutral, narrowly tailored to serve a significant government interest, be the least restrictive means available, and leave open ample alternative channels of communication. Defendants' Limited Public Comment Rule and other practices cannot pretend to be content-neutral, narrowly tailored, leave an open, ample alternative channel of communication, or be the least restrictive means of achieving any compelling interest.

142. Rather, Individual Defendants' speech policies and practice are an impermissible prior restraint on free speech and impose an unconstitutional heckler's veto because they allow RRISD to restrict protected expression merely because a

board official deems the expression critical or not germane. Such policies chill the speech of citizens who might seek to speak critically of the RRISD but realize that the Board may prohibit speech on a vague pretext that provides unbridled discretion to deny speakers the opportunity to give public comment subject to no standards or guidelines, thereby permitting content- and viewpoint-based policy enforcement, sweeping within their ambit protected First Amendment expression.

143.   Even content-neutral ordinances can be considered prior restraints on free speech if officials enforcing them enjoy undue discretion. In this case, Trustee Defendant Weir publicly exercised prior restraint in conspiracy with the RRISD Chief of Police Yarbrough to attempt to intimidate Story in advance of his comments and then again herself individually as Story began to speak from the podium.

144.   While the District may set reasonable time, place, and manner restrictions on the exercise of rights, its policies are not narrowly tailored and fail strict scrutiny review. The District does not define "related to items on the agenda" and thus gives overly broad and unbridled discretion to RRISD board members and officers enforcing the policy and gives insufficient notice to citizens exercising their free speech rights. Thus, RRISD's enforcement of these rules constitute as-applied discrimination.

145.   On its face, Defendants' Limited Public Comment Rule violates RRISD Board Policy BED (Legal), which reads:

"A board may not prohibit public criticism of the board, including criticism of any act, omission, policy, procedure, program, or service. This does not apply to public criticism that is otherwise prohibited by law. Gov't Code 551.007."[28]

RRISD Board Policy BED (Legal).

146.   As part of its instructions regarding the above, RRISD Board Policy BED (Legal) includes the following citations to the Constitution and case law:

"A district shall take no action abridging the freedom of speech or the right of the people to petition the board for redress of grievances. U.S. Const. Amend. I, XIV."[29]

"A board may confine its meetings to specified subject matter and may hold nonpublic sessions to transact business. When the board sits in public meetings to conduct public business and hear the views of citizens, it may not discriminate between speakers on the basis of the content of their speech or the message it conveys. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995); *City of Madison v. Wis. Emp. Rel. Comm'n*, 429 U.S. 167, 176 (1976); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)."[30]

"A board may create a limited public forum for the purpose of hearing comments from the public so long as:

1. The board does not discriminate against speech on the basis of viewpoint;

2. Any restrictions are reasonable in light of the purpose served by the forum; and

---

[28] Exhibit 4 at 2.
[29] Exhibit 2 at 1.
[30] *Id.*

3. The board provides alternative paths for expressing categories of protected speech that are excluded from the forum. *Fairchild v. Liberty Indep. Sch. Dist.*,597 F.3d 747 (5th Cir. 2010)."[31]

*Id.*

147. As RRISD's own board policies join with state and national laws and the country's Constitution, RRISD board members may not discriminate or prevent criticism of its members if it wishes to avoid liability.

148. Irrespective of the Limited Public Comment Rule, Defendant Weir abused her discretion as chair of the meeting by unconstitutionally preventing Story's speech, which complied with her Limited Public Comment Rule; Story's comments were germane and compliant with Weir's arbitrary rules.

### 3. Defendants Violated Plaintiffs' Right to Free Speech – Prior Restraint

149. By refusing Plaintiffs permission to address the Board at its public meetings, the Board, individually and by conspiracy among some of its members, has interfered with and restrained Plaintiffs in the exercise of their First Amendment right to express their views to the Board and to participate in public discussions during Board meetings.

150. The actions of the Individual Defendants, in denying Plaintiffs right to speak, constitute a prior restraint of plaintiffs' First Amendment right to free speech.

---

[31] *Id.*

151.   The Board's denial of permission to address the Board was unreasonable, arbitrary, discriminatory, and in violation of Plaintiffs' Fourteenth Amendment rights because, during public Board meetings on August 16th and September 14th as well as on prior and later dates, numerous community members and otherwise of the District were granted permission to address the Board and their comments, having been invited instead of forbidden, were not surprisingly deemed "non-germane" to the items on the agenda.

