```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION

 3   JEREMY STORY and DUSTIN CLARK,      :
     Plaintiffs,                         :
 4                                       : Case No.
     vs.                                 : AU:22-CV-00448
 5                                       :
     ROUND ROCK INDEPENDENT              :
 6   SCHOOL DISTRICT, ET AL,             : April 11, 2023
     Defendants.                         : Austin, Texas
 7   ********************************************************

 8                 TRANSCRIPT OF MOTION HEARING
              BEFORE THE HONORABLE DAVID A. EZRA
 9             SENIOR UNITED STATES DISTRICT JUDGE

10   APPEARANCES:
     FOR THE PLAINTIFFS:
11     Warren V. Norred, Esquire
       Norred Law, PLLC
12     515 E. Border
       Arlington, Texas  76010
13     (817)704-3984; warren@norredlaw.com

14
     FOR THE DEFENDANTS:
15     Kathryn E. Long, Esquire
       Kenneth Adam Rothey, Esquire
16     Thompson & Horton, LLP
       500 N. Akard Street, Suite 3150
17     Dallas, Texas  75201
       (972)734-5613; klong@thompsonhorton.com
18

19

20   COURT REPORTER:
     Angela M. Hailey, CSR, CRR, RPR, RMR
21   Official Court Reporter, U.S.D.C.
     262 West Nueva Street
22   San Antonio, Texas  78207
     Phone(210)244-5048
23   angela_hailey@txwd.uscourts.gov

24   Proceedings reported by stenotype, transcript produced by
     computer-aided transcription.
25
```

1    *(April 11, 2023, 1:26 p.m.)*

2                        *   *   *

3              COURT SECURITY OFFICER:  All rise.

4              COURTROOM DEPUTY CLERK:  Austin 22-CV-00448, Story, et

5    al versus Round Rock Independent School District, et al.

6              THE COURT:  All right.  Can I have appearances please?

7              MS. LONG:  Kathryn Long and Adam Rothey for the Round

8    Rock ISD defendants.

9              MR. NORRED:  Warren Norred for plaintiffs Jeremy Story

10   and Dustin Clark.

11             THE COURT:  I'm sorry, can you give me your name?

12             MR. NORRED:  My name is Warren Norred, N-O-R-R-E-D,

13   and Jeremy Story, one of my plaintiffs is here.

14             THE COURT:  All right.  You may proceed.

15             MS. LONG:  Would you like us to stand here?

16             THE COURT:  You can do it right there.

17             MS. LONG:  Thank you, Your Honor, and may it please

18   the Court.  If the Court will indulge, I will be addressing the

19   primary First Amendment claims, the Section 1983 Monell

20   liability and failure to train and failure to supervise.  With

21   respect to the claims against the officer, defendants and the

22   intermediate -- the independent intermediary doctrine and the

23   issue of probable cause, my colleague, Adam Rothey, will be

24   addressing that if the Court will allow.

25             THE COURT:  Yes, but we don't have all afternoon.

1          MS. LONG:  I understand.  The claims in this lawsuit

2    arise from two meetings of Round Rock ISD's Board of Trustees,

3    an August 16th, 2021 special or called board meeting and a

4    September 14th, 2021 regular board meeting.  It has been

5    undisputed in this case that both meetings presented a limited

6    public forum and, therefore, that is the legal analysis that

7    will apply to the motions to dismiss.  Only Mr. Story's claims

8    relate to the August 16th board meeting.  Mr. Clark asserts no

9    claims related to what transpired at that board meeting

10   specifically.  And both Mr. Story and Mr. Clark have claims

11   arising from events that occurred at the September 14th board

12   meeting.

13          The August 16th board meeting was not the monthly

14   regular board meeting, but was convened for the district's

15   board to consider two specific agenda items.  As the Delta

16   variant of COVID was spreading, the two agenda items were the

17   COVID-19 employee leave and the fall 2021 COVID health and

18   safety protocols.  Because this was a specially called meeting

19   under the district's board policy BED Local, which is

20   challenged here, a limited public comment rule applied that

21   only allowed the people who had signed up for public comment to

22   speak on agenda items.

23          At the beginning of this meeting, the president of the

24   board just for context noted that there were 180 speakers that

25   were going to be given two minutes to speak during public

M O T I O N   H E A R I N G                4

1    comment and just the public comment portion would last more

2    than six months, and noted the rules of the forum that speakers

3    were only allowed to speak on the posted agenda items.  About

4    two and a half hours into the meeting, Mr. Story approached the

5    podium.  Trustee Weir noted e-mails he previously sent the

6    trustees, which are attached as Exhibit Six to the plaintiff's

7    appendix, and noted the e-mails indicated he had intended to

8    speak on topics off the agenda.  When he approached the podium,

9    there was back and forth where Trustee Weir and Mr. Story

10   discussed whether he was going to stick to the items on the

11   agenda, but Mr. Story was allowed to speak.  And as he was

12   talking about COVID-19 and mask and Executive Order GA-38, he

13   was allowed to proceed.  But when he veered from the posted

14   agenda item, President Weir, Board President Weir told him to

15   stop.  And when he wouldn't stop speaking off the agenda items,

16   she asked the officers to remove him from the room.

17          Notably in contrast, Mr. Clark actually spoke at the

18   August 16th meeting about masks without interruption from the

19   board at all because he was discussing the agenda items.  The

20   September 14th board meeting was a regular board meeting where

21   public comment could comment on anything that they wanted.  The

22   district administration, consistent with the COVID-19 safety

23   protocols, had established the social distancing within the

24   room, spacing chairs 6 feet apart which reduced the overall

25   capacity of the room.  If people did not have one of the seats,

M O T I O N   H E A R I N G                5

 1   they were not allowed in the room, but there was an overflow

 2   area and the open meeting was live streaming.  People were

 3   allowed to enter the meeting when it was their time for public

 4   comment, so every single person signed up for public comment

 5   could enter the meeting for public comment.

 6            THE COURT:  They maintain that before the meeting

 7   before or at some meeting before, there were multiple -- over a

 8   hundred people, and the meeting after there were over a hundred

 9   people.  This was the only one that allegedly had this, what

10   was it, 18 chairs or something like that?

11            MS. LONG:  They picked two pictures, they put three

12   pictures in their pleading.  One was a June 2021 board meeting,

13   so it was almost three months before this meeting.  And just

14   temporally, that was before the Delta variant and before COVID

15   protocols actually began being put in place by schools again.

16   So that was a June meeting.  The second meeting that they

17   reference was a September 22nd.  After this meeting when they

18   realized there was attendance, you can tell from the pictures,

19   they actually moved to an auditorium as opposed to kind of a

20   lecture area.  And the auditorium was much larger, but even in

21   the picture in the Complaint, you can see people are spaced

22   apart, it's just a larger venue.  They moved the venue.  So the

23   three images that they discuss in reference in the Complaint,

24   one was three months earlier before the Delta variant and the

25   other was at a different location where they moved the board

1    meeting after September 14th, so it was a little different.

2              THE COURT:  All right.

3              MS. LONG:  Mr. Story and others were displeased with

4    the social distancing rule which was their absolute right to

5    disagree with the rule.  According to the Complaint, Mr. Story

6    and others questioned or argued with police officers for 45

7    minutes regarding the social distancing rule.  Although

8    district police officers were stationed at the doors to enforce

9    the rule, Mr. Story admittedly attempted to enter the door

10   through the police officers multiple times.  And that's in

11   paragraph 72 of the Complaint.

12             At some point after trying to push through them

13   several times to enter in the room, although they were telling

14   him he could not enter the room because the chairs were full,

15   Mr. Story was trying to push back past the officers next to a

16   pole, and according to the Complaint, the officers bear-hugged

17   him around the pole where he was trying to squeeze through

18   space and the pole cut him on the back.

19             Separately, Mr. Clark was in the meeting.  He was in

20   one of the chairs in the meeting, but Complaint does not plead

21   that he was speaking during the public comment in the meeting.

22   Rather in the Complaint, paragraph 97 discusses that throughout

23   the meeting he attempted to instruct the board about various

24   things about the meeting, his disagreement with the social

25   distancing rule, his disagreement with the tax rate, but not

 1    during public comment.  He was just instructing the board in a

 2    meeting separate and apart from public comment.

