UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS – AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY,<br><br>*Plaintiffs*,<br><br>v.<br><br>SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES AMBER FELLER, TIFFANIE HARRISON, AMY WEIR, JUN XIAO, CORY VESSA; OFFICERS JEFFREY YARBROUGH, JAMES WILLIBY, DEBORAH GRIFFITH, MILTON POPE, FRANK PONTILLO, RON COLE, CHIEF DENNIS WEINER, and CARLA AMACHER, individually, and ROUND ROCK INDEP. SCHOOL DISTRICT,<br><br>*Defendants.* | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>1:22-cv-00448-DAE |

**CHIEF DENNIS WEINER, DETECTIVE RON COLE, AND DR. CARLA AMACHER'S REPLY IN SUPPORT OF THEIR MOTION TO DISMISS JEREMY STORY'S THIRD AMENDED COMPLAINT**

**THOMPSON & HORTON LLP**

**KATHRYN E. LONG**
State Bar No. 24041679
klong@thompsonhorton.com

**K. ADAM ROTHEY**
State Bar No. 24051274
arothey@thompsonhorton.com

500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(972) 692-8334 – Facsimile

**ATTORNEYS FOR THE ROUND ROCK ISD DEFENDANTS, INCLUDING CHIEF DENNIS WEINER, DETECTIVE RON COLE, AND DR. CARLA AMACHER**

**SUMMARY OF REPLY**

The Response fails to support Story's contention that the RRHS parking lot was a public forum. Story also does not contend that GKDA (Local) itself is unconstitutional. Moreover, nothing in Story's Response (or his proposed Supplement to the Complaint (Dkt. 79-1))[1] alters or changes the fact that Story has not plausibly alleged that the Homecoming Defendants unconstitutionally applied GKDA (Local) when they instructed him to stop distributing political flyers. Consequently, the Response does not demonstrate that the Homecoming Defendants violated Story's First Amendment rights by acting in conformity with a constitutional policy.

Even if Story had plausibly alleged the Homecoming Defendants violated his rights, which he has not, the Response also concedes that there is no clearly established law designating the parking lot as a public forum. This concession conclusively proves the Homecoming Defendants' entitlement to qualified immunity since not every reasonable official would know that the Homecoming Defendants' actions to curtail distribution of the flyers in a non-public forum would violate Story's constitutional rights. For these reasons, as more fully explained below and in the Homecoming Defendants' Motion to Dismiss, the Court should dismiss Story's claims against them.

**I. The high school parking lot is a non-public forum and, even if it is not, GKDA (Local)'s restrictions, and the Homecoming Defendants' application of those restrictions to Story, are constitutionally permissible.**

The Response cites no authority supporting Story's contention that a public-school parking lot is a traditional public forum. The Response also cites no controverting authority to the proposition that school facilities, including parking lots, are public fora "only if school authorities have 'by policy or practice' opened those facilities 'for *indiscriminate use* by the general public or by some segment of

---

[1] The Round Rock ISD Defendants oppose Story's efforts to seek leave to further supplement his Complaint, which is now his Third Amended Complaint. They will file their opposition to Story's Motion for Leave to File Supplement (Dkt. 79) separately. Any references to the proposed Supplement to the Complaint ("Supplement") in this Reply are merely for the purpose of highlighting the futility of the proposed Supplement, even if it were granted, and do not constitute a waiver of the Round Rock ISD Defendants' opposition thereto.

1

the public." Dkt. 78, p. 5 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988)). Rather, the Response attempts to argue—citing *Kuhlmeier*—that because a few Round Rock ISD police officers and the RRHS Principal "observed [Story's] distribution [of the flyers] without acting," this alleged "tacit endorsement" of Story's conduct constituted a "clear practice which opened the [parking lot] for indiscriminate use by the general public … ." *Id.*, p. 6. But, Story's argument ignores *Kuhlmeier*'s guidance that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Kuhlmeier*, 484 U.S. at 267 (internal citations omitted). Consequently, Story cannot rely on any alleged inaction by RRISD employees to support his argument that the District opened the parking lot for indiscriminate use by the general public. Furthermore, even if Story could rely on the inaction of a few RRISD employees, his allegations of a single instance of inaction do not demonstrate an intent to open the parking lot for indiscriminate use by the public. *See Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 350 (5th Cir. 2001) (*Chiu I*) ("there is no evidence that the PISD's selective opening of the school mail system was intended to create a designated public forum for use by the general public"). Indeed, Story does not allege—even in his proposed Supplement—any other specific instance where the high school parking lot was opened for indiscriminate use by the general public.[2] As a result, Story does not plausibly allege that the parking lot was a public forum.

