IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY, | § | NO. 1:22-CV-448-DAE |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | |
| | § | |
| HAFEDH AZAIEZ, et al., | § | |
| | § | |
| *Defendants.* | § | |
| _____ | § | |

ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO DISMISS

Before the Court are four Motions to Dismiss Jeremy Story's Third

Amended Complaint.  (Dkt. # 49.)  The first motion was filed on October 27, 2023,

by Defendants Jeffrey Yarbrough and James Williby (Dkt. # 51); the second was

filed on October 27, 2023, by Defendants Amber Feller Landrum, Tiffanie

Harrison, Amy Weir, Jun Xiao, and Cory Vessa (Dkt. # 52); the third was filed on

October 27, 2023 by Defendants Hafedh Azaiez and the Round Rock Independent

School District (Dkt. # 53); and the fourth was filed on April 2, 2024 by Dennis

Weiner, Ron Cole, and Carla Amacher (Dkt. # 74)  After careful consideration of

the memoranda filed in support of and in opposition to the motions, the Court

**GRANTS IN PART** and **DENIES IN PART** Defendants' Motions to Dismiss.

## FACTUAL BACKGROUND

Story alleges the Round Rock Independent School District (the "District"), its trustees, police officers, and superintendent committed a host of constitutional violations while coordinating to deprive Story of his rights under the First, Fourth, and Fourteenth Amendments of the U.S. Constitution. (Dkt. # 49.) Story also seeks injunctive relief against the District and individual trustees for violating the Texas Open Meetings Act ("TOMA").

On June 14, 2021, RRISD Board of Trustees ("the Board") held a special meeting and voted 5-2 to hire Hafedh Azaiez as the District's new superintendent. (Id. at ¶ 14.) The two dissenting votes allegedly criticized the hiring process as preordained because some district employees privately communicated with Azaiez prior to his interview. (Id. at ¶ 15.) After naming Azaiez as a finalist for superintendent, Amber Feller Landrum, Tiffanie Harrison, Amy Weir, Jun Xiao, and Cory Vessa ("Trustee Defendants") allegedly engaged in an "illegal walking quorum by conducting deliberations regarding Azaiez's hiring in private." (Dkt. #49 at ¶ 16.)

In July of 2021, Story, who identified himself as concerned member of the District, learned that Azaiez allegedly assaulted a woman after she refused to abort Azaiez's child. (Id. at ¶ 18.) That month, the woman obtained a protective order against Azaiez. (Id. at ¶ 23.) Story contacted the Board via email to inform

them of her allegations.  (Id. at ¶¶ 24-25.)  Story also offered video evidence of the

protective order being served on Azaiez at the District's offices.  (Id. at ¶ 24.)

Moreover, the Board allegedly received emails from the woman with details about

Azaiez "fathering her child." (Id. at ¶ 22.)

      Story's constitutional claims arise from disputes between Defendants

at two school board meetings and a homecoming football game.

## I.    August School Board Meeting

      On August 16, 2021, the Board held a special meeting concerning two

agenda items: (1) COVID-19 Employee Leave, and (2) Fall 2021 COVID-19

Health and Safety Protocols.  (Id. at ¶ 28.)  Pursuant to BED (Local), public

comments at special meetings are "limited to items on the agenda posted with

notice of the meeting."  (Id. at ¶ 20.)  At regular meetings, on the other hand, the

Board "shall permit public comment, regardless of whether the topic is an item on

the agenda posted with notice of the meeting."  (Dkt. # 49-1 at 6.)

      Before the special meeting, RRISD Police Chief Jeffrey Yarbrough

allegedly demanded that Story leave the meeting room so that he could speak with

Story in private.  (Id. at ¶ 31.)  After Story refused, Yarbrough allegedly

"unconstitutionally threatened Story."  (Id.)

      When Story approached the podium to speak during public comment,

President Weir allegedly "[tried] to stop Story from beginning . . . his speech and

even asserted at one point . . . that she did not want to allow him to even

demonstrate whether his comments were going to be germane." (Id. at ¶ 32.)

After Story attested that his comments were relevant to the agenda, Story began to

speak:

> Today I speak on the rule of law, I don't envy your choice today.  I
> trust that most people value each other even though they are on
> different sides of the issue, I also understand the seriousness of the
> COVID epidemic.  I understand the rule of law, yet several members
> of this board and Superintendent have another utter disregard for the
> rule of law.  Today you are considering thwarting the Governor's
> order and the legislature and the Supreme Court of Texas.  This will
> result in tremendous fines to the district.  Even today, you violated the
> rule of law by putting officers in the back of this room in the difficult
> position of being asked to illegally enforce a last-minute violation of
> the Open Meetings Act.  An agenda item today includes a resolution
> which includes 80% of the text concerning itself with the safety of
> public employees and students.  The resolutions being considered
> today include statements like, "the Board of trustees has a substantial
> public interest in protecting the health and safety of students and
> community."  It talks about "supervision of the Superintendent" and
> even other things related to public health and public safety.  Several of
> you have demonstrated strong disregard for the rule of law.  You
> consider public safety today by violating the Supreme Court of Texas.
> *Still more, our Superintendent has a protective order filed against
> him*.  (Id.)

When Story mentioned the protective order on Azaiez, he was

interrupted by President Weir.  (Id. at ¶ 34.)   Story was approached by RRISD

Officers Milton Pope and Frank Pontillo, who grabbed Story's arms and allegedly

dragged him out of the meeting.  (Id. at ¶ 34.)  Trustees Feller, Harrison, and Weir

allegedly endorsed his removal.  (Id. ¶ at 35.)

4

Story alleges that other speakers at the meeting were given more latitude.  (Id. at ¶ 36.)  For example, one speaker who said that Azaiez "assaulted a pregnant girl" was prevented from speaking further but was not removed by RRISD police.  (Id. at ¶ 36(d).)  Another speaker who brought up the protective order was not removed from the meeting.  (Id. at ¶ 36(f).)  Story alleges that he was singled out because he was "a leader of the opposition to RRISD's hurried and secret hiring" of Azaiez.  (Id. at ¶ 37.)

II.    September Board Meeting

On September 14, 2021, the Board held a regular meeting.  (Id. at ¶ 44.)  Although the meeting room had the capacity for 375 persons, only eighteen chairs (spaced six feet apart) were available for attendees.  (Id. at ¶ 45.)  Attendees were told they could view the meeting remotely in the cafeteria.  (Id. at ¶ 45, n.19.)  Story and other parents were allegedly physically prevented from entering the meeting room by Defendant Trustees and RRISD police officers (Id. at ¶ 45.)  Story alleges that Yarborough ordered the officers to block the meeting room doors.  (Id. at ¶ 64).

Story alleges that Azaiez admitted to creating the limited seating policy.  (Id. at ¶ 50.)  Story alleges Trustee Defendants voted for the seating limit.  The two dissenters left the meeting, citing TOMA concerns.  (Id. at ¶ 52.)

Story argues the Board's use of the COVID seating policy was used in an arbitrary fashion to prevent the expression of dissenting views.  (Id. at ¶ 45 n.19.)

While attempting to enter the meeting room, Story alleges that Asst. Chief of Police Williby instructed Officer Chavez to read Texas Education Code § 37.105.  (Id. at ¶ 68.)  However, Chavez allegedly misleadingly read only the first portion of the Code.  (Id. at ¶ 69.)  An argument ensued between Story and Officers Pope and Pontillo who were stationed outside the board meeting.  (Id. at ¶ 73.)  Asst. Chief Williby allegedly watched as Pope and Pontillo bear-hugged Story around a pole, cutting his back, and slamming him to the ground" (Id. at ¶ 77.)

III.  Story's Arrests

On September 17, 2021, RRISD police issued an arrest warrant for Story for "Hindering Proceedings by Disorderly Conduct."  (Id. at ¶ 95.)  The arrest warrant was signed by Officer Lauren Griffith, with the alleged cooperation of Officer Pope and Chief Yarbrough.  (Id. at ¶¶ 95, 217.)  The warrant allegedly included false information.  (Id. at ¶ 94.)  Story alleges Azaiez communicated via text with the Williamson County Judge and other county officials to encourage the county to arrest Story.  (Id. at ¶ 96.)

IV.    <u>Homecoming Incident</u>

Story attended the Round Rock High School homecoming football game on September 16, 2022. (<u>Id.</u> at ¶ 129.)  Story and other parents distributed flyers in the parking lot next to the school football stadium.  (<u>Id.</u> at ¶ 130.)   The flyers listed the names of five candidates for the RRISD school board. (<u>Id.</u> at ¶ 130.)

Story alleges RRISD officer Connie Garza instructed the group to stop distributing materials.  (<u>Id</u>. at ¶ 133.)   Story alleges Officer Ron Cole and Chief Dennis Weiner also asked the group to stop handing out flyers. (<u>Id.</u> at ¶ 136.) Cole's orders were allegedly on behalf of Azaiez.  (<u>Id.</u>)

After Story's confrontation with the police, Round Rock Learning Community Area Superintendent Dr. Carla Amacher allegedly admonished Story and asked the group to stop handing out the flyers.  (<u>Id.</u> at ¶ 139.)  Story complied but protested that Defendants violated his first amendment rights.  (<u>Id.</u> at ¶ 142.)

