IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS – AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| DETECTIVE LAUREN GRIFFITH, | § | |
| OFFICER MILTON POPE, and OFFICER | § | CIVIL ACTION |
| FRANK PONTILLO, | § | NO. 1:22-CV-00448-DAE |
| *Defendants*. | § | |

---

**DEFENDANTS DR. HAFEDH AZAIEZ, JEFFREY YARBROUGH, AND
LAUREN GRIFFITH'S MOTION FOR SUMMARY JUDGMENT**

---

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## SUMMARY OF THE ARGUMENT

Jeremy Story asserts First Amendment retaliatory arrest claims against RRISD Superintendent Dr. Hafedh Azaiez, former RRISD Chief of Police Jeffrey Yarbrough, and RRISD Detective Sergeant Lauren Griffith, and a Fourth Amendment false arrest claim against Griffith related to his arrest based on his conduct at the August 16, 2021 meeting of RRISD's Board of Trustees (the "August 16th Meeting"). The Court should grant summary judgment on Story's First Amendment retaliation claim because the speech that forms the basis of the claim is not protected speech. And Story has no evidence—just his speculation or subjective belief—that his speech played any role in his arrest. The evidence, instead, shows that it was Story's disruptive conduct at the August 16th Meeting that was the reason for his arrest.

Story's Fourth Amendment false arrest claim against Griffith fails because Griffith did not make a false statement knowingly and intentionally, or with reckless disregard for the truth in the Warrant Affidavit she prepared. Rather, Story objects to specific words Griffith chose to use or her characterization of events. Moreover, the disagreements that Story raises to the Warrant Affidavit were not necessary to the Magistrate finding probable cause for Story's arrest.

Even if Story could otherwise maintain any claim against them, Azaiez, Yarbrough, and Griffith are entitled to summary judgment because they did not act in an objectively unreasonable manner to violate Story's clearly established rights. Therefore, they are entitled to qualified immunity.[1]

## STATEMENT OF FACTS

In Spring 2021, RRISD's Board engaged in a search for a new superintendent. App. 188–91. In June 2021, the Board hired Dr. Hafedh Azaiez to serve as the District's Superintendent effective July 5, 2021. App. 189–90.

---

[1]    The RRISD Defendants are submitting an Appendix in support of their Motions for Summary Judgment, which is incorporated by reference. The Appendix pages are cited herein as "App."

In July 2021, there were allegations made against Dr. Azaiez about his personal life and that he had threatened and assaulted a woman he knew, which Dr. Azaiez denies. App. 192, 168. Dr. Azaiez advised Weir of the allegations, and former Trustee Dr. Mary Bone provided information to the Board regarding these allegations. App. 192. The Board scheduled a July 23, 2021 Called Board Meeting to consult with the Board's counsel regarding Dr. Azaiez's contract and the allegations against him, but the meeting had to be re-scheduled to August 23, 2021 so that all Trustees could be present and attend in person to discuss these matters. App. 192, 212–20. On July 29, 2021, an ex parte temporary protective order was entered against Dr. Azaiez. Dkt. 1-1, Ex. 3.

Between July 23, 2021 and August 12, 2021, Story emailed the Trustees to report the allegations against Dr. Azaiez, report that there was a protective order, and request the opportunity to provide testimony to the Board. App. 192–94, App. 221–25. The Board was already aware of this information and had started looking into the allegations and had scheduled a Board meeting to consult with Board counsel about them. App. 192–95, App. 212–20.

In late July and early August 2021, COVID-19 cases were rising, and there was heightened concern regarding the new Delta variant. App. 167–68, 195–96, App. 268–67. Health officials were advocating mask requirements, and schools districts, like RRISD, were making decisions regarding whether to institute mask mandates. App. 167–68, 195–96, 268–67. To address concerns related to the new Delta variant, at 2:00 p.m. on August 12, 2021, the District posted notice that the Board would have a special meeting on August 16, 2021, and discuss a potential mask mandate. App. 196–97, 226–28. There were only two items on the Agenda for the August 16th Meeting: (1) D.1—"Adoption of Resolution for Employee COVID-19 Positive Extended Leave During COVID-19 Pandemic"; and (2)  D.2–"Fall 2021 COVID-19 Health and Safety Protocols." App. 226–28.

On August 13, 2021, the District posted the agenda for the Board's August 19, 2021 Regular Board Meeting (the "August 19th Meeting"). App. 205, 280–90. The Agenda for the August 19th

Meeting specifically noted that members of the public would be afforded "an opportunity to speak on items listed *and not listed* on the Board agenda." App. 281.

