IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS – AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY,<br><br>  *Plaintiff,*<br><br>v.<br><br>DETECTIVE LAUREN GRIFFITH,<br>OFFICER MILTON POPE, and OFFICER<br>FRANK PONTILLO,<br><br>  *Defendants.* | § § § § § § § § § § § § § § § § § § | CIVIL ACTION<br>NO. 1:22-CV-00448-DAE |

---

**DEFENDANTS AMY WEIR, MILTON POPE, AND FRANK PONTILLO'S
MOTION FOR SUMMARY JUDGMENT**

---

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## SUMMARY OF THE ARGUMENT

Jeremy Story asserts First and Fourteenth Amendment claims against RRISD Trustee Amy Weir, RRISD Sergeant Milton Pope, and former RRISD Police Officer Frank Pontillo regarding his removal from an August 16, 2021 meeting of RRISD's Board of Trustees (the "August 16th Meeting"). He also asserts Fourth Amendment claims for unreasonable seizure against Pontillo and Pope related to his removal, and a false arrest claim against Pope. Weir, Pontillo, and Pope are entitled to summary judgment on Story's First Amendment claims because Story was not removed because of the viewpoint expressed in his speech but because he violated rules of the forum and was disruptive to the meeting. And the speech for which Story alleges he was removed was not protected speech; he was violating the rules of the forum. Even if the speech were protected, Weir, Pontillo, and Pope did not treat Story differently based on his viewpoint.

Story's Fourth Amendment claims against Pontillo and Pope fail because the alleged seizure—Story's removal—was not unreasonable. The indisputable video evidence shows that Pontillo and Pope removed Story at Weir's directive because he was violating the rules of the forum and disrupting the August 16th Meeting. And, to the extent that Story asserts an excessive force claim against Pontillo and Pope based on the removal, this claim fails because Story did not sustain any injury, the minimal physical contact used by Pontillo and Pope was not excessive (much less clearly excessive), and the force used was not clearly unreasonable under the circumstances. Story's claim against Pope for false arrest likewise fails because an independent intermediary determined that probable cause existed for Story's arrest and there is no evidence that Pope engaged in any action to taint that finding.

Even if Story could otherwise maintain any claim against them, Weir, Pontillo, and Pope are entitled to summary judgment because they are entitled to qualified immunity.[1]

---

[1]     The RRISD Defendants are submitting an Appendix in support of their Motions for Summary Judgment, which is incorporated by reference. The Appendix pages are cited herein as "App."

## STATEMENT OF FACTS

In Spring 2021, RRISD's Board engaged in a search for a new superintendent. App. 188–91. In June 2021, the Board hired Dr. Hafedh Azaiez to serve as the District's Superintendent effective July 5, 2021. App. 189–90.

In July 2021, there were allegations made against Dr. Azaiez about his personal life and that he had threatened and assaulted a woman he knew, which Dr. Azaiez denies. App. 192, 168. Dr. Azaiez advised Weir of the allegations, and former Trustee Dr. Mary Bone provided information to the Board regarding these allegations. App. 192. The Board scheduled a July 23, 2021 Called Board Meeting to consult with the Board's counsel regarding Dr. Azaiez's contract and the allegations against him, but the meeting had to be re-scheduled to August 23, 2021 so that all Trustees could be present and attend in person to discuss these matters. App. 192, 212–20. On July 29, 2021, an ex parte temporary protective order was entered against Dr. Azaiez. Dkt. 1-1, Ex. 3.

Between July 23, 2021 and August 12, 2021, Story emailed the Trustees to report the allegations against Dr. Azaiez, report that there was a protective order, and request the opportunity to provide testimony to the Board. App. 192–94, App. 221–25. The Board was already aware of this information and had started looking into the allegations and had scheduled a Board meeting to consult with Board counsel about them. App. 192–95, App. 212–20.

In late July and early August 2021, COVID-19 cases were rising, and there was heightened concern regarding the new Delta variant. App. 167–68, 195–96, App. 268–67. Health officials were advocating mask requirements, and schools districts, like RRISD, were making decisions regarding whether to institute mask mandates. App. 167–68, 195–96, 268–67. To address concerns related to the new Delta variant, at 2:00 p.m. on August 12, 2021, the District posted notice that the Board would have a special meeting on August 16, 2021, and discuss a potential mask mandate. App. 196–97, 226–28. There were only two items on the Agenda for the August 16th Meeting: (1) D.1—

"Adoption of Resolution for Employee COVID-19 Positive Extended Leave During COVID-19 Pandemic"; and (2)  D.2–"Fall 2021 COVID-19 Health and Safety Protocols." App. 226–28.

On August 13, 2021, the District posted the agenda for the Board's August 19, 2021 Regular Board Meeting (the "August 19th Meeting"). App. 205, 280–90. The Agenda for the August 19th Meeting specifically noted that members of the public would be afforded "an opportunity to speak on items listed *and not listed* on the Board agenda." App. 281.

