IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS − AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY, | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| SUPERINTENDENT HAFEDH AZAIEZ, | § | CIVIL ACTION NO. |
| TRUSTEES AMBER FELLER, TIFFANIE | § | 1:22-cv-00448-DAE |
| HARRISON, AMY WEIR, JUN XIAO, CORY | § | |
| VESSA; OFFICERS JEFFREY YARBROUGH, | § | |
| JAMES WILLIBY, DEBORAH GRIFFITH, | § | |
| MILTON POPE, FRANK PONTILLO, RON | § | |
| COLE, CHIEF DENNIS WEINER, and CARLA | § | |
| AMACHER, individually, and ROUND ROCK | § | |
| INDEP. SCHOOL DISTRICT, | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS DR. HAFEDH AZAIEZ, JEFFREY YARBROUGH, AND
LAUREN GRIFFITH'S AMENDED MOTION FOR SUMMARY JUDGMENT**

---

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## SUMMARY OF THE ARGUMENT

Story asserts First Amendment retaliatory arrest claims against Superintendent Dr. Hafedh Azaiez, former Chief of Police Jeffrey Yarbrough, and Detective Sergeant Lauren Griffith, and a Fourth Amendment false arrest claim against Griffith. Story was arrested based on his conduct at the August 16, 2021 meeting of RRISD's Board of Trustees (the "August 16th Meeting"). The Court should grant summary judgment on Story's First Amendment retaliation claim because there was probable cause to arrest Story for violating Texas Penal Code § 38.13 by hindering proceedings by disorderly conduct. And Story cannot meet the narrow exception to this bar to his retaliatory arrest claim. Moreover, the speech that forms the basis of the claim is not protected speech. Even if Story could satisfy these threshold requirements, he has no competent evidence that his speech played any role in his arrest. Defendants' evidence—including the videorecording of the August 16th Meeting and body camera footage—shows that it was Story's disruptive conduct that was the reason for his arrest.

Story's false arrest claim against Griffith fails because an independent intermediary—a Williamson County magistrate judge—found there was probable cause. Griffith did not make a false statement knowingly and intentionally, or with reckless disregard for the truth, in the Warrant Affidavit that the magistrate judge signed. Story's hyper-specific objections to the words Griffith used or her characterization of events is not sufficient. Further, the disagreements that Story raises to the Warrant Affidavit were not necessary to the magistrate judge finding probable cause. The video footage demonstrates that the salient facts Griffith provided were correct. Even if the independent intermediary's determination did not bar his claims, the evidence, including video footage, shows there was probable cause for Story's arrest for violating Texas Penal Code § 38.13.

Even if Story could otherwise maintain a claim, Azaiez, Yarbrough, and Griffith are entitled to summary judgment because they did not act in an objectively unreasonable manner to violate Story's clearly-established rights. Therefore, Story cannot overcome Defendants' qualified immunity.

**STATEMENT OF FACTS**[1]

In June 2021, RRISD's Board hired Azaiez to serve as the District's Superintendent effective July 5, 2021. App. 188–91, ¶¶ 4–12.[2] In July 2021, there were allegations made against Azaiez about his personal life and that he had threatened and assaulted a woman he knew, which Azaiez denies. App. 168, ¶ 12; App. 192, ¶ 17. On July 29, 2021, an ex parte temporary protective order was entered against Azaiez. Dkt. 1-1, Ex. 3.

Between July 23, 2021 and August 12, 2021, Story emailed the RRISD Trustees to address the allegations against Azaiez and the protective order, and request the opportunity to provide testimony to the Board. App. 193–94, ¶¶ 19–26; App. 221–25. Azaiez, Yarbrough, and Griffith were unaware of Story's emails to the Board. App. 42–44, ¶¶ 14, 20, 24; App. 141–42, ¶ 16; App. 168–69, ¶¶ 14–16.[3]

In late July and early August 2021, COVID-19 cases were rising, and there was heightened concern regarding the new Delta variant. App. 167–68, ¶¶ 8–11, 17; App. 195–96, ¶¶ 28–30. To address concerns related to the new Delta variant, at 2:00 p.m. on August 12, 2021, the District posted notice that the Board would have a *special* meeting on August 16, 2021, and discuss a potential mask mandate. App. 196, ¶¶ 29–30; App. 226–28.[4] There were only two items on the Agenda: (1) D.1—"Adoption of Resolution for Employee COVID-19 Positive Extended Leave During COVID-19 Pandemic"; and (2) D.2–"Fall 2021 COVID-19 Health and Safety Protocols." App. 226–28.

Board policy BED (Local) addresses public participation at Board Meetings. App. 188, ¶ 3; App. 208–11. BED (Local)provides that at special or called meetings, "public comment shall be

---

[1]    Defendants are submitting an Amended Appendix in support of all RRISD Defendants' Motions for Summary Judgment, which is incorporated by reference. The Appendix pages are cited herein as "App."

[2]    *See also* App. 165, ¶ 4; App. 175–86; App. 407 at 109:3–111:5, 112:7–13; App. 504–05 at 41:5–42:24, 49:2–50:23.

[3]    *See also* App. 193–94, ¶¶ 19–26; App. 381–83 at 19:19–21:7, 21:23–25, 24:17–25:4; App. 419, 422 at 171:10–172:14, 199:1–200:15; App. 529–30, 538 at 60:24–61:6, 61:21–62:7, 64:12–24, 98:20–23, 98:24–99:1, 99:7–17.

