IN THE UNITED STATES DISTRICT COURT
WESTERN DIVISION OF TEXAS – AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SUPERINTENDENT HAFEDH AZAIEZ, | § | |
| TRUSTEES AMBER FELLER, TIFFANIE | § | |
| HARRISON, AMY WEIR, JUN XIAO, | § | CIVIL ACTION |
| CORY VESSA, OFFICERS JEFFREY | § | NO. 1:22-CV-00448-DAE |
| YARBOROUGH, JAMES WILLIBY, | § | |
| DEBORAH GRIFFITH, MILTON POPE, | § | |
| FRANK PONTILLO, RON COLE, CHIEF | § | |
| DENNIS WEINER, and CARLA | § | |
| AMACHER, individually, AND ROUND | § | |
| ROCK INDEP. SCHOOL DISTRICT, | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF JEFFREY YARBROUGH

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF WILLIAMSON | § |

1.      My name is Jeffrey Yarbrough. I am over the age of 18, have never been convicted of any felony or any misdemeanor involving moral turpitude, and am fully competent to testify to all facts contained herein. I am fully competent to make this Declaration, and by virtue of my former position as Chief of Police for Round Rock Independent School District's ("Round Rock ISD" or the "District") Police Department, I have personal knowledge of all facts stated herein.

2.      I have served in law enforcement for more than thirty years. I obtained a Bachelor's Degree in Criminal Justice from the University of Texas at Brownsville and a Master of Arts degree in Educational Human Resource Development from Texas A&M University in College Station. I previously served in the United States Army and exited the military in 1992.

**EXHIBIT D**

**App. 137**

3.      I began my career in law enforcement in 1994. I am a Texas licensed Master Peace Officer. I worked as a patrol officer for the City of Giddings from 1994 to 1996. I then served six years in the Lee County Sheriff's Office as a deputy, investigator, and captain. I continued my career at the Bastrop County Sheriff's Department where I served as an investigator for three years. In 2006, I was hired by the Texas Attorney General's Office to serve as a sergeant investigator. In that role, I primarily handled capital murder and murder cases around Texas. I left the AG's office in early 2011 and began working for the State Bar of Texas. I served as a senior investigator for the criminal prosecutions division of the State Bar until January 2014. I then served for a year as the Chief of Police for the City of Tulia. I left the City of Tulia to join the Travis County District Attorney's Office to serve for one year and address general investigations assigned to the Public Integrity Unity, primarily addressing allegations of criminal conduct against elected officials. In 2015, an opportunity arose for me to serve as the Chief of Police for Bastrop Independent School District. I worked as Chief of Police for Bastrop ISD until I joined Round Rock ISD in 2019.

4.      During my career in law enforcement, I developed a school safety model called the Four Pillars of School Safety and Policing as a national standard for effective, innovative, and transformational school safety. In 2022, I was the recipient of the Texas A&M University Outstanding Alumni-Early Career Award from the School of Education and Human Development in large part due to the Four Pillars of School Safety and Policing model I developed. In 2022, I received the State of Texas Law Enforcement Achievement Award for Professional Achievement through the Texas Commission on Law Enforcement ("TCOLE"). I completed the Northwestern University Center for Public Safety senior leadership command program. I have also served as an adjunct instructor for Texas State University in the Texas School Safety Center's School Based Law Enforcement masters level program.

5.     On April 1, 2019, former Round Rock ISD Superintendent, Dr. Steve Flores, hired me to serve as Round Rock ISD's Director of Safety and Security. At that time, Round Rock ISD did not have an internal police department. I served as the Director of Safety and Security until November 4, 2019, when my position was elevated to Executive Director of Safety and Security. When Round Rock ISD decided to create an internal Police Department in 2020, the District conducted a nationwide search for a police chief. In late August 2020, through that search, I was selected to serve as the District's first Chief of Police for the newly-created Round Rock ISD Police Department. I was the Chief of Police from August 24, 2022 through April 20, 2024. I resigned from Round Rock ISD and left school-based law enforcement. I became, and currently am, the Chief of Police for the City of Hutto.

6.     Attached hereto as **Exhibit 1** is a true and correct copy of my Employee Service Record with Round Rock ISD. The information contained in **Exhibit 1** is true and correct. Attached hereto as **Exhibit 2** is a true and correct copy of my Round Rock ISD Police Department Police Officer Bio Sketch. The information contained in **Exhibit 2** is true and correct. Attached hereto as **Exhibit 3** is a true and correct copy of my Round Rock ISD Job Description as Chief of Police. The information contained in **Exhibit 3** is true and correct.

7.     The Round Rock ISD Police Department was created during the COVID-19 pandemic. From the Department's inception through late Spring or early Summer 2021, most if not all Round Rock ISD Board of Trustees (the "Board") Meetings were held virtually.

8.     Beginning in July 2021, Dr. Hafedz Azaiez was the District's Superintendent. I reported directly to him. Although Dr. Azaiez was my direct supervisor, he did not make or direct law enforcement decisions, and he did not command officers to take law enforcement action. That was the job of licensed peace officers working for the District. The District's Police Department personnel

were directly supervised by Assistant Chief of Police James ("Jim") Williby, who reported directly to me.

9.      At the time of Round Rock ISD's August 16, 2021 Board Meeting (the "August 16th Meeting"), there had been a limited number of Board meetings conducted in-person where Police Department personnel were present to monitor and maintain security and safety. I believe that, at the time of the August 16th Meeting, there had been fewer than five in-person Board meetings since the District created an internal police department.

10.     To my recollection, the August 16th Meeting was the first time I met, or had any interaction with, Jeremy Story. I generally knew who Mr. Story was but did not know much about him, his beliefs, or general involvement in District matters. I vaguely recall there was one incident involving Mr. Story around August 1, 2021, where Detective Sergeant Lauren Griffith responded to a dispatch notice regarding concerns raised about Mr. Story's presence at the Round Rock ISD Administration Building. I do not recall receiving the dispatch notice; I generally did not monitor dispatch notices because as Chief of Police I was addressing other matters. Detective Griffith or Assistant Chief Williby later conveyed to me that Detective Griffith spoke with Mr. Story in the parking lot before he left. I did not know why he was there and did not inquire further because it did not seem to be a significant issue. At the time, I did not know that Mr. Story's presence at the Administration Building related to any process servers serving any legal documents on Dr. Azaiez.

