**JEREMY STORY**

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
                       AUSTIN DIVISION

JEREMY STORY,                    *
        Plaintiff,               *
                                 *
v.                               *   CIVIL ACTION NO.
                                 *   1:22-cv-00448-DAE
SUPERINTENDENT HAFEDH            *
AZAIEZ, TRUSTEES AMBER           *
FELLER, TIFFANIE HARRISON,       *
AMY WEIR, JUN XIAO, CORY         *
VESSA; OFFICERS JEFFREY          *
YARBROUGH, JAMES WILLIBY,        *
DEBORAH GRIFFITH, MILTON         *
POPE, FRANK PONTILLO, RON        *
COLE, CHIEF DENNIS WEINER,       *
and CARLA AMACHER,               *
individually, and ROUND          *
ROCK INDEP. SCHOOL               *
DISTRICT,                        *
        Defendants.              *

  -----------------------------------------------------

            ORAL AND VIDEOTAPED DEPOSITION OF

                       JEREMY STORY

                      JUNE 16, 2025

                   (REPORTED REMOTELY)

  -----------------------------------------------------


      ORAL AND VIDEOTAPED DEPOSITION OF JEREMY STORY,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

-numbered cause on the 16th day of June, 2025, from

10:08 a.m. to 7:58 p.m., before Kristy Owen, CSR, in and

for the State of Texas, reported by machine shorthand
```

**Page 2**

```
with the witness appearing via Zoom from his home in the
City of Paige, County of Bastrop, Texas, pursuant to the
Federal Rules of Civil Procedure.
```

**Page 3**

```
                    A P P E A R A N C E S

FOR THE PLAINTIFF (via Zoom):
      Mr. Stephen D. Casey
      Casey Law Office, P.C.
      P.O. Box 2451
      Round Rock, Texas 78680
      stephen@caseylawoffice.us

FOR THE DEFENDANTS (via Zoom):
      Ms. Kathryn E. Long
      Mr. Adam Rothey
      Thompson & Horton LLP
      500 North Akard Street
      Suite 3150
      Dallas, Texas 75201
      Phone: (972) 853-5115
      Fax: (713) 583-8884
      klong@thompsonhorton.com
      arothey@thompsonhorton.com

ALSO PRESENT (via Zoom):
      Mr. Forrest Gunderson, Videographer

      Ms. Cindy Hill, General Counsel for Round Rock
      Independent School District
      Ms. Amber Feller-Landrum, Defendant (Exits page
      175.) (Enters page 327.)

      Ms. Tiffanie Harrison, Defendant (Enters page 65.)
      (Exits page 103.)
```

**Page 4**

```
                        I N D E X

Appearances................................   3
JEREMY STORY
     Examination by Ms. Long...................   7
     Examination by Mr. Casey.................. 329
Reporter's Certificate........................ 332


                       EXHIBITS

NO.  DESCRIPTION                          PAGE

1    First Amended Notice of Deposition.........   7

2    Original Complaint May 2022...............  46

3    Letter to Warren Norred...................  48

4    Third Amended Complaint...................  51

5    Order.....................................  53

6    Wilco Complaint........................... 250

7    (Not introduced.)

8    BED (Local)...............................  91

9    8/16/2021 Board Agenda.................... 100

10   Story and Bone messages.................. 101

11   JS100285................................. 104

12   JS100290................................. 107

13   8/16/2021 board meeting recording......... 124

14   Board meeting recording clip of Mr. Story.. 127

15   (Not introduced.)
```

**EXHIBIT G**

**App. 299**

**JEREMY STORY**

Page 5

```
1              (Exhibits cont'd)
2   NO.  DESCRIPTION                    PAGE
3   16  (Not introduced.)
4   17  8/19/2021 board meeting recording.......... 163
5   18  JS100289.................................. 164
6   19  8/24/21 board meeting agenda............... 170
7   20  (Not introduced.)
8   21  (Not introduced.)
9   22  Kristi Leigh Facebook video................ 213
10  23  (Not introduced.)
11  24  JS100291.................................. 224
12  25  Campaign sign............................. 264
13  26  GKDA (Local).............................. 295
14
15
              CERTIFIED QUESTIONS
16
    QUESTION                        PAGE/LINE
17
    "What boards have you withdrawn from?"........ 326/5
18
19
20
              (NOTE: Page 9 marked confidential.)
21
22
23
24
25
```

Page 6

```
1          P R O C E E D I N G S
2      (All exhibits were premarked, unless otherwise
3   indicated.)
4          THE VIDEOGRAPHER:  Going on the record.
5   June 16th, 2025.  The time is approximately 10:08 a.m.
6   This is the videotaped deposition of Jeremy Story, taken
7   by defendants in the matter of Civil Action Number
8   1:22-cv-00448-DAE, styled Jeremy Story versus
9   Superintendent Hafedh Azaiez, et al.  Filed in the
10  United States District Court, Western District of Texas,
11  Austin Division.  This deposition is being held via Zoom
12  videoconferencing.
13          Will the counsel please state their
14  appearances for the record.
15          MR. CASEY:  Stephen Casey on behalf of the
16  deponent Jeremy Story.
17          MS. LONG:  Kathryn Long and Adam Rothey on
18  behalf of defendants Round Rock ISD, et al., and I'm
19  here with Round Rock ISD's general counsel, Cindy Hill
20  and defendant Trustee Amber Feller-Landrum.
21          THE VIDEOGRAPHER:  My name is Forrest
22  Gunderson, I'm the videographer.  The court reporter is
23  Kristy Owen.  And we are in association with Stovall
24  Reporting.  The court reporter may now proceed.
25          THE REPORTER:  Thank you.  Mr. Story, I'm
```

Page 7

