**HAFEDH AZAIEZ**

---

**Page 1**

```
              IN THE UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
                      AUSTIN DIVISION

JEREMY STORY,                    *
     Plaintiff,                  *
                                 *
v.                               *   CIVIL ACTION NO.
                                 *   1:22-cv-448
                                 *
SUPERINTENDENT HAFEDH            *
AZAIEZ, TRUSTEES AMBER           *
FELLER, TIFFANIE HARRISON,       *
AMY WEIR, JUN XIAO, CORY         *
VESSA; OFFICERS JEFFREY          *
YARBROUGH, JAMES WILLIBY,        *
DEBORAH GRIFFITH, MILTON         *
POPE, FRANK PONTILLO, RON        *
COLE, CHIEF DENNIS WEINER,       *
and CARLA AMACHER,               *
individually, and ROUND          *
ROCK INDEP. SCHOOL               *
DISTRICT,                        *
     Defendants.                 *

---------------------------------------------------

                ORAL DEPOSITION OF

                   HAFEDH AZAIEZ

                  NOVEMBER 6, 2025

                (REPORTED REMOTELY)

---------------------------------------------------

     ORAL DEPOSITION of HAFEDH AZAIEZ, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and -numbered cause
on the 6th day of November, 2025, from 8:03 a.m. to
3:15 p.m., before Kristy Owen, CSR, in and for the State
of Texas, reported by machine shorthand with the witness
```

**Page 2**

```
appearing via Zoom from the offices of Thompson & Horton
LLP, 8300 N. MoPac Expressway, Suite 220, in the City of
Austin, County of Travis, Texas, pursuant to the Federal
Rules of Civil Procedure.
```

**Page 3**

APPEARANCES

FOR THE PLAINTIFF (via Zoom):
    Mr. Stephen D. Casey
    Casey Law Office, P.C.
    P.O. Box 2451
    Round Rock, Texas 78680
    Phone: (512) 257-1324
    Fax: (512) 853-4098
    stephen@caseylawoffice.us

    and

    Mr. David Rogers
    Law Office of David Rogers
    821 Grand Avenue Parkway
    Suite 401-B
    Pflugerville, Texas 78660
    Phone: (512) 923-1836
    firm@darogerslaw.com

FOR THE DEFENDANTS (via Zoom):
    Ms. Kathryn E. Long
    Mr. K. Adam Rothey
    Thompson & Horton LLP
    500 North Akard Street
    Suite 3150
    Dallas, Texas 75201
    Phone: (972) 853-5115
    Fax: (713) 583-8884
    klong@thompsonhorton.com
    arothey@thompsonhorton.com

ALSO PRESENT (via Zoom):
    Ms. Cynthia Hill, General Counsel for Round Rock
    Independent School District (Enters page 30.)
    Mr. Jeremy Story, Plaintiff (Enters page 11.)

**Page 4**

                    I N D E X

Appearances...................................   3
HAFEDH AZAIEZ
    Examination by Mr. Casey...................   5
Changes and Signature..........................  241
Reporter's Certificate.........................  243

                    EXHIBITS

NO.  DESCRIPTION                        PAGE

1    Third Amended Complaint...................   19

2    BJA (Legal)...............................   41

3    Round Rock Independent School District
     Superintendent Contract...................   59
4    Affidavit for Warrant of Arrest and
     Detention.................................   92

5    August 16, 2021 board meeting agenda.......  130

6    August 16, 2021 board meeting agenda with
     Resolution................................  131
7    Application for protective order...........  168
8    Printout of text exchanges................  189
9    Agreed Permanent Restraining Order.........  193
10   Protective order against Vanessa Aldrich...  228

(NOTE: Pages 30, 63-65, 71-72, 98, 104, 112-113, 114,
169-178, 186-201, 229-231, 235, 236, 238-239 marked
confidential as stated on page 239.)

