IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JEREMY STORY,
Plaintiff,

VS.

SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES AMBER FELLER, TIFFANIE HARRISON, AMY WEIR, JUN XIAO, CORY VESSA; OFFICERS JEFFREY YARBROUGH, JAMES WILLIBY, LAUREN GRIFFITH, MILTON POPE, FRANK PONTILLO, RON COLE, CHIEF DENNIS WEINER, AND CARLA AMACHER, Individually, and ROUND ROCK INDEP. SCHOOL DISTRICT,
Defendants.

CIVIL ACTION NO. 1:22-CV-448

---

ORAL DEPOSITION OF

LAUREN MARIE GRIFFITH

OCTOBER 24, 2025

(Reported Remotely)

---

ANSWERS AND DEPOSITION of LAUREN MARIE GRIFFITH, taken at the instance of the Plaintiff, on the 24th day of October, 2025, from 9:07 a.m. to 2:23 p.m., with all parties present via Zoom, in the above-styled and -numbered cause in Georgetown, Texas, before Rachel D.

Chavez, RPR, a Certified Shorthand Reporter in and for the State of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

Pursuant to information made a part of the record at the time said testimony was taken, the following includes all parties present.

A P P E A R A N C E S

COUNSEL FOR THE PLAINTIFF: (via Zoom)
Mr. Stephen D. Casey
Casey Law Office, P.C.
P.O. Box 2451
Round Rock, Texas 78680
Phone: (512) 257-1324
Fax: (512) 853-4098
stephen@caseylawoffice.us
Mr. David Rogers
Law Office of David Rogers
821 Grand Avenue Parkway, Suite 401-B
Pflugerville, Texas 78660
Phone: (512) 923-1836
firm@darogerslaw.com

COUNSEL FOR THE DEFENDANTS: (via Zoom)
Ms. Kathryn E. Long
Ms. Kelsey R. McKeag
Mr. Kenneth Adam Rothey
Thompson & Horton, LLP
500 North Akard, Suite 3150
Dallas, Texas 75201
Phone: (972) 853-5115
Fax: (972) 692-8334
klong@thompsonhorton.com
kmckeag@thompsonhorton.com
arothey@thompsonhorton.com

COUNSEL FOR THE DEFENDANT ROUND ROCK INDEPENDENT SCHOOL DISTRICT: (via Zoom)
Ms. Cynthia L. Hill
Round Rock Independent School District
General Counsel
1311 Round Rock Avenue
Round Rock, TX 78681
Phone: (512) 464-5054
cindy_hill@roundrockisd.org

ALSO APPEARING: (via Zoom)
Mr. Jeremy Story

I N D E X

Appearances.................................... 3
The Witness: LAUREN MARIE GRIFFITH
Examination by Mr. Casey..................... 6
Reporter's Certificate............................ 160

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Email from Dee Hobbs...................... | 35 |
| 2 | Affidavit for Warrant of Arrest and Detention................................. | 42 |
| 3 | Monday, August 16, 2021, Round Rock Independent School District Board of Trustees called Board Meeting agenda....... | 84 |

5

Let me swear you in, Ms. Griffith. Would you raise your right hand, please?

(Witness sworn.)

6

7

8

Could you tell the jury your full name, rank. Let's just do those first.

A. My full name is Lauren Marie Griffith. And my current rank at Round Rock ISD Police Department is detective sergeant.

Q. Okay. And what's your badge number and your current assignment, if that's different from detective sergeant?

A. My current badge number is ███. And my current assignment is the supervisor over the Westwood Learning Community.

Q. Okay. And what is that -- what's that -- As far as supervisor over Westwood Learning Community, what

9

does that entail? What's the scope of that? I'm not familiar with how Round Rock ISD is structured.

A. So we have five major high schools, and there is a supervisor over each learning community, so each high school. So I oversee every school that feeds into Westwood High School, including the elementaries, middle school, and then the high school itself.

10

11

12

LAUREN MARIE GRIFFITH

13

15

Q. Okay. All right. In 2021 and in the late --

14

16

let's say the summer, starting around June, through the end of 2021, what was the chain of command for you at Round Rock ISD?

A. So at that time, we had -- I don't believe we -- I didn't promote to sergeant until July, but at that time we had an assistant Chief of Police Jim Williby, and then we had our Chief of Police Jeffrey Yarbrough.

Q. And at that time, what was your -- what was your rank?

A. Before -- I was just an officer at that point.

Q. And when did you get promoted? What was the next subsequent promotion? You said sergeant in July of that year?

A. Yes. We tested at the end of July.

Q. Okay.

A. In early August.

Q. When you -- When you pass the test -- pass the

5 (Pages 17-20)
LAUREN MARIE GRIFFITH

17

test, you get promoted?

A. There was written tests, and then there was an oral board and -- and a presentation. And then, yes, after that you were promoted.

18

19

20

STOVALL REPORTING & VIDEO, INC. (214) 695-2024
EXHIBIT J
App. 434

Q. Okay. If you could describe to me when you first encountered him.
A. So I believe the date was July 26th, because that was the date we tested for sergeant. I left the Stony Point Performing Arts Center where we were holding the testing. And there was a call through dispatch that an individual was at the administration building for Round Rock ISD, Lillie Delgado Administration Building. And it was just that they were up there filming. This is all -- You know, dispatch only had so much information. So the individual was up there filming. And the ladies -- the receptionists inside the administration building were startled, and they called law enforcement for assistance.
So I headed over to the administration building. I was the first one there. When I arrived, I

don't even know if I had a description at that point. I think -- I think it only said there was potentially a white male in a van.
So I went inside, I talked to the receptionist, and they told me there was a man filming them and that they were scared. They didn't know what he wanted. So I didn't see anyone in the -- in the room at the time. I walked back outside, and at the time Mr. Story was -- was pulling out. He did have his video camera out and was -- and appeared to be filming. He told me if I got any closer, he was going to leave. I told him that would be great, that's -- that's what we all wanted, was for him to exit the premises. At that point, he left and he went across the street to, I believe, the Sonic at the time, and he parked there. And that was the end of that interaction.
Q. Okay. Was that the day that the superintendent was being served with a restraining order?
A. I am not sure of that date that he was served, but I believe that's what Mr. Story was potentially alleging.
Q. Did -- Did dispatch indicate at any time -- Let me back up for a second. Did dispatch call you directly? Or was that put out across the general air waves?

A. It was put out on the air waves, yes, sir.
Q. Okay. Did dispatch make a previous call when the process servers came by the admin building to serve the superintendent?
MS. LONG: Objection, assumes facts not in evidence.
Q. (BY MR. CASEY) Was there any broadcast over dispatch about process servers at the admin office?
A. Not to my knowledge.
Q. Okay. When the person said they were scared, did they -- did they indicate what they were scared of?
A. No. They just told me they were startled and they didn't know why this individual was filming them and questioning them.
Q. And did you ever ask Mr. Story why he was filming?
A. No, sir. He left the area.
Q. Okay. So his only comment to you that day, as I understand you to say, is that if you came closer, he would leave?
A. Yes. He also said, "Who sent you here?" And I advised him, dispatch. And that was our only other interaction, to my recollection.
Q. Okay. Okay. So after that -- after that encounter in July, then when did you next encounter

Mr. Story?
A. Not until the August 16th board meeting.
Q. Okay. And on August 16th, where were you assigned?
A. I was in the parking lot.

Q. Okay. All right. So on -- Did you have any other interactions with anyone from July 26th through August 16th about Jeremy Story?

A. No, sir.

Q. Okay. Did his name come up at all in any, what I'll call office conversation or department conversations?

A. No, sir.

Q. Okay. So in August 16th, you said you were assigned to the parking lot?

A. Correct.

Q. Okay. Did you encounter Mr. Story at that time?

A. I observed Mr. Story at that time.

Q. How? Describe that, please.

A. I observed that he parked in the parking lot and then walked inside the building.

Q. Okay. Okay. Was there -- Was there any information transmitted over dispatch about him at that

time?

A. No, sir.

Q. (BY MR. CASEY) Okay. So you were in the parking lot. Did you have any other assignments that night?

A. No, sir, just parking lot security.

Q. And were you there for the entire meeting in the parking lot?

A. I don't recall if we were there for the entire meeting. They might have cut us loose. Maybe -- I think after the public comment, we potentially might have been cut loose.

Q. Okay.

A. Some of us. Sorry.

Q. Okay. Were there any comments relayed over that common communication system about Mr. Story while you were outside in the parking lot?

A. No, sir.

Q. Okay. So aside from any passing comments with Assistant Chief Williby or Chief Yarbrough after the meeting, what would've been the next time that anything about Jeremy Story came to your attention or was said to you?

A. That would've been in September when I was assigned to begin my investigation.

Q. Okay. And how did you receive that assignment? What was the -- What was the process by which that assignment was given to you?

A. I received a phone call from either -- I can't remember if it was Assistant Chief Williby or Chief Yarbrough that said, "You need to start working on these cases and begin investigating them."

Q. Okay. All right. So let's talk about your investigation. And thank you, by the way. You're doing -- You're being, like, an excellent witness.

So let's talk about your investigation. Walk me through step by step as -- as to the best level of detail you can remember of how you proceeded forth with your investigation.

A. Okay. So I began my investigation by reviewing the Incident Reports that were written by the officers shortly after the incident occurred. From there, I reviewed video, including public video and body-worn cam- -- body-worn cameras. And I looked up the penal code and the elements of the offense. And from there I felt that the elements for hindering proceedings by disorderly conduct were met, and I drafted an affidavit. And that affidavit was reviewed by Chief Yarbrough. And

LAUREN MARIE GRIFFITH

then I took that affidavit to the courthouse to be reviewed by a magistrate, and that magistrate signed off on it.

**Q. (BY MR. CASEY) So, you reviewed the Incident Reports, correct? That was the first step?**

A. Correct.

**Q. Okay. Second step is you -- you had an affidavit that you -- or you watched the body cams and the -- and the public cameras?**

A. Correct.

**Q. Okay. All right. Then next you checked the Texas Penal Code?**

A. Correct.

**Q. All right. Did you ever speak to -- Before you went to the magistrate, did you ever speak to any outside law enforcement agency?**

A. No, I did not.

**Q. Did you ever meet with the county attorney's office?**

A. Yes, we did.

**Q. Okay. So the sequence -- When did -- Did you meet with a county attorney before or after getting the affidavit signed?**

A. Before.

**Q. Okay. All right. All right. And why was that meeting there -- Why was that meeting there at that**

time? Was it -- Was it necessary to have that meeting?
Excuse me. Strike that.
Was it necessary to have that meeting before you went to the magistrate?
A. I did not schedule that meeting.
Q. Okay. I'm going to -- I don't think that's necessarily what I'm getting at.
Even if you didn't schedule the meeting, was that meeting necessary for you to have before you went to the magistrate?
A. No, sir. My affidavit was printed already for review before I attended that meeting.

Q. Okay. When you left that meeting, did you go straight to the magistrate?
A. To the best of my recollection, yes, I did.
Q. Okay. Were you already planning to go to the magistrate that day when you found out you had to go to this meeting?
A. Yes. That's why I had printed the affidavit and had it with me.
Q. Okay. Is it reasonable -- Not necessary whether you agree with it, but is it reasonable that you would've brought up the fact that you've got this affidavit already signed and notarized, ready to go to the magistrate? Is it reasonable to believe you would bring that up at that meeting?
MS. LONG: Objection, calls for speculation, and foundation. Lack of foundation. You can answer, Detective Griffith.
A. I -- That meeting was a meeting of men a lot higher up than me. I was the low lady on the totem pole in that meeting. So, I, you know, sat there quietly. I really didn't get involved in that meeting. But there was nothing signed at that point. It was just a blank affidavit ready for review by a magistrate.

Q. Okay. At the time this was done -- I'm looking at this -- this top line with the four X's on it. And you had -- you had made sergeant, so at that time you and Milton Pope were the same rank; is that correct?
A. That's correct.

Q. Okay. All right. You know, I'm unfamiliar with the goings on and the workings of Round Rock ISD Police Department. Why would he -- You said you were out in the parking lot. Why would he not have done the affidavit, if he had direct personal knowledge about what went on?

A. At the time, I was assigned as the detective sergeant, and so that case was handed to me.
Q. Okay. Was that because he was -- he was involved internally to that? Was there a distance issue?
A. No.

Let's talk about Paragraph 3. So you learned at approximately 8:35, Mr. Story was called upon by the Board of Trustees to speak at the podium on the subject of the masked mandate. Was that the actual -- Was that the actual subject on the agency; do you recall?
A. I believe the subject on the agenda was COVID protocols. However, most of the individuals were speaking on a mask mandate.
Q. Okay. So let's -- I want to ask you questions about that. The subject was COVID protocols. In your

45

opinion, as you're writing this affidavit, is that -- is that -- is the mask mandate related to COVID protocols?

A. Yes. In my opinion, it is.

46

Q. So is the COVID protocols then -- Is mask mandate under the umbrella of your understanding of COVID protocols? Or is it outside of that?

A. It is my understanding that it's under that umbrella, yes, sir.

Q. Okay. Okay. And then, your next sentence describes an interaction between the Board of Trustees President Amy Weir. She informs Mr. Story he was attending a called meeting, and would only be able to speak about the items on the agenda, specifically the mask mandate. Do you recall her saying, "Hey, you need to limit your comments to the mask mandate"? Is that -- Is that what you recall her saying?

A. I recall her saying it needed to be under that umbrella.

Q. Okay.

A. And in my opinion, how I viewed it is -- was the mask mandate was under that umbrella.

Q. Okay. All right. So were there any other speakers that night when you reviewed the video? Did you listen to any other people's comments?

A. I listened to a few of them, yes, sir.

47

Q. Okay. All right. The others that you listened to, do you remember their names?

A. No, I do not recall their names. There was over 180 speakers, I believe.

Q. Okay. Do you recall whether all of them spoke on the mask mandate?

A. I do not recall.

Q. Do you recall whether all of them spoke about COVID protocols?

A. I do not recall.

Q. Do you recall whether all of them spoke on topic?

A. It's my understanding that there was some, potentially, that were off topic. However, after redirection from the presiding officer, they ceased discussing non-related items.

48

49

51

50

Q. (BY MR. CASEY) Did you ever -- And you know what the Telephone Game is, right, that kids play?
A. Sure.
Q. Okay. So in this sequence, you're sort of doing the Telephone Game with Sergeant Pope here because you -- you identify that -- that, you know, you're getting this information from Pope, because you say at the top, "Information is provided to me by Sergeant Pope," right? And you don't check personal knowledge. So all this information is based on Pope's perception that he conveyed to you; is that accurate?
A. I also reviewed the videos and corroborated Sergeant Pope's report, Incident Report.

52

53

55

mask mandate."

Q. If -- If a person speaks on unrelated topics, does -- would you, if you were standing there, or did Sergeant Pope, based on your understanding about the roles of a school-based law -- law enforcement, would y'all have an independent responsibility to stop them from speaking?

A. No. That decision is up to the presiding officer.

Q. Okay. So if the presiding officer doesn't stop a speaker, y'all are just kind of standing by kind of like -- like the old master-at-arms in the old, like -- just in -- in other types of settings, or sergeant-at-arms, it's kind of similar to that function where you're under the command of the Board Chair to do whatever the Board Chair needs, correct?

A. Only when the presiding officer requests law enforcement assistance.

Q. Okay. So let me understand then, in this meeting, the chain of command. The superintendent is there, and he's the top in that chain of command. Superintendant, police chief, and then it trickles through to Sergeant Pope at this meeting. Would Sergeant Pope need the superintendent's permission to take action?

54

Q. And so, any questions that you had about what you were reading on his Incident -- Incident Reports, would have been asked and clarified in that conversation, correct?

A. Correct.

Q. And so then, what -- the gap then, as I'm understanding this transmission gap, you -- what you're doing in that, when you're having this conversation with Sergeant Pope, is you're just narrowing that gap to make sure you're getting an accurate understanding of what Sergeant Pope wrote as possible, right?

A. Correct.

Q. All right. And so, for example, Paragraph 3 where it says, "Affiant learned while Story was discussing the unrelated topics" -- Let me back up for a second. "Affiant learned during the duration of Story's time to speak, the president instructed him to stop speaking on unrelated topics and to only discuss the

56

A. No. It's my understanding that he only needs the request of the officer presiding over the official meeting.

Q. Okay. I want to -- I want to clarify something that was in my mind on the break. When we were talking about this, and we were kind of drilling down on this section right here with the X's, but, you know, we're human beings, whenever you ring a bell, you can't unring it. So talking about the videos and the Incident Reports that aren't identified here, even though they're not identified, did you review those before or after you wrote the affidavit and took it down to the magistrate?

A. Before.

[redacted]

Q. Yes. This middle sentence says, "Affiant learned," which would be you, "that during the duration of Story's time to speak, Round Rock ISD Board Trust -- Board of Trustee President Amy Weir, instructed Story to

stop speaking on unrelated topics and to only discuss the mask mandate."

I'm assuming -- assuming right now for sake of our discussion that the topic was the mask mandate. What did he do that you learned of, what was he saying that was, apparently from this sentence, not on topic?

A. Mr. Story was discussing a Protective Order in regards to the superintendent, --

Q. Okay.

A. -- and a personal matter with the superintendent.

Q. Okay. And so, when you say, "He was discussing a Protective Order," did he reference it? Or was that the entire topic he was talking about?

A. I believe that was the entire unrelated topic.

[redacted]

[redacted]

Q. Okay. So that's two things. So you have not watched the video in its entirety. You have watched portions of it. How many occasions have you had to watch the video total?

A. Like, potential occasions, is that what the question is?

Q. No. Let me back up for a second. How many times have you sat down in any setting and watched the video?

A. The entire four-hour video?

Q. Well, that was my first one, that you already said that you haven't watched it in its entirety. So

how many times have you just sat down and said, "Okay. For the next 30 minutes, I'm going to watch some snippets"? How many times have you done that?

A. Probably at least more than one time.

Q. Okay. More than five?

A. No, I wouldn't say more than five. More than one, less than five, I would -- I would say.

Q. Okay. And -- And I'm just going to assume that it's an odd number, for sake of argument. Would the majority -- And if that's incorrect, let me know. Would the majority of the times have been back here closer to when the incident happened, or when you were preparing for this deposition?

A. Closer to when the incident happened.

Q. Okay. And would all those have been before the affidavit, or were some slightly after the affidavit?

A. Both.

[redacted]

61

Q. Okay. Does that -- Do you understand that concept, "speaking by analogy"?
A. I do.
Q. Okay. Did you observe Mr. Story at all speaking by analogy?
A. Not in my opinion, no.
[redacted]
Q. Okay. Now, this next sentence, "Affiant learned while Story was discussing unrelated topics, Story had several outbursts." I don't see the word "outburst" very clearly defined in here. And everybody probably has a different thought about what outbursts means. So I would like to find out what you mean -- pause. What you received from Sergeant Pope as to what an outburst was.

62

A. As a verbal outburst. So a sudden verbal statement.
Q. Okay. Now, when you say, "sudden verbal statement," is it in the context of a back and forth with the Board Chair? Or -- Or, that's one option. Or the other option would be, it's completely silent, and he starts talking very, very loudly.
A. Based on my recollection, the outbursts were interrupting and talking over the presiding officer.
Q. Okay. So your definition, then, of an outburst is any time a speaker talks over the presiding officer, as I'm understanding that accurately?
A. Not in -- I mean, that's a -- an example, yes, sir.
Q. Okay.
A. But that's not my definition.
Q. Okay. Well, let's -- let's -- I want to be -- have the record really be accurate. So that's an example. So what would be another example in this context?
A. As far as this -- this case goes, sir?
Q. Well, just an outburst. So you're in a -- In any -- any Round Rock ISD Board meeting you've been to, what would characterize an outburst? You said this would be an example. So I would want to see what other

63

types of examples you would have that you would call an outburst. And the first one --
A. That I would --
Q. I'm sorry.
A. That I would call an outburst, if an individual is being escorted out of the room or escorted out of the building, and they continue to -- to speak loudly.
Q. Okay. So --
A. Al- -- Almost shouting, I would say.
Q. So your -- your understanding then, is if someone is being escorted -- escorted, and they're shouting, those would be two requirements. If they're being escorted, and they're talking loudly, that would be an outburst?
A. I would consider that an example of an outburst, yes, sir.
[redacted]

64

[redacted]



LAUREN MARIE GRIFFITH

[redacted]

[redacted]

Q. Okay. All right. So -- So I want to cabin in, so we understand outbursts, what I've understood you to say in summary, is that because when he got removed from the room, he was speaking in a loud manner, that's an outburst?

A. Like I said, he was speaking, interrupting the presiding officer, and speaking over the presiding officer.

[redacted]

Q. And -- And as we've observed here, sometimes it's difficult because people pause at different cadences in their speech to understand when they may be

ending speaking, and the other one may be starting, do you think some of those overlaps happened just naturally in the context of a public meeting?

A. Not in this instance, no, sir.

Q. When you say, "this instance," you're talking about the August 16th meeting, or Jeremy Story individually?

A. I'm talking about the interaction between Mr. Story and the presiding officer, Board President Weir, during his two minutes of public speaking time.

Q. Okay. So at any other time that night, are you aware, because you got your information from Sergeant Pope, are you aware of any other time that night that people spoke over the presiding officer, rather than the tiny types of overlaps that happen when people are starting and stopping talking?

A. Not to my knowledge.

Q. Okay. If -- If that had happened, if you observed that, based on your definition of outbursts, would they be -- would they be subject to the Texas Penal Code for hindering a public meeting?

A. That would be depending on whether the presiding officer determined they were disrupting the meeting or not, and asked law enforcement to remove them.

Q. Okay. So I understand you to be saying that the presiding officer then has this, we'll use the term loosely, discretion, that if the person interrupts them too much, that that's disrupting?

A. Not -- I would say whether -- They determine whether or not the individual is disrupting the meeting, as opposed to -- In my opinion, disrupting the meeting, as opposed to disrupting them individually.

Q. Okay. Explain that difference to me, please.

A. Well, loose -- I mean, the -- the presiding officer, per Board Policy, has the authority to determine whether or not the meeting has been disrupted, and remove any individual that they have determined is disrupting the meeting. And I would say that's the definition. And if someone is disrupting them, I would say that like leads up to that. That's an example of how that individual is disrupting the meeting as a whole.

Q. So as I understand it, for me to understand what you're saying, there's two levels. The first one is, just kind of speaking loosely, "Hey, you're -- you're -- you're interfering with my ability to run this meeting." That's one level. And they've got this tolerance band, that's Level 1. And Level 2 is, "Hey, Sergeant Pope and -- Sergeants Pope and Pontillo, get

69

**this person out of here." That's Level 2. And that Level 2 is then what gets them an arrest affidavit, or qualifies for that. Is that the two levels?**

A. I would say that's a fair statement. And there's potentially more levels underneath those, with warnings or something along those lines.

**Q. Okay. So at -- where then -- So does an outburst get you immediately to Level 2?**

A. No. Ignoring the presiding officer's request, that -- that gets you to the -- the later of the levels.

**Q. Okay. So in -- in -- where was it -- Was his voice raised while he was being taken out, or was it raised at the podium?**

A. I believe his -- his voice was raised in both incidents. And there was at a point between the podium and the exit where his voice did come to a regular level, and then it escalated again from there.

**Q. Okay. Where is that -- Let's look at here. So, as I'm -- as I understand your definition of outbursts, that would be the sentence that "Affiant learned while Story was discussing unrelated topics, Story had several outbursts. Affiant learned after several verbal warnings from Round Rock ISD Board of Trustee President Amy Weir, Story continued to have verbal outbursts."**

70

**So based on your definition, and correct me if I'm wrong, that means he continued to talk over her, correct?**

A. Correct.

**Q. All right. So then, next sentence, "Affiant learned Round Rock ISD Board of Trustee President Amy Weir requested for Story to be removed from the board room for hindering and disrupting -- disturbing the Board proceedings." Let's pause there.**

**Prior to that sentence, that last sentence, had Mr. Story qualified, based on your understanding, because you're the peace officer that wrote this, had he -- had he qualified to be charged under the Texas Penal Code for hindering and disturbing the Board proceeding?**

A. Yes. In my opinion, yes.

**Q. Okay. So this removal from the board room had -- had -- either it only added to it, but it -- but it was sufficient before that, right?**

A. Correct.

71

**Q. Okay. You say, "They approached Story and made several verbal requests for him to leave the board room. Affiant learned Story refused to leave the board meeting."**

**So then this next paragraph, you learned that they had to forcibly remove him from the board room. Affiant -- Let me pause for a second. I remember you said that you had a phone call with -- with Sergeant Pope. Did Sergeant Pope describe on that phone call how he removed Mr. Story from the board room?**

A. I believe he had to place his -- his hands, I think, underneath his armpit.

**Q. Okay. All right. Is that a -- that a -- By the way of background, I've done security and martial arts for 20 years. Is that a pain compliance movement?**

A. No, it is not, not --

**Q. Is --**

72

A. -- in my opinion.

**Q. I'm sorry. I talked over you. Is that a joint lock?**

A. No, not in my opinion.

**Q. Okay. What -- What is the -- What's the reason for that type of -- of, I guess, control hold?**

A. To gain compliance from the individual.

**Q. Okay. If they don't comply with that, is there any pain that results from it, based on the position of their arm?**

A. Based on how I believe Sergeant Pope to be holding him, no, not in my opinion. There was no strikes or pressure points used.

Q. Okay. That's kind of a -- That's kind of what we call in the Navy an albatross. That's kind of rare. That's interesting.

Okay. So then, going to Paragraph 5. You said, "Story continued to resist officers, yell, and scream, causing a major disruption during the Board meeting." Do you differentiate between "yell" and "scream"?

A. I would describe those as similar nouns.

Q. Okay. Then, why did you use both of those?

A. It was just my description of the events.

Q. Okay. All right. And so, your -- Am I understanding that out of Paragraphs 1 through 5, this is what you received from Sergeant Pope, as accurate as can be, according to the words he conveyed to you?

A. That's correct.

Q. And you didn't add -- And I'll go through a couple of things. You didn't add any exaggerations, correct?

A. That's correct.

Q. You didn't add any, you know, what broadcasters would call "color commentary." You didn't give it any of your own flavor, so to speak as a writer, correct?

A. No, sir.

Q. Let's -- Let's role with that, based on what you remember, and if we need to, we'll just pull it up. Okay. So -- Actually, let me do -- go back and -- and actually look at your affidavit, because I want to get that up there.
So got your affidavit up here, and that's still the same size, so it should be visible. Let's talk about 38.13, and see -- see where it goes. What do you recall, as far as the elements, under 38.13?
A. So I recall in 38.13 Texas Penal Code, an individual commits the offense if intentionally or recklessly they cause a disruption to official proceedings, by noise. I think there's another one, or violent -- I forgot the word after "violent." Violent blank, or disturbance, I believe, is the last word.

Q. Okay. All right. That's pretty good. Yeah, that's -- So by "noise," the first part of it is "Hinders an official proceeding by noise." What types of noise then are sufficient to hinder an official proceeding?
A. Any noise that's disruption, whether that be a voice, that could be noise made with your clapping noise, banging something, playing loud music. I think all those would be examples of -- of noise.

Q. Okay. All right. Was Mr. Story -- Did Mr. Story create noise?

A. Yes.
Q. Okay. Did anybody else that night create noise?
A. I would imagine there was also noise that night. However, I don't know that that noise disrupted the meeting.
Q. Okay. But you -- Would you describe outburst as noise?
A. Yes.

Okay. Did the Board share -- There's a Part B to it that adds "explicit" -- "after an explicit

official request to desist." Did anybody, after the Board Chair redirected them, continue to talk on the same topic without chaining their course of speech?
A. To my knowledge, no. Only Mr. Story.

Q. Okay. So if anyone else was talking, and the Board Chair said, "Hey, you're off topic," but they continued, they would be liable under 38.13 also, in your opinion?
A. If the presiding officer determined that they were disrupting the meeting, then, yes.

Q. Okay. So what I understand you to be saying is no one edited any single fact on that?
A. Correct.
Q. Did Sergeant Pope review it before you turned it in?
A. No, he did not.
Q. Okay. So not a time -- And I'm probably -- I might -- At the risk of drawing an asked and answered, Pope didn't double-check to make sure you accurately conveyed what he said?
A. Only through our conversations over the phone.

Q. Okay. Now, that it's been -- you've had time, you reviewed the video prior to this deposition, is there anything in your affidavit that you would qualify or maybe write differently?
A. No. Everything in there is true and factual.
Q. Okay. All right. All right. Who else was with you when you went to the magistrate's office?
A. I was walked there by someone from the county attorney's office, but I was the only peace officer there.
Q. Okay. So I'm trying to go back in my head a little bit to when you talked about the county attorney's office. Y'all didn't discuss Mr. Story. Why would the county attorney accompany you to the magistrate?
A. They were advised that I had a warrant that needed to be signed and reviewed -- sorry -- reviewed by

a magistrate, and someone, I do not recall who, was assigned to walk me to an available magistrate.
Q. Okay. Did -- And when you were walking with him, did you discuss the affidavit at all?
A. No, I did not.
Q. Okay. And the magistrate was Gau- -- Gauthier, right? "Gauthier," as they say in Louisiana.
A. I don't know how to pronounce the name properly, but --
Q. G-a-u-t-h-i-e-r, correct?
A. Yes. Yes.
Q. Okay. All right. And -- And based on that notarization, the magistratic signed it right -- right there in front of you, and then you gave it over to, I guess, the local sheriff to -- to do the arrest?
A. So, it's our practice after we have an Affidavit of Arrest that is signed, we walk that -- if it's for an adult, we walk that over to the Williamson County Sheriff's Office warrants division, and they place that warrant into the system. And I believe they keep the original copy of that, and then we only leave with a copy of it. They keep the original.

85

86

87

88

Q. (BY MR. CASEY) And -- And I'm not -- That's a reasonable objection. I'm not asking you to jump in Mr. Story's head. But is it reasonable to see that point? Can you see that point of view? You don't have to speculate about what he's thinking. Can you see how those connect? I mean, that's part of what we do, is try and understand another person's point of view. Can you see how those connect? Him pointing out the hypocrisy of the School District being concerned with safety, when the superintendent isn't a safe person.

A. In my opinion, that did not relate to the full title, which was "COVID-19 Health and Safety Protocols."

Q. Okay. So what was the safety protocol? I mean, what does it mean to be safe in this sentence?

A. Well, in reference to COVID-19, it was whether

89

or not they wanted to determine any kind of social distancing, class sizes, mask mandates, things along the lines of protecting students and staff from the COVID-19 variant.

**Q. So they are saying that their overall concern is the safety of the -- of the staff, faculty, and student population, correct?**

A. Correct. In reference to COVID-19.

90

91

**Q. (BY MR. CASEY) We've done the analogy since then. So you can go ahead and talk -- you can speak, Detective Sergeant Griffith.**

**Isn't it fair to say, "Look, your -- your -- your -- your top leader is an unsafe person. How can you seriously say you're concerned about the safety of everybody, when your leader is not safe?" I mean, that'd be just like the gun situation. You're telling me that this thing over here, because I think**

92

**that while it's important, masking and safety -- safety protocols, to have that conversation is important, it's a lot more serious if you've got a Protective Order for beating up a pregnant woman.**

**So I think the -- it's similar in that, you've got this parking issue, which parking is important, but it's not, you know, no one is dying. And then you got -- you got this guy who's unsafe with his gun and his firearm that could kill somebody. Isn't that -- Isn't that arguing by analogy, what Mr. Story was doing?**

MS. LONG: Objection, compound. Objection, asked and answered. Objection, argumentative.

**Q. (BY MR. CASEY) You can go ahead and answer.**

A. In -- You know, how I view it is if -- if he -- if Mr. Story had that concern for that safety, you know, there was other ways to bring that forward in meetings that aren't regarding COVID-19 safety protocols. You know, at that time, COVID-19, there was people dying at this time, so it was a serious matter. And I think -- I don't think that the Protective Order against a superintendent was in any way related to COVID-19 health and safety protocols.

97

Q. Okay. So in that portion right there, would you agree that the Round Rock ISD board president, Board Trustee President Amy Weir talked to Mr. Story at the very beginning about items on the agenda, and then he started to respond briefly, that he was going to talk about agenda items, correct?

A. In my opinion, she provided him a verbal warning to make sure that he only spoke to items on the agenda.

98

99

100

101

103

102

104

Q. Okay. All right. Well, let's keep going. We've cleared that hurdle. We're going to listen to the rest of this. Just give you a road map, and then we're going to go back to the affidavit.

(Video played.)

I'm sorry. I was making sure -- There's some cross talk on here. I was making sure that that was not -- not on the actual zoom.

(Video played.)

Okay. Throughout that bit of garbleness, isn't it true that the only person's voice that's being heard is -- Actually, I don't think it's the Board president. It's another person on the Board, right?

A. I -- I hear the Board president. I also believe I hear -- I think it was Feller Landrum. I hear -- I believe I hear her speaking as well.

Q. That's right. As a matter of fact, Mr. Story's voice is completely drowned out by theirs. He's not raising his voice, is he?

A. I believe that's hard to determine because I believe his microphone was muted at that point.

Q. Okay. Well, I -- I agree. So if his microphone is muted, and he's continuing to talk and you can't hear him, then it means that all you can hear are their voices, right?

A. No, I believe you can still hear his voice if you listen closely in the -- in the back of the video.

**Q. That's the point. His voice is not disruptive over their voices. Their voices are dominating. Their voices are blasting, correct. Right?**

A. Only because this video has them on a -- In my opinion, it's because this video has them mic'd up and --

**Q. But --**

A. -- their voices are -- In this video, the voices are louder due to the microphones of the video.

**Q. I a hundred percent agree with you. And because you weren't there, you don't have any understanding of Mr. Story's volume, right?**

A. That's incorrect.

**Q. How do you know Mr. Story's volume by not being there?**

A. I reviewed the body-worn camera video from Officer Pontillo's body camera.

**Q. Okay. That body camera video that was turned over and produced during discovery?**

A. That's correct.

**Q. Okay. And on there you can hear Mr. Story above everybody, is what you're saying?**

A. Not above -- above everybody, but you can still

hear him speaking over and interrupting the presiding officer.

**Q. Okay. We're going to keep going.**

(Video played.)

Well, is it true that was Trustee Feller Landrum that said, "Please remove him" just now? And not the presiding officer.

A. In this clip, yes, the presiding officer had already said it.

**Q. Okay. I want to go back for a second. Let's -- Let's catch that. I want to hear where it say, "Remove him." So rewind for a moment. Okay. We'll go through it again, and I'm going to pause it just right after that. Let me know when you first hear, "Remove him."**

(Video played.)

A. Right there.

**Q. Who said, "We need to have this gentleman removed, please"?**

A. In my opinion, that was President Weir's voice.

**Q. Okay. And that was at 2:49. Okay.**

(Video played.)

Who's talking right there? The loudest mic right there.

A. I could hear President Weir. I could hear

Mr. Story. And I potentially think I might have heard Trustee Harrison as well.

**Q. Yeah. And I think Trustee Feller Landrum. Okay. Let's keep going.**

(Video played.)

Okay. So it's 2:49. I'm going to let it run for a second, because that was the last I heard of Mr. Story's voice, and it was a couple of seconds of him not there. Let me let it run for a few seconds.

(Video played.)

Okay. So my question on that is, where was the scream?

A. So the voice that you -- when you -- In this video, you can hear him, and there's no microphone at that point. He's not near a microphone. So his voice is being picked up by other microphones, in this clip. Like I said, if you refer to the body-worn camera, you'll see that his voice was elevated in more of a yell, in more of a screaming matter.

[redacted]

[redacted]

**Q. -- that at all, just to be clear. But if -- on all the body camera footage and on this footage, we don't hear the screaming. And you'd agree screaming is the loudest. If we don't hear screaming, then it means that that statement conveyed to you by Sergeant Pope would be incorrect?**

A. I disagree with that. I think -- I mean, even on this video, the fact that he was nowhere near a microphone, and you can hear him over people who have active microphones on this recording, I think that demonstrates how loud his voice was at that time.

**Q. Okay. Now, acoustically in this room, you're saying his voice was as loud as theirs, because it sounds like a faint echo, does it not?**

A. I don't believe it was as loud as someone who's hooked up to a live microphone, but it was loud enough to where you could hear his voice, even when live microphones were -- were on.

LAUREN MARIE GRIFFITH

**Q. And those microphones are picking up his voice, right? I mean, these -- these are sometimes directional, bu there's some condenser mics in there, right?**

A. I believe the only microphones are on the dais, and then the public speaker mic that had been muted already. I think -- I believe those are the only microphones, to my knowledge.

**Q. Okay. I understand that, but that's not my question. Are there any rules that are promulgated to the speakers during the time of public comment, because everybody was given two minutes, to tell them during their two-minute time that's assigned to them, that they have to stop talking when the presiding officer starts talking?**

A. I'd have to refer to the Board Policy for that.

I know it does mention disruption. So it'd be up to the presiding officer whether or not that counted as disruption in their eyes.

**Q. Okay. So when she interrupts him, isn't she speaking over him and disrupting the proceeding, if it's his two minutes to talk?**

MS. LONG: Objection, foundation.

**Q. (BY MR. CASEY) Okay. Go ahead and answer, please.**

A. In my opinion, no. She was enforcing the rules of the Board meeting at that point.

117

119

118

120

Q. (BY MR. CASEY) Yeah. So isn't it true that because we don't know today the full two minutes of what Jeremy Story was going to say, that we can't tell whether or not there was a consistent theme throughout the whole thing?

A. All I know, based on the video, is that there was a -- he did divert from the COVID-19 protocols.

MR. CASEY: Okay. Objection, nonresponsive.

Q. (BY MR. CASEY) My question is very narrow, and I'll rephrase it. In order to say whether or not Jeremy Story had a consistent theme, you have to evaluate it in the totality of what he was going to say?

MS. LONG: Objection, foundation.

A. I -- I think -- I don't know if we would've been able -- He would've had to tie it back to COVID at that point. But in President Weir's opinion, that was not being done. That was -- He was diverting from that.

121

123

followed for you to continue your two minutes.

122

Q. (BY MR. CASEY) That's not my question.
In order to determine whether a statement is consistent, in order to determine whether that two-minute piece of speech is -- has a consistent theme, you have to hear the whole thing, "yes" or "no"?
MS. LONG: Objection, foundation.
Q. (BY MR. CASEY) You can answer.
A. In my opinion, I think the rules have to be

133

135

134

Q. Okay. What is your understanding of the -- your role as a law enforcement officer for enforcing the boundaries of Freedom of Speech as it pertains to a School Board meeting?

A. So, it's my understanding that, you know, each individual has the right to their Freedom of Speech. However, while you're at an official meeting, and an example at a School Board meeting, there are rules to be followed to continue that Freedom of Speech. And once those rules have been broken, then the Freedom of Speech -- your Freedom of Speech changes.

136

137

139

138

Q. All right. Yeah. And I apologize if -- Most of the time I'm going to be seeking "yes" or "no" questions. If I ask a longer one or if I poorly word my question that may seem otherwise, but that's generally what I'm going for.

Okay. All right. What is your understanding when you go to -- as a law enforcement officer, when you go to arrest someone, for what you need to have probable cause?

A. I need to have probable cause that they've violated a criminal offense.

Q. Okay. What does -- What does that -- You kind of defined -- defined it when you answered. So without saying, this is kind of circular, "I need to have probable cause," what does probable cause mean to you, as a law enforcement officer?

A. It means you have -- You know a reasonable officer would believe that the elements of a particular crime have been met and are present.

140

145

**Q. All right. How -- What policies -- When you reviewed it on September 16th, 17th time frame, do you recall which policies you looked at in particular?**

A. It would've been the Board policies in reference to, you know, the public comment and what the public comment can be, what they can speak about, as well as what happens when there's a disruption.

146

147

148

**Q. Okay. Did you ever talk with the superintendent about your affidavit?**

A. I did not.

**Q. Did you ever meet with him about your affidavit?**

A. I did not.

**Q. Okay. All right. Did you ever -- ever talk with the president of the Board, Amy Weir, about your affidavit?**

A. I did not.

**Q. Okay. All right. Did you ever talk -- After the arrest in the course of this, did you ever talk with the superintendent about the -- about the situation?**

A. The only thing I would ask him would be in passing, if he had any update on this civil lawsuit.

**Q. Okay. Did you -- Did you ever discuss Jeremy Story with the superintendant?**

A. No. I would only ask for updates on this lawsuit.

149

Q. How about -- How about the Board president, whether it was Amy Weir or -- I apologize, I forget her name. Feller Landrum.

A. No, I never spoke with him about it.

Q. Okay. Did Chief Yarbrough ever -- What did Chief Yarbrough ever say about Jeremy Story individually to you?

A. Nothing about him individually.

150

Q. Did he ever say he disagreed with his politics?

A. No.

Q. Did he ever say he disagreed with his personality?

A. No.

151

So after the arrest happened, Chief Yarbrough retired shortly after that, correct?

A. I don't know when his final day was.

Q. All right. Who was the next chief after that?

A. I was the interim chief after that.

152

Q. Would that have been like what I would term like a hot runner promotion? Like -- They're like, "She's at the top of her game. We're going to make her the interim chief."

A. I think at that time, our assistant chief was also retiring, and so they decided I was the best candidate, as far as out of the remaining ser- -- I think at the time we only had three other sergeants, and myself.

Q. Okay. And that -- the assistant chief, that would've been Williby, or was he before? Was there another assistant chief?

A. It was Williby, yes, sir.

Q. Okay. And then, so you were interim chief, and did you roll straight into being the permanent chief after that?

A. No, sir. They hired an individual named Dennis Weiner.

Q. Okay. So when Dennis Weiner came in, you -- you went back to being sergeant at that point?

A. Correct.

153

155

Q. Okay. During the time that this was going on, until today, did you observe in any way at any time the superintendent being involved in the inner workings of the police department?
A. No.
Q. Okay. How many times did you -- When you were interim chief, how often did you meet with the superintendent?
A. The first time I was interim chief, I don't know that we met very often at all. The second time I

154

156

was interim chief, between Weiner and Urritia, I met with him probably once every two weeks, I believe.
Q. Okay. So the first time, you said didn't meet with him that often. The second time, you say once every two weeks. Please define "not that often" to me. Or let me back up. How long was the first interim chief period in number of weeks or months?
A. I'd have to go back and look at -- and look at that. I'm not sure. At best guess, June, July -- like three months or so, for the first one.
Q. Okay. And over the course of those three months, more than five?
A. Less than five.
Q. Okay. So three months. So I'm guessing, two or three times?
A. If that. It wasn't -- You know, I was kind of -- I think Williby was still there as a consultant at the time. So I was kind of just running things and making sure the department was functioning. And then I think Williby was still potentially meeting with the high-ups of the District at that point.
Q. So during those meetings, with -- on the first gap, was this case ever a topic of conversation between you and the superintendent?
A. No.



157

**Q. Okay. And I think for clarity purposes, that scope of detail is what I'm looking for, even if you had side conversations, even if you had updates, any of that.**

**So then the second time where you were meeting every other week, what conversations did you have? And feel free to be detailed.**

A. Those we were discussing making changes to where our employees were happier, adding different shifts, our hiring. And I think there was a bond in the works, so talking about equipment that was needed for the department. Hiring a new chief. And then just basically the safety and security of the District.

158

159

160

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JEREMY STORY, *
*
Plaintiff, *
* CIVIL ACTION NO.
VS. * 1:22-CV-448
*
SUPERINTENDENT HAFEDH AZAIEZ, *
TRUSTEES AMBER FELLER, TIFFANIE *
HARRISON, AMY WEIR, JUN XIAO, *
CORY VESSA; OFFICERS JEFFREY *
YARBROUGH, JAMES WILLIBY, *
LAUREN GRIFFITH, MILTON POPE, *
FRANK PONTILLO, RON COLE, CHIEF *
DENNIS WEINER, AND CARLA *
AMACHER, Individually, and ROUND *
ROCK INDEP. SCHOOL DISTRICT, *
*
Defendants. *

REPORTER'S CERTIFICATION
DEPOSITION OF LAUREN MARIE GRIFFITH
OCTOBER 24, 2025
(REPORTED REMOTELY)

I, Rachel D. Chavez, Certified Shorthand Reporter, duly qualified in and for the State of Texas, do hereby certify to the following:

That the witness, LAUREN MARIE GRIFFITH, was by me duly sworn to testify the truth, the whole truth and nothing but the truth, and that the transcript of the

oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

__ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

X was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 10th day of November, 2025.

Rachel D. Chavez

______________________________

RACHEL D. CHAVEZ, Texas CSR 2610
Expiration Date: 4-30-26

STOVALL REPORTING & VIDEO, INC.
Firm Registration No. 10259
1414 Creekview Drive
Lewisville, Texas 75067
Phone: (214) 695-2024