SERGEANT MILTON NAMON POPE, JR.

**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
                       AUSTIN DIVISION

JEREMY STORY,                    *
        Plaintiff,               *
                                 *
v.                               *   CIVIL ACTION NO.
                                 *   1:22-cv-448
SUPERINTENDENT HAFEDH            *
AZAIEZ, TRUSTEES AMBER           *
FELLER, TIFFANIE HARRISON,       *
AMY WEIR, JUN XIAO, CORY         *
VESSA; OFFICERS JEFFREY          *
YARBROUGH, JAMES WILLIBY,        *
DEBORAH GRIFFITH, MILTON         *
POPE, FRANK PONTILLO, RON        *
COLE, CHIEF DENNIS WEINER,       *
and CARLA AMACHER,               *
individually, and ROUND          *
ROCK INDEP. SCHOOL               *
DISTRICT,                        *
        Defendants.              *

------------------------------------------------------

                    ORAL DEPOSITION OF

              SERGEANT MILTON NAMON POPE, JR.

                     OCTOBER 30, 2025

                   (REPORTED REMOTELY)

------------------------------------------------------

       ORAL DEPOSITION of SERGEANT MILTON NAMON POPE, JR.,

produced as a witness at the instance of the Plaintiff,

and duly sworn, was taken in the above-styled and

-numbered cause on the 30th day of October, 2025, from

9:04 a.m. to  2:54 p.m., before Kristy Owen, CSR, in and

for the State of Texas, reported by machine shorthand
```

**Page 2**

with the witness appearing via Zoom in the City of
Austin, County of Travis, Texas, pursuant to the Federal
Rules of Civil Procedure.

**Page 3**

A P P E A R A N C E S

FOR THE PLAINTIFF (via Zoom):
    Mr. Stephen D. Casey
    Casey Law Office, P.C.
    P.O. Box 2451
    Round Rock, Texas 78680
    Phone: (512) 257-1324
    Fax: (512) 853-4098
    stephen@caseylawoffice.us

FOR THE DEFENDANTS (via Zoom):
    Ms. Kathryn E. Long
    Ms. Kelsey McKeag (Exits page 165.)
    Thompson & Horton LLP
    500 North Akard Street
    Suite 3150
    Dallas, Texas 75201
    Phone: (972) 853-5115
    Fax: (713) 583-8884
    klong@thompsonhorton.com
    kmckeag@thompsonhorton.com

ALSO PRESENT (via Zoom):
    Ms. Cynthia Hill, General Counsel for Round Rock
    Independent School District
    Mr. Jeremy Story, Plaintiff (Enters page 30.)
    (Exits page 153.) (Enters page 156.) (Exits page
    173.)(Enters page 175.)

**Page 4**

I N D E X

Appearances.....................................  3
SERGEANT MILTON NAMON POPE JR.
    Examination by Mr. Casey..................  5
Changes and Signature........................  197
Reporter's Certificate.......................  199

                    EXHIBITS

NO.  DESCRIPTION                          PAGE

1   Agenda for August 16th, 2021 board meeting.  54

2   Affidavit for Warrant of Arrest and
    Detention................................  82
3   RRISD 06311 through 06314.................  107
4   Case Supplemental Report
    (Exhibit identified on page 85)...........  --
5   Use-of-Force Report......................  132

6   Plaintiff's Third Amended Complaint........  137

7   RRISD 02124 through 02125
    (Exhibit identified on page 144)..........  --
8   RRISD 02114 through 02166.................  154

**SERGEANT MILTON NAMON POPE, JR.**

Page 5

1             P R O C E E D I N G S
2         THE REPORTER:  Sergeant Pope, I'm going to
3    put you under oath.  Will you raise your right hand,
4    please?
5             (Witness sworn.)

Page 6

Page 7

Page 8

14        Q.  All right.  Okay.  Let's get started on that.
15    What's your current job title and rank?
16        A.  I am the McNeil Learning Community sergeant,
17    and I'm a sergeant -- patrol sergeant basically for
18    Round Rock ISD Police Department.
19        Q.  Okay.  All right.  And with respect to the rank
20    structure in Round Rock ISD Police Department, what are
21    the -- what are the levels?  Like, for example, what are
22    the subordinate rank levels to your rank?
23        A.  Subordinate rank levels would be just officer.
24        Q.  And based on my understanding from the
25    depositions we've done this week, above that would be

EXHIBIT K                                    App. 466

SERGEANT MILTON NAMON POPE, JR.



SERGEANT MILTON NAMON POPE, JR.



16    Q. All right. When you escorted Mr. Story out of
17  the August 16th board meeting, was that a penal code
18  violation?
19    A. Yes.
20    Q. Okay. Was it an education code violation?
21    A. Yes, I want to say so. I know it's a penal
22  code violation.
23    Q. What penal code was the violation?
24    A. 38.13, I believe.
25    Q. What education --

**EXHIBIT K**              **App. 468**

SERGEANT MILTON NAMON POPE, JR.



29

1    A. Disruption of a meeting.

31

15    Q. Okay. So I understand that to be similar to
16    your testimony about the -- a board of trustees member
17    or the board president, it would be either a -- some
18    sort of penal code or education code violation; correct?
19    A. I would say also for the safety of the
20    community.
21    Q. So --
22    A. Things of that -- things of that nature.
23    Q. So I -- now I understand three categories.
24    Correct me if I'm mischaracterizing your testimony. An
25    education code violation, a penal code violation, and

30

2    Q. Okay. Thank you. So in the instance I was
3    talking about an individual trustee member and you said
4    education code or penal code, would that same standard
5    apply to the board president?
6    A. Yes.
7    Q. Okay. Would that same standard apply to the
8    superintendent's command?
9    A. I -- to be honest, I don't know.
10    Q. Why when it applies to the superintendent do
11    you not know?
12    A. I've understood that the board president is in
13    charge of the meeting, so that's the person that is in
14    charge of the meeting, that's the person that can give
15    out directives. And I've given an example of when a
16    secondary person could ask -- request that a person's
17    being removed from the meeting.

32

1    for the sake of argument, is it -- is it safe to say
2    some sort of statutory violation that's in Texas law
3    that allows you to remove them?
4    A. Yes, I'll agree.
5    Q. Okay. And would you consider the last thing
6    you introduced of a safety issue, is that something that
7    you consider a different category?
8    A. I would also categorize all of them the same,
9    my personal opinion.

EXHIBIT K

App. 469

**SERGEANT MILTON NAMON POPE, JR.**



**33**

10    Q. (By Mr. Casey) So before we took a break we
11    were talking about law versus policy. So would your
12    understanding be that if policy corresponds to law, then
13    that's when you would enforce policy?
14    A. Agree.
15    Q. All right. And if policy and law diverge,
16    which did you have to follow?
17    A. The law.

**34**

1    Q. Okay. Which -- which -- which policies are you
2    familiar with governing board meetings?
3    A. I would say just disruption of the meeting
4    because that's what we deal with.
5    Q. Okay. And for you, based on your understanding
6    as a law enforcement officer -- in fact, a school-based
7    law enforcement officer, what is your -- how do you
8    categorize disruption?
9    A. Speaking out of turn, causing havoc. Things of
10    that nature. Causing a disturbance.
11    Q. Okay. When you say speaking out of turn, and I
12    know that in this instance I've -- I've accidently
13    talked over you in this deposition. Is that what you
14    would call speaking out of turn, by talking over
15    someone?
16    A. I would say it depends.
17    Q. On what does it depend?
18    A. If -- if you're in charge of the meeting and
19    I'm constantly over-talking you, then that right there
20    could be considered a disruption if you're in charge of
21    the meeting.
22    Q. And so your position would be when the person
23    who's in charge of the meeting tells someone who's
24    speaking to be quiet, by law they have to immediately
25    stop talking?

**35**

1    A. Again, it depends. I mean, this is not a
2    yes-or-no question. It depends.
3    Q. Okay. On -- in that instance, the -- the
4    situation I presented, the hypothetical I presented,
5    what does that depend on?
6    A. If -- if there's a violation of the law.
7    Q. Could you be more specific about that?
8    A. Yeah. If it violates a law. If -- if -- if --
9    if there are rules and the rules say we're going to do
10    this, this, this and this, and I continue to talk and
11    you tell me, "Hey, listen, those" -- "that's not on the
12    meeting agenda," and I keep talking, now I'm -- I'm
13    creating a disruption.

**36**

SERGEANT MILTON NAMON POPE, JR.



13    Q. Okay. Does the agenda -- the posted agenda for
14    a school board meeting say what's allowed to be talked
15    about and not allowed to be talked about?
16    A. Yes.



SERGEANT MILTON NAMON POPE, JR.

53

54

55

1   Q.  Okay.  And I'll represent to you, this is a
2   agenda for August 16th, 2021 board meeting.  Have you
3   seen these before?
4       A.  Maybe in passing.
5       Q.  Okay.  Let's look at Section D.  What are the
6   agenda items on Section D?
7       A.  Adoption of resolution for employee COVID-19
8   positive extended leave during COVID-19 pandemic and
9   fall 2021 COVID-19 health and safety protocols.
10      Q.  Okay.  And would you agree with me that mask
11  mandates falls somewhere under there?
12      A.  Yes.

17      Q.  Okay.  This is health and safety protocols.  Do
18  you -- would you determine that as narrow or broad?
19      A.  I would look at that as it being compared to
20  anything that relates to COVID-19.
21      Q.  Okay.
22      A.  I mean, if I'm the -- if I'm interpreting it,
23  that's what -- the way I interpret it.
24      Q.  Okay.  So if someone wanted to talk about
25  safety, would that be related to it?

56

1       A.  The way I'm interpreting, it depends on what --
2   what topic of safety.
3       Q.  Okay.
4       A.  Seems like to me everything refers to COVID-19.
5       Q.  Okay.  That's fair.  All right.  I'm going to
6   stop share.  So that's P-1.
7           All right.  So then when that -- when that
8   event happened where -- at the board meeting, do you
9   remember what people talked about during the public
10  comment time?
11      A.  Mask mandate, wearing mask, social distancing,
12  issues with the amount of individuals allowed in the
13  meeting, you know...
14      Q.  Okay.  What was the problem with the amount of
15  people in the meeting room; do you recall?
16      A.  They had limited seating.
17      Q.  And why was there limited seating, if you
18  recall?
19      A.  The social distancing mandate.
20      Q.  When you say "mandate," do you mean a -- a
21  state law mandate?
22      A.  I -- I just -- I just understand it as mandate.
23  You know, we -- that's all I understand.  Just mandate.
24  I don't know which -- if it was state, national.  I
25  don't know.  Just mandate.

5       Q.  Okay.  At the board meeting, where were you --
6   where were you stationed, if you will, in the room when
7   the board meeting started?
8       A.  I want to say to the rear center.
9       Q.  Okay.  And what was your role that night?
10      A.  Provide safety and security.
11      Q.  Okay.  And who was -- who was your on-site
12  supervisor?
13      A.  I want to say it was Assistant Chief Williby.

16      Q.  Okay.  And so let's talk about the public
17  comment session.  Hold on for a second.  Do you remember
18  what the topics of the agenda items were for that night?
19      A.  That was during COVID, so mask mandates, social
20  distancing.  Things of that nature.

24          (Exhibit 1 marked for identification.)
25      A.  Yes.

**EXHIBIT K**                    **App. 472**



**57**

1    Q.  Okay.  So what if it was purely a school board
2  policy, you couldn't distinguish between those -- and I
3  don't mean this in a negative way, but you wouldn't --
4  you wouldn't know if it was just by the school board
5  that was ordering it or if that was state law; correct?
6    A.  Back then I probably would have been more
7  refreshed on that; but right now, I can't recall.
8    Q.  That's fair.  Yeah, if you -- if there's
9  something that you can't recall because of the --
10  because of the time, just let me know.  So then -- and
11  we're here obviously because of Mr. Story's comments.
12  Do you recall what Mr. Story said?
13    A.  At what time?
14    Q.  When he was doing the public comment period?
15    A.  Yes, he -- yes, I do recall some of what he
16  said.
17    Q.  Okay.  To the best of your recollection -- and
18  we'll get to the, you know, video and other stuff later.
19  To the best of your recollection, what do you recall
20  that Mr. Story said?
21    A.  He had mentioned the situation with that -- the
22  superintendent was involved in.
23    Q.  And do you recall if he talked for a
24  substantial amount of time or a small amount of time?
25    A.  I can't really recall.  I know I reviewed the

**58**

1  video, but I -- it -- I know everyone had two minutes,
2  and I would say that it was pretty close to two minutes.
3    Q.  Did -- so let me unpack that.  When you say it
4  was pretty close to two minutes, do you mean that
5  Mr. Story did speak for approximately two minutes and
6  then mentioned the superintendent, or he mentioned the
7  superintendent at the beginning?
8    A.  He mentioned it, I want to say, maybe halfway
9  through, if I can recall correctly.
10    Q.  So -- so your -- your recollection is that he
11  didn't go the whole two minutes?
12    A.  I mean, I don't -- I don't recall.
13    Q.  Okay.  And I'm not asking you to, you know,
14  have stopwatch accuracy.  I'm just trying to get a
15  general sense.  Did he mention anything else besides the
16  superintendent?
17    A.  I can't recall.
18    Q.  Okay.  And then when he mentioned the
19  superintendent, what happened next?
20    A.  The president instructed him to -- that -- that
21  wasn't on the agenda.
22    Q.  And by "not on the agenda," you mean the
23  mention of the superintendent or the way in which he was
24  using the superintendent's situation?
25    A.  The superintendent's situation, I guess.  I

**59**

1  don't know.  She said it wasn't on the agenda.
2    Q.  Okay.
3    A.  She said it several times.
19    Q.  No problem.  That's fair.  All right.  And so
20  then when the board chair gaveled at Mr. Story, what
21  happened next?
22    A.  President Weir instructed Mr. Story to -- don't
23  bring that subject up, don't mention it, don't talk
24  about it.  And Mr. Story kept, you know, speaking on
25  that point.  And she told him several times, and then

**60**

1  after that she said, "Hey, have him removed, please."
2  Something to that effect.
3    Q.  Okay.  When Mr. Story mentioned the
4  superintendent and the board chair, Ms. Weir, gaveled
5  him, do you recall whether he continued to talk about
6  the superintendent's situation or he said that his
7  rights were being interfered with?
8    A.  I can't --
9    Q.  Do you recall --
10    A.  I can't -- I can't recall the exact verbiage.
11    Q.  Okay.  So you're unaware whether he continued
12  to mention the superintendent?
13    A.  I know he kept speaking.

SERGEANT MILTON NAMON POPE, JR.



**Page 61**

*(redacted)*

**Page 62**

7   Q. (By Mr. Casey)  When an officer is physically
8   contacting a person to place them in physical restraint
9   such as Mr. Story -- I mean, this is the -- kind of the
10  elephant in the room, Mr. Story and the school board
11  meeting that night.  When you put him in physical
12  restraint to escort him out of the room, was he required
13  by law to comply with you at that moment?
14      A.  Okay.  I didn't restrain him; I escorted him
15  out.  He wasn't in handcuffs, and I escorted him out.
16  So he was escorted out of the meeting.
17      Q.  Okay.  Let's -- let's piece this apart because
18  I don't want us to be talking past each other using
19  different terms.  Did Mr. Story go with you willingly
20  out of the room?
21      A.  No.
22      Q.  Okay.  Did you use even the slightest amount of
23  physical force to bring Mr. Story out of the room?
24      A.  Yes.
25      Q.  Okay.  What would be the terminology in -- in

**Page 63**

1   police terms that you utilized to escort Mr. Story out
2   of the room?
3       A.  The -- the -- he -- he disrupted a meeting, so
4   the board president said, "Please escort Mr. Story out."
5   So that's what we did.
6           MR. CASEY:  Objection.  Nonresponsive.
7       Q. (By Mr. Casey)  Okay.  So my question is very
8   specific.  In police terms when you put -- let me back
9   up.  Did you physically contact Mr. Story?
10      A.  Yes.
11      Q.  Okay.  When you physically contacted Mr. Story,
12  did you use any type of compliance hold on Mr. Story?
13      A.  I just grabbed him by his arm gently, and my
14  partner Frank got on one side and we escorted him out.
15      Q.  Okay.  How did you grab him?
16      A.  With one hand, I believe.
17      Q.  What part of the body -- of his arm did you
18  touch?
19      A.  I want to say his midarm.
20      Q.  Above or below the elbow?
21      A.  Above.
22      Q.  Did he resist your contact?
23      A.  He resisted me moving him.

**Page 64**

4       Q.  Okay.  Well, I want to -- I want to parse those
5   because I understand you're saying he was asked to leave
6   and didn't leave.  And you would -- you would say that
7   comes under the education code; right?
8       A.  Penal code as well.



65

67

1   A.  Yes.  There was a lot of yelling.

66

68

8   Q.  Okay.  So in the scope of your employment, your
9   tenure, this would have been uncommon; right?
10   A.  No, not uncommon.  People tend to act out, so
11   not uncommon at all.  You see it all the time on TV.  I
12   didn't -- I wasn't, but at ACC often people would be
13   escorted from the board meetings.

21   Q.  (By Mr. Casey)  All right.  So when we -- when
22   we left, we were wrapping up on your recollection of the
23   events of that night.  After you left the room, did
24   Mr. Story continue to speak when you were escorting him
25   from the meeting room through the front doors?



69

71

1  **you-all met that night.**
2    A.  We just talked about the situation and how we
3  need to ensure that -- I do -- I do remember this.  We
4  need to probably try to keep -- you know, keep control
5  of the meetings, make sure that, you know, everybody's
6  safe.
7    **Q.  When you say "keep control of the meetings" and**
8  **"everybody's safe," was there an unsafe situation?**
9    A.  There's -- there's always potential for unsafe
10  situations.  You know, we don't know -- again, we don't
11  have metal detectors, we're not, you know, frisking
12  people, so an individual can come in with a gun, knife,
13  whatever the case is.  So we're talking about overall of
14  the safety and security of the event of the meeting.
15    **Q.  Okay.**
16    A.  Just like if I was working a football game or a
17  play or something like that, nothing -- the tempo
18  doesn't change.
19    **Q.  Okay.  So my -- I want to make my question more**
20  **specific.  I probably asked it nonspecifically.  That**
21  **night of August 16th, were any actions that you observed**
22  **taken by any citizens unsafe?**
23    A.  I would -- I would say if you were in a setting
24  and you raised your voice, you have to be escorted out,
25  that right there is causing a safety concern because now

70

72

1  whereas we have two individuals in a meeting, now we
2  have to remove those two individuals, which actually
3  basically means that the -- the room as a whole is
4  unsafe.  So we're there for safety and security.  So we
5  have one individual that we have to occupy because of
6  that, and that's not good -- that's never good.

17    All right.  Who was the next person you met
18  with in the Round Rock ISD chain of command or
19  co-workers regarding August 16th after it happened?
20    A.  I want to say chief -- it would have been Chief
21  Williby -- Assistant Chief Williby.
22    Q.  Okay.  So when did you meet with Chief Williby?
23    A.  I know we spoke that night after the event.
24  And I know we spoke -- yeah, that night after it.
25    Q.  Okay.  That night.  Describe what happened when

SERGEANT MILTON NAMON POPE, JR.



**Page 75**

1    Q. I understand. All right. Okay. So you spoke
2  with Chief Williby that night and you said you have to
3  keep control. What do you mean by "keep control"?
4    A. Stay vigilant, just like anything else. Just
5  like any other game, just like any other event, we have
6  to be vigilant. We have to provide safety for the
7  individuals. You know, at any given time -- there's
8  been several instances where individuals walk into a
9  board meeting because their agenda isn't being supported
10  and they start shooting people. So --
11    Q. Okay.
12    A. -- you know, active shooter all over the place.
13  That's what we train for. So when I say that, I'm
14  talking -- that's what I'm referring to. You know, it's
15  -- it's the unknown. You know, I -- we have to be
16  there. You know, my job is to not go home so everybody
17  like Mr. Story and everyone in this panel can. So
18  that's my job.
19    Q. I understand.
20    A. So when we say safety, that's what we're
21  referring to.

**Page 76**

14    Q. Okay. So after the meeting with Chief Williby,
15  what -- who was the next person you met with and when?
16    A. I don't know if there was a meeting after that
17  or not. Since we had to escort Mr. Story out, I had to
18  generate a report. So I generated my report, submitted
19  it with my use of force form and uploaded my videos,
20  which Frank uploaded his. And after that, it was done,
21  we were out of it.
22    Q. Okay. So you generated your report. When did
23  you speak with -- excuse me. Who was the next person
24  you spoke with after that night, the very next incident
25  you spoke with someone after this --

**SERGEANT MILTON NAMON POPE, JR.**

77

1    A. I think it would have been Detective Sergeant
2  Griffith to go over my report I want to say because
3  generally we would have a conversation. She's sort of
4  like the -- I want to say the stop keep, if you will.
5  She -- she reviews reports and stuff like that.
6  Although she and I are equals, again, she's specialized
7  unit.
8    **Q. Okay. And that makes sense. As I understood**
9  **it, you know, Detective Griffith, both -- both Chief**
10 **Yarbrough and she identified that she was the**
11 **investigator. Is that -- is that your understanding?**
12   A. Yes, that's how it generally goes. I -- you
13 know, we submit the report. After that, we turn it over
14 to the detective because foot officers, you know, we
15 have other things to worry about. We present our
16 findings to them, and then they take it on from there.
17   **Q. Okay. So you type down a report. When you met**
18 **with Detective Sergeant Griffith, do you recall -- let**
19 **me pause for a second. There's time frame from August**
20 **16th to September 18th, I believe, when -- when the --**
21 **when the warrant was signed. It was about a month. Was**
22 **your meeting with Detective Griffith closer on**
23 **to the August board meeting or was it closer toward that**
24 **September 18th when that warrant got signed?**
25   A. I think it was closer to after -- after the

78

1  board meeting because, again, once we generate a report,
2  we turn it over to the detective, and then we go back to
3  our normal duties, i.e. handling kids. ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████
████████████████
10   **Q. Okay. How long was your meeting with Detective**
11 **Sergeant Griffith?**
12   A. I can't -- maybe five or 10 minutes. It's not
13 -- it's just going over my report and, you know, I'll
14 maybe have to make some minor changes maybe. I don't
15 know. But it's not that -- nothing -- nothing that was
16 that long.
17   **Q. Okay. And so you made your report. And then**
18 **like you said, you go back on to other stuff and then**
19 **Detective Sergeant Griffith, you know, she continues**
20 **with her investigation; right?**
21   A. That's correct.
22   **Q. Did you -- did you email her your report? Did**
23 **you hand it over?**
24   A. No, we have a database. So my report is typed,
25 and then she can review it.

79

1    **Q. Uh-huh.**
2    A. And then from there, she prints it off.
3    **Q. Okay. Was your -- did you contribute anything**
4  **else to the database other than your report?**
5    A. So the way our system is set up is we have --
6  we have the database, which is our report writing
7  system, and then we have Axon, which handles all of our
8  evidence, body camera footage, you know, audio, you name
9  it. So everything was submitted between those two.
10   **Q. So you have -- did you have on a body camera**
11 **that right?**
12   A. My body camera wasn't working. Yes. I had to
13 -- the next day I had to do a -- what we call a soft
14 restart.
15   **Q. So you were wearing one, it's just that footage**
16 **is not available?**
17   A. I was wearing one, and it wasn't operational.
18 So we -- we -- so just for your information, this right
19 here, what I'm wearing right now is called a Body Camera
20 4; prior to that was a Body Camera 3, prior to that was
21 a Body Camera 2. We'd just received the Body Camera 3s.
22 Anything that -- as you know, once they put it out,
23 we're the first ones to receive them; we're the test
24 bots.
25   **Q. Military sense --**

80

1    A. So whenever you need it the most, it didn't
2  work. So I was on -- because I am the custodian for
3  Axon videos, I got on the phone, Whitney Cooper's my
4  area rep, and I'm going off. So, "There was a soft
5  reset there." I was on hold, and then it worked.
6    **Q. I totally get it.**
7    A. I plug in -- unplug the computer, restarting
8  the computer, whatever. Same thing.
9    **Q. Yeah. We call it -- in the Navy we call it**
10 **using yesterday's technology tomorrow.**
11   A. Yeah, there you go.
12   **Q. Right? Okay. So do you recall whether Officer**
13 **Pontillo was wearing a body cam that night?**
14   A. Yes, he was.
15   **Q. Do you recall whether he had any problems with**
16 **his?**
17   A. No, he didn't.
18   **Q. So his body camera footage from that night**
19 **should be available?**
20   A. Yes. ███████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

**EXHIBIT K**                                **App. 478**

SERGEANT MILTON NAMON POPE, JR.



81

82

8      (Exhibit 2 marked for identification.)

9      A.  Yes, that's a perfect size.

10     Q.  Okay.  Excellent.  So let's walk through this.

11     Do you -- do you recognize this -- this arrest

12     affidavit?

13     A.  No, I do not.

18     Q.  Okay.  So you have not seen this arrest

19     affidavit before whenever -- for Mr. Story.  Just --

20     just out of your just general knowledge you know that

21     you've not seen it before?

22     A.  Yes, sir.  I mean, I -- not this one.  No, I

23     don't think I have.

24     Q.  Okay.

25     A.  Because we don't -- we don't generally do

83

1      arrest affidavits; the detective does that.

2      Q.  Okay.

3      A.  All I do is submit my report, upload my videos,

4      if available, and any other documentation.  The

5      detective handles all of that.  Again, once we do our

6      part, we go back to trying to protect the kids or, you

7      know, calm parents down.

84

4      This second line is where your name comes up.

5      There's four X's.  It says, "Information provided to me

6      by Round Rock ISD PD Sergeant Milton Pope, a credible

7      person who," and it gives two things here.  It says,

8      "Who personally observed or gathered such information."

9      Now, as I understood your testimony a moment ago, you

10     said that Officer Pontillo would have uploaded his Axon

11     information onto the database, and your -- your input

12     into this process would have been your -- your report

13     your incident report; correct?

14     A.  My report, yes.  And also since I was the

15     reason -- I was -- the reason I have a report -- I'm the

16     primary person for the report is because I was the first

17     person to have interactions with Mr. Story.  Frank --

18     Frank during that -- during the time of questioning,

19     Frank on the other hand has a supplement, so he would

20     have had a supplement report.

21     Q.  Okay.  Well, I'm looking at it right here,

22     though, this supplement report because -- I mean, this

23     is -- this is specifically important because we're kind

24     of slicing and dicing the facts.  This section -- this

25     section where it says, "My belief," you know, it has

EXHIBIT K

App. 479

**SERGEANT MILTON NAMON POPE, JR.**

85

1  that -- before we get to that "Facts supporting my
2  belief," this section is not limited to just these two
3  lines; correct?
4      A. That's correct.
5      Q. I mean, you can put more in here --
6      A. That's common -- that's common verbiage for
7  affidavits.
8      Q. Well, what I mean is, there could be Sergeant
9  -- Detective Sergeant Griffith could have put additional
10  lines in here by inputting other person's names;
11  correct?
12      A. Again, since I was the first person -- primary
13  person on the case, that's why my name is there, and
14  that's common verbiage.

86

1      Q. For example, I'll give you a hypothetical.
2  Since personal knowledge is not checked, but then you
3  got four X's right there on this line, could another
4  line say, "Information provided to me by Round Rock ISD
5  PD Officer Frank Pontillo, a credible person who
6  personally observed or gathered such information"?
7      A. I think it depends on the -- how a department
8  writes affidavits. Since, again, I made first contact
9  with Mr. Story, that's why my name was first.
10      Q. All right.
11      A. Hopefully we --
12      Q. What --
13      A. -- because that's the way I'm understanding
14  your question.
15      Q. Okay. Is this -- and just so I understand how
16  these are formatted and made, is this just a generalized
17  Word document or do you have a program that does this?
18      A. That's a generalized Word document that's
19  generally used throughout the county.
20      Q. Okay. That's fair. I mean, you don't want to
21  redo the wheel. But -- but there's no -- there's
22  nothing prohibiting her from adding a hard return and
23  typing in another -- more lines underneath there where
24  she got the information from; right?
25      A. Again, the way we operate is I'm the first

87

1  person -- if Frank was the first person -- if Frank was
2  the first person that made contact with Mr. Story during
3  this incident, then he would have been listed. I was
4  the first person. If that's the case, we would have
5  50,000 letters -- I mean, 50,000 names on an affidavit.
6  That's what supplements are for. So you submit your
7  affidavit; and then from the affidavit, then you look at
8  your supplements and, "Oh, okay. Well, Williby was
9  there. Oh. Okay. Frank was there." I mean, that's
10  part of the evidence process. If that's the case, we'd
11  have 50,000 names on there. So remember, the judge has
12  to read this. I mean, we can't tie him up. So that's
13  the way it is.
14      Q. Okay. And that -- that -- that makes sense.
15  I'm just trying to get what your experience and
16  knowledge is on this. So -- so regardless of the amount
17  of information that goes into this, what goes right
18  there that Detective Sergeant Griffith is -- is -- is
19  averring and swearing to in front of the magistrate is
20  just your name; correct?
21      A. That's correct.

88

**EXHIBIT K**    **App. 480**

**SERGEANT MILTON NAMON POPE, JR.**



89

21     Q. Okay. That's fair. If your report says
22 something other than "subject to the mask mandate" --
23 actually, let me pause there. Does it make sense that
24 there's kind of a -- there are gaps and transfers of
25 information between you experiencing it and you -- and

90

1    then the report being read by Detective Sergeant
2    Griffith, and then her writing her understanding on this
3    affidavit? Does that make sense?
4      A. Me reading -- just briefly reading the
5 affidavit, it pretty much mirrors the report. Remember,
6 the affidavit is not the report. The affidavit is just
7 a synopsis of the report so we can present it to the
8 judge. Again, if we end up with an affidavit that
9 mirrored a report -- if a report is five pages, we would
10 not get anything to the -- the judicial system. That's
11 why an affidavit is a precursor or a introduction to
12 whatever the crime is. So of course this right here may
13 be a little bit lacking because of the report. The
14 report is the evidence. So once you go to court, then
15 the report, all the evidence, all that stuff, as you're
16 aware of, is submitted. An affidavit is just a
17 synopsis. You know, again, I've -- I've turned in
18 affidavits that was like, I don't know, crazy verbiage
19 and all kind of -- and the judge is like, "What is this?
20 Summarize it. Summarize it. Summarize it." You know,
21 we already have the elements. That's what we're looking
22 for. "We got the elements?" "Yes, we have the
23 elements." "Okay. Why are you telling me the story?
24 We got the elements. I'm going to see your report
25 during the trial, let's go." So this --

91

1      Q. Okay.
2      A. -- this right here is -- is -- you're comparing
3 this to my report and -- and you can't. That's what I'm
4 saying. I mean, we should have a judge on this panel.
5 They'll tell you the same thing, "No one wants to read
6 50,000 words. Tell me what's going on because I got 50
7 other cases I got to deal with." Just like me, I got 50
8 other arrests. It's the same thing, sir. So I don't
9 understand what you're trying to say with this affidavit
10 stuff.
11      Q. Well --
12      A. It's an affidavit and it's -- it's -- it's it's a
13 summary. That's all it is.
14      Q. And I understand.
15      A. This verbiage, that sentence, it's an
16 affidavit. It's a brief.

92

19      Q. I want to compare the agenda item, which is
20 P-1, all 2021 COVID-19 health and safety protocols.
21 It's fair to say that the mask mandate relates to that
22 in a summary form as you've stated; right? Because this
23 is a summary; right?
24      A. Yes.
25      Q. All right. And your report, we're going to go

SERGEANT MILTON NAMON POPE, JR.

**93**

1  over that, but as it is right now, this topic is
2  probably and may be written -- because it's an agenda
3  item, probably written broader than that.  Would you
4  agree?
5      A.  It refers to COVID-19 safety protocols.  That's
6  the way I'm interpreting it.  I'm not interpreting it
7  other than anything else.  I'm not interpreting it as
8  drunk driving.  I'm not interpreting it as how many
9  police officers we have.  What I'm interpreting it is,
10 it pertains to COVID-19.
11     Q.  Okay.
12     A.  That's the subject of this sentence, COVID-19.
13     Q.  Okay.  So --
14     A.  That's the way I interpret that.

[redacted]

**94**

[redacted]

7      Q.  Okay.  That's fair.  All right.  Let's go back.
8  So the next sentence, "Affiant learned Round Rock ISD
9  Board of Trustee President Amy Weir informed Story he
10 was attending a called meeting and would only be able to
11 speak about the items on the agenda, specifically the
12 mask mandate."  Is that -- is that what you recall?  Is
13 that what you recall happening?  I'm going back to your
14 memory of what happened, not your report.  Is that what
15 you recall happened?
16     A.  All I know is we were going -- the -- the
17 meeting was going to be about mask mandates and COVID
18 protocols.
19     Q.  Okay.
20     A.  Again, in affidavits we subject as police
21 officers since we're not, you know, English scholars and
22 we understand who we're dealing with.  When we're
23 dealing with judges, we may summarize something.  So if
24 you tell me it's a mask mandate, I'm under the
25 impression that we're talking about COVID-19 issues.

**95**

1      Q.  All right.  That's fair.  I'm not angry that
2  it's a summary.  I'm not bothered that it's a summary.
3  I'm just trying to see if this affidavit in summary
4  style reflects your memory of the event.  That's the
5  only things I'm comparing.  I'm let you know what I'm
6  comparing.  I'm comparing your memory of the event with
7  this affidavit.  Do you recall Mr. Story -- excuse me.
8  Do you recall the board president saying he's only going
9  to be able to speak about items on the agenda?
10     A.  Yes.

[redacted]

19     Q.  Okay.  No problem.  So the next one, I'll read
20 this sentence and we'll talk about that.  "Affiant
21 learned during the duration of Story's time to speak
22 Round Rock ISD Board of Trustee President Amy Weir
23 instructed Story to stop speaking on unrelated topics
24 and to only discuss the mask mandate."  Do you remember
25 that taking place?

**96**

1      A.  Yes.
2      Q.  Okay.  Next sentence.  "Affiant learned while
3  Story was discussing the unrelated topics Story had
4  several outbursts."  Do you remember that taking place?
5      A.  I remember him elevating his voice.  Yes.
6      Q.  Okay.  So let's pause there.
7      A.  And we can look at the video too.  That's --

[redacted]

10     Q.  Let's pause there.  I want to go back to that
11 night.  When Mr. Story started talking, did the board
12 chair do anything to the microphone he was speaking
13 through when he was talking?
14     A.  After she told him to -- after she told him --
15 I want to say it was muted after she told him several
16 times to stay on topic, I think.

[redacted]

EXHIBIT K                        App. 482

SERGEANT MILTON NAMON POPE, JR.



**97**

**99**

8   Q. -- the -- the -- hold on.  Let me finish my
9   question first, sir.  Were -- did they continue to talk
10  at the same volume through their microphones?
11      A.  I cannot recall, but I do recall Mr. Story
12  continuing to speak.
13      Q.  Okay.  So you don't know if they continued to
14  speak at the same time?
15      A.  I cannot recall.
16      Q.  Okay.
17      A.  But I do remember President Weir telling him
18  several times, you know, "You can't" -- You can't
19  discuss this topic.  You can't discuss this topic.  You
20  can't discuss" -- "discuss this topic."  Then she said,
21  "You know what, escort him out.  We told you one time,
22  escort him out."  And that's what we did.
23      Q.  Okay.  Do you recall any of the other board of
24  trustees members speaking up at that time?
25      A.  No.  Because at the end of the time -- again,

**98**

12      Q.  (By Mr. Casey)  Okay.  Thank you.  All right.
13  So when -- when the mic -- and I'll represent to you, on
14  the video we're going to talk about the later, the mic
15  gets turned off.  You -- you heard Mr. Story elevate his
16  voice?
17      A.  Yes.  It wasn't at a normal tone.

**100**

1   when I have a situation and I have an individual that's
2   in front of me, I don't have time to be looking at
3   everyone else.  I have to look at the subject.  Okay?
4   Not knowing Mr. Story's history, he could have a weapon
5   on him.  I don't know.  So I'm looking at hands, I'm
6   looking at him, and then I'm trying to go ahead on and
7   -- and, as you say, de-escalate the situation by getting
8   him out in a -- in a professional manner.
9       Q.  Okay.  So my question's going to be real
10  specific.
11      A.  Okay.
12      Q.  You -- while you were looking at Mr. Story, you
13  continued to hear the Board President Amy Weir telling
14  him to stop speaking; correct?
15      A.  I heard him -- I heard her give him a directive
16  several times --
17      Q.  Okay.
18      A.  -- not to speak --
19      Q.  And was your -- once she started giving him
20  directives, were you already looking at him?
21      A.  Yes.
22      Q.  Okay.  And did she continue to give him
23  directives while you were walking toward him?
24      A.  I start walking towards him when she instructed
25  me to escort him out.

EXHIBIT K                               App. 483

SERGEANT MILTON NAMON POPE, JR.

101

1    Q.  Okay.

2        A.  After that, I did not -- I did not walk to him.

3    I just -- of course I'm looking at him because at the

4    particular time he was the subject at hand.  So by him

5    being the subject at hand, I'm looking at him.  Again,

6    I'm going through safety protocols.  I'm looking at

7    waistbands.  I'm looking at hands.  That's what I'm

8    looking at.  I'm looking at his demeanor.  So I did

9    engage him.  I didn't walk towards him until I received

10   a directive, "Please escort Mr. Story out."

103

2        Q.  And I appreciate the desire to want to fill in.

3    It's a natural desire.  Did the superintendent give you

4    any specific direction --

5        A.  No.

6        Q.  -- at that time regarding Mr. Story?

7        A.  And if I may, please, just say one thing.

8        Q.  I -- sir --

9        A.  If --

10       MS. LONG:  Sergeant, let -- Sergeant Pope,

11   just answer the question.

12       THE WITNESS:  Yes, ma'am.

13       MS. LONG:  And -- and I can ask you

14   questions at the end.  But his question was, did the

15   superintendent give you any directives.

16       A.  Not at all.  Never.  I apologize.

17       Q.  (By Mr. Casey)  Okay.  And when I can't say

18   "directives," did he give you any nonverbals like nod

19   his head or motion toward the door at all?

20       A.  No.  No, sir.  Not at all.

21       Q.  Okay.  All right.  The language in here -- and

22   we -- we kind of had to do something specific -- but the

23   language in here that I was curious about, it says

24   "verbal outbursts."  What -- how do you define, based on

25   where you were there that night, would be a verbal

102

104

1    outburst?

2        A.  Well, he elevated his voice.  And as we was

3    escorting him out -- and you can look at the video.

4    He's also -- so the individuals that are watching, you

5    know, the meeting and abiding by the rules as he's

6    passed -- as we're escorting him out, he's screaming.

7    They can't even watch the meeting.  So that was another

8    disruption.  Yes, he was -- he -- he -- voice was super

9    elevated.  As we got out and we were in front of the

10   audience, it got super elevated.  And it's in the video,

11   you can see it.

12       Q.  We will go to the video, sir.  I'm just trying

13   to go through these kind of sequentially.  So thank you

14   for explaining that.

15       Okay.  All right.  So this is the last portion

16   of it.  I'm going to look at the last -- the last

17   sentence, there's two words there.  And because

18   Detective Sergeant Griffith wasn't there and she's

19   getting this secondhand from -- and I'm assuming the

20   supplement was already written by this time.  It says,

21   "Story continued to resist officers, yell and scream,

22   causing a major disruption during the board meeting."

23   Do you make a distinction, do you recall, in your report

24   between yelling and screaming?

25       A.  Again, it depends on your definition.  My

15       Q.  All right.  Did the superintendent give you any

16   direction or physical indication on what to do at that

17   moment in time?

18       A.  No.  So let me just say something real quick.

19   Let me just clear the air up on --

20       Q.  There's no -- I'm just asking narrow questions,

21   sir.

22       A.  Okay.

EXHIBIT K                                        App. 484



105

1   definition is his voice was extremely elevated.  So that
2   right there covers all of it, everything -- it --
3      Q.  Okay.
4      A.  It's not -- it's not -- his voice wasn't, like
5   -- like mine right now, like yours.  No, that's normal
6   tone.  So anything other than normal tone if he has an
7   elevated voice.  And that's what --

107

13         (Exhibit 3 marked for identification.)

106

108

SERGEANT MILTON NAMON POPE, JR.



117

119

118

120

2    Q. So -- so you just mentioned the offer of the
3    seat. He was seated. Then it said, "He made two
4    outbursts. I'm not sure what" -- "what was said." I
5    want to make sure that this term outburst, I'm
6    understanding it to make sure whether you're using it in
7    a general sense or a specific sense and how the outburst
8    was made. Was this outburst a singular shout?
9        A. I cannot recall, but there was two times he
10   made -- he made a loud statement.
11       Q. Okay.
12       A. I think it was during another individual's time
13   at the podium, so...

121

123

122

124

14    Q.  Okay.  And I -- that's what I was getting at
15  because it seemed to be very important to you when we
16  were talking about the affidavit that that was a
17  summary.  And so I'm just making sure that -- that I
18  understand the distinction correctly.
19         So then it says, "Story acknowledged that he
20  did."  Then this next sentence says, "Story spoke on
21  issues concerning the mask mandate, and suddenly
22  transitioned into an unrelated topic about the
23  superintendent and the protective" -- "and the
24  protective order."  So what I understand this to be --
25  because when we talked about -- before we talked about

1   the arrest affidavit, we talked about your memory of it.
2   And you said -- you started speaking about the
3   superintendent.  And I'm going to go back to my notes.
4   And I don't know if you -- I don't recall you saying
5   that there was a gap.  You said he -- hold on.  You said
6   "halfway through."  There you go.  "Situation with the
7   superintendent about halfway through."  Okay.
8          So do you recall when he was -- when he -- he
9   shifted -- when he transitioned into this unrelated
10  topic?  Do you recall anything about this -- this
11  transition?  Was it -- was it abrupt or was it -- do you
12  recall him trying to relate it back to the mask mandate?
13    A.  Two different subjects, that's what I
14  understood.  That's the way I interpreted it.
15    Q.  And I -- I didn't hear the very first phrase of
16  what you said.
17    A.  Yes, I interpreted it as two different
18  subjects.
19    Q.  Okay.
20    A.  He transitioned to two different subjects.  One
21  not relating to the other.
22    Q.  Okay.  And -- and so you don't recall him
23  saying in any way that those two subjects were related?
24    A.  I don't see how they are related.

SERGEANT MILTON NAMON POPE, JR.



8    Q. Okay. All right. So this next section
9  describes what you and I have talked about before. You
10  say you "grabbed Story around the arm and both Officer
11  Pope and Pontillo forcibly escorted him out of the
12  room." And when you say "forcibly," that was because he
13  -- he resisted your escort?
14    A. Yes.
15    Q. Okay. In what ways did he resist your escort?
16    A. He stiffened up. He didn't move his legs. He
17  didn't -- he didn't go into a -- as I can recall, he
18  didn't go into a -- like a deadweight move. Because if
19  he had done that, then he probably would have fell to
20  the ground and we would have had to escort him out by
21  hands and feet. So he just kind of stiffened up and
22  tried to stand as -- as -- just stand.
23    Q. Okay. And so by you-all grabbing him by the
24  arm and moving him, I'm going to -- I'm going to guess
25  -- by the way, I've done -- I don't have the experience

EXHIBIT K                          App. 488

SERGEANT MILTON NAMON POPE, JR.



**129**

1  you have in law enforcement, but I have a, you know,
2  fourth-degree black belt in Karate and done security
3  before, so I kind of understand this.
4      When you grabbed him by the arm, he had to
5  move his feet or else he would have fell on his face;
6  right?
7      A. Again, he did not -- he resisted, so we -- he
8  was -- we -- I would say like a little -- probably a
9  little minor drag, a tug.
10     Q. Okay. So were you -- you and Officer Pontillo
11  supporting his bodyweight?
12     A. We was pulling him and supporting him I would
13  say.
14     Q. Okay. But he didn't go deadweight you're
15  saying?
16     A. Not that I can recall. It was --
17     Q. All right.
18     A. -- resisting. It was more like we're going
19  forward, he's trying to go backwards.
20     Q. Okay.
21     A. Holding -- holding his -- trying to just hold
22  the ground.
23     Q. Okay. All right. So you escort him from the
24  room to the main entrance overflow sitting area. There
25  were public citizens there. You continued to reason

**130**

1  with Story. What does that -- that third line on the
2  bottom? What were you telling him?
3      A. "Let's go, sir." Again, it's part
4  de-escalation. You know, "Let's go, sir. I understand.
5  Let's go, sir." You can hear that verbatim on the
6  video.
7      Q. Okay.
8      A. Not one time did I use any profanity. Not at
9  one time did I raise my voice. I was very, very
10  professional and courteous -- courteous -- courteous
11  with Mr. Story as I --
12     Q. And -- yeah.
13     A. -- as I was escorting him out.
14     Q. Okay. And I don't think anyone's saying you
15  used profanity.
16     A. I'm sorry?
17     Q. No one's saying you used profanity.
18     A. Oh, no. I understand that, but I'm -- I'm --
19  what I'm trying to do is draw a picture for you on what
20  I did to help de-escalate the situation and show, you
21  know, although, you know, he may have -- although he may
22  -- he con--- he committed an offense, okay, per se, I
23  was still giving him that dignity and that
24  professionalism. That's what I'm trying to --
25     Q. Okay.

**131**

1      A. -- get you to see.

14         All right. So I stopped the share. All
15  right. Would you agree that Mr. Story's outburst, as
16  you recall when he was talking, happened after the mic
17  was cut off?
18     A. I think it started once he brought up the
19  subject, and then President Weir and him went back and
20  forth. She was telling him, "Hey, you can't say this,"
21  and he kept elevating, elevating, elevating, elevating
22  as far as...
23     Q. Okay. So the shouting -- the outburst from a
24  -- so I want to understand the timeline from what you
25  just described to make sure I'm receiving what you're

**132**

1  saying accurately. The mic was cut off, and he began to
2  elevate his voice. And at that point, that -- that
3  constituted what -- after the mic was cut off, of the
4  outburst?
5      A. I think it probably would -- could have been
6  before the mic was cut off. Because again, when she
7  told him, "Hey, you're getting off topic. We're not
8  going to discuss this," then he just kept on trying to
9  get his point across.
10     Q. So when -- when she said -- when he kept trying
11  to get his point across, if he was talking over her,
12  would that be an outburst?
13     A. That would be considered one. Yes.

19     Q. Okay. All right. All right. Let's go to
20  what's -- let me show you what's Plaintiff's Exhibit 5.
21  It was produced by your attorney during discovery, Round
22  Rock ISD 06324. I'll ask if you are familiar with this
23  form. Let me expand it a little bit. Do you remember
24  this form?
25         (Exhibit 5 marked for identification.)

SERGEANT MILTON NAMON POPE, JR.

133

1    A.  Yes.
2        Q.  Okay.  Okay.  So when you talk about -- now,
3    this is the date from the 16th of August; right?
4    A.  Yes.
5        Q.  Okay.  So, "The subject's actions" -- I want to
6    go back to your -- your recollection of the event.  You
7    have, "Refusal to move, dead weight," you checked that
8    box.  You checked, "Dead weight, clinging to objects,
9    preventing custody."  Out of those three, which -- what
10   was -- you said you -- well, you didn't recall him doing
11   deadweight.  This might have refreshed your memory.
12   Does that refresh you memory at all?
13       A.  Yeah, when I mean deadweight, I'm talking about
14   -- I'm talking about dead weight as just dropping down.
15   Deadweight can also apply to just him placing his feet
16   and just resisting.  You know, preventing movement.  So
17   his feet can also cause deadweight as well.  That's what
18   I was referring to there.
19       Q.  Okay.  Was he clinging to any objects?
20       A.  No.  I -- we had both arms.  He had his
21   computer in his hand.
22       Q.  Okay.  And -- and I guess from your
23   perspective -- I don't want to assume -- he was
24   preventing custody?
25       A.  Yes.

134

1        Q.  Okay.  It says, "Pulling, pushing, running away
2    to avoid control, not harming an officer."  Is that --
3    is that like a summary sentence or are these separate
4    categories when you're filling this out?
5        A.  It's a summary.  Just, you know, they give you
6    different options.  You know, that way you can
7    articulate to the jury or the judge of how severe the
8    situation was.  You know, did he fight us?  No, he did
9    not fight us.  Did he resist us?  Yes, he did.
10       Q.  Okay.  "Officer's actions."  You -- you
11   mentioned verbal direction.  The soft weapons control,
12   the -- the three -- are -- are these three, muscling,
13   joint lock, pressure points, are those kind of summary
14   actions and there's more underneath soft weapons control
15   than just those three?
16       A.  Yeah.  That right there are the two least
17   options that we have.
18       Q.  When you say the two, there's three things
19   there.
20       A.  I'm looking at -- I'm looking at one, two.  I'm
21   looking at -- I'm looking at verbal de-escalation and
22   soft weaponless.  That's what I'm talking about.
23       Q.  Oh, I'm sorry.  I apologize.  I was -- and I
24   was poor -- that was fault on my part.  I'm referring to
25   this parenthetical right there following the words,

135

1        "Soft weapon," and it says, "Muscling, joint locks,
2    pressure points."
3        A.  Muscling basically is when you grab someone.
4    You know, basically you're taking -- taking control of
5    them.  That's what I'm saying --
6        Q.  Okay.
7        A.  -- it's -- it's a lesser use of force.  You
8    know, then you have, you know, hard weaponless when, you
9    know, we doing hard strikes, OC spray, ASP/baton, you
10   know, TASER, things of that nature.  So these two right
11   here, if -- if I -- if I just gave him verbal direction
12   and he left, then it would have just been verbal
13   direction.  But we also had to put our hands on him, so
14   I have to articulate that, yes, we did come in contact
15   with Mr. Story to remove him from the -- from the
16   boardroom.
17       Q.  Okay.  And this right here, this officer
18   summary, "Officer Pope grabbed Story around the arm and
19   both Officer Pope and Pontillo forcibly escorted him out
20   of the building" -- "board meeting while Story continued
21   to resist, yell and scream."  Okay.  So it says right
22   here at the top, "Type of force ultimately successful in
23   control of the subject."  So that's asking you to list
24   what you did; right?
25       A.  That's correct.  Yes.

136

1        Q.  Okay.  This -- this second -- this second
2    sentence, this may be customary or it may just be an
3    anomaly.  When you write this that, "He continued to
4    resist, yell and scream, causing a major disruption to
5    the board meeting as officers worked to remove him from
6    the room."
7        A.  Yes.

EXHIBIT K                                   App. 490

SERGEANT MILTON NAMON POPE, JR.



165

167

23   Q.  (By Mr. Casey)  I'm asking about in -- in a
24   meeting like that, when someone wants to draw an
25   analogy, is there any topic that they are prohibited, to

166

168

1   your understanding of as a law enforcement officer
2   having to be familiar with the constitution, is there
3   any topic that they can't use to draw a comparison?
4       A.  Let me say this, I follow the directives -- the
5   directives of the board president.  That's it.  So I'm
6   not -- I don't -- I'm not here to interpret that.  My --
7   I'm just scanning the room.  If she says an individual
8   needs to leave, then an individual needs to leave.
9       Q.  Okay.  So you exercise no independent judgment
10  about an individual's constitutional rights when the
11  board president tells you to do something; is that what
12  you're saying?  That you are -- let me characterize it
13  -- and I don't mean this in a negative sense.  I'm
14  trying to define the boundaries of your
15  responsibilities.  If the board president tells you to
16  do something --
17      A.  No.
18      Q.  -- you do -- you're not thinking about
19  constitutional rights; correct?
20      A.  When the board president tells me to do
21  something when there is a violation of the law.  Now, if
22  the board president tells me to go ahead and arrest a
23  person that hasn't done anything, that's something
24  totally different.  But when an individual violates the
25  law, that's a -- that's a total different scenario.

SERGEANT MILTON NAMON POPE, JR.



**169**

1   **Q. Okay.**
2   A. Especially when the law specifically states
3   that.
4   **Q. Okay. That's fair. And so when the board**
5   **president shuts off Mr. Story's microphone and tells him**
6   **to stop talking, at that point is she telling him that**
7   **his speech needs to cease?**
8   A. I don't know what she's thinking. That's
9   not --

**171**

9   **Q. All right. So in order to violate someone's**
10  **free speech rights, isn't it true that when the board**
11  **president talked, told him to stop speaking -- I'm not**
12  **asking you to make a legal conclusion -- that he had to**
13  **stop speaking, according to you, right when she said**
14  **stop?**
15  A. You know, that's a very -- that's very vague.
16  Because, again, we have rules at the meeting. So that's
17  what I'm saying. I'm -- you're confusing me. We have
18  rules of a meeting. If I go into a meeting and I'm
19  speaking off topic, yes, I can be told to be quiet.
20  That's no different than me going into a theater and
21  yelling fire.
22  **Q. Okay.**
23  A. We're not allowed to yell that. Then it's the
24  same thing.
25  **Q. All right.**

**170**

**172**

1   A. But I mean, I'm not understanding you. I mean,
2   it's --
3   **Q. Yeah. That's fine.**
4   A. -- you're asking me to make a broad statement.
5   And what I'm telling you is, these are the rules. So if
6   those are the rules --
7   **Q. Okay.**
8   A. -- you know, that -- those are the rules.

SERGEANT MILTON NAMON POPE, JR.

173

21    It's at this point, as I understand your
22  testimony in the last few minutes, you are not really
23  thinking about whether he's on topic or not?
24        (Mr. Story exits.)
25    A.  No.

174

1    Q.  Okay.
2    A.  That's not my -- that's not my job.

175

1    Q.  Yeah.  Yeah.  That's my fault.  Which
2  constitutional rights of Mr. Story did you consider at
3  this moment?
4    A.  Obviously, it'd be his First Amendment.  But
5  again, you know, I'll go back to the, you know, you just
6  can't say what you want.  We have rules in place for a
7  reason, and that's to conduct a professional-held
8  meeting.  And if that's the case, everyone would just
9  say whatever they want to say and we wouldn't get
10  anything done in meetings.
11        So -- so if he doesn't abide by the rules of
12  the meeting that was set forth before, then he's causing
13  a disruption -- which at that time he was -- I get the
14  directive.  You know, he could -- again, he could have
15  been just using profanity, whatever the case is.  Not my
16  issue.  Okay?  If the board president says, "Hey, you
17  know what, this is an interruption, she needs to" -- "he
18  needs to be escorted out," I'm going to escort him out.

176

18    Q.  If he had followed one of the other speakers
19  and referenced Frederick Douglass, would you have a
20  problem with that?
21    A.  Let me just make this clear, regardless if I
22  have a -- regardless if I have a problem with it or not,
23  it's -- that's not up for me to interpret.  Okay?
24  Again, there's -- there are -- there are rules and
25  there's a law.  So in the law and the rules, it



**177**

1  basically says you can't disrupt the meeting.  So if the
2  agenda, is A, B and C, you start talking about Q, we
3  give you a -- well, not we -- they give a verbal, "Hey,
4  listen, we're not talking about that."  You continue to
5  talk about Q, now you're disrupting a meeting.  That's a
6  basic.  It's so simple.
7      Q.  And -- and do you -- well, you say it's simple.
8      A.  It is.
9      Q.  Well, let's -- so does the board chair then
10  have kind of pretty broad discretion, in your mind, to
11  discern what's on topic and what's off topic?
12      A.  I'm not privy to that.  However, if these -- if
13  when I walk in there and -- and again, A, B, and C is on
14  the agenda, you're speaking of Q, just because you're
15  speaking of Q, that doesn't mean I'm going to go ahead
16  and just remove you.  But if I'm directed to remove you
17  because you are creating a disruption to the meeting,
18  then that's what's going to happen.

25      Q.  He says superintendent.  So is it -- is it fair

**178**

1  to say that you can make an analogy about anything not
2  using profanity about any topic and tie it back in like
3  the other speakers, except if you use an analogy about
4  the superintendent?
5      MS. LONG:  Objection to the extent it
6  mischaracterizes his prior testimony.
7      A.  Mr. Story was speaking of the mask mandate up
8  until that point, then he changed topics.
9      Q.  (By Mr. Casey)  Okay.  Okay.  Was -- now when
10  we listen to Elaine Chow -- or excuse me -- so Elaine
11  Lee's statement, she was talking about the mask mandate,
12  and then she shifted to talk about Ted Cruz; right?
13      A.  In reference to his daughter attending a school
14  that man- -- a private school that mandated a mask.
15      Q.  I agree a hundred percent.  But that -- that --
16  you had to listen to her whole sentence to figure that
17  out; isn't it true?
18      A.  I -- I'll -- that's what -- because it's real
19  quick.  I mean, this was straight up, you know.

**179**

**180**

23      Q.  Okay.  So then let's go think about Jeremy
24  Story.  Is it understandable -- not necessarily whether
25  you agree with it because you didn't agree with

**EXHIBIT K**                    **App. 494**

SERGEANT MILTON NAMON POPE, JR.



181

1  Catherine Wrightmire's analogy.  Is it understandable
2  that Jeremy Story appears, based on the words that we
3  read, to be relating the superintendent's protective
4  order back to the mask mandate?
5          MS. LONG:  Objection.  Foundation, best
6  evidence, and speculation.
7      Q.  (By Mr. Casey)  Okay.  You can go ahead and
8  answer, sir.
9      A.  No.  If it's me personally speaking -- if I'm
10  just personally speaking, no, I don't think so, but --

EXHIBIT K                                App. 495

SERGEANT MILTON NAMON POPE, JR.



197

198

199

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF TEXAS
                   AUSTIN DIVISION
 3   JEREMY STORY,            *
         Plaintiff,           *
                              *
 4   v.                       *  CIVIL ACTION NO.
                              *  1:22-cv-448
 5                            *
     SUPERINTENDENT HAFEDH    *
 6   AZAIEZ, TRUSTEES AMBER   *
     FELLER, TIFFANIE HARRISON, *
 7   AMY WEIR, JUN XIAO, CORY *
     VESSA; OFFICERS JEFFREY  *
 8   YARBROUGH, JAMES WILLIBY, *
     DEBORAH GRIFFITH, MILTON *
 9   POPE, FRANK PONTILLO, RON *
     COLE, CHIEF DENNIS WEINER, *
10   and CARLA AMACHER,       *
     individually, and ROUND  *
11   ROCK INDEP. SCHOOL       *
     DISTRICT,                *
12       Defendants.          *
13
14           REPORTER'S CERTIFICATION
     DEPOSITION OF SERGEANT MILTON NAMON POPE, JR.
15             OCTOBER 30, 2025
              (REPORTED REMOTELY)
16
17      I, Kristy Owen, Certified Shorthand Reporter, duly
18   qualified in and for the State of Texas, do hereby
19   certify to the following:
20      That the witness, SERGEANT MILTON NAMON POPE, JR.,
21   was duly sworn by the officer and that the transcript of
22   the oral deposition is a true record of the testimony
23   given by the witness;
24      I further certify that pursuant to FRCP Rule
25   30(f)(1) that the signature of the deponent:
```

200

```
 1      _X_ was requested by the deponent or a party before
 2   the completion of the deposition and that the signature
 3   is to be before any notary public and returned within 30
 4   days from date of receipt of the transcript.  If
 5   returned, the attached Changes and Signature Page
 6   contains any changes and the reasons therefor:
 7      __ was not requested by the deponent or a party
 8   before the completion of the deposition.
 9      I further certify that I am neither counsel for,
10   related to, nor employed by any of the parties or
11   attorneys in the action in which this proceeding was
12   taken, and further that I am not financially or
13   otherwise interested in the outcome of the action.
14
15      Certified to by me this 18th day of November, 2025.
16
17
18
     _____
19   KRISTY OWEN, RPR, Texas CSR 10790
     RPR Expiration Date:  9-30-2026
20   CSR Expiration Date:  7-31-2026
     STOVALL REPORTING & VIDEO, INC.
21   Firm Registration No. 10259
     1414 Creekview Drive
22   Lewisville, Texas  75067
     Phone:  (214) 695-2024
23
24
25
```

EXHIBIT K                    App. 496