**DANIELLE MARIE WESTON**

**Page 1**

```
            IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF TEXAS
                    AUSTIN DIVISION

JEREMY STORY,                        *
        Plaintiff,                   *
                                     *
v.                                   *   CIVIL ACTION NO.
                                     *   1:22-cv-00448-DAE
                                     *
SUPERINTENDENT HAFEDH                *
AZAIEZ, TRUSTEES AMBER               *
FELLER, TIFFANIE HARRISON,           *
AMY WEIR, JUN XIAO, CORY             *
VESSA; OFFICERS JEFFREY              *
YARBROUGH, JAMES WILLIBY,            *
DEBORAH GRIFFITH, MILTON             *
POPE, FRANK PONTILLO, RON            *
COLE, CHIEF DENNIS WEINER,           *
and CARLA AMACHER,                   *
individually, and ROUND              *
ROCK INDEP. SCHOOL                   *
DISTRICT,                            *
        Defendants.                  *

----------------------------------------------------
        ORAL AND VIDEOTAPED DEPOSITION OF

                DANIELLE MARIE WESTON

                    APRIL 22, 2025

                 (REPORTED REMOTELY)
----------------------------------------------------


        ORAL AND VIDEOTAPED DEPOSITION of DANIELLE MARIE
WESTON, produced as a witness at the instance of the
Defendants, and duly sworn, was taken in the
above-styled and -numbered cause on the 22nd day of
April, 2025, from 9:16 a.m. to 3:34 p.m., before Kristy
Owen, CSR, in and for the State of Texas, reported by
```

**Page 2**

```
machine shorthand with the witness appearing via Zoom
from 3216 Sanibel Court, in the City of Round Rock,
County of Williamson, Texas, pursuant to the Federal
Rules of Civil Procedure.
```

**Page 3**

```
                    A P P E A R A N C E S

FOR THE PLAINTIFF (via Zoom):
    Mr. Stephen D. Casey
    Casey Law Office, P.C.
    P.O. Box 2451
    Round Rock, Texas 78680
    stephen@caseylawoffice.us
FOR THE DEFENDANTS (via Zoom):
    Ms. Kathryn E. Long
    Mr. Ibrahim Yaseen
    Mr. K. Adam Rothey (Enters on page 179.)
    Thompson & Horton LLP
    500 North Akard Street
    Suite 3150
    Dallas, Texas 75201
    Phone: (972) 853-5115
    Fax: (713) 583-8884
    klong@thompsonhorton.com
    iyaseen@thompsonhorton.com
    arothey@thompsonhorton.com
FOR THE DEPONENT (via Zoom):
    Mr. Tony McDonald
    The Law Office of Tony McDonald
    1308 Ranchers Legacy Trail
    Fort Worth, Texas 76126
    Phone:  (512) 200-3608
    tony@tonymcdonald.com

ALSO PRESENT (via Zoom):
    Mr. Forrest Gunderson, Videographer
    Ms. Cindy Hill, General Counsel for Round Rock
    Independent School District

    Mr. Jeremy Story, Plaintiff (Enters page 16.)
    (Exits page 145.) (Enters page 150.)
```

**Page 4**

```
                    I N D E X

Appearances.................................   3

DANIELLE MARIE WESTON

    Examination by Ms. Long...................   7

    Examination by Mr. Casey..................  197

    Further Examination by Ms. Long...........  236

    Further Examination by Mr. Casey..........  239

Reporter's Certificate........................  242

                    EXHIBITS
NO.  DESCRIPTION                          PAGE
 1   (Not introduced.)
 2   (Not introduced.)
 3   (Not introduced.)
 4   (Not introduced.)
 5   (Not introduced.)
 6   Weston Declaration........................  15
 7   (Not introduced.)
 8   May 21, 2021 Board Agenda.................  48
 9   5/21/21 Minutes Called Board Meeting.......  49
10   Story July 23 2021 Emails to Board.........  54
11   July 25 and Aug 2 Weston Response to Story.  73
12   (Not introduced.)
13   (Not introduced.)
14   (Not introduced.)
```

**DANIELLE MARIE WESTON**

---

**Page 5**

(Exhibits cont'd)

NO.  DESCRIPTION                    PAGE

15  (Not introduced.)

16  August 16, 2021 Board Agenda............... 79

17  Story and Weston Messages.................. 82

18  (Not introduced.)

19  (Not introduced.)

20  (Not introduced.)

21  Affidavit for Warrant of Arrest............ 152

22  (Not introduced.)

23  GKDA (Local)............................... 168

(NOTE: Pages 61 and 62 marked confidential.)

---

**Page 7**

6      THE REPORTER:  Thank you.  Ms. Weston, I'm

7  going to put you under oath.  Will you raise your right

8  hand, please?

9          (Witness sworn.)

10      THE REPORTER:  All right.  Thank you.

11  Counsel, you may proceed.

12          DANIELLE MARIE WESTON,

13  having been duly sworn, testified as follows:

14          EXAMINATION

15  BY MS. LONG:

16    Q.  Good morning, Ms. Weston.  Could you please

17  state your full name for the record.

18    A.  Danielle Marie Weston.

---

**Page 6**

---

**Page 8**

---

**EXHIBIT L**

DANIELLE MARIE WESTON



**Page 11:**

17   Q.  Were you previously a trustee on Round Rock
18   ISD's Board of Trustees?
19   A.  Yes.
20   Q.  When were you first elected?
21   A.  November of 2020.
22   Q.  And what was -- do you recall the date you were
23   sworn in as a trustee?
24   A.  I do not recall the date.  It was sometime in
25   the middle -- before Thanksgiving in the middle of the

**Page 12:**

1   month.
2   Q.  But sometime in November 2020?
3   A.  Yes, ma'am.
4   Q.  Okay.  And were you only elected one time or
5   did you ever seek reelection?
6   A.  I -- I served one term.  I did not seek
7   reelection.
8   Q.  What was your final date as a trustee?
9   A.  It was in November of 2024.  I don't remember
10   what exact date in November of 2024.
11   Q.  So generally speaking, you served from November
12   of 2020 to November 2024 as a trustee on Round Rock
13   ISD's Board of Trustees?
14   A.  Yes.

## DANIELLE MARIE WESTON



**Page 19**

8  Q.  When did you first meet Jeremy Story?
9  A.  I'm not sure that I know exactly when I first
10  met him, but I knew him prior to my election in 2020.  I
11  -- I don't remember exactly when we met.
12  Q.  Do you remember in what context you met Jeremy
13  Story?
14  A.  My political campaign.
15  Q.  And is that your political campaign for Board
16  of Trustees?
17  A.  Yes.
18  Q.  Did he support your political campaign?
19  A.  Yes.
20  Q.  Did he contribute financially to your political
21  campaign?
22  A.  I -- I don't believe so.  I'm not 100 percent
23  sure, but I do not believe that he did.
24  Q.  And how did he support your political campaign?
25  A.  My memory is watching him talk to voters as

**Page 20**

1  they approached the poling location to encourage them to
2  vote for me.  He may have done other things.  I don't
3  know.

## EXHIBIT L

**App. 500**

**DANIELLE MARIE WESTON**



21    Q.  Did you draft Mary Bone's declaration or did...
22    A.  I don't -- if I remember right, I drafted it.
23    See, this two years ago.  I believe I developed the
24    first draft.  She and I may have gone back and forth.  I
25    don't know if she just wanted to use what I had already

## EXHIBIT L                                   App. 501

DANIELLE MARIE WESTON



33

1  written with no edits.  So when you're asking me if I
2  drafted hers, at some point we came to an agreement on
3  the language.  I don't know how much back and forth
4  there was.

35

17     Q.  Let's talk -- talk about the differences that
18  come to your mind between a regular meeting and a
19  special meeting.
20     A.  A regular meeting is required by law.  Special
21  meetings are at the discretion of the local school
22  board.
23     Q.  And you may have a special called meeting
24  regarding any number of types of items; correct?
25     A.  Yes.

34

36

EXHIBIT L

DANIELLE MARIE WESTON



9    Q.  Okay.  And at special board meetings the public
10  could only provide public comment on items that were
11  actually on the agenda; correct?
12    A.  Yes.
13    Q.  Okay.  And in the fall of 2021, in the -- the
14  idea of limited public comment at special meetings was a
15  part of District Board Policy; correct?
16    A.  Yes.

EXHIBIT L                                        App. 503

DANIELLE MARIE WESTON

**41**

5    Q.  Was Dr. Steve Flores the Round Rock ISD
6  superintendent when you first became a trustee?
7    A.  When I was sworn in, he had already signed an
8  agreement, I think the week prior, with the school board
9  about a retirement agreement and severance package, so I
10  -- I never met him.  He never attended a school board
11  meeting after I was sworn in, but I believe he was still
12  under some agreement with the School District for a
13  period of time.  I don't remember the details.
14    Q.  So Dr. Flores announced his departure from
15  Round Rock ISD in fall 2020?
16    A.  Yes.  The week before we were sworn in -- the
17  newly elected trustees were worn in.
18    Q.  Did Dr. Daniel Presley become the interim or
19  acting superintendent after Dr. Flores retired?
20    A.  Yes.
21    Q.  Did the Board begin a superintendent search
22  thereafter?
23    A.  Yes.
24    Q.  Who -- and who conducted the search?
25    A.  I believe the firm was called Ray and

**42**

1  Associates.
2    Q.  And I don't want to divulge any confidential
3  information regarding individuals -- candidates, but how
4  many candidates for superintendent were interviewed by
5  the Board?
6    A.  I believe we interviewed -- I don't remember if
7  it was seven or eight or twelve.  I don't remember.
8    Q.  And -- and I understand.  Seven -- it was more
9  than seven?
10    A.  I don't remember if it was seven -- the numbers
11  seven, eight and twelve come to mind.  I don't remember
12  which one.
13    Q.  And was there a second round of Board
14  interviews for certain candidates?
15    A.  Yes.
16    Q.  How many candidates received this second round
17  of interviews?
18    A.  I believe we scheduled four, and I believe one
19  backed out.  So I believe we did three, but I am not 100
20  percent sure.  But that is what I re- -- that is the
21  best of my memory.
22    Q.  Okay.  And did these interviews occur in late
23  April and early May of 2021?
24    A.  I believe so.

**43**

**44**

EXHIBIT L                                                    App. 504

DANIELLE MARIE WESTON



**49**

20    Q. Agenda Item F1. And at that -- at the May 21st
21  meeting, did Amy Weir move that the Board of Trust --
22  Trustees designate Dr. Azaiez as the sole finalist being
23  considered for the position of Round Rock ISD
24  Superintendent?
25    A. Well, yes. It appears you've had this -- yeah,

**50**

1  you've got the dates in front of you. I just didn't
2  have this in front of me. That appears to be exactly
3  what happened.
4    Q. And it was a 5-2 vote; correct?
5    A. Yes.
6    Q. And you and Trust- -- then Trustee Mary Bone
7  were against the naming of Dr. Azaiez as the one
8  finalist; correct?
9    A. Yes.

17    Q. So you -- you were opposed or -- or you -- you
18  did not vote in favor of Dr. Azaiez from the beginning
19  of the process; correct?
20    A. Yes. And I made a statement in the -- at the
21  -- in the June meeting so that I could go on the record
22  publicly with why I voted no so it would be there for
23  anybody to see in the future. I gave the specifics.

**51**

**52**

DANIELLE MARIE WESTON



77

78

79

```
 3      Q.  And I'm going to hand you -- I'm going to share
 4   with you what's marked as Exhibit 16, which is the
 5   August 16th, 2021 Board agenda.
 6          (Exhibit 16 introduced into the record.)
 7      A.  Yes.
 8      Q.  Okay.  And so the August 16th, 2021 board
 9   agenda was a called board meeting; correct?
10      A.  Yes.  I see it now on the agenda.
11      Q.  And that's different from a regular monthly
12   board meeting; correct?
13      A.  Yes.
14      Q.  And at the called board meeting, people who
15   speak and sign up to speak in public comment are limited
16   to items that are on the agenda; correct?
17      A.  Yes.
18      Q.  And on August 16th, there were two specific
19   items on the agenda; correct?
20      A.  I'm looking at the agenda now to refresh my
21   memory.  Yes, I see that.
22      Q.  Okay.  And one was the adoption of a resolution
23   for employee COVID-19 positive extended leave during
24   COVID-19 pandemic; correct?
25      A.  Yes.
```

80

```
 1      Q.  And one was a fall 2021 COVID-19 health and
 2   safety protocols; correct?
 3      A.  Yes.
```

DANIELLE MARIE WESTON



81

5    Q.  Yeah.  And then, but that sum -- that fall,
6    there were school districts who were doing mask
7    mandates, and part of the discussion of COVID-19 health
8    and safety protocols at Round Rock ISD was the
9    discussion of a potential mask requirement; correct?
10       A.  Yes.

24       Q.  Were you aware Jeremy Story was planning to
25    attend the August 16th, 2021 board meeting?

82

1       A.  I -- I don't believe I was.
2       Q.  Did you have any knowledge that Mr. Story
3    wanted to speak about the issues surrounding Dr. Azaiez
4    at the August 16th, 2021 board meeting?
5       A.  I don't remember.

14       (Exhibit 17 introduced into the record.)

83

84

DANIELLE MARIE WESTON



**85**

19  Q. So the reason I wanted to go through this is
20  because on August 16th at 4:21 p.m., which is before the
21  board meeting --
22  A. Yeah.
23  Q. -- you say, "Hey, Jeremy, our Board policy
24  allows for public comments on items both on and off the
25  agenda only at the monthly regular board meetings. For

**86**

1  called meetings like tonight, public comments are
2  limited to items that are on the agenda. Thursday of
3  this week is a regular board meeting." Is there -- do
4  you recall anything that prompted you -- well, let's go
5  back.
6      Is that a text message that you sent Jeremy
7  Story at 4:21 on August 16th, 2021?
8  A. If that's what being asserted, I don't have any
9  reason to disbelieve it.
10  Q. Is there anything that prompted you to send
11  Jeremy Story this text message in a few hours before the
12  August 16th board meeting?
13  A. I don't remember.
14  Q. Did you know that Jeremy Story wanted to talk
15  about Dr. Azaiez at the August 16th called meeting?
16  A. I don't remember.
17  Q. Would you agree if you were -- you -- with me
18  that you were telling him that Thursday is when you
19  could talk about any item at a regular board meeting;
20  correct?
21  A. The only thing that I can assert is what's on
22  -- typed out in front of me here.
23  Q. Did you know before the -- did you review the
24  board agendas before each board meeting to prepare for
25  the board meeting?

**87**

1  A. Absolutely.
2  Q. So had you reviewed the August 16th board
3  agenda that we looked at earlier today prior to this
4  4:21 p.m. text message?
5  A. I usually made a habit of reading over the
6  agendas long before the meetings were held. So I don't
7  remember this one specifically, but I would -- I would
8  think so.
9  Q. And we discussed that the two agenda items were
10  the resolution regarding employee leave related to
11  COVID; correct?
12  A. Yes.
13  Q. And COVID-19 health and safety protocols;
14  correct?
15  A. Yes.
16  Q. So did you know at 4:21 p.m. on August 16th,
17  2021 that issues regarding Dr. Azaiez's hiring or
18  allegations about Dr. Azaiez were not items on the
19  agenda for the August 16th called meeting?
20  A. I'm -- I'm not -- did I know that the hiring of
21  Dr. Azaiez was not specifically on the agenda?
22  Q. So in items regarding the hiring or allegations
23  about Dr. Azaiez, were not --
24  A. So --
25  Q. -- on the agenda for the called board meeting

**88**

1  on August 16th, 2021; correct?
2  A. So I knew the words Azaiez hiring were not on
3  the agenda. I -- I did know that.
12  Q. (By Ms. Long) My question was -- I don't care
13  about interpretations. I'm asking, Ms. Weston, you knew
14  on August 16th, 2021 at 4:21 p.m. that items regarding
15  Dr. Azaiez and the allegations against him were not
16  agenda items for the August 16th, 2021 called meeting;
17  correct?
18  A. I knew that it was not explicitly stated.
19  Q. So it was not expressly listed on the agenda;
20  correct?
21  A. Right. The terms that you're using, his name,
22  the words "allegations," and I think you used another
23  word, those -- those words were not on the agenda.

EXHIBIT L

App. 508

DANIELLE MARIE WESTON



**Page 89**

**Page 91**

13  Q. (By Ms. Long)  I'm asking you, what do you
14  remember about what Jeremy Story said and what Trustee
15  Weir said during that public comment?
16  A. You're asking me what I remember -- so you have
17  a two-part question.  What I remember Jeremy Story
18  saying?
19  Q. Yes.
20  A. And what Amy Weir -- what -- what she did?
21  Q. Yes.
22  A. I remember Jeremy Story speaking on whatever he
23  was talking about with regard to health and safety of
24  the school district, and I remember witnessing Amy Weir,
25  a civilian, ordering law enforcement officers to remove

**Page 90**

**Page 92**

1  him.
2  Q. Okay.  Did Amy Weir actually order the law
3  enforcement officers to remove him?
4  A. If I remember correctly -- and I haven't
5  watched this for probably two years.  If I remember
6  correctly, she told the police officers present to
7  remove him.

13  Q. And did Mr. Story stop speaking when Ms. --
14  when Trustee Weir advised that it was not a matter on
15  the agenda?
16  A. Did he stop speaking?
17  Q. Yes.
18  A. I only remember him stop speaking when the
19  police pulled him out of a room.
20  Q. In other words, did he continue speaking after
21  Trustee Weir advised him that wasn't a matter on the
22  agenda until the police removed him from the room?  Was
23  he speaking that whole time?
24  A. Right.  He has a certain number of minutes to
25  speak, so I -- I would imagine that he continued to

DANIELLE MARIE WESTON



93

1   speak during his time.

95

94

96

20    Q.  Okay.  Who gave the directive -- wait.  Was
21    there a directive that was actually given at the August
22    16th, 2021 meeting to remove Mr. Story from the board
23    meeting room?
24    A.  Okay.  So again, I did not re-watch that
25    meeting, so I'm kind of -- I -- I -- I don't feel super

**DANIELLE MARIE WESTON**



**97**

1  equipped to assert exactly what was said or by whom.  My
2  guess is that you have it in front of you.  So I don't
3  believe that the police on their own walked up to
4  Mr. Story and removed him.  I believe they were reacting
5  to a directive from the Board President.  If I'm
6  misremembering that, I'm open to your clarification.
7      Q.  No.  I just, I want to know what your
8  recollection is.
9      A.  My recollection is that a civilian, the School
10  Board President directed law enforcement officers, sworn
11  officers to remove him from the board room.
12      Q.  Did Dr. Azaiez give any directive to the law
13  enforcement officers at the August 16th board meeting?
14      A.  If -- if there were any orders, it was not done
15  to where I could hear it.
16      Q.  Did you see him make any gesture or movement or
17  directive to the police officers at the August 16th
18  board meeting?
19      A.  No, but he's not in my line of sight.
20      Q.  But you didn't hear him say anything; correct?
21      A.  I did -- I did not hear him say anything.

**98**

4      Q.  So you don't have any recollection of anything
5  that doc-- Jeffrey Yarbrough did at the August 16th
6  meeting regarding Mr. Story's removal from the meeting?
7      A.  Correct.

**100**

21      Q.  Did you ever speak to Jeff Yarbrough about
22  Jeremy Story's removal from the August 16th board
23  meeting?
24      A.  Can you define "speak"?
25      Q.  Talk.  Did you ever talk to Jerry [sic]

DANIELLE MARIE WESTON

**101**

1  **Yarbrough?**
2  A. Verbally?
3  **Q. Verbally.**
4  A. No.

[REDACTED]

**102**

1  **Did Mr. Yarbrough ever tell you anything about**
2  **Jeremy Story's removal for the August -- removal from**
3  **the August 16th board meeting either verbally or in**
4  **writing?**
5  A. I don't believe so.
6  **Q. Did you ever speak verbally to Officer Frank**
7  **Pontillo regarding Jeremy Story's removal from the**
8  **August 16th board meeting?**
9  A. I don't believe so.
10  **Q. Did you ever speak with Sergeant Milton Pope**
11  **regarding Jeremy Story's removal from the August 16th**
12  **board meeting?**
13  A. I don't believe so.
14  **Q. Did you ever hear that Mr. Pontillo -- or**
15  **Officer Pontillo had said anything about Jeremy Story's**
16  **removal from the August 16th board meeting?**
17  A. Did I ever read that he did?
18  **Q. Did you ever hear?**
19  A. Oh, hear. I don't believe so.
20  **Q. Did you ever hear anything that Sergeant Milton**
21  **Pope said about Jeremy Story's removal from the August**
22  **16th board meeting?**
23  A. I don't believe so.
24  **Q. Did you ever speak verbally to Former Assistant**
25  **Police Chief James Williby regarding Jeremy Story's**

**103**

1  **removal from the August 16th board meeting?**
2  A. I don't believe so.
3  **Q. Did Mr. Williby ever put anything in writing to**
4  **you about the August -- Jeremy Story's removal from the**
5  **August 16th board meeting?**
6  A. I don't believe so. But I mean, if you have
7  something, I'm -- I'm open to reading it. I just don't
8  believe so.
9  **Q. No, I just want to make -- I'm just tying to**
10  **see what you do know or do -- do not know. That's it.**
11  A. Okay.
12  **Q. Did you ever speak to Dr. Azaiez verbally about**
13  **Jeremy Story's removal from the August 16th board**
14  **meeting?**
15  A. I don't believe so. I -- I reached a point
16  where all of my communications with the Superintendent I
17  put in writing to protect myself from him.
18  **Q. Did Dr. Azaiez ever say anything to you about**
19  **Jeremy Story's removal from the August 16th board**
20  **meeting?**
21  A. I don't believe so.
22  **Q. Did you ever hear Dr. Azaiez say anything to**
23  **you about Jeremy Story's removal from the August 16th**
24  **board meeting?**
25  A. Nothing comes to mind.

**104**

1  **Q. Did you ever hear anything about Dr. Azaiez's**
2  **involvement in Jeremy Story's removal from the August**
3  **16th board meeting?**
4  A. I don't believe so. I -- I don't know if it's
5  clear, these people were not talking to me about any of
6  this stuff. I -- I -- I'd been excluded by that point.
7  **Q. Do you have any knowledge regarding**
8  **Dr. Azaiez's role, if any, in Jeremy Story's removal**
9  **from the August 16th board meeting?**
10  A. I -- I don't have any. No.
11  **Q. Other than Board President Weir and the two**
12  **officers who removed him from the meeting, do you know**
13  **if any Round Rock ISD trustee or employee had any role**
14  **in Jeremy Story's removal from the August 16th board**
15  **meeting?**
16  A. No. I'm the last person anybody would have
17  been speaking to about that.

[REDACTED]

DANIELLE MARIE WESTON



109

111

112

4    Q.  Okay.  I just wanted to give you the

5    opportunity so people couldn't say that you weren't

6    given the opportunity during discovery.  Do you know

7    anything about -- I will tell you that the officers who

8    guided Mr. Story or removed him -- however you want to

9    say -- from the August 16th board members [sic], were

10   Frank Pontillo and Milton Pope.  Do you have any

11   knowledge about Milton Pope's motivations in removing

12   Story from the August 16th board meeting?

13   A.  No.

14   Q.  Do you know if he disagreed with Mr. Story's

15   speech about Dr. Azaiez?

16   A.  I have no idea.

17   Q.  Do you know if he treated Mr. Story differently

18   than he would have treated another person who the Board

19   President had determined was off topic?

20   A.  There's only one thing I know about these two

21   police officers, and -- and you've not hit on it.

22   Q.  What do you know about these two police

23   officers?

24   A.  They obviously did not understand their role.

25   Q.  Other than that, do you know anything about

DANIELLE MARIE WESTON

113

1  these two police officers?
2      A.  No.
3      Q.  And you don't know if Officer Pope or Sergeant
4  -- or Officer Pontillo or Sergeant Pope were motivated
5  by the content of Jeremy Story's speech in effectuating
6  the removal?
7      A.  No.

115

114

116

7      Q.  Would you agree with me that the Texas Open
8  Meetings Act doesn't require a certain seating capacity
9  for a board meeting?
10     A.  Yes.  I don't believe there's anything in TOMA
11  that gives a seating capacity.



DANIELLE MARIE WESTON



117

1    Q. And TOMA doesn't say you must not have seating
2  capacity limitations; does it?
3    A. Right. It -- it doesn't say a lot of things.
4  That's one of the things it doesn't say.

12    Q. And there was no executive order at the time
13  prohibiting the use of social distancing measures in
14  board meetings; correct?
15    A. I don't think it -- that that was mentioned
16  specifically, no.

**EXHIBIT L**    **App. 515**

DANIELLE MARIE WESTON



141

8   Q. I'll tell you in a minute.  Do you know who was
9  involved in the preparation of the affidavit for the
10  warrant for Jeremy Story's arrest?
11     A. No, but I would love to.
12     Q. Okay.  Do you know if Jeffrey Yarbrough had any
13  involvement in the affidavit for the warrant for Jeremy
14  Story's arrest?
15     A. I don't.
16     Q. Do you know if Dr. Azaiez had any involvement
17  in the preparation of the affidavit of warrant for
18  Jeremy Story's arrest?
19     A. No.
20     Q. Do you know if any Board member at Round Rock
21  ISD had any involvement in the preparation of the
22  affidavit for the warrant for Jeremy Story's arrest?
23     A. No.

143

6   Q. Do you have -- do you have any knowledge of
7  Lauren Griffin's [sic] motivations for preparing the
8  affidavit for the warrant for Jeremy Story's arrest?
9     A. Other than being a subordinate of the
10  Superintendent, I don't.
11     Q. Do you know with whom Lauren Griffith spoke
12  when she prepared the affidavit for the warrant in
13  Jeremy Story's arrest?
14     A. No.
15     Q. Do you know if she ever spoke to any trustees
16  when she was preparing the affidavit for the warrant of
17  Jeremy Story's arrest?
18     A. No, but I would love to.
19     Q. Did you have any conversations with Jeff
20  Yarbrough about Jeremy Story's arrest?
21     A. No.
22     Q. Did you have any conversations with James
23  Williby regarding Jeremy Story's arrest?
24     A. No.
25     Q. Did you ever hear Jeff Yarbrough say anything

142

5   Q. Did you ever speak with Warren [sic] -- Lauren
6  Griffith regarding Jeremy Story?
7     A. I don't believe so.
8     Q. Did you ever speak with Lauren Griffith about
9  Jeremy Story's arrest?
10     A. I don't believe so.
11     Q. Do you know if Lauren Griffith was present at
12  the August 16th board meeting?
13     A. If she was, I do not remember her being there.
14     Q. Do you know if Lauren Griffith was present at
15  the September 14th board meeting?
16     A. If she was, I do not remember her being there.

144

1  about Jeremy Story's arrest?
2     A. No.
3     Q. Did you ever hear James Williby say anything
4  about Jeremy Story's arrest?
5     A. No.
6     Q. Did you ever speak with Frank Pontillo about
7  Jeremy Story's arrest?
8     A. No.
9     Q. Did you ever hear Frank Pontillo say anything
10  about Jeremy Story's arrest?
11     A. No.
12     Q. Did you ever have any conversations with Milton
13  -- Milton Pope regarding Jeremy Story's arrest?
14     A. No.
15     Q. Did you ever hear Milton Pope say anything
16  about Jeremy Story's arrest?
17     A. No.
18     Q. Did you ever have any conversations with any R
19  -- Round Rock ISD police officer regarding Jeremy
20  Story's arrest?
21     A. No.
22     Q. Did you ever hear any member of the Round Rock
23  ISD Police Department say anything about Jeremy Story's
24  arrest?
25     A. No.

EXHIBIT L                    App. 516

DANIELLE MARIE WESTON



**145**

5   Q. Did you have any conversations with any Board
6  Member other than Mary Bone regarding Jeremy Story's
7  arrest?
8   A. It would have been confined to board meetings
9  if it was ever on the agenda.
10   Q. And did you ever have any conversations with
11  Dr. Azaiez regarding Jeremy Story's arrest?
12   A. Not outside of a board meeting, and I don't
13  even know that we did inside of a board meeting.
14   Q. Did you ever hear Dr. Azaiez say anything about
15  Jeremy Story's arrest?
16   A. Not that I can recall.
17   Q. Did you ever have any conversations with anyone
18  at Williamson County about Jeremy Story's arrest?
19   A. I don't think so.

**146**

8   Do you have any reason to believe that
9  Sergeant Detective Lauren Griffith would falsify --
10  personally falsify information in an affidavit for the
11  warrant for Jeremy Story's arrest?
12   A. I -- I can't speak to her motives, and I don't
13  even know what she said, so I --

**147**

3   Q. Do you have any reason to believe that Lauren
4  Griffith would falsify information in the affidavit for
5  the arrest of Jeremy warrant?
6   A. I -- I don't -- ma'am, I don't feel prepared
7  because I don't even know what she said.  So I don't
8  know if it was a truth or a lie.  I've never -- I don't
9  even know that she and I have ever had a meaningful
10  conversation.  My only meaningful interaction with her
11  was via email where I was reporting when I thought --
12  when I was a victim of a crime to her.  So I don't know
13  her well enough to be able to speak.  I -- I know that
14  she's a subordinate of the Superintendent, which is
15  problematic in my view.  But beyond that, I don't have
16  any insight about her motivations or what she might or
17  might not do.
18   Q. Okay.  So then your answer to my question, do
19  you have any reason to believe that Lauren Griffith
20  would falsify information in the affidavit for the
21  arrest warrant for Jeremy Story?
22   A. Insofar as she is a police officer in a police
23  department that I believe is corrupt, I believe anything
24  is possible with any of them.
25   Q. Other than that, do you have any reason to

**148**

1  believe that Lauren Griffith would falsify information
2  in the affidavit for the warrant for Jeremy Story's
3  arrest?
4   A. No.
5   Q. Okay.  Do you have any reason to believe that
6  Sergeant Milton Pope would falsify information in --
7  provided to Lauren Griffith for use in the affidavit for
8  the warrant for Jeremy Story's arrest?
9   A. Insofar as he is a police officer in an outfit
10  that I believe is corrupt, so I believe anything is
11  possible.  But I don't have any insight about him
12  specifically lying.
13   Q. Okay.  So other than his employment with the
14  Round Rock ISD Police Department, do you have any other
15  reason to believe that he would falsify information he
16  provided for use in the warrant for the aff- --
17  affidavit for warrant of Jeremy Story's arrest?
18   A. Yeah, outside of him being an employee in a
19  corrupt police outfit, I don't have any reason to
20  believe that he would falsify information.
21   Q. Are you aware of any communications between
22  Dr. Azaiez and the will -- and Williamson County
23  officials regarding Story's arrest?
24   A. Communications between the County and the
25  School District regarding the arrest?

EXHIBIT L

App. 517

DANIELLE MARIE WESTON

149

1    Q.  Okay.  Are you aware of any communications
2  between Dr. Azaiez and the Williamson County Sheriff's
3  Department regarding the -- regarding Jeremy Story's
4  arrest?
5    A.  No.  They -- I think it might be helpful for
6  you to understand, they were actively not telling me
7  things.  I was being excluded from all of this stuff.
8  So I don't -- I don't have any knowledge about any of
9  that.

24    Q.  Okay.  So are you aware of any communications
25  between Dr. Azaiez and the Williamson County Sheriff's

150

1  Department regarding Jeremy Story's arrest?
2    A.  No.
3    Q.  Are you aware of any communicate- -- other
4  communications with Dr. Azaiez and any other Williamson
5  County official regarding Jeremy Story's arrest?
6    A.  No.
7    Q.  Do you have any reason to believe that
8  Dr. Azaiez directly spoke with anyone in the Williamson
9  County Sheriff's Department regarding Jeremy Story's
10  arrest?
11    A.  Do -- do I have any -- did you say do I have
12  any reason to believe?
13    Q.  Yes, that Dr. Azaiez actually communicated with
14  someone in the Williamson County Sheriff's Department
15  regarding Jeremy Story's arrest?
16    A.  If I had to guess, that happened.  But I don't
17  know.  I don't have any knowledge of it.
18    Q.  So that would be just your guess?
19    A.  Yes.
20    Q.  Okay.  Do you have any reason to believe that
21  Dr. Azaiez exerted any type of influence over anyone at
22  Williamson County to pressure them into arresting Jeremy
23  Story?
24    (Mr. Story enters.)
25    A.  Did you ask if I had any evidence?

151

1    Q.  No.  Any reason to believe?
2    A.  I -- I -- I can't point to anything that I know
3  that that happened, but I think that -- I -- that is --
4  I believe that that did happen because he had the motive
5  and the position to do that.  But, no, I don't have any
6  knowledge or things I can point to.
7    Q.  So that's your -- just your personal belief?
8    A.  Yes.

152

EXHIBIT L                                    App. 518

DANIELLE MARIE WESTON



209

210

25   Q. Okay. Real quick. I'm going to pause a couple

211

1   times in there.  Did you hear the Board Chair say that
2   they were only taking comments on those two items?
3       A. Yes.
4       Q. All right.  And had Mr. Story even begun to
5   speak from the microphone at that time?
6       A. No.
7       Q. Okay.  So did -- did the board chair at all
8   know at that time that what he was going to talk about
9   would or would not be germane?
10          MS. LONG:  Objection.  Foundation.
11      A. She clearly did not know.
12      Q. (By Mr. Casey)  Okay.  Did you have any idea
13  what Mr. Story was going to speak about at that time?
14      A. I -- well, I hadn't heard anything out of his
15  mouth yet, so I didn't.

212

19      Q. Okay.  And so right now then, the decision on
20  germanous then -- would you agree the decision on
21  germanous was completely in the hands of the Board
22  Chair?
23          MS. LONG:  Objection.  Calls for a legal
24  conclusion.
25      Q. (By Mr. Casey)  Like, who had the ability to

DANIELLE MARIE WESTON

**213**

1   say something was not -- was or was not germane?  Who
2   had that ability?
3       A.  Well, we've adopted -- when I say "we," I'm
4   talking about when I was a trustee, adopted Robert's
5   Rules of Order to run our meetings.  And Robert's Rules
6   of Order says that the Board Chair basically is in
7   charge of, you know, all of those decisions to include
8   what you're talking about.  I mean, she's
9   single-handedly empowered.

**215**

**214**

**216**



241

243

1  the completion of the deposition and that the signature
2  is to be before any notary public and returned within 30
3  days from date of receipt of the transcript.  If
4  returned, the attached Changes and Signature Page
5  contains any changes and the reasons therefor:
6      _X_ was not requested by the deponent or a party
7  before the completion of the deposition.
8      I further certify that I am neither counsel for,
9  related to, nor employed by any of the parties in the
10  action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13
14      Certified to by me this 5th day of May, 2025.
15
16
17
18  KRISTY OWEN, RPR, Texas CSR 10790
    RPR Expiration Date:  9-30-2026
19  CSR Expiration Date:  7-31-2026
20  STOVALL REPORTING & VIDEO, INC.
    Firm Registration No. 10259
21  1414 Creekview Drive
    Lewisville, Texas  75067
22  Phone:  (214) 695-2024
23
24
25

242

1       IN THE UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF TEXAS
2            AUSTIN DIVISION
3  JEREMY STORY,           *
       Plaintiff,          *
4                          *
   v.                      * CIVIL ACTION NO.
5                          * 1:22-cv-00448-DAE
                           *
6  SUPERINTENDENT HAFEDH    *
   AZAIEZ, TRUSTEES AMBER   *
7  FELLER, TIFFANIE HARRISON, *
   AMY WEIR, JUN XIAO, CORY  *
8  VESSA; OFFICERS JEFFREY   *
   YARBROUGH, JAMES WILLIBY, *
9  DEBORAH GRIFFITH, MILTON  *
   POPE, FRANK PONTILLO, RON *
10  COLE, CHIEF DENNIS WEINER, *
   and CARLA AMACHER,       *
11  individually, and ROUND   *
   ROCK INDEP. SCHOOL       *
12  DISTRICT,                *
       Defendants.          *
13
14      REPORTER'S CERTIFICATION
   DEPOSITION OF DANIELLE MARIE WESTON
15            APRIL 22, 2025
16      I, Kristy Owen, Certified Shorthand Reporter, duly
17  qualified in and for the State of Texas, do hereby
18  certify to the following:
19      That the witness, DANIELLE MARIE WESTON, was duly
20  sworn by the officer and that the transcript of the oral
21  deposition is a true record of the testimony given by
22  the witness;
23      I further certify that pursuant to FRCP Rule
24  30(f)(1) that the signature of the deponent:
25      __ was requested by the deponent or a party before

EXHIBIT L                                    App. 521