152.   The Board's written policy which denies participation in a public forum is unconstitutional on its face and in its application, in that it deprives plaintiffs' First Amendment rights and constitutes arbitrary, capricious, and unreasonable discrimination.

153.   Defendant Board's policy of refusing to recognize plaintiffs during public discussions at Board meetings cannot be justified by a rational basis or compelling state interest.

154.   Unless restrained from doing so, defendants will continue to violate plaintiffs' constitutional rights, via conspiracy and individually, to participate in the public discussions at Board meetings.

155.   The conduct of Defendants causes a chilling effect on the exercise of First Amendment rights of all parents and other would-be public participants in the District, is patently discriminatory and illegal, and prevents important matters of

concern to both teachers and the public from being openly discussed before the Board.

156.   Plaintiffs have no adequate remedy at law because the damages and injuries that they have suffered, are suffering, and will continue to suffer are not capable of definite and complete ascertainment.

157.   Unless this court grants the relief prayed for, the plaintiffs will suffer serious and irreparable damage to their constitutional rights.

### 4.   *Defendants Violated Plaintiffs' Right to Exercise Fundamental Rights without Retaliation*

158.   Individual Defendants retaliated against Plaintiffs for exercising their right of free speech and petition by conspiring and unlawfully causing their arrest, physical injury, and harassment without probable cause.

159.   This unconstitutional action against Plaintiffs was enabled by an asserted unbridled authority to restrict speech based on the Limited Public Comment Rule and COVID-19 seating rules as a pretext to stop Plaintiffs from petitioning Defendants who engaged in viewpoint discrimination.

160.   Defendants' retaliatory actions to cause Plaintiffs' arrest based on the content and viewpoint of Plaintiffs' speech violated their First Amendment right to petition the government and was designed to deter others of ordinary firmness or with similar viewpoints from exercising their right to free speech in the future.

161.   As described above, Plaintiffs were arrested by Williamson County Sheriff's

Dept. for "Hindering Proceedings by Disorderly Conduct," a Class A misdemeanor, though no record shows Dustin Clark as cited for this crime (only the Class B misdemeanor of section 42.05). Not until the warrant process was carried out by Det. Griffith were Clark's actions associated with Texas Penal Code § 38.13.

162.   In an ineffectual attempt to ratify an action, the board voted illegally that their "rules" constitute a policy, the enforcement of which directly caused Plaintiffs' injuries. Thus, this policy is necessarily attributable to the policy maker. *See Pineda v. City of Houston*, 291 F.3d 325, 330-31 (5th Cir. 2002).

163.   Individual Defendants have mentioned Texas Penal Code § 42.05 in support of their actions regarding Story and Clark, but that statute is not helpful to their cause:

> "It is a criminal offense for a person, with intent to prevent or disrupt a lawful meeting, to substantially obstruct or interfere with the ordinary conduct of a meeting by physical action or verbal utterance and thereby curtail the exercise of others' First Amendment rights."

164.   TEX. PEN. CODE § 42.05; *See Morehead v. State*, 807 S.W. 2d 577 (Tex. Crim. App. 1991)."[32] At no point did Plaintiff substantially obstruct or interfere with the ordinary conduct of a meeting, as ordinary meetings in this country do not include deliberate restriction of citizens addressing a government body or board members walking out in protest of pretextual excuse-making to keep out critical voices.

---

[32] Exhibit 4 at 2.

Additionally, there is not even a colorable argument that either Plaintiff substantially

*obstructed* RRISD meetings.

165.   RRISD's Board Policy BED (Local) reads:

> The Board shall not tolerate disruption of the meeting by members of the audience. If, after at least one warning from the presiding officer, an individual continues to disrupt the meeting by his or her words or actions, the presiding officer may request assistance from law enforcement officials to have the individual removed from the meeting.[33]

166.   The RRISD does not appear to have a rule about its Board choosing to demand

public comment by unwarranted seating arrangements, denial of access, and ongoing

demands to control what should be free speech.

## B.   Defendants Violated Plaintiffs' Right to Due Process Protected by the Fourteenth Amendment and 42 USC § 1983

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> U.S. CONST. amend XIV.

167.   At all times relevant to this Complaint, Defendant Officers were acting under

color of state law because they were employed by and performing official duties.

The actions of Defendant Officers violated Plaintiffs' rights under the Fourth and

Fourteenth Amendments to the U.S. Constitution to be free from unreasonable arrest.

---

[33] Exhibit 2 at 2.

168.   Defendant Officers Assistant Chief Williby and Chief Yarbrough were callously indifferent in supervising, failing to train, or both, the subordinates as to how to investigate a person alleged to have committed an offense, how to prepare an affidavit to apply for and obtain a warrant, and how to execute a warrant.

169.   Defendant Officers Williby and Chief Yarbrough personally exhibited deliberate indifference to Plaintiffs' constitutional rights by personally participating in, directing, encouraging, ratifying, conspiring, and approving the officers' unconstitutional conduct, and then by failing to prevent, discipline, or take other actions at the time officers engaged in unconstitutional conduct.

170.   The Trustee Defendants, a majority of the trustees needed to control the RRISD Board, the policymaker for the internal police policy of RRISD Police Department on behalf of RRISD, personally participated in, conspired in, encouraged, and ratified the warrantless, unjustified, and unlawful arrest of Plaintiffs for the alleged offense of hindering proceedings by disorderly conduct in the complete absence of probable cause or exigent circumstances.

171.   Officer Defendant Chief Yarbrough made the decisions to adopt the particular course of action to arrest Plaintiffs for the alleged offenses of hindering proceedings by disorderly conduct without probable cause, a valid warrant, or a justified exigency. His personal participation in this civil conspiracy of violating Plaintiffs' constitutional rights represented acts of official government "policy" of the District.

172.   Because Defendant Round Rock ISD employs the officer Defendants, and through the conspiratorial support of the Trustee Defendants, caused directly and proximately Officer Defendants Chief Yarbrough, Assistant Chief Jim Williby, Officers Pontillo, Sanchez, and Pope to carry out actions which violated Plaintiffs' constitutionally protected rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

173.   Defendant Hafedh Azaiez, to the extent he supervises the RRISD Police, also directly and proximately caused the violations of the law against Plaintiffs in conspiracy with other Defendants.

174.   Trustee Defendants and Azaiez encouraged, tolerated, and ratified the Defendant Officers' unconstitutional conduct, and have been deliberately indifferent to its policies, patterns, practices, and customs, and need for more training, supervision, investigation, and discipline in:

    a.  Legal cause to arrest and criminally charge a citizen;

    b.  The correct legal process for obtaining and executing arrest warrants;

    c.  The proper exercise of police powers, including, but not limited to, initiating and bringing criminal charges, procuring and serving valid warrants;

    d.  Officers' constitutional duties to disclose all relevant evidence, including exculpatory evidence, when procuring a warrant, signing an affidavit, and initiating and bringing criminal charges;

e.   The failure to identify and take remedial or disciplinary action against officers who were the subject of civilian complaints of misconduct;

f.   The failure to properly sanction or discipline RRISD Police Department officers who are aware of and conceal or aid and abet constitutional and statutory violations of citizens' rights;

g.   The wrongful practice by RRISD Police Department officers of initiating and instituting false charges against citizens; and,

h.   The failure to train RRISD officers regarding the differences between the practices of peace officers who operate as patrol officers and those operating in schools.[34]

175.   The Fourteenth Amendment prohibits unequal protection and access to government actors without a reasonable basis. No case law exists to support the idea that "telling the school board unsavory facts about its new superintendent" is a reasonable basis to allow unequal treatment of those petitioning the RRISD Board.

176.   The Due Process Clause of the Fourteenth Amendment prohibits the government from censoring speech pursuant to vague standards that grant enforcement officials unbridled discretion.

177.   The arbitrary determination by school officials of what is and is not "germane" or "criticizing others" violates this norm as granting unbridled discretion to

---

[34] Peace officers assigned or commissioned by schools have a number of titles and are referred to by various names; the point is that a police officer dealing with public schools, parents, and their minor children, have different practices from those on patrol looking for criminal behavior.

Defendants; citizens of common intelligence must guess as to whether their expression will be deemed "germane" or "critical" of others and thus subject to censorship and punishment.

178.  The arbitrary determination by school officials regarding who is allowed into the meeting room also constitutes impermissible unbridled discretion.

179.  The arbitrary seating determination by school officials of how many people are allowed into the room violates the "unbridled discretion" prohibition when the decision is based on who is present and their politics. Defendants' speech policy, both facially and as-applied, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

180.  All named individual Defendants personally participated in the infringement of Plaintiffs' right to due process and are thus individually liable, as well as RRISD.Defendants Violated Plaintiffs' Right to be Free of Unreasonable Arrest and Excessive Force under the Fourth Amendment and § 1983.

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
>
> U.S. Const. amend. IV.

181.  No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own

person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

182.   To establish a claim of excessive force under the Fourth Amendment, plaintiffs must demonstrate: (1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

183.   Plaintiffs' Fourth Amendment right to freedom from unreasonable search and seizure prohibits, without probable cause, the arrest, detention, imprisonment of Plaintiffs, and unreasonable force.

184.   Probable cause exists when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude the suspect had committed or was committing an offense. *Haggerty v. Texas S. Univ.,* 391 F.3d 653, 655 (5th Cir. 2004).

185.   The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).

186.   Officer Defendants intentionally arrested Plaintiffs in conspiracy and in retaliation for exercise of constitutionally protected rights without probable cause; even a cursory review of Section 38.13 of the Texas Penal Code (Hindering Proceedings by Disorderly Conduct) militates against any such allegation against Plaintiffs by RRISD.

187.   The cited charges against Clark on September 14 (TEX. PENAL CODE § 42.05) and September 17 (TEX. PENAL CODE § 38.13) did not constitute a basis for arrest because Plaintiffs were simply exercising their constitutional right to participate in the board meeting. The exercise of Plaintiffs' constitutional rights was obvious to the reasonable observer.

188.   Had Defendants allowed those at the August and September meetings to participate as was their right, and which Defendants are bound by Texas and Federal law to allow, the meeting would have proceeded without issue.

189.   Individual Defendants appear to believe that they can break Texas law and violate obvious, well-established rights, both constitutional and statutory, and then conspire to have dissenters jailed for raising their voice in protest. However, Plaintiffs assert that such actions are false arrests which violate the Fourth Amendment.

190.   Upon information and belief, Plaintiffs allege that discovery will show that the arrest of Story and Clark was the result of all named Individual Defendants.

Defendants violated the Texas Open Meetings Act by restricting the public from the RRISD Board Meeting (Tex. Gov't Code § 551).

191.   As described above, the Individual Defendants both prevented Plaintiffs from entering an open meeting based on an unsupportable seat-spacing rule and also removed Plaintiffs from the open meeting. However, a nearby meeting of students was occurring at the same time in the same building without restrictions.

192.   At times during the subject meetings, Individual Defendants preferred empty chairs, rather than to allow would-be critics into the meeting room. Even before the meetings concerning Plaintiffs, the Trustee Defendants violated the Open Meetings Act with secret meetings to arrange for the hiring of Azaiez, deliberately excluding Trustees Bones and Weston from deliberations concerning Azaiez, and springing his sudden appearance when he was hired.

193.   Plaintiffs assert that all named Individual Defendant board members are responsible for ensuring that meetings remain open, and thus they should be liable for the failure to accomplish that goal.

## C.   Individual Defendants Conspired to Violate Plaintiffs' Civil Rights Protected by 42 U.S.C. § 1985.

194.   At all times, various groups of Individual Defendants acted in concert, both privately and overtly, with a meeting of the minds, to oppress the civil rights of Plaintiffs and are liable under 42 U.S.C. § 1985 for such violations.

195.   Plaintiffs assert no § 1983 claim against the District, as the actions of the

Individual Defendants act in derogation to the mission of the District, and the District has not benefitted in any way by the protection of the Individual Defendants or the cover-up of Azaiez's illegal hiring or his malevolent actions toward his girlfriend once she became pregnant and potential exposure of his extra-marital affair endangered Azaiez's professional career at RRISD.

### D.    RRISD has violated the Texas Open Meetings Act.

196.    As described above, the RRISD Board of Trustees has failed to operate openly, and violated the Texas Open Meetings Act by deliberating in secret and deciding that Azaiez should be hired in a later sham vote.

197.    Additionally, the RRISD Board of Trustees held a tax rate hearing that was effectively closed to the public because the Board used arbitrary seat spacing that reduced the capacity for public input, using COVID-19 as pretext.

198.    Plaintiffs seek an injunction to void the Azaiez contract and prevent the District from spending tax dollars collected under the non-public approved tax rate.

### VIII.    APPLICATION FOR INJUNCTIVE RELIEF

### A.    Plaintiffs are being harmed with no adequate remedy at law.

199.    Plaintiffs request an immediate temporary restraining order ("TRO"), then a preliminary injunction after notice and a hearing, and  permanent injunction following trial, all to protect the status quo, preventing Defendants from enforcing arbitrary spacing rules at board meetings using the Limited Public Comment and pretextual COVID-19 seating rule to limit criticism.

200.   Plaintiffs have suffered false arrest, effective assault by RRISD police guarding Defendants' meeting rooms from discontented constituents, and now a new tax rate has been set at a meeting where Defendants stacked the rhetorical deck by allowing as few as possible of those who were not to participate.

201.   Plaintiffs' claims for declaratory and injunctive relief are brought pursuant to 28 U.S.C. §§ 2201-2202, by Federal Rules of Civil Procedure 57 and 65, 42 U.S.C. § 1983, the Texas Open Meetings Act, and the Court's legal and equitable powers.

202.   The purpose of a TRO is to preserve the status quo, which the Supreme Court has defined as "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (cleaned up).

203.   A TRO restrains  only during the pendency of a motion for temporary injunction. *Del Valle ISD v. Lopez*, 845 S.W.2d 808 (Tex. 1992).

204.   Similarly, Rule 65(b)(2) states: "Every temporary restraining order issued without notice must state the date and hour it was issued; describe the injury and state why it is irreparable; state why the order was issued without notice; and be promptly filed in the clerk's office and entered in the record."

205.   Additionally, Rule 65(d) requires "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

206.   The comparative injury, or balance of equities, to the parties and to the public interest, support granting a temporary restraining order; Plaintiffs asks the Court to preserve the status quo by enjoining Defendants as follows:

a.   Defendants must cease their prohibition on free speech on topics which are not on the listed agenda of the RRISD board meetings;

b.   Defendants must refrain from arbitrarily using COVID-19 as a pretext to reduce public participation when it is not doing so District-wide; and

c.   Defendant District may not expend collected taxes based on the rate set at its September 12th meeting until a proper public meeting is held where the public may participate as Texas law requires.

**B.     Immediate injunctive relief is required to stop irreparable injury.**

207.   There is no adequate remedy at law that will give Plaintiffs adequate relief because Defendants' actions are illegal, and Plaintiffs continue to suffer harm under Defendants' regime. Plaintiffs and other taxpayers are disallowed from attending RRISD board meetings for fear of unlawful arrest.

208.   Plaintiffs' total damages cannot be measured with certainty, and it is neither equitable, nor conscionable to allow Defendants to violate state law requiring open meetings to stifle critical views. The loss of constitutional freedoms for, "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

209.   Defendants can also show no harm to the ISD in granting the relief requested. Defendants violated rights protected by the Constitution and the Texas Open Meetings Act. Enjoining an illegal and unconstitutional policy can cause no harm.

210.   A proposed preliminary restraining order is attached as Exhibit 1.

## C.   Plaintiffs Request a 14-day TRO and Preliminary Injunction.

211.   Plaintiffs request that a temporary restraining order last for fourteen days from the date of issue and then following a hearing on the matter, a preliminary injunction be issued by this Court until this matter is fully concluded.

212.   Because Plaintiffs seek a TRO, they must post a bond. As Defendants are state actors who will suffer no damage, Plaintiffs' request that bond be set at $100.00.

213.   Plaintiffs ask that this Court first temporarily enjoin, and then permanently enjoin RRISD's Limited Public Comment Rule and seat spacing arrangement.

214.   Absent judicial intervention, Plaintiffs face ongoing unconstitutional restrictions on their participation in state government and have no practical ability to prevent the ISD from further penalizing them, and continuing to threaten jail as punishment for failing to meekly accept RRISD's unconstitutional operations.

215.   There is no adequate remedy at law that will give Plaintiffs full relief because denial of RRISD board meeting is illegal under multiple Texas law.

216.   The comparative injury, or balance of equities and hardships, to the parties and to the public interest, support granting injunctive relief.

217.   Plaintiffs are only asking the Court to preserve the status quo by requiring Defendants to cease unlawfully infringing upon Plaintiffs' rights, which has caused harm and continues to do, Plaintiffs having no adequate remedy at law, with a temporary, and then permanent injunction.

## IX.   PENDING LITIGATION

218.   Dustin Clark is a plaintiff in mask rule enforcement case against RRISD, *Clark v. Round Rock Independent School District,* No. 21-1187-C425, before the 425th District Court in Williamson County, which is irrelevant to this case.

## X.   DEMAND FOR TRIAL BY JURY

219.   Plaintiffs demand a jury by trial for all issues so triable.

## XI.   ATTORNEYS' FEES

220.   Pursuant to 18 U.S.C. § 1988(b), Plaintiffs seek an award of their reasonable attorneys' fees, costs, and expenses.

221.   Pursuant to Tex. Gov't Code § 551.142(b), Plaintiffs seek an award of their reasonable attorneys' fees, other costs, and expenses.

## XII.   CONDITIONS PRECEDENT

222.   Plaintiffs have met all conditions precedent. Though unnecessary due to constitutional allegations, Plaintiffs have filed related grievances with the District.

## XIII.   PRAYER

Plaintiffs pray that Defendants be cited to appear and answer, and, after trial,

Plaintiffs be granted all relief to which they are entitled, including but not limited to:

a. Immediate injunctive relief in the form of a temporary restraining order, then after notice and a hearing, a preliminary and permanent injunction prohibiting Defendants and their agents from enforcing the challenged provisions of their Limited Public Comment Rule and limited seating policy sometimes enforced during RRISD board meetings, violative of Plaintiffs' federal rights and state rights; void the RRISD-Azaiez contract; and enjoin expenditures of new rate tax income until the RRISD properly holds a public meeting to vote on that rate.

b. An award of nominal, compensatory, and punitive damages to Plaintiffs from all Individual Defendants, jointly and severally, for their actions undertaken in violation of Plaintiffs' constitutionally protected rights.

c. Reasonable and attorneys' fees, costs, and expenses.

d. All further relief to which Plaintiffs may be entitled.

|  |  |
|---|---|
| Norred Law, PLLC. | Casey Law Office, P.C. |
| By: _/s/ Warren V. Norred_ | By: _/s/ Stephen D. Casey_ |
| Warren V. Norred | Stephen D. Casey |
| Texas Bar No. 24045094 | Texas Bar No. 24065015 |
| warren@norredlaw.com | stephen@caseylawoffice.us |
| 515 East Border Street | P.O. Box 2451 |
| Arlington, Texas 76010 | Round Rock, TX 78680 |
| P: 817-704-3984 | P: 512-257-1324 |
| F: 817-524-6686 | F: 512-853-4098 |

*Attorneys for Plaintiffs*

**DECLARATION UNDER PENALTY OF PERJURY**

I, JEREMY WADE STORY, a citizen of the United States and a resident of the State of Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the allegations contained in para. 5-99, 111-132, as well as the facts supporting the claims in para. 133-195, are true and correct. Many of these statements I know to be true even though I was not present because the official RRISD videos of board meetings are available, and I have had access to public documents, including the documents attached and filed with this Complaint, which are true copies of the originals.

Executed this 10th day of May, 2022, in Round Rock, Williamson County, Texas,

_____
Jeremy Wade Story

**DECLARATION UNDER PENALTY OF PERJURY**

I, DUSTIN KANSAS CLARK, a citizen of the United States and a resident of the State of Texas, declare under penalty of perjury under 28 U.S.C. § 1746 that the allegations contained in para. 5-14, 16-20, 24-25, 29-30, 33-38, 46-87, 95-99, 111-132, as well as the facts supporting the claims in para. 133-195, are true and correct. Many of these statements I know to be true even though I was not present because the official RRISD videos of board meetings are available, including the documents attached and filed with this Complaint, which are true copies of the originals.

Executed this 10th day of May, 2022, in Round Rock, Williamson County, Texas,

_____
Dustin Kansas Clark

## Appendix of Exhibits Concurrently Filed

Exhibit 1 - Plaintiffs' Proposed Preliminary Restraining Order
Exhibit 2 - Board Policy BED (Local)
Exhibit 3 - Application for Protective Order and Order and associated documents
Exhibit 4 - Board Policy BED (Legal)
Exhibit 5 - August 3 Press Release of Trustees Weston and Bone
Exhibit 6 – Story's emails sent to RRISD Board of Trustees
Exhibit 7 - Agenda and Minutes for the August 16 RRISD Called Meeting
Exhibit 8 - Story Incident Report
Exhibit 9 - Story's complaint filed with the Williamson County Attorney's Office
Exhibit 10 - Story's RRISD Complaint
Exhibit 11 - Story's TEA Complaint
Exhibit 12 - Story's Legal Grievance
Exhibit 13 - August 23 Original Agenda
Exhibit 14 - August 23 Amended Agenda
Exhibit 15 - September Minutes Approved in October
Exhibit 16 - TEA Corrective Active Plan
Exhibit 17 - Trustees Weston and Bone Press Release and TRO
Exhibit 18 - Williamson County Jailing Policy and Plaintiffs' Arrest Documents
Exhibit 19 - Plaintiff's Original Petition in *Quintanilla v. Donna Independent
School District*, No. C-0842-22-B