 3            When President Weir asked him to stop interrupting the

 4    meeting, he failed to heed her warnings and he was removed due

 5    to his disruptive behavior after multiple warnings.  From these

 6    two incidents, Mr. Story and Clark assert First, Fourth and

 7    14th Amendment in Texas Open Meetings Act claims against the

 8    defendants.  With respect to Section 1983 claims, for each

 9    claim, the plaintiffs have to show an underlying constitutional

10    violation, that's kind of the threshold requirement.  With

11    respect to the individual defendants, they have to plead facts

12    to overcome the individual defendants' assertion of qualified

13    immunity.  Specifically they have to show that the

14    constitutional right allegedly violated was clearly established

15    and that the individuals acted in an objectively unreasonable

16    manner in light of this clearly established law.  And with

17    respect to Round Rock ISD, although they don't have to overcome

18    qualified immunity, they must plead facts to show entity

19    liability either through direct action of the board as a body

20    corporate or through Monell liability that a policy or custom,

21    official policy or custom of the Round Rock ISD's board caused

22    -- was the moving force of the violation or some other similar

23    theory of Monell liability such as failure to train or failure

24    to supervise.

25            Before discussing the lack of underlying

1  constitutional violation and because there are so many

2  individual defendants, I think it's very important for the

3  Court to look through the Complaint to see what is actually

4  pleaded with respect to the actions of each individual because

5  the individuals' actions are what have to be measured under the

6  qualified immunity established to see if they individually

7  violated plaintiff's clearly established constitutional rights.

8         For example, other than in paragraph nine regarding

9  the identity of the parties, former trustee, Dr. Xiao, is

10  mentioned only twice in the Complaint.  And neither of them

11  relate to any allegations of First Amendment violations, Fourth

12  Amendment violations or 14th Amendment violations.  They only

13  talk about his involvement in a procedural vote regarding

14  social distancing requirement.  The same is true of Trustee

15  Vessa, former Trustee Vessa, they only mention her three times

16  in the Complaint and none relate to the underlying

17  constitutional violations at issue.  While Trustee Feller and

18  Harrison are mentioned several times in the Complaint, none of

19  them actually address their involvement or their role or any

20  actions they took that resulted in the removal of the

21  plaintiffs from the meeting, any type of limitation on their

22  speech even if it were protected or the alleged arrest or

23  excessive force that plaintiffs complain of in the Complaint.

24  In fact, the allegations with respect to Trustee Harrison and

25  Feller, the only allegations that they plead, and it's

1  interesting, is plaintiff's plead in one paragraph that these

2  board members stated that Story should leave the meeting,

3  apparently believing Story's intended words could not be

4  possibly related to an agenda item.  So the only actions of

5  Trustee Feller and Trustee Harrison that relate to any type of

6  removal from the meeting or limit it, they affirmatively plead

7  it's because these trustees apparently believed the comments

8  had nothing to do with the posted agenda items, not to suppress

9  protected speech.  And the same is true for some of the officer

10 defendants as well because they just kind of group everyone

11 together and don't show what officers were involved in what

12 actions.  And without those type of individual actions, it's

13 very difficult to hold an individual liable in their individual

14 capacity, particularly in light of qualified immunity.

15        With respect to their First Amendment claims, I want

16 to start with the facial -- their claims that BED Local and a

17 social distancing rule are facially unconstitutional.  Because

18 it's an -- it's undisputed that as a limited and public forum,

19 speech can be restricted if it is reasonable in light of the

20 purpose served by the forum and does not discriminate on the

21 basis of viewpoint.  To show that either rule is facially

22 unconstitutional, they must show there's no set of

23 circumstances under which the rule would be valid, and the

24 Court may not look beyond the text of the rule.  Looking at BED

25 Local, it limits public comment only at special and called

1    board meetings to items on the agenda.  Looking at the text of

2    the rule, this is a reasonable restriction to serve the purpose

3    of the forum, a special meeting to discuss a few select

4    designated matters as opposed to a regular monthly meeting of

5    the board where citizens can speak on any matter.  So they have

6    another forum where they can speak on any matter, the regular

7    monthly board meetings.  And based on the text of the rule, it

8    does not discriminate based on viewpoint.  Regardless of your

9    view on an off-topic item, you cannot speak on it because it is

10   off topic.  At the end of the day, this is simply a time,

11   manner and place restriction, you can't comment on off-agenda

12   items at special or called board meetings, but you can at

13   another time in a regular board meeting.

14        Finding BED Local's limited public comment rule is

15   facially constitutional is consistent with the Fifth Circuit

16   holding in *Fairchild versus Liberty Independent School

17   District*, Fifth Circuit 2010.  And in fact, in the supplement

18   the plaintiffs filed just a few hours ago where they presented

19   the *Ryan vs. Grapevine-Colleyville Independent School District*,

20   in that case they found not a BED Local with respect to

21   off-topic agenda, but a different one that limited certain

22   speech based on whether you could provide critical comments of

23   employees, found that facially constitutional and said it was

24   governed by the Fairchild case, which is cited in our briefing.

25        In fact, the Northern District held in *Wenthold versus*

1  *City of Farmers Branch* that in limited public forums, a
2  government entity is justified in limiting its meeting to
3  discussion of specified agenda items and imposing reasonable
4  restrictions to preserve the civility and decorum necessary to
5  further the forum's purpose.  BED Local on its face, it's a
6  promulgated policy that is adopted by almost every school
7  district in the State of Texas as well as other governmental
8  entities for special and called board meetings that limit the
9  comments to the agenda items the board will be discussing and
10 voting on that day.

11        It's not overly broad and it's not -- their vagueness
12 challenge fails based on the pleaded facts alone, because the
13 pleaded facts say they were warned that they could only talk
14 about agenda items, and it was after that warning that their
15 speech was stopped.  The fact that that warning occurs
16 basically precludes a vagueness challenge under the governing
17 case law.  Because those facts are affirmatively pleaded, their
18 vagueness challenge is a nonstarter.  The Complaint actually
19 negates any vagueness challenge to BED Local.  The socially
20 distancing rule which limited seating was a rule that concerned
21 conduct not what anyone could write or say.  And courts outside
22 the Fifth Circuit who dealt with social distancing requirements
23 in many respects had decided not to treat them as if they were
24 regulations of speech, but orders regulating conduct.  There's
25 no allegation that somebody could not come in the room to make

1    public comment, that only people sitting in the room could make

2    public comment.  There's no pleaded facts that those in the

3    meeting had a greater right to make public comment.  That the

4    individuals were not allowed to be in the room the entire time

5    is not enough.

6           Moreover, if this was a nonstarter from the beginning

7    because it restricted conduct and not speech, the restriction

8    was reasonable in light of the purpose served by the forum and

9    was viewpoint neutral.  There was no selection of people who

10   could be in the room based upon viewpoint, there's no

11   allegation that there was.  And these were not prior restraints

12   on speech.  In fact, the Complaint pleads facts to show that

13   Mr. Story participated and was restrained only after he

14   violated the rule and disregarded warnings to stop.  And the

15   social distancing rule had no prior restraint, everybody who

16   was signed up to comment before the board had to actually

17   adjourn the meeting because of the disruption would have -- was

18   being allowed to comment.

19          The facial unconstitutionality is fairly

20   straightforward.  The as-applied challenge -- you know, in many

21   circumstances, an as-applied challenge at the motion to dismiss

22   stage would be much more difficult, but this is an unusual

23   circumstance where the plaintiffs have actually asked the Court

24   to take judicial notice, as have the defendants, at the video

25   recording of the meeting so that the Court can see exactly how

1    the rule was applied.  And the plaintiffs have not objected to

2    our request for judicial notice.  And in fact, they also ask

3    the Court to take judicial notice and have cited numerous parts

4    of that recording in their Complaint.  And the pleaded facts in

5    the video show the limited public comment rule was not applied

6    in an unconstitutional manner.

7            First, the pleaded facts show that President Weir

8    reminded Mr. Story, before he began speaking, about the limited

9    public comment rule.  He was allowed to speak, and while he was

10   speaking about COVID and COVID policies, he was uninterrupted

11   because those were agenda items.  He pleads specifically in

12   paragraph 37 that as soon as he mentioned the protective order

13   against Dr. Azaiez, something that was not on the agenda item

14   and did not relate to COVID-19 safety policies, he was

15   interrupted by President Weir.  This shows it wasn't until he

16   deviated from the viewpoint neutral rule that he was stopped

17   and warned, and when he continued he was asked to be removed

18   from the room.

19           But perhaps more fatal to his claim of an as-applied

20   challenge is the examples provided in the Complaint, in

21   paragraphs 39, because instead of showing viewpoint

22   discrimination, they actually show viewpoint neutral

23   application of BED Local.  Paragraphs 39 A, B and C show that

24   there was no action taken to limit speech when speakers were

25   speaking to the topic on the agenda, mask and COVID policy,

1    regardless of the individual's viewpoint or position on the

2    issue.  And paragraphs 39 D, E and F show that when speakers

3    veered off topics, both similar to Mr. Story's speech and in

4    contrast.  So one also decided to speak about the

5    superintendent and another chose to speak about two board

6    members who are not parties to this case who were more

7    sympathetic to Mr. Story's cause.  And in both cases they say

8    the speaker was stopped and directed not to speak on off-topic

9    agendas.  So rather than showing disparate application or

10   differential application or viewpoint specific application of

11   BED Local, the pleaded facts themselves show that there is no

12   as-applied challenge to BED Local.

13          And with respect to the social distancing rule, it is

14   not a restriction on speech and there is no facts that it was

15   applied in a discriminatory manner to limit Mr. Story's or

16   Mr. Clark's speech.  And Mr. Clark was not removed from

17   violating the social distancing rule.

18          One last thing with respect to the facial

19   constitutionality challenges.  The only proper defendant for

20   those challenges would be Round Rock ISD because they plead no

21   facts that any board member actually voted on BED Local or that

22   the superintendent promulgated BED Local or that any of the

23   officers actually promulgated that policy.  That's a claim

24   against Round Rock ISD.

25          With respect to the retaliation claim, and I

1  understand there's going to be a lot of discussion of the

2  independent intermediary doctrine, all of the exceptions,

3  probable cause and when that doesn't apply, but I think there's

4  reasons that the First Amendment retaliation claim doesn't even

5  get there.  You don't even need to get to the analysis.  And

6  the plaintiffs' First Amendment retaliation claim fails against

7  the individual defendants for four primary reasons, many of

8  which also apply to Round Rock ISD.

9          First, plaintiffs cannot show they engaged in

10  constitutionally protected speech.  As shown, the veering off

11  topic at a limited public forum in violation of the proper

12  rules is not constitutionally protected speech.  So to the

13  extent that plaintiff claims he was retaliated against or

14  arrested or anything for that, he cannot show and Mr. Story

15  cannot show an underlying constitutionally protected speech.

16  Similarly, Mr. Clark's pleaded facts that he was instructing

17  the board outside of the public comment period at a board

18  meeting, so he was just speaking without being given the floor,

19  interrupting other people who were trying to exercise their

20  First Amendment rights is not constitutionally protected

21  speech.  And if that's the reason he was removed and arrested

22  based upon the probable cause affidavit, that is not, cannot

23  establish an underlying basis for a First Amendment retaliation

24  or First Amendment retaliatory arrest claim.

25          Second, because plaintiffs cannot show that any

1  protected speech was the motivation behind any adverse action

2  here, the arrest, plaintiffs cannot show that.  But plaintiffs

3  do not identify who had retaliatory animus specifically.  It

4  was this collective had retaliatory animus.  And then who acted

5  upon that evidence?  They have to connect those dots and plead

6  those facts to be able to stay the claim against an individual

7  and only with respect to the individual who acted upon or

8  caused others to act upon retaliatory animus.

9          Third, even if they could meet these first two

10 requirements, the individuals are entitled to qualified

11 immunity, because based upon the limited public comment rule

12 and the social distancing requirement and the actual speech at

13 issue in the case, it is not clearly established that that

14 speech was constitutionally protected such that their actions

15 could be objectively reasonable under clearly established in

16 law.

17         And finally, which Mr. Rothey will discuss, because of

18 the independent intermediary found probable cause for the

19 arrest, this precludes the claim.  But we don't even need to

20 get to that fourth part because they cannot show that they

21 engaged in constitutionally protected speech that this right

22 was clearly established or show with respect to the individuals

23 they have sued individually that they had a retaliatory animus

24 and acted or caused to have an adverse action or arrest taken

25 against them.

1          It is well established law that speech outside the

2    bounds of the forum in a limited forum is not constitutionally

3    protected, and at a minimum it was not clearly established that

4    this speech was constitutionally protected.

5          Before getting to the Fourth Amendment and 14th, and I

6    thought I would handle this at the end, but with respect to

7    Monell liability with respect to First Amendment retaliation,

8    the Fourth Amendment claim and the 14th Amendment claim, they

9    haven't shown a board policy, custom or practice that was the

10   moving force.  They haven't talked about prior incidents to

11   establish a custom.  They haven't showed any board policy or

12   custom of First Amendment retaliation, retaliatory arrest,

13   excessive force or 14th Amendment due process violations to

14   even begin to establish Monell liability, but perhaps more

15   critically they didn't address this in their response.  They

16   completely ignored Monell liability in a response to Round Rock

17   ISD's motion to dismiss, so they basically have dismissed and

18   waived the claims.  And it's kind of not surprising because in

19   paragraph 215 of the Complaint, they assert they're not

20   asserting any Section 1983 claims against Round Rock ISD, which

21   actually contradicts earlier in their Complaint where they

22   tried to hold Round Rock ISD liable for constitutional

23   violations.  Section 1983 is the only mechanism to do that, but

24   regardless, they abandon their Monell liability arguments and

25   because they abandon the Monell liability arguments, other than

1  if the facial constitutionality claim were to proceed, there is

2  no viable claim against Round Rock ISD as an entity because you

3  can't hold them liable just under respondeat superior.

4         And with respect to the failure to train and failure

5  to supervise, this is when liability is at its most tenuous

6  because of the risk in these circumstances of holding an entity

7  liable for respondeat superior which is prohibited by Monell.

8  But there is really no pleaded facts to support the board's

9  failure to train.  They don't actually identify anything about

10  the board's training regimen for employees or police officers

11  generally.  So if they don't say this is what they provided

12  them and they just provide the conclusory allegations, well,

13  obviously because of this, they don't train them enough on

14  excessive force.  Those aren't the kind of pleaded facts for a

15  failure to train claim because you have to show what the policy

16  is and what is constitutionally inadequate.  But beyond that,

17  you have to show that the board was aware, had actual or

18  constructive knowledge of deficiencies in the training or

19  supervision provided.  And even though had they had that actual

20  or constructive knowledge, they didn't do anything and

21  responded with the deliberate indifference.  Here they plead no

22  prior incidents of excessive force, no prior incidents of

23  14th Amendment violations, no prior incidents of First

24  Amendment violations to give the board any notice whatsoever of

25  the need for a change in their training program.  And I think

1  it's important to note that in their pleading they talk about

2  how the officers receive regular officer training.  That's

3  TCOLE training.  The law is that if the officers -- if the

4  people they're complaining that weren't trained actually

5  received the legal minimum, which is TCOLE training for police

6  officers, then the plaintiffs actually had to specify something

7  specific about the TCOLE training that officers received that

8  is inadequate.  They don't do that.  Their pleading admits that

9  the officers get the basic officer training, which is TCOLE

10 training that all officers receive.  Given that pleaded fact,

11 they have to do even more with respect to failure to train

12 claim.

13        And without any type of prior incidents or prior

14 information being brought to the board, they cannot show the

15 board had the actual knowledge or constructive knowledge of

16 deficiencies in training or supervision and responded with

17 deliberate indifference.  And those same infirmities relate to

18 the claims against both Chief Yarbrough and Assistant Chief

19 Williby that Mr. Rothey will discuss with respect to the Fourth

20 Amendment and probable cause claims.

21        THE COURT:  Okay.  Thank you.

22        MR. ROTHEY:  Good afternoon, Your Honor.  May it

23 please the Court, and I just want to hit some of the high

24 points because Mr. Long I think has addressed a lot of the

25 intricacies of the law.  Again I also want to point out

1  something that Ms. Long pointed out, that when you talk about

2  the officers and the allegations that are against the officers,

3  there's a lot of kind of lumping everybody in one and alleging

4  a giant conspiracy as to everybody in attempt to hold everybody

5  liable for everything in the Complaint, but that's just not how

6  the law works, especially with regard to false arrest claim or

7  retaliatory arrest or excessive force.

8          I point out to the Court that, for example, with

9  regard to the arrests of Mr. Story and Mr. Clark, there's no

10 allegations in the Complaint that Officer Williby or Yarbrough

11 or Pontillo were at all involved in any aspect of the arrest,

12 whether it be the arrest itself which none of the officers were

13 involved in the arrest, not even the warrant process, so

14 Williby, Yarbrough, Pontillo, not even involved in the warrant

15 process according to the allegations of the Complaint.

16          Similarly, there's no allegations in the Complaint

17 that tie Officer Griffith, Officer Yarbrough or Officer Chavez

18 with the excessive force claim.  Again that's just a claim by

19 Mr. Story.  Getting even more granular, we point this out in

20 the briefing.  There's no allegations at all in the Complaint

21 that identifies who exerted excessive force against Mr. Story.

22 There's allegations that particular officers were outside the

23 board meeting or that officer -- Assistant Chief Williby was

24 behind a door.  But there's no allegation -- the Amended

25 Complaint never says that it was Officer Williby that

1   bear-hugged Mr. Story and took him to the ground or it was

2   Officer Chavez that did it or Officer Yarbrough.  There's no

3   identification of who exerted excessive force as to Mr. Story,

4   and just make that point to the Court and ask the Court to be

5   mindful of that when making its decision.

6          Just hitting some high points on first the Fourth

7   Amendment false arrest claim.  Judge, as the Court knows, the

8   general rule is that if an arrest warrant is supported by

9   probable cause, then you can't state a Fourth Amendment false

10  arrest claim.  The question is here, is it supported by

11  probable cause?  The answer is yes.  And how do we know that?

12  Because Officer Griffith who signed the warrant affidavit

13  presented it to an independent magistrate who independently

14  evaluated the warrant affidavit and decided there was probable

15  cause and issued the arrest warrant.  So probable cause -- you

16  can also just look at the arrest warrants themselves and the

17  affidavits and see that there's probable cause on the face of

18  them given the elements of the crime, which is hindering

19  unofficial proceeding through noise or disturbance, and the

20  conduct that's alleged in those warrants, in the warrant

21  affidavits.

22          So then the question is does an exception apply?

23  Really the only exception that the plaintiffs attempt to assert

24  is the taint exception.  And but if you look carefully at the

25  Amended Complaint, there's no allegations that any one of the

1   officers or anybody exerted any influence over the independent

2   magistrate.  At most you have an allegation that the

3   superintendent, Dr. Azaiez, texted the Williamson County judge

4   about the efforts to arrest Mr. Story and Mr. Clark.  But the

5   Williamson County judge is not -- the County judge is not the

6   independent magistrate.  There's nothing in the Complaint that

7   ties those two together.  A County judge is a political

8   officer.  A magistrate is an appointed judge in Williamson

9   County to specifically deal with issues of arrest warrants.

10          So again there's nothing in the Complaint that

11   satisfies the taint exception to the independent intermediary

12   doctrine.  There's no Franks violation here because there's no

13   false information in the warrant.  At most again they allege

14   that certain aspects of the warrant differ with their

15   perspective of how things went down, but according to the Fifth

16   Circuit in Buehler, just different interpretations of the same

17   actions doesn't mean that there's false statements, so I don't

18   think they state a Franks violation.

19          And also there's no Malley violation.  This isn't a

20   situation where we have a bare bones affidavit that says

21   nothing other than so and so committed X crime.  There's plenty

22   of detailed facts about Officer Griffith's experience, where

23   she got her information, what the alleged actions were to

24   support the finding of probable cause.  Again, this has been

25   something that's held in the Fifth Circuit for decades that

1    since probable cause exists here, it's not a false arrest.

2           Turning to kind of the retaliatory arrest, again the

3    general rule is it's not a retaliatory arrest again where it's

4    supported by probable cause, and this is affirmed just recently

5    as last year by the Fifth Circuit in *Gonzalez v. Trevino,* a

6    case that I know that the Court is very familiar with.  So

7    again we just ask are the arrest warrants supported by probable

8    cause?  Yes, based on the same argument I just presented.

9           Now, we look at are there exceptions for in the

10   retaliatory arrest context and we look at the Supreme Court's

11   case in Lozman and the Supreme Court's case in Nieves.  Lozman

12   won't apply here because it involved a very specific

13   retaliatory municipal policy.  And again there's no allegations

14   of a retaliatory policy here.  Even if there were, that would

15   only be successful in a claim against the district, not against

16   the officers.  Then we turn to Nieves.  Again Nieves doesn't

17   apply here, because there's no allegations of objective

18   evidence that Mr. Story and Mr. Clark were arrested where other

19   similarly situated people not engaged in the same sort of

20   protected speech were not arrested.  If that were the case,

21   then you could draw an inference that the speech was the cause

22   of the arrest, but that's not what happened here.  On the

23   contrary, what we have here is people who are not similarly

24   situated also engaged in the same speech, but they're not

25   arrested.  Well, the fact that there are other individuals that

1   Ms. Long specifically referred to who engaged in the same

2   speech were warned and told they couldn't, stopped speaking,

3   walked away from the microphone.  Mr. Story is the only one who

4   remained at the microphone, continued to speak after being

5   warned, forcing officers to remove him from the room.  That's

6   not a situation of similarly situated people engaged in -- not

7   engaged in the same conduct.

8            Judge, turning to the excessive force, again the

9   allegations about excessive force are very vague.  We don't

10  know who committed the excessive force.  We also know that the

11  injury is de minimis under longstanding Fifth Circuit law.  You

12  look at, you know -- and of course, the Fifth Circuit does say

13  any injury can support a claim of excessive force if the force

14  was unreasonable.  Consider the context.  Mr. Story, and this

15  is as pleaded in the Complaint, for 45 minutes Mr. Story and

16  several other parents are outside yelling at officers,

17  confronting officers, attempting to push their way through into

18  the meeting.  And officers are using measured and ascending, I

19  guess, measured and ascending force to repel, I guess,

20  Mr. Story -- because this only applies to Mr. Story, not

21  Mr. Clark -- from the board meeting.

22           That's absolutely reasonable, a reasonable amount of

23  force given the fact -- and there's plenty of Fifth Circuit

24  cases that hold this, specifically I would cite the Court to

25  the Buehler decision where they say, *In case after case, use of*

 1   *takedowns to gain control of suspects who had disregarded*

 2   *lawful police orders or mildly resisted arrest did not violate*

 3   *the Fourth Amendment even where minor injuries occurred.*

 4           So again even if you get past the fact that he hasn't

 5   told you who allegedly injured him, this is de minimis force,

 6   this is a situation where reasonable -- a de minimis injury,

 7   reasonable force, even in the face of a minor injury.  I'm not

 8   going to rehash qualified immunity which Ms. Long already

 9   addressed, but again there's no constitutional violation

10   alleged and definitely not a clearly established right that's

11   been alleged by the plaintiffs.  Thank you, Judge.

12           THE COURT:  All right.  Thank you.  Okay.

13           MR. NORRED:  May it please the Court.  I'm going to

14   start with the end and go backwards.  So just responding to

15   what we've heard today so far, opposing counsel have argued

16   that all Mr. Story had to do was wait his turn for a general

17   meeting where he could speak on any topic he liked.  As you see

18   in the petition, there were several meetings, none of them were

19   general meetings.  They were not having meetings that were

20   general meetings for months on end, and that necessitated the

21   activity.  Even if --

22           THE COURT:  I thought, in reading the documents, there

23   was one general meeting that -- am I right here?

24           MR. NORRED:  That was the tax hearing meeting, yes.

25   That's after the tumultuous one beginning.

1          THE COURT:  But there was a general meeting.

2          MR. NORRED:  Right.  That's the tax hearing.  So I

3   generally put this into the physical altercation meeting which

4   happened first and then there's a second meeting which was the

5   tax hearing meeting where you had the diminished seating.  So

6   Mr. Story was forced out of the room for speaking on a

7   non-germane topic after months of non-general meetings where if

8   they wanted to say he couldn't talk about it, they could always

9   do so.  And opposing counsel kind of demonstrated the

10  difficulty here.  Opposing counsel and Ms. Weir, they both see

11  that any mention of a protective order is outside the boundary.

12  You can mention slavery as long as you have the word "mask" in

13  or COVID in there, and that's okay.  You can insult Senator

14  Cruz, you can talk about QAnon, you can make all sorts of

15  insults as long as you have the word "mask" in there, you're

16  okay.  But if you try to use the word "mask" and say Why are

17  you worried about this danger when you're not worried about the

18  superintendent, and he actually has a real protective order,

19  and they go ballistic and say that's too far away.

20          I've given the Court maybe a dozen examples over the

21  course of months where their public comment rule is sometimes

22  not enforced, sometimes it's enforced sternly, I have not

23  claimed that it is -- well, at one point I did, but I have not

24  really argued that it's facially unconstitutional as to subject

25  matter.  I have said that it's unconstitutional for vagueness

1   because it is so vague that you can't tell what's inside the

2   boundary and outside the boundary.  Then we've said and if

3   that's not obvious, it's facially as -- sorry, it's as applied

4   unconstitutional because you can look at the multitude of

5   examples.  The last one that I did the look-up on and added to

6   the amended petition or Complaint was I think Ms. Feller or

7   Ms. Weir said as long as you eventually get back around to the

8   subject, that's good enough.  But would it be good enough if

9   Mr. Story got up and got around to it?  We have demonstrated

10  that that wouldn't be the case, it just wouldn't be.  We know

11  because that's what happened.

12          Paragraph 102 of our Complaint we talk about how

13  others were allowed to speak out, not just from the podium, but

14  like Mr. Clark was sent out for speaking out repeatedly, others

15  were allowed to speak out, they weren't sent out.  We've talked

16  about paragraph 102, Weir enforced the rule arbitrary to favor

17  some.  I have a number of notes.  You can do a search on each

18  one of the names of the individuals and you see what we have

19  alleged about each one.  It is true that some of these trustees

20  are more active than others, but for example, Xiao and Weir

21  talked about the violation of the seat spacing and decided that

22  was okay and the five of them voted on that.  Okay, so we would

23  say that that's actively violating the right to petition.

24          In paragraph 146, we say specifically they're allowing

25  for more speech for some than for others based on viewpoint,

1    and again we give examples.  Opposing counsel just a few

2    seconds ago said that other people stopped, therefore, they

3    weren't punished.  Okay.  You've successfully chilled the

4    speech of some, so that makes it okay that you physically have

5    an altercation with somebody who is not willing to take it.

6    And the key phrase that opposing counsel gave just a minute ago

7    was lawful order.  You have to obey the lawful orders.  And

8    let's remember what that lawful order is.  We have a First

9    Amendment, dare say one of the founding principles of our

10   country that we don't have taxation without representation, we

11   have the right to petition.

12          Then we have a Texas state law that says, hey, this is

13   a big deal, when you have a tax hearing for an independent

14   school district you've got to allow the public not to just

15   attend, the state law says participate.  Two way, you didn't

16   get that there.  And as the Court remembered, we had this

17   excuse of Delta variant showing up.  Less than a week later,

18   eight days maybe it was there was a meeting of more than 300

19   people in that same room.  There was no intervening new medical

20   understanding or recognition that we had conquered COVID now.

21   And we do have pictures from various types of the various parts

22   of the room, if they walked in and there were 18 chairs there,

23   they had an obligation to allow everybody in there, and they

24   didn't.  There were hundreds of people outside.  That's in the

25   petition.  So there was not public participation, there was a

1    direct deliberate attempt, I would say at almost at a summary

2    judgment level of evidence that they were deliberately

3    maneuvering the situation so that they would not have to deal

4    with a crowd of people who were not happy about their taxes

5    going up.

6          THE COURT:  Look, one of the concerns that I have is

7    that your Complaint contains a lot, a lot of supposition and

8    conjecture.  I mean, you make these very broad allegations of a

9    conspiracy.  Many of the board members who you sued did very

10   little, if anything, if I were to read your Complaint.  The

11   only two board members you didn't sue were the ones who voted

12   against having the superintendent hired.  The ones you did sue

13   were the ones who voted in favor of hiring him.  Now, that's

14   not a constitutional violation.

15         MR. NORRED:  True.  A lot of our allegations against

16   the five instead of the seven revolve around the Open Meetings

17   Act, again not a constitutional violation.

18         THE COURT:  You are not going to win on the majority

19   of these -- now, this is a motion to dismiss.  This is not a

20   motion for summary judgment.

21         MR. NORRED:  Right.

22         THE COURT:  So I have to take the allegations in your

23   Complaint generally as true for this purpose.  But there also

24   has to be some basis for them, and just suing somebody because

25   they voted in favor of hiring somebody that your client thinks

1    is a bad person for whatever reason does not withstand scrutiny

2    even under the liberalist pleading standard there is, just

3    doesn't.  Now, there are allegations in your Complaint I think

4    which do at this stage.  I mean, there's suggestions about your

5    client being manhandled and taken out and so on and thrown to

6    the ground.  Those things I think are such that they well may

7    survive a motion to dismiss, but some of this is very -- I

8    mean, you basically without any basis, except in somebody's

9    head, and maybe there is a conspiracy, I don't know if there's

10   a conspiracy or there isn't a conspiracy going on, but you

11   can't just say there's a conspiracy.  That doesn't suffice.

12           MR. NORRED:  Your Honor, I understand that.

13           THE COURT:  And your Complaint just says that time and

14   time again.  It doesn't work.

15           MR. NORRED:  Your Honor, I've been in front of a lot

16   of courts, and some courts will have come down firmly on one

17   side of a set of claims in a way that I would not have and

18   others do, and I never know how a Court is going --

19           THE COURT:  I am all for the First Amendment, okay.  I

20   am all for people's right under the First Amendment.  I mean, I

21   was given -- I think I'm the only judge ever to receive the

22   Freedom of Information Award from the Hawaii Journalism

23   Society.  I recently got reversed in the Fifth Circuit for

24   issuing a decision with a very, very strong dissent from a

25   number of judges that supported a person's First Amendment

1   right, so I am not anti First Amendment, but you can't just say

2   these councilmembers engaged in a conspiracy.  That doesn't

3   fly.  That's great for political speech.  I'm perfectly happy

4   to have somebody have that viewpoint and speak it and that may

5   be a First Amendment right.  You can certainly stand out in

6   front of the courthouse and say there's a big conspiracy or in

7   front of the board, wherever these board meetings are held, and

8   say I think there's a big conspiracy going on here.  That's

9   perfectly okay.  But you're suing predicated on a

10  constitutional violation, so you have to have more here than

11  just simply, you know, we didn't sue these two people because

12  they voted against this superintendent, who may or may not have

13  been appropriately hired, I don't know.  But we sued these

14  others because they're in a conspiracy because they voted to

15  hire him.  That's not a constitutional conspiracy.

16          MR. NORRED:  If I might, paragraph 14 talks about the

17  five trustees and what they did concerning -- and the Court

18  takes into account understood facts that are proveable and we

19  can show and natural inferences, just natural.  And I'm not

20  looking for the conspiracy on this, I'm just looking for the

21  TOMA violations against the five.  If this Court says, look,

22  this unnamed fifth trustee you never talk about, I'm letting

23  him out, my issue is I've got a school district that says we

24  can beat on people if they talk about things we don't like and

25  we can hire people illegally.  That's the crux --

1            THE COURT:  I think you're going a little far here.  I

2     don't see any direct evidence of that.  I do see that there

3     certainly are -- there is an instance where your client was at

4     one point, you know, taken out of the room and there was

5     another altercation.  I don't know whether that was when he was

6     trying to get in the room or he was getting out of the room,

7     I'm not sure.  He went up against a pole and was hurt at that

8     point.  If this was a summary judgment motion, there would have

9     to be a lot more there, okay.  But this is not a summary

10    judgment motion, it's a motion to dismiss.  So I think that may

11    well survive, but a lot of this conspiracy stuff is just --

12    it's not going anywhere.

13           MR. NORRED:  But let me give you an example.

14           THE COURT:  And I'm not doing you any favors because

15    it isn't going anywhere in any court.

16           MR. NORRED:  I understand that.  Opposing counsel says

17    we haven't talked about the training.  This Court just now said

18    you're not giving me enough.  Paragraph 86 we say Chief

19    Yarbrough states at a Texas school board -- Texas Association

20    of School Board meeting to an individual who is also a former

21    police officer and Yarbrough admitted in public his officers

22    did not have proper school resource officer training, they only

23    had typical municipal street patrol training.  That's paragraph

24    86.  Does opposing counsel want me to come up and say here

25    are --

1          THE COURT:  You have to remember something now, this

2     is a public meeting.  We're not talking here about officers who

3     go about working day in and day out in a school, okay, with a

4     school setting.  That's a totally different situation.  That's

5     what you're talking about.  When you're talking about a public

6     meeting, you're talking about people -- it doesn't matter

7     whether it's a school meeting or it's a City Council meeting or

8     what kind of meeting it is, you don't have to have specialized

9     law enforcement training as a school resource officer just

10     because the subject matter of the meeting happens to be

11     something to do with the school.  School resource officer is

12     working in the school and they should have specialized

13     training, but that's not what we're talking about here.

14          MR. NORRED:  We are talking about an open meeting.

15          THE COURT:  What is he doing?

16          THE PLAINTIFF:  I'm asking if I can speak on my

17     behalf, Your Honor?

18          THE COURT:  No, sir, you cannot.

19          THE PLAINTIFF:  Because I know a lot of the facts

20     here.

21          THE COURT:  Look, this is not the time or place for

22     your extensive knowledge of the facts, and I'm not trying to be

23     denigrating at all.  There is a time and place for it and that

24     will be at trial, if we get to trial.  It's not here.  All

25     right?  You have very competent counsel, he's perfectly careful

1    in arguing your position.

2         MR. NORRED:  I'll put that on my Yelp review.

3         THE COURT:  I've been a federal judge for 35 years,

4    so --

5         MR. NORRED:  As long as we have this one second of

6    that.  You are the person I think of when people talk about

7    moving back to Texas from someplace as though Texas is not the

8    greatest, because I said I know a judge who moved here from

9    Hawaii.

10        THE COURT:  Don't remind me, please.

11        MR. NORRED:  I don't know, seems like grade A evidence

12   to me, but anyway, I should probably continue.

13        City Council members and members of -- not City

14   Council, school board members are required to get Open Meetings

15   Act training.

16        THE COURT:  Sure, of course.

17        MR. NORRED:  And they give the nod to the police to

18   move people.  Now, we have a pending motion to amend this, but

19   as you can tell, we've been here a year and I didn't want to --

20        THE COURT:  That's not my fault.  I just got this

21   case.

22        MR. NORRED:  No dispersions cast, but we had other

23   events at school events just recently as November where the

24   police said no you can't pass out political fans in a public

25   area.

1           THE COURT:  Political what?

2           MR. NORRED:  They were fans with names of candidates

3    on them.

4           THE COURT:  Oh, okay.

5           MR. NORRED:  Political propaganda, electioneer, but

6    they're in a public area, and this is on school grounds.  So

7    there's a lot going on here.  We had a 70-page Complaint,

8    right, so there's a lot going on.

9           THE COURT:  I fully understand.

10          MR. NORRED:  The Court doesn't want to read through

11   one more word from me until he trims it down to the extent that

12   he wants to, but let me just skip through, in the famous words,

13   briefly.

14          As we talk about the petition, one of the officers was

15   reading a section of Texas law to defend keeping out Mr. Story

16   and other people, and he deliberately cut out the part that

17   would have said that this law that he's quoting doesn't apply.

18   Now, it's in our Complaint, so here you have --

19          THE COURT:  I did read that.

20          MR. NORRED:  So he is deliberately misstating the law

21   to abuse people and keep them out of a room during a meeting

22   that lawfully has to be open to everybody.  And if we were

23   talking about a thousand people trying to get into a 20-person

24   room that we didn't know about, that would be a different

25   question.  It's a room that would have easily handled all the

1    people that were there and didn't, only because the desire of

2    the people who are running the show was that they not be

3    allowed in.  And that is the natural reading of what happened.

4    I don't think that that's a stretch.  I think you can see it

5    the next week when you have the next hearing and there's

6    hundreds of people there with no intervening medical

7    instructions that, oh, now we can do things.  And before that,

8    we had the same thing, so that's all in there.

9         We talk about the flaws in the warrant.  I think that,

10   of course, the warrant is in the Exhibit 1-1 at page 198.  You

11   can see Officer Pope is giving the information to the affiant.

12        THE COURT:  What happened to those charges?  I wasn't

13   clear.

14        MR. NORRED:  My understanding is that --

15        THE COURT:  Were they dismissed?

16        MR. NORRED:  -- they're in limbo forever.  Nothing has

17   happened.

18        THE COURT:  He's still charged?

19        MR. NORRED:  He's still been charged and it's not

20   going anywhere.  Some people might say that it's a deliberate

21   decision not to do anything until this case is over, that's

22   what some people might say.  All of the local people who might

23   prosecute these charges have said no thanks.  That's what I can

24   tell the Court without a doubt.  It's not going anywhere.  So

25   we're going to have to wait until the statute of limitations

1    runs out and then it will go away long after the damage is

2    done.

3              THE COURT:  No, I don't think it's a statute of

4    limitations that you would be concerned about because they

5    brought the charges.  It would be the speedy -- whether he

6    received a speedy trial.  That's what you would be concerned

7    about.  But anyway, let's move forward.  You're not a criminal

8    lawyer.  I wasn't a criminal lawyer either, but I've been a

9    criminal judge and civil judge for a long time, so I learned

10   that stuff, but that wasn't my calling.  I was a trial lawyer.

11             MR. NORRED:  I think my criminal cases can be counted

12   on one hand, but one of them I am involved in is whenever

13   there's a politically trumped-up charge, it usually dies for

14   lack of attention and then you can get it expunged.  Not while

15   we're here.

16             Opposing counsel talked about we can't argue both the

17   Franks and Malley violation, citing *Kohler versus Englade,* 470

18   F. 3d at 1113.  That's an imprecise analysis.  In that case in

19   Kohler, the Court said you've already failed under Malley, so

20   Franks is inappropriate.  We can argue both and this Court can

21   decide to pick one.  Obviously if you get one, you don't need

22   the other, it's inappropriate to go to the other one.

23             And now we're moving pretty fast.  We've also

24   suggested -- and I apologize, as the Court may guess, whenever

25   I'm trying to answer three different motions to dismiss they

1    wind up kind of running into each other, so I think at some

2    point in all of them I said we incorporate from reference all

3    these things from the other.

4           THE COURT:  That's why I was asking you some pointed

5    questions because I want to be sure that I understand where

6    you're coming from and what your view is, what your argument

7    is.

8           MR. NORRED:  I appreciate that.  And sometimes -- it's

9    one of those things where if you kind of change your viewpoint

10   halfway through one of the documents, you have to go back and

11   make sure that you're consistent.

12          THE COURT:  I hope so.

13          MR. NORRED:  It's a goal, you know.  So we would say

14   that officers abuse *Alexander versus City of Round Rock* in

15   their reply to say only objectively unreasonable force allows

16   us to get past the pleading stage.  We think that's an

17   unsupportable twist on what Alexander teaches.  The correct

18   teaching is that if objectively unreasonable force is present,

19   then any alleged injury is sufficient.  But we don't say in

20   Alexander -- Alexander does not say that this Court has to find

21   objectively unreasonable force at the pleading stage.  I don't

22   think that's what Alexander says.  There may be another course,

23   not my area of court of the law, but that's an issue.

24          Opposing counsel and the officers want to defend on

25   the basis of Story did this to himself by trying to disobey

1    police, but officers want this Court to ignore the officers

2    were not actively breaking the law, actively breaking Texas law

3    to prevent the public from participating in a tax hearing.  As

4    opposing counsel said, I'm not afraid of the video.  If the

5    Court wants to watch the video, I applaud that.  It helps to

6    cut down the noise, you can see what happened.  What you can't

7    see is how others were treated better --

8              THE COURT:  I have a little bit of a problem.  In a

9    motion to dismiss, I am bound to stay within the four corners

10   of the pleadings and the only time I can look -- there's a few

11   exceptions to that having to do with documents that are

12   appended to the Complaint and so forth.  But generally

13   speaking, if I step outside of that, it's a motion for summary

14   judgment, then we're arguing about the appropriate -- I'm sure

15   at some point there will be a motion for summary judgment in

16   this case, but this is not a motion for summary judgment.  Now,

17   I could convert it to a motion for summary judgment, I have the

18   authority to do that, but that would be grossly unfair because

19   if I convert it to a motion for summary judgment, you're going

20   to be stuck and so will the other side with the record as we

21   sit.  And there may be other evidence that you will want to

22   bring to the attention of the Court that you hadn't brought

23   forward because this was a motion to dismiss and not a motion

24   for summary judgment.  So I can't be wandering off and looking

25   at videos and testing credibility of witnesses and so forth

1   because that is for another day at another motion, in another

2   type of motion.  People don't understand that we have rules

3   here.

4           MR. NORRED:  Which I appreciate, Your Honor.  And I'm

5   just about done.  Government entities often will say you have

6   not shown that we should have known what we were doing was

7   unconstitutional, and they get away with that all the time.

8   And that's what's happened here.  They said, well, you haven't

9   shown that our officers should have known that they should let

10  people into this tax meeting.  Except, as we've pled, the law

11  was shown to them during that event.  And they read the law and

12  they responded with other law and said, Oh, yes we can, by

13  deliberately omitting key components of what they were reading.

14  We detailed this in excruciating detail in our pleading.  So we

15  would say that they are absolutely responsible for knowing what

16  the law was when they're reading from the law and determining

17  how to misrepresent it so they can continue to play the part of

18  bouncers at a dance club where the manager says let these

19  people in and don't let these other people in, because that's

20  what was happening and we do say that.

21          Let's talk about the conspiracy and then we'll wrap

22  up.  Officers site the Hilliard case which involve a school

23  district and a superintendent.  In that case, the

24  superintendent's actions were all aligned arguably for the good

25  of the district.  What we don't have is a set of employees who

1    were acting to the detriment of the district while they're

2    breaking state law, targeting dissidence for arrest.  And even

3    Hilliard says, *A corporation cannot conspire with itself any*

4    *more than a private individual can.  It is the general rule*

5    *that the acts of the agents are the acts of the corporation.*

6         The general rules have exceptions.  We have not

7    alleged several of our claims against the entire district.

8    We've said these individuals are the ones that are doing the

9    damage.

10         Weir told the cops to remove Jeremy Story.  It wasn't

11   some nebulous Round Rock ISD.  Now, we may find that in the way

12   that our system works Round Rock ISD is responsible for the

13   actions of its agent, but Round Rock ISD did not nebulously --

14   nebulous entity did not do it, it was Weir that did that.  So

15   we have not said that the entire district did it.  We have said

16   that these individuals did it.  And I can give you a number of

17   cases.  I'll just give you one and it's hard to spell,

18   *Jokeck(ph) versus Clayburn*, it's 3-92-113-CV, 1993 Tex. app,

19   Lexis 1632.  The Court held the general rule is inapplicable

20   where there's a breach of fiduciary duties, it also ruled that

21   malice could be applied by the breached fiduciary duty, and the

22   decision was affirmed.

23         There are other cases where people work for an

24   organization and there is a conspiracy established.  So this

25   would be -- I would think that this is an exception to that

1    rule.  We have a long way to go before we prove this, I get

2    that, but what we do have is we have a set of real things that

3    happened, insurance purchased for Azaiez before he was a

4    finalist.  There was a lot of communication between the five

5    and Azaiez.  That's pled with real facts that are supported.

6    All of this started with an Open Meetings Act violation, all of

7    it, at least that's what our pleadings say.

8              THE COURT:  Okay.  Well, all of this might provide a

9    background or a backdrop for why your client was upset and he

10   wanted to say something, but I have a standing issue here that

11   I have to deal with also that hasn't been raised.  Let us

12   assume for just a moment that three or four and five members of

13   this board were in some sort of nefarious conspiracy to hire

14   this unqualified person, okay.  How does that violate your

15   client's constitutional rights?

16             MR. NORRED:  It does not.

17             THE COURT:  It doesn't.  And that's the problem.  Now,

18   it certainly would be evidence of maybe something else going

19   on, okay.  It might be evidence of why your client was

20   speaking, he wasn't just running in there for something else,

21   you know, just to be heard or to hear himself, but it isn't --

22   and it might be a violation of state law, it might be a

23   violation of federal law.  Who knows?  I don't know.  But it

24   wouldn't be a violation of your client's constitutional rights,

25   either client's constitutional rights because they're not in a

1    position to be harmed any more than the general public.  See,

2    they don't have, really don't have standing to raise that claim

3    in a private 1983 suit.

4              MR. NORRED:  Well, of course, our claims start with

5    the unequal -- the as applied public limited public comment

6    rule.  That's where we get our --

7              THE COURT:  That's different, that's not hiring this

8    guy and giving him insurance and all that stuff.  That has to

9    do with maybe they did something they shouldn't have done, I

10   don't know.  I'm not suggesting they did or they didn't.  I

11   haven't have the faintest idea.  I'm sure they have a very

12   different view from it than you do.  But that doesn't create a

13   constitutional cause of action for your client.

14             MR. NORRED:  Your Honor --

15             THE COURT:  Might create a cause of action for the

16   Attorney General, but not your client.

17             MR. NORRED:  Let's say that Jeremy Story goes in

18   there, he says his piece, he's not interrupted and he leaves.

19             THE COURT:  Okay.

20             MR. NORRED:  He's not tackled, he's not arrested, none

21   of that happens.

22             THE COURT:  All right.

23             MR. NORRED:  Well, we're in state court on an Open

24   Meetings Act claim at best.  We're here today because we have

25   the right to petition and right to free speech and be treated

1  like everybody else --

2          THE COURT:  I just told you that.  You and I are

3  talking right past each other, I think.  I am not suggesting

4  for a moment that whatever occurred there may not at the

5  appropriate time be evidence of one thing or another, but what

6  it isn't is an independent cause of action for your client.  He

7  has no standing to raise that issue as an independent -- it

8  isn't a violation of his rights, his constitutional rights, it

9  just isn't.

10          MR. NORRED:  I'm not suggesting --

11          THE COURT:  Now, his speaking and being told that he

12  couldn't speak for whatever reason, if we get to trial, that

13  may or may not come in as evidence of why he wanted to speak

14  and why they wouldn't let him speak.  Okay?  That's evidence.

15  But it isn't a cause of action, it just isn't.  He doesn't have

16  standing to raise a board malfeasance as an individual cause of

17  action.  It may be the reason why he is doing something or

18  other, but it isn't his constitutional cause of action, it just

19  doesn't exist.

20          MR. NORRED:  I don't think that we have alleged that.

21          THE COURT:  Well, it kind of sounds like that in your

22  Complaint.  But regardless of whether you did or didn't, you're

23  not going forward on it.  I hope that you didn't allege it

24  because if you didn't, we don't have a problem.

25          MR. NORRED:  I don't think that we alleged that we

1    have a claim for malfeasance.  Now, I think I may have just

2    used an example.

3               THE COURT:  You don't claim malfeasance, you claim

4    conspiracy.  That's not malfeasance.  Conspiracy is a -- it's

5    an overt act taken in furtherance of an illegal objective.

6    That is not -- malfeasance can be part of that.  Malfeasance

7    can be just gross negligence.  It can be somebody who doesn't

8    know what they're doing.  It can be somebody who has no --

9               MR. NORRED:  I always thought that malfeasance

10   requires a bad intent, but we're not alleging -- we allege the

11   conspiracy --

12              THE COURT:  So now you're in the area of some

13   ambiguity here.  It depends upon how you look at it.  That's

14   why I just said, I said malfeasance can be part of an

15   intentional act or, or it can be just gross negligence as we

16   use that term commonly.

17              MR. NORRED:  Well, I'm not sure that either of those

18   phrases are in my pleadings.

19              THE COURT:  No, I don't think so.

20              MR. NORRED:  So what we're alleging is that the five

21   defendant trustees have a goal and their goal is to protect

22   their man, the superintendent.  And whenever somebody

23   jeopardizes that goal, we wind up with an injury and that's

24   what we're suing on.

25              THE COURT:  What you can sue individuals for are

1   concrete constitutional violations that you allege that they

2   did.  And to the extent that you allege that somebody made a --

3   has done something that violated your clients' rights, that

4   could well be cognizable.  Some peripheral thought that

5   somebody might have in the back of their head as to what is or

6   is not appropriate isn't a constitutional violation.

7              MR. NORRED:  I hope we haven't alleged that.  I hope

8   that what we've alleged is that --

9              THE COURT:  I was trying to find some concrete

10  examples, but you do have some instances where people said or

11  did things, and those things I have to look at very carefully.

12  As I told you, when I construe this Complaint that you filed,

13  all 70-some pages of it, I will construe the evidence, the

14  facts, in a light most favorable to your client as the

15  nonmoving party.  That's what I have an obligation to do and

16  that's what I will do.

17             MR. NORRED:  Thank you, Your Honor.

18             THE COURT:  Okay.  All right.  Thank you very much.

19  Any rebuttal?  Very brief.

20             MR. ROTHEY:  Thank you, Your Honor.  Just one point on

21  procedural clarification, I don't believe there's a pending

22  motion to amend the Complaint.  They filed the original

23  Complaint, we moved to dismiss.  They filed an Amended

24  Complaint as a matter of right and I don't know that there's

25  any pending motion.

```
 1            THE COURT:  I think we're in the Amended Complaint.
 2            MR. ROTHEY:  That's right, Your Honor.
 3            THE COURT:  I think we're in your Amended Complaint.
 4            MR. NORRED:  I'm sorry, I didn't want to confuse
 5    things.  We have a pending that nobody has seen yet that's
 6    mostly written, but we wanted to wait until we get past this
 7    first.
 8            THE COURT:  Don't say -- counsel, look -- you can be
 9    seated.  In federal court when you say to me, Judge, we have a
10    pending motion to amend, you know what that says to me?
11            MR. NORRED:  Misstatement of fact, Your Honor.
12            THE COURT:  It says to me that you have something
13    filed that I haven't ruled on.  So this one jumped about 4 feet
14    in the air over here because it's her obligation to keep me
15    advised, and so you're telling me, *Well, we haven't finished*
16    *writing it.*  Well, obviously, I haven't seen it yet.  Hope it's
17    not 80 pages long.
18            MR. NORRED:  It is not, Your Honor.
19            MR. ROTHEY:  Since the Court expressed some concerns
20    on the excessive force, I just wanted to make some
21    clarifications.  One, Mr. Story doesn't claim excessive force
22    with respect to his removal from the August 16th meeting.  He
23    doesn't claim -- and Mr. Clark doesn't claim excessive force
24    with respect to his removal from the September 14th meeting.
25    The only allegation of excessive force is by Mr. Story with
```

1   respect to the September 14th meeting where he claims that he

2   was not allowed to enter the board room.

3           THE COURT:  Was that the one where he was pushed

4   against the pole?

5           MR. ROTHEY:  The allegation is that he was pushed

6   against a pole.

7           THE COURT:  That's what I was talking about.

8           MR. ROTHEY:  Okay.  And the point of clarification I

9   want to make there, and I'm just quoting the *Buehler v. Dear*

10  case from the Fifth Circuit last year, when you're making

11  claims brought against multiple officers in connection with a

12  single arrest.  We're not talking about arrest, but we're

13  talking about the excessive force, the reviewing court, of

14  course, must analyze the officers' actions separately.

15          The problem here is we don't know who did what.  The

16  allegations in the Amended Complaint don't say which officer

17  bear-hugged him or which officer caused the injury or which

18  officer exerted excessive force.  So do we just allow the

19  claims to proceed as to all the officers because we don't know

20  who it was?  I don't think that's what the Fifth Circuit is

21  saying.

22          THE COURT:  No, the law doesn't allow that, but if I

23  were to dismiss portions of the Complaint for that reason, it

24  would generally be without prejudice for them to correct the

25  problem.

1          MR. ROTHEY:  Correct.  If there's not --

2          THE COURT:  I mean, if they know who the officers

3    were, one would assume they would.

4          MR. ROTHEY:  If there's not a legal basis --

5          THE COURT:  Obviously.

6          MR. ROTHEY:  With respect to the conspiracy, Judge,

7    the law we cited in our brief is very clear.  A conspiracy

8    allegation against a government entity, you've got to have a

9    private actor.  A government entity can't conspire among

10   itself.  They've kind of alleged that Williamson County

11   Sheriff's Department, but they haven't brought them in as

12   defendants or alleged that they were a part of the conspiracy.

13         And this allegation that -- again, the Court raised

14   some concerns about the amounts of supposition and conjecture

15   in the Amended Complaint.  When Mr. Norred pleads, or Mr. Story

16   pleads that the officers were standing out there deliberately

17   misstating the law, I think the Court can accept the allegation

18   as true that the officer misstated the law, but this idea that

19   there's deliberateness or intent to misstate, there's no

20   support for that in the allegations, and that's just a

21   conclusory allegation.

22         THE COURT:  His counsel's suggestion was that he read

23   part of the statute, but did not read the rest.

24         MR. ROTHEY:  And again, I would -- what I would ask

25   is, well, where is the -- how do you draw an inference that

 1    there was deliberate, not just that he didn't read part of it,

 2    but that he deliberately didn't read part of it so that he

 3    could justify his allegedly illegal actions, which by the way,

 4    were not illegal because there are officers there to enforce a

 5    social distancing rule that is constitutionally valid.  So the

 6    officers were acting in compliance with the law in limiting

 7    access to the board meeting.

 8          And the other thing the Court should be aware of and

 9    this is apparent in their allegations in the Complaint and in

10    the warrant, while there was limited amounts of seating in this

11    area where the board was sitting, there's an overflow where

12    additional people were, the whole thing is live streamed.  The

13    August 16th meeting, for example, involved six hours of public

14    comment from people present including Mr. Story, from people in

15    the overflow who came in and then left, and from people online.

16    So the idea that Round Rock ISD is somehow trying to limit

17    public comment or prevent people from participating in the

18    meetings, it seems really absurd in light of the fact that --

19    and you can look, the August 16th meeting is eight hours long.

20    The video is eight hours long, six hours of that public

21    comment.

22          THE COURT:  Well, at some point I suspect I'll have to

23    look at that.  I don't know how I'm going to do it, sit there

24    for eight hours?

25          MR. ROTHEY:  Well, and, Judge, we've cited specific

1   smaller sections.

2          THE COURT:  There are sections of it, most of it is

3   not relevant.

4          MR. ROTHEY:  Yes, Your Honor.  That's all I have.

5          THE COURT:  Not that those people's comments aren't

6   important.

7          MR. NORRED:  Just seconds?

8          MR. ROTHEY:  Thank you, Judge.

9          THE COURT:  Okay.

10          MR. NORRED:  Officers -- paragraph 82 says that Chief

11   Williby watched the officers manage to use force that caused

12   the cut in the back.  Paragraph 78 to 79 state that these

13   defendants were identified as Pope and Pontillo.  We have

14   identified them.  Thank you.

15          THE COURT:  I remember Pope and Pontillo because it

16   sounds so much like -- who were those two guys?

17          COURTROOM DEPUTY CLERK:  Portillo and Pike.

18          THE COURT:  Portillo and Pike, which was a

19   three-and-a-half-month criminal trial I had over felony murder.

20          MR. NORRED:  No relation, I assume.

21          THE COURT:  I hope not.  They were convicted and their

22   convictions were affirmed all the way to the Supreme Court.

23   They're not coming back from federal prison.

24          But I was reading that, I was going, my God, the name

25   sounds awfully familiar with me.  Nothing to do with this case.

1          All right.  I will do the very best I can to get this

2   out as quickly as I possibly can.  One of the problems I have

3   is the reason I'm sitting here and not Judge Yeakel is because

4   Judge Yeakel is, as you know, retiring.  If you don't know, he

5   is retiring.  And May 1 he's gone, last day of April.  He's

6   going to work at a law firm here in town and have, I hope, a

7   good second career for himself, or third career really.  And I

8   am going to inherit a very substantial chunk of Judge Yeakel's

9   250, 300 cases maybe.

10          In addition, of course, I sit in San Antonio also.  So

11  I kind of run back and forth, and a lot of these cases are like

12  this case.  I treat every case the same, an important case in

13  the eyes of the people who were involved.  I don't triage cases

14  and this one is important and this one isn't.  We try to do

15  them as quickly and as expeditiously as we possibly can

16  consistent with doing a fair and right job.  That's the name of

17  the game, and not just to rush things out the door.  But I'm

18  not looking for anybody's sympathy because I can retire too if

19  I wanted to, but it's just a practical matter.  I mean, I just

20  have so many cases on the docket, it's impossible to get

21  through things as quickly as I would like to get through them.

22  So I will do the very best I can.

23          Most federal judges have two law clerks and a JA.  I

24  have four law clerks because my docket is so heavy.  And they

25  don't give you extra law clerks for nothing, believe me.  So

1    I've got two here in Austin and I've got two in San Antonio.

2    So we're going to do the very best we can to get it out as

3    quickly as we can, but sometimes the parties have expectations

4    that we had our hearing and, gee, we should be getting a

5    decision here next week.  Isn't going to happen.  But it isn't

6    going to be an inordinately long time.  I'll do the best I can

7    to get through it.  You've got a very lengthy Complaint which

8    makes it on a motion to dismiss -- I'm not complaining about

9    it, but it makes it much more difficult for me to get through

10   it.  Most Complaints are 10 or 15, 20 pages at most.  This is

11   70 pages, and you make all kinds of allegations in those 70

12   pages.  And they have filed a very detailed, as you well know,

13   motion to dismiss.  So I have to give credence to the arguments

14   that have been raised by them and your defenses to those

15   arguments, and that takes a while.

16         I won't be looking at the video because it's outside

17   of the pleadings, it's evidence that is not part of the

18   pleading and so this is not the appropriate time for me looking

19   at the video.  That would have me judging the credibility of

20   the evidence and I'm not allowed to do that in a motion to

21   dismiss.  I have to take your allegations in your Complaint as

22   carrying weight and then determine whether they have a legal

23   argument and a factual argument, unless your allegations are

24   fanciful, but a factual, a legal argument as to why this can't

25   stand for one reason or another.  Okay.

1          All right.  Thank you very much for your arguments

2     today.  I do appreciate it very much and for your courtesies

3     and I will do the very best I can to get this out as quickly as

4     I possibly can.  I always put out a written order.  I know a

5     lot of judges give you these little short orders.  There's no

6     short order out of me.  You will get a written order that is

7     consistent with my review of all of the arguments and the

8     evidence.  Okay?

9          COURT SECURITY OFFICER:  All rise.

10          MS. LONG:  Thank you, Your Honor, for giving us this

11     time today for both of us with your busy docket.

12          THE COURT:  Well, it's okay.  Federal courts don't

13     have oral argument very much anymore.  If you're a lawyer in

14     Los Angeles, if this case was filed in Los Angeles, there would

15     be no oral argument, absolutely no oral argument at all, zero.

16          MR. NORRED:  I don't normally like them, but in this

17     case I did because I wanted to make sure we answered the

18     questions.

19          THE COURT:  There are cases I can decide without oral

20     argument, but where I think that oral argument would be

21     beneficial, I give the parties the opportunity to do that

22     because we're trying to get to the right result.

23          *(3:00 p.m.)*

24                              *   *   *

25

1                        *   *   *   *   *

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF TEXAS

4

5         I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.  I

7    further certify that the transcript fees and format comply with

8    those prescribed by the Court and the Judicial Conference of

9    the United States.

10

11   Date signed:  June 2, 2023

12

13   /s/ Angela M. Hailey

14   Angela M. Hailey, CSR, CRR, RPR, RMR
     Official Court Reporter
15   262 West Nueva Street
     San Antonio, Texas  78207
16   (210)244-5048

17

18

19

20

21

22

23

24

25