---

[2] The Supplement generically alleges a few instances of alleged viewpoint discrimination with respect to content of speech by the public distributed on District premises or through District communication channels. With respect to high school parking lots, however, the Supplement alleges only that "[f]lyers by outside organizations are regularly allowed to be put on cars in the parking lot before football games with no prior superintendent approval; nor has there been any regular subsequent attempt to remove such flyers from cars once discovered by the district or district police." Dkt. 79-1, p. 3 ¶ 8. But the Supplement does not provide any specific allegations about any of these supposed other instances where flyers were allowed to be distributed in parking lots without Superintendent approval. These are exactly the type of vague and conclusory allegations that are not entitled to a presumption of truth, even if they were properly before the Court—which they are not. *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009).

2

Furthermore, the Response acknowledges that case law holds that a prior approval process, like that in GKDA (Local), suggests the high school parking lot is not a traditional public forum. Dkt. 78, p. 9, ¶ 29 (citing *Little Pencil, LLC v. Lubbock Indep. Sch. Dist.*, No. 5:14-CV-014-C, 2014 WL 11531267, at *7 (N.D. Tex. May 29, 2014); *State of Tex. v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1079 (5th Cir. 1995)). The Response attempts to factually distinguish *Little Pencil* "because it dealt with the display of a religious advertisement on a school jumbotron at a school sporting event," but otherwise fails to explain why these facts distinguish its application here. Dkt. 78, p. 9, ¶ 29. In fact, *Little Pencil* involved the enforcement of a school district policy similar to GKDA (Local) that required prior review by the district's superintendent before nonschool-related organizations could use school facilities to, among other things, advertise for any nonschool-related purpose. *Little Pencil*, 2014 WL 11531267 at *1–3. There, the court concluded that the jumbotron constituted a "limited public forum," citing, in part, the school district's argument that a policy requiring preapproval "is a further indication that the forum was not an open forum as Plaintiffs attempt to argue." *Id.* at *7. Perhaps not surprisingly, the Response admits that "RRHS's [p]arking lot is [at least] a limited public forum … ." Dkt. 78, p. 4.

As with Story's attempts to distinguish *Little Pencil*, the Response goes to great lengths to attempt to factually distinguish other case law cited by the Homecoming Defendants in their Motion to Dismiss regarding the high school parking lot's forum classification.[3] These factual distinctions aside, the Response cites **no** case law that supports an argument that a high school parking lot is a

---

[3] The Response attempts to distinguish *State of Tex. v. Knights of Ku Klux Klan*, 58 F.3d 1075, 1079 (5th Cir. 1995), merely because that case involved "the State's 'Adopt a Highway Program.'" Dkt. 78, p. 9, ¶ 29. It attempts to distinguish *Grattan v. Bd. of Sch. Com'rs of Baltimore City*, 805 F.2d 1160, 1162 (4th Cir. 1986) because it involved distribution of political materials regarding a city, not a school campaign over the objection of the deputy superintendent and school principal. *Id.* pp. 6–7, ¶¶ 17–18. It also attempts to distinguish *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 406 (5th Cir. 1995), merely because that case involved student expression at a school-sponsored sporting event, and *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983), because it involved access to a school mail system. *Id.* pp. 7, ¶¶ 19–21.

3

forum that "time out of mind, [has] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions … ." *Kuhlmeier*, 484 U.S. 260 at 267 (internal citations and quotation mark omitted). Indeed, the Response maintains that "neither the Supreme Court of the United States nor the Fifth Circuit have direct precedent on the proper classification for [the] school parking lot." Dkt. 78, p. 9, ¶ 30.

Furthermore, Story's continued reliance on *Chiu v. Plano Independent School* District, 339 F.3d 273 (5th Cir. 2003) (*Chiu II*), ignores that the Fifth Circuit has cautioned against applying *Chiu* outside the facts in that case. Dkt. 74, pp. 6–7 (citing *Morgan v. Swanson*, 755 F.3d 757, 761 (5th Cir. 2014)). In *Morgan*, the Fifth Circuit noted that *Chiu* "dealt with after-school meetings whose express purpose was to allow adults to discuss mathematics instruction." *Morgan*, 755 F.3d at 761 (citing *Chiu I*, 260 F.3d at 336–37). The Fifth Circuit then distinguished *Chiu* from *Morgan* because that case did not involve an "individual trying to contribute relevant materials to a public forum dedicated to adult dialogue." *Id*. *Chiu* is also distinguishable here. Neither a high school football game nor the parking lot outside the game is a public forum dedicated to adult dialogue. While parents and members of the public attend the event, the purpose is to allow students to compete and perform in their extracurricular activity, albeit in front of an audience of adults, students, and children. The game or the parking lot which provides access to the stadium is in no way dedicated to adult dialogue, and the Response cites no case law suggesting otherwise. Moreover, campaign flyers, even for school board candidates, are not akin to the math curriculum materials at issue in *Chiu*, which have a direct education-related purpose. Thus, as in *Morgan*, the "different factual context renders *Chiu* incapable of providing any meaningful guidance" to a school official trying to address the distribution of non-school literature on the campus parking lot before and during a high school football game. *Morgan*, 755 F.3d at 761.

But even if the high school parking lot were a public forum, GKDA (Local)'s restrictions are constitutionally permissible. *See* Dkt. 74, pp. 7–11. Indeed, the Response concedes that GKDA (Local)

4

"is content neutral, narrowly tailored, and leaves open alternative channels for communication in accordance with both *Perry*, 460 U.S. at 45 [and] *Chiu [I]*, 260 F.3d at 345 n.9." Dkt. 78, p. 11, ¶ 34. Because the parking lot was not a public forum, or at most a limited public forum, the only question is whether the Homecoming Defendants unconstitutionally applied GKDA (Local) to Story's speech. But despite the Response's protestations, the Complaint contains no well-pleaded allegations from which the Court could reasonably infer discriminatory intent by the Homecoming Defendants.

In general, the Response asks the Court to infer discriminatory intent for two reasons. First, Story alleges that at the time of the parking lot incident, he was "locked in a political battle with Superintendent Azaiez," which Story contends "clearly evince[s] political animus as a motive for the censorship of Story … ." Dkt. 78, pp. 16–17, ¶ 47. Second, Story argues that because none of the Homecoming Defendants allegedly cited GKDA (Local) to him at the time of their efforts to curtail his distribution efforts, efforts by the District's general counsel to inform school board candidates regarding the provisions of GKDA (Local) following the homecoming game evince "application of GKDA (Local) as a pretextual, *post hoc*, rationale for the Homecoming Defendant[s'] [allegedly] unconstitutional behavior." *Id.* p. 17, ¶ 47. But the inference of discriminatory intent Story asks the Court to infer based on these allegations is not plausible for a number of reasons.

First, other than the Response's assertion that Story was engaged in a political battle with Dr. Azaiez, the Complaint contains no allegations that support an inference that *because* of their political differences, Dr. Azaiez harbored any discriminatory animus toward Story in September 2022 or otherwise intended to curtail Story's speech in the parking lot based on viewpoint. *See* Dkt. 58, p. 6. For example, the Complaint does not allege that Dr. Azaiez voiced any opinion about the content of Story's speech or allowed his own supporters or supporters of other school board candidates to distribute flyers while denying Story that same right. But even if one could properly infer discriminatory animus as to Dr. Azaiez merely because of opposing political views, the Complaint

5

contains no allegations suggesting the *Homecoming Defendants* harbored or acted in accordance with the same discriminatory animus. On the contrary, the Complaint alleges only that Chief Weiner and Detective Cole approached Story's group and that Detective Cole asked them to stop passing out the flyers, which request he allegedly made "on behalf of Superintendent Azaiez." Dkt. 49 ¶ 136. Nothing in this allegations supports an inference that Chief Weiner or Detective Cole harbored any discriminatory animus as to Story or his group, even if they had received the directive from Dr. Azaiez. Importantly, as to Chief Weiner, Story does not allege he did anything other than merely observe. *See id.* ¶¶ 136, 142. Additionally, Story alleges that Dr. Amacher only referenced a discussion with the District's legal counsel, not Dr. Azaiez, as the basis of her efforts to curtail distribution of the flyers. *Id.* ¶ 139. As a result, Story's conclusory allegations regarding political differences between him and Dr. Azaiez do not support a plausible inference that the Homecoming Defendants harbored or acted with discriminatory animus in requesting Story cease distribution of the flyers.

Second, Story's allegations about the Homecoming Defendants' alleged failure or refusal to cite GKDA (Local) as the basis for their actions also do not plausibly suggest discriminatory motive.[4] Indeed, merely because no one allegedly informed Story of GKDA (Local)'s provisions until after the fact does not mean it was retroactively applied. Again, the Complaint does not allege that Chief Weiner ever said anything to Story. With respect to Detective Cole, the Complaint alleges that he referenced Dr. Azaiez as support for his request. Detective Cole's reference to Dr. Azaiez is in fact entirely consistent with the requirement in GKDA (Local) that nonschool literature intended for distribution on District premises must be "submitted to the Superintendent or designee for prior review … ." Dkt. 49-1, Ex. 16, p. 2. As a result, Story's request that the Court infer discriminatory intent merely because Detective Cole did not expressly reference GKDA (Local) at the time lacks factual or logical support.

---

[4] This is especially true since available video evidence affirmatively proves that Dr. Amacher referenced GKDA (Local) on numerous occasions in her interactions with Story and his group.

The same holds true as to Dr. Amacher, who, while allegedly not expressly citing GKDA (Local), did inform Story that the District's legal counsel had advised her that Story's group must cease distribution of the flyers, which is the same counsel who provided all school board candidates with an explanation regarding GKDA (Local) on the next business day.[5] Dkt. 49, ¶¶ 139–41.

Moreover, despite the Response's extensive efforts to argue that GKDA (Local) did not actually apply to Story's conduct, the Complaint and the Response ultimately concede that GKDA (Local) did apply. For example, the Complaint and the Response assert that the RRHS Principal implicitly approved of Story's conduct under the "Time, Place, and Manner Restrictions" provision of GKDA (Local), which Story contends—wrongly—supersedes the need for prior review and approval by the Superintendent.[6] *See* Dkt. 49, ¶ 149; Dkt. 78, p. 11 ¶ 35. Meanwhile, the Response also argues that GKDA (Local)'s prior review provision did not apply due to an exception outlined *in GKDA (Local)* regarding distribution of materials "by an attendee to other attendees at a school-sponsored meeting intended for adults and held after school hours … ." Dkt. 49-1, Ex. 16, p. 2; Dkt. 78, p. 13, ¶ 38. But in making these arguments, Story concedes that GKDA (Local) outlines the

---

[5]     The Response attempts to make hay of the allegations in the Complaint that Dr. Amacher did not identify the "unknown" legal counsel that had told her to approach Story and his group. *See* Dkt. 78, ¶¶ 23, 46, 51, 56. In light of the fact that Cynthia Hill, the District's general counsel, sent the follow-up email referencing GKDA (Local), Story's feigned ignorance of what counsel Dr. Amacher relied on rings hollow. So too does Story's emphasis on the purported "three day" delay between the incident and the email. *Id.* ¶¶ 26, 47. As alleged, the homecoming incident occurred on September 16, 2022, and Ms. Hill sent the email on September 19, 2022. Dkt. 49 ¶¶ 129, 144. The Court can take judicial notice of the fact that September 16, 2022 was a Friday and September 19, 2022, was a Monday. Because school personnel typically do not work on weekends, Story's allegations demonstrate diligence by the District's counsel in promptly informing all school board candidates of the District's policies on the very next business day. As a result, Story's allegations do not support an inference of nefarious intent to "find" an applicable policy.

[6]     GKDA (Local) requires nonschool materials be submitted to RRISD's Superintendent or designee for prior review, not a campus principal. Dkt. 49-1, Ex. 16, p. 2; Dkt. 49, ¶ 147. A campus principal only has authority to direct how nonschool materials, which receive prior approval by the Superintendent or designee, may be distributed on the campus. Dkt. 53, p. 16; Dkt. 49, ¶ 148. On this point, the Response in fact attempts to argue that GKDA (Local) "was initially not applied to Story when his conduct was tacitly approved by the designated authority *under the policy*." Dkt. 78, p. 11, ¶ 35 (emphasis added). Story cannot argue that GKDA (Local) did not apply to his conduct while simultaneously arguing that his conduct was authorized by application of the policy's provisions.

7

contours of the District's policies—and exceptions to those policies—applicable to his efforts to distribute nonschool literature on District premises. Because GKDA (Local) undeniably applied to Story's conduct, any alleged failure by the Homecoming Defendants to specifically reference GKDA (Local) when interacting with Story does not give rise to a plausible inference of discriminatory intent.

## II. Story cannot overcome the Homecoming Defendants' qualified immunity because he admittedly cannot plead a violation of a clearly established right.

The Motion and this Reply show the absence of well-pleaded facts that the Homecoming Defendants violated Story's First Amendment rights or applied GKDA (Local) in an unconstitutional manner at the homecoming game. The high school parking lot was not a public forum. And, even if a limited public forum, time, manner, and place restrictions—like those in GKDA (Local)—are permissible so long as they are reasonable and content and viewpoint neutral. There are no pleaded facts that the Homecoming Defendants directed Story to stop distributing campaign literature based on his viewpoint, or that they were motivated by anything other than the direction they received consistent with GKDA (Local). And there are no pleaded facts that the Homecoming Defendants— or anyone at RRISD—had treated speakers with different viewpoints who had not received prior approval more favorably, despite engaging in the same conduct.

But even if Story could show the Homecoming Defendants violated his rights, which he cannot, the Response's admission that there is no "controlling Fifth Circuit precedent on the [forum] classification of school parking lots" (Dkt. 78, p. 6, ¶ 18), demonstrates the Homecoming Defendants' entitlement to qualified immunity. The Response attempts to circumvent this reality by instead claiming—without citation to any authority whatsoever—that if discovery shows the Homecoming Defendants did not know they were acting in accordance with GKDA (Local) when speaking with Story, then they are not entitled to qualified immunity because they would have been "acting contrary to clearly established law[,] i.e.[,] censoring people without legal basis." Dkt. 78, p. 18, ¶ 51. But "[a] plaintiff does not overcome the qualified immunity defense by alleging the violation of a right that is

8

only defined 'at a high level of generality.'" *Morgan*, 755 F.3d at 760 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Instead, there must exist a clearly established 'particular right' such that the official had 'fair notice' of that right and its concomitant legal obligations." *Morgan*, 755 F.3d at 760 (quoting *Camreta v. Greene*, 563 U.S. 692, 705 (2011)).

Therefore, the relevant question is not whether Homecoming Defendants knew whether they were acting in accordance with a specific District policy. The question for the purposes of qualified immunity is would a reasonable official have known that by asking Story to stop distributing nonschool materials in the high school parking lot that they were violating his constitutional rights. Because Story cannot cite controlling precedent that clearly establishes an unfettered right to distribute nonschool materials in a school parking lot, thereby placing this constitutional question beyond debate, he cannot plead that every reasonable official would have understood that what they are doing violates that right in order to defeat the Homecoming Defendants' qualified immunity. *See Villarreal v. City of Laredo, Tex.*, 94 F.4th 374, 397 (5th Cir. 2024) ("No case would have given these officers 'fair notice' that their conduct … would run afoul of the First Amendment. Consequently, [plaintiff] has not met her burden on the second prong of the qualified immunity standard.").[7]

---

[7] The Response also argues that if the Homecoming Defendants did in fact know and rely specifically on GKDA (Local), their reliance was still objectively unreasonable because Story's conduct allegedly "falls under an enumerated exception to the … prior approval requirement … ." Dkt. 78, p. 18, ¶ 51. This argument flies in the face of GKDA (Local)'s plain language. No reasonable interpretation of GKDA (Local)'s exception for "[d]istribution of materials by an attendee to other attendees at a school-sponsored meeting intended for adults," would include Story's efforts to distribute campaign materials at a high school football game. Likewise, the Response's recitation of the rules of statutory construction to support an argument that prior review is not required for materials subject to the "Time, Place, and Manner Restrictions" provision of GKDA (Local) defies logic. *See* Dkt. 78, pp. 14–15, ¶¶ 42–44. GKDA (Local)'s "Prior Review" language states that "*[a]ll* nonschool literature intended for distribution on school campuses or other District premises … shall be submitted to the Superintendent," and it specifically enumerates only three exceptions to the prior review requirement. Dkt. 49-1, Ex. 16, p. 2 (emphasis added). Moreover, the "Time, Place, and Manner Restrictions," provision only authorizes a principal to designate "times, locations, and means by which nonschool literature *that is appropriate for distribution, as provided in this policy*, may be made available … at the principal's campus." *Id.* (emphasis added). Again, no reasonable interpretation of GKDA (Local)'s language would support a conclusion that a campus principal is authorized to determine whether nonschool material is appropriate for distribution in the first place.

9

Furthermore, especially where the law is unclear, the fact that the Homecoming Defendants allegedly sought out and relied on direction from the Superintendent—who is statutorily mandated to "oversee[ ] the implementation of [board] adopted policies" (TEX. EDUC. CODE § 11.201(d)(7))—or the District's legal counsel in requesting that Story cease his distribution efforts only strengthens their case for qualified immunity. *See Brassel v. Turner*, 468 F. Supp. 2d 854, 860 (S.D. Miss. 2006) ("Indeed, most courts recognize that 'where the law is unclear, a police officer is immune if the officer consulted with and relied upon the advice of a county attorney.'"). This is particularly true as to Dr. Amacher, since "educators are rarely denied immunity from liability arising out of First-Amendment disputes." *Morgan*, 755 F.3d at 760. And "[w]here there is no authority recognizing an asserted right, and where the area of law is as 'abstruse' and 'complicated' as First Amendment jurisprudence, that right cannot be clearly established for the purposes of qualified immunity analysis." *Id.* at 761.[8] Because Story identifies no particularized right the Homecoming Defendants violated where the contours of the right are clearly established, the Homecoming Defendants are entitled to qualified immunity.

---

[8] *See also Marcavage v. National Park Service*, 666 F.3d 856, 859 (3rd Cir. 2012) ("[t]he question whether a particular sidewalk is a public or nonpublic forum is highly fact specific and not one factor is dispositive" and the rangers "should not be stripped of qualified immunity simply because" their belief that the sidewalk was not a public forum "turned out to be mistaken"); *Hershey v. City of Bossier City*, No. 21-cv-460, 2021 WL 4395056, at *6 (W.D. La. Aug. 23, 2021) (holding officers entitled to qualified immunity in light of absence of a court decision that an officer violated rights of a leafleteer who was prohibited from distributing leaflets on sidewalks outside arena during concert, noting the "many nuances to First Amendment claims of this nature, beginning with questions about the category of the forum and continuing through the reasonableness of various regulations or restrictions," and stating that "[v]ery little about this field of law is clearly established.").

10

Respectfully submitted,

*/s/ Kathryn E Long*
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(972) 692-8334 – Facsimile

**ATTORNEYS FOR THE ROUND ROCK ISD DEFENDANTS, INCLUDING CHIEF DENNIS WEINER, DETECTIVE RON COLE, AND DR. CARLA AMACHER**

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 23, 2024, a true and correct copy of this document has been served upon all parties via the Court's electronic filing system:

| | |
|---|---|
| Warren V. Norred | Stephen D. Casey |
| NORRED LAW, PLLC | CASEY LAW OFFICE, P.C. |
| 515 E. Border St. | P.O. Box 2451 |
| Arlington, TX 76010 | Round Rock, TX 78680 |
| warren@norredlaw.com | stephen@caseylawoffice.us |

*/s/    Kathryn E. Long*
KATHRYN E. LONG