V.    <u>Grievance hearings</u>

In September of 2021, Story filed a grievance with the District regarding his removal from an August 16, 2021 Board Meeting.  (<u>Id.</u> at ¶ 110.) The District claimed the grievance had been "lost in their spam filter."  (<u>Id.</u>).  On

October 13, 2022, the Board attempted to hold a hearing but did not have the requisite number of members attend to create a quorum.  (Id. at ¶¶ 110, 115.)

After months of inaction, the Board rescheduled the hearing for January 12, 2023. (Id. at ¶ 119.)   Story alleges numerous procedural violations at this meeting.  Story alleges Trustee Weir recused herself, but then participated as a witness.  (Id. at ¶ 124.)    Story alleges Trustee Feller recused herself but voted her replacement.  (Id. at ¶ 121.)   Story alleges Cindy Hill, RRISD's counsel, provided packets of false information to the Board.  (Id. at ¶ 125.)  The packets allegedly created confusion forcing a postponed hearing.  (Id. at ¶ 126.)

PROCEDURAL HISTORY

On July 26, 2023, this Court granted in part and denied in part Defendants' motion to dismiss the first amended complaint. (Dkt. # 43).

I.    First Amendment Claims

The Court found that Story's facial challenge to (BED) Local failed. (Dkt. # 43 at 15.)  As applied, the Court found a plausible claim against President Weir and Officers Pope and Pontillo for the application of (BED) Local.   (Dkt. # 43 at 17.)  The as applied challenge against Trustee Vessa, Trustee Xiao, Azaiez, and the remaining Officer Defendants were dismissed without prejudice.  (Id.)

The Court found that Story stated a plausible claim that the COVID seating limitation, as applied by Trustee Defendants and Azaiez was unconstitutional and violated his right to petition.  (Dkt. # 43 at 20.)

The Court found that Story stated a First Amendment retaliation claim. (Dkt. # 43 at 23.)  However, Story did not adequately allege the personal involvement of the Trustee Defendants, Officer Pontillo, Sergeant Chavez, or Assistant Chief Williby.  (Id.)  Therefore, the claims were dismissed as to those Defendants.  (Id.)  Story's prior restraint claim was also dismissed without prejudice. (Dkt. #  43 at 18.)

II.    <u>Fourth Amendment Claims</u>

Without prejudice, the Court dismissed Story's excessive force claim with the instruction to identify the defendants involved in each violation by name or plead an inability to identify the defendant.  (Dkt. # 43 at 27.)  Moreover, Story did not adequately plead a "failure to train or supervise" claim against both Asst. Chief of Police Williby and Chief Yarbrough.  (Dkt. # 43 at 29.)  The Court held that Story failed to state a claim of unreasonable seizure as to Defendants other than Officers Pope and Pontillo. (Dkt. #  43 at 31.)

The Court found that Story stated a plausible false arrest claim as to Griffith and Pope. (Dkt. #  43 at 36.)  However, the Court did not extend the claim to Yarbrough, Williby, Pontillo, and Chavez who were not alleged to have been

involved in the warrant application process.  (Dkt. # 43 at 31.)   Similarly, the

Court held that Story did not plausibly allege that Officer Defendants or Azaiez

withheld information or misdirected an intermediary during the warrant process.

(Dkt. # 43 at 35.)

### III.    Fourteenth Amendment Claim

The Court found that Story plausibly pled a Fourteenth Amendment

claim as to the COVID seating limitation rule by Weir, Pope, and Pontillo.  (Dkt. #

43 at 37.)

### IV.    Monell Liability

The Court dismissed without prejudice claims against the District that

relied on pleading an unconstitutional policy or widespread practice of

constitutional violations.  (Dkt. # 43 at 39.)

### V.    Conspiracy Claim

The Court dismissed without prejudice Story's § 1985(3) claims

because the Complaint failed to plausibly plead a conspiratorial agreement to

violate Story's constitutional rights. (Dkt. # 43 at 44.)

### VI.    Texas Open Meetings Act Claims

The Court found that Story did not state a claim that the Board

violated TOMA with respect to Azaiez's hiring.  (Dkt. # 43 at 45.)   However, the

Court found that Story plausibly stated a claim that Defendants violated TOMA with respect to the limited public seating rule. (Dkt. # 43 at 46.)

VII.    Absolute and Qualified Immunity

The Court found that the Trustee Defendants and Azaiez were entitled to legislative immunity with respect to the limited seating rule. (Dkt. # 43 at 42.) However, the Court found no entitlement to absolute legislative immunity for the enforcement of BED (Local). (Dkt. # 43 at 42.) The Court stated it would revisit qualified immunity at the summary judgment stage on a complete record. (Dkt. # 43 at 43.) Following this order, Story filed an amended complaint on October 5, 2023 (Dkt. # 49).

LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." In analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

DISCUSSION

Story has brought claims under 42 U.S.C. § 1983, alleging violations of his First Amendment, Fourth Amendment, and Fourteenth Amendment rights. Story also asserts Texas state-law claims for violations of the Texas Open Meetings Act ("TOMA"). The Court will proceed as follows: first, the Court will address claims brought against the District and Superintendent Azaiez. Second, the Court will address the "Homecoming Defendants." Third, the Court will address claims against individual trustees of the school board. Lastly, the Court will address supervisor liability claims brought against Yarbrough and Williby.

## I.    First Amendment Claims Against the District

Story claims that the District violated his First Amendment rights on three separate occasions. The first instance occurred at an August 16, 2021, school board meeting when he was allegedly silenced and removed from the meeting. The second instance occurred through an alleged retaliatory arrest following a

September school board meeting.  The third instance occurred when he was asked to stop distributing flyers at a homecoming football game.  The Court will evaluate each First Amendment claim in turn.

A. First Amendment Claim Regarding the August 16 Meeting

Story claims the District violated the First Amendment by cutting off his speech and subsequently removing him from the August 16, 2021, meeting. (Dkt. # 49 at ¶ 195.)  The Court must decide whether Story's removal can be attributed to the District.

Parties can sue a municipality that has violated their constitutional rights "under color of any statute, ordinance, regulation, custom, or usage."  42 U.S.C. § 1983 (2015); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978) (holding that municipalities are "persons" for purposes of § 1983); Rodriguez v. Laredo Indep. Sch. Dist., 82 F. Supp. 2d 679, 682 (S.D. Tex. 2000) ("applying Monell a school district").  Thus, ordinarily, municipal liability must be based on "an official policy."  Monell, 436 U.S. at 694.  Official policy is defined as: (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the [district] ... or by an official to whom the [district] ha[s] delegated policy-making authority; (2) or a persistent, widespread practice of [district] officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a

custom that fairly represents [district] policy.  Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.), on reh'g, 739 F.2d 993 (5th Cir. 1984).  Actual or constructive knowledge of such custom must be attributable to the governing body of the district or to an official to whom that body had delegated policy-making authority. Id.

In this case, Story does not allege any facial unconstitutional policy. However, Story claims that the District has a custom or practice of silencing speech at Board meetings.  On this, the Court disagrees with Story.

At the time of the August hearing, it cannot be said that the Board had such a widespread practice or official custom.  The inquiry of whether an "official custom" exists focuses on whether the final policymaker knew about prior constitutional violations.  See, e.g., Peterson v. City of Fort Worth, 588 F.3d 838, 850–52 (5th Cir. 2009) (focusing on prior complaints of excessive force of which the city knew).  In a Monell claim, Courts focus on prior constitutional violations because the final policymaker had to know about or acquiesce in a practice violating a plaintiff's constitutional right.  Piotrowski, 237 F.3d at 578–79.  In this case, Story pleads no history leading up to the August meeting that the Board had such a policy or practice of viewpoint discrimination.

While Story has failed to plausibly plead an unconstitutional policy or practice, written or unwritten, he contests that President Weir's actions should be attributed to the District.

Monell established that a municipality cannot be liable for the actions of its employees under the theory of *respondeat superior*.  See Monell, 436 U.S. at 694, 98 S.Ct. 2018; Colle v. Brazos County, 981 F.2d 237, 244 (5th Cir.1993); Williams v. Luna, 909 F.2d 121, 123 (5th Cir.1990); Hickman v. Lively, 897 F.Supp. 955, 958 (S.D.Tex.1995).  Monell held that recovery from a municipality is limited to acts that are, properly speaking, "of the municipality," i.e., acts that the municipality has officially sanctioned or ordered.  Pembaur v. City of Cincinnati, 475 U.S. 469, 470 (1986).  In Pembaur, the Court clarified that Monell liability may extend to a "single decision" by an authorized policymaker as "an act of official government policy."  Nevertheless, "liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  Id. at 481.  "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."  Id. at 481–82.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.  Pembaur, 475 U.S. at 484.

Thus, the District is potentially liable if Weir is a final policymaker and can be said to make official government policy.  See Jett v. Dall. Indep. Sch. Dist., 7 F.3d 1241, 1245 (5th Cir.1993).

State law determines whether a particular official has final policymaking authority.  Jett v. Dallas Indep. Sch. Dist., 7 F.3d 1241, 1244-45 (5th Cir. 1993).  Under the Texas Education Code, an independent school district's board of trustees has "the exclusive power and duty to govern and oversee the management of public schools of the district" and "may adopt rules and bylaws necessary to carry out" this power and duty.  TEX. EDUC. CODE ANN. § 11.151 (Vernon 2006); see also TEX. EDUC. CODE ANN. § 11.051 (Vernon 2006) ("[a]n independent school district is governed by a board of trustees who, as a body corporate, shall...oversee the management of the district.").  In Jett, the Fifth Circuit concluded that "Texas law is clear that final policymaking authority in an independent school district . . . rests with the district's board of trustees."  Jett, 7 F.3d at 1245 (citing TEX. EDUC. CODE §§ 23.01, 23.26 (repealed in 1995 and reenacted as amended in 1999).

The District does not deny that final policymaking authority is with the school board.  However, the District argues that it cannot be held liable by the rogue acts of one of its trustees.  According to the District, acts taken by a faction of the board of trustees does not create policy.

Under Texas law, "[u]nless authorized by the board, a member of the board may not, individually, act on behalf of the board."  Tex. Educ. Code Ann. § 11.051 (a–1).  Moreover, "[t]he board of trustees may act only by majority vote of the members present at a meeting held in compliance with Chapter 551, Government Code, at which a quorum of the board is present and voting."  Id.

Story alleges he was ejected from the meeting at the direction of President Weir.  (Dkt. # 20 ¶ at 40.)  However, this alone is not sufficient to hold the District liable.  This type of *respondeat superior* is exactly what Monell rejected.  In Texas, the final policymaker for a school district is the Board of Trustees as a collective body.  While Weir might have discretion to make decisions particularly at a Board meeting, she is not a final policymaker.  Rivera v. Houston I.S.D., 349 F.3d 244, 248 (5th Cir. 2003) (distinguishing decision-making authority from final policymaking authority).  Only the Board can make a policy and that requires majority support.  Story has not argued that Weir is a final policymaker.  Rather, Story's argument is rooted in *respondeat superior*.[1]

---

[1] Courts tend to see many Monell claims following incidents of excessive force by local law enforcement.  The outcome of those cases can inform the Court and shed light on why Story's liability theory in unpersuasive.  Courts rarely hold municipalities liable under Monell in § 1983 claims brought by family of a decedent who was shot by the rogue acts of a police officer.  See e.g., Goodman v. Harris Cnty., 571 F.3d 388, 396 (5th Cir. 2009).  When claims are successful, they are usually brought under a theory of failure to supervise or failure to train.  One also may succeed under Monell by showing a custom or practice of excessive force.  However, it is rare for an officer to impute liability based on a single discretionary act.  In this case, while the context is different, we have a similar single discretionary act.  Story pleads that upon mentioning the Superintendent, Weir and a couple other school board members made a split-

Recently, a court in this district allowed a <u>Monell</u> claim to proceed after a Plaintiff "alleged that the Chairman [of the Board] terminated him." However, the Court emphasized that the termination occurred "with the backing of the school board." <u>Wayside Hopkins v. Sch.</u>, No. 1:21-CV-0334-RP, 2023 WL 5186881, at *5 (W.D. Tex. Aug. 11, 2023). In this case, Plaintiff has only pled the endorsement of removal by a few members of the Board rather than an overall policy backed by the Board as a final policymaker. Therefore, the Court finds that Story failed to plausibly plead a <u>Monell</u> violation against the District from the August 16 meeting.

### B. First Amendment Retaliation Claim For A False Arrest

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." <u>Batyukova v. Doege</u>, 994 F.3d 717, 729–30 (5th Cir. 2021) (quoting <u>Nieves v. Bartlett</u>, 139 S. Ct. 1715, 1722 (2019)). A First Amendment retaliation claim requires that a plaintiff plead (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially

---

second discretionary remark to order Story's removal. The Board as a collective did not vote or order his removal. Nor is it clear that they "backed this decision" as Weir's comments were made off the cuff upon hearing Story's remark about the Superintendent.

motivated against the plaintiff's exercise of constitutionally protected conduct.

Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002)

The same Monell doctrine as described above pertains to the

retaliation claim.  A local governmental entity such as an independent school

district cannot be held liable under a *respondeat superior* theory.  Story must

identify a policymaker with final policymaking authority and a policy that is the

'moving force' behind the alleged constitutional violation." Rivera v. Houston

Indep. Sch. Dist., 349 F.3d 244, 247 (5th Cir. 2003).

This Court's recent discussion in Gonzalez v. City of Castle Hills is

instructive to the retaliatory arrest claim alleged by Story.  No. 5:20-CV-1151-

DAE, 2021 WL 4046758 (W.D. Tex. Mar. 12, 2021), rev'd and remanded sub nom.

Gonzalez v. Trevino, 42 F.4th 487 (5th Cir. 2022), vacated and remanded, 144 S.

Ct. 1663 (2024). [2]   There, the Court evaluated a retaliatory arrest claim against

---

[2] In Gonzalez, plaintiff alleged defendants planned a retaliation scheme for her criticism of
certain city officials. Plaintiff was charged with tampering a government record.  That charge
"had [allegedly] never been brought against someone for even remotely similar conduct, and
certainly not against someone for stealing their own petition."  The Fifth Circuit reviewed an
interlocutory appeal of the claims asserted against the individual defendants and reversed this
Court's application of the Nieves exception. Nieves v. Bartlett, S. Ct. 1715, 204 L.Ed.2d 1
(2019); 42 F.4th 487 (5th Cir. 2022).  Nieves outlines an exception to the general rule that
retaliatory arrest claim requires a plaintiff to plead the absence of probable cause for the arrest.
However, one may still pursue a retaliatory arrest against individual defendants if the complaint
pleads "objective evidence that the plaintiff was arrested when otherwise similarly situated
individuals not engaged in the same sort of protected speech had not been." 139 S.Ct. 1715.
After granting Gonzalez's cert petition, the Supreme Court reversed and remanded to the Fifth
Circuit its application of Nieves. The Supreme Court held the Fifth Circuit took too narrow a
view of Nieves by demanding specific comparator evidence.  Gonzalez v. Trevino, 144 S. Ct.
1663, 1667 (2024).  The interlocutory appeal before the Fifth Circuit did not address the claims

both a municipality and individual defendants.  In discussing the claims against the

City of Castle Hills, the Court summarized the Supreme Court's decision in

Lozman v. City of Riviera Beach, 138 S. Ct. 1945 (2018).  In Lozman, the plaintiff

frequently criticized a municipal development project and opposed what he

perceived as improper conduct by various city officials.  138 S. Ct. at 1950.  The

plaintiff, Lozman, participated in the public-comment session of the city council

meetings more than 200 times and he filed a lawsuit alleging that the city council

violated Florida's open-meetings law.  At one council meeting, he stood at the

podium and began speaking about arrests of former officials.  Id.  One

councilmember told him to stop talking, and a police officer approached Lozman

and asked him to leave the podium.  Id. When he refused, Lozman was arrested

and charged with disorderly conduct and resisting arrest without violence.  Id. at

1949–50.

Lozman controlled this Court's decision in Gonzalez.  The facts in

Lozman are almost identical those currently before the Court, except for a few

notable distinctions that warrant a dismissal of the retaliation claim against the

District.

---

against Castle Hills as a municipality.  Only the denial of the individual conspirator's motion to
dismiss was relevant on appeal and before the Supreme Court.

The most important distinction is Story's failure to plead and argue an official policy.  In <u>Lozman</u>, the Supreme Court assumed that Lozman's arrest was taken pursuant to an official city policy. 138 S. Ct. 1945, 1947.  Lozman asserted that the City, through its city councilmembers, formed an official policy to retaliate against him and ordered his arrest.  However, the Supreme Court stated "whether there was such a policy and what its content may have been are issues not decided here." 138 S. Ct. 1945, 1951.

In <u>Gonzalez</u>, this Court held that plaintiff stated an official policy.  Plaintiff alleged "Castle Hills adopted and enforced an official policy or custom to retaliate against Sylvia for her First Amendment activities, namely the expression of her political thought through a nonbinding citizens' petition urging the firing of city manager Rapelye."  This made Gonzalez's claim plausible as it has in other cases.  <u>See e..g</u>, <u>Henagan v. City of Lafayette</u>, No. 6:21-CV-03946, 2022 WL 4553055, at *17 (W.D. La. Aug. 16, 2022), objections overruled, No. 6:21-CV-03946, 2022 WL 4546721 (W.D. La. Sept. 27, 2022) ("Plaintiff's Amended Complaint alleges the institution of anti-panhandling efforts by Mayor Guillory, City-Parish Attorney Logan, and Chiefs Morgan and Glover, all of whom are 'official policymakers' as required for <u>Monell</u> purposes."); <u>cf</u>. <u>Meyer v. Coffey</u>, 231 F. Supp. 3d 137, 147–48 (N.D. Tex. 2017) ("Without any other specific facts that would support [Plaintiff's] argument that the chief of police is the policymaker

. . . Plaintiff's Amended Complaint does not state sufficient facts to support the first element of municipal liability under [§] 1983.")

In the present case, Story's complaint and pleadings fail to identify a policymaker or plead an official policy. Story's complaint merely alleges an attempt to retaliate through an arrest by individual actors. Story alleges that Officer Griffith, with cooperation from Officer Pope, signed an arrest warrant for Hindering Proceedings by Disorderly Conduct. (Dkt. # 49 at ¶ 95.) Story alleges Azaiez communicated with the Williamson County Judge and other county officials to encourage Story's arrest. (Dkt. # 49 at ¶ 96.) However, Story pleads no facts that the Board participated in preparing or submitting the purportedly false arrest warrant or affidavit. Moreover, Story makes no argument as to the final policymaker under Texas law for such claim. Story makes no argument as to any official policy of retaliation by the District itself. Rather, Story alleges individual culpability. Thus, the pleading starkly contrasts the allegations presented in both Lozman and Gonzalez.

Therefore, Story's retaliation claim cannot be attributed to the District. Story fails to plausibly plead facts that RRISD's Board maintains an official policy or practice of directing or allowing officials or employees to retaliate against individuals for engaging in constitutionally protected speech, unlawfully removing members of the public from Board meetings; or causing false arrests.

Story pleads no facts that can be attributed to the Board regarding the purported false arrest.  The Complaint still does not identify any prior instance where the Board caused a false arrest.  Story pleads no fact that the Board participated in preparing or submitting the purportedly false arrest warrant or affidavit.

Story pleads that "[n]o one has been arrested since [he] was jailed." (Dkt. # 49, p. 26, ¶ 105.)  Therefore, these alleged "[i]solated violations are not the persistent, often repeated constant violations that constitute custom and policy as required for municipal section 1983 liability."  Campbell v. City of San Antonio, 43 F.3d 973, 977 (5th Cir. 1995); see also Piotrowski v. City of Hous., 237 F.3d 567m 581 (5th Cir. 2001).

Story contends that the COVID-19 seat rule enacted by the Board is "necessarily attributable to the [Board as a] policymaker."  Story argues that the seating rule may provide a basis for a retaliation claim.  However, the retaliation claim, as stated in a prior order, is limited to his protected speech and subsequent arrest.  The COVID-19 seating rule is therefore not applicable to his protected speech which occurred at the August meeting and his future arrest.

Lastly, as stated above, the Court does not find that any of the Officers or Trustees individually have final policymaking authority to hold the District liable for a single act.  The actions of an individual board member do not constitute

the action of the Board.  Rather, Story's pleading attempts to hold the District accountable under a theory of *respondeat superior*, which <u>Monell</u> forecloses.

The Response states that "[i]n the absence of discovery, it [ ] is not possible to reach [the] conclusion" that the Board played no part in submission of false evidence on the police affidavit.  (Dkt. # 55, p. 9, at ¶ 17.)  But Story pleads no facts that the Board played a role in preparing or submitting a purportedly false arrest warrant or affidavit.  The pleading standard requires that Story's factual allegations "must be enough to raise a right to relief above the speculative level." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 570, 555 (2007).  While reasonable inferences will be resolved in favor of the plaintiff, "the plaintiff must plead specific facts, not mere conclusory allegations."  <u>Tuchman v. DSC Commc'ns Corp.</u>, 14 F.3d 1061, 1067 (5th Cir. 1994).

For the foregoing reasons, the Court does not find the District liable for retaliation.

C.  <u>Story plausibly pled that the District violated Story's First Amendment rights at the Homecoming Football Game.</u>

Story attended the September 16, 2022, homecoming football game at Round Rock High School. (Dkt. # 49 at ¶ 129.)  Story and other interested parents distributed flyers in the parking lot next to the school football stadium.  The flyer listed the names of five candidates for the RRISD school board. (<u>Id.</u> at ¶ 130.)

Shortly after being greeted warmly by the school principal, Story was allegedly asked to stop handing out the flyers by multiple RRISD officers. (<u>Id.</u> at ¶ 132.) Story alleges the instructions came on behalf of the superintendent. (<u>Id.</u> at ¶ 212.) Story ultimately complied but protested that his first amendment rights had been violated. (<u>Id.</u> at ¶ 143.)

GKDA (Local) governs the distribution of non-school literature on District premises. GKDA (Local) requires all non-school literature intended for distribution on District premises to be submitted to the Superintendent for prior review and permits campus principals to designate the "times, locations, and means by which" such literature may be distributed on a campus. (Dkt. # 49 ¶ at 47; Dkt. # 49-1 Ex. 16.) Story does not attempt to make a facial challenge to GDKA. Rather, Story asserts that the rule was unconstitutionally applied to his speech.

The Supreme Court has acknowledged that reasonable time, place, and manner restrictions are permitted in both public and nonpublic forums provided they are content neutral, narrowly tailored, and leave open alternative channels for communication. <u>Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n</u>, 460 U.S. 37, 45 (1983); <u>Chiu v. Plano Indep. Sch. Dist.</u>, 260 F.3d 330, 345 n.9. (5th Cir. 2001).

Again, Story does not challenge this rule facially. (Dkt. # 55 at 13.) Story asserts he was denied his right to leaflet because of the views expressed in

the flyer.  It is well settled that viewpoint discrimination is a clearly established

violation of the First Amendment in any forum.  "It is axiomatic that the

government may not regulate speech based on its substantive content or the

message it conveys."  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S.

819, 828, 829 (1995) (finding that viewpoint discrimination is a form of content

discrimination, in which "the government targets not subject matter, but particular

views taken by speakers on a subject." (citing R.A.V. v. City of St. Paul, 505 U.S.

377, 391 (1992)).  "Viewpoint discrimination is thus an egregious form of content

discrimination.  The government must abstain from regulating speech when the

specific motivating ideology or the opinion or perspective of the speaker is the

rationale for the restriction."  Id.[3]

The activity in which Story and others engaged—specifically

leafletting on matters of public concern—is considered a fundamental First

Amendment right.  Schenck v. Pro–Choice Network, 519 U.S. 357, 377 (1997).

However, the District argues that Story was instructed to cease

distributing materials, not because of his viewpoint, but because he did not follow

---

[3] Both Story and Defendants engage in a lengthy debate over whether the parking
lot in question is a public or non-public forum.  The Court need not decide the
issue in the current order because viewpoint discrimination is a clearly established
violation of the First Amendment in *any forum*.  The issue is not whether GKDA
(Local) is constitutional.  Rather, the issue is whether it was applied unequally
based on the views of Story's speech.

GKDA (Local)'s prior review requirement.  Under the terms of the GKDA, individuals may distribute political literature so long as it comports with the time, place, and manner restrictions that apply evenhandedly to all individuals and all non-school literature.  (Dkt. # 49-1, Ex. 16.)

The District asserts that the Complaint fails to plausibly plead that Story was treated differently from other individuals who were allowed to continue leafletting despite not having complied with GKDA (Local).   (Dkt. # 74 at 12.)

In this case, Story did not submit his materials for prior review. However, Story has stated a plausible claim that he was silenced because of his speech based on the longstanding hostile relationship with the District.  Indeed, Story has pled plausible facts that GKDA (Local) was used as a pretext to silence his speech.  (Dkt. # 78 at 16-17.)  Story has plausibly alleged that the longstanding hostile relationship between himself and the District caused him to stop distributing the flyers.

Story alleges that GKDA (Local) was not initially applied when his conduct was tacitly approved by the school principal.  (Dkt. #  49 at ¶ 132.)   He plausibly alleges that GKDA was subsequently applied as a justification to the actions by the Homecoming Defendants. (Dkt. # 78 at 16-17.)  In fact, Story does not take issue with GKDA (Local).  Story concedes that preapproval regulations of student speech are often upheld.   As Story describes in his Response brief, the

issue is whether there was a retroactive and inconsistent application of the policy by various school officials.  (Id.)  Story alleges the initial approval of the principal plausibly demonstrates that the policy was not applied evenly.  This Court agrees that the approval creates a plausible claim of an inconsistent application of the local rule.  Story has plausibly pled that at the time of the incident, he was asked to stop distributing literature because of the instruction by Superintendent Azaiez rather than the GKDA (local) regulation.  Story alleges that Counsel for RRISD did not communicate RRISD's position on Parking Lot distribution until September 19, 2022, three days after the September 16, 2022, homecoming game.  (Dkt. #  49 at ¶ 144.)   Story argues he "had been locked in a political battle with Superintendent Azaiez at the time of the homecoming game."  (Dkt. # 78 at 16.) Taking as true and viewed in the light most favorable to the Plaintiff, the Court finds it plausible that Azaiez was motivated to censor Story and the application of GKDA (Local) was a pretextual, post hoc, rationale for the Homecoming Defendant's behavior.

Story also pleads that Defendants with plausible final policymaking authority were allegedly involved in this decision.  Story pleads that the principal initially condoned the distribution.  Under the policy, the principal is responsible for implementing "time, place, and manner restrictions." (Dkt. #  49 at ¶ 148.) Moreover, he pleads that the direction to stop distributing the flyers came from

Azaiez.  (Id. at ¶ 136.)  Under GKDA (Local), the Superintendent has final

policymaking authority under the preapproval process.  Story has pled that "all

non-school literature intended for distribution on school campuses or other District

premises under this policy shall be submitted to the Superintendent or designee for

prior review." (Id. ¶ 147.)    It is therefore Azaiez who decides whether flyers may

be distributed at the homecoming parking lot.

The Court also finds that it is plausible that after discovery and based

on a full evidentiary record, that the District was involved and directed such

removal.  Story has alleged throughout the third amended complaint close

communication between Azaiez and the District such that he asserts a plausible

claim.

Therefore, the District is plausibly liable for the events that occurred

at homecoming.

### D. Story plausibly pled that Azaiez, Amacher, Cole, Weiner violated his First Amendment rights at homecoming.

The Court finds that Story states a potential claim against Azaiez with

respect to the events that took place at homecoming.  Story alleges the personal

involvement of Azaiez since he allegedly directed the actions of his subordinates.

(Id. at ¶ 136.)  Based on Azaiez's hostile history with Story, the Court finds that

the local rule was plausibly applied unconstitutionally.

The Court also finds that Amacher, Cole, and Weiner plausibly violated Story's first amendment rights for their participation at the Homecoming Football game.  Story alleges the personal involvement of Amacher, Cole and Weiner.  He alleges that Detective Cole accompanied by Chief Weiner, "asked the group to stop passing out flyers and leave."  (Dkt. # 49 at ¶ 136.)  Story contends that Detective Cole stated that he made the request "on behalf of Superintendent Azaiez."  (Id.)  Minutes later, Dr. Amacher approached the group and made another request for them to cease distributing campaign materials.  (Id. ¶ at 139.)  A member of Story's group asked Dr. Amacher to "show the group the policy that was being violated," but Story alleges Dr. Amacher was unable to do so.  (Id.)  Amacher left after a few minutes and then Detective Cole again allegedly demanded that Story and his group stop distributing the campaign materials.  (Id. at ¶ 140.)  Story concludes that the Homecoming Defendants "acted together to chill [his] speech during [the homecoming] event" and violated his right to exercise free speech.  (Dkt. #  49 at ¶¶ 149(b), 150.)

According to Defendants, the Complaint contains no allegations of other individuals distributing different content or communicating a different viewpoint who were allowed to continue to do so despite not complying with GKDA (Local).  Moreover, Defendants argue there is no allegation that Amacher, Cole and Weiner disagreed or had any opinion of Story's views.

However, Story does not have to allege a comparator in order to bring a First Amendment claim.  It is enough to allege that Defendants (specifically Azaiez) plausibly disagreed with Story's views and sought to silence his speech.  Story has plausibly alleged that his speech was unfavorable to Azaiez.  Thereafter, Amacher, Cole, and Weiner carried out Azaiez's instructions.  Taking as true and viewed in the light most favorable to the Plaintiff, the Court finds it plausible that Azaiez was motivated to censor Story and the application of GKDA (Local) was a pretextual, post hoc, rationale for the Homecoming Defendant's behavior.  As Story has alleged personal involvement Azaiez, Amacher, Cole, and Weiner, the Court will deny their motion to dismiss.

## II.    Texas Open Meetings Act ("TOMA")

TOMA provides that "[a]n action taken by a governmental body in violation [of TOMA] is voidable."  TEX. GOV'T CODE § 551.141.  Texas Government Code Section 551.142(a) states that "[a]n interested person . . . may bring an action by mandamus or injunction to stop, prevent, or reverse a violation or threatened violation of [TOMA] by members of a government body."  Id.

Story's TOMA allegations against the Board date back to when the body initially deliberated applicants for Superintendent.[4]  According to Story, the

---

[4] The Complaint contains a litany of allegations regarding purported TOMA violations. However, Story's causes of action relate only to the hiring of Azaiez and the September 14 meeting.

Board held a closed session on May 21, 2021, to deliberate about applicants for Superintendent and name multiple finalists for the superintendent position. (Dkt. # 55 at 17.) However, Story alleges the Board decided to hire Azaiez in that meeting in violation of the state's process which requires a 21-day notice for the public to evaluate superintendent finalists. (Dkt. # 55 at 18.) TEX. GOV'T CODE § 552.126. Story alleges that Weir, as Board President, began negotiating a contract with Azaiez and no other applicant following this meeting. (Id.)

Story alleges that the Board began to engage in a "walking quorum." (Id.) A "walking quorum" violates TOMA when a quorum of a governmental body attempts to avoid TOMA by deliberately meeting in numbers, physically less than a quorum, in closed sessions to discuss public business and, then, ratifying its actions in a physical gathering of the quorum in a later public meeting." (Id. at 19.)

Lastly, Story alleges that the COVID-19 policy that was implemented on September 14 violated TOMA, which states "the location where the member of the governmental body presiding over the meeting is physically present shall be open to the public during the open portions of the meeting." TEX. GOV'T CODE. § 551.127(e).

A. Story's TOMA Claims Are Moot

Story alleges that a TOMA violation led to the hiring of Azaiez as superintendent. Even if the Court accepts that a TOMA violation occurred, the

allegation is moot.  There is no justiciable controversy because the Board voted a
second time to adopt Azaiez's contract at the June 19, 2021 meeting.  (Dkt. 49 ¶
27; App. 014.  See City of Combine v. Robinson, No. 05-10-01384-CV, 2011 WL
3570510, at *3 (Tex. App.—Dallas Aug. 16, 2011, no pet.) ("The vote at the
August 9, 2010 meeting ratified actions taken at the July 24, 2010 meeting and,
thereby, negated any justiciable controversy as to the validity of the July 24, 2010
vote").  Since June of 2021, the Board has issued two amendments to Azaiez's
contract, extending his term and compensation.  (Dkt. # 52 at 11.)  Therefore, there
is no live controversy regarding the hiring of Azaiez.

Story's claim that a TOMA violation at the September 14 meeting led
to an improper tax rate is similarly moot.  Since then, the Board has voted twice to
set tax rates: for the 2022–2023 and the 2023–2024 school years.  (Id. at 10-11)
And all money has been spent for the 2021–2022 school year. (Id.)  Any claim
regarding the tax rate vote at the September 14 meeting is therefore moot.

Story claims that the subsequent tax votes are irrelevant because he is
challenging the Board's procedures such as the "walking quorum" rather than the
outcome of those allegedly procedurally deficient meetings.  (Dkt. # 56 at 14-15)

Story misunderstands the purpose and relief accorded under TOMA.
To state a valid TOMA claim, Story must seek to void "[a]n action taken by a
governmental body in violation" of TOMA or bring a mandamus or injunction "to

stop, prevent, or reverse a violation or threatened violation of this chapter by members of a governmental body."  TEX. GOV'T CODE § 551.141; § 551.142. Story can only maintain a claim if he seeks to stop, prevent, or reverse a threatened violation.  Story no longer wishes to do so and cannot because subsequent acts have mooted the claim.

Lastly, Story seeks to enjoin the future use of the 18-seat rule as a violation of TOMA.  Again, the Court finds that this is moot.

Story argues that a court may have jurisdiction over a moot claim if the "capable of repetition, yet evading review" mootness exception applies. Kingdomware Techs., Inc. v. United States, 136 S. Ct. 1969, 1976 (2016) (quoting Spencer v. Kemna, 523 U.S. 1, 17 (1998)).  "This exception overcomes the general rule against deciding stale claims only if: (1) 'the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration,' and (2) 'there [is] a reasonable expectation that the [plaintiffs] [will] be subject to the same action again.'" Kingdomware, 136 S. Ct. at 1976.

"[M]erely showing that the government will 'have an opportunity to act in the same allegedly unlawful manner in the future' is not enough to satisfy the second prong of the exception without a reasonable expectation that the government will act in that manner."  Libertarian Party v. Dardenne, 595 F.3d 215, 217 (5th Cir. 2010).  A party can satisfy this prong by providing evidence showing

that the opposing party's "actions reflect a policy or a consistent pattern of behavior that [it] has determined to continue, or that [the] action was prescribed by statute." Dardenne, 595 F.3d at 218 (footnote omitted).

Applying these rules, the Fifth Circuit has held that the mere possibility of COVID-19 worsening or COVID-19 policies being re-imposed is insufficient to satisfy the "reasonable expectation" requirement of the second prong. See Spell v. Edwards, 962 F.3d 175, 180 (5th Cir. 2020). In Spell, a pastor challenged Louisiana's stay-at-home orders and requested injunctive relief to stop enforcement of those orders. Id. at 178. The Fifth Circuit, considering whether the pastor's claims were moot, observed that "[t]he trend in Louisiana has been to reopen the state, not to close it down" and that "no one knows what the future of COVID-19 holds." Id. As a result, the Fifth Circuit held that "it [was] speculative, at best, that the Governor might reimpose the ten-person restriction or a similar one." Id.; Long v. Jayton-Girard Indep. Sch. Dist., No. 5:21-CV-111-H, 2021 WL 7906835, at *4 (N.D. Tex. Sept. 3, 2021).

Story does not cite a single RRISD Board Meeting since September 14, 2021 that has used an "18-seat rule." He pleads no facts that the Board will institute one in the future.

Moreover, Texas courts have held that TOMA claims are not subject to the capable-of-repetition-yet-evading-review exception. Cornyn v. City of

Garland, 994 S.W.2d 258 (Tex. App.—Austin 1999, no pet.). That is because TOMA provides a "right of immediate judicial review by an application for a writ of mandamus or injunction to stop, prevent, or reverse a violation or threaten violations," and "if a violation evades review, the reason does not lie in the inherent nature of the wrongful act, it lies rather in the failure of the 'interested person' to invoke the immediate remedy expressly provided by the legislature." Id. at 267 (quoting TEX. GOV'T CODE § 551.142(a)). In this case, Story did not immediately seek to challenge the Board's actions at the September 14 meeting. Story waited nine months until May 16, 2022 to file this lawsuit. (Dkt. # 1.)

In sum, Story seeks a decision simply addressing whether the Trustee Defendants violated TOMA in the past. Hedtke, 2018 WL 1660078, at *2, 3. Because such a decision would have no practical effect on the parties, there is no actual controversy, and the Court lacks jurisdiction over his claims.

III.     Claims Against Individual Trustees

Story asserts a number of claims directed towards specific trustees. The Court will evaluate each in turn.

A. TOMA Claims against Individual Trustees

As detailed above, Story's TOMA claims are moot. Nevertheless, Story's request for equitable relief under TOMA would also be improper as to the individual trustees not currently on the Board. Story seeks "an injunction requiring

that the RRISD Trustees cease initiating 'walking' quorums and cease creating policies in violation of TOMA and the U.S. Constitution."  (Dkt. # 56 at ¶ 52.) However, Vessa and Xiao are not currently on the Board and would not be proper parties.  The Court could not enjoin them as private citizens from engaging in future actions taken by sitting trustees.  Therefore, the Court dismisses the TOMA claims against the individual trustees.

      B. <u>Fourth Amendment Claim Against Weir</u>

      Story re-asserts that Weir should be liable for excessive force, unreasonable seizure, and false arrest in violation of the Fourth Amendment.

      The Court has already dismissed Story's unreasonable seizure claim against all individual defendants other than Pope and Pontillo due to their lack of personal involvement.  (Dkt. # 43 at 31.)  The Court previously dismissed any excessive force claim against Weir because "a plaintiff bringing a section 1983 action must specify the personal involvement of each defendant."  (Dkt. # 43 at 27) (quoting <u>Murphy v. Kellar</u>, 950 F.2d 290, 292 (5th Cir. 1992)).  The Court similarly dismissed any false arrest claim against the RRISD Defendants, other than Griffith and Pope, because they "were not alleged to have been involved in the warrant application process for Story's arrest."  (<u>Id.</u> at 36.)

      The Complaint does not plead any new facts to show that Weir was personally involved in the use of force or false arrest.   Story alleges that he was

prevented from entering the board meeting room where Weir was seating.  (Dkt. # 49 at ¶¶ 66, 89.)  Weir could not have been personally involved in the alleged excessive force when the two were not in the same room.

Likewise, Story alleges no facts that Weir was involved in his arrest. Story's warrant affidavit was prepared by Officer Griffith with the cooperation of Officer Pope. (Dkt. # 49 at ¶ 95.)  Story has failed to allege that Weir said or did anything that could plausibly have contributed to his alleged false arrest.

Story alleges that Weir authorized and instructed RRISD police to remove Story from the August 16 and September 14 meetings.  (See Dkt. # 49 at ¶¶ 224, 228.)  However, Story has not argued that Weir should be liable under supervisor liability.  Story only alleges that Weir is directly liable for Fourth Amendment violations. Compare Dkt. # 49 at ¶ 224 (claims against Weir) with Dkt. # 49 at ¶¶ 225–27 (supervisory claims against Yarbrough and Williby). Because Story has failed to allege any personal involvement in any Fourth Amendment violation, the Court dismisses these claims against Weir.[5]

C. Fourteenth Amendment Claim Against Feller

---

[5] The Court notes that Story has confused his First Amendment and Fourth Amendment claims in his pleadings.  Story's First Amendment claim is that he was "ejected from the meeting at the direction of President Weir."  (Dkt. 56 at ¶ 56) (citing Dkt. # 43, p. 16). This does not necessarily support Story's Fourth Amendment claim against Weir pertaining to his false arrest and the use of excessive force.

Story does not assert an equal protection claim based on any suspect classification.  Rather, he invokes the "'class of one' doctrine." (Dkt. # 49 at ¶ 221); Engquist v. Oregon Dept. of Agr., 533 U.S. 591, 601 (2008).  A class-of-one plaintiff must plead he was "intentionally treated differently from others similarly situated" without any "rational basis."  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000).  Story carries "the heavy burden of negating any reasonably conceivable set of facts that could provide a rational basis for [his] differential treatment." Lindquist v. City of Pasadena, 525 F.3d 383, 387 (5th Cir. 2008).

The Court already dismissed any equal protection claim against Feller because Story only pled the personal involvement of Weir, Pope, and Pontillo regarding Story's ejection from the meeting. (Dkt. # 43 at 37.)

Story adds an additional allegation contending that Feller "treat[ed] him differently from other speakers" because Feller participated in a procedural vote after recusing herself from Story's grievance hearing.  (Dkt. # 49 at ¶ 215.) Specifically, Story contends that Feller never participated in such a manner before or since during other grievances. (Id.)

Story alleges that Feller knew participating in the procedural vote was unlawful because the Texas Education Agency ("TEA") had previously sent a Monitor to the District after board members were accused of participating in hearings after purported recusals.  (Dkt. # 49 at ¶ 122.)  In addition, Jeff Cotrill,

Deputy Commissioner of the TEA for Governance and Accountability, also visited the District and warned the Board about their past actions during the 2021-2022 school year.  (Id.)  Story alleges that Feller endorsed continuing with the grievance hearing after the Board's legal counsel distributed inaccurate information concerning Story's behavior.  (Id. at ¶ 126.)

Based on these facts, the Court finds that Story plausibly alleged a Fourteenth Amendment violation committed by Feller.  Story plausibly alleged he was singled out by Feller.  (Dkt. # 49 at ¶ 215.)   Story supports his Fourteenth Amendment claim by asserting that Feller moved to continue the grievance hearing after false statements were presented to the Board.  Story pleads that Trustees Bone and Weston argued for equal treatment, while Feller took an opposing stance. (Id. at ¶ 126.)   Based on the facts alleged regarding the grievance hearings, the Court finds a plausible claim against Feller and denies her motion to dismiss.

IV.   Claims against Yarbrough and Williby

Story's claims against Assistant Police Chief James Williby and former Police Chief Jeffrey Yarbrough relate to: (1) his physical removal from a Board meeting on August 16, 2021; (2) his exclusion from a Board meeting on September 14, 2021; and (3) his alleged false arrest based on a warrant application with false information.

Story seeks to hold Williby and Yarbrough responsible as supervisors. The Fifth Circuit has held that under § 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). A supervisor is liable only if he (1) affirmatively participates in the acts that cause the constitutional deprivation, or (2) implements unconstitutional policies that causally result in the constitutional injury. Gates v. Tex. Dep't of Prot. & Reg. Servs., 537 F.3d 404, 435 (5th Cir. 2008)).

Without personal participation by the official, the Fifth Circuit allows supervisory liability under § 1983 in three circumstances.

The first is where the official implemented an unconstitutional policy that causally resulted in the constitutional injury. Peña v. City of Rio Grande City, 879 F.3d 613, 620 (5th Cir. 2018) (citing Gates v. Texas Department of Protective and Regulatory Services, 537 F.3d 404, 435 (5th Cir. 2008)). Official municipal policy includes "the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011). Liability attaches where "supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." Thompkins v. Belt, 828 F 2d 298, 304 (5th Cir. 1987)

(quotation marks and citations omitted).  This standard requires more than

conclusory assertions.  As framed by the Fifth Circuit, a complaint's "description of

a policy or custom and its relationship to the underlying constitutional violation ...

cannot be conclusory; it must contain specific facts." Peña, 879 F.3d at 621

(quoting Spiller v. City of Texas City, Police Department, 130 F.3d 162, 167 (5th

Cir. 1997)); see also Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002) (necessary

to plead specific conduct and facts giving rise to constitutional violation).

       The second and third are where the supervisor either failed to

supervise or to train the subordinate official, and a causal link exists between that

failure and the violation of the plaintiff's rights.  Goodman v. Harris County, 571

F.3d 388, 395 (5th Cir. 2009) (citations omitted).  The Fifth Circuit directs that the

focus must be on the adequacy of the training or supervision in relation to the tasks

the particular officer must perform.  Roberts v. City of Shreveport, 397 F.3d 287,

293 (5th Cir. 2005) (citations omitted).  For instance, to defeat a motion to dismiss

regarding training, the "plaintiff must allege with specificity how a particular

training program is defective." Id.  As the Court previously noted, proof of a single

instance, rather than a pattern of similar violations, normally will not sustain a

plaintiff's claim that such a lack of training or supervision caused a violation of her

constitutional rights.  Cozzo v. Tangipahoa Par. Council--President Gov't, 279 F.3d

273, 286–87 (5th Cir. 2002).

A. <u>First Amendment Supervisor Liability</u>

    1. <u>First Amendment Claims Against Williby</u>

Story alleges that Williby violated his First Amendment free speech and petition rights "[a]s a supervising authority," of Chavez, Pontillo, and Pope." (Dkt. # 49 at ¶ 199.)

Story alleges Williby instructed Officer Chavez to reference a penal code statute in order to provide a legal basis for their refusal to let Story into the September meeting.  However, Chavez allegedly only referenced part of the code. (<u>Id.</u> at ¶ 68.)

The Court finds that Williby cannot be held liable under supervisor liability because the Complaint fails to show any affirmative participation by Williby for the error made by Chavez.  Story fails to allege that Williby had reason to believe that a substantial risk of serious harm existed in directing Chavez to read the penal code.  <u>Est. of Davis ex rel. McCully v. City of N. Richland Hills</u>, 406 F.3d 375, 381–86 (5th Cir. 2005).

Story alleges that Williby was the enforcer of the COVID seating rule, "as instructed by Weir."  (Dkt. # 49 at  ¶ 51.)  But paragraph 51 of the Complaint alleges only that Weir instructed Williby to "remove those not in the chairs provided by the administrators." (<u>Id.</u>)  Story does not allege that he was in a chair or removed by Williby.  To the contrary, Story alleges that he was prevented from

entering the September 14 meeting by Pope and Pontillo. Indeed, the Complaint pleads that Officers Pope and Pontillo enforced the COVID seating rule to everyone in the "crowd" outside the meeting. (Dkt. # 49 at ¶ 66.) Therefore, there was no personal participation that Williby removed Story.

Story pleads that Pope and Pontillo allegedly referred to Williby "as an authority," who was watching through the door window. (Id. ¶ at 73.) However, the mere fact that Williby is a supervisor is not enough to hold him liable. A plaintiff cannot establish § 1983 liability against a government official simply by virtue of the official's role as a supervisor. Monell, 436 U.S. at 691. In this case, even if Williby had the authority to implement the policy, there is nothing pled that he affirmatively participated in applying it unconstitutionally, which is required in Story's as applied challenge.

Ultimately, Story has failed to plead it was obvious that the likely consequences of Pope and Pontillo's enforcement of the seating policy could plausibly lead to a deprivation of Story's First Amendment Right. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 409 (1997) ("in order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must also plead that the supervisor act[ed], or fail[ed] to act, with deliberate indifference to violations of others' constitutional rights committed by

their subordinates.)  Therefore, the Court dismisses the First Amendment Claim against Williby.

### 2.  First Amendment Retaliation Claim Against Williby

Story alleges Williby is liable as a supervisor for the retaliation that occurred in his arrest.  Story pleads the arrest was motivated by an effort to prevent him from exercising his right to free speech. (Dkt. # 49 at ¶ 207.)

The Court previously dismissed Story's retaliation claim as to Williby finding that Story had not alleged his "personal involvement" in Story's removal from the August 16 meeting or arrest.  This time, Story attempts to re-assert the claim because Williby was a supervisor of Pope and Pontillo.

In the latest Amended Complaint, there are no facts that plausibly suggest Williby directly instructed Pope and Pontillo to remove him from the August 16 meeting or to use purportedly excessive force in doing so.  Story alleges only that Weir interrupted him and Pope and Pontillo thereafter removed him from the meeting.  (Dkt. # 49 at ¶ 34.)

Moreover, Story has not alleged Williby's personal involvement in his arrest or involvement in the warrant application process. Story only pleads that Williby would have reviewed the false affidavit.  (Dkt. # 49 at ¶ 207.)   Moreover, Story has also failed to plead facts that as a supervisor, Williby would have been on notice that acts by his subordinates were obvious and likely to result in a

constitutional violation.  Est. of Davis ex rel., 406 F.3d at 381–86 (5th Cir. 2005).

Therefore, the Court dismisses the retaliation claim against Williby.

3. First Amendment Claims Against Chief Yarbrough at the August Meeting

Prior to speaking at the August meeting, Story alleges he was "unconstitutionally threatened by Yarbrough." (Dkt. # 38 at ¶ 31.)  Story argues that Yarbrough should therefore be held accountable for his subsequent removal which violated his First Amendment right to free speech. [6]

However, this fact does not support the proposition that Yarbrough implemented or participated in his removal.  Indeed, Story was allowed and did speak at the August meeting.  Thereafter, he was removed by Pope and Pontillo at the direction of President Weir. (Dkt. # 38 at ¶ 34.)  While there is bystander liability for an "officer who is present at the scene and does not take reasonable

---

[6] Although the Complaint names Yarbrough as a defendant who allegedly violated his First Amendment right to petition and free speech with respect to the use of the BED (Local) policy at the August 16 meeting, the Complaint does not actually plead any specific facts as to Yarbrough related to that claim.  (Dkt. # 51 at 9 n.5) (citing Dkt. # 49 at  ¶¶ 194–95).  However, even if the Court considered facts from the August meeting, Story would still fail to plead a supervisory claim against Yarbrough.  Story pleads that Yarbrough allegedly demanded that Story leave the meeting room so that they could speak in private.  (Id. at ¶ 31.)  After Story refused, Yarbrough allegedly "unconstitutionally threatened Story."  (Id.). However, Story was still allowed to speak at the August meeting.  Story fails to plead any act by Yarbrough pertaining to his removal after he was allowed to speak and went off topic in violation of the special rules.

measures to protect a suspect," Story has not argued for the bystander theory.  Hale

v. Townley, 45 F.3d 914, 919 (5th Cir. 1995).  Therefore, Story has not pled the

requisite involvement necessary to state supervisor liability from the August

meeting.

### 4.  First Amendment Claims Against Chief Yarbrough at the September Meeting.

The Court finds that Story has plausibly pled that Yarbrough violated

his First Amendment right to free speech as a supervisor at the September meeting.

To hold a police chief liable under section 1983 for the

unconstitutional actions of one of his officers, a plaintiff is required to establish a

causal connection between the police chief's actions and the officer's

unconstitutional activity.  Commonwealth of Pennsylvania v. Porter, 659 F.2d 306

at 321 (3d Cir. 1981) (en banc).

In a previous order, the Court recognized that Story stated a plausible

claim that the COVID seating rule was applied unconstitutionally. (Dkt. # 43)

Story clearly alleges that Yarbrough had a role in implementing the COVID seating

rule at the September 14 meeting.  (Dkt. # 49 at ¶¶ 64, 197.)  Story alleges that he

was unable to enter the meeting because of Yarbrough's instruction.

A direct instruction can be the basis for supervisor liability.  See Pena

v. City of Rio Grande City, 879 F.3d 613, 620–21 (5th Cir. 2018) ("[Plaintiff]

alleges that Lt. Solis . . .  gave the order to tase Maria Julissa Peña . . .  three times.

. . . A superior officer issuing a direct order to a subordinate to use excessive force demonstrates both the necessary action and causality for a supervisor-liability claim.")

Yarbrough argues he must have notice of a pattern of "similar violations" to demonstrate deliberate indifference. Est. of Davis ex rel., 406 F.3d at 382–383 (5th Cir. 2005) (emphasis in original). A "pattern is shown through 'sufficiently numerous prior incidents' rather than '[i]solated incidents.'" McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir. 1989). Yarbrough argues he was not deliberately indifferent to Story's first amendment rights because there is no history of his subordinates or himself violating the right to free speech. Moreover, Yarbrough argues the August meeting cannot support a finding that he was on notice that his subordinates might commit constitutional harms at the September meeting.

The Court finds sufficient similarities between the actions that occurred during the August meeting and the September meeting to support a plausible indifference towards Story's First Amendment rights. In both meetings, Story was precluded from speaking by Pope and Pontillo. Moreover, Yarbrough was aware of Story's efforts to voice his opposition towards the Board as detailed in his August 19 conversation with Story. (Dkt. # 49 at ¶ 39.) It is plausible that based on Yarbrough's hostile history with Story, specifically that Yarbrough

allegedly threatened to silence Story at the August meeting, that his orders were meant to keep Story from speaking at the September meeting. Ultimately, this can be seen as deliberate indifference as "government actors violate a clearly established right if they discriminate on the basis of the views espoused by the speaker." Chiu v. Plano Indep. Sch. Dist., 339 F.3d 273, 280 (5th Cir. 2003) (citing Hobbs v. Hawkins, 968 F.2d 471, 481 (5th Cir. 1992)).

B. Fourth Amendment Supervisor Liability Claims Against Yarbrough and Williby

1. Excessive Force Claim Against Williby

This Court previously dismissed Story's excessive force claim against Williby finding no personal use of excessive force or that he ordered his officers to use force. (Dkt. # 43 at 28.)

This time, Story seeks to hold Williby accountable under supervisory liability because Williby "watch[ed]" Pope and Pontillo's alleged use of force. (Dkt. # 49 at ¶¶ 225–26.)

Story's supervisory claim regarding any excessive force by Pope or Pontillo fails because he does not allege any facts that Williby knew of any propensity by Pope or Pontillo for the improper use of force. Roberts, 387 F.3d at 292. There are no facts to plausibly allege prior incidents where Pope or Pontillo used excessive force to place Williby on notice of the need for more or different

supervision. Parker v. Blackwell, 23 F.4th 517, 525 (5th Cir. 2022). Therefore, the Court dismisses the excessive force claim against Williby.

### 2. False Arrest Claim Against Yarbrough and Williby

Story claims that Yarbrough and Williby should be held liable for their supervision of the "affidavit creation and submission process which directly resulted in Story's arrest." (Dkt. # 49 at ¶ 227.)

The Court previously dismissed this claim because Yarbrough and Williby were not alleged to have been involved in the warrant application process and Story had not identified previous similar incidents that Yarbrough and Williby were on notice that additional or different supervision was needed. Parker v. Blackwell, 23 F.4th 517, 525 (5th Cir. 2022).

Story now asserts that "Yarbrough and Williby *would have reviewed* the [allegedly] false affidavit for Story's arrest before submitting it," because he considers his arrest to have been "historically unprecedented" and preceded by large amounts of national and local press coverage. (Dkt. # 49 at ¶ 207.) The Court finds that this additional allegation is conclusory and speculative. See Oliver v. Scott, 276 F.3d 736, 741 (5th Cir. 2002) (to state a constitutional violation against a government official, a plaintiff must allege "specific conduct," which requires more than conclusory assertions). There are no allegations that Yarbrough and Williby presented or signed the warrant application or prepared information for

use in the warrant application.  Terwilliger v. Renya, 4 F.4th 270, 283 (5th Cir. 2021).

Story contends Yarbrough "participated in actively supervising the creation and official submission of a false affidavit to arrest Story."  (Dkt. # 49 at ¶ 217.)  Moreover, Story asserts that "Yarbrough carefully worked to actively approve of the actions behind closed doors while working hard to keep his name off public documents."  (Dkt. # 49 at ¶ 217.)  This conspiratorial speculation does not satisfy the Twombly/Iqbal pleading standard.  Indeed, this is the exact type of pleading that the Court rejected in Ibqal in which Defendant Mueller was alleged to be "instrumental" in its adoption and execution of the policy and that the FBI worked on implementing the policy "under the direction" of Mueller.  Iqbal, 556 U.S. at 681.  This was found to be conclusory and not entitled to be assumed as true.  In this case, Story provides nothing but speculation as to what may have occurred behind closed doors.

Story believes discovery is necessary to know the real truth behind the decisions that went into the warrant and whether Yarbrough and Williby were involved.   However, the pleading standard requires that Story's factual allegations "must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 570, 555 (2007).  While reasonable inferences will be resolved in favor of the plaintiff, "the plaintiff must plead specific facts, not mere

conclusory allegations." <u>Tuchman v. DSC Commc'ns Corp.</u>, 14 F.3d 1061, 1067

(5th Cir. 1994).  Story's allegations regarding Williby and Yarbrough's alleged

involvement in the warrant affidavit process are speculation.  He claims they

"would have" reviewed the affidavit before it was submitted to the magistrate

judge.  He does not plead they actually reviewed his warrant affidavit or had any

supervision of this process.   Therefore, the Court dismisses the false arrest claim

against Yarbrough and Williby.

      C.   <u>Fourteenth Amendment Claims Against Yarbrough and Williby</u>

      Story invokes the "'class of one' doctrine," which focuses on

discrimination against a specific individual. (Dkt. # 49 at ¶ 221); <u>Engquist v.</u>

<u>Oregon Dept. of Agr.</u>, 533 U.S. 591, 601 (2008).   As a class-of-one plaintiff, Story

must plead he was "intentionally treated differently from others similarly situated."

<u>Village of Willowbrook v. Olech</u>, 528 U.S. 562, 564 (2000).  Story must also

plausibly plead that there is no "rational basis" for the state action.  <u>Id.</u>

      Story asserts that he meets the class of one requirement because

Yarbrough and Williby acted out of spite to punish Story for his views.  (Dkt # 49

at ¶ 28-39.)  Story alleges Yarbrough treated him "unequally by harassing him in

an attempt to chill his voice at the August [16 Board] meeting, while not asking

others to behave or refrain from speaking."  (<u>Id.</u> at ¶ 216.)

Story alleges that Williby treated him "unequally" by refusing to investigate Story's complaint to the District's Police Department.  (Id. ¶¶ 38–42, 218.)

Story's allegations fail to state an equal protection claim against Yarbrough because they do not identify how Yarbrough treated similarly situated individuals differently.  Story remained at the August 16 meeting and was only removed after he began speaking during the public comment period. (Dkt. # 49 at ¶ 34.)  As stated above, the Court does not find that Yarbrough participated in Story's August 16 removal.

The same is true for the equal protection claim via the warrant affidavit process.  Story has not alleged well-pleaded facts that Williby or Yarbrough participated in the warrant affidavit process.  Story only alleges in conclusory fashion that Yarbrough "participated in actively supervising the creation and official submission of a false affidavit to arrest Story."  (Id. at ¶ 217.) Story asserts that "Yarbrough carefully worked to actively approve of the actions behind closed doors while working hard to keep his name off public documents." (Id.)  As stated above, this speculation does not satisfy the Twombly/Iqbal pleading standard.

Story's equal protection claim against Williby likewise lacks merit. Story has not plausibly alleged that his grievance to the RRISD's Police

Department was treated differently from any other complaint.  Rather, Story

alleges that Williby informed him that RRISD's Police Department could not

address the complaint because it involved Yarbrough, the Board of Trustees, and

the Superintendent.  (Dkt. # 49 at ¶ 42.)  Williby told Story that the Police

Department could not investigate their bosses.  The Complaint contains no well-

pleaded facts that Williby responded differently, or treated Story's grievance

differently, from other complaints against high-ranking school officials.

Therefore, the Court dismisses the supervisory claims under the

Fourteenth Amendment.

V.     Qualified Immunity

As stated in the Court's previous Order on Defendants' Motion to

Dismiss, the qualified immunity issue will be considered on a full evidentiary

record either at the summary judgment stage or at trial.  Williams v. Bolin, No. CV

H-23-302, 2024 WL 420900, at *2 (S.D. Tex. Feb. 5, 2024) ("qualified immunity

could not be accurately determined without the fuller record available at summary

judgment"); Alvarado v. Texas Health & Hum. Servs. Comm'n, No. 5:19-CV-0106-

JKP, 2020 WL 4677304, at *5 (W.D. Tex. Aug. 12, 2020).

CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and

**DENIES IN PART** Defendants' Motion to Dismiss. The Court **DENIES** the

District's Motion to Dismiss Story's free speech claim related to the homecoming football game.  The remaining <u>Monell</u> claims are dismissed.  The Court **DENIES** Azaiez's Motion to Dismiss Story's First Amendment Claim related to the homecoming football game.  The Court **GRANTS** the dismissal of all TOMA Claims.  The Court **GRANTS** Weir's Motion to Dismiss Story's Fourth Amendment Claim.  The Court **DENIES** Feller's Motion to Dismiss Story's Fourteenth Amendment Claim. The Court **GRANTS** Williby's Motion to Dismiss Story's First Amendment and Retaliation Claim.  The Court **GRANTS IN PART** and **DENIES IN PART** Yarbrough's Motion to Dismiss Story's First Amendment Claim.  The Court **GRANTS** Yarbrough's Motion to Dismiss Story's First Amendment Claim from the August meeting.  The Court **DENIES** Yarbrough's Motion to Dismiss Story's First Amendment Claim from the September meeting. The Court **GRANTS** Williby and Yarbrough's Motion to Dismiss Story's Fourth Amendment and Fourteenth Amendment Claims.

The dismissed claims are with prejudice.  Story has had ample opportunities to plead his best case.  To date, Story has amended his complaint three times.  Dismissal with prejudice is appropriate because Story has had multiple chances to plead his best case and it is apparent he is unable to plead his claim in a manner which will avoid dismissal.  <u>Schiller v. Physicians Res. Grp. Inc.</u>, 342 F.3d 563, 567 (5th Cir. 2003).

**IT IS SO ORDERED**

**DATED**: Austin, Texas July 19, 2024.


_____
David Alan Ezra
Senior United States District Judge