**The August 16, 2021 Board Meeting**

The August 16th Meeting was not the regular, monthly Board Meeting; it was a specially-called Board meeting. App. 198. Under Board policy BED (Local), public comment was limited to the two items on the agenda for the August 16th Meeting. *Id.*; *see also* App. 188, 208–11.

Story signed up to speak at the August 16th Meeting. In the form he submitted to speak during public comment, Story wrote that he would be speaking on topic "2" related to COVID-19 health and safety protocols, "or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 102, 199. Story was the only speaker who wrote on the form that he either intended to speak about an item that was not listed on the agenda or that he did not believe he had to limit his public comment to an item on the agenda. App. 102, 199.

Because of the recent surge in COVID cases caused by the Delta variant, the District limited seating in the Board meeting room and arranged the chairs to enforce social distancing. App. 170–71. It set up an overflow room for individuals who came to the meeting but did not obtain a seat in the main room. *Id.* Before and as the August 16th Meeting began, Story did not have a chair in the meeting room and was standing at the back of the room. App. 5. Pope and, then, Pontillo both explained the social distancing protocols to Story. App. 5–6, 111–12; *see also* App. 93 at 1:14–5:53; App. 377–78. Story refused to leave the meeting room and asserted that the social distancing requirements were unlawful. *Id.* In fact, at one point he stated that he wanted a Trustee to tell him to leave. App. 111. During this interaction, after the meeting began, Story shouted out across the room when a Trustee asked if people were not being allowed in the meeting. App. 111–12. To deescalate the situation and ensure there was no further disruption to the August 16th Meeting, Pope and Pontillo permitted Story to remain in the meeting room, where he ultimately was offered a chair by another attendee. App. 112.

When Weir opened the meeting, she noted that approximately 180 people were signed up to speak during public comment, which, at two minutes per person, would take six hours. App. 199, 279 at 1:12-1:22.[2] Before beginning with public comment from RRISD students, Weir reminded attendees and listeners that the Board allowed for public comment "on items on the agenda" and reminded them that concerns regarding specific employees or former employees should not be addressed in the comments but rather handled through the applicable grievance process. App. 279 at 1:54–2:12. Then, thirteen students spoke to the Board regarding the posted agenda items (*Id.* at 5:07–33:01), and the Board heard from the Travis County Health Authority regarding the recent surge in COVID-19 cases driven by the Delta variant and methods to slow the spread of the disease, such as mask mandates. *Id.* at 33:04–1:05:04, *see also* App. 236–58. The Board began public comment for non-students, a little after 6:30 p.m. App. 279 at 1:05:40. Generally, during the first hour of public comment, the speakers addressed only agenda items. *Id.* at 1:05:40–2:07:25. Several community members raised the allegations against the Superintendent, and Weir repeatedly advised that they were not allowed to speak about items not on the agenda. *Id.* at 1:35:00–135:50; 2:09:08–2:09:13.

Then, Jennifer White, after voicing her opposition to a mask mandate, veered off the topic of COVID-19 safety protocols and onto the topic of the allegations against Azaiez, attempting to group the two topics together into a broader one on "student safety." *Id.* at 2:26:19–2:26:41. Trustee Landrum immediately interrupted her, saying "I'm sorry, you're not allowed to talk about items not on the agenda." *Id.* When White continued speaking, Weir asked for White to be escorted out. But by then, White had stopped speaking and left. *Id.* Story can be heard off-camera, yelling "it's germane" more than once and "it's on the agenda." *Id.* at 2:26:39–2:27:07; *see also* App. 145, 161. Weir responded

---

[2]    This was in addition to the invited testimony from local health officials regarding the health risks posed by the Delta surge, the administration's presentation regarding COVID-19 health and safety regulations, and the Board's deliberation and votes. App. 229–79.

by explaining that the agenda was limited to COVID-19 health and safety protocols and the employee resolution, ending with "You have to stop. You will be asked to leave." App. 279 at 2:26:39–2:27:07.

Shortly thereafter, the Board took a break. *Id.* at 2:27:08–2:33:40. When they come back from the break, Story can be seen on camera speaking to Chief Yarborough, who had walked over to give him a warning regarding his outbursts and warn him that he could not disrupt the meeting. *Id.* at 2:33:50–2:34:05; *see also* App. 145, 161.

After a few more speakers, Story was called to speak. As he was walking to the microphone, Weir reminded him, "Mr. Story, you did write that you felt like you could speak about something other than D1 or D2. I would like to remind you this is a special-called meeting. It is not a regular board meeting. We are only taking comments on these two items." App. 279 at 2:47:12–2:47:30. Story immediately pushed back, saying he could "demonstrate" how what he wanted to discuss is "related to that," and "show how your resolution that you're debating today has absolute germanity to what I'm going to speak on." *Id.* at 2:47:31–2:47:51. He repeatedly interrupted Weir when she attempted to speak or respond to him, before cutting her off with "good, then I will begin." *Id.* at 2:47:31–2:47:58. He characterized his testimony as being on the "rule of law," and the resolution regarding COVID-19 protocols as being about "public health and public safety." He then began to speak louder, stating "Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our superintendent has a protective order filed against him." *Id.* at 2:48:49–2:48:59. Weir immediately told him he could not speak on that issue because it was not on the agenda, but Story ignored her and continued his off-topic comments, so Weir asked that he be removed. *Id.* at 2:48:59–2:49-09; App. 94.

Pope and Pontillo had heard Weir warn Story to stay on topic and warn Story multiple times that he was off-topic before asking for his removal. App. 7–9, 113–15. Because Story was off-topic and would not adhere to the presiding officer's directives to stop speaking, they complied with Weir's

request and approached Story and directed him to leave. *Id.*; *see also* App. 94 at 0:40–0:48. Rather than leave willingly, Story attempted to stand his ground, yelling to be heard without a microphone and resisting as Pope and Pontillo physically moved him across the room to the exit. App. 7–12, 113–15, 270 at 2:49:00–2:49:35; *see also* App. 94 at 0:40–1:02.

Story continued to argue with the officers in the hallway. App. 7–12, 113–15; *see also* App. 94 at 01:41–01:50. As they approached and walked through the overflow room, Story again raised his voice to yell over the testimony on the video feed, continuing until he was outside the building. App. 7–12, 113–15; *see also* App. 94 at 1:50–2:49.

After Story spoke, a community member testifying via Zoom veered off-topic, criticizing two Board members and calling them members of Q-Anon. App. 279 at 3:02:09; App. 203. A trustee quickly raised a point of order, and Weir reminded him that "we've got to stick to the agenda items" and called the next speaker. App. 279 at 3:02:22-3:02-27. About 20 minutes later, another virtual speaker switched from talking about masks to discussing Afghanistan; Weir interrupted, asking if she was speaking to something on the agenda, then called the next speaker. App. 279 at 3:25:40-3:26:09. Public testimony continued another two-and-a-half hours before board deliberations began.

After the August 16th Meeting, Pope prepared an Incident Report, Reporting Officer's Narrative, and a Use of Force Form. App. 12–13, 33–38. Pontillo prepared a Case Supplemental Report and Use of Force form. App. 115–16, 134–136.

**August 19 Board Meeting**

Three days later, the Board met for its regular meeting. App. 205. Because this was a regular meeting, the public was allowed to "speak on items listed or not listed on the agenda." App. 298. Story and multiple other commenters discussed the allegations against Dr. Azaiez and the Board's response to those allegations. *See, e.g.,* App. 298 at 6:40–8:55, 12:58–15:10, 31:21. Story personally spent the entirety of his allotted two minutes on this topic. *Id.* at 15:10–17:37.

**Story's Arrest**

The RRISD Police Department assigned Detective Lauren Griffith to investigate the events of August 16. *See* App. 44. Griffith reviewed the reports submitted by Pope and Pontillo,[3] portions of the recording of the August 16th Meeting, and Pontillo's body camera footage. App. 44–46, 84–94. She also spoke with Pope to confirm the information in his Reporting Narrative and reviewed Texas Penal Code Section 38.13. App. 46. Griffith believed Story's conduct met the elements for the crime "Hindering Proceedings by Disorderly Conduct" and prepared and signed an Affidavit for Warrant of Arrest and Detention (the "Warrant Affidavit"). App. 46–48.

After review of the Warrant Affidavit, a Williamson County Magistrate found that probable cause existed for the issuance of a warrant of arrest for Story and signed an arrest warrant. App. 96, 99. Shortly thereafter, Williamson County peace officers arrested Story.

## ARGUMENT AND AUTHORITIES

Story brings two claims arising out of his arrest for disrupting the August 16th Meeting. First, he alleges that Griffith, Azaiez, and Yarborough arrested him in retaliation for his viewpoint. Second, he alleges that Griffith falsely arrested him.

## I.    Free Speech Retaliation

A First Amendment retaliation claim requires that a plaintiff show (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). But here, the speech for which

---

[3]    Pope's Reporting Officer Narrative described Story's argument with Pope and Pontillo regarding the COVID-19 protocols, at least one outburst during the meeting, Story "yelling and screaming" when he raised his voice to talk over Weir and as he was being removed from the premises, and his resistance to his and Pontillo's efforts to escort him out of the room and building. App. 86–87; *see also* App. 88.

Story was arrested was not protected speech, and there is no evidence that it was motivated by the viewpoint he expressed while disrupting the meeting. There is also no evidence that Azaiez directed or was involved in the decision to arrest Story.

### A.    There is no evidence that Azaiez directed Story's arrest.

Story's First Amendment retaliation claim against Azaiez is based on his belief that "Azaiez communicated via text and other means with the Williamson County Judge and other county officials to encourage the county to arrest Plaintiffs" and that "Azaiez employed his personal police force to create a false affidavit, secure an arrest warrant and then encouraged the retaliatory arrest." Dkt. 49, ¶ 96. In his deposition, it became clear that Story's belief was just that—he could not cite any evidence to support that subjective belief. App. 328–29 at 228:17-229:5. Despite multiple opportunities to identify which Williamson County Official had told him what District official had talked to whom at the County before his arrest, Story could not identify any of the individuals involved, much less confirm Azaiez communicated with the judge. App. 329–32 at 229:6-236:11; 241:2-23.

In contrast, Yarbrough and Griffith—the two officers with personal knowledge of the decisionmaking process—testified consistently that Azaiez did not direct Story's arrest and was not involved in any step in the arrest process. According to Chief Yarbrough, Azaiez "did not make or direct law enforcement decisions," nor "command officers to take law enforcement action." App. 139. More specifically, Azaiez did not give Yarbrough "any directives or instructions regarding Mr. Story or how to proceed regarding Mr. Story's conduct at the August 16 meeting," and "never spoke with [Yarbrough] about the investigation or any law enforcement decisions" regarding Story's conduct. App. 149–50. Likewise, Griffith testified that she never spoke with Azaiez regarding Story, the August 16th Meeting, or her investigation, and that he did not oversee or provide any guidance regarding whether to submit the warrant affidavit to a magistrate judge for Story's arrest. App. 49. And they both testified that, to their knowledge, Azaiez had *no* involvement in preparing the warrant affidavit

or in the decision to submit it for arrest. App. 50, 152; *see also* App. 15. Azaiez confirmed their testimony, noting that, as Superintendent, he does not "direct or command law enforcement action," and did not direct Yarbrough, Griffith, or any other RRISD Police Department personnel to investigate Mr. Story or seek to have him arrested." App. 173-74. Azaiez was "not involved in any way in any decision-making regarding investigating Mr. Story, preparing an affidavit for warrant of his arrest, or deciding to pursue any arrest or charges against Mr. Story" and did not see the affidavit prior to this lawsuit. App. 174. Azaiez also denied Story's unsupported accusation that he spoke to any Williamson County officials about Story or his conduct prior to Story's arrest. *Id.*

Story's speculation, subjective belief, and vague hearsay is not evidence—much less evidence sufficient to create a material issue of fact when weighed against the unequivocal and consistent testimony from the individuals with actual knowledge of the process. The only remaining claim against Azaiez should be dismissed.

### B.    Story's off-topic speech was not protected by the First Amendment

Whether Story was engaged in protected speech is a threshold issue. *Cornelius v. NAACP*, 473 U.S. 788, 797 (1985) ("To resolve this issue we must first decide whether solicitation in the context of the CFC is speech protected by the First Amendment, for, if it is not, we need go no further.). In a forum case, this analysis begins with "the nature of the forum." *Id.* The Fifth Circuit has held that school board meetings are a limited forum.[4] *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010). In a limited public forum, the government may restrict speech "as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum.'" *Id.* at 758 (quoting *Chiu v. Plano Indep. Sch. Dist.,* 260 F.3d 330, 346 (5th Cir.2001)). When a speaker in a limited public forum violates a lawful restriction, their speech ceases

---

[4]    The parties and the Court have previously agreed that the August 16 Board meeting was a limited public forum because it was "dedicated solely to the discussion of certain subjects." Dkt. 43 at 12 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).

to be protected. *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) ("If Heaney were to have violated a reasonable restriction, such as a topic or time constraint, there would be no constitutional violation."); *see also Crawford–El v. Britton*, 523 U.S. 574, 593 (1998) ("A reasonable restriction, such as a topic or time constraint, does not violate the Constitution."); *Sousa v. Seekonk Sch. Comm.*, No. 1:22-CV-40120-IT, 2023 WL 349923, at *9 (D. Mass. Jan. 20, 2023) ("Sousa has not shown a likelihood of success on the merits of his claim that his speech – which occurred outside of any period where he was a recognized speaker – was protected.").

Here, when Story began his comments, his speech was undoubtedly protected. But that is not the speech he claims to have been arrested for—rather, he claims that he was arrested for "bringing up Hafedh Azaiez and his misdeeds." App. 324 at 150:2-15, 190:1-8. In a public forum, the First Amendment would protect his speech regarding allegations against the Superintendent and perceived wrongs against Story, but in a school board meeting dedicated to COVID-19 protocols and leave, it does not. *See Fairchild*, 597 F.3d at 759.

> School boards are permitted to set reasonable, viewpoint-neutral limits on the subject matter of and the process by which members of the public may provide comment, as well as on the time, place, and manner of said comments. Otherwise, members of the public would be free to raise idiosyncratic, personal complaints and air irrelevant grievances—thereby derailing or delaying a school board's work, frustrating the purpose of the meeting, and denying other citizens the chance to make their voices heard. **In short, the First Amendment does not provide a right to commandeer school board meetings.**

*Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508 (6th Cir. 2025) (cleaned up, internal citation omitted); *see also Biggs-Leavy v. Lewis*, No. 24-1317, 2025 WL 451369, at *3 (6th Cir. Feb. 10, 2025) (where plaintiff interrupted meeting and, when admonished, continued to voice her objection, removal was "tied to her failure to adhere to the rules and her continuing protests" and thus did not violate her speech rights). Hence, Story was not engaged in protected speech when he continued to speak off-topic about Azaiez and to protest the instruction to have him removed,

even yelling out to be heard after the microphone was turned off. *Startzell v. City of Philadelphia, Penn.*, 533 F.3d 183, 198 (3d Cir. 2008) ("The right of free speech does not encompass the right to cause disruption."); *see also. See San Antonio Firefighters' Ass'n, Local 624 v. City of San Antonio*, 404 F.Supp.3d 1045, 1063 (W.D. Tex. 2019) ("While the First Amendment would protect such activities in a different forum, such activities are not protected in a nonpublic forum."); *cf.* Dkt. 43 at 22. ("If Clark was not a recognized speaker when he was making these comments, he was not engaged in constitutionally protected activity.") (citing *Sousa*, 2023 WL 349923, at *9 (holding that the plaintiff had "not shown a likelihood of success on the merits of his claim that his speech—which occurred outside of any period where he was a recognized speaker—was protected")). Story's "retaliation claim fails on this basis alone." *San Antonio Firefighters' Ass'n, Local 624*, 404 F.Supp.3d at 1063; *see Porter v. City of Philadelphia*, 975 F.3d 374, 393 (3d Cir. 2020) (plaintiff failed to establish First Amendment retaliation claim as a matter of law because restriction plaintiff violated was constitutional).

Even if the Court were to find that Story's speech was protected, in light of the foregoing caselaw, that right is not clearly established to overcome Azaiez's, Yarbrough's, and Griffith's qualified immunity from suit.

**C.    Story's arrest was not motivated by retaliatory animus but was sought because he repeatedly interrupted the August 16th Meeting and refused to heed instructions to stay on topic hindering the meeting.**

As with his belief about Azaiez's involvement in his arrest, Story's subjective belief that his arrest was motivated by the viewpoint he expressed in his speech is not supported by any actual evidence. Story complains that Griffith alerted the other officers to his arrival, claiming this shows animus toward his perspective. But while Story presumes she knew what he was there to say, because "everyone did," Griffith testified that she "had no idea why" Story was at the meeting and was unaware Story had previously criticized the District or Azaiez. App. 44. She simply passed along his presence

because a few weeks earlier, she had responded to a call from assistants in the administration building that he was recording them and making them nervous. App. 042, 044.

Yarbrough confirmed that Story's disruptive conduct was the impetus for his removal in a conversation Story recorded on August 19, 2021. App. 149–50; App. 161. Yarbrough cited Story to Texas Education Code § 37.105 and Texas Penal Code §§ 38.13 and 42.05 and stated that when he started speaking off topic, the Board President asked him to stop, he continued speaking, and refused to leave when removal was requested, that this triggered the law enforcement response. App. 161 at 5:10–6:21, 6:55–7:37, 8:50–9:15.

While Griffith was "vaguely aware" of Story's removal at the time, she did not become involved until she was assigned to determine whether Story's conduct met the elements of "Hindering Proceedings by Disorderly Conduct" under Texas Penal Code Section 38.13. App. 44. Yarbrough did not say anything to Griffith about Story criticizing or saying anything about Azaiez or the District, much less express animus regarding Story's comments. App. 51. Griffith reviewed Pope's Reporting Officer Narrative and spoke briefly with him to confirm that the information was correct. App. 45-46. She also reviewed Pontillo's Case Supplemental Report, portions of the video footage of the meeting, and Pontillo's body camera footage. App. 46. The footage showed Story speaking over Weir, continuing to speak after he was told he was off-topic, and raising his voice once his microphone was turned off. App.46, 93, 94. Griffith saw Pope and Pontillo step into remove Story, and Story yelling as he was being escorted, including doing so in the overflow room in a manner that disrupted attendees' ability to follow the meeting. App. 46-47, 94. Accordingly, the Warrant Affidavit cites this conduct, and says nothing about what specifically Story was saying other than that it was off-topic. App. 95–96.

Simply put, there is no direct evidence of animus or retaliatory intent by anyone involved in the determination to seek Story's arrest. This leaves Story to rely solely on the fact that the other

people who spoke off-topic during the August 16th Meeting were not arrested. But this fact cannot support an inference of retaliation because none of those individuals behaved in the same manner as Story. Each of the others either briefly addressed something not on the agenda and walked off before, or as Weir warned them to stay on topic, or stopped soon after she warned them. *See, e.g.*, App. 279 at 2:09:08–2:09:13 (Winters), 2:26:19–2:26:41 (White), 3:02:22-3:02-27 (Schklar). Story is also the only speaker to have previously interrupted the meeting by loudly calling out when he did not have the floor. App. 93 at 03:50-03:55, 2:09:08–2:09:13. And he was the only one to repeatedly interrupt Weir when she reminded him that he needed to limit his comments to the posted agenda item. App. 279 at 2:47:31–2:47:58. Yet despite these things—and despite his presumption that Weir, Pope, and Pontillo knew what he was going to say—they allowed him to stay in the meeting and begin his comments— and did not remove him until he continued speaking (and eventually yelling) on his chosen topic even as he was warned and his microphone was cut-off. App. 279 at 2:48:59–2:49-09; App. 094 at 0:33–0:040.

Even more importantly, Story and many others spoke about the accusations against the superintendent just three days later, at the very next Board meeting on August 19, 2021. And because the rules governing that meeting allowed comment on items not on the agenda, he was not stopped from speaking or removed. Nothing about this sequence of events suggests the District was trying to silence Story or punish him for expressing his viewpoint.

Put simply, despite years of discovery, Story still has only inference and presumption to support his subjective belief about why he was arrested. For this reason—and the fact that his off-topic speech and disruptions were not protected—his First Amendment retaliation claim fails.

## II.     Story's False Arrest Claim Against Griffith.

The Fourth Amendment protects the rights of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. U.S. CONST. amend XIV. "A

constitutional claim for false arrest … through the vehicle of § 1983, 'requires a showing of no probable cause.'" *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (internal citations omitted). But the Constitution does not guarantee that only the guilty will be arrested. *Baker v. McCollan*, 443 U.S. 137, 145 (1979). An arrest based on a valid warrant is not a false arrest, is not unconstitutional, and cannot form the basis of a Fourth Amendment claim. *Smith v. Gonzalez*, 670 F.2d 522, 526 (5th Cir. 1982). If a warrant is issued by an intermediary magistrate judge, the causal chain is broken, and the initiating party is insulated. *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013); *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988).

As such, Story's claim for false arrest is dependent on a reasonable jury being able to determine that Griffith included "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) the allegedly false statement is necessary to the finding of probable cause." *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56, 165 (1978)).

### A.   The Warrant Affidavit does not include any knowingly or intentionally false statement, or any statement made with reckless disregard for the truth.

To meet the first prong of a false arrest claim, Story must be able to show that Griffith "through material omissions or otherwise, made 'a false statement knowingly and intentionally, or with reckless disregard for the truth.'" *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). Story claims that the Warrant Affidavit "included false information regarding Story's behavior, alleging that Story received warnings about unrelated topics and had verbal outbursts, among other statements." But taking the portions of the Warrant Affidavit that this allegation appears to be challenging and comparing them to the video footage shows that each statement is supported by the record.

Griffith stated:

(1)    "Affiant learned RRISD Board of Trustee President Amy Weir informed Story he was attending a called meeting and would only be able to speak about the items on the agenda, specifically the mask mandate."

(2)    "Affiant learned during the duration of Story's time to speak, RRISD Board of Trustee Amy Weir instructed Story to stop speaking on unrelated topic's [sic] and to only discuss the mask mandate."

App. 95. Weir's exact words were, "I would like to remind you this is a special called meeting. It is not a regular board meeting. We are only taking comments on these two items."[5] App. 279 at 2:47:12–2:47:30. Griffith understood the agenda items to be about the mask mandate, because they were about COVID-19 generally and the vast majority of speakers at the meeting testified about the mask mandate. App. 43, 48.

Griffith also attested in the Warrant Affidavit:

(3)    "Affiant learned while Story was discussing the unrelated topics, Story had several outbursts. Affiant learned after several verbal warnings from RRISD Board of Trustee President Amy Weir, Story continued to have verbal outbursts."

App. 95. While you cannot hear Story in the official meeting recording, because his microphone was cut off, you can hear him in Officer Pontillo's body-camera footage. App. 94. As Weir is warning Story, he can be heard to raise his voice louder and louder to be heard without the microphone, as he continued to speak off-topic. While Story might not like that Griffith described Story raising his voice to be heard across the room without a microphone as he repeatedly talked over the presiding officer as "outbursts," it is hardly a knowing, intentional or recklessly false statement to characterize these statements as such.

Griffith further attested in the Warrant Affidavit:

(4)    "Affiant learned Sgt. Pope and RRISD Officer Frank Pontillo approached Story and made several verbal requests for Story to leave the board room." App. 95.

---

[5]    Rather than listen to her, he interrupted and talked over her. App. 279 at 2:47:31–2:47:51.

(5)     "Affiant learned while being forcibly removed from the board meeting, Story continued to resist Officers, yell, and scream causing a major disruption during the Board meeting." App. 95 at ¶ 5.

These statements are also accurate: Pope can clearly be heard on the body camera footage saying "let's go" several times. App. 94. Story can be heard on the video, getting louder the further he got from the podium, yelling that they were violating the law. *Id.* Story might prefer that Griffith had said he raised his voice, but the dictionary defines "yell" as "to utter a loud cry, scream, or shout."[6] And it defines scream, among other ways, as "to speak or write with intense emotion" and "to protest, demand, or complain vehemently."[7] There is nothing false about describing Story's raised volume as yelling or screaming.

Finally, Griffith stated in the Warrant Affidavit:

(6)     "Affiant learned after Story was removed from the board meeting room, Story continued to be disruptive in the lobby where the overflow seating was located. Affiant learned because Story continued to be verbally loud, verbally disruptive, and uncooperative with Officers in the lobby where other citizens were watching the meeting live streamed, Story was escorted out of the building."

Here, the video footage shows Story arguing with the officers the entire time he is in the hallway and being escorted out, and the closer they came to the lobby, the louder he got. App. 94. While Story might not think that arguing and yelling out to be heard over the livestream is disruptive, here again, the dictionary supports Griffith's use of the terms. Disrupt includes "to interrupt the normal course or unity of"—something the video shows he did, as you can see the people gathered around to watch the live stream turn around to watch Story as he yelled out.

Based on this analysis, Story's false arrest claim appears to rest solely on the fact that he disagrees with the descriptive words that Griffith uses in her affidavit. But the fact that the same behavior can be described or characterized in more than one way does not make Griffith's wording

---

[6]     https://www.merriam-webster.com/dictionary/yell (last visited December 12, 2022).

[7]     https://www.merriam-webster.com/dictionary/scream (last visited December 12, 2022).

choices false. The Fifth Circuit has held that "[l]iability under *Franks* requires a certain mindset and certain conduct: an officer must intentionally, or with a reckless disregard for the truth, include a false statement in a warrant application or omit a material fact from it." *Nerio v. Evans*, 974 F.3d 571, 577 (5th Cir. 2020 (cleaned up). There is no liability for "an honest mistake." *Id.* (citation omitted). When finding liability under *Franks*, the Fifth Circuit points to provable wrong statements and failure to identify that the supporting witnesses original statements were inconsistent and included statements that were contradicted by the evidence." Likewise, in the context of immunity for a false arrest, the Supreme Court has said that "defendants will not be immune if, on an *objective* basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). As such, falsity must be interpreted as an objective standard—and cannot encompass quibbles over descriptive phrasing.

> **B.**     **Griffith's affidavit would support an arrest for hindering a meeting through disorderly conduct even without her descriptive phrasing.**

If Griffith had (a) quoted Weir's actual statements, rather than paraphrasing them, (b) listed the number of warnings, rather than describing them as "several," and (c) called Story's continued testimony "an interruption" rather than an outburst or yelling or screaming, it would still be sufficient to establish probable cause for Story's arrest. Under Texas law:

(a)  A person commits an offense if he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance.

(b)  A person commits an offense if he recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist.

(c)  An offense under this section is a Class A misdemeanor.

TEX. PENAL CODE § 38.13. "Hinders" is not defined, but the Texas Code Construction Act instructs courts to interpret undefined words and phrases according to "common usage" unless they have acquired a technical or particular meaning through legislative definition or otherwise. TEX. GOV'T

CODE § 311.011. And hinder includes "to make slow or difficult the progress of."[8] That Story refused to stop giving his off-topic speech, or to walk out of the room when directed to do so by officers, would have shown that he slowed down the proceedings—requiring him to be physically removed before testimony could resume—no matter how those actions were described.

"Probable cause is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Terwilliger*, 4 F.4th at 282 (cleaned up). In deciding whether probable cause exists, courts look at the totality of the circumstances and decide whether the facts, viewed from the standpoint of an objectively reasonable police officer, demonstrate "a probability or substantial chance of criminal activity."

Although Story does not agree with the subjective characterizations of his behavior, he does not and cannot—based on the video evidence—dispute the assertions in the warrant affidavit that: (1) Weir informed Story he could only speak on posted agenda items; (2) he acknowledged Weir's warning; (3) Weir instructed Story to stop speaking when he veered into topics unrelated to agenda items; and (4) he continued to speak after Weir instructed him to stop. *See* App. 279 at 2:47:10-2:49:35). These indisputable facts are sufficient to support the Magistrate's determination that there was a probability that Story had intentionally hindered an official proceeding by noise or tumultuous behavior or disturbance. As a result, Story cannot show that Griffith Magistrate's determination of probable cause, which shields her from any liability for false arrest. Further, qualified immunity applies if the corrected affidavit supports a finding of probable cause as it does here. *Garcia v. Orta*, 47 F.4th ---, 2022 WL 3652971, at *5 (5th Cir. 2022).

---

[8]    https://www.merriam-webster.com/dictionary/hinder (last visited December 12, 2025).

Without evidence of a knowing, intentional, or recklessly false statement, the independent intermediary rule applies. If a warrant is issued by an intermediary magistrate judge, the causal chain is broken, and the initiating party is insulated. *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013); *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). Here, because the facts supporting Plaintiff's arrests were "placed before an independent intermediary such as a magistrate . . . the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009).

### C. Even if the Court were to find the descriptive phrasing "false," it would be insufficient to overcome Griffith's qualified immunity.

When qualified immunity if raised, courts must determine (i) whether the plaintiffs have described a violation of a constitutional right; and (ii) whether the right was "clearly established" at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If so, the court must evaluate whether the conduct of the official was objectively unreasonable under clearly established law. *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998); *Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008).

Story bears the burden to show that Griffith violated clearly established law. *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 347 (5th Cir. 2017); *Kovacic v. Villareal*, 628 F.3d 209, 212 (5th Cir. 2010), *cert. denied*, 564 U.S. 1004 (2011). He must identify the violation of a "particularized" right so that it is apparent to the official that his actions are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). He may not defeat immunity by describing a "general proposition" of constitutional law, such as a right to equal protection (or to be free from false arrest). *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011). To defeat immunity, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what the defendant is doing violates federal law *in the circumstances*." *Pierce v.*

*Smith*, 117 F.3d 866, 882 (5th Cir. 1997) (emphasis in original) (citations omitted). This means that "existing precedent" must have placed the question "beyond debate." *Al-Kidd*, 536 U.S. at 741.

"The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution … as alleged by the plaintiff." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (emphasis in original). If "officers of reasonable competence could disagree on the issue, immunity should be recognized." *Hope v. Pelzer*, 536 U.S. 730, 752 (2002). The reasonableness of an official's actions is based on the information available to the official at the time of the event. *Morgan v. Swanson*, 755 F.3d 757, 760 (5th Cir. 2014). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *see also Jordan v. Brumfield*, 687 F. App'x 408, 412 (5th Cir. 2017).

Here, Story cannot show that Griffith engaged in any action to violate his clearly-established rights. Or that her actions were objectively reasonable under clearly-established law. As set forth above, Story cannot show that Griffith made any false statements, much less did so intentionally or recklessly. And even if the evidence were sufficient to show that any of the statements in Griffith's Warrant Affidavit could have been characterized differently and that doing so would have changed the Magistrate's probable cause determination, Story cannot demonstrate that Griffith's actions were objectively unreasonable in light of clearly established law to overcome her assertion of qualified immunity. Here, the exacting scrutiny Story asks the Court to use to review the Warrant Affidavit to support his false arrest claim is not supported by law, much less clearly-established law. Moreover, it cannot be said that every reasonable officer in Griffith's circumstances would understand that the lack of meticulous precision in the words she selected could violate an individual's clearly-established constitutional rights. Griffith is, therefore, entitled to qualified immunity.

Respectfully submitted,

/s/     *Kathryn E. Long*
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on this 12th day of December, 2025.

Stephen D. Casey
CASEY LAW OFFICE, P.C.
P.O. Box 2451
Round Rock, Texas 78680
stephen@caseylawoffice.us

Warren V. Norred
Solomon G. Norred
NORRED LAW, PLLC
515 E. Border St.
Arlington, TX 76010
warren@norredlaw.com

/s/     *Kathryn E. Long*
Kathryn Long