**The August 16, 2021 Board Meeting**

The August 16th Meeting was not the regular, monthly Board Meeting; it was a specially-called Board meeting. App. 198. Under Board policy BED (Local), public comment was limited to the two items on the agenda for the August 16th Meeting. *Id.*; *see also* App. 188, 208–11.

Story signed up to speak at the August 16th Meeting. In the form he submitted to speak during public comment, Story wrote that he would be speaking on topic "2" related to COVID-19 health and safety protocols, "or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 102, 199. Story was the only speaker who wrote on the form that he either intended to speak about an item that was not listed on the agenda or that he did not believe he had to limit his public comment to an item on the agenda. App. 102, 199.

Because of the recent surge in COVID cases caused by the Delta variant, the District limited seating in the Board meeting room and arranged the chairs to enforce social distancing. App. 170–71. It set up an overflow room for individuals who came to the meeting but did not obtain a seat in the main room. *Id.* Before and as the August 16th Meeting began, Story did not have a chair in the meeting room and was standing at the back of the room. App. 5. Pope and, then, Pontillo both explained the social distancing protocols to Story. App. 5–6, 111–12; *see also* App. 93 at 1:14–5:53; App. 377–78. Story refused to leave the meeting room and asserted that the social distancing requirements were unlawful. *Id.* In fact, at one point he stated that he wanted a Trustee to tell him to leave. App. 111.

3

During this interaction, after the meeting began, Story shouted out across the room when a Trustee asked if people were not being allowed in the meeting. App. 111–12. To deescalate the situation and ensure there was no further disruption to the August 16th Meeting, Pope and Pontillo permitted Story to remain in the meeting room, where he ultimately was offered a chair by another attendee. App. 112.

When Weir opened the meeting, she noted that approximately 180 people were signed up to speak during public comment, which, at two minutes per person, would take six hours. App. 199, 279 at 1:12-1:22.[2] Before beginning with public comment from RRISD students, Weir reminded attendees and listeners that the Board allowed for public comment "on items on the agenda" and reminded them that concerns regarding specific employees or former employees should not be addressed in the comments but rather handled through the applicable grievance process. App. 279 at 1:54–2:12. Then, thirteen students spoke to the Board regarding the posted agenda items (*Id.* at 5:07–33:01), and the Board heard from the Travis County Health Authority regarding the recent surge in COVID-19 cases driven by the Delta variant and methods to slow the spread of the disease, such as mask mandates. *Id.* at 33:04–1:05:04, *see also* App. 236–58. The Board began public comment for non-students, a little after 6:30 p.m. App. 279 at 1:05:40. Generally, during the first hour of public comment, the speakers addressed only agenda items. *Id.* at 1:05:40–2:07:25. Several community members raised the allegations against the Superintendent, and Weir repeatedly advised that they were not allowed to speak about items not on the agenda. *Id.* at 1:35:00–135:50; 2:09:08–2:09:13.

Then, Jennifer White, after voicing her opposition to a mask mandate, veered off the topic of COVID-19 safety protocols and onto the topic of the allegations against Azaiez, attempting to group the two topics together into a broader one on "student safety." *Id.* at 2:26:19–2:26:41. Trustee Landrum immediately interrupted her, saying "I'm sorry, you're not allowed to talk about items not

---

[2]      This was in addition to the invited testimony from local health officials regarding the health risks posed by the Delta surge, the administration's presentation regarding COVID-19 health and safety regulations, and the Board's deliberation and votes. App. 229–79.

on the agenda." *Id.* When White continued speaking, Weir asked for White to be escorted out. But by then, White had stopped speaking and left. *Id.* Story can be heard off-camera, yelling "it's germane" more than once and "it's on the agenda." *Id.* at 2:26:39–2:27:07; *see also* App. 145, 161. Weir responded by explaining that the agenda was limited to COVID-19 health and safety protocols and the employee resolution, ending with "You have to stop. You will be asked to leave." App. 279 at 2:26:39–2:27:07.

Shortly thereafter, the Board took a break. *Id.* at 2:27:08–2:33:40. When they come back from the break, Story can be seen on camera speaking to Chief Yarborough, who had walked over to give him a warning regarding his outbursts and warn him that he could not disrupt the meeting. *Id.* at 2:33:50–2:34:05; *see also* App. 145, 161.

After a few more speakers, Story was called to speak. As he was walking to the microphone, Weir reminded him, "Mr. Story, you did write that you felt like you could speak about something other than D1 or D2. I would like to remind you this is a special-called meeting. It is not a regular board meeting. We are only taking comments on these two items." App. 279 at 2:47:12–2:47:30. Story immediately pushed back, saying he could "demonstrate" how what he wanted to discuss is "related to that," and "show how your resolution that you're debating today has absolute germanity to what I'm going to speak on." *Id.* at 2:47:31–2:47:51. He repeatedly interrupted Weir when she attempted to speak or respond to him, before cutting her off with "good, then I will begin." *Id.* at 2:47:31–2:47:58. He characterized his testimony as being on the "rule of law," and the resolution regarding COVID-19 protocols as being about "public health and public safety." He then began to speak louder, stating "Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our superintendent has a protective order filed against him." *Id.* at 2:48:49–2:48:59. Weir immediately told him he could not speak on that issue because it was not on the agenda, but Story ignored her and continued his off-topic comments, so Weir asked that he be removed. *Id.* at 2:48:59–2:49-09; App. 94.

Pope and Pontillo had heard Weir warn Story to stay on topic and warn Story multiple times that he was off-topic before asking for his removal. App. 7–9, 113–15. Because Story was off-topic and would not adhere to the presiding officer's directives to stop speaking, they complied with Weir's request and approached Story and directed him to leave. *Id.*; *see also* App. 94 at 0:40–0:48. Rather than leave willingly, Story attempted to stand his ground, yelling to be heard without a microphone and resisting as Pope and Pontillo physically moved him across the room to the exit. App. 7–12, 113–15, 270 at 2:49:00–2:49:35; *see also* App. 94 at 0:40–1:02.

Story continued to argue with the officers in the hallway. App. 7–12, 113–15; *see also* App. 94 at 01:41–01:50. As they approached and walked through the overflow room, Story again raised his voice to yell over the testimony on the video feed, continuing until he was outside the building. App. 7–12, 113–15; *see also* App. 94 at 1:50–2:49.

After Story spoke, a community member testifying via Zoom veered off-topic, criticizing two Board members and calling them members of Q-Anon. App. 279 at 3:02:09; App. 203. A trustee quickly raised a point of order, and Weir reminded him that "we've got to stick to the agenda items" and called the next speaker. App. 279 at 3:02:22-3:02-27. About 20 minutes later, another virtual speaker switched from talking about masks to discussing Afghanistan; Weir interrupted, asking if she was speaking to something on the agenda, then called the next speaker. App. 279 at 3:25:40-3:26:09. Public testimony continued another two-and-a-half hours before board deliberations began.

After the August 16th Meeting, Pope prepared an Incident Report, Reporting Officer's Narrative, and a Use of Force Form. App. 12–13, 33–38. Pontillo prepared a Case Supplemental Report and Use of Force form. App. 115–16, 134–136.

**August 19 Board Meeting**

Three days later, the Board met for its regular meeting. App. 205. Because this was a regular meeting, the public was allowed to "speak on items listed or not listed on the agenda." App. 298. Story

and multiple other commenters discussed the allegations against Dr. Azaiez and the Board's response to those allegations. *See, e.g.,* App. 298 at 6:40–8:55, 12:58–15:10, 31:21. Story personally spent the entirety of his allotted two minutes on this topic. *Id.* at 15:10–17:37.

**Story's Arrest**

The RRISD Police Department assigned Detective Lauren Griffith to investigate the events of August 16. *See* App. 44. Griffith investigated, App. 44–46, 84–94, and concluded that Story's conduct met the elements for the crime "Hindering Proceedings by Disorderly Conduct" and prepared an Affidavit for Warrant of Arrest and Detention (the "Warrant Affidavit"). App. 46–48. After review of the Warrant Affidavit, a Williamson County Magistrate found that probable cause existed for the issuance of a warrant of arrest for Story and signed an arrest warrant. App. 96, 99. Shortly thereafter, Williamson County peace officers arrested Story.

**ARGUMENT AND AUTHORITIES**

I.   **Story's claims that he was treated more harshly because of his viewpoint are not supported by the evidence.**

Story brings claims against Weir, Pontillo, and Pope for violations of both the First Amendment and the Fourteenth Amendment Equal Protection Clause based on his removal from the August 16th Meeting.[3] The speech for which Story was purportedly removed is not protected by the First Amendment. Even if it were, there is no evidence that Weir, Pontillo, and Pope treated Story differently because of his viewpoint. *See* Dkt. 49 at 15–16, 36–37.

A.   **Story must be able to show he was selectively restrained from expressing protected speech because of his viewpoint.**

The first step in any First Amendment case is to determine whether the speech is protected by the First Amendment. *Cornelius v. NAACP*, 473 U.S. 788, 797 (1985) ("To resolve this issue we

---

[3]   The First and Fourteenth Amendment claims against the other Defendants were dismissed because he did not allege their personal involvement in his removal. Dkt. 43 at 16-17, 37.

must first decide whether solicitation in the context of the CFC is speech protected by the First Amendment, for, if it is not, we need go no further.). In a forum case, this analysis begins with "the nature of the forum." *Id.* The Fifth Circuit has held that school board meetings are a limited forum.[4] *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010). In a limited public forum, the government may restrict speech "as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum.'" *Id.* at 758 (quoting *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 346 (5th Cir.2001)). If the restriction itself is both viewpoint-neutral and reasonable, courts then look to whether the government "respect[ed] the lawful boundaries it has itself set" on speech in the forum. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

"[I]n determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible *when directed against speech otherwise within the forum's limitations*." *Id.* at 829–30 (citation omitted) (emphasis added). *If* a speaker was not silenced or ejected for violating a reasonable restriction, the speech is protected and the First Amendment claim then turns on the silencer's motive or intent in taking the actions against the speaker. *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017); *see also Biggers v. Massingill*, No. 23-11023, 2025 WL 429974, at *2 (5th Cir. Feb. 7, 2025) (allowing case to proceed where the plaintiff alleged they had not actually violated the established limits of the forum).

An equal protection claim based on speech restrictions requires a showing that the plaintiff "received treatment different from that received by similarly situated individuals and that the unequal

---

[4]     The parties and the Court have previously agreed that the August 16th Meeting was a limited public forum because it was "dedicated solely to the discussion of certain subjects." Dkt. 43 at 12 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).

treatment stemmed from a discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). Here, the Court cited allegations that Story was the only person removed from the meeting in determining that he pleaded a claim under a class-of-one theory. Dkt. 43 at 36.

**B.    The speech that resulted in Story's removal was not protected by the First Amendment.**

This Court previously determined, based on Story's allegations, that Weir interrupted Story when he veered off-topic from the agenda items. Dkt. 43 at 16. "Courts discussing public comment periods at government meetings have routinely found that the governing body may restrict speakers to the subject at hand, impose time limits on speakers, and prevent disruptions of the meeting." *Wenthold v. City of Farmers Branch*, No. 3:11-CV0748-B, 2012 WL 467325, at *8–9 (N.D. Tex. Feb. 14, 2012), aff'd sub nom., *Wenthold v. City of Farmers Branch*, 532 F. App'x 474 (5th Cir. 2013). Boards may also "exclude from public discourse certain topics of speech," instead channeling such topics "into more effective dispute resolution arenas, before it hears the matter and resolves it." *Fairchild*, 597 F.3d at 759. When a speaker in a limited public forum violates these reasonable restrictions, their speech is no longer protected. *Heaney*, 846 F.3d at 802; *see also Crawford–El v. Britton*, 523 U.S. 574, 593 (1998); *Sousa v. Seekonk Sch. Comm.*, No. 1:22-CV-40120-IT, 2023 WL 349923, at *9 (D. Mass. Jan. 20, 2023).

Nonetheless, Story maintains that his removal was unconstitutional because he was the only person removed from the meeting for speaking off-topic. In addition to ignoring several salient differences between Story's speech and conduct and that of the other individuals who wandered off topic during the August 16th Meeting (as discussed *infra*), Story's argument ignores that speech must be protected to support a First Amendment claim. *Cornelius*, 473 U.S. at 797. Whether the speech is protected is a threshold issue in every First Amendment case. *Id.* at 797. Case law abounds with cases in which the First Amendment analysis ends when the speech is determined not to be protected.[5]

---

[5]    We see this in employee free speech retaliation cases, when courts first ask whether the plaintiff was speaking as a public citizen on a matter of public concern—i.e., whether the speech is protected by the First Amendment. *Garcetti v.*

Here, Story was allowed to speak—and his speech was protected—until he veered off-topic. At that point, Weir was able to direct him to stop, just as she did with other speakers who went off topic. Dkt. 43 at 16. When Story continued to speak off-topic, even yelling out to be heard after the microphone was turned off, he was in the same position as Clark: he did not have the floor, and his speech was no longer protected by the First Amendment. *See id.* at 22. ("If Clark was not a recognized speaker when he was making these comments, he was not engaged in constitutionally protected activity.") (citing *Sousa*, 2023 WL 349923, at *9).

This should end the analysis.[6] But even if it did not, Story's claim would fail because the evidence shows that none of the other individuals at the August 16th Meeting—including those who also spoke off-topic—refused to stop speaking off-topic when instructed to do so. App. 279; *see also* App.[7] And that conduct—not his viewpoint—is the reason that Story was removed from the meeting.

## C. Story was removed, not because of his viewpoint, but because he repeatedly disrupted the meeting.

The evidence shows that when a speaker veered off-topic, Weir reminded the speaker and the crowd that they could only speak on agenda items. She did this regardless of whether the speakers were pro-mask or anti-mask, and regardless of what non-agenda topic they raised. App. 279. It is true

---

*Ceballos*, 547 U.S. 410, 418 (2006) ("*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.") (internal citations removed). We also see it in cases involving true threats, speech integral to criminal conduct, defamation, and obscenity. *United States v. Alvarez*, 567 U.S. 709, 717 (2012) (plurality opinion) (collecting cases); *see also United States v. Jubert*, 139 F.4th 484, 490 (5th Cir. 2025) ("But the First Amendment does not protect all expression."). We see it in First Amendment retaliation cases—including this one, when the Court dismissed the free speech retaliation claim by former Plaintiff Dustin Clark, because he had not alleged facts sufficient to state a claim that he was engaged in constitutionally-protected speech. Dkt. 43 at 22–23.

[6]    To the extent Story asserts a First Amendment retaliation claim against Pope related to the arrest, it fails for this same reason, as well as the reasons set forth in Azaiez, Yarbrough, and Griffith's Motion, which Pope incorporates by reference. Dkt. 125, pp. 7–12.

[7]    There was one individual, Jennifer White, who did continue speaking off-topic when instructed to do so. App. 279 at 2:26:19–2:26:41. Weir asked that she be escorted out of the meeting. *Id.* At that point, unlike Mr. Story, Ms. White stopped speaking and voluntarily left. *Id.*; *see also* App. 203–04. Because she did so, Pontillo and Pope did not have to physically remove her from the meeting. App. 7, 115.

that Story was the only one removed from the meeting, but there is no evidence that his removal was ordered to silence his viewpoint, rather than because he violated the legitimate restrictions on public comment.

There is certainly no direct evidence of animus. Story has no evidence that Weir, Pope, Pontillo, or anyone else said anything to Story or the public that would indicate his particular viewpoint, and not the topic, motivated his removal. The video footage of the Officers' interactions with Story before the meeting shows their discussion was about the seating capacity limit—not about what he intended to say during his public comment or regarding his opinion of the Superintendent. App. 93, 377–78. Likewise, Weir's discussion with Story regarding his testimony was limited solely to whether he would be limiting his testimony to the agenda items. She did not ask, and Story did not say, what he intended to discuss if he refused to go off-topic. App. 279 at 247:12-249:09. Further, even after Story accused the Board of not caring about the rule of law or about public safety, he was allowed to continue—because as long as his criticism potentially related to COVID-19 protocols, he was on topic. *Id.* at 2:48:49–2:48:59. Weir did not interrupt him until he demonstrated clearly that he had switched to the topic of the allegations against Azaiez. App. 319 at 131:9-18. And she did not ask the officers to remove Story until after she had warned him several times and he refused to either end his testimony or return to discussing a posted agenda item. App. 279 at 2:48:59–2:49-09; App. 94 at 0:33–0:040. When Pope and Pontillo stepped in to carry out her directive, they directed Story to leave and directed him to calm down and stop yelling. App. 279 at 2:49:00–2:49:35; App. 94 at 0:40–2:49; App. 11, 113. They said nothing about his perspective or opinion. Nothing that any of them said or did that evening indicated that Story was being removed because of the viewpoint he expressed.

There is also no evidence that Weir, Pope, or Pontillo revealed animus in their statements to others before or after the meeting. Story has never presented any evidence that there were statements from Weir, Pope, and Pontillo that would suggest they were motivated by animus. Story's speculation,

presumption, or subjective belief that Weir, Pope, and Pontillo knew what he was going to talk about that night are not evidence. But even if it were, these two items alone are insufficient to support the conclusory leap that, therefore, he was removed because of what opinion he expressed. Especially when others had expressed a similar opinion but had not been removed.

Story tries to spin the fact that individuals who also spoke about the Superintendent and the protective order were not removed in his favor, arguing that singling him out is evidence of discrimination. But the fact that others who expressed the same viewpoint as him were not removed does not support his contention that he was removed *because of* his viewpoint. To win a claim of viewpoint discrimination, a plaintiff must show not just that he was treated differently, but that he was treated differently *because of* his opinion or viewpoint. *Crawford-El*, 523 U.S. at 592 (citing see, *e.g., Washington v. Davis,* 426 U.S. 229, 239–248, 96 (1976)). Here, the overwhelming evidence is that he was treated differently from the other speakers, including those who shared his viewpoint on Azaiez, because he acted differently from them. Each of the others either briefly addressed something not on the agenda and walked off before, or as, Weir warned them to stay on topic, or stopped soon after she warned them. *See* App. 279 at 2:09:08–2:09:13, 2:26:19–2:26:41. Story is also the only speaker to have previously interrupted the meeting by loudly calling out when he did not have the floor. App. 279 at 03:50-03:55, 2:09:08–2:09:13. And he was the only one to repeatedly interrupt Weir when she reminded him that he needed to limit his comments to the posted agenda item. *Id.* at 2:47:31–2:47:58. Yet despite these things—and despite his presumption that Weir, Pope, and Pontillo knew what he was going to say—they allowed him to stay in the meeting and begin his comments and did not remove him until he continued speaking (and eventually yelling) on his chosen topic even as he was warned and his microphone was cut off. *Id.* at 2:48:59–2:49-09; App. 94 at 0:33–0:040. Nothing about this sequence of events supports Story's perspective on the removal.

One Fifth Circuit case with a similar fact pattern is Story's own against Williamson County commissioners. *Story v. Gravell*, No. 24-50646, 2025 WL 2602550 (5th Cir. Sept. 9, 2025). In that instance, Story and another audience member had an argument following a vote at a county commissioners' court meeting. *Id.* at *2. The presiding officer addressed Story, who, as he did here, argued with the judge, who ejected Story. *Id.* As here, Story complained he was "singled out" because the people who applauded and the other person involved in the argument were not ejected. *Id,* However, the Court concluded that, because "the uncontested video evidence incorporated into his pleading shows that Story engaged in an extended colloquy with Judge Gravell, all while being warned to discontinue the interruption," he had "not plausibly plead that he was treated differently from anyone who committed a *sustained* violation of the court's decorum rules." *Id.* at *5 (emphasis added).

This Court previously noted that "[u]nstructured, chaotic school board meetings not only would be inefficient but also could deny other citizens the chance to make their voices heard." Dkt. 13 (quoting *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 433 (6th Cir. 2009) (citations omitted)); *see also Rowe v. City of Cocoa*, 358 F.3d 800, 803 (11th Cir. 2004) (per curiam). School boards also have a particular interest in ensuring specially-called meetings focus on the topic at hand. Story had a channel available to him to raise his concerns. Three days later, the Board held their regular August 19th Meeting where Story could—and did—speak during public comment about Azaiez and the protective order. App. 205; App. 298 at 15:10–17:37. But rather than wait to avail himself of that channel, he chose to disrupt a school board meeting called to address COVID-19 protocols during the dangerous Delta surge. That choice—and his persistent refusal to stop speaking despite the Board President's repeated warnings that he was off-topic—led to his removal.

### D. Story was treated differently from the other off-topic speakers because he behaved differently from the other off-topic speakers.

The Equal Protection Clause "is essentially a direction that all persons *similarly situated* should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "Similarly situated

means in all relevant respects alike." *Golden Glow Tanning Salon, Inc. v. City of Columbus, Mississippi*, 52 F.4th 974, 978 (5th Cir. 2022) (quoting *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 513 (5th Cir. 2021)). When individuals are treated differently because they are differently situated, there can be no equal protection violation. *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020); *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988).

The same distinctions in how Story reacted to being warned to stay on topic make him not similarly situated to the other speakers for purposes of his Fourteenth Amendment claim. When others were asked to stop speaking because they were off-topic, they did so. For example, Ms. Winters was already walking away from the microphone when she was advised that she was off topic. *See* App. 279 at 2:09:08–2:09:13. Ms. Sims said nothing further after being told to stop (*Id.* at 1:34:17 - 1:35:50), and Ms. White said nothing further after Weir called for her removal, instead leaving willingly. *Id.* at 2:26:19–2:26:4. The two virtual speakers who wandered off-topic either stopped speaking or were muted. *Id.* at 3:02:22-3:02-27, 3:25:40-3:26:09. In contrast, Story never stopped speaking off-topic and raised his voice to be heard after his microphone was cut off and even as he was being escorted out of the meeting. *Id.* at 2:48:59–2:49:35; App. 94 at 0:33–1:02.

Without a showing that he was treated differently than a similarly situated speaker, Story's Fourteenth Amendment claim fails.

## II.    Story's removal was not an unreasonable seizure under the Fourth Amendment.

The Constitution only prohibits unreasonable searches and seizures. *Terry v. Ohio*, 392 U.S. 1, 11 (1968). "A temporary, warrantless detention of an individual constitutes a seizure for Fourth Amendment purposes and must be justified by reasonable suspicion that criminal activity has taken or is currently taking place . . . ." *United States v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). Reasonable suspicion requires more than a hunch, but "obviously less [proof] than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014). Here, the basis for removing Story from the

14

August 16th Meeting—hindering proceedings by disorderly conduct—also formed the basis for their ultimate arrests, which the Magistrate found to be supported by probable cause. Because his arrests on charges of hindering proceedings by disorderly conduct was supported by probable cause as determined by an independent intermediary, his removal from the Board meetings for the same misconduct based on the less demanding reasonable suspicion standard was likewise not unreasonable. *See United States v. Tarango-Hinojos*, 791 F.2d 1174, at 1176 (5th Cir. 1986).

Even assuming the Magistrate's finding of probable cause was not enough, at the dismissal stage, the Court could not determine that Story's seizure was reasonable, given the factual disputes. *Id.* But now, given, a.) clear evidence that, *unlike any other speaker at the August 16th Meeting*, Story continued to disrupt the meeting even after being warned about his off-topic speech; and b.) the complete lack of evidence that the removal was based on viewpoint discrimination (rather than his sustained violation of the rules), there is no grounds to determine that the seizure was unreasonable. Indeed, both Pope and Pontillo attest that, at the August 16th Meeting, Story intentionally or recklessly hindered the meeting by making noise (shouting from the crowd) or by tumultuous behavior or disturbance (continuing to speak when told he was off topic). App. 7–11, 113–114, 116. They had reasonable suspicion to believe Story had committed an offense. And the short, purported seizure—escorting him out of the meeting room and building—was not unreasonable based on Story's actions.

## III. Story has no evidence that Pope and Pontillo used excessive force when removing him from the August 16th Meeting.

To the extent that Story asserts an excessive force claim against Pope and Pontillo related to his removal, he cannot maintain a claim. To establish a claim of excessive force against Pope or Pontillo, Story must show he suffered an injury that resulted directly and only from a use of force by Pope or Pontillo that was clearly excessive and that the excessiveness was clearly unreasonable. *See Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009). Moreover, the allegations must demonstrate he suffered some form of injury that is more than *de*

*minimis. Buehler v. Dear*, 27 F.4th 969, 983 (5th Cir. 2022). The injury necessary to establish a constitutional violation is directly related to the amount of force that is constitutionally permissible under the circumstances. *Williams v. Bramer*, 180 F.3d 699, 703–04 (5th Cir. 1999). "Any force found to be objectively unreasonable necessarily exceeds the *de minimis* threshold, and, conversely, objectively reasonable force will result in *de minimis* injuries only." Dkt. 43, p. 25 (citing *Byrd v. Cornelius*, 52 F.4th 265, 274 (5th Cir. 2022) (quoting *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017)). The vantage point of the Court is "the perspective of a reasonable officer on the scene, rather than . . . the 20/20 vision of hindsight." *Betts v. Brennan*, 22 F.4th 577, 582 (5th Cir. 2022). Various factors guide the analysis, including the severity of the crime at issue, whether the suspect poses an immediate safety threat to officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.*

When asked in his deposition if he sustained any physical injury on August 16th, Story answered: "I mean, other than them just grabbing me really hard and dragging me out of the room? . . . No, not – not other than that." App. 321 at 138:24–139:4. The body camera footage also shows Story was not injured; Story even repeatedly stated he was calm, indicating no psychological injury. App. 94. Pontillo's body camera footage also indisputably demonstrates that any use of force by Pope and Pontillo was not clearly excessive or unreasonable. *Id.* Pope braced Story's arms, and Pontillo momentarily grabbed his arm, to escort him out of the room when he would not leave and resisted their efforts to remove him. App. 11, 113–14. Story has no evidence that Pope or Pontillo used excessive force, and the video evidence shows that Story cannot maintain a claim.

## IV.    Story cannot maintain a false arrest claim against Officer Pope.

"A constitutional claim for false arrest . . . 'requires a showing of no probable cause.'" *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (internal citations omitted). But the Constitution does not guarantee that only the guilty will be arrested. *Baker v. McCollan*, 443 U.S. 137, 145 (1979).

An arrest based on a valid warrant is not a false arrest, is not unconstitutional, and cannot form the basis of a Fourth Amendment claim. *Smith v. Gonzalez*, 670 F.2d 522, 526 (5th Cir. 1982). A "complaint based on such an arrest is subject to dismissal for failure to state a claim." *Id.* If a warrant is issued by an intermediary magistrate judge, the causal chain is broken, and the initiating party is insulated. *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013); *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988).

Pope's sole involvement in Story's arrest was the preparation of his Investigation Report and Reporting Narrative, which Detective Griffith reviewed, and his conversation with Griffith to confirm the facts set forth in his Reporting Narrative. App. 12–13, 33–36. An independent intermediary found probable cause. And the video evidence shows that the information Pope provided was not false. Therefore, the intermediary's finding of probable cause shows that Pope cannot be held liable for false arrest. This claim against him should be dismissed, as more fully discussed in Azaiez, Yarbrough, and Griffith's Motion. Dkt. 125, pp. 13–20.

## V.     Even if Story could show that his removal or arrest violated his constitutional rights, he cannot overcome the Defendants' qualified immunity.

### A.     Weir did not violate Story's clearly established rights.

School officials are "entitled to qualified immunity if their 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Longoria v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 264 (5th Cir. 2019) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity provides 'ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Wooley v. City of Baton Rouge*, 211 F.3d 913, 918–19 (5th Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335 (1986)). A plaintiff can defeat qualified immunity only if they demonstrate that (i) the official violated a clearly established constitutional right, and (ii) the official's conduct was objectively unreasonable "in light of clearly established law at the time[.]" *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000).

"It is beyond debate that the law prohibits viewpoint discrimination in a limited public forum." *Heaney*, 846 F.3d 795, 801 (5th Cir. 2017). But it is also clear that school boards may limit public comment to agenda items and restrict off-topic speech. *Fairchild*, 597 F.3d at 759. And courts assess the reasonableness of an official's actions "in light of 'the facts available to him at the time of his action.'" *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 614 (5th Cir. 2004) (quoting *Chiu*, 339 F.3d at 284). Here, the evidence establishes that Story violated the valid restrictions on public comment and that Weir consistently stopped individuals from speaking on topic. In the absence of any direct evidence of animus, the question becomes whether, under these circumstances, Weir acted clearly unreasonably in removing Story from the meeting after he continued to speak off-topic despite being told to stop—even though she did not remove others who did *not* continue to speak after being warned—was a violation of a clearly established First or Fourteenth Amendment right. He cannot make such a showing in the Fifth Circuit, considering *Heany* and the decision in Story's own prior case. *Heaney*, 846 F.3d at 802; *Story,* 2025 WL 2602550 at *5.

### B.    Pope and Pontillo have qualified immunity because they were carrying out Weir's directive and their actions were not clearly unreasonable.

*Heany* is dispositive as to the officers' immunity. In that case, as here, the officer was responsible for responding to requests by the council president to address disruptions. *Compare Heaney*, 846 F.3d at 805 *with* App. 7–10, 113–15, 208–09. The Fifth Circuit found that the officer was entitled to qualified immunity because he "had no reason to believe that he was violating Heaney's First Amendment rights by following" the order. *Id.* As such, his actions in responding to the presiding officer's request were not objectively unreasonable in light of clearly established law, *even though* the plaintiff did not violate the limited public forum's reasonable restrictions. *Id.*; *Gonzales v. Dankel*, No. 4:22-CV-416, 2024 WL 2959821, at *8 (E.D. Tex. June 12, 2024) ("[A] reasonable police officer would not understand that removing an individual from a meeting at the direction of the School Board President . . . violates the individual's First Amendment rights.").

That conclusion is even more obvious here, where Story clearly violated the public comment limits, and Pope and Pontillo personally observed him continue to speak after being warned by Weir. Like the officer in *Heany*, neither Pope nor Pontillo were "required to cross-examine and second-guess [the presiding officer] regarding his First Amendment motives before acting." *Heany*, 846 F.3d at 805 (quoting *Collinson v. Gott*, 895 F.2d 994, 997 (4th Cir. 1990) (affirming qualified immunity for a sheriff's deputy who escorted a citizen out of a city council meeting upon receiving orders to do so from the presiding officer). What *is* unreasonable is to expect Pope or Pontillo to, in the moment, second-guess the Board's president on what is or is not off-topic and refuse to remove someone who continued to speak even after being warned and having his microphone cut off.

*Heany* also resolves Story's Fourth Amendment unreasonable seizure claims. As with that officer, Pope and Pontillo reasonably believed it was their duty to prevent disruptions to the Board's meeting. *Compare Heaney*, 846 F.3d at 805 *with* App. 008–10 *and* App. 113-14. Therefore, as in *Heany*, it was "not objectively unreasonable for [Pope and Pontillo] to respond to [Weir's] request and escort [Story] out of the room . . . ." *Heaney*, 846 F.3d at 805; *see also Von Derhaar v. Watson*, 109 F.4th 817, 830 (5th Cir. 2024). As such, the officers are entitled to qualified immunity on the Fourth Amendment claim. *See Heaney*, 846 F.3d at 805.[8] Without clear case law requiring officers to second-guess a presiding officer's judgment as to whether a procedural rule has been violated—and whether a person's continued violation of that rule justifies removal—Story cannot overcome Pope's or Pontillo's qualified immunity as to his First or Fourth Amendment claims regarding his removal.

With respect to the Fourteenth Amendment, even if the Court were to conclude that Story was similarly situated to other off-topic speakers, to overcome the officers' qualified immunity, Story

---

[8]    Other circuits have reached similar conclusions. In *Halley v. Huckaby*, the Tenth Circuit granted qualified immunity to an officer sued for unlawful seizure because "he merely relied on" another official's directions to transport a minor child to a safe-house "without knowing specifics," and therefore reasonably responded "to what he could have assumed to be an adequately supported child welfare investigation." 902 F.3d 1136, 1149–51 (10th Cir. 2018). The Second Circuit granted qualified immunity to officers who "reasonably could have concluded, given [a superior's] order, that probable cause existed to seize" the plaintiff. *Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003).

would need to show that it was unreasonable for Pope and Pontillo to reach a different conclusion. Given Fifth Circuit case law regarding what it means to be similarly situated (*see Golden Glow*, 52 F.4th at 978; *Tex. Ent. Ass'n*, 10 F.4th at 513) and the lack of evidence that another speaker interrupted Weir's warnings and raised their voice to be heard after their microphone was turned off, there is no way for Story to do this. While there are Fifth Circuit cases holding that similar differences prevent parties from being similarly situated, *see Story*, 2025 WL 2602550, at *5, the undersigned counsel is unaware of any case law finding two individuals to be similarly situated despite such key differences in their behavior. Under such circumstances, it can hardly be said that any reasonable officer would know that Story was similarly situated to the other off-topic speakers who were not removed.

### C. Pope and Pontillo did not act in an objectively unreasonable manner, given the clearly established law regarding Story's excessive force or false arrest claim.

Story cannot show that Pope or Pontillo's limited physical contact to remove him from the meeting, while Story resisted, violated his clearly established constitutional rights, or that their actions were clearly unreasonable under the circumstances known to them at the time. At the pleadings stage, the Court referenced the standard for excessive force and found that Story's allegation that he was slammed to the ground at a different Board meeting was sufficient to state a claim. But the reasonable force used by Pope and Pontillo reflected in the video body camera footage, App. 94, shows that any force used was not clearly excessive. Story has never presented a case to show that a physical escort from a room resulting in no physical injuries would violate a person's constitutional rights, much less their clearly-established rights.

The same is true for Story's false arrest claim against Pope. Pope merely recited the events as he recalled them from the meeting. There were no facts that were false. While Story may quibble with the words used or the characterization of events, that does not show participation in a false arrest to violate Story's clearly established constitutional rights. *See* Dkt. 25, pp. 19–20.

Respectfully submitted,

/s/    *Kathryn E. Long*
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on this 12th day of December, 2025.

Stephen D. Casey                  Warren V. Norred
CASEY LAW OFFICE, P.C.            Solomon G. Norred
P.O. Box 2451                     NORRED LAW, PLLC
Round Rock, Texas 78680          515 E. Border St.
stephen@caseylawoffice.us        Arlington, TX 76010
                                  warren@norredlaw.com

/s/    *Kathryn E. Long*
Kathryn Long