[4]    *See also* App. 410–14 at 134:5–135:4, 136:16–137:8, 138:20–139:3, 139:21-147:11; App. 426–29; App. 506–07 at 79:3-80:3, 81:5–10.

limited to items on the agenda posted with notice of the meeting." App. 208. BED (Local) also addresses disruptions at Board meetings and provides that "the presiding officer may request assistance from law enforcement officials to have [a disruptive] individual removed from the meeting." App. 209; *see also* App. 210 (citing Texas Penal Code § 42.05).

**The August 16, 2021 Board Meeting**

Because the August 16th Meeting was a specially-called Board meeting, App. 198, ¶ 35, public comment was limited to the two items on the agenda for the August 16th Meeting. App. 226–28.

The afternoon of the August 16th Meeting, Story engaged in text messages with then-Trustee Danielle Weston, one of the Trustees who voted against hiring Azaiez. App. 353, App. 507–08 at 82:14, 85:19–86:22; *see also* App. 407 at 112:7–13; App. 505 at 49:2–50:9, 50:17–23. Weston and Story had the following text exchange:

> Hey Jeremy,
> Our board policy allows for public comments on items both on and off the agenda only at the monthly "Regular" board meeting. For called meetings (like tonight), public comments are limited to items that are on the agenda.
>
> Thursday of this week is a "Regular" board meeting.

App. 353. Story responded:

> It seems to me that the public complaints GF legal policy would allow for otherwise since a "called" meeting is still a public meeting. Can you point me to the policy you are describing? Is it some edict from the Board President or a particular policy? Willing to challenge kindly by simply speaking on a different subject if there is no policy.

*Id.*

Story signed up to speak at the August 16th Meeting. In the form he submitted to speak during public comment, Story wrote that he would be speaking on topic "2" related to COVID-19 health and safety protocols, "or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 199, ¶ 37; App. 102.

Because of the recent surge in COVID cases, the District's administration, with approval of Azaiez, limited seating in the Board meeting room and arranged the chairs to enforce social distancing. App. 197–98, ¶¶ 32–34. It set up an overflow room for individuals who came to the meeting but did not obtain a seat in the meeting room. *Id.* Before and as the August 16th Meeting began, Story did not have a chair in the meeting room and was standing at the back of the room. App. 5, ¶ 15; App. 93. Officer Milton Pope and, then, Officer Frank Pontillo both explained the social distancing protocols to Story. App. 5–6, ¶¶ 15–20; App. 111–12, ¶¶ 16–21; App. 93 at 1:14–5:53; App. 377–78. Story refused to leave the meeting room and asserted that the social distancing requirements were unlawful. *Id.* At one point he stated that he wanted a Trustee to tell him to leave. App. 111, ¶ 18; App. 93. During this interaction, after the meeting began, Story shouted out across the room when a Trustee asked if people were not being allowed in the meeting. App. 6, ¶ 18; App. 112, ¶ 19; App. 93. To deescalate the situation, Pope and Pontillo permitted Story to remain in the meeting room, where he ultimately was offered a chair. App. 6, ¶¶ 19–20; App. 112, ¶¶ 19–21.

When Board President Amy Weir opened the meeting, she noted that approximately 180 people were signed up to speak during public comment, which, at two minutes per person, would take six hours. App. 199, ¶ 38; App. 279 at 1:12-1:22.[5] Generally, during the first hour of public comment, the speakers addressed only agenda items. *Id.* at 1:05:40–2:07:25. Several community members raised the allegations against Azaiez, and Weir advised that they were not allowed to speak about items not on the agenda. *Id.* at 1:35:00–135:50; 2:09:08–2:09:28. Then, Jennifer White veered off the topic of COVID-19 safety protocols and onto the topic of the allegations against Azaiez, attempting to group the two topics together into a broader one on "student safety." *Id.* at 2:26:19–2:26:41. Weir used her

---

[5] Before beginning with public comment from RRISD students, Weir reminded attendees and listeners that the Board allowed for public comment "on items on the agenda." App. 279 at 1:54–2:12. Then, students spoke to the Board regarding the posted agenda items, and the Board heard from the Travis County Health Authority regarding the surge in COVID-19 cases and methods to slow the spread of the disease, such as mask mandates. App. 279. The Board began public comment for non-students, a little after 6:30 p.m. App. 279 at 1:05:11.

gavel to halt White, and Board Vice President Amber Feller Landrum stated, "I'm sorry, you're not allowed to talk about items not on the agenda." *Id.* When White continued speaking, Weir asked for White to be escorted out. But by then, White had stopped speaking and left. *Id.*

Story can be heard off-camera, yelling "it's germane" more than once and "it's on the agenda." *Id.* at 2:26:37–2:27:07; *see also* App. 145, ¶ 25; App. 161 at 1:18–1:18:28. Weir responded by explaining that the agenda was limited to COVID-19 health and safety protocols and the employee resolution, ending with "You have to stop. You will be asked to leave." App. 279 at 2:26:39–2:27:07. Shortly thereafter, the Board took a break. *Id.* at 2:27:08–2:33:40. During the break, Yarbrough walked over to give Story a warning regarding his outbursts and warn him that he could not disrupt the meeting. *Id.* at 2:33:50–2:34:05; App. 145–46, ¶¶ 25–27; App. 161.

After a few more speakers, Story was called to speak.[6] As he was walking to the microphone, Weir warned him, "Mr. Story, you did write that you felt like you could speak about something other than D1 or D2. I would like to remind you this is a special-called meeting. It is not a regular board meeting. We are only taking comments on these two items." App. 279 at 2:47:12–2:47:30. Story immediately pushed back, saying he could "demonstrate" how what he wanted to discuss is "related to that,"[7] and "show how your resolution that you're debating today has absolute germanity to what I'm going to speak on." *Id.* at 2:47:31–2:47:51. He repeatedly interrupted Weir when she attempted to speak or respond to him, before cutting her off with "good, then I will begin." *Id.* 2:47:31–2:47:58.

Story characterized his testimony as being on the "rule of law," and the resolution regarding COVID-19 protocols as being about "public health and public safety." *Id.* at 2:47:59–2:48:48. He then began to speak louder, stating "Several of you have demonstrated strong disregard for the rule of law.

---

[6]    The entirety can be found at App. 279 at 2:47:13–2:49:35, with body camera footage providing a different vantage point. App. 94.

[7]    Although Story was speaking over Weir, she stated that she "did not want him to *demonstrate*" how it was related, and stated she was "absolutely willing to hear [him] on D1 and D2." App. 279 at 2:47:31–2:47:59. (emphasis added).

You consider public safety today by violating the Supreme Court of Texas. Still more, our superintendent has a protective order filed against him." *Id.* at 2:48:49–2:48:59. Weir told him he could not speak on that issue because it was not on the agenda, but Story ignored her and continued his off-topic comments, so Weir asked that he be removed. *Id.* at 2:48:59–2:49-09; App. 94.[8]

Because Story was off-topic and would not adhere to the presiding officer's directives to stop speaking, Pope and Pontillo complied with Weir's request, approached Story, and directed him to leave. App. 7–11, ¶¶ 24–33; ; App. 113, ¶¶ 24–25; App. 94 at 0:40–0:48. Rather than leave willingly, Story attempted to stand his ground, yelling to be heard without a microphone and resisting as Pope and Pontillo physically moved him across the room to the exit. App. 11, ¶ 33–34; App. 113–14, ¶¶ 26–28; App. 279 at 2:49:00–2:49:35; App. 94 at 0:40–1:02. Story continued to argue with Pope and Pontillo in the hallway. App. 11, ¶¶ 34–35; App. 113, ¶¶ 27–28; App. 94 at 01:41–01:50. As they approached and walked through the overflow room, Story again raised his voice to yell over the testimony on the video feed, continuing until he was outside the building. App. 7–12, 113–15; App. 94 at 1:50–2:49.[9]

Only two individuals at the August 16th Meeting continued speaking after Weir advised they were off-topic: White and Story. App. 279. Weir asked that both be escorted or removed from the meeting room. *Id.* at 2:26:19–2:26:41, 2:48:59–2:49-09. White left voluntarily and did not have to be removed. Story was the only member of the public who continued to speak off-topic despite warnings and did not voluntarily leave, but had to be physically removed from the August 16th Meeting.[10]

---

[8]     The video footage shows that Weir was having issues with her microphone, which prompted Landrum, to assist.

[9]     After Story spoke, a community member testifying via Zoom veered off-topic, criticizing two Board members for their stance against social distancing at the August 16th Meeting and calling them members of Q-Anon. App. 279 at 3:02:09; App. 203, ¶ 52. A trustee quickly raised a point of order, and Weir reminded the community member "we've got to stick to the agenda items" and called the next speaker. App. 279 at 3:02:22–3:02-27. About 20 minutes later, another virtual speaker switched from talking about masks to discussing Afghanistan; Weir interrupted, asking if she was speaking to something on the agenda, then called the next speaker. *Id.* at 3:25:40-3:26:09.

[10]     There was no arrest of Story that evening because there were insufficient law enforcement personnel present to have two officers leave the premises to deal with the arrest. App. 148, ¶ 34; App. 116, ¶ 39.

After the August 16th Meeting, Pope prepared an Incident Report, Reporting Officer's Narrative, and a Use of Force Form. App. 12–13, ¶¶ 39–40; App. 33–38. Pontillo prepared a Case Supplemental Report and Use of Force form. App. 115–16, ¶¶ 35–37; App. 134–136.

**The August 19, 2021 Regular, Monthly Board Meeting**

Three days later, the Board met for its regular meeting. App. 205, ¶¶ 56–57; App. 280–98. Because this was a regular meeting, the public was allowed to "speak on items listed or not listed on the agenda." App. 205, ¶ 57; App. 208; App. 280–81; App. 298. Story and multiple other commenters discussed the allegations against Azaiez and the Board's response to those allegations. *See, e.g.*, App. 298 at 6:40–8:55, 12:58–15:10, 31:21. Story personally spent the entirety of his allotted two minutes, without interruption, on this topic. *Id.* at 15:10–17:37.

**Story's Arrest**

After the August 16th Meeting, Yarbrough reached out to the Williamson County Attorney regarding Story's misconduct. App. 149, ¶ 41; App. 552 at 153:11–155:1; App. 562. The Williamson County Attorney was about to be out of town for several weeks and indicated upon his return he could meet with RRISD police to discuss and staff the case. *Id.*

The RRISD Police Department assigned Griffith to investigate the events of August 16, 2021. App. 44, ¶ 27. Griffith reviewed the reports submitted by Pope and Pontillo,[11] portions of the recording of the August 16th Meeting, and Pontillo's body camera footage. App. 44–46, ¶¶ 27–32; App 84–94; App. 436–37, 441, 443 at 28:10–29:3, 29:14–23, 50:5–17, 57:1–10. She also spoke with Pope to confirm the information in his Reporting Narrative and reviewed Texas Penal Code § 38.13. App. 46, ¶¶ 33–34; App. 442, 449 at 54:8–19, 81:16–21. Griffith believed Story's conduct met the elements

---

[11]    Pope's Reporting Officer Narrative described Story's argument with Pope and Pontillo regarding the COVID-19 protocols, at least one outburst during the meeting, Story "yelling and screaming" when he raised his voice to talk over Weir and as he was being removed from the premises, and his resistance to his and Pontillo's efforts to escort him out of the room and building. App. 86–87; *see also* App. 88. Pontillo's Case Supplemental Report referenced Story's outburst for which Yarbrough had to give Story a verbal warning. App. 88.

for the crime "Hindering Proceedings by Disorderly Conduct" and prepared and signed an Affidavit for Warrant of Arrest and Detention (the "Warrant Affidavit"). App. 46–48, ¶¶ 34–41; App. 448 at 77:11–78:9, 78:24–79:9, 79:24–80:4; App. 95–97.

After review of the Warrant Affidavit, a Williamson County Magistrate found that probable cause existed for the issuance of a warrant of arrest for Story and signed an arrest warrant. App. 48 ¶¶ 42–44; App. 96; App. 99. Shortly thereafter, Williamson County peace officers arrested Story.

## ARGUMENT AND AUTHORITIES

### I.    Overview of Qualified Immunity

When qualified immunity is raised, courts must determine (i) whether the plaintiffs have shown a violation of a constitutional right; and (ii) whether the right was "clearly established" at the time of the official's conduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). If so, the court must evaluate whether the conduct of the official was objectively unreasonable under clearly established law. *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 326 (5th Cir. 1998); *Davis v. McKinney*, 518 F.3d 304, 317 (5th Cir. 2008). Story bears the burden to show that Defendants violated clearly established law. *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 347 (5th Cir. 2017); *Kovacic v. Villareal*, 628 F.3d 209, 212 (5th Cir. 2010), *cert. denied*, 564 U.S. 1004 (2011). He must identify the violation of a "particularized" right so that it is apparent to the official that his actions are unlawful in light of pre-existing law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The defendant's acts are held to be objectively reasonable unless *all* reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution … as alleged by the plaintiff." *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001) (emphasis in original).

### II.    First Amendment Retaliatory Arrest Claim

Generally, a First Amendment retaliation claim requires that a plaintiff show (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him to suffer an injury

that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated against the plaintiff's exercise of constitutionally protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). In the context of a claim for retaliatory arrest, the existence of probable cause for the arrest generally bars the claim. *Spiller v. Harris Cnty., Tex.*, 113 F.4th 573, 579 (5th Cir. 2024). The plaintiff must show the absence of probable cause for the arrest. *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). The Supreme Court in *Nieves* recognized a "slim" exception to this general bar to a retaliatory arrest claim. *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (explaining *Nieves*). This exception applies if the plaintiff presents "objective evidence that he was arrested when other similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407.

Here, there was probable cause for Story's arrest. And Story has no evidence to fall within the *Nieves* exception. Moreover, the alleged speech for which Story was arrested was not protected speech, and there is no evidence that Defendants were motivated by the viewpoint he expressed.

### A.    There is no evidence that Azaiez directed or was involved in Story's arrest.

Story's First Amendment retaliation claim against Azaiez is based on his subjective belief that "Azaiez communicated via text and other means with the Williamson County Judge and other county officials to encourage the county to arrest Plaintiffs" and that "Azaiez employed his personal police force to create a false affidavit, secure an arrest warrant and then encouraged the retaliatory arrest." Dkt. 49, ¶ 96. In his deposition, it became clear that Story's belief was just that—he could not cite any evidence to support that belief. App. 328–29 at 228:17-229:5. Despite multiple opportunities to identify which Williamson County Official had told him what District official had talked to whom at the County before his arrest, Story could not identify any of the individuals involved, much less confirm Azaiez communicated with the magistrate judge. App. 329–32 at 229:6-236:11; 241:2-23.

Azaiez attested he was not involved in any way in the Warrant Affidavit or Story's arrest, and never spoke with any Williamson County official. App. 173–74, ¶¶ 33–36; App. 387–88, 391–94 at 90:17–91:23, 92:13–93:2, 105:5–8, 105;17–106:3, 112:13–16, 117:8–16. Furthermore, Yarbrough and Griffith testified that Azaiez did not direct Story's arrest and was not involved in any step in the arrest process or the preparation of the Warrant Affidavit. App. 49–50, ¶ 45; App. 139–40, ¶ 8; App. 149–50, ¶ 40; App. 152, ¶ 52; App.460, 462 at 148:7–25, 155:16–156:25; *see also* App. 15, ¶ 47.[12]

Because there is no evidence that Azaiez was involved in or directed anything about the arrest, Story's only remaining claim against him should be dismissed.

### B.    There was probable cause for Story's arrest.

As set forth *infra*, a Williamson County magistrate judge found there was probable cause for Story's arrest, App. 95–97, 99, and Story cannot show that this process was tainted. Even if the independent intermediary's decision did not bar Story's retaliatory arrest claim, the summary judgment evidence, including the video footage, shows there was probable cause for Story's arrest. App. 94; App. 279 at 2:47:13–2:49:35. Texas Penal Code § 38.13 provides that a person commits an offense if "he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance" or "recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist." TEX. PENAL CODE § 38.13.

Here, then-Trustee Weston advised Story before the August 16th Meeting that he could speak only about items on the agenda for the meeting. App. 353. Story responded that he was "willing to challenge kindly by simply speaking on a different subject if there is no policy." *Id.* This is evidence of knowledge and intent to speak off-topic. When Story signed up to speak at the August 16th Meeting,

---

[12]    Azaiez did not give Yarbrough "any directives or instructions regarding Mr. Story or how to proceed regarding Mr. Story's conduct at the August 16 meeting," and "never spoke with [Yarbrough] about the investigation or any law enforcement decisions" regarding Story's conduct. App. 149–50, ¶ 40. Griffith never spoke with Azaiez regarding Story, the August 16th Meeting, or her investigation, and he did not oversee or provide any guidance regarding whether to submit the warrant affidavit to a magistrate judge for Story's arrest. App. 49, ¶ 45. And they both testified that Azaiez had *no* involvement in preparing the warrant affidavit or in the decision to submit it for arrest. App. 50, ¶ 40; App. 152, ¶ 52.

he wrote he would be speaking on topic "2" related to COVID-19 health and safety protocols, "or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 102. This further evinces knowledge and intent. Then, Weir advised the audience at the beginning of the August 16th Meeting that public comment was limited to items on the agenda, repeatedly advised speakers who spoke about the allegations against Azaiez that this was not a topic on the agenda, and even advised Story when he yelled from the audience that this topic was not an agenda item. App. 279 at:1:54–2:12, 1:35:00–135:50; 2:09:08–2:09:28, 2:26:19–2:27:07. On more than one occasion, Story yelled from the audience in a disruptive manner, which required a warning from Yarbrough. App. 6, ¶ 18; App. 112, ¶ 19; App. 93; App. 279 at 2:26:37–2:27:07, 2:33:50–2:34:05; App. 145–46, ¶¶ 25–27.

Before Story began his public comment, Weir warned him again of the forum rules because he had advised in writing that he did not believe he was limited to speaking about agenda items. App. 279 at 2:47:12–2:47:30. Despite this warning, Story deviated from the agenda items to raise the protective order against Azaiez. *Id.* at 2:48:49–2:48:59. Story continued speaking despite Weir's directive that he was speaking off-topic, even after she asked that he be removed from the meeting. And Story refused to leave and resisted physical removal, and yelled as he was being escorted from the room. *Id.* at 2:48:49–2:49:09; App. 94. His disruptive behavior continued as he was being escorted from the building, while others were watching the Board meeting in the overflow room. App. 94. This evidence shows that there was probable cause that Story intentionally, or recklessly despite warning, hindered proceedings by noise or tumultuous behavior. Yarbrough and Griffith both attested they believed Story's conduct met the elements of Section 38.13. App. 44–47, ¶¶ 27–36; App. 50–51, ¶ 48; App. 146–48, ¶¶ 28–34, 36l.[13]

---

[13]    *See also* App. 538–539, 543–49 at 100:1–12, 101:5–104:10, 117:13–18, 121:11–122:6, 122:19–123:25, 124:16–22, 126:14–20, 128:14–129:14, 138:12–140:1, 140:23–141:3; App. 443–456 at 57:22–58:15, 61:1–6, 61:18–63:16, 66:12–19, 66:23–67:10, 68:1–70:20, 74:8–15, 75:17–76:4, 82:9–13, 88:11–89:8. 91:17–92:23, 97:11–19, 104:1–106:2, 107:6–19, 108:8–109;8, 120:8–25.

The existence of probable cause, discussed above, generally bars a retaliatory arrest claim. And, here, Story does not have any objective evidence that he was arrested when other similarly situated individuals not engaged in the same sort of protected speech had not been. More specifically, Story has no evidence that Azaiez, Yarbrough, or Griffith made disparate decisions related to his arrest. Story cannot identify anyone else who engaged in the continuous conduct to disrupt a meeting like he did at the August 16th Meeting. Yarbrough attested that he "had never seen anyone behave or engage in disruptive conduct like Mr. Story did at the August 16th Meeting." App. 149, ¶ 39. And Griffith stated that she was unaware of any other speaker at the August 16th Meeting who engaged in similar misconduct. App. 52, ¶ 54.

Because there was probable cause for his arrest and Story has no objective evidence to fall within the narrow *Nieves* exception, summary judgment is proper on his retaliatory arrest claim. Even if Story could establish an underlying violation, he cannot show that it was objectively unreasonable for Defendants to believe there was probable cause for his arrest to overcome their qualified immunity.

### C.    Story's off-topic speech was not protected by the First Amendment.

Whether Story was engaged in protected speech is also a threshold issue. *Cornelius v. NAACP*, 473 U.S. 788, 797 (1985) ("To resolve this issue we must first decide whether solicitation in the context of the CFC is speech protected by the First Amendment, for, if it is not, we need go no further.). The Fifth Circuit has held that school board meetings are a limited forum.[14] *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010). In a limited public forum, the government may restrict speech "as long as the regulation '(1) does not discriminate against speech on the basis of viewpoint and (2) is reasonable in light of the purpose served by the forum.'" *Id.* at 758 (quoting *Chiu v. Plano Indep. Sch. Dist.,* 260 F.3d 330, 346 (5th Cir.2001)). When a speaker in a limited public forum violates a lawful

---

[14]    The parties and the Court agreed that the August 16th Meeting was a limited public forum because it was "dedicated solely to the discussion of certain subjects." Dkt. 43 at 12 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).

restriction, their speech ceases to be protected. *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) ("If Heaney were to have violated a reasonable restriction, such as a topic or time constraint, there would be no constitutional violation."); *see also Crawford–El v. Britton*, 523 U.S. 574, 593 (1998); *Sousa v. Seekonk Sch. Comm.*, No. 1:22-CV-40120-IT, 2023 WL 349923, at *9 (D. Mass. Jan. 20, 2023).

Here, when Story began his comments, his speech was undoubtedly protected. But that is not the speech he claims to have been arrested for—rather, he claims that he was arrested for "bringing up [] Azaiez and his misdeeds." App. 324 at 150:2-15, 190:1-8. In a public forum, the First Amendment would protect his speech regarding allegations against the Azaiez, but in a school board meeting dedicated to COVID-19 protocols and leave, it does not. *See Fairchild*, 597 F.3d at 759.

> School boards are permitted to set reasonable, viewpoint-neutral limits on the subject matter of and the process by which members of the public may provide comment, as well as on the time, place, and manner of said comments. Otherwise, members of the public would be free to raise idiosyncratic, personal complaints and air irrelevant grievances—thereby derailing or delaying a school board's work, frustrating the purpose of the meeting, and denying other citizens the chance to make their voices heard. **In short, the First Amendment does not provide a right to commandeer school board meetings.**

*Moms for Liberty - Wilson Cnty., Tenn. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508 (6th Cir. 2025) (cleaned up, internal citation omitted); *see also Biggs-Leavy v. Lewis*, No. 24-1317, 2025 WL 451369, at *3 (6th Cir. Feb. 10, 2025) (where plaintiff interrupted meeting and, when admonished, continued to voice her objection, removal was "tied to her failure to adhere to the rules and her continuing protests" and thus did not violate her speech rights). Hence, Story was not engaged in protected speech when he continued to speak off-topic about Azaiez and to protest the instruction to have him removed, even yelling out to be heard after the microphone was turned off. *Startzell v. City of Philadelphia, Penn.*, 533 F.3d 183, 198 (3d Cir. 2008) ("The right of free speech does not encompass the right to cause

disruption.").[15] Story's "retaliation claim fails on this basis alone." *San Antonio Firefighters' Ass'n, Local 624*, 404 F.Supp.3d at 1063; *see Porter v. City of Philadelphia*, 975 F.3d 374, 393 (3d Cir. 2020).

Even if the Court were to find that Story's speech was protected, in light of the foregoing caselaw, that right is not clearly established to overcome Defendants' qualified immunity.

### D.    Story's arrest was not motivated by retaliatory animus but was sought because he disrupted and hindered the August 16th Meeting.

Story has no direct evidence of animus or retaliatory intent by Azaiez, Yarbrough, or Griffith. There is, likewise, no circumstantial evidence of their retaliatory intent or animus. Story's subjective belief that his arrest was motivated by the viewpoint he expressed in his public comment is not supported by any actual evidence. Griffith and Yarbrough denied that Story's speech played any role in any decisions made. App. 50–51, ¶ 48; App. 151, ¶ 50. And, as discussed *supra*, pp. 9–10, Azaiez was not involved in the arrest.

Yarbrough confirmed that Story's disruptive conduct was the impetus for his removal in a conversation Story recorded on August 19, 2021. App. 161; *see also* App. 147, ¶ 30. Yarbrough cited Story to Texas Education Code § 37.105 and Texas Penal Code §§ 38.13 and 42.05 and stated that when he started speaking off topic, the Board President asked him to stop, he continued speaking, and refused to leave when removal was requested, that this triggered the law enforcement response. App. 161 at 5:10–6:21, 6:55–7:37, 8:50–9:15. And Griffith believed Story's conduct met the elements for the crime "Hindering Proceedings by Disorderly Conduct" and prepared and signed the Warrant Affidavit. App. 46–48, ¶¶ 34–41; App. 448 at 77:11–78:9, 78:24–79:9, 79:24–80:4; App. 95–97. The video footage she reviewed showed Story speaking over Weir, continuing to speak after he was told

---

[15]    *See also. See San Antonio Firefighters' Ass'n, Local 624 v. City of San Antonio*, 404 F.Supp.3d 1045, 1063 (W.D. Tex. 2019) ("While the First Amendment would protect such activities in a different forum, such activities are not protected in a nonpublic forum."); *cf.* Dkt. 43 at 22. ("If Clark was not a recognized speaker when he was making these comments, he was not engaged in constitutionally protected activity.") (citing *Sousa*, 2023 WL 349923, at *9 (holding that the plaintiff had "not shown a likelihood of success on the merits of his claim that his speech—which occurred outside of any period where he was a recognized speaker—was protected")).

he was off-topic, raising his voice once his microphone was turned off, and yelling as he was being escorted, including doing so in the overflow room in a manner that disrupted attendees' ability to follow the meeting. App.46–47, ¶¶ 34–36; App. 93, App. 94, App. 279. This conduct was the basis for the Warrant Affidavit. App. 95–96.

To the extent Story asserts that the other people who spoke off-topic during the August 16th Meeting were not arrested, this does not raise a fact issue. None of those individuals behaved in the same manner as Story. *See, e.g.*, App. 279 at  2:09:08–2:09:13, 2:26:19–2:26:41, 3:02:22-3:02-27. Story was the only speaker to have previously interrupted the meeting by loudly calling out when he did not have the floor. He was the only one to repeatedly interrupt Weir when she reminded him that he needed to limit his comments to the posted agenda item. And he was the only individual who had to be physically escorted from the room, resisted leaving the meeting, and yelled out during the process. Even more importantly, Story and many others spoke about the accusations against Azaiez just three days later, at the August 19th Board Meeting, and he was not stopped from speaking or removed. Nothing about this sequence of events suggests Defendants were trying to silence Story or punish him for expressing his viewpoint.

Put simply, despite years of discovery, Story still has only inference and presumption to support his subjective belief about why he was arrested. For this reason—and the fact that his off-topic speech and disruptions were not protected—his First Amendment retaliation claim fails.

## III.    Story's Fourth Amendment False Arrest Claim Against Griffith.

"A constitutional claim for false arrest … through the vehicle of § 1983, 'requires a showing of no probable cause.'" *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019) (internal citations

omitted).[16] As discussed *supra*, pp. 10–12, there was probable cause for Story's arrest, which is an independent bar to his false arrest claim.

Moreover, an arrest based on a valid warrant is not a false arrest, is not unconstitutional, and cannot form the basis of a Fourth Amendment claim. *Smith v. Gonzalez*, 670 F.2d 522, 526 (5th Cir. 1982). If a warrant is issued by an intermediary magistrate judge, the causal chain is broken, and the initiating party is insulated. *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013); *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). As such, Story's claim is dependent on presenting competent evidence that Griffith "deliberately or recklessly provide[d] false, material information for use in an affidavit or ... ma[de] knowing and intentional omissions that result[ed] in a warrant being issued without probable cause"—known as a *Franks* violation. *Mayfield v. Currie*, 976 F.3d 482, 487 (5th Cir. 2020) (internal quotation marks and alterations omitted) (quoting *Melton v. Phillips*, 875 F.3d 256, 264 (5th Cir. 2017) (en banc)). The Court previously found that the *Malley* exception does not apply. *See* Dkt. 43, p. 33, n.8.

### A.    The Warrant Affidavit does not include any knowingly or intentionally false statement, or any statement made with reckless disregard for the truth.

To meet the first prong of a false arrest claim, Story must be able to show that Griffith "through material omissions or otherwise, made 'a false statement knowingly and intentionally, or with reckless disregard for the truth.'" *Winfrey v. Rogers*, 901 F.3d 483, 494 (5th Cir. 2018). But the video footage shows that each statement in the Warrant Affidavit, which largely mirrored Pope's written reports, is supported by the record.

Griffith stated:

---

[16]    "Probable cause is analyzed under the totality of the circumstances," and there is no requirement that "the officer's belief ... be correct [or] more likely true than false." *Herron v. Lew Sterrett Just. Ctr.*, No. 3:07-CV-0357-N, 2007 WL 2241688, at *3 (N.D. Tex. Aug. 6, 2007) (citation omitted). "Rather, the probable cause analysis only requires that [the Court] find a basis for an officer to believe to a 'fair probability' that a violation occurred." *Piazza v. Mayne*, 217 F.3d 239, 246 (5th Cir. 2000) (per curiam) (citation omitted). "'[F]air probability' is something more than a bare suspicion, but need not reach the fifty percent mark." *United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999).

    (1)    "Affiant learned RRISD Board of Trustee President Amy Weir informed Story he was attending a called meeting and would only be able to speak about the items on the agenda, specifically the mask mandate."

    (2)    "Affiant learned during the duration of Story's time to speak, RRISD Board of Trustee Amy Weir instructed Story to stop speaking on unrelated topic's [sic] and to only discuss the mask mandate."

App. 95. Weir's exact words were, "I would like to remind you this is a special called meeting. It is not a regular board meeting. We are only taking comments on these two items." App. 279 at 2:47:12–2:47:30. Griffith understood the agenda items to be about the mask mandate, because they were about COVID-19 generally and the vast majority of speakers at the meeting testified about the mask mandate. App. 43, ¶ 21; App. 48, ¶ 49. The video recording shows that Weir advised Story he could not speak on the unrelated topic and cut off his microphone. App. 279 at 2:48:59–2:49-09; App. 94

    Griffith also attested in the Warrant Affidavit:

    (3)    "Affiant learned while Story was discussing the unrelated topics, Story had several outbursts. Affiant learned after several verbal warnings from RRISD Board of Trustee President Amy Weir, Story continued to have verbal outbursts."

App. 95. While you cannot fully hear Story in the official meeting recording, because his microphone was cut off, you can hear him in Pontillo's body-camera footage. App. 94. As Weir is warning Story, he can be heard to raise his voice louder and louder to be heard without the microphone, as he continued to speak off-topic. *Id.*; *see also* App. 46–47, ¶ 35. While Story might not like that Griffith described Story raising his voice to be heard across the room without a microphone as he repeatedly talked over the presiding officer as "outbursts," it is hardly a knowing, intentional or recklessly false statement to characterize these statements as such.

    Griffith further attested in the Warrant Affidavit:

    (4)    "Affiant learned Sgt. Pope and RRISD Officer Frank Pontillo approached Story and made several verbal requests for Story to leave the board room." App. 95.

    (5)    "Affiant learned while being forcibly removed from the board meeting, Story continued to resist Officers, yell, and scream causing a major disruption during the Board meeting." App. 95.

These statements are also accurate: Pope can clearly be heard on the body camera footage saying "let's go" several times. App. 94. Story can be heard on the video, getting louder the further he got from the podium, yelling that they were violating the law. *Id.* Story might prefer that Griffith had said he raised his voice, but the dictionary defines "yell" as "to utter a loud cry, scream, or shout."[17] And it defines scream, among other ways, as "to speak or write with intense emotion" and "to protest, demand, or complain vehemently."[18] There is nothing false about describing Story's raised volume as yelling or screaming.

Finally, Griffith stated in the Warrant Affidavit:

(6)    "Affiant learned after Story was removed from the board meeting room, Story continued to be disruptive in the lobby where the overflow seating was located. Affiant learned because Story continued to be verbally loud, verbally disruptive, and uncooperative with Officers in the lobby where other citizens were watching the meeting live streamed, Story was escorted out of the building."

Here, the video footage shows Story arguing with the officers the entire time he is in the hallway and being escorted out, and the closer they came to the lobby, the louder he got. App. 94. While Story might not think that arguing and yelling out to be heard over the livestream is disruptive, here again, the dictionary supports Griffith's use of the terms. Disrupt includes "to interrupt the normal course or unity of"—something the video shows he did, as you can see the people gathered around to watch the live stream turn around to watch Story as he yelled out. *Id.*

Based on this analysis, Story's false arrest claim appears to rest solely on the fact that he disagrees with the descriptive words that Griffith uses in the Warrant Affidavit. But the fact that the same behavior can be described or characterized in more than one way does not make Griffith's wording choices false. The Fifth Circuit has held that "[l]iability under *Franks* requires a certain mindset and certain conduct: an officer must intentionally, or with a reckless disregard for the truth,

---

[17]    https://www.merriam-webster.com/dictionary/yell (last visited December 12, 2022).

[18]    https://www.merriam-webster.com/dictionary/scream (last visited December 12, 2022).

include a false statement in a warrant application or omit a material fact from it." *Nerio v. Evans*, 974

F.3d 571, 577 (5th Cir. 2020 (cleaned up). There is no liability for "an honest mistake." *Id.* (citation

omitted). When finding liability under *Franks*, the Fifth Circuit points to provable wrong statements

and failure to identify that the supporting witnesses original statements were inconsistent and included

statements that were contradicted by the evidence." Likewise, in the context of immunity for a false

arrest, the Supreme Court has said that "defendants will not be immune if, on an *objective* basis, it is

obvious that no reasonably competent officer would have concluded that a warrant should issue; but

if officers of reasonable competence could disagree on this issue, immunity should be recognized."

*Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986). As such, falsity must

be interpreted as an objective standard—and cannot encompass quibbles over descriptive phrasing.

### B. The Warrant Affidavit would support an arrest for hindering a meeting through disorderly conduct even without the chosen phrasing.

If Griffith had (a) quoted Weir's actual statements, rather than paraphrasing them, (b) listed

the number of warnings, rather than describing them as "several," and (c) called Story's continued

testimony "an interruption" rather than an outburst or yelling or screaming, it would still be sufficient

to establish probable cause for Story's arrest under Texas Penal Code § 38.13.[19] That Story refused to

stop giving his off-topic speech, or to walk out of the room when directed to do so by officers, would

have shown that he slowed down the proceedings—requiring him to be physically removed before

testimony could resume—no matter how those actions were described.

Although Story does not agree with the subjective characterizations of his behavior, he does

not and cannot—based on the video evidence—dispute the assertions in the warrant affidavit that:

(1) Weir informed Story he could only speak on posted agenda items; (2) he acknowledged Weir's

---

[19]    "Hinders" is not defined, but the Texas Code Construction Act instructs courts to interpret undefined words and phrases according to "common usage" unless they have acquired a technical or particular meaning through legislative definition or otherwise. TEX. GOV'T CODE § 311.011. And hinder includes "to make slow or difficult the progress of." https://www.merriam-webster.com/dictionary/hinder (last visited December 12, 2025).

warning; (3) Weir instructed Story to stop speaking when he veered into topics unrelated to agenda items; (4) he continued to speak after Weir instructed him to stop; and (5) raised his voice both before and as he was being removed from the meeting room and when he was being escorted from the building. *See* App. 279 at 2:47:10-2:49:35; App. 94. These indisputable facts are sufficient to support the magistrate's determination that there was a probability that Story had intentionally hindered an official proceeding by noise or tumultuous behavior or disturbance. As a result, Story cannot show that Griffith tainted the magistrate's determination of probable cause, which shields her from any liability for false arrest. Further, qualified immunity applies if the corrected affidavit supports a finding of probable cause as it does here. *Garcia v. Orta*, 47 F.4th ---, 2022 WL 3652971, at *5 (5th Cir. 2022).

Without evidence of a knowing, intentional, or recklessly false statement, the independent intermediary rule applies, the causal chain is broken, and the initiating party is insulated. *Russell v. Altom*, 546 F. App'x 432, 436–37 (5th Cir. 2013); *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *Hand v. Gary*, 838 F.2d 1420, 1427 (5th Cir. 1988). Accordingly, Story's false arrest claim against Griffith should be dismissed.

### C. Even if the Court were to find the descriptive phrasing "false," it would be insufficient to overcome Griffith's qualified immunity.

Here, Story cannot show that Griffith engaged in any action to violate his clearly-established rights, or that her actions were objectively reasonable under clearly-established law. Even if there were evidence that any of the statements in the Warrant Affidavit could have been characterized differently and that doing so would have changed the magistrate's probable cause determination, Story cannot demonstrate that Griffith's actions were objectively unreasonable in light of clearly established law. The exacting scrutiny Story asks the Court to use to review the Warrant Affidavit is not supported by law, much less clearly-established law. Moreover, it cannot be said that every reasonable officer in Griffith's circumstances would understand that the lack of meticulous precision in the words she selected could violate an individual's clearly-established constitutional rights..

Respectfully submitted,

*/s/    Kathryn E. Long*
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served

upon all parties via the Court's electronic filing system on this 12th day of December, 2025.

| | |
|---|---|
| Stephen D. Casey | Warren V. Norred |
| CASEY LAW OFFICE, P.C. | Solomon G. Norred |
| P.O. Box 2451 | NORRED LAW, PLLC |
| Round Rock, Texas 78680 | 515 E. Border St. |
| stephen@caseylawoffice.us | Arlington, TX 76010 |
| | warren@norredlaw.com |

*/s/    Kathryn E. Long*
Kathryn Long