11.     As Chief of Police for Round Rock ISD, I deployed the Four Pillars of School Safety and Policing. I also ensured that all District Police Department personnel had school-based law enforcement training. At Round Rock ISD we encouraged and required a variety of police personnel training above and beyond the training mandated by the State including crisis intervention, child abuse training, sexual assault training, trauma-based informed care, and school-based law enforcement training, among others.

**App. 140**

12.     Before August 16, 2021, I was not aware of any prior instances where Round Rock ISD police officers engaged in any actions to violate, or allegedly violate, the First Amendment freedom of speech or freedom to petition rights of public citizens at public meetings or otherwise. I do not recall receiving any complaints about Round Rock ISD police officers engaging in actions that violated an individual's free speech rights.

13.     Before August 16, 2021, I was not aware of any prior instances where Round Rock ISD police officers engaged in any actions that violated an individual's right to be free from unreasonable seizure or that constituted excessive force. There had been no prior allegations against Round Rock ISD police personnel regarding the violation of Fourth Amendment rights of public citizens to be free from unreasonable seizure or allegations that the District's police officers had used excessive force against members of the public. I do not recall receiving any complaints about Round Rock ISD police officers engaging in actions that violated an individual's right to be free from unreasonable seizure or that they had engaged in excessive force.

14.     Before August 16, 2021, I had not received any prior complaints that Milton Pope, Frank Pontillo, or Lauren Griffith had engaged in any actions at Round Rock ISD to violate a citizen's constitutional rights.

15.     I had no information that made me believe that Round Rock ISD police department personnel—and, specifically, officers Pope, Pontillo, and Griffith—needed more or better training or supervision regarding the constitutional rights of citizens, particularly citizens' rights at public meetings.

16.     Prior to the August 16th Meeting, I had no knowledge about any communications Mr. Story sent to District Trustees or personnel, or other persons, regarding Dr. Hafedh Azaiez. Before the August 16th Meeting, I was not aware that Mr. Story had engaged in any type of speech regarding Dr. Azaiez. Prior to the August 16th Meeting, I did not speak to any Trustee, including Board President

Amy Weir, regarding Mr. Story. Dr. Azaiez did not speak to me prior to the August 16th Meeting regarding Mr. Story. No District personnel or Trustee warned me before the August 16th Meeting that Mr. Story might be present. I received no directives or instructions from any District personnel or Trustee to monitor or be ready for Mr. Story or any other member of the public.

17.    Round Rock ISD police officers are assigned to work at Board meetings to monitor and ensure safety and security for the Board, District personnel, and all members of the public attending the meeting. The Round Rock ISD Police Department is at Board meetings to support citizens and their right to petition and speak, so long as they are not violating the law, creating a disturbance, or a safety risk.

18.    The August 16th Meeting was not the regular, monthly meeting of the Board. At regular, monthly Board meetings, members of the public can sign up to speak during the public comment portion of the meeting and can speak about any matter. The Board's policies for special or called Board meeting are different. At special or called Board meetings, speakers in the public comment portion are limited to speaking about items posted on the Board meeting agenda. As I attested in my deposition, in a limited public forum like a special or called meeting, I understand that the government cannot censure a person's speech simply because the government does not like what the person is saying. Instead, there must be another reason that would trigger the government to halt the person's opportunity to speak or express themselves. As I also attested in my deposition, I understand that a limited forum is limited based on the requirements or guidelines that the governing body establishes for the forum or meeting. For example, at Round Rock ISD special or called Board meetings, the Board has established a limit that people can speak in public comment about matters only on the agenda.

19.    The August 16th Meeting was a special or called Board meeting. Members of the public who signed up to speak could discuss only items listed on the agenda. I do not believe I reviewed the

agenda for the August 16th Meeting prior to the meeting. I understood that the meeting was specially scheduled to discuss COVID-19 health and safety protocols and, particularly, whether the District would adopt a mask mandate in response to the recent increase in COVID-19 cases, the new Delta variant, and recent health guidance from local and national officials.

20.      Board President Amy Weir served as the presiding officer of the August 16th Meeting. As the presiding officer, the Board President maintains order over the Board meetings and enforces meeting rules. Under Board policy, the Board President, as presiding officer, could request the assistance of law enforcement to address disruptions of the Board meeting, including requesting law enforcement to remove a member of the public who is being disruptive. This was consistent with my law enforcement experience for public entities and public schools. In these circumstances, law enforcement is not just enforcing a Board policy but is also enforcing state law, including sections of the Education Code and Penal Code. As I attested in my deposition, speaking off topic would be a policy violation—a violation of the rules of the forum—and when other things (such as disruptive conduct or failure to comply) accompany the breach of forum rules, that triggers law enforcement intervention.

21.      During most of the August 16th Meeting, I sat in a room behind the dais where I could listen to and observe the meeting. I was not physically present in the meeting room except on a few, limited occasions. At the August 16th Meeting, the District implemented social distancing protocols by limiting the seating capacity in the meeting room and socially distancing the chairs available for members of the public in the meeting room. Only individuals who had located an open chair were allowed to enter or remain in the Board meeting room. Citizens signed up for public comment were allowed in the meeting room when it was their turn to speak to the Board. The lobby in the building was set up with additional chairs, that were socially-distanced, which served as the overflow room for the meeting. The meeting was live-streamed to the overflow room. In my experience in law

**App. 143**

enforcement for public entities and public school districts, setting up an overflow room where the meeting can be watched by live stream is not an unusual practice.

22.     I do not know who made the decisions regarding social distancing in the Board meeting room for the August 16th Meeting. I understood that the social distancing measures were the rules for the meeting. I believed these social distancing rules were a health and safety precaution to limit the spread of COVID-19. I did not observe or hear anything that gave me any reason to believe the limited seating capacity or social distancing in the meeting room was for any reason other than COVID-19-related health and safety. I did not believe, and had no reason to believe, that these social distancing protocols were an effort to limit public participation in the August 16th Meeting or an effort to suppress the public's, or any member of the public's, speech or right to petition. I did not believe, or have any reason to believe, that the social distancing protocols for the August 16th Meeting were in response to anything other than the recent increase in COVID-19 cases which would be discussed at the meeting.

23.     I did not observe Mr. Story at the beginning of the August 16th Meeting. I did not observe his interactions with Sergeant Pope or Officer Pontillo prior to or at the beginning of the August 16th Meeting.

24.     At the time, I knew that issues surrounding mask mandates had created tensions, including tension at public school board meetings around the country. I recall that there were a substantial number of citizens signed up for public comment at the August 16th Meeting to voice their opposition to or support of a mask mandate. Because of the number of people signed up for public comment, I knew the August 16th Meeting would last much longer than normal Board meetings. The Round Rock ISD Police Department was present to support these individuals' rights to speak to their elected officials. But my focus during the meeting, and the focus of the law enforcement officers present and working at the August 16th Meeting, was not listening to the members of the public giving

public comment, but to focus on monitoring the room to ensure safety and security throughout the meeting. Because the public speakers and the substance of their comments was not a focus, I did not listen closely to what the individuals said. I generally recall that most speakers spoke in favor of or against a mask mandate at Round Rock ISD.

25.     At one point during the August 16th Meeting, I heard an outburst from the audience and saw that it was Mr. Story. I observed another outburst from Mr. Story. I recall him yelling out during another speaker's time for public comment. Upon review of the video recording of the August 16th Meeting, I recall that Jennifer White had been speaking and veered off the topic of COVID-19 health and safety protocols. When Board President Weir warned Ms. White that she was off topic, Mr. Story yelled from the audience that Ms. White's comments were "germane" and that they were on the agenda. In fact, when Mr. Story spoke to me in the hallway on August 19, 2021 while the Board was in closed session at the August 19, 2021 Board Meeting (the "August 19th Meeting"), he admitted that he made these statements when it was not his turn to speak. Mr. Story was recording this conversation. Included with this Declaration as **Exhibit 4** is a recording labeled JS100289. This recording accurately depicts portions of the conversation I had with Mr. Story at the August 19th Meeting.

26.     Because of Mr. Story's outbursts, when the Board took a break, I went into the meeting room to talk to Mr. Story. I asked him to step outside the meeting room because I did not want to warn him in front of people. I believed speaking to him in the meeting room would be counterproductive and he might feel disrespected. Mr. Story did not want to leave the meeting room and advised I could speak to him in the meeting room. I told Mr. Story that we respect him and support his right to address his elected officials, but he could not disrupt the meeting. Mr. Story asked if I had heard other people disrupting the meeting and I told him that I had not. I warned Mr. Story that he could not disrupt the meeting and if he did so, he would be asked to leave the meeting room.

**App. 145**

27.     No one told me to approach or speak with Mr. Story. I approached Mr. Story to advise him that these disturbances were not allowed on my own. I did not approach or speak with Mr. Story because of what he said or the subject matter of his outburst. I approached him because I had observed his conduct of shouting in the middle of the meeting when it was not his turn for public comment, which was disruptive to the meeting.

28.     The video recording of the August 16th Meeting, combined with Officer Pontillo's body camera footage, accurately depict what occurred when it was Mr. Story's turn to speak during public comment. I was not present in the meeting room when Mr. Story was called to speak. I was in the room behind the dais. I recall that Mr. Story and Board President Weir had some back-and-forth about whether Mr. Story was going to speak about a listed agenda item. Mr. Story interrupted, or spoke over, Board President Weir while she was trying to provide him with directives. In my experience, that is unusual and can be disruptive to a meeting, as well as disruptive to the Board President's ability to effectively preside over a meeting and maintain order and the rules of the forum.

29.     Mr. Story began speaking. I believe he started his comments by speaking about agenda items related to COVID-19 and mask mandates. But then, Mr. Story began speaking about an item that was not on the meeting agenda, a protective order against the Superintendent. This was not related to COVID-19 protocols or a mask mandate. When Mr. Story began speaking off topic, Board President Weir gave Mr. Story several warnings that he was speaking off topic. Mr. Story did not stop speaking even after his microphone was cut off. When Mr. Story did not respond to Board President Weir's warnings or directives and continued to speak loudly, Board President Weir instructed that Mr. Story be removed from the room. Mr. Story's failure to stop speaking after the repeated warnings, and raised voice in response, became disruptive to the meeting. Based on my observations and experience, it was proper for the presiding officer to request law enforcement assistance to remove a member of the public who had become disruptive and hindered the orderly proceeding of a meeting.

**App. 146**

30.     Given Mr. Story's actions after receiving warning from the Board President, I believed there was cause to remove Mr. Story from the meeting for disruption of a public meeting under the Texas Penal Code and the Texas Education Code. Mr. Story engaged in repeated actions and verbal outbursts that interfered and disrupted the August 16th Meeting.

31.     It was not the words Mr. Story was saying or the subject matter of his speech that were disruptive, it was his actions and conduct. Mr. Story could have been reciting "Mary Had a Little Lamb." But if "Mary Had a Little Lamb" was not on the agenda, Mr. Story was warned to stop speaking about a matter not on the agenda, and he continued to recite "Mary Had a Little Lamb" despite several warnings, those actions would have been disruptive.

32.     When Sergeant Pope and Officer Pontillo approached Mr. Story and had to physically remove him from the meeting room, I walked into the Board meeting room. I did so because the two officers present to provide security for the meeting were having to address a situation and leave the meeting room. I needed to fill in any resulting gap in the presence of law enforcement personnel in the room.

33.     I did not personally observe the entire encounter between Sergeant Pope, Officer Pontillo, and Mr. Story. From what I observed, Sergeant Pope and Officer Pontillo tried to get Mr. Story to leave the room. Mr. Story would not leave. When they tried to physically escort him from the room, he resisted. Therefore, they had to physically remove him from the meeting room. Based on my observations at the time, I believed Sergeant Pope and Officer Pontillo used limited and reasonable force to physically remove Mr. Story from the meeting room. Their physical contact with Mr. Story aligned with the resistance they were experiencing from Mr. Story. As Sergeant Pope and Officer Pontillo were escorting Mr. Story from the room, Mr. Story shouted and yelled out in the meeting room.

**App. 147**

34.     Although I believed that Mr. Story had violated Texas Penal Code § 38.13 by hindering the August 16th Meeting based on his conduct and had engaged in disruptive and tumultuous behavior, Assistant Chief Williby made the operational decision—with which I agreed or approved—not to effectuate an arrest that evening. There was no arrest that evening because we did not have sufficient law enforcement personnel present to have two officers leave the premises to deal with an arrest.

35.     Based on my observation, Dr. Azaiez did not give any verbal or non-verbal directives to remove Mr. Story from the meeting room. Neither Assistant Chief Williby, Sergeant Pope, nor Officer Pontillo ever expressed that they received any verbal or non-verbal directive from Dr. Azaiez regarding Mr. Story's removal from the August 16th Meeting.

36.     I had no reason to believe, and did not believe, that the Board President's directive to remove Mr. Story was unlawful. I had no reason to believe, and did not believe, that the Board President's directive to remove Mr. Story was because of the substance of his speech or because she disagreed with the content of what he was saying or his viewpoint. Rather, I believed it was because Mr. Story violated the rules of the meeting and when directed to stop, he continued to violate the rules, raise his voice to continue speaking, and was disruptive to the meeting.

37.     As I attested in my deposition, I believe unequal treatment occurs if two people commit identical actions but there are different outcomes. I did not observe Board President Weir treat Mr. Story differently from other speakers at the August 16th Meeting who engaged in identical actions. I did not observe any other speakers respond to being advised that they were speaking off topic by continuing to speak and, then, refusing to leave the room when asked to do so.

38.     Because Mr. Story had to be physically removed from the Board meeting, Assistant Chief Williby directed Sergeant Pope and Officer Pontillo to complete Use of Force forms. Assistant Chief Williby found that the force used complied with policy and signed the Use of Force forms as Sergeant Pope and Officer Pontillo's supervisor. I reviewed the video footage and the Use of Force

forms and also determined the use of force was in compliance and signed the forms as the Chief of Police. I believed the amount of physical contact used was more than reasonable based on the circumstances.

39.      There was no prior occasion where the Round Rock ISD Police Department was asked or required to physically remove a member of the public from a Board meeting. At Round Rock ISD, I had never seen anyone behave or engage in disruptive conduct like Mr. Story did at the August 16th Meeting. While I had not observed a removal at Round Rock ISD, during my work in law enforcement, I had observed individuals who had to be removed from public meetings on a number of occasions. Based on my experience, the request for Mr. Story to leave the meeting, or be removed from the meeting based on the circumstances, was not unusual and his conduct warranted removal.

40.      Neither Dr. Azaiez, Board President Weir, nor any other District official or Trustee gave me any directives or instructions regarding Mr. Story or how to proceed regarding Mr. Story's conduct at the August 16th Meeting.

41.      Shortly after the August 16th Meeting, I reached out to the Williamson County Attorney, Dee Hobbs, regarding Mr. Story's conduct and violation of Section 38.13. He was about to be out of town for several weeks but indicated we could meet upon his return to discuss and "staff" the case.

42.      Detective Lauren Griffith, who was recently promoted to Detective Sergeant and was the only designated "Detective" at the time, was assigned to investigate Mr. Story's conduct at the August 16th Meeting. I did not discuss my conversation with the Williamson County Attorney with Detective Griffith.

43.      At the August 19th Meeting, which was the regular monthly Board meeting, Mr. Story attended and made public comment. Mr. Story was allowed to speak, without interruption, for the entire time allotted regarding Dr. Azaiez and the protective order. When the Board went into closed

session, Mr. Story approached me, Assistant Chief Williby, Sergeant Pope, and Detective Griffith in the hallway outside the room where the Trustees were engaged in closed session. **Exhibit 4** accurately depicts most of that conversation.

44.     Detective Griffith conducted an independent investigation regarding Mr. Story's conduct at the August 16th Meeting. I was not involved in the investigation. To my knowledge, neither Dr. Azaiez, Board President Weir, nor any other District official or Trustee, was involved, in any way, in the investigation. They never spoke with me about the investigation or any law enforcement decisions regarding Mr. Story's conduct at the August 16th Meeting.

45.     Detective Griffith concluded her investigation. It was my understanding that she concluded that Mr. Story had engaged in conduct that violated Section 38.13.

46.     When she had concluded her investigation and the Williamson County Attorney returned, we scheduled a meeting in mid-September. My recollection was that the meeting was to discuss several things. First, there were ongoing tensions in school board meetings across the country related to COVID-19 health and safety protocols, and there was an upcoming Board meeting regarding Round Rock ISD's mask mandate and recent censure of two Board members. Because the meeting was going to be held in a location that impacted both Travis and Williamson Counties, I wanted to discuss protocols for the meetings because we might have to reach out to Williamson County law enforcement. Second, it was a follow-up to my conversation with the Williamson County Attorney to "staff" the case regarding Mr. Story's conduct at the August 16th Meeting. There was also another unrelated matter to discuss.

47.     On or about September 17, 2021, Assistant Chief Williby, Detective Griffith, and I met with Mr. Hobbs at his office with his First Assistant and another attorney from the County Attorney's Office. Detective Griffith provided them with a copy of her prepared Affidavit for Warrant of Arrest and Detention for Mr. Story for violation of Texas Penal Code § 38.13 (the "Warrant

Affidavit"). Based on my recollection and notes made at or near the time of the meeting, we discussed the criminal charge options. I remember Detective Griffith providing them a copy of the Warrant Affidavit. I recall someone from the County Attorney's Office mentioning it should be charged as a Class A misdemeanor instead of a Class B misdemeanor. At the conclusion of the meeting, a member of the Williamson County Attorney's office accompanied Detective Griffith to a judge to review the Warrant Affidavit and determine whether to issue an arrest warrant. Based on my later discussion with Detective Griffith and review of the documents, I know the judge signed the Warrant Affidavit, after determining that probable cause existed for the issuance of a warrant of arrest, and signed the Warrant of Arrest.

48.    Attached hereto as **Exhibit 5** is a true and correct copy of my notes in the report I prepared regarding Mr. Story's conduct at the August 16th Meeting and the discussions with the Williamson County Attorney's Office. The information contained in **Exhibit 5** truthfully and accurately states my recollection of events around the time of the events described in the report.

49.    Other than at the Williamson County Attorney's Office, I do not recall reviewing the Warrant Affidavit before it was presented to the magistrate judge. I may have done so, I just do not remember. I do know that I did not make any substantive changes to it. The information contained in the Warrant Affidavit was accurate based on my knowledge and recollection of what occurred at the August 16th Meeting. I did not see anything that was false in the Warrant Affidavit or key facts that were omitted.

50.    None of my actions towards Mr. Story were motivated in any way by the viewpoint he expressed, his opposition to Dr. Azaiez, or any speech in which Mr. Story engaged. As I mentioned previously, I was not aware of any speech of Mr. Story prior to August 16, 2021. And his speech or viewpoint expressed during public comment were not the reasons for his removal from the Board meeting room, the investigation, or the other law enforcement actions taken. It was solely based on

**App. 151**

Mr. Story's conduct: violating the Board President's lawful directive to discontinue speaking about matters not on the agenda, continuing to speak and yell in the Board meeting room after being warned to stop, and the continued disruption caused when asked to leave the room, such that he had to be physically removed from the meeting. That disruption continued even after he left the meeting room.

51.     I have no reason to believe that Sergeant Pope's or Officer Pontillo's actions regarding Mr. Story and his removal were, in any way, motivated by Mr. Story's speech prior to the August 16th Meeting or the viewpoint Mr. Story expressed at that meeting. Neither of them ever mentioned Mr. Story's prior speech, the viewpoint or opinions he was expressing at the August 16th Meeting, or any of his speech. I also had no reason to believe that Detective Griffith's actions in her investigation, the preparation of the Warrant Affidavit, or its submission were, in any way, motivated by Mr. Story's speech prior to the August 16th Meeting or the viewpoint Mr. Story expressed at that meeting. Detective Griffith never mentioned any of Mr. Story's speech or viewpoints to me. I believed their actions were based on Mr. Story's conduct which disrupted and hindered the orderly proceedings of the August 16th Meetings. Their actions were consistent with routine law enforcement practice when a member of the public disrupts a Board meeting.

52.     To my knowledge, neither Dr. Azaiez, Board President Weir, or any other Trustee had any involvement in the preparation of the Warrant Affidavit or the decision to submit it for Mr. Story's arrest. They never gave me any instructions or directives to do so or even spoke to me about the investigation or what the Round Rock ISD Police Department was going to do in response.

53.     I was aware that Mr. Story filed a complaint with the Round Rock ISD Police Department in August 2021, sometime after the August 16th Meeting. Assistant Chief Williby advised Mr. Story that we were not the appropriate department to conduct an investigation regarding the allegations. Mr. Story's complaint did not influence our actions or decisions regarding his conduct at

the August 16th Meeting. I was unaware in September 2021 that Mr. Story had filed a grievance, a TEA

complaint, or any other complaint against Round Rock ISD or Dr. Azaiez.

     54.     Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

     Executed on this <u>11th</u> day of _____ December _____, 2025.

JEFFREY YARBROUGH

**App. 153**

# Employee Service Record

Date: 05/30/2025
Name: YARBROUGH, JEFFERY D
ID: ▮▮▮▮

Employee Signature: _____





**ROUND ROCK**
INDEPENDENT SCHOOL DISTRICT
1311 Round Rock Avenue
Round Rock, TX 78681-4999
Phone: (512) 464-5000

| 1 School Year | 2 State or Country | 3 County or Equivalent | 4 School District or Institution | 5 Indicate if public or private school | 6 Position Held | 7 Years of Exp | 8 % of Day Emp | 9 No. Days Emp | 10 Indicate if a full semester, if it is less than 90 days | 11 Dates of Service From | Dates of Service To | 13 Authorized District Signature |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 18-19 | TEXAS | WMSN | RRISD | Public | DIRECTOR SAFETY SECR | 0 | 100% | 65 | | 04/01/2019 | 06/28/2019 | |
| 19-20 | TEXAS | WMSN | RRISD | Public | DIRECTOR SAFETY SECR | 4 | 100% | 90 | | 07/01/2019 | 11/03/2019 | |
| 19-20 | TEXAS | WMSN | RRISD | Public | EXEC DIR SAFETY SECURITY | 0 | % | 170 | | 11/04/2019 | 06/30/2020 | |
| 20-21 | TEXAS | WMSN | RRISD | Public | CHIEF OF POLICE | 5 | 100% | 222 | | 08/24/2020 | 06/30/2021 | |
| 21-22 | TEXAS | WMSN | RRISD | Public | CHIEF OF POLICE | 6 | 100% | 209 | | 07/01/2021 | 04/20/2022 | |

## State Sick Leave Program

| Year Earned | Prior Year Balance | Earned | Used | End of Year Balance |
|---|---|---|---|---|
| 18-19 | .0000 | .0000 | .0000 | .0000 |
| 19-20 | .0000 | .0000 | .0000 | .0000 |
| 19-20 | .0000 | .0000 | .0000 | .0000 |
| 20-21 | .0000 | .0000 | .0000 | .0000 |
| 21-22 | .0000 | .0000 | .0000 | .0000 |

## State Personal Leave Program

| Prior Year Balance | Year Earned | Earned | Used | End of Year Balance |
|---|---|---|---|---|
| 1.5000 | 18-19 | -3.5000 | 1.5000 | -3.5000 |
| .0000 | 19-20 | .0000 | .0000 | .0000 |
| 1.5000 | 19-20 | 17.5000 | 3.5000 | 15.5000 |
| 15.5000 | 20-21 | 5.0000 | .0000 | 20.5000 |
| 20.5000 | 21-22 | 5.0000 | 17.0000 | 8.5000 |

Comments:

RRISD 03911

**EXHIBIT 1**

# Employee Service Record

All service claimed for salary increment purposes must be documented on this form or other similar document containing similar information.

**Instructions for completing the Employee Service Record:**

**1. School Year** — Corresponds to the scholastic school year (e.g., 1997-98) employment is claimed. No more than one year of experience can be shown on one line.

**2. State/Country** — Enter state or territory of the USA Enter name of foreign nation if applicable.

**3. County/Equivalent** — Enter county or parish in USA. Department of Defense Education Activity (DoDEA), enter the names of sub-territories of foreign nations. DoDEA service must be completed by the National Archives and Records Administrations (NARA). Send a blank service record to: National Personnel Records Center, Civilian Personnel Records, 1411 Boulder Blvd, Valmeyer IL 62295.

**4. School District or Institution** — Enter name of public school district or institution and name of private school or institution. Give sufficient information in this column to identify the school for accreditation purposes.

**5. Public or Private** — Enter either Public or Private, for the British System enter either Government or Public.

**6. Position Held** — Enter position held (e.g., teacher, librarian, substitute, bus driver, aide, etc.)

**7. Years of Experience** — Enter the number of year(s) of actual experience as of September 1, of the school year indicated in column 1. (Do not include the additional year(s) for career ladder, career and technology education work experience, or qualified teacher aide experience. This experience must be recorded as a footnote on the service record).

**8. % of Day Employed** — Enter percentage of the school day the employee was employed. Full day is reported as 100%, one-half day is reported as 50%, three-quarters of the day is reported as 75%, etc

**9. No. of Days Employed** — Enter the number of days employed during the contractual year (July 1 through June 30). The days entered must not include the number of days a person was docked a full day's pay.

**10. Indicate if a full semester, if it is less than 90 days** — Enter full semester if it was a full semester that was less than 90 days.

**11. Date of Service From** — Enter the actual beginning date of employment during the contractual year (July 1 thru June 30).

**12. Date of Service To** — Enter the actual ending date of employment during the contractual year (July 1 thru June 30).

**13. Authorized District Signature** — The record must be verified by either signing each line of the record separately (in ink) or by drawing a diagonal line and placing the signature diagonally across from the experience. An authorized official of the school system must sign the record. A rubber stamp signature may be used, in lieu of the original signature, provided the name of the person appearing on the stamp is the same designated by the school district to sign the service record. Such official, if not the superintendent of the school, must have been authorized to sign personnel records of the institution by the governing board of that institution. In the case of public schools, the board of trustees is the governing body. The organization's official stamp must be included on the service record if service from overseas is reported. For public schools, colleges and universities, the country's Department of Education is the organization official stamp. If service is reported from the US, official stamp may be included depending on availability.

**State Sick Leave and State Personal Leave**

**1. State Sick Leave** — Enter state sick leave information in this table, not required for private schools, colleges and out-of-state schools.

**2. State Personal Leave** — Enter state personal leave information in this table. (Required for Charter schools if state days are offered) – not required for private schools, colleges, and out-of-state schools. (Note: This program was initiated in the 1995-96 school year).

**Service Notes:**
If service for a skill-based certificate added by exam, record the first date the educator worked 50% of day in the appropriate assignment. Valid Educational Aide experience and any other unique information regarding service should also be included.

**Note:** 1. All service claimed for salary increment purposes must be documented on this form or other similar document containing similar information.
2. Service records and any supporting documents must be completed in ink (the document may be completed electronically and printed).
3. White out may not be used, any white out used on any document submitted will nullify the document.

RRISD 039172

**EXHIBIT 1**



# Round Rock ISD Police Department
## Police officer Bio Sketch

## Complies with SB 111 87ᵗʰ Legislature

Name: Jeffrey Yarbrough          Radio ID: ▮          OSSI ID: Enter number

Gender: Male          TCOLE PID# ▮ Hire date: 08/21/2020

Total years of Law enforcement experience: 27

Primary assignment: Round Rock ISD Police Department          Title: Chief of Police

Work address: 1311 Round Rock Ave. Round Rock, TX 78681

Education: Master's Degree

TCOLE Peace Officer Level: Master

## Awards and Commendations:

1. Campus Safety Director of the Year Finalist
2. Staff Excellent Award- State Bar of Texas
3. Bastrop County District Attorney Commendation- Narcotics Investigations
4. Comal County District Attorney Commendation- Criminal Investigation
5. Texas Attorney General Commendation- Criminal Investigation
6. Travis County District Attorney- Service Award

**EXHIBIT 2**          **RRISD 06340**



7.  Click or tap here to enter text.
8.  Click or tap here to enter text.
9.  Click or tap here to enter text.
10. Click or tap here to enter text.
11. Click or tap here to enter text.
12. Click or tap here to enter text.
13. Click or tap here to enter text.
14. Click or tap here to enter text.
15. Click or tap here to enter text.
16. Click or tap here to enter text.
17. Click or tap here to enter text.
18. Click or tap here to enter text.
19. Click or tap here to enter text.

Discipline:

☒None

| Date | Type | Disposition | Written reprimand or Suspension | Days off |
|------|------|-------------|--------------------------------|----------|
| MM/DD/YYYY | Ex. Formal Reprimand | Ex. Sustained Complaint | Ex. Written Warning | |
| MM/DD/YYYY | Ex. Formal Reprimand | Ex. Sustained Complaint | Ex. Written Warning | |
| MM/DD/YYYY | Ex. Formal Reprimand | Ex. Sustained Complaint | Ex. Written Warning | |

**EXHIBIT 2**        **RRISD 06341**

Round Rock ISD Police Department 023

**App. 157**



**ROUND ROCK**
INDEPENDENT SCHOOL DISTRICT

## JOB DESCRIPTION

| Job Title | | Evaluation Type | Department |
|---|---|---|---|
| **Chief of Police** | | **Leadership** | **Police Department** |
| Pay Grade | FLSA | Date Revised | Supervisor |
| **608** | **Exempt** | **May 2020** | **Superintendent** |

**BASIC FUNCTION & RESPONSIBILITY:** Direct and manage district police department. Coordinate daily operations of department to provide a safe environment for students and staff. Ensure enforcement of all federal, state, and local laws and ordinances.

**CHARACTERISTIC DUTIES & RESPONSIBILITIES:** The essential functions, pursuant to the Americans with Disabilities Act, may include the characteristic duties, responsibilities, knowledge, skills, and abilities noted herein; however, this is not a comprehensive listing of all functions and tasks performed by positions found in this job description.

### Management of Administrative, Fiscal and/or Facilities Functions:

- Direct the daily operations of the district police department to ensure effective law enforcement.
- Ensure enforcement of all laws and ordinances within the scope of board policy and the jurisdiction of district.
- Oversee investigation of criminal activities that occur within the district's jurisdiction and support other agencies conducting investigations.
- Serve as district liaison to state and local law enforcement agencies and juvenile authorities and represent the district on assigned committees and task forces.
- Develop department safety procedures including procedures for safe handling and use of firearms.
- Coordinate enforcement activities with other department directors and campus principals and work cooperatively to develop and implement preventative security programs, gang management plans, and other safety programs.
- Investigate and make recommendations on all complaints and accusations made against district police officers or staff.
- Maintain property room for storage of weapons and contraband confiscated on district property.
- Compile and administer department budget based on documented needs and ensure that operations are cost-effective and funds are managed wisely.
- Compile, maintain, and file all reports, records, and other documents required.
- Coordinate departmental activities with other District offices and administrators and provide assistance to requesting departments.
- Prepare annual operating budget recommendation for department and implement and monitor assigned budgets.

### Human Resources Management:

- Provide administrative direction and leadership to assigned staff for the operational, financial, and personnel resources to effectively support District goals.
- Supervise, evaluate performance, and lead the recruitment, hire, and placement of assigned staff.
- Recognize exemplary performance of assigned staff.

### Organization Improvement:

- Analyze critical needs in assigned areas and work collaboratively to design, implement, refine, and evaluate assigned programs in order to continuously improve the campus/department.

Page 1 of 3

# EXHIBIT 3

**RRISD 03916**

**App. 158**



## JOB DESCRIPTION

| Job Title | | Evaluation Type | Department |
|---|---|---|---|
| **Chief of Police** | | **Leadership** | **Police Department** |
| Pay Grade | FLSA | Date Revised | Supervisor |
| **608** | **Exempt** | **May 2020** | **Superintendent** |

**Professional Growth and Development:**
- Guide assigned staff in the planning and implementation of professional development that increases effectiveness and improves District performance.
- Participate in professional development that increases effectiveness and improves District performance.

**School/Community Relations:**
- Interface with governmental agencies, business and civic organizations, and the community to provide needed information and to promote the District's initiatives.

**Organization Morale:**
- Foster collegiality and team building among department employees; encourage active involvement in the decision-making process by all department employees; communicate expectations for high-level performance to staff; recognize staff achievements; and ensure effective and quick resolution of conflicts among department employees.
- Facilitate communication and collaboration among assigned department personnel and campus administrators to enhance service delivery, program development, and customer satisfaction.

**Other Responsibilities:**
- Comply with policies established by federal and state law, including but not limited to State Board of Education and local Board policy.
- Perform other job-related duties as assigned.

**SUPERVISION EXERCISED:** Supervise and evaluate the performance of assigned staff.

**KNOWLEDGE, SKILLS & ABILITIES:**
- Knowledge of all aspects of Police Department operations, including criminal investigations, report writing, and criminal law.
- Knowledge of Board of Trustee policy and district regulation/procedures.
- Skill in implementing communication and collaboration between and among various areas of the organization to enhance service delivery, program development, and customer satisfaction.
- Skill in communicating effectively, both verbally and in writing.
- Skill in conducting group presentations.
- Skill in mediation/facilitation of group/individual problem resolution.
- Ability to subdue offenders, including use of firearms and handcuffs.
- Ability to control sudden violent or extreme physical acts of others and exhibit rapid mental and muscular coordination simultaneously.
- Ability to effectively present information and respond to inquiries from district personnel, parents, and the general public.
- Ability to analyze facts and exercise sound judgment in arriving at conclusions.
- Ability to manage budget and personnel.

**EXHIBIT 3**

**RRISD 03917**

**App. 159**



**ROUND ROCK**
INDEPENDENT SCHOOL DISTRICT

## JOB DESCRIPTION

| Job Title | Evaluation Type | Department |
|---|---|---|
| **Chief of Police** | **Leadership** | **Police Department** |

| Pay Grade | FLSA | Date Revised | Supervisor |
|---|---|---|---|
| **608** | **Exempt** | **May 2020** | **Superintendent** |

- Ability to solve complex problems and build consensus.
- Ability to develop and implement long-range plans.

**ENTRY QUALIFICATIONS:** Bachelor's degree from an accredited college or university, valid and current Texas Peace Officer license issued by Texas Commission on Law Enforcement (TCOLE) and five years of related experience, including three years in a supervisor or command capacity.  Must be able to meet the district vehicle liability policy requirements. Must hold and maintain a current Texas driver's license; bondable as required by Texas Education Code 37.081(h).

**PHYSICAL & MENTAL DEMANDS:**
- Maintain emotional control under stress.
- Work with frequent interruptions.
- Drive motor vehicles; use firearms, handcuffs, alarm systems, security equipment, two-way radio, alarm and other security equipment, fire extinguisher, and standard office equipment.
- Use computer for prolonged period resulting in repetitive hand motions.
- Lift, carry, and/or move up to 20 lbs. occasionally.
- Sit, stand, and walk for prolonged periods of time.
- Bend, stoop, twist, turn, pull, push, and climb as needed.
- Travel district-wide on a frequent basis and statewide occasionally.
- Work extended and irregular hours and be on-call 24 hours a day.

**ENVIRONMENTAL FACTORS:**
- Work is performed both inside and outside with moderate exposure to sun, heat, cold, and inclement weather.
- Work may involve adverse and hazardous working conditions, including violent and armed confrontations.
- Work involves considerable exposure to unusual elements, such as dirt, dust, fumes, smoke, unpleasant odors, and/or loud noises.
- Work environment involves exposure to hazards of physical risks, which require following safety precautions.

---

The foregoing statements describe the general purpose and responsibilities assigned to this job and are not an exhaustive list of all responsibilities and duties that may be assigned or skills that may be required.

Employee Name (printed): _Jeffrey Yarbrough_

Employee Signature: _____  Date: _8/24/2020_

Page 3 of 3

## EXHIBIT 3

**RRISD 03918**

**App. 160**

**Exhibit 4**

**JS100289**

**Copy submitted to the Clerk's
office and to Chambers**

JS-304202

 

**6:14** ✈

📶 5G<sup>U</sup><sub>C</sub> 43

⊗ electdanielleweston.com

On August 16, 2021, I Jeffrey Yarbrough, in my role as Police Chief of the Round Rock ISD Police Department, attended a special called meeting of the Round Rock ISD Board of Trustees. The board meeting was held in the 100 building of Round Rock High School starting at 5:30 PM. During the meeting, I was seated in a room behind the school board members where I was able to see and hear individuals in the board room through a one-way glass. During the meeting, a person yelled out from the audience, and I observed the male individual who made the loud outburst. The person repeated the tumultuous noise and behavior in a manner that disrupted the meeting.

The Board went into recess a short time later, and I approached the individual in the audience who had caused the interruptions, later identified as Jeremy Story. Mr. Story was talking to another person when I contacted him. I asked to speak to Mr. Story outside in private so as to avoid making him feel uncomfortable by warning him in the presence of others to desist with his tumultuous outbursts during the meeting. Mr. Story asked who I was, at which time, I identified myself as Jeffrey Yarbrough, the Round Rock ISD Police Chief. He responded, "I'm not going outside, and you can speak to me right here." I informed Mr. Story that we were there to support his right to address his elected officials, but he needed to do it respectfully and he could not continue to interrupt or disrupt the meeting. Mr. Story became argumentative and stated that there were others yelling in addition to him and asked me if I was going to speak to them. I informed him that he was the person I heard and observed yelling out in a manner that disturbed the meeting. I informed Mr. Story that if his behavior continued, he would be asked to leave the meeting. Mr. Story continued to be argumentative with me, and I restated that we were there to support his right to address his elected officials but if he continued to disturb the meeting, he would be asked to leave. Mr. Story restated that others were yelling out too, at which time, I disengaged from the conversation.

The meeting resumed and Mr. Story was eventually called to the microphone to speak during public comments. School Board President Amy Weir informed Mr. Story before he began to speak that the current meeting was a special called meeting and not a regular board meeting. She added that he could only speak on the items that were listed on the agenda. Mr. Story spoke during public comments and while speaking, it was determined by President Weir and other members of the school board that Mr. Story had deviated from the items listed on the agenda. President Weir and other board members repeatedly informed Mr. Story that he was not allowed to speak regarding any non-agenda item. Mr. Story continued to ignore the directives from the dais which hindered the proceedings. In response to his non-compliance which delayed the proceedings, Sgt. Milton Pope, who was working security in the board meeting room, was given a directive by President Weir to remove Mr. Story from the meeting room. I observed Sgt. Pope approach Mr. Story, who continued to stand at the microphone and refuse to comply with board directives to discontinue his behavior and leave the meeting room. Sgt. Pope approached Mr. Story and gave him verbal directives to leave. Mr. Story refused Sgt. Pope's directives and continued to stand and yell at the board members. Sgt. Pope transitioned from giving verbal directives to placing his hand on Mr. Story's arm for a soft escort of Mr. Story from the room. Mr. Story's continued his non-compliance and tumultuous behavior. In response to Mr. Story's conduct, Sgt. Pope and Officer Frank Pontillo transitioned to using the minimum amount of physical force necessary to escort Mr. Story out of the room and restore peace so that the school board meeting could resume. Mr. Story resisted the physical escort and continued to yell during the entire time Sgt. Pope physically escorted him from the room.

# EXHIBIT 5

**EXHIBIT**

Yarbrough Ex. 4

**App. 162**

On August 17, 2021, at approximately 7:45 AM, I contact Williamson County Attorney Dee Hobbs regarding the actions and possible criminal violations committed by Mr. Story that led to Sgt. Pope and Officer Pontillo having to use physical force to remove Mr. Story from the board room due to him hindering and disrupting the school board meeting. Mr. Hobbs was informed that the Round Rock ISD Police Department would complete its investigation into the incident and submit the findings to his office for review regarding the filing of criminal charges. Mr. Hobbs stated that he would be out for two weeks in the coming days but would schedule a meeting date to discuss the case and findings. Mr. Hobbs' office later contacted me and scheduled a meeting for September 18, 2021, to discuss the case against Mr. Story.

On September 14, 2021, another incident occurred at a school board meeting where an individual identified as Dustin Clark was present in the board meeting room and hindered the official proceedings through repeated verbal outbursts and tumultuous behavior. Mr. Clark was warned by members of the school board from the dais and by Round Rock ISD PD officers to stop his repeated outbursts during the meeting. Mr. Clark continued the disruptive behavior which resulted in him being directed to leave the meeting. Mr. Clark ignored these verbal requests to leave the meeting. At that point, after Sgt. Sam Chavez and Assistant Chief Jim Williby had verbally requested for Mr. Clark to leave multiple times, the officers physically escorted him from the room. Mr. Clark was escorted out the rear door of the board room. After being removed, Mr. Clark re-entered the building and stood outside of the board room where he was captured on video speaking about the events that had just occurred inside the board room. He stated, "That's why I caused a disruption, that's why I tried to stop it."

On or about September 14, 2021, shortly after Mr. Clark was removed from the board meeting, I contacted County Attorney Dee Hobbs and informed him of what had transpired. I informed him that the case would be investigated, and Round Rock ISD PD would like to discuss the possibility of filing criminal charges due to Mr. Clark's hindering the meeting with his tumultuous behavior and repeated outbursts that led to officers using physical force to remove him from the meeting. Mr. Hobbs stated that Mr. Clark's case could be reviewed on September 18, 2021, when Mr. Story's case was scheduled for review.

On September 18, 2021, Assistant Chief Williby, Sgt. Lauren Griffith, and I met with Mr. Dee Hobbs at his office. The meeting was also attended by Williamson County Attorney First Assistant Corby Holcomb and another attorney from the County Attorney's Office. Sgt. Griffith provided the investigative reports, criminal complaints, and criminal charge options were discussed with those in attendance. At the conclusion of the meeting, the County Attorney's Office supported the filing of criminal charges against Mr. Story and Mr. Clark for hindering proceedings. Sgt. Griffith was accompanied by a member of the Williamson County Attorney's Office to a District Judge to review the complaint and issue arrest warrants for Mr. Story and Mr. Clark.

End of Report

# EXHIBIT 5

App. 163