```
1   going to put you under oath.  Will you raise your right
2   hand, please?
3              (Witness sworn.)
4          THE REPORTER:  Thank you so much.  And,
5   Counsel, will you state your agreements for the record
6   if you have any.
7          MS. LONG:  Under the rules.
8          MR. CASEY:  Yep.
9          THE REPORTER:  All right.  Thank you.  You
10  may proceed.
11          JEREMY STORY,
12  having been duly sworn, testified as follows:
13          EXAMINATION
```

Page 8



**App. 300**

**JEREMY STORY**



23    Q.  Did any of your children attend a Round Rock
24    ISD school in 2020?
25    A.  Honestly, I don't know.  I just d...     **App.301**

JEREMY STORY



**41**

1  when they were enrolled.  I'm so sorry.

2       Q.  Did any attend?

3       A.  And you know you -- you do have access to their

4  records in Round Rock ISD.  You could look it up.  I --

5  I just genuinely don't know.

6       Q.  Did any of your children attend a Round Rock

7  ISD school in 2021?

8       A.  Same answer.

9       Q.  In August of 2021, were any of your children

10  attending a Round Rock ISD school?

11       A.  No.

12       Q.  In September of 2021, were any of your children

13  attending a Round Rock ISD school?

14       A.  No, I don't think so.

15       Q.  Since August 1st, 2021, have any of your

16  children attended a Round Rock ISD school?

17       A.  I don't think so.  I'm not sure of that one,

18  but I'm pretty sure no, but I'm not 100 percent certain.

**App. 302**

JEREMY STORY



45

16    Q.  When did you start attending Round Rock ISD
17  board meetings?
18    A.  Well, you mean during this season?  I attended
19  Round Rock ISD board meetings, I believe first in this
20  season of the case, in May.  I think right around there.
21    Q.  May of 2021?
22    A.  I believe so.  May or June.  Uh-huh.
23    Q.  Prior to May of 2021, did you regularly attend
24  Round Rock ISD board meetings?
25    A.  No.  Prior to the time at which they were

46

1  hiring Hafedh Azaiez, which I believe -- it's been many
2  years since this case was filed, but believe that was
3  May of 2021.
4    Q.  Okay.
5    A.  And like I said, I did not prepare.  I'm trying
6  to do this authentically off the top of my head.

47

48

**App. 303**

JEREMY STORY



57

59

25    Q.  Okay.  Round Rock ISD hired Dr. Hafedh Azaiez

58

60

1    to serve as its superintendent in May or June of 2021;
2    correct?
3        A.  They were the -- the -- the -- he was -- what'd
4    you say?  Voted in?  Is that what you said?
5        Q.  He was hired around May or June of 2021;
6    correct?
7        A.  I think so.  Around that time frame.  Yes.

13        Q.  Okay.  And in May or June of 2021 there were
14    members of the community were -- that were opposed to
15    that decision and spoke out at board meetings; correct?
16        A.  Yes.

App. 304

JEREMY STORY



**Page 61**

7    Q.  Okay.  And so is it correct that many community
8    members urged the Board to delay voting for Dr. Azaiez
9    as superintendent?
10   A.  Yes.

16   Q.  (By Ms. Long)  How many community members do
17   you believe urged a delay in the hiring of Dr. Azaiez?
18   A.  I honestly don't know.
19   Q.  Okay.  Can you name any of them?
20   A.  Oh, yes.  Yeah, I can do that.
21   Q.  Okay.  Can you name them for me, please?
22   A.  Sure.  Ones that come to my mind -- you mean
23   non-board members, right, when you say community
24   members?  Because board members are also community
25   members.  So Mary Bone and Danielle Weston are community

**Page 62**

1    members.
2    Q.  Okay.
3    A.  And they have clearly voiced their opposition.
4    Q.  Okay.  Other than Dr. Bone and Ms. Weston, who
5    -- who else?
6    A.  Boy, there were tons.  I'm -- I'm bad with
7    names.  Christie Slape was one.  Many of the people who
8    later ran for school board were there.  Don Zimmerman.
9    Orlando Salinas.  I mean, there were tons and tons of
10   people.  Again, this was three years ago.  Those are
11   some.
12   Q.  What about Dustin Clark?
13   A.  Oh, yeah, Dustin Clark for sure.
14   Q.  Jennifer White?
15   A.  Yes, ma'am.
16   Q.  Can you remember any others?
17   A.  I mean, there -- there were a lot.  I -- as
18   most people do when you go to board meetings, you're not
19   writing done everyone's names that gives testimony.  So
20   I -- I'm trying to give you as many as come to mind
21   presently.
22   Q.  Okay.
23   A.  If you want to suggest some others.
24   Q.  And those individuals spoke out at -- at board
25   meetings?

**Page 63**

1    A.  Yes, ma'am.

**Page 64**

11   Q.  Did you ever have any conversations other than
12   emails or -- or during public comment at a board meeting
13   with Trustee Amy Weir regarding the hiring of
14   Dr. Azaiez?
15   A.  Other than public comment or what?  Or -- or --
16   Q.  Or in email?
17   A.  Or in email?  Yes.
18   Q.  When?
19   A.  In the meeting where she hired Hafedh Azaiez,
20   was a part of that -- or well, they had to go revisit it
21   later because they did it wrongly.  They violated TOMA,
22   so they had to have a later meeting.  But in the first
23   time they tried to hire Azaiez, I walked up to the dais
24   after the meeting was over and I spoke to her about the
25   hire.

**App. 305**

**JEREMY STORY**



65

1    **Q.  And what did you say to her?**
2         (Ms. Harrison enters.)
3    A.  I asked her why she hadn't listened to
4    community input and how long had it been since she had
5    stopped listening to community input because it seemed
6    like she had made a decision prior to the vote.  And she
7    said that she had stopped listening to the community
8    input a long time ago.
9    **Q.  Did Trustee Weir say anything else?**
10   A.  I'm trying to remember.  You're talking about a
11   conversation from a while back.  Presently I'm not
12   remembering that -- anything beyond that.  I mean,
13   that's the gist of the conversation.

**JEREMY STORY**



77

1　No.  And even on the day that they were there, I did not
2　speak to them.
3　　Q.  Okay.  And did you go to Round Rock ISD on the
4　day the protective order was served?
5　　A.  Yes.
6　　Q.  Did you video that -- those interactions?
7　　A.  Yes, I did video on that day.  Uh-huh.  You
8　used the word "those interactions," but I mean I -- I
9　did take -- take video of that day.
10　　Q.  And where did you go at Round Rock ISD that
11　day?
12　　A.  To that -- to that Round Rock ISD headquarters.
13　　Q.  Okay.  And with whom did you speak at Round
14　Rock ISD headquarters?
15　　A.  A lady at the front desk.  I don't know her
16　name.  I can't remember.  But a lady at the front desk.
17　Some gentleman who entered the lobby from the back rooms
18　of the -- so they weren't coming from the front, they
19　came from the back.  And then there was some other
20　gentleman that I think that came from the front door, if
21　I remember right.
22　　Q.  And --
23　　A.  Oh, and also I spoke with Lauren Griffith and
24　another unidentified officer who came out of the
25　building when I left.

78

79

80

21　　Q.  And you said you spoke with Detective Griffith
22　that day.  Did you speak with her in the building or in
23　the parking lot?
24　　A.  In the parking lot.

App. 397

**JEREMY STORY**



Page 85

[redacted]

Page 86

[redacted]

16    Q.  Did you have any discussions with Officer
17 Pontillo before August 16th, 2021?
18    A.  Possibly.
19    Q.  Do you remember anything specifically?
20    A.  The problem is at the time I wouldn't have been
21 able to identify him.
22    Q.  Now you know who he is.
23    A.  Yeah.
24    Q.  Do you specifically recall any communications
25 that you had with --

Page 87

1    A.  No, ma'am.  I don't -- I don't know.  It seems
2 like we would have talked --
3    Q.  Can you let me finish my question?
4    A.  Sure.
5    Q.  -- Officer Pontillo prior to August 16th, 2021?
6    A.  My answer's still the same, I'm uncertain.
7    Q.  Okay.  Did you have any communications with
8 Sergeant Milton Pope prior to August 16th, 2021?
9    A.  It feels like I did.  Yes.  Uh-huh.  Yep.
10 Because they were in the board meetings.
11    Q.  Okay.  Did you recall any communications you
12 had with Sergeant Pope before August 16th, 2021?
13    A.  Not at this time in the deposition.
14    Q.  Okay.  And other than your communication with
15 Detective Griffith on August 2nd, 2021, did you have any
16 communications with Detective Griffith prior to August
17 16th, 2021?
18    A.  I don't think so.
19    Q.  Did you have any communications with Chief --
20 former chief Jeffrey Yarbrough prior to August 16th
21 2021?
22    A.  No.  That one I know for certain.
23    Q.  And why do you know that work for certain?
24    A.  Because when he came to me and tried to
25 unlawfully remove me from the board meeting under

Page 88

1 threat, I didn't know who he was.  I -- I thought he
2 might be just a member of the public feigning his
3 identity.  So that's how I know I didn't know him before
4 because I can remember that experience.
5    Q.  Okay.
6    A.  He was plainclothes that day, so it wasn't like
7 an easy ID, and when he made the claim to be who he said
8 he was, and I remember thinking, "I don't know if I
9 believe you," because I'd never seen him before.
10    Q.  Prior to the August 16th board meeting, did you
11 have any written communications with Trustee Weir
12 regarding what you wish to speak about at the August
13 16th board meeting?
14    A.  Yes.
15    Q.  Okay.  And what did you tell Trustee Weir that
16 you wanted to speak about at the August 16th --
17    A.  Well, okay.  Let me -- no, I'm sorry.  I don't
18 think it was couched in terms of what I would speak
19 about, but we had had emails where I was exposing what
20 they were hiding.  So I -- it was Ms. Weir would have
21 been aware of what my interests were.  Did we have a
22 dialogue specifically, "I'm going to speak about this"?
23 No.
24    Q.  Did you request the opportunity to speak in
25 public about Dr. Azai- -- the allegations against

**App. 308**

JEREMY STORY

**89**

1  Dr. Azaiez to Trustee Weir?
2     A. When?
3     Q. In August 20 -- prior to the August 16th board
4  meeting?
5     A. Prior?
6     Q. Prior.
7     A. I don't know. I don't remember. I do know I
8  did in the meeting because you have to sign a piece of
9  paper.
10    Q. Did any trustee -- oh, you did -- what do you
11  have to sign on a piece of paper?
12    A. I don't -- I don't -- I don't know. Your name.
13    Q. Do you have to say what you're going to speak
14  about?
15    A. That's not required by law. No.
16    Q. On the paper that you -- you said that you
17  wrote something on paper. What did you write on the
18  paper the night of August 16th when you signed up for
19  public comment?
20    A. I don't remember exactly what I wrote. I mean,
21  often I will write multiple things on those papers, like
22  multiple items. They'll say, you know, "What do you
23  want to write on?" Which, I think, by the way is not --
24  they shouldn't be asking that, but I'll -- I'll say
25  multiple different items that I'm going to speak on.

**90**

1     Q. And on the form or the paper that you signed up
2  for public comment on August 16th, did you reference
3  that you would be speaking about the allegations against
4  Dr. Azaiez?
5     A. I don't think so. There were two resolutions
6  on the agenda that night and I think I referenced that I
7  was speaking to those resolutions.
8     Q. Did you reference that you would be speaking
9  out about the protective order against Dr. Azaiez?
10    A. No.
11    Q. Okay.
12    A. I mean, I don't think that their form works
13  that way. I mean -- I don't know. Yeah. I mean, so
14  I'm -- they had two resolutions on the agenda that night
15  and I said I was speaking to all of them, which I did.
16    Q. Were you aware in August 16th of 2021 about
17  Board Policy BED (Local)?
18    A. No. No. No. Huh-uh.
19    Q. Okay.
20    A. Not -- I -- no. In terms of reading the board
21  policies and things, I don't think so. No.
22    Q. And I'm going to show you -- represent to you
23  that I have marked BED (Local) as Exhibit 8. This is
24  Round Rock ISD Board Policy regarding board meetings
25  public participation. And this was actually filed, this

**91**

1  copy, which is Exhibit 8 was filed as Document 11, which
2  was in the appendix to your verified original complaint
3  filed in this lawsuit on May 11th, 2022. And under
4  Round Rock ISD Board Policy, date issued March 3rd,
5  2021, "At regular board meetings the Board meeting" --
6  "Board shall permit public comment regardless of whether
7  the topic is an item on the agenda posted with notice of
8  the meeting." Did I read that correctly?
9        (Exhibit 8 introduced into the record.)

**92**

5     Q. And special meetings, it also says, "BED
6  (Local) at special meetings," it says, "At all other
7  board meetings, public comment shall be limited to items
8  on the agenda posted with notice of the meeting." Did I
9  read that correctly?
10    A. Yes, ma'am.
11    Q. Was the August 16th board meeting a regular or
12  special meeting?
13    A. Special.
14    Q. Okay. And so at the August 16th board meeting
15  public comment was limited to items on the agenda posted
16  with notice of the meeting; correct?
17    A. According to these board policies.



**App. 309**

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024



12    Q. Was there a seating capacity limit at the
13    August 16th board meeting?
14    A. Yes.

19    Q. Okay. Were -- was -- were all members of the
20    public allowed in the August 16th board meeting or was
21    it limited to the number of chairs available?
22    A. The officers were saying that you had to be
23    sitting in the chairs.

App. 310

JEREMY STORY



**97**

**99**

1  legal depositions, so I apologize.

2      Q.  Were other members of the public -- did other

3  members of the public have to stay outside the board

4  meeting room and watch on the live stream at the August

5  16th board meeting because of the seating capacity

6  limit?

7      A.  Yes.  To my recollection, yes.

**98**

1      Q.  Did you have a chair in the board meeting room

2  at the August 16th board meeting?

3      A.  No, not initially.

11      Q.  But you were allowed to stay in the board

12  meeting room the entire time?

13      A.  Only because of my persistence.  If I had done

14  what the officers wanted, I would not have been allowed

15  to stay.

16      Q.  Were others -- did others have to watch the

17  meeting out on a live stream because --

18      A.  Yes.

19      Q.  -- of the seating capacity limit at --

20      A.  Yeah.  Uh-huh.

21      Q.  -- August 16th board meeting?

22      A.  Yeah.

23      Q.  Mr. Story, it's very important that you let me

24  finish my question.

25      A.  I'm sorry.  I'm used to conversations, not

**100**

101

.

Q. Okay. I'm going to show you what has been marked in this case as Exhibit 10.

(Exhibit 10 introduced into the record.)

A. Okay.

Q. And I will tell -- on the bottom of page 18 of this it says JS105174.

A. Okay.

Q. Which is how the documents you produced in this case were labeled.

A. Sure. I mean, like I said, we produced hundreds and hundreds of documents doing our best for

102

you.

Q. Okay. And this appears to be text messages that you produced; is that correct?

A. Yes, that's what it appears.

Q. And there's one that says August 16th, 2021 at 4:21. And it says, "Hey, Jeremy. Our Board policy allows for public comments on item both on and off the agenda only at the monthly regular board meeting. For called meetings like tonight, public comments are limited to items that are on the agenda. Thursday" --

A. Okay.

Q. -- "of this week is a regular board meeting." Is this from Trustee Bone to you on August 16th, 2021?

A. I'm reading the rest of it here. Okay. What were you asking, ma'am? I was just reading the rest of that text message.

Q. Is this text message from Trustee Bone to you on August 16th, 2021?

A. Yeah, it appears to be. So it looks like we had a conversation, uh-huh, here on that day.

Q. Do you know why she texted you that on August 16th, 2021?

A. No, I don't.

Q. Had you had a conversation with her prior to that text message that precipitate -- precipitated that

103

text message?

A. I presume so. I mean, I don't know. I don't remember. But I mean, we're clearly talking about the regular board meeting. Yeah.

(Ms. Harrison exits.)

Q. (By Ms. Long) Okay. And Trustee Bone told you, "For called meetings like tonight, public comments are limited to items that are on the agenda." Correct?

A. Yeah, sure. I see it there.

Q. And that's -- and that's consistent with what Board Policy BED (Local) says; correct?

A. It seems to be that way. Yep.

Q. So Trustee Bone advised you of that limitation prior to the August 16th board meeting; correct?

A. It appears that way. Yes, ma'am. So I would further amend just to say well, it looks like that according to these text messages I had a conversation with -- via text message Mrs. Bone about that meeting and that I needed to speak on topic. That was her opinion and view.

Q. Okay. And prior to the meeting beginning, did you have a conversation with Officers Pope and Pontillo?

A. Yes.

Q. Okay. I just want to make sure that I have this correct. This is a video that we received from you

104

that's marked -- that I'm marking as Exhibit 11, and it's labeled JS100285.

(Exhibit 11 introduced into the record.)

(Video playing.)

Q. (By Ms. Long) Let me see if I can turn this volume up.

A. Okay.

MR. CASEY: While you're doing that Katie, do you have a time we want to plan for a break for lunch?

MS. LONG: Five minutes.

MR. CASEY: Sounds great. Thank you.

(Video playing.)

Q. (By Ms. Long) So I'm going to play the -- some more of this, but that's the first minute and 11 seconds of Exhibit 11, which is JS100285 that you produced in this matter. Do you know who was making the recording that is in Exhibit 11 that you produced to us?

A. I believe it's Marcia Watson.

Q. Okay.

A. I'm not certain, but I'm pretty sure that's the one.

Q. And did Ms. Watson provide a copy of that to you? Is that how you got it?

A. Yeah. Right. Whoever took this provided it to



**105**

1  me. I'm pretty sure it was Marcia Watson.
2      Q. And is the video you provided, JS100285, a true
3  and correct copy of what you received from Marcia Watson
4  that she videoed that -- that evening?
5      A. I believe so. I mean --
6      Q. Did you receive --
7      A. -- there's been a lot of water under the
8  bridge. I also have -- I think I submitted to you the
9  one that I taped too on that phone that you're seeing in
10  the --
11      Q. We'll get to it.
12      A. Okay.
13      Q. We'll get to it. Was the -- was this the
14  entire recording that Marcia Watson provided or is there
15  a longer recording?
16      A. I think this is the entirety of it.
17      Q. And was Exhibit 11 recorded on August -- at the
18  August 16th, 2021 board meeting?
19      A. Yes.
20      Q. And was this -- did this conver- -- sorry. And
21  in this conversation you're talking to two police
22  officers; correct?
23      A. Two Round Rock ISD police officers. Uh-huh.
24      Q. Okay. And are they Sergeant Pope and Officers
25  Pont- -- Officer Pontillo?

**106**

1      A. Yes.

13      Q. And at the August 16th board meeting you were
14  talking to the officers about whether they were going to
15  enforce that social distancing requirement; correct?
16      A. I was talking to the officers because I was
17  obeying their unlawful social distancing pretense by
18  distancing myself and they were trying to say that I
19  needed to leave the board meeting.
20      Q. Okay.
21      (Video playing.)
22      A. They wanted me to leave. You don't have the
23  sound on right now.
24      Q. I do have the sound on, it's just very quiet.
25  It's a very quiet video.

**107**

1      (Video playing.)
2      Q. Okay. And was that the entirety of the
3  recording from Ms. Watson?
4      A. I think so. Uh-huh. I provided another one, I
5  think it was more length, from my own cell phone. It
6  has better audio too.
7      Q. As I told you --
8      A. Uh-huh.
9      Q. -- that's next. And marked as Exhibit 12 is a
10  video that was produced to us as JS100290. And I want
11  to see if this is the video that you made and provided.
12      (Exhibit 12 introduced into the record.)

**108**

12      Q. Okay. I'm -- okay. And do you know how many
13  speakers were signed up to speak that evening in public
14  comment?
15      A. Actually, I don't know how many were signed up.
16  I do know from watching the video that Ms. Weir said
17  that there were 180 -- from the dais she said there were
18  180 speakers that night. I don't know how many signed
19  up, though. There'd be no way for me to know that.

**App. 313**



17    Q.  (By Ms. Long)  Mr. Story, were there people who
18    were outside the meeting room who were not allowed in
19    the meeting room at the August 16th, 2021 board meeting?
20    A.  Yes.

App. 314



**113**

**115**

**114**

4  Q. At the August 16th, 2021 board meeting --
5  A. Uh-huh.
6  Q. -- the people who were not allowed in the board
7  meeting room, do you believe there was any other reason
8  that those other people were not allowed in the board
9  meeting room other than they did not have a seat in the
10  room?
11  A. I don't know.
12  Q. Okay.
13  A. I don't know.

**116**

2  Q. Okay. How do you know that Sergeant Pope knew
3  what you were going to speak about in the August 16th,
4  2021 board meeting?
5  A. Because I had made it public knowledge to
6  everyone throughout the District and in the community.
7  Q. How do you know that he was --
8  A. He even addresses me by my name, which was
9  interesting too in that video.
10  Q. How do you know that Sergeant Pontillo was
11  aware of the things that you had made public?
12  A. Because I'd -- because they were -- clearly
13  knew about it from the context of the conversation.
14  They even knew who I was when they were speaking to me
15  that day. They were addressing me by name. I don't
16  even know their names. You know, the reason I know
17  their names at this point is because of the lawsuit and
18  because I looked at the video and saw their tags. But
19  yet, in that conversation, they're -- they're addressing
20  me by my own name. Everybody knew what I was about to
21  say. Everybody knew that -- that -- that I was outing
22  the School District for safety violations.
23  Q. And other than the context of that conversation
24  that was on video that we've -- on those two videos that
25  we both watched, do you have any other reason to believe

**App. 315**

117

1 that Sergeant Pope knew what you were going to speak
2 about at the August 16th, 2021 board meeting?
3    A. Other than the conversation and the public
4 dialogue, no. I mean, the conversation with him
5 directly as I entered the board meeting, yes, that was
6 an indicator that he knew. And then also the broader
7 conversation that the whole public had engaged in.
8    Q. And the consideration that you're referencing
9 with respect to Sergeant Pope was fully recorded on the
10 two videos that we watched; correct?
11    A. I'm -- if that's what you were asking me
12 earlier, no, I wouldn't say that amalgamates to every
13 conversation I've ever had with him that day. That is
14 the full conversation in that moment where they were
15 trying to restrict me from entering the board room.
16    Q. Okay. And how did Officer Ponti- -- Pontillo
17 know what you were going to speak about at the August
18 16th, 2021 board meeting?
19    A. Same answer as before.
20    Q. Okay. Other than the context of the
21 conversation he had with you prior to the board meeting
22 that was on video or the fact that you had made it
23 public what you were going to speak about, do you have
24 any other reason to believe that Officer Pontillo knew
25 what you were going to speak about at the August 16th

118

1 board meeting?
2    A. Yes. I -- I believe that the District had
3 communicated with these officers what I had been
4 communicating with them.
5    Q. And you said -- what is the basis for your
6 belief that the District had been communicating to
7 Sergeant Pope and Officer Pontillo what you had been
8 communicating to the District?
9    A. It was apparent, like I said, from their
10 actions in that board meeting. And so outside of that
11 board meeting, I don't have -- I don't have other
12 indicators. Just in that board meeting there's a lot of
13 indicators.
14    Q. Okay. Well --
15    A. There was the conversation, there was the way
16 they set it up, there was the nervousness, there was a
17 lot of things. There was the police report where they
18 ID me before I even walk in the building. I mean,
19 there's a lot of indicators that they knew in advance
20 and were trying to prevent me from speaking. But
21 they're related to that board meeting if that's what
22 you're asking.
23    Q. Okay. You also had a conversation with former
24 chief Jeffrey Yarbrough on August 16th, 2021 -- let me
25 go back. I just want to ask real quick. Have you seen

119

1 any documents indicating that Sergeant Pope was aware on
2 August 16th, 2021 what you were going to say in public
3 comment?
4    A. Have I seen any documents --
5    Q. Yes.
6    A. -- is that what you're saying? That -- that
7 Pope was aware of what I was going to say?
8    Q. Yes.
9    A. Other than the police report where they're
10 IDing me as I walk into the building, which is really
11 unusual. They didn't ID anybody else.
12    Q. So other than that, no; correct?
13    A. His comment to me when we're in that dialogue.
14 He seems to have --
15    Q. My question was regarding documents.
16    A. Documents? No, not -- no.
17    Q. Okay. And have you seen any documents
18 indicating that Officer Pontillo knew what you were
19 going to speak about at the August 16th, 2021 board
20 meeting?
21    A. The police report.
22    Q. Other than the police report, are there any
23 other documents indicating that Officer Pontillo knew
24 what you were going to speak about at the August 16th,
25 2021 board meeting?

120

1    A. As far as documents, none that I'm aware of.
2    Q. Has anyone ever told you that Sergeant Pope
3 knew that you were going to speak about allegations
4 against Dr. Azaiez at the August 16th, 2021 board
5 meeting?
6    A. Nope.
7    Q. Has anyone ever told you that Officer Pontillo
8 knew that you were going to speak about allegations
9 against Dr. Azaiez at the August 16th, 2021 board
10 meeting?
11    A. No.

App. 316



**121**

**123**

18    Q.  Okay.  Was the superintendent's contract on the
19  agenda for the August 16th, 2021 board meeting?
20    A.  Was the superintendent's conduct?
21    Q.  Contract.
22    A.  Oh, contract.  You know, were they formally
23  debating about his specific contract?  No.
24    Q.  Was the superintendent's performance on the
25  agenda for the August 16th, 2021 board meeting?

**122**

**124**

1    A.  I would say yes.
2    Q.  Okay.  Was the super- -- was a potential
3  investigation of the superintendent on the agenda for
4  the August 16th, 2021 board meeting?
5    A.  I would say yes.
6    Q.  Do you know how long the board meeting was on
7  August 16th, 2021?
8    A.  Very long.  Hours.
9    Q.  Was it about eight hours?  Was it over eight
10  hours long?
11    A.  I don't know.
12    Q.  I'm going to show you what's been marked as
13  Exhibit 13.
14        (Exhibit 13 introduced into the record.)
24    Q.  (By Ms. Long)  I'm going to -- I've marked what
25  is Exhibit 13, is an August 16th board

**App. 317**

**JEREMY STORY**



125

1  recording.  And at the bottom of that recording you can

2  see it's eight hours and 31 minutes.  And at the

3  beginning of the board meeting Trustee Weir advised that

4  you -- that you -- you saw that there were 180 people

5  signed up for public comment; correct?

6      A.  Yeah.  Yes, ma'am.

126

5      Q.  (By Ms. Long)  Mr. Story, and she indicated

6  that there were 180 speakers; correct?

7      A.  She did indicate that.  Yes, ma'am.

8      Q.  And public comment -- people that are signed up

9  for public comment get two minutes to speak; correct?

10     A.  Yes, ma'am.  That's what I remember.

11     Q.  So if everyone spoke at the board meeting on

12  August 16th, just public comment would be six hours;

13  correct?

14     A.  Thus is the nature of being on a school board.

15     Q.  Is that -- so that's a -- that is correct; yes?

16     A.  Sure.

17     Q.  Okay.  And you were signed up to speak at the

18  public comment; correct?

19     A.  Yes, ma'am.

127

9      Q.  (By Ms. Long)  Did you put anything in writing

10 before hand that was handed or, you know, provided to

11 the Board that you believed that you could talk about

12 matters that were not listed in D1 or D2?

13     A.  I don't -- I don't know.  I don't know what my

14 exact wording was on that form.

**App. 318**



**129**

5    Q.  Do you know if anyone had advised, in writing
6    or otherwise, Trustee Weir prior to their public comment
7    that they thought they could speak on matters that were
8    not on the agenda?
9        A.  I don't know.  I don't know a lot of these
10   things.  You expect me to be some omniscient person a
11   lot of times.
12           MS. LONG:  I'm going to object to
13   nonresponsive.
14       Q.  (By Ms. Long)  You can just say "I don't know."
15   I just want to know what you do and do not know and do
16   not --
17       A.  I don't know.  I don't what other people put on
18   their forms.  I have no knowledge of what the people
19   told the School District on private forms that only go
20   to school board members.

**130**

1

**131**

15       Q.  (By Ms. Long)  She did not pound the gavel
16   until you started talking about the protective order
17   against Dr. Azaiez; correct?
18       A.  That's correct.

**132**

1    Q.  (By Ms. Long)  When she pounded the gavel,
2    Trustee Weir said, "That is not on D1 or D2 on the
3    agenda."  Correct?
4        A.  She also said, "That's not appropriate."
5        Q.  Okay.  But did she also say that is -- that
6    that is not D1 or D2 on the agenda?
7        A.  That is part of what she said.
8        Q.  Okay.  And as --
9        A.  -- of what she said.

**App. 319**

JEREMY STORY



133

135

134

136

8    Q.  And in the video we could hear you make
9    comments as you were being removed from the board
10   meeting room; correct?
11      A.  I continued the speech that I had originally
12   planned.

24   Q.  Okay.  And did they -- did Off- -- Officer
25   Pontillo or Sergeant Pope say anyth...

**App. 320**

**JEREMY STORY**



137

1  **were directing you out of the meeting room?**
2    A.  Not that I remember.  No.  Because my main
3  thing was to try to continue the speech that I had the
4  lawful right to continue.

138

24    Q.  (By Ms. Long)  Did you sustain any physical
25  injury on August 16th, 2021?

139

1    A.  I mean, other than them just grabbing me really
2  hard and dragging me out of the room?
3    Q.  Yes.
4    A.  No, not -- not other than that.

140

**App. 321**



**141**

**142**

**143**

es.

24    Q.  Okay.  Did -- was -- were the officers directed
25    to remove anyone other than you from the board meeting?

**144**

1     A.  No.  Actually, I think there was one time or
2    twice -- but one time, if I remember right looking at
3    the video, where I think Weir tries to do this but the
4    officers don't come forward.
5     Q.  Okay.  So you think there was another time that
6    Weir did direct removal of somebody but the officers
7    didn't come forward?
8     A.  Yeah.  It was a woman.  I don't remember which
9    woman.
10     Q.  Do you realize the -- do you remember the
11    context of what was occurring?
12     A.  No.  I mean, the context of her -- of this
13    woman's particular speech?  No.  I mean, you'd have to
14    review and go through.  But there's one where she does
15    this.
16     Q.  And was that other person speaking about
17    Dr. Azaiez?
18     A.  That's kind of the repeat of the last question
19    you just asked.  I don't remember.  Maybe.  I don't
20    remember.  There were many speakers who spoke about
21    Dr. Azaiez.  I was not the only one.
22     Q.  But the other speakers who spoke regarding
23    Dr. Azaiez were not removed from the meeting?
24     A.  That's correct.  I was the only person removed
25    from the meeting.

**App. 322**

JEREMY STORY



145

18    Q.  Who continued to speak an off-topic matters

19  after she was told the matters were off topic?

20    A.  I don't remember.  You'd have to watch the

21  video.  There were -- that -- that happened more than

22  once.

147

22    Q.  Okay.  So who were the ones who continued to

23  seek an off-topic matters after Trustee Weir advised

24  them that they were no longer speaking on items on the

25  agenda?

146

148

1    A.  Two that I remember, just looking at your list

2  here that were in our list -- it does make it

3  complicated because there's so many -- but of the ones

4  we noted, the ones that I remember would be -- because

5  they happen to be up on the screen even right now --

6  Jennifer White and Renata Sims.

**App. 323**

**JEREMY STORY**

149

5    **What evidence that -- do you have that you**
6    **were targeted because you were speaking about the**
7    **allegations against Dr. Azaiez and not because you**
8    **deviated from the topics that were listed on the agenda**
9    **for the August 16th board meeting?**
10        MR. CASEY:  And I don't have an objection
11   to that question.  I thought you had worded it
12   differently the last time.
13        MS. LONG:  Okay.
14        MR. CASEY:  Sorry.
15        A.  So, yeah.  I mean, the whole case is
16   significant and all that's outlined in this case.  But
17   basically, there's a lot of things.  Number one, she
18   stopped me before I even began to speak.  She presumed
19   that I was going to speak on and said it was going to be
20   non-germane.  Unless she's psychic, she was prematurely
21   -- had already determined that what I was going to do
22   was non-germane.
23        Secondly, other people spoke on the same exact
24   topic and even yelled back at her and she did nothing.
25   No one was arrested.  No one was called out of the room

150

1    except for me.
2        Thirdly, she used the words "that's
3    inappropriate" when she was calling me out.  She wasn't
4    just talking about it being non-germane, she clearly
5    thought that there was some sort of -- it was -- it was
6    a -- it was personal call of what she thought was,
7    quote, appropriate.  And she had already made clear to
8    me in an email that she did not think it was appropriate
9    for me to be bringing up Hafedh Azaiez and his misdeeds.
10   And -- and mostly I spoke on topic.  I was the only
11   person all night long who even quoted that resolution.
12   Only person who quoted it.  I was directly speaking
13   about using examples just like everybody else had that
14   night.  And unlike anybody else, I was called out.  I
15   was arrested.  I was pulled out of the room.  There were
16   people who used examples that there is no way on God's
17   green earth that they have anything to do with the topic
18   whatsoever, not even -- not even a little bit, and yet
19   this did not happen to them.  There was not banging
20   gavel.  There is no, "You need to stop speaking right
21   now."  We just went right on through them.  But when I
22   spoke, I got called out in advance, I got called out
23   during my meeting and during my talk, and then I got
24   pulled out of the room.
25        And -- and so for all those reasons plus

151

1    others that we've stated in our suit, I believe that she
2    discriminated against me.  It wasn't about germaneness.
3    That a false pretense that Ms. Weir is lying about.
4        Q.  Other than what is identified in your complaint
5    **and what you just testified to here, do you have any**
6    **other evidence that Trustee Weir targeted you because**
7    **you were speaking about allegations against Dr. Azaiez**
8    **and not because she believed you dev-- -- deviated from**
9    **the topics on the agenda?**
10       A.  None that I can think of right now.
22       Q.  (By Ms. Long)  Do you have any evidence that
23   **Sergeant Pope knew that Trustee Weir's directive was**
24   **because of the content of your speech, which was the**
25   **allegations between Dr. Azaiez, and not because she**

152

1    **believed you were speaking on matters that were not on**
2    **the agenda?**
3        A.  Yeah, because he's a living breathing human
4    cognisant being, meaning that any rational person in
5    that room would have seen that because there were tons
6    and tons of examples where this didn't happen and that
7    all of a sudden I was treated differently.
8        Q.  Any other evidence?
9        A.  He knew what I was -- that my general
10   disposition towards the whole issue of safety in the
11   District and he alluded, you know, that he knew who I
12   was when he spoke to me when I walked into the room.  He
13   tried to pretend like he was on my side even in the
14   midst of that conversation while trying to extricate me
15   from the board room, you saw that in the video.  There
16   were a lot of reasons why I would say that he knew
17   better, knew what was really going on.
18       Q.  What were the other reasons he knew what was
19   really --
20       A.  I believe -- uh-huh.  Go ahead.  Stephen, I'm
21   sorry.
22       Q.  What were the reasons you believe he -- he
23   knew?
24       A.  I believe Azaiez communicated with him.  I
25   believe the police chief communicate

**App. 324**

JEREMY STORY



**153**

1  believe the police -- I don't believe, I know the police

2  report shows they ID'd me as I got out of my car, which

3  is strange for someone who's -- really there's no reason

4  for them to ID me getting out of my car in a parking

5  lot.  They knew their plans before this happened.

6      Q.  Okay.  Other than your belief that Dr. Azaiez

7  communicated with Sergeant Pope, do you have any

8  evidence that Dr. Azaiez communicated with Sergeant

9  Pope?

10     A.  Well, he nodded his head when this was going on

11  to the police.

18     Q.  Okay.  And do you have any evidence that Chief

19  Yarbrough communicated with Pontillo or Pope prior to --

20     A.  Yeah, it's on your video that you just watched.

21     Q.  Other than that?

22     A.  That he communicated with them when?

**155**

**154**

**156**

20     Q.  (By Ms. Long)  What evidence do you have,

21  Mr. Story, that Officer Pontillo was aware that Trustee

22  Weir was -- sought your removal because of the content

23  of your public comment at the August 16th board meeting

24  and not because she believed you were deviating from the

25  posted agenda items?  You're on mu...

App. 325

**JEREMY STORY**



157

```
1    A.  I'm confused because it -- it sounded like to
2    me you said Officer Pontillo, but then you said "she."
3    Are you...
4    Q.  "She" was referring to Weir.
5    A.  Oh, to Weir.  So the same answer as for Pope.
```

App. 326

**JEREMY STORY**



161

17    Q.  Okay.  And three days later on August 19th,
18    there was a regular meeting of the Round Rock ISD Board
19    of Trustees; correct?
20    A.  Yes, it seems like -- yeah, there was another
21    meeting.
22    Q.  And at a regular meeting, people could talk on
23    -- at -- in 2021, people could talk about any matter,
24    even if it was not a posted agenda item; correct?
25    A.  Yes, ma'am.  We covered that earlier.

162

1    Q.  And you spoke at the August 19th, 2021 meeting;
2    correct?
3    A.  Yes, ma'am.
4    Q.  And were there multiple speakers at the August
5    19th, 2021 meeting who talked about the allegations
6    against Dr. Azaiez?
7    A.  I don't fully know.  I -- I would suppose so,
8    yes.
9    Q.  Okay.  And did you speak at the August 19th,
10   2021 meeting regarding the allegations against
11   Dr. Azaiez?
12   A.  Yes.
13   Q.  And were you allowed to speak for your full two
14   minutes?
15   A.  Yes, ma'am.
16   Q.  Were you interrupted at all?
17   A.  I don't remember.

163

13    Q.  (By Ms. Long)  And I'm going to play you a clip
14    from the Exhibit 17, which is a recording of the August
15    19th, 2021 board meeting, starting at the
16    15-minute-and-24-second mark.
17        (Exhibit 17 introduced into the record.)
18        (Video playing.)
19    Q.  Was that the public comment that you provided
20    at the August 19th, 2021 board meeting?
21    A.  Yes.
22    Q.  And does that reflect -- refresh your
23    recollection that you weren't interrupted during the two
24    minutes of your allotted time?
25    A.  Yeah.  Thank you for that.

164

**App. 327**

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**



17    Q.  What was Dr. Azaiez's involvement in preparing
18  the warrant affidavit?
19    A.  I don't fully know at this time.  I can say to
20  you -- I just don't want to go beyond the scope of your
21  question.  But I believe that he was involved because
22  Yarbrough would have talked to him about it, as would
23  any of these officers, Griffith, whomever, because of
24  un- -- historical nature of it and his involvement in
25  the -- the prior -- lead -- events leading up. I

**App. 328**

**JEREMY STORY**

229

1  is irrational to believe that Azaiez would have been
2  completely out of the know of the preparation of this
3  warrant.  And we've gotten information from Williamson
4  County officials that they had heard from Azaiez and
5  communicated with him.
6      Q.  Who at Williamson County -- what evidence do
7  you have from Williamson County that anyone there
8  communicated with Dr. Azaiez?
9      A.  I -- I laugh because, unfortunately, it's
10  someone that is presently involved in the suit I have
11  against Williamson County for the same incident, and
12  that would be Judge Gravell.  Bill Gravell spoke to me
13  privately at one point and sort of hinted at that,
14  indirectly said that along with -- anyway, that -- that
15  -- that's really there.  Also -- also the -- the --
16  what's his name?  Constable Paul Leal communicated with
17  me that he had received some communications.  And so I
18  -- I have reason to believe strongly that there was
19  communication.
20      Q.  And what did --
21      A.  The sheriff of Williamson County during his
22  election gave a speech, and during that speech he
23  answered questions afterwards.  And in one of those
24  questions someone asked him about our arrest, Dustin and
25  I's, and he said that he had been contacted by the

230

1  District.
2      Q.  Okay.  Let's break that down a little bit.
3      A.  Okay.
4      Q.  First of all, you said one of the reasons for
5  believing Dr. Azaiez's prepared is that Yarbrough and
6  the other officers would have communicated with him.  Do
7  you have any evidence that Yarbrough or the other
8  officers actually did communicate with Dr. Azaiez
9  regarding the preparation of the warrant affidavit?
10      A.  In one of the police reports I believe or the
11  -- I don't remember where it is, in the police report or
12  in one of the complaints dealing with it or something,
13  one of the documents we got indicated that Griffith had
14  said that she was going to invest- -- investigate and
15  ask questions of all the involved people.
16      Q.  Okay.  Other than that statement, do you have
17  any evident that Yarbrough or the other officers
18  actually communicated with Dr. Azaiez regarding the
19  preparation of the warrant affidavit?
20      A.  Beyond all the things I've already said?  Is
21  that what you're trying to get at?
22      Q.  Yes.
23      A.  I'm trying to think if I know of anything else
24  that comes to mind right now.  Nothing presently.
25      Q.  Then you stated that Judge Gravell, the

231

1  Williamson County Judge, hinted at the fact that he had
2  spoken to Dr. Azaiez.  What did Judge Gravell say?
3      A.  It's been a while, but he walked up to me,
4  which he didn't normally -- didn't normally do, but he
5  walked up to me in a meeting, weirdly enough gave me a
6  giant hug, which he'd never done before, and then sort
7  of talked to me privately and quietly about how they had
8  contacted him and that -- kind of said that he felt, you
9  know, that it -- like, it was a bad thing, you know.  I
10  don't remember his exact words.  It was years ago at
11  this point.  I remember thinking, "This is really
12  weird."  I've never been hugged by the county judge
13  before, and also the fact that he was saying that this
14  had happened was a little shocking to me.
15      Q.  So you said that "they contacted him."  Who did
16  he tell you had contacted him?
17      A.  I'm thinking.  I don't honestly remember at
18  this moment.
19      Q.  And did he --
20      A.  He --
21      Q.  -- tell you what they contacted -- this
22  unidentified person contacted him about?
23      A.  I -- I can give you some other -- wait.  Can
24  you go back to that former question because I want to
25  stay on your question.  I'm really trying for you.  You

232

1  said --
2      Q.  You're not.  I mean, the question is, you say
3  that Judge Gravell --
4      A.  Uh-huh.
5      Q.  -- hinted at you --
6      A.  Yeah.
7      Q.  -- that Dr. -- when I asked how do you know
8  that Dr. Azaiez reached out to Judge Gravell --
9      A.  And used the word "they."
10      Q.  You said Judge Gravell hinted at it.  I asked,
11  "What did he say?"  And you said, "They contacted him."
12      A.  Uh-huh.
13      Q.  And my question is, who did he say contacted
14  him?  And you said you didn't know exactly.
15      A.  Yes, ma'am.
16      Q.  And then I said, "What did they say" -- "What
17  did Judge Gravell say they said to him?"
18      A.  Essentially, you know, they -- he'd implied
19  that they were -- not implied.  He stated -- let me use
20  the right words.  He stated that they had contacted him
21  about what they were doing, about -- about their concern
22  and what they were -- what they were going to do or what
23  they had done.
24      Q.  Who had contacted him?
25      A.  Again, I don't remember.  That's  **App. 329**

**JEREMY STORY**

233

1  question.  I -- I don't remember exactly who he said or
2  if he even identified specifically who.  I can tell you
3  that in a subsequent commissioner's meeting, the
4  commissioners all talked together and one of them said
5  that they had had a meeting with Azaiez and they really
6  trusted him and he seems like a really trustworthy guy.
7      Q.  Okay.
8      A.  Which the judge just -- you know, just as we
9  all understand in Texas, is a -- is a part of the four
10  or five people that are commissioners.
11      Q.  Okay.
12      A.  Five people.
13      Q.  So Judge Gravell never told you that Dr. Azaiez
14  contacted him; correct?
15      A.  I didn't say that.  I just said I can't
16  remember the exact person he identified or if, you know,
17  if he identified a group or whatever.
18      Q.  Did Judge Gravell tell you that Dr. Azaiez had
19  contacted him about your arrest?
20      A.  I don't remember if he used, like, the word
21  "the District" or "administrators" or "Azaiez," but he
22  did definitely say he had been contacted by either board
23  members or Azaiez or an administrator about it.  Yeah.
24      Q.  And when -- what when did he say he was
25  contacted?

234

1      A.  It wasn't like, "Hey, some teacher called me
2  about it."  It wasn't that because it was shocking,
3  especially that he just hugged me.  It was -- the whole
4  thing was just weird.
5      Q.  When did this occur?
6      A.  It -- I actually remember this.  It was at a
7  Christmas party shortly after this had happened.  So I
8  guess this happened, what, September.  This would have
9  been that December.
10      Q.  And when did he tell you they had contacted
11  him?
12      A.  He didn't list a specific date.
13      Q.  Did they contact him --
14      A.  He was referencing my arrest.
15      Q.  Did they contact him before or after your
16  arrest?
17      A.  Maybe it wasn't even a -- whenever we would
18  have done a Christmas party.  It might have been early
19  December.  You said, did...
20      Q.  Did he say they had contacted him before or
21  after your arrest?
22      A.  I think it was before.
23      Q.  Okay.  And you said he contact -- they
24  contacted him about.  What did they contact him about?
25  What did he say --

235

1      A.  It was clear just from what he was talking to
2  me about was the whole -- at this point, of course, I
3  had been arrested and then released, and it was clear
4  that it was all about what the School Board had done to
5  me.  So he -- he was talking about that he had been
6  contacted by, you know, I think -- I don't know if he
7  said a board member or Azaiez, but about this.  It was
8  sort of like he was apologizing for them.  He was sort
9  of being conciliatory, which is why he hugged me.  It
10  was the only time he's ever hugged me.  It was very,
11  like I said, unusual.
12      Q.  Did he specifically say they contacted him
13  about your arrest?
14      A.  Yeah.  Yeah.  It definitely had to do with my
15  arrest for sure.  I just don't remember some of the
16  other more nuanced stuff you've asked.
17      Q.  And what did he say they contacted him to say
18  about your arrest?
19      A.  I'm trying to -- what did he say they contacted
20  him to say?  What did he say they contacted him to say?
21  What?  I don't understand your -- I'm really...
22      Q.  It -- you're -- I'm trying to break down your
23  pronouns and your --
24      A.  Okay.
25      Q.  -- you know, what you're saying --

236

1      A.  I'll --
2      Q.  -- occurred.  And only after I push and push do
3  you say that they mentioned the arrest.  And I'm trying
4  to say, what did they say -- what did -- what did Judge
5  Gravell say that this unspecified District person --
6      A.  Yeah.
7      Q.  -- said about your arrest?
8      A.  It was sort of like all painted in a negative
9  light, and he was trying to be conciliatory towards me.
10  I mean, that -- that's pretty much what it was.  That's
11  why I remember it.  It was just weird.

**App. 130**

JEREMY STORY



**237**

*(Redacted)*

**238**

*(Redacted)*

22  Q. (By Ms. Long)  So, Mr. Story, you spoke with
23  Constable Leal after your arrest; correct?
24  A. Yes, ma'am.
25  Q. And he told you that he had heard from -- he

**239**

1  had spoken to unidentified people from Round Rock ISD
2  and Williamson County who said your arrest was a
3  warning; correct?
4  A. Yes, ma'am.
5  Q. And so that conversation occurred after your
6  arrest; correct?
7  A. Yes, ma'am.
8  Q. And so --
9  A. Thereafter.
10  Q. So Constable Leal did not say that he had
11  spoken to Dr. Azaiez before your arrest; correct?
12  A. He did not say who he had spoken to
13  specifically.
14  Q. And --
15  A. Probably for fear of his own safety.
16  Q. And he didn't say he had spoken to anyone
17  before your arrest; correct?
18  A. He didn't identify exactly when he had spoken
19  to them.
20  Q. But he --
21  A. No, wait.  Actually, he did.  Let me be clear.
22  I'm sorry.  I want -- go ahead.  You -- go ahead.  I
23  want you to say whatever you --
24  Q. So you said that what he said was the arrest
25  was a warning --

**240**

1  A. Exactly.
2  Q. -- which means the arrest --
3  A. So it had to have happened --
4  Q. -- at the party occurred?
5  A. Yes, ma'am.  I agree with you.
6  Q. So he had to have spoken to the District
7  officials after your arrest; correct?
8  A. Yes.
9  Q. Okay.  Then you talked about the Sheriff at a
10  campaign event.  What did the Sheriff say at the
11  campaign event?
12  A. He was asked why, you know, parents -- this
13  historical unprecedented arrest had occurred.  And he
14  said that -- again, these people, they do this on
15  purpose.  He said something like -- if you need -- I
16  submitted the video to you-all, but -- or I think I did.
17  If I haven't, I'll give it to you.  But -- but he said
18  something like the -- the District had contacted him
19  that they over at the District -- again, another one of
20  these let's not tell who it is -- had contacted him and
21  told him that they were concerned about the fallout from
22  arresting a parent and they wanted him to do it instead
23  of them having to deal with it.
24  Q. Okay.
25  A. He was -- he was basically tr... *(cut off)*

**App. 331**

**JEREMY STORY**

241

1  you know, or whatever people do.
2      Q.  Okay.  I understand.  And then at the
3  commissioners' meeting, you said there was also
4  discussion about a meeting they had with Dr. Azaiez.
5  When was the commissioners' meeting where they talked
6  about -- well, they -- they talked about meeting --
7  start.
8          When was the commissioners' meeting where they
9  talked about having a meeting with Dr. Azaiez and he
10  seemed like a trustworthy person?
11      A.  I'm not trying to go beyond the bounds of your
12  question, but it was -- it's the same commissioners'
13  meeting that my other lawsuit's about in which I believe
14  the meeting was in December, I think.  Later in December
15  I think.  Right around there.
16      Q.  December of '21?
17      A.  I think so.  Yes, ma'am.
18      Q.  Do you know when the commissioners met with
19  Dr. Azaiez?
20      A.  No, ma'am.
21      Q.  Do you know if during that meeting with
22  Dr. Azaiez you were discussed in any way?
23      A.  There'd be no way for me to know that.
24      Q.  Okay.
25      A.  At least not until discovery.

242

1      Q.  Okay.  And I think we've gone through your
2  list.  Is there any other reason you believe that
3  Dr. Azaiez was involved in the preparation of the
4  warrant affidavit for arrest and detention?
5      A.  I -- I don't mean to repeat myself, so I just
6  don't want to leave anything out.  He has a history of
7  -- of abusing the police to -- to silence his critics.
8      Q.  Okay.
9      A.  So in addition to just all the other rational
10  explanations that I've given you that a reasonable
11  person would believe or draw conclusions on, he also has
12  a history of doing this.
13      Q.  Okay.  And do you have any evidence that Chief
14  Yarbrough was involved in the preparation of the warrant
15  of affidavit for your arrest?
16      A.  Do I have any -- did you say specifically do I
17  have any --
18      Q.  Evidence.
19      A.  Any evidence.  Okay.
20      Q.  That Chief Yarbrough was involved.
21      A.  Yeah, I mentioned that earlier.  And that was
22  that -- I think it was in one of the police reports or
23  descriptions the we got, the PIR.  It describes how
24  Griffith said that she was going to interview everybody
25  and talk to everybody about it.  And also, normal police

243

1  protocol would have been, you know, for something like
2  this to -- to run it by the chief.  So I mean, to
3  believe otherwise would be just completely irrational
4  that she lied, I guess, and didn't investigate.  That's
5  not good.  But I mean I -- I mean, I guess she could
6  have done that or -- I don't know.  I don't have to
7  defend them.  So I don't know.
8      Q.  Any other evidence?
9      A.  She said that she talked to everybody.  And so
10  if she talked to everybody, she did.  And -- and then
11  the other would be that she would have reported it to
12  her boss.  I mean, you don't make historically
13  unprecedented arrests without running it by your boss.
14      Q.  And any reason to believe that Officer Pontillo
15  was involved in the preparation of the warrant affidavit
16  for your arrest and detention?
17      A.  Officer Pontillo?  Yeah, because in the warrant
18  affidavit he's listed as being interviewed and making
19  statements.

[REDACTED]

244

[REDACTED]

9      Q.  (By Ms. Long)  Do you know who the Williamson
10  County Magistrate Judge is who signed the warrant for
11  your arrest?
12      A.  Do I -- do I know who they are, like,
13  personally?
14      Q.  Do you know who it is?  Just -- not personally,
15  just generally, do you know who it is?
16      A.  I looked at the signature and I can't quite
17  make it out.
18      Q.  Okay.  Do you have any reason to believe that
19  the magistrate judge was contacted by anyone with Round
20  Rock ISD?
21      A.  Yeah.
22      Q.  Okay.  Who contacted the magistrate judge from
23  Round Rock ISD?
24      A.  I don't know.
25      Q.  And why do you believe the magistrate judge

**App. 332**

JEREMY STORY

245

1 contacted by someone from Round Rock ISD?
2     A. Again, I want to answer your questions, I just
3 want to stay as close as I can. Williamson County has a
4 history of corruption that's a mile long. How's that?
5     Q. Any other reason to believe that anyone in
6 Round Rock ISD communicated with the magistrate judge
7 before they signed the warrant affidavit?
8     A. You mean -- you mean other than the things I've
9 already given you about officials saying they talked to
10 each other. One, that clearly indicated the Sheriff
11 himself that he had talked to them before the arrest.
12 The judge of Williamson County, the highest ranking
13 officer, telling me that he had had a conversation with
14 Azaiez -- or with somebody at the District. Do I have
15 like a piece of paper that says that? No. There's
16 just, you know, Williamson County has a long history of
17 corruption.
18     Another one would be -- actually, I do have
19 one other piece of evidence. Marcia Watson, who was
20 mentioned earlier in this case -- in this deposition,
21 told me that she was attending an event -- at the time
22 she told me this. She had been attending an event where
23 one of county -- Williamson County judges was present,
24 and then that judge was -- she was sitting behind him,
25 and that judge was talking to another Williamson County

246

1 official who I don't know and wasn't identified in this
2 moment -- or if she was -- she did, I don't remember it.
3 And that judge said that he believed that I was just
4 completely guilty and they were right in what they did.
5     Q. Believed that you were guilty and Round Rock
6 ISD was absolutely right in what they did?
7     A. That -- yeah, Round Rock ISD and Williamson
8 County collaborating with them were right in what they
9 did, yeah, and was kind of -- I don't know that -- the
10 judge that she mentioned, I forgot his name, you -- but
11 she -- I don't know him. He just was -- I mean, I guess
12 I know of him. I'm a well-known person in Williamson
13 County and I'm known for exposing corruption, and I
14 don't think -- you know, I don't think a lot of them
15 like me who are involved in it.
16     Q. And you don't know who the judge was that
17 Ms. Watson allegedly overheard?
18     A. No. Huh-uh. You could ask her.
19     Q. Okay. Do you know if it was the magistrate
20 judge who signed the warrant?
21     A. I honestly don't know.
22     Q. Okay. Any other reason to believe the
23 magistrate judge spoke with anyone at Round Rock ISD
24 before signing the warrant affidavit?
25     A. There's a lot of documents I'm trying to

247

1 process through in my head. I guess I would say none
2 presently that I can remember.
3     Q. And you sued Williamson County in part based
4 upon your arrest; correct?
5     A. In part, yes.
6     Q. And Williamson County effectuated your arrest
7 in September 2021; correct?
8     A. Define effectuated.
9     Q. Williamson County officials are the ones who
10 actually arrested you; correct?
11     A. That is correct.
12     Q. And Williamson County made the -- you were --
13 you were detained in -- in Williamson County facilities;
14 correct?
15     A. That is correct.
16     Q. And the decisions regarding your detention and
17 how long you stayed and everything were dictated by
18 Williamson County; correct?
19     A. I don't know.
20     Q. Okay. Do you have any evidence that Round Rock
21 ISD or any Round Rock ISD official had any influence
22 over any detention decisions of Williamson County?
23     A. That's the nice thing about corruption and
24 hiding things, it's -- it's hard to see. You just can
25 look at the trends. And so based on all the things I've

248

1 already said with people telling me they were talking to
2 each other and things they admitted that they were
3 talking to each other and then the fact that I had filed
4 every complaint known to Sunday -- or I should say nine
5 ways to Sunday, every way I could, filed a complaint.
6 And supposedly all these people I'm supposed to believe
7 never talked to each other, never said anything, and yet
8 all of a sudden on day 30 just propose an arrest warrant
9 out of nowhere? It's historically unprecedented. I
10 don't buy it. I don't -- I don't think any rational
11 jury or person's going to buy that either.
12     Q. Okay. And then you actually sued Williamson
13 County regarding your arrest and as -- as well regarding
14 your removal from a December 2021 board meeting for
15 Williamson County; correct?
16     A. Did I sue them? I'm sorry. We've just been at
17 this for so long. I'm trying. Did I sue them for what,
18 correct, are you saying?
19     Q. Did you also sue them for the -- your removal
20 from a December 2021 Williamson County board mem- --
21 board meeting?
22     A. From a December -- could you say the date
23 again?
24     Q. Sometime in December 2021.
25     A. Yes, ma'am.

**App. 333**

**JEREMY STORY**



249

1    Q.  Okay.  And you were removed from a December
2  2021 meeting.  What meeting was that?
3    A.  A county commissioners meeting.
4    Q.  And who was presiding over the county
5  commissioners meeting?
6    A.  Judge Bill Gravell.

JEREMY STORY



**329**

**331**

9      MR. CASEY:  Okay.  I retain the -- pass the

10  witness.

11      MS. LONG:  No further questions.

12      MR. CASEY:  All right.

13      THE VIDEOGRAPHER:  Okay.  Going off the

14  record.  7:58 p.m.

15      (Proceedings concluded at 7:58 p.m.)

16

17

18

19

20

21

22

23

24

25

**330**

**332**

1      IN THE UNITED STATES DISTRICT COURT
        WESTERN DISTRICT OF TEXAS

2        AUSTIN DIVISION

3  JEREMY STORY,     *
     Plaintiff,    *

4           *
  v.       *  CIVIL ACTION NO.

5        *  1:22-cv-00448-DAE
         *

6  SUPERINTENDENT HAFEDH  *
  AZAIEZ, TRUSTEES AMBER  *

7  FELLER, TIFFANIE HARRISON,  *
  AMY WEIR, JUN XIAO, CORY  *

8  VESSA; OFFICERS JEFFREY  *
  YARBROUGH, JAMES WILLIBY,  *

9  DEBORAH GRIFFITH, MILTON  *
  POPE, FRANK PONTILLO, RON  *

10  COLE, CHIEF DENNIS WEINER,  *
  and CARLA AMACHER,    *

11  individually, and ROUND   *
  ROCK INDEP. SCHOOL    *

12  DISTRICT,      *
     Defendants.    *

13

14      REPORTER'S CERTIFICATION
      DEPOSITION OF JEREMY STORY

15       JUNE 16, 2025

16    I, Kristy Owen, Certified Shorthand Reporter, duly

17  qualified in and for the State of Texas, do hereby

18  certify to the following:

19    That the witness, JEREMY STORY, was duly sworn by

20  the officer and that the transcript of the oral

21  deposition is a true record of the testimony given by

22  the witness;

23    I further certify that pursuant to FRCP Rule

24  30(f)(1) that the signature of the deponent: **App. 335**

25    __ was requested by the deponent or a party before

**JEREMY STORY**

333

1   the completion of the deposition and that the signature
2   is to be before any notary public and returned within 30
3   days from date of receipt of the transcript.  If
4   returned, the attached Changes and Signature Page
5   contains any changes and the reasons therefor:
6      _X_ was not requested by the deponent or a party
7   before the completion of the deposition.
8      I further certify that I am neither counsel for,
9   related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13
14     Certified to by me this 8th day of June, 2025.
15
16
17

18  KRISTY OWEN, RPR, Texas CSR 10790
    RPR Expiration Date:  9-30-2026
19  CSR Expiration Date:  7-31-2026
20  STOVALL REPORTING & VIDEO, INC.
    Firm Registration No. 10259
21  1414 Creekview Drive
    Lewisville, Texas  75067
22  Phone:  (214) 695-2024
23
24
25

**App. 336**

...what website? I surprise me on this topic

**Mailer**

It's best to be proactive in inoculate in our mass messaging

Yes. Those statistics are cited by Jill in her one family video.

The board goals are on the district website. I am going inside to go to the bathroom and will send you some screenshots When I am done

**Ok**

It seems there united strategy right now is to paint us as hateful over the next two weeks. There are two access is on that false message our hate towards LGTBQ and hate towards racial issues

**Axis**

Typo. I am in no way saying we are actually hateful but in fact that this is a false message



Racist 3d grade reading and math goals the board approved. MB and I voted "no". Look at 2022 column. These were passed early in 2021

**EXHIBIT G-1**       **App. 337**

JS105158

Looking through all your stuff texted

Do you have links to minutes for wire/feller missing the safety meeting?  I have looked on rrisd website through all board meetings on each tab and don't find these meeting links

Has to fit on flyer...can't put pictures of minutes on flyer

I sent you the screenshots on this text thread of those minutes

Call me

On RRISD website
Go to A-Z index
Click on "S"
Click on "Safety and Security Committee"
You will see links to all the meetings minutes

Wonderful.  Can use one link to reference all meetings.

Do you know the date of the mask mandate vote?  Need to find the link to the meeting or minutes

?

Never mind

I see that is referenced both for masks and anti-parent

Do you remember the date of the lets keep the TASB library books vote?

Looking for that link...can't link to Christies stuff...not on a website

Sep 15 board mtg. Item I5.

Board had opportunity to adopt TEA model policy to keep books out but didn't do it.

Yes.  This is all I need.

# EXHIBIT G-1    App. 338

JS105159

Minutes from Jul 2022 school safety mtg showing weir and feller absence

Do I need to send you proof that Weir had 2 fathers arrested?

The reference to "anti-parental rights" refers to their mask mandate votes.



That leaves the accusation that they raised taxes. That is obvious but here is the resolution from the RRISD website from the Sep 2022 mtg where taxes were most recently raised.

Of the 8 accusations in the mailer, the only one left is the "Ok with porn, obscenities in schools". Christie has the list of inappropriate books that remain in RRISD schools.

**EXHIBIT G-1**    **App. 339**

JS105160

Jim Willby, Assistant Chief of Police called the meeting to order at 12:00pm.

Thanked everyone for being a part of the Safety and Security Committee. This is the Spring 2021 meeting.

2.  Public Comment/Audience Participation/Comments on Agenda:

The following citizens spoke on School Policing and Mental/Behavioral Health.

- Christel Erickson
- Carolyn Dower

The following citizen spoke on lack of information pertaining to this meeting.

- Esmeralda Rubalcava

Minutes from May 2021 school safety mtg showing weir and feller absence

Round Rock Independent School District
Safety and Security Committee Meeting Minutes
Wednesday, July 20, 2022 - 2:00pm

George Scherer, Director of Risk Management & Regulatory Compliance called the meeting to order at 2:05 pm at the Round Rock Independent School District, Lillie Delgado Administration Building.  Notice of meeting was posted in accordance with the Texas Open Meetings Act, Texas Government Code Chapter 551.

Committee Members Present:  George Scherer, Director of Risk Management & Regulatory Compliance, Kimberly Amicon, Westwood Learning Community Parent, Rosanna Oliver, Coordinator, Safety & Security, Hafedh Azaiez, Superintendent, Cheree Smith, City of Round Rock Emergency Management, Tera Harris, Cedar Ridge Learning Community Parent, Amy Margulies, Round Rock ISD Teacher.

Honored Guests:  Shane Glaiser, City of Round Rock Fire Department Chief, Elizabeth Cleere, Sgt, Round Rock ISD Police Department, Cory Vessa, Round Rock ISD, Board Trustee, Danielle Weston, Round Rock ISD, Board Trustee, Mark Gabehart, Chief Technology Officer.

Committee Members Absent:  Chief of Police, Vacant, Assistant Chief of Police, Vacant, Amy Grosso, Director of Behavioral Health, Jonathon Hodgkiss, Williamson County Sheriff Department, Drew Brown, McNeil Learning Community Parent, Heather De La Paz, Round Rock Learning Community Parent, Lisa Marie Rosales, Stony Point Learning Community Parent, Amy Weir, Round ISD, Board Trustee, Amber Feller, Round ISD, Board Trustee, President.

Members of the Press:  None

1.  Call Meeting to Order:

George Scherer, Director of Risk Management & Regulatory Compliance called the meeting to order at 2:05 pm.

Thanked everyone for being a part of the Safety and Security Committee.  This is the Summer 2022 meeting.



# EXHIBIT G-1

## App. 340

JS105161

Thanked everyone for being a part of the Safety and Security Committee. This is the Summer 2021 meeting.

2. Public Comment/Audience Participation/Comments on Agenda:

No public speakers.

3. Closed Session:

Assistant Chief Williby called the Safety and Security members into Executive Session at 6:05 pm for the purposes permitted by the Texas Open Meetings Act, Texas Government Code Section 551.001 through 551.146 to:

Pursuant to Texas Government Code 551.076 the committee met for the Overview of the Safety and Security Audit Assessments, Campus Audit Round Rock High School.

Minutes from Aug 2021 school safety mtg showing weir and feller absence

Round Rock Independent School District
Safety and Security Committee Meeting Minutes
Tuesday, May 18, 2021

Assistant Chief of Police Jim Williby called the Spring virtual meeting to order at 12:00 pm at the Round Rock Independent School District Administration Building.  Notice of meeting was posted in accordance with the Texas Open Meetings Act, Texas Government Code Chapter 551.

Committee Members Joined:  Chief Jeffrey Yarbrough, Assistant Chief Jim Williby, George Scherer, Director of Risk Management, Rosanna Oliver, Safety and Security Coordinator, Lisa Marie Rosales, Stony Point Learning Community Parent.

Committee Members Absent:  Daniel Presley, Acting Superintendent, Round Rock ISD, Amy Weir, Round Rock ISD Board of Trustees, President, Amber Feller, Round Rock Board of Trustee, Amy Grosso, Director of Behavioral Health Services, Kim Amicon, Westwood Learning Community Parent, Drew Brown, McNeil Learning Community Parent, Heather de la Paz, Round Rock Learning Community Parent, Dorothy Brown, City Coordinator Round Rock, Chris Lockemy, Assistant Principal Bluebonnet Elementary.

Members of the Press:  None

1. Call Meeting to Order:

Jim Williby, Assistant Chief of Police called the meeting to order at 12:00pm.

Thanked everyone for being a part of the Safety and Security Committee. This is the Spring 2021 meeting.

2. Public Comment/Audience Participation/Comments on Agenda:

The following citizens spoke on School Policing and Mental/Behavioral Health.

- Christel Erickson
- Carolyn Dower

The following citizen spoke on lack of information pertaining to this meeting.

- Esmeralda Rubalcava



Back into open session at 7:19pm

Minutes from Nov 2021 school safety mtg showing weir and feller absence

Round Rock Independent School District
Safety and Security Committee Meeting Minutes
Tuesday, August 17, 2021

Assistant Chief of Police Jim Williby called the meeting to order at 6:02 pm at the Round Rock Independent School District Administration Building. Notice of meeting was posted in accordance with the Texas Open Meetings Act, Texas Government Code Chapter 551.

Committee Members Joined: Chief Jeffrey Yarbrough, Assistant Chief Jim Williby, George Scherer, Director of Risk Management, Rosanna Oliver, Safety and Security Coordinator, Jonathan Hodgkiss of Williamson County Sheriff Department.

Committee Members Absent: Hafedh Azaiez, Superintendent, Round Rock ISD, Amy Weir, Round Rock ISD Board of Trustees, President, Amber Feller, Round Rock Board of Trustee, Amy Grosso, Director of Behavioral Health Services, Kim Amicon, Westwood Learning Community Parent, Drew Brown, McNeil Learning Community Parent, Heather de la Paz, Round Rock Learning Community Parent, Dorothy Brown, City Coordinator Round Rock, Chris Lockemy, Assistant Principal Bluebonnet Elementary, Lisa Marie Rosales, Stony Point Learning Community Parent.

Members of the Press: None

1. Call Meeting to Order:

   Jim Williby, Assistant Chief of Police called the meeting to order at 6:02 pm.

       Thanked everyone for being a part of the Safety and Security Committee.
       This is the Summer 2021 meeting.

2. Public Comment/Audience Participation/Comments on Agenda:

       No public speakers.

3. Closed Session:

   Assistant Chief Williby called the Safety and Security members into Executive Session at 6:05 pm for the purposes permitted by the Texas Open Meetings Act, Texas Government Code Section 551.001 through 551.146 to:

   Pursuant to Texas Government Code 551.076 the committee met for the Overview of the Safety and Security Audit Assessments, Campus Audit Round Rock High School.

Minutes from Aug 2021 school safety mtg showing weir and feller absence

**EXHIBIT G-1**    **App. 342**

JS105163



**Confronting Racism: Panel discussion of How to Be an Antiracist by Ibram X. Kendi**
youtu.be

**Round Rock ISD Safety & Security Committee**
November 9, 2021

<u>MINUTES</u>

<u>ATTENDANCE</u>
Lisa Marie
Jim Willsby
Jeff Yarbrough
George Sherer
Sgt. Jonathan Hodgekiss
Ricci Nelson
Kim Amicon

1. Called to order at 6:00pm.
2. Public comments open at 6:01pm
   a. Cathleen Buchanan first speaker given 2min
      i. Not a lot of information on the committee. Wants to know what ins about and what the process for filling vacancies, agendas, policies procedures, etc.
      ii. Electronic device policy on campus and wants the district to review the way is being enforced. TikTok concerns.
      iii. Passing period- some schools have shaved time off the passing periods to make up time during the day. Looking to have a waiver because it impacts students with disability. 3min given for passing period.
3. Closed session

Back into open session at 7:19pm

Minutes from Nov 2021 school safety mtg showing weir and feller absence



**EXHIBIT G-1**          **App. 343**

JS105164

Proof that Harrison is pro-CRT.



**More details emerge on grievance over Round Rock ISD trustee**
statesman.com

Proof of Feller's double middle fingers.

More proof of harrison's support of CRT.



**Confronting Racism: Panel discussion of How to Be an Antiracist by Ibram X. Kendi**
youtu.be

# EXHIBIT G-1          App. 344

JS105165



**Round Rock ISD Reinstates Mask Mandate After Hours Of Heated Public Comments**
kut.org

Proof of the 5 voting for mask mandate in Sep 2021.
Abbott's GA-38 was signed in June 2021 and prohibited schools from requiring masks.

⊞ 4 Photos



Proof that Harrison is pro-CRT.

**EXHIBIT G-1**    **App. 345**

JS105166

Oct 19, 2022 at 1:12 PM

RPT lawyers asking for citations on second mailer for the attack statements

Anyway you can get those citations to me today?

OMG

Ye

Yep

Lawyered

Lawyers 

**EXHIBIT G-1**          **App. 346**

JS105167

Apr 29, 2021 at 8:57 PM



I just sent these two pictures of Round Rock ISD Trustee Amber Feller via email to all of my colleagues (including her) along with my demand that all of our meetings be held in person effective immediately starting with Monday night's board meeting. I called out her hypocrisy and the hypocrisy of others in forcing children to wear masks well there she was on Saturday night at the PIE gala, shoulder to shoulder with many people outside of her household, unmasked.
Amber enthusiastically voted on April 15 to continue to require children to wear a mask all day long in order to receive a public education. She also told all of us in Monday nights closed session meeting that she has requested to be moved away from me at the dais because she is afraid that I'm going to give her the coronavirus.

Apr 30, 2021 at 12:00 AM

Seems like something some local press might be interested in if the board doesn't change course on masks.



May 2, 2021 at 5:34 PM

# EXHIBIT G-1    App. 347

JS105168

May 21, 2021 at 9:56 PM

Board just approved the Donna ISD superintendent to be the RRISD lone finalist. Mary and I voted no. Name is Hafedh Azaiez.

I saw that and wondered what your thoughts were. 'Lone finalist' signaled me to a possible problem. They only allowed for one finalist? That is an interesting way to do an Executive Search as a board. I have done three before....not usually how it happens.

Texas law requires a 21 day waiting period from the date a lone finalist is named. This allows the community to investigate the candidate and bring any concerns to the board.

Got it.

Jun 10, 2021 at 9:57 PM

Had to leave due to a surprise visit from my out of town in laws. I appreciate your clarity and wisdom in addressing the core issues. Thank you for your boldness and willingness to serve.

Jun 10, 2021 at 10:58 PM

You are too kind.

Jun 11, 2021 at 2:04 AM

Thank you for coming tonight!

Jun 13, 2021 at 2:05 PM



**Transparency questioned in selection of Round Rock superintendent finalist Hafedh Azaiez**
statesman.com

"Community members had to be reminded to stay quiet several times as they clapped for the trustees who voted against naming Azaiez as the finalist and booed the other trustees."

# EXHIBIT G-1        App. 348

JS105169

Jun 13, 2021 at 5:48 PM

Saw your discovery of the conservator.  Also saw Amy Weir's response to your request to delay Monday's meeting.  Did the board President know and not tell the rest of the board?

I sent Amy an email letting her know I genuinely have no memory ever being briefed that the entirety of Dr Azaiez' tenure at Donna ISD has been under a TEA conservator.

I will be making a lengthy statement at tomorrow's 12:30 pm meeting. Signing this contract is the only item on the agenda.

Jun 13, 2021 at 7:54 PM



← Woolridge for the People     🔍

**Woolridge for the People**
2h · 🌐

Tomorrow (Monday) at 12:30 pm, the RRISD Board of Trustees will be meeting to discuss & vote of the approval of the Superintendent Contract for Dr. Azaiez.

As expected, there are quite a few, mostly followers of Trustees Bone & Weston, who object to this hire. Now, I could offer any number of opinions as to why that is, needless to say, Dr. Azaiez - A Muslim of North African descent who has been the Superintendent of Donna ISD (a poor school district), is NOT the kind of leadership Bone & Weston's crowd wants any part of.



Don't believe me? Check the Board docs conversation about Azaiez, between Bone, Weston, Weir & Vessa to confirm what I'm saying. I will be there to support Dr. Azaiez's candidacy and minority representation at the highest levels of RRISD. If you can make it, please attend, and if you want to speak, arrive no later than 12:15.

For more details, check this link and go to "Agendas":
https://roundrockisd.org/about-rrisd/board-of-trustees/

# EXHIBIT G-1          App. 349

JS105170

Jun 18, 2021 at 12:31PM

Cory Vessa is out as VP in a 2:30am vote.

Board policy states that trustees have to have been in office for a year to be an officer. Feller is only trustee who meets this criteria besides Amy and Cory. There was not support to waive board policy to appoint someone else so Feller is now VP.
Officer roles (P, VP & Sec) will be up for a vote again in Dec.

Thanks for the update

Sure.
Also, I will go ahead now and accept the appreciation for getting the tax rate as low as I possibly could (no M&O golden penny plus reducing the I&S rate by 2.5 pennies) from my fellow taxpayers.
Budget barely passed with a 4-3 vote but I did not expect this level of success in my first year. New superintendent is now tasked with finding efficiencies.
Cory Vessa insisted the sky will now fall so get an umbrella ready.

Don't worry, my fellow property owners are still going to pay RRISD more in taxes next year than this year. 👍🏽 
🙂
But not nearly as much more as they  would have w/o a conservative influence on the board.

Victories are measured in milimeters, not inches.

Who were the 4 who voted for the reductions/budget besides you and Mary?

Sorry the 2 besides you and Mary

Tiffanie and Amy

Tiffanie?  Why did she say she would vote for a reduced budget?  Amy I can see in order to avoid the tremendous pressure increasing on her due to her other actions...Tiffanie?  I am a bit surprised by that one vote.

I can only engage in informed speculation on why they went along with my motion. Tiffanie is very opposed to the district police force which is going to bear explosive cost to the school district. The impact on the budget is the reason I've always opposed the school police force and favored partnerships with WCSO and RRPD.
But for Tiffanie, she opposes it because she believes it contributes to a school to prison pipeline.
Amy is genuinely concerned about the rising burden of taxes on property owners. She lives in a pretty modest, working class  neighborhood over in the Austin part of our school district. She and her neighbors are now faced with property values over half a million dollars and are very concerned about the tax burden they face.

Good to know

**EXHIBIT G-1**          **App. 350**

JS105171

Jul 13, 2021 at 5:43 PM

The only problem with that is the school board voting balance.   We are so close (possibly one election away) from having the majority of board members be people of courageous conservative action.

I understand. It's a very difficult situation.

I received an email from the Texas Tribune reporter today at my trustee email account. He probably sent it to many trustees throughout the state. I just forwarded you my response to him in case you are interested in reading it.

**EXHIBIT G-1**      **App. 351**

JS105172

Jul 21, 2021 at 10:12 PM

Is there possible validity to the indecent allegations against the Superintendent?

Jul 23, 2021 at 8:03 PM

Trustee Weston, I would like to draw your attention to an urgent issue of concern that I am about to email to you right now.

Ok. I will keep an eye on my email.

Thank you for your consideration of my email.  The email should be in your inbox now.

Got it.

**EXHIBIT G-1**        **App. 352**

JS105173

Aug 16, 2021 at 4:21 PM

Hey Jeremy,
Our board policy allows for public comments on items both on and off the agenda only at the monthly "Regular" board meeting.
For called meetings (like tonight), public comments are limited to items that are on the agenda.

Thursday of this week is a "Regular" board meeting.

It seems to me that the public complaints GF legal policy would allow for otherwise since a 'called' meeting is still a public meeting. Can you point me to the policy you are describing? Is it some edict from the Board President or a particular policy? Willing to challenge kindly by simply speaking on a different subject if there is no policy.

I am in a noisy hair salon with spotty service now so I can't pull up the policy.

Aug 17, 2021 at 2:19 PM

FYI...Felice Meadow is my next door neighbor. I noticed she referenced conversations with you last night. She moved here recently from Boston. Advertised yard signs for Harrison, etc. We have tried to pray over her, bless her and her family. I spent about three months working hard to rebuild our wooden fence we both share with high end custom materials to fix an on ongoing problem. So far our relationship has been cordial but, she is very connected to Democrat machine in Wilco. I am watchful...I am sure she monitors our family's activities.

When I first met her, she asked if I was one of "those Trump supporters" ...we didn't answer...she said she couldn't even talk with "people like that"

Oh... Yes let's talk about her sometime.

# EXHIBIT G-1        App. 353

JS105174

Sep 14, 2021 at 10:12 PM

Mary and I have sent an email to Dee Hobbs to meet tomorrow and brief him on what happened tonight and why Mary and I walked out 20 mon i to the meeting.
I think that community members who were denied access to the meeting need to file a complaint with the sheriffs office tomorrow morning.

Sep 15, 2021 at 12:42 AM

I was called into the RR City Police Dept and made a complaint with pictures tonight. The officers slammed to a pole and on the ground tonight and drew blood. I have an email from RRISD Assistant Police Chief which was a response to my complaint from being drug out of the building a month ago. The RRISD Assistant Police Chief stated in his response that I should go to the RR City Police, Sheriff, Wilco Attorney, WilcoDA. In so doing he voluntarily opened the door to these agencies getting involved. I would love to meet with Dee as well. His Chief Investigator is working on the complaint I filed a month ago.

Sep 15, 2021 at 7:58 AM

I can't believe this is happening to our community. I don't know how else to return to the rule of law other than to hold folks accountable. I worry that if you don't file a report with the sheriffs office, then what happened to you last night never happened.

Sep 15, 2021 at 11:47 AM

I filed it with Round Rock police. I will also go file it with the Sheriff's office too.

 **9-15-21 HOUR 3**
The Todd and Don Show on News Radio
KLBJ 2020 · September 15, 2021
🎙️ Podcasts

My interview with Todd and Don show this morning on KLBJ. Go to the 24:00 mark. This might help you.

Sep 15, 2021 at 1:16 PM

Thank you. I listened. It was very helpful.

**EXHIBIT G-1**      **App. 354**

JS105175

Sep 18, 2021 at 3:19 PM



Sep 20, 2021 at 6:55 PM

They just posted the censure resolutions. They want to prevent us from being able to step foot on any campus and they want to list us as "Censured Trustee Danielle Weston" and "Censured Trustee Mary Bone" on the district website.

Wow.  This is surreal.

**EXHIBIT G-1**        **App. 355**

JS105176



Sep 24, 2021 at 10:30 AM

Sep 24, 2021 at 4:31PM

Is this the lady who was at the board meeting?

She is the top lawyer for RRISD, general counsel. An employee of RRISD.

Just heard from someone else about this too.  God is exposing things and will continue to do so.  We are to follow his lead boldly.

This is spiritual warfare as you know.

Absolutely.  We must stay humble and submissive to Him.  As we walk in His strength we will see more.  As this happens do not begin to believe it is out strength that has done this and He will continue.

Yes

Not 'out' ....'our' typo

Remember....God uses our enemies/opposition often for our advancement.

David, Joseph, Esther, Nehemiah, Daniel, etc

# EXHIBIT G-1    App. 356

JS105177

Nov 3, 2021 at 5:37 PM

Plz look at item D1 for tomorrow's board meeting.
CKE(L)-A.pdf.
it's three pages long. Look at number 5 and 6 on page 1.

**Apr 20, 2021 Called Board Meetings - Round Rock ISD, TX**
new.swagit.com

Go to the 50:30 mark in this board meeting from 4.20.2021.



**EXHIBIT G-1**        **App. 357**

JS105178

CKE|LOCAL|-A



**Dec 1, 2021 at 9:27 PM**

Thank you. They hate us.

Praying for you

**Dec 17, 2021 at 12:55 PM**

What you did last night to force the false censure attempt into public session and put your lawyer in front of them was AMAZING.  Great next move in their unlawful and unnecessary political game.

Thanks Jeremy. It was a chess move that needed to happen but was not risk free. But I have to say it went off even better than I had hoped. The more they talk on camera, the better.

I went off very, very well.  I suspect if you press further on M6 that Harrison was involved in the editing too.  I think Caputo's comment saying she edited it was cover to avoid a further dig to find other editors and collaboration. Also, where and from who did the source material Vessa started with come from?

Seek and you shall find.  ;)

The contrast between pushing the parental rights resolution off and questioning its authorship vs. in depth word smithing of M6 was stark and clear.  People need to know that.  It put worldviews and motives on full display.

Yes. They have a majority so we can't stop anything. All we can do is expose it and let the voters decide in Nov.

# EXHIBIT G-1        App. 358

JS105179

Dec 21, 2021 at 11:00 AM



**EXHIBIT G-1**          **App. 359**

JS105180

Jan 10, 2022 at 11:27 AM



Tomorrow night (Jan 11) at 7 pm, Mary Bone and I will be speaking at the WilCo Young Republicans Club meeting at The Alcove in downtown Round Rock. All are welcome and you don't have to be a club member to attend.
Hope to see you there!
-dw

Jan 20, 2022 at 11:09 AM

I have been feeling a bit under the weather for a couple of days. Thus, out of an abundance of caution I have decided to stay home tonight and miss the board meeting. All is well with me and I look forward to attending the next meeting.

Sent with the Hit 'Em Up App

Praying for your healing

TY JS. I feel fine but don't need to be coughing over and over at the dais. This was a terrible week for this to happen. I have had to miss so much.

Will you be able to zoom in for closed session?  I noticed you have asked for several important agenda items.

Not asking for the content of the items of course.  I am asking if the board will allow you to be there virtually in closed session due to your agenda items.

No virtual participation.

Jan 20, 2022 at 3:52 PM

My closed session agenda items will be moved to February.

# EXHIBIT G-1          App. 360

JS105181

Jan 20, 2022 at 5:25 PM

Good to know.

Jan 30, 2022 at 5:27 PM



**Round Rock ISD trustee announces plans to resign at next board meeting**
kxan.com

Feb 19, 2022 at 11:03 AM

Did you see the 4 motions at the end of the Thursday meeting? In The one on Weir, I cited the 16 Aug mtg.

Start at 3:18:30 mark.

Feb 23, 2022 at 12:40 PM

FYI Lady arrested in Eanes ISD. I have Ryan and a friend of his working on the case. I'm about to go into the jail to minister to the lady. I met her and her husband months ago. They are Romanian immigrants who impart came and stayed here to pursue greater freedom. Their parents escaped the USSR when they were kids. They immigrated to Switzerland and then to America.

Feb 23, 2022 at 1:43 PM

Thanks for letting me know.

Feb 24, 2022 at 7:08 PM

Reviewed all the board meeting from last week. Taking action.

Captured footage too.

Feb 24, 2022 at 9:07 PM

Yes

The one with all the motions



# EXHIBIT G-1        App. 361

JS105182

Feb 27, 2022 at 10:54 PM



Mar 8, 2022 at 8:06 PM

❤️ Praying for you.

Mar 10, 2022 at 6:15 PM

I learned today that the agenda for the March 24, 2022 RRISD board meeting includes an agenda item of Step 2 in the board sanction process against me. Step 3 is a public censure. The board majority has been consumed and obsessed with censuring me since last summer when I vocally opposed their tyrannical mask mandates and took accusations against the superintendent seriously. These actions put a target on my back. I believe children are worth fighting for, defending and protecting.

I have requested that the name of the trustee(s) requesting this agenda item be placed on the agenda once it's published on March 21.

I have not been provided an explanation about what policy they are alleging I violated to justify doing this to me. My guess is that this may stem from my desire to replace a current SHAC member with another parent in our community. My understanding is that asking questions and making requests does not constitute a policy violation. We'll learn more in the meeting. My attorney has been alerted.

What I know today is that after all of the torture that the board has put our community through, they show no sign of abandoning costly personal attacks and focusing back on students. The constant doubling down on trying to destroy those who seek the truth, transparency and accountability is a strategy they are deeply wedded to for reasons known only to them.

I believe this is all very damaging to our sacred mission of educating students for a bright future. All this does is tear our community further apart. Folks have figured out by now that I am not their real target. I am what stands between them and countless students, parents, teachers and taxpayers. These stakeholders and their values are the board majority's actual target.

If you want to help, let me know.

# EXHIBIT G-1

App. 362

JS105183

Mar 10, 2022 at 6:15 PM

I learned today that the agenda for the March 24, 2022 RRISD board meeting includes an agenda item of Step 2 in the board sanction process against me. Step 3 is a public censure. The board majority has been consumed and obsessed with censuring me since last summer when I vocally opposed their tyrannical mask mandates and took accusations against the superintendent seriously. These actions put a target on my back. I believe children are worth fighting for, defending and protecting.

I have requested that the name of the trustee(s) requesting this agenda item be placed on the agenda once it's published on March 21.

I have not been provided an explanation about what policy they are alleging I violated to justify doing this to me. My guess is that this may stem from my desire to replace a current SHAC member with another parent in our community. My understanding is that asking questions and making requests does not constitute a policy violation. We'll learn more in the meeting. My attorney has been alerted.

What I know today is that after all of the torture that the board has put our community through, they show no sign of abandoning costly personal attacks and focusing back on students. The constant doubling down on trying to destroy those who seek the truth, transparency and accountability is a strategy they are deeply wedded to for reasons known only to them.

I believe this is all very damaging to our sacred mission of educating students for a bright future. All this does is tear our community further apart. Folks have figured out by now that I am not their real target. I am what stands between them and countless students, parents, teachers and taxpayers. These stakeholders and their values are the board majority's actual target.

If you want to help, let me know.

Danielle Weston 🇺🇸
Sent with the Hit 'Em Up App

Mar 10, 2022 at 7:41PM

I am speaking tonight to a citywide gathering in Fredricksburgh.   You and Mary are always mentioned in my presentation.  I will share with them tonight the update.  Press on.

🩷 I am thankful for your persistence and courage.

Mar 24, 2022 at 9:05 AM

🩷 Praying for you this morning and today.  Praying for courage, insight and wisdom.  Big meeting tonight.

Apr 5, 2022 at 11:48 AM

I learned this morning that an individual has filed a lawsuit against me. I have not been served yet but my understanding is that I'm being sued in my official capacity. I look forward to learning more and reading the lawsuit. This is just the latest chapter in a relentless effort to get me off the board. And it's a warning shot to future school board candidates. This morning KLBJ was talking about the lawsuit so I called in to the Todd and Don show. You can listen to that short interview here. It's at the beginning.


**EXHIBIT G-1**          **App. 363**

JS105184

Apr 5, 2022 at 11:48 AM

I learned this morning that an individual has filed a lawsuit against me. I have not been served yet but my understanding is that I'm being sued in my official capacity. I look forward to learning more and reading the lawsuit. This is just the latest chapter in a relentless effort to get me off the board. And it's a warning shot to future school board candidates. This morning KLBJ was talking about the lawsuit so I called in to the Todd and Don show. You can listen to that short interview here. It's at the beginning. https://podcasts.apple.com/us/podcast/the-todd-and-don-show-on-news-radio-klbj-2020/id1213954304?i=1000556320144

Sent with the Hit 'Em Up App.

Apr 6, 2022 at 10:56 AM

**Victim's Legal Counsel Speaks Out About Round Rock ISD Board's Decision to Reinstate Superintendent Dr. Hafedh Azaiez**
prnewswire.com

Apr 22, 2022 at 3:35 PM

Parent speaks after Sarasota School Board tosses her for what she was 'about to say'

https://www.foxnews.com/politics/parent-sarasota-school-board-public-comment

Explore the Fox News apps that are right for you at http://www.foxnews.com/apps-products/index.html

May 16, 2022 at 8:11 PM



Lighthouse complaints or concerns against the Superintendent and Trustees.

**6.** Pursuant to Texas Government Code Section 551.071, the Board will consult with its attorney in a December 2021 for an update regarding a review of documents of concern and potential unauthorized disclosures.

**7.** Pursuant to Texas Government Code Section 551.071, and as requested by Trustee Weston, the Board will seek legal advice and guidance related to electioneering.

**8.** Pursuant to Texas Government Code Section 551.071, the Board will meet in consultation with legal counsel regarding EEOC Charge of Discrimination, No. 31C-2022-00277.

**9.** Pursuant to Texas Government Code Sections 551.071 and 551.074, and as requested by Trustee Harrison, the Board will consult with its attorney to discuss the duties, roles and responsibilities of a public officer and employees including discussion of third step of Trustee sanction process for Trustee Weston.

**10.** Pursuant to Texas Government Code Sections 551.071 and 551.074, and as requested by Trustee Harrison, the Board will consult with its attorney to discuss the duties, roles and responsibilities of a public officer and employees including discussion of first step of Trustee sanction process for Trustee Bone.

N. CALL BACK TO ORDER/EXECUTIVE SESSION MOTIONS

# EXHIBIT G-1    App. 364

JS105185

10. Pursuant to Texas Government Code Sections
551.071 and 551.074, and as requested by Trustee
Weir and Trustee Harrison, the Board will consult with
its attorney to discuss the duties, roles and
responsibilities of a public officer and employees
including discussion of first step of Trustee sanction
process for Trustee Bone.

**N.  CALL BACK TO ORDER/EXECUTIVE SESSION
MOTIONS**

1.  Call Back to Order/Executive Session Motions

**O. THE BOARD RESERVES THE RIGHT TO ENTER
INTO CLOSED SESSION ON ANY AGENDA ITEM AS
PERMITTED BY THE TEXAS OPEN MEETINGS ACT,
SECTION 551.071 ET SEQ.**

1.  The Board reserves the right to enter into closed
session on any agenda item as permitted by the
Texas Open Meetings Act, Section 551.071 et seq.

go.boarddocs.com

There it is. Thursday night.

Unbelievable

*May 18, 2022 at 12:43 PM*

Jonathan Covey who is the policy director for Texas Values is asking me for your cell phone. Do you want me to give it to him?

He called

*May 18, 2022 at 2:45 PM*

Ok

*May 23, 2022 at 10:31 PM*

Just out...

Dear TASB members,
Within the next hour, TASB will announce that we will leave the National School Boards Association (NSBA). This decision was made by our Board of Directors following NSBA's release of an independent investigation report on Friday, May 20. This report discloses new details about the development of the NSBA Sept. 29 letter to the Biden administration and highlights operational practices and a lack of internal controls and processes at NSBA that do not align with our commitment to excellent governance.
As you know, TASB has been monitoring carefully NSBA's efforts to rebuild trust with its members over the past eight months and awaiting the release of its independent investigation into the Sept. 29 letter.
While we acknowledge that improvements have been made under NSBA's new leadership, it's clear that those efforts don't go far enough at this time to overcome the operational deficiencies and lack of internal controls outlined in the investigation report.
Of course, it is our hope that someday state school board associations across our nation can once again be united in our advocacy efforts on behalf of U.S. public school students.
Until then, our singular focus is ensuring Texas continues to have a strong voice and presence in Washington, D.C., moving forward. As always, TASB is focused on supporting its members and the advancement of their advocacy agenda — both here in Austin and at our nation's capital.

# EXHIBIT G-1          App. 365

JS105186

to the Biden administration and highlights operational practices and a lack of internal controls and processes at NSBA that do not align with our commitment to excellent governance.

As you know, TASB has been monitoring carefully NSBA's efforts to rebuild trust with its members over the past eight months and awaiting the release of its independent investigation into the Sept. 29 letter.

While we acknowledge that improvements have been made under NSBA's new leadership, it's clear that those efforts don't go far enough at this time to overcome the operational deficiencies and lack of internal controls outlined in the investigation report.

Of course, it is our hope that someday state school board associations across our nation can once again be united in our advocacy efforts on behalf of U.S. public school students.

Until then, our singular focus is ensuring Texas continues to have a strong voice and presence in Washington, D.C., moving forward. As always, TASB is focused on supporting its members and the advancement of their advocacy agenda — both here in Austin and at our nation's capital.

Lastly, we have asked NSBA to allow Texas trustees who wish to continue to participate in NSBA-sponsored conferences or events — but as individual trustees and individual boards rather than state association members — the ability to do so. We've been assured by NSBA Executive Director John Heim that this courtesy will be extended.

Should you have any questions, please let me know.

Sincerely,
Dan Troxell

Jun 14, 2022 at 2:47 PM

Weaponizing "investigations" against political opponents and folks who are critical of powerful people and entities is nothing new. I have never illegally shared confidential information. Taxpayer money intended for students was diverted to a Dallas law firm to create a political hit piece on me as retaliation for exposing the misdeeds of elected and unelected leaders here in Round Rock ISD. I will continue to vocally share my concerns about what is going on in RRISD with stakeholders in my community. Accountability will come for those adults who place their ambition and selfish desires above the education and safety needs of children. See article published moments ago.

https://texasscorecard.com/local/round-rock-isd-trustee-sues-superintendent-over-alleged-illegal-investigation/

Sent with my friend: Hit Em Up App 🚀
https://apps.apple.com/us/app/hit-em-up-personal-mass-text/id943630636

Jun 17, 2022 at 1:06 PM

After being inundated with emails, PIA requests and phone calls by the Left, Williamson County Attorney, Dee Hobbs, filed a letter with the court today asking to recuse himself from McCullough's lawsuit and referred the judge to Williamson County District Attorney, Shawn Dick.

The judge accepted this and has given Dick until 1 pm on Monday to show up to the court and add his name to McCullough's lawsuit to represent the state of Texas to prosecute me for removal.

Hobbs lacks the courage to be blamed by the Left for not prosecuting me.

It is unknown what Dick will do.

That's all I have offer.

I ask that folks take a step back and think about what is being done to me, specifically regarding my decision

# EXHIBIT G-1          App. 366

JS105187

Jun 17, 2022 at 1:06 PM

After being inundated with emails, PIA requests and phone calls by the Left, Williamson County Attorney, Dee Hobbs, filed a letter with the court today asking to recuse himself from McCullough's lawsuit and referred the judge to Williamson County District Attorney, Shawn Dick.

The judge accepted this and has given Dick until 1 pm on Monday to show up to the court and add his name to McCullough's lawsuit to represent the state of Texas to prosecute me for removal.

Hobbs lacks the courage to be blamed by the Left for not prosecuting me.

It is unknown what Dick will do.

That's all I have offer.

I ask that folks take a step back and think about what is being done to me, specifically regarding my decision to depart last night's meeting. I am not a professional politician. I am a wife, mom and unapologetic conservative. I have withstood a lot and I'm still here.  Most would have resigned by now.

If all that I have done is not enough for folks and more is expected of me, I would encourage critics to file to run for a seat on the board of trustees and wish them well.  I stand ready to watch somebody else do a better job.

**EXHIBIT G-1**          **App. 367**

JS105188

Jul 14, 2022 at 10:22 AM

An OBBM Network interview I recently gave to Lynn Davenport's Social Impact podcast on RRISD current events was just released. You can listen on Spotify or Apple Podcasts or wherever you get podcasts. It's 37 min long.

"We had a decision to make.  Bow to the demands of the board officers to not act, meet or even talk about accusations from a credible accuser or to go public and expose that we were denied our right to hold a special meeting on this. We chose to go public. And that's when everything in RRISD changed. In my opinion, the decision to hire this superintendent has been a disaster based on results...based on the fact that our school district is not focused on students. We turn our children over to these schools and all we want is for them to be educated and prepared for a bright future. Too many of these precious children cannot read, write or do math on grade level."

https://podcasts.apple.com/us/podcast/obbm-network/id1297519660?i=1000569769940

https://open.spotify.com/episode/2oLDT9wzQf10YM4HWRlBBM?si=iFuPtSWtSK-W_g-wV5waow&utm_source=native-share-menu&nd=1&utm_medium=organic&_branch_referrer=H4sIAAAAAAAA82O30rDMBTGnya7a%2BvaqUwo-Y2MWQYeyyYpX5Sw9XcPSnJicWPTpzQZe7QWE7%2BLj%2BwO%2Fntn6hyzzllh13ylYm2plTtnCOmqD5Jls-monlZ13QuglOl%2F35IoglyKuoc53%2BvSUNMUKrPLUYXU4v6%2Ff5%2BPPaTW8%2BNrOneqtXq40o-Kq9EsVZVeONdzbvnpG4%2Bk3F%2FOwKNIr8LPDSegpMYVwZYfWHie3CYDGjCBQa0PoA8%2FQugODBt-LKYTcf8oezAGdXmN3SFwcFiSO4JR8hfvAJ0YegEAAA%3D%3D&product=open&%24full_url=https%3A%2F%2Fopen.spotify.com%2Fepisode%2F2oLDT9wzQf10YM4HWRlBBM%3Fsi%3DiFuPtSWtSK-W_g-wV5waow%26utm_source%3Dnative-share-menu&~channel=native-share-menu&feature=organic&_branch_match_id=856371247662559432

Sent with my friend: Hit Em Up App 🚀
https://apps.apple.com/us/app/hit-em-up-personal-mass-text/id943630636

Jul 14, 2022 at 7:32 PM

Here is the flyer for the event on Tuesday.  Please share widely with MFL and others you know.



App. 368

JS105189

Part my plan would be to use this meeting to recruit some people to show up at the Capitol and otherwise lobby for TEA yanking Azaiez credentials.

We'll pass out sign-up cards and have a automatic text message sign up specifically for the purpose to build that team.

**EXHIBIT G-1**

**App. 369**

JS105190

Jul 27, 2022 at 10:42 PM

CAUSE NO. 22-0409-C425

Joseph McCullough,                          §              In the District Court
Petitioner,                                 §
                                            §
v.                                          §
                                            §              425th Judicial District
Danielle Weston, In her Representative      §
Capacity as Trustee of the Round Rock       §
Independent School District                 §
Defendant.                                  §              Williamson County, Texas

**ORDER**

On June 15, 2022, this Court conducted a hearing which was scheduled to be on Petitioner's Motion for Application of an Order Requiring Citation of Trustee Danielle Weston. Also before the Court was Trustee Weston's Plea to the Jurisdiction, which the court first considered and orally granted. This decision was then appealed by McCullough to the 3rd Court of Appeals. That appeal has been dismissed by the 3rd Court for want of jurisdiction in their court.

Subsequently, and at the request of the court, the parties submitted briefs regarding the application for an order requiring citation. Having considering Petitioner's Motion, Trustee Weston's Plea to the Jurisdiction, the arguments of counsel, the applicable law, and the case file, the Court hereby **REFUSES** to issue an order for citation of Trustee Weston and **DISMISSES WITH PREJUDICE** Petitioner's Original Petition for Removal of Round Rock Independent School District Trustee Danielle Weston.

**SO ORDERED** on this 27th day of July, 2022.



Hon. James Morgan
425th Judicial District Court

Removal lawsuit against me dismissed with prejudice today.

<div align="center">

# EXHIBIT G-1    App. 370

</div>

JS105191

Jul 29, 2022 at 11:02 AM



**Election Day: 8 November 2022**

Round Rock One Family enthusiastically announces your next school board trustees in Round Rock ISD! All of our candidates are parents and taxpayers in your community. They are laser focused on returning our schools to children and families and making student-centered decisions while respecting your hard earned tax dollars.

**Round Rock One Family proudly endorses:**

  

John Keagy, Place 1     Orlando Salinas, Place 3     Jill Farris, Place 4



Christie Slape, Place 5     Don Zimmerman, Place 6

**MEET THE CANDIDATES:**
Come meet your next trustees on August 17, 2022 at 6 pm at
Wingate by Wyndam Hotel and Conference Center.
1209 N Interstate Hwy 35, Round Rock, TX 78664
RSVP: contact@oundrockonefamily.com

Our candidates bring diverse experiences to represent our beloved community and will work hard to provide a bright future for all students. Come meet and hear from them to learn more and find out how to help.

Pol ad pd for by Round Rock One Family PAC



Come meet your next RRISD trustees!
Matt Rinaldi, Chairman of the Republican Party of Texas, will be there to endorse the candidates.

When: August 17, 2022 at 6 pm
Where: Wingate by Wyndam Hotel and Conference Center.
1209 N Interstate Hwy 35, Round Rock, TX 78664

RSVP: contact@oundrockonefamily.com
Election Day is November 8, 2022

Sent with my friend: Hit Em Up App 🚀

**EXHIBIT G-1**          **App. 371**

JS105192

Text Message
Jul 30, 2022 at 4:31PM



A "satire" Facebook page was created to harass me. This is a comment made this week by the person who filed the removal lawsuit against me. Note his last line, "the petition is still out there."

This illustrates that the value of the removal lawsuit was not in the hope that it would be successful, but to put accusations in writing for the public and the media.

I saw the site and Facebook page.

**EXHIBIT G-1**                    **App. 372**

JS105193

Aug 18, 2022 at 5:12 PM



Can you have this person remove the words about partners in education in his post? Partners in education had nothing to do with this and this is creating problems.

Aug 18, 2022 at 8:51 PM

I'm wondering how that ended up in his post.

Text Message

Sure I can talk to Troy about it. I don't think he even knows about the partners in education foundation. He lives in Dallas

iMessage

Sometimes when you type in things it will substitute names of groups that it thinks you're trying to type in Based on other contextual words in your post. He makes lots of posts. He may not have even realized the mistake.

**EXHIBIT G-1**        **App. 373**

JS105194

Aug 18, 2022 at 9:55 PM

I agree it was probably an accident

Aug 19, 2022 at 12:11PM

 Spoke with Troy regarding post. He had no idea. He is going to fix it today and respond.

We need to get those who shared his post to do the same

Troy is by far the most connected trainer in the RPT staff. His influence equals the chairman's. They don't realize by unfairly calling him out they just caused him to get further involved. I explained to him what the PIE foundations all about and how it seems the district gives favorable contracts to those who donate to the foundation. He's not happy about that and intends to act.

# EXHIBIT G-1    App. 374

JS105195

**Aug 20, 2022** at 2:10 PM

Not at the moment.  Finishing LOTS of paperwork and reviewing others paperwork.  Trying to take some further time out from the paperwork for a second to see if I can do anything to clear the way for our candidates today.....and saw your text.  Could talk a bit later today.

Just have some coaching to Jill on her responses.  She is the one candidate I am uncertain if we have been able to secure a endorsement for from FOCUS.  It is possible but tenuous.

I know we are running strong whether focus endorses or not but, in every hurdle I am looking for the best pathway forward for our candidates.  I would rather each of them focus on the progressives and not even have to think about a focus opponent

 Rest assured.  I am making no deals or promises.  I don't do that.  Just navigating with influence and relationships.

**EXHIBIT G-1**          **App. 375**

JS105196

Will do

What pct or pcts do you want walk lists setup for?

I'm going to have to look up what precinct Steve Flores' neighborhood is. That's the one I want to do.

You are setup now as a user.  I will need to add walk lists for you once you let me know where you want to start.

**App. 376**

**EXHIBIT G-2**

**Exhibit 11 to Deposition of Jeremy Story**

**Recording of Interaction Between J. Story, M. Pope, and F. Pontillo at August 16th Meeting
Produced as JS100285**

**EXHIBIT G-3**

**Exhibit 11 to Deposition of Jeremy Story**

**Recording of Interaction Between J. Story, M. Pope, and F. Pontillo at August 16th Meeting
Produced as JS100290**