**EXHIBIT H**                                    **App. 379**

HAFEDH AZAIEZ

5

```
 1          P R O C E E D I N G S
 2          THE REPORTER:  Dr. Aza- -- Azaiez, I'm
 3   going to put you under oath.  Will you raise your right
 4   hand, please?
 5          (Witness sworn.)
```

```
13          HAFEDH AZAIEZ,
14   having been duly sworn, testified as follows:
```

EXHIBIT H

**HAFEDH AZAIEZ**



**17**

**18**

**19**

19    Paragraph 14.  Read paragraph 14 and then let
20    me know when you're done reading it so we can talk about
21    the background.
22        A.  Okay.  I read it, sir.
23        Q.  Okay.  Do you -- yes or no, do you understand
24    that Mr. Story got involved in this based on -- based on
25    your conclusions that he had a problem with your hiring

**20**

1    process?
2        A.  No.

11        Q.  Okay.  All right.  So Paragraph 14, let's go
12    through this.  This may refresh your memory.  June 14th,
13    the board of trustees voted five to two to hire you --
14        A.  Uh-huh.
15        Q.  -- as the new superintendent.  Do you recall
16    that vote?
17        A.  I was -- I was -- if I remember correctly, this
18    is the -- after the 21 days; right?  This is the second
19    vote.  Because there was one meeting to do the finalist,
20    and then after the 21 days this is the -- I think the --
21    the second meeting, right, if I remember correct?  Is
22    that true?
23        Q.  Yes.  There's a footnote to there.  This says
24    all dates are in 2021.  But, yes, I'll represent to you
25    that was the second vote.

**EXHIBIT H**                    **App. 381**

**HAFEDH AZAIEZ**



21

1    A. Okay. So at that -- yes, sir. Sorry.
2    Q. It's just yes or no. I'm sorry. And I --
3    A. Yeah. So -- so at that -- at that meeting I
4  was not -- I wasn't present when they took the vote. I
5  was actually in a different room. At Round Rock High
6  School, in a different room. So I did not hear or see
7  what happened. I was only called in after the vote.

23    Q. No problem. Okay. So you're saying there was
24  a -- there was a meeting in May where you attended?
25    A. No. I did not attend, sir.

22

1    Q. Okay. On this June 14th meeting, prior to your
2  vote, were you contacted by the Board to appear, yes or
3  no?
4    A. I was contacted by, if I remember correctly,
5  the chief of communication for Round Rock at that time.

24    Q. (By Mr. Casey) -- yes or no, did Round Rock
25  ISD pay for you to travel to that board meeting?

23

1    A. No.
2    Q. Okay. Yes or no, during the selection process
3  leading up to that board meeting, did you receive any --
4  any of the interview questions from any Round Rock ISD
5  employees?
6    A. No.
7    Q. Did you receive it from any Round Rock ISD
8  board members?
9    A. No.

24

17    Q. On June 14th --
18    A. Yeah.
19    Q. -- 2021, did Mr. Story speak at that board
20  meeting?
21    A. I'm not aware. Because again, I wasn't -- I
22  was -- I was at Round Rock, but I wasn't at the board
23  meeting. I was in a different room.
24    Q. No. When -- when the vote happened -- isn't it
25  true that at that board meeting you came out of the back

**EXHIBIT H**                                              **App. 382**

**HAFEDH AZAIEZ**

25

1  room?
2      A.  I was in a different room, but I came after the
3  vote.  So I wasn't there when the -- when the vote took
4  place.  Does that make sense?

16      Q.  Okay.  Are you aware and familiar with or
17  reviewed, yes or no, the policy BED (Local)?
18      A.  Yes.
19      Q.  Okay.  What is your understanding of the board
20  policy BED (Local)?
21          MS. LONG:  Objection.  Vague, lack
22  specificity.
23          MR. CASEY:  True.  I'll be more specific.
24      Q.  (By Mr. Casey)  With respect to public
25  participation in a school board meeting, what is your

26

1  understanding on how the public is allowed to
2  participate under policy BED (Local)?
3      A.  Yeah.  I know that that policy's changed since
4  2021, but these policy -- the policy at that time, if I
5  remember correctly, would allow for the community to
6  address the Board on any topic if it's a regular board
7  meeting.  But if it's a called board meeting, they're
8  only allowed to speak on items that are on the agenda,
9  if I remember correctly.
10      Q.  Okay.  Thank you.  And -- and I appreciate your
11  clarification that it's changed since then.  What in BED
12  (Local) are you aware of that has changed since 2021?
13      A.  I think the Board made -- Board made the
14  decision to only allow public comments on agenda items
15  on all -- during all board meetings.
16      Q.  Okay.  And I understand that.  And I would
17  agree, that's what I -- that's my assessment as well.
18  Were you involved in that rule change at all?
19      A.  No.  I don't -- superintendent -- as a
20  superintendent, I don't control policy, I don't make
21  policies, I don't approve policy.  Those policies are
22  done by the Board -- or approved by the Board and
23  adopted by the Board.
24      Q.  Okay.  Isn't it true that in the
25  responsibilities and duties of the superintendent under

27

1  the pol- -- under Round Rock ISD board policies, that
2  you are allowed to propose policy changes to -- to the
3  board?
4      A.  Yes.  But, yes -- yes.
5      Q.  Okay.  And you're -- you're saying you did not
6  have any -- any involvement with this proposed policy
7  change?
8      A.  Yes, sir.  Because this involved the Board.
9  Does not involve the administration or policy related to
10  things that we do at Round Rock, day-to-day business.

28

**EXHIBIT H**                    **App. 383**

**HAFEDH AZAIEZ**



12    Q.  Okay.  Does your position as the superintendent
13    include -- include any final policy-making authority for
14    Round Rock ISD?
15        A.  No, sir.

**EXHIBIT H**                                    **App. 384**

HAFEDH AZAIEZ



**71**

1    Q.  All right.  Do you recall the Board passing a

2  resolution that night about -- about -- excuse me --

3  related to COVID?

4    A.  I think what -- if I remember correctly, it was

5  around, yes, mask mandate.  I think that was it, I

6  think, now that you're refreshing my memory.

7    Q.  Okay.  Do you recall, yes or no, there being an

8  agenda item about employee leave?

9    A.  Yes.  That was another one too.  Necessary --

10  yes, sir.  Now I remember.  Yes, sir.  You're right.

11    Q.  Okay.  All right.  When the public began to

12  speak, do you recall the nature -- and I don't expect

13  you to remember every speaker.  Do you recall the nature

14  of the comments?

15    A.  I think most of them were, again, related to

16  something -- like COVID; right?  Like COVID protocols

17  and things like that.  Mask mandates was a big topic at

18  that time.

19    Q.  Okay.

20    A.  Folks felt strongly against and some folks felt

21  strongly for it.  And, yes, that was one of them.

**70**

15    Q.  Yeah, it was.  I agree with you.  It was pretty

16  long.  Do you recall what the agenda items were on for

17  the meeting for that -- that night, for August --

18    A.  I think that -- that whole conversation was

19  about COVID and mask mandates.  I think that was pretty

20  much the entire, if I remember correctly -- if I recall

21  correctly, most of 90-some percent of the conversation

22  -- no, a hundred percent was around that.

23    Q.  All right.

24    A.  COVID protocols and mask mandates is part of

25  that.

**72**

**EXHIBIT H**                    **App. 385**

HAFEDH AZAIEZ



73

3    Q.  Okay.  All right.  Do you -- do you recall when
4    Mr. Story was escorted out of the room?
5    A.  I think I have -- I have a vague memory of it.
6    Yes.  To a certain degree, yes.  Part, yes, I guess.
7    Q.  All right.  Do you recall Mr. Story screaming?
8    A.  There was some shouting, I think.  If I
9    remember correctly.
10    Q.  Okay.  So your -- your recollection is
11    shouting.  Do you recall his microphone being turned
12    off?
13    A.  It's very typical.  I mean, if -- if whenever
14    -- at least -- at least, you know, I remember because
15    they would turn off the mics if it -- if the presiding
16    officer tells, like, the speaker, "Hey, you're off
17    topic.  Can you get on" -- "stay on topic," and the
18    person doesn't get back on topic.  It's very -- like, it
19    was a practice, I guess, to do that.



HAFEDH AZAIEZ

**89**

[Redacted]

**90**

[Redacted]

17    Q. Okay. I'll stop sharing. Through -- let me
18  ask you about the process of Mr. Story's arrest. Did
19  you ever talk -- excuse me. How frequently did you
20  communicate with Police Chief Yarbrough?
21    A. We -- we -- we talk, obviously. We have
22  one-on-ones, you know, because we -- he -- he reports to
23  me directly, so we would have one-on-one meetings to
24  talk about -- at that time we were still hiring officers
25  and we were going through -- because I think that was

**91**

1   year one or two -- year two, I'm sorry, of the police
2   incep- -- inception of the police department. So he was
3   working still in -- in getting that police department up
4   -- up and running.
5        So we -- ask then if there are like a
6   situation where -- you know, let's say there is a --
7   something's happening at or about to happen on a campus
8   with -- that can endanger safety and security of our
9   students so -- and he's aware of it, he may let me know,
10  inform me about it. Give me a heads-up. Things like
11  that, sir, that we communicate with.
12    Q. Okay. That's fine. And I'm just looking for a
13  number in answer to this next question. Across the 2021
14  school year, meaning which would have been from when you
15  were hired until December of that year.
16    A. Yes, sir.
17    Q. How frequently per week did you meet with Chief
18  Yarbrough?
19    A. I would say no more than once a week.
20    Q. Okay. Did Chief Yarbrough, in any verbal or
21  written communications, ever discuss with you Jeremy
22  Story?
23    A. No, sir.
24    Q. Okay. Do you have any emails about Jeremy
25  Story with any of the Round Rock ISD board members?

**92**

1   A. I don't recall I have. I don't recall I have.
2    Q. All right. Did you have any text messages with
3   any of the Round Rock ISD board members regarding Jeremy
4   Story?
5    A. No, sir.
6    Q. Okay. Did you and Chief Yarbrough communicate
7   between June 1st, 2021 to December 31st of 2021 via text
8   message?
9    A. Probably. I don't -- I don't recall. But I --
10  we typically talk, as I said, either meet or maybe phone
11  calls; typically that's our way of communication. But I
12  don't recall.
13    Q. Okay. But when he was Chief Yarbrough and his
14  team were preparing the arrest affidavit for Jeremy
15  Story, did he ever mention it to you or discuss it with
16  you at any -- in any way?
17    A. No, sir. No, sir.
18    Q. Okay. Okay. I'm going to walk through and --
19  and -- I'm not -- did you ever see the arrest affidavit
20  that -- that Lauren --
21    A. No, sir. No, sir.
22    MS. LONG: Wait until he finishes.
23    THE WITNESS: Oh, sorry. Sorry.
24    Q. (By Mr. Casey) -- that -- that Detective
25  Griffith had? But I -- I'm understanding your testimony

HAFEDH AZAIEZ

93

1  is that you didn't see it?
2      A.  No, sir.  I didn't see it.

94

9      Q.  -- the word, "affiant"?  Okay.  When Mr. Story
10  -- excuse me.  When Mr. Story was speaking -- and you
11  remember -- you said microphones getting cut off.  Do
12  you remember that night of his microphone being cut off
13  specifically?
14      A.  I don't remember.  But as I said, typically
15  that's the -- I guess the protocol, you know.
16      Q.  All right.  Do you remember Amy Weir requesting
17  Mr. Story to be removed when he would not get back on
18  topic?
19      A.  I don't recall, sir.
20      Q.  Okay.  Do you -- do you recall looking at,
21  nodding, or motioning to Officers Pope or Pontillo --
22  Pontillo, sorry -- Officers Pope or Pontillo in
23  Mr. Story's direction?
24      A.  No, sir.
25      Q.  Okay.  So when you -- when we're at trial, we

95

1  present testimony from anyone that says you -- you
2  looked over and then nodded and gave a suggestion with
3  your head to move him out of the room, you're saying
4  that testimony would be false?
5      A.  I don't -- I don't -- I don't -- I don't do
6  that, sir.  I mean, I did not do it.  I don't do it.
7  That's not my call to make to remove somebody.
8      Q.  Okay.  So the answer to my question then --
9      A.  Is no.
10      Q.  -- to that testimony would be false?
11      A.  Yes, false.  Yeah.

96

HAFEDH AZAIEZ



**Page 97**

4    Q.   Okay.  Isn't it true that Amy Weir directed the
5    police officers to remove Mr. Story from the room?
6    A.   That's my understanding, sir.  If anybody can
7    do that, it would be the presiding officer.  And at that
8    time, Amy Weir was the board president and the presiding
9    officer.
10    Q.   Okay.  In a school board meeting, who has the
11    authority to determine whether a speaker's comments are
12    off topic?
13    A.   No, sir.  I don't make those decisions.
14         MS. LONG:  I think his question was who.
15    A.   Oh, who?  I'm sorry.  Yes, Amy.  I'm sorry.  I
16    misunderstood the question, Mr. Casey.  Who?  That would
17    be Amy -- the presiding officer in this case would be
18    Amy Weir.

**Page 100**

6    Q.   Yes.  Totally understand.  When Mr. Story spoke
7    about you, did -- did that come across to you -- did you
8    draw the conclusion that that was a personal attack
9    against you?
10    A.   No, sir.
11    Q.   Okay.  Then did you simply believe he was
12    trying to point out hypocrisy?
13         MS. LONG:  Objection.  Calls for
14    speculation.
15    Q.   (By Mr. Casey)  What was your conclusion, sir?
16    Why did you make --
17    A.   Well --
18    Q.   Why did you --
19    A.   My con- --
20    Q.   -- believe --
21    A.   I think my conclusion of that, Mr. Story was
22    misinformed.  I knew I didn't do none of that stuff.
23    But also, I understand also I'm a public figure, so I'm
24    also -- I'm -- I'm -- it's normal for -- for public
25    figures to be addressed in one way or another.  But I'm

HAFEDH AZAIEZ



101

1    -- I feel sorry for Mr. Story because he was
2    misinformed.

**EXHIBIT H**                                          **App. 390**

**HAFEDH AZAIEZ**



105

5    Q. (By Mr. Casey) After the August 16th board
6    meeting, did you ever meet with Chief Yarbrough directly
7    about what transpired during that meeting?
8        A. I don't think I did, sir. I don't think I did.

17    Q. Okay. Why wouldn't you meet with your police
18    chief on this rare instance briefly?
19        A. Because I didn't -- I mean, for me, again, the
20    removal and all the process wasn't -- has nothing to do
21    with me. I did not make those decisions. That's
22    something that was done by the presiding officer. And
23    then, obviously, the rest of the stuff was done or
24    handled -- I'm not a lawyer, I'm not a criminal law
25    enforcement agent, so I don't get involved with the

106

1    police matters per se. Right? I don't tell them who
2    to -- what to do and not to do, so I -- there wasn't
3    something that I could have talked to -- to him about.

107

7    Q. Yeah. A hypothetical. I'll absolutely do
8    that. Let's take a situation used by -- I think it was
9    Officer Pope. You have a meeting where the agenda item
10    is about -- the -- the agenda is about cars. The agenda
11    is about cars, and 80 percent of the speakers come up
12    and talk about Ford Mustangs. They really love Ford
13    Mustangs. And then one speaker comes up and talks about
14    a Chevy Camaro. And the presiding officer of that
15    meeting says, "Stop. You cannot talk about Chevy
16    Camaros." Would that be fair to the person talking
17    about Chevy Camaros?
18        A. I mean, as I said, I mean, I don't -- those are
19    not my call to make. The presiding officer have to make
20    that -- that determination. Right?
21        Q. Okay.
22        A. And if -- and I don't interfere with that
23    decision -- with that decision, obviously. That's --
24        Q. All right. So if the presiding officer makes a
25    decision that -- that -- that -- that you believe, based

108

1    on your understanding of the law and as you're a
2    superintendent, do you have a duty or responsibility to
3    speak up at all?
4        A. I don't -- I don't think the -- I don't think
5    the law or the policy allow me to contradict the
6    presiding officer's decision. And I could be wrong. I
7    don't know. I'm not a lawyer. I'm going to have to
8    check with legal counsel.

**EXHIBIT H**                    **App. 391**

HAFEDH AZAIEZ



**109**

18    Q.  That's fair.  Okay.  Prior to the meeting on
19  August 16th where Mr. Story was removed, did you
20  communicate to any staff or law enforcement that you did
21  not want your personal legal matters mentioned publicly?
22    A.  No.
23    Q.  And when I say "communicate," I want to go
24  break those down.  Did you communicate verbally?
25    A.  No, sir.

**110**

1    Q.  Did you communicate with any law enforcement or
2  staff via email that you did not want that -- your
3  personal legal matters mentioned publicly?
4    A.  No, sir.
5    Q.  Did you communicate by text message to any
6  staff or law enforcement that you did not want your
7  personal or legal matters mentioned publicly?
8    A.  No, sir.

**111**

**112**

13    Q.  Okay.  Did you ever discuss with Chief
14  Yarbrough the issues of criminal trespass or arrest
15  regarding Mr. Story?
16    A.  No, sir.

HAFEDH AZAIEZ



8    Q. (By Mr. Casey)  After the September 14th board
9  meeting, are you aware -- are you aware whether Chief
10  Yarbrough met with the Williamson County attorney's
11  office regarding how to conduct future board meetings?
12    A. No, sir.
13    Q. Okay.  Did Chief Yarbrough tell you whether he
14  was meeting with the Williamson County attorney's
15  office?
16    A. No, sir.

HAFEDH AZAIEZ



**141**

**142**

**143**

19    Q.  Okay.  So then when you identified earlier in
20    this deposition that the police officers in Round Rock
21    ISD are there to enforce the law, I -- I -- I was only
22    making a distinction between policy and state law.  Are
23    the police officers -- are you allowed to use the police
24    officer to enforce your administrative decisions?
25       A.  It could be -- it could a trespassing.  Like a

**144**

1    trespass, like it's a -- you know, you -- somebody is
2    trespassing, right, so that's an -- I mean -- I mean,
3    usually that's an administrator telling you cannot --
4    you're not allowed to be in this building.  But if that
5    person comes to the building, that's when the -- that's
6    when the law is, I guess -- that's when the law
7    enforcement may get involved.
8       Q.  Okay.
9       A.  The decision was an admin- -- administrative --
10   administrative decision to tell the person, "You're not
11   supposed to be here.  The next thing would be a warning
12   or could be, you know, whatever that might be.

**EXHIBIT H**    **App. 394**

HAFEDH AZAIEZ



145

1    Q.  Okay.  Have you used that in the -- at other --
2  when you were in Donna ISD, have you used the police to
3  criminally trespass someone from the Donna ISD campuses?
4    A.  I think it was one time when we had a situation
5  where a staff member felt threatened by a particular
6  person, a community member.  And we had to give that
7  person a warning because that person was -- was really
8  fearful for her safety.

**EXHIBIT H**

HAFEDH AZAIEZ



149

150

151

152

13    Q.  Okay.  And if that doesn't exist, is it fair --
14    and I'm going to submit to you it doesn't -- is it --
15    isn't it true that you created those alternatives in
16    order to -- in order to compensate because you limited
17    the chairs in the meeting room?
18       A.  No, sir.  The flow -- the overflow room existed
19    prior to my arrival.  It's been there.  And also, it
20    happens at every school district in Houston ISD.  We
21    have the same setup too.  We have an overflow room.
22    It's very common for a school district to have an
23    overflow room.
24       Q.  Okay.  Does the overflow room -- because of the
25    fact there's an overflow room there, did that influence

EXHIBIT H                                        App. 396



153

1  **your decision to limit the chairs in any way?**
2       A.  No, sir.  Because the chairs were based on,
3  again, COVID protocols, recommendations; right?  So
4  that's what we did.  But we ensure that there is enough
5  space outside -- actually, you pass it before coming
6  to this room.  It's the first thing you see as you enter
7  the building is that overflow room.

HAFEDH AZAIEZ



**201**

**203**

15  Q.  Okay.  Do you give any -- from this vantage
16  point, were you giving any indication or head nod or
17  motion to the officers to remove him -- Mr. Story?
18  A.  No, sir.  But I heard Amy Weir talking about --
19  I have to -- I think she said something.  Right?
20  Q.  Okay.  So at this point where your head changes
21  position, that wasn't you indicating that they need to
22  move him toward the door?
23  A.  No, sir.  That's not -- never was my call.
24  It's not my call.
25  Q.  Okay.

**202**

**204**

1  (Video playing.)
2  Okay.  We reviewed earlier the affidavit.  And
3  I understand that Mr. Story's voice is on here.  Do you
4  hear Mr. Story screaming at this point?
5  A.  I guess.  I mean, screaming, shouting, I guess.
6  I mean, I don't know how to say it, but yeah.
7  Q.  He --
8  A.  He didn't stop.  Obviously, he didn't stop once
9  she told him to stop and get back on topic.
10  Q.  Okay.  I understood that that's what she said.
11  We may disagree about the legal aspects of that.
12  You heard him raise his voice about above a
13  conversational tone, yes?
14  A.  I guess, yes, he was shouting.  Yes, sir.

**HAFEDH AZAIEZ**



243

```
 1          IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
 2                 AUSTIN DIVISION
    JEREMY STORY,            *
 3      Plaintiff,          *
                             *
 4   v.                      *  CIVIL ACTION NO.
                             *  1:22-cv-448
 5                           *
    SUPERINTENDENT HAFEDH    *
 6   AZAIEZ, TRUSTEES AMBER   *
     FELLER, TIFFANIE HARRISON, *
 7   AMY WEIR, JUN XIAO, CORY  *
     VESSA; OFFICERS JEFFREY   *
 8   YARBROUGH, JAMES WILLIBY, *
     DEBORAH GRIFFITH, MILTON  *
 9   POPE, FRANK PONTILLO, RON *
     COLE, CHIEF DENNIS WEINER, *
10   and CARLA AMACHER,       *
     individually, and ROUND  *
11   ROCK INDEP. SCHOOL       *
     DISTRICT,                *
12      Defendants.          *
13
14         REPORTER'S CERTIFICATION
         DEPOSITION OF HAFEDH AZAIEZ
15            NOVEMBER 6, 2025
             (REPORTED REMOTELY)
16
17      I, Kristy Owen, Certified Shorthand Reporter, duly
18   qualified in and for the State of Texas, do hereby
19   certify to the following:
20      That the witness, HAFEDH AZAIEZ, was duly sworn by
21   the officer and that the transcript of the oral
22   deposition is a true record of the testimony given by
23   the witness;
24      I further certify that pursuant to FRCP Rule
25   30(f)(1) that the signature of the deponent:
```

244

```
 1      _X_ was requested by the deponent or a party before
 2   the completion of the deposition and that the signature
 3   is to be before any notary public and returned within 30
 4   days from date of receipt of the transcript.  If
 5   returned, the attached Changes and Signature Page
 6   contains any changes and the reasons therefor:
 7      __ was not requested by the deponent or a party
 8   before the completion of the deposition.
 9      I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
13   otherwise interested in the outcome of the action.
14
15      Certified to by me this 25th day of November, 2025.
16
17
18
     _____
19   KRISTY OWEN, RPR, Texas CSR 10790
     RPR Expiration Date:  9-30-2026
20   CSR Expiration Date:  7-31-2026
21   STOVALL REPORTING & VIDEO, INC.
     Firm Registration No. 10259
22   1414 Creekview Drive
     Lewisville, Texas  75067
23   Phone:  (214) 695-2024
24
25
```

**EXHIBIT H**    **App. 399**