IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JEREMY STORY, Plaintiff,

v.

SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES AMBER FELLER, TIFFANIE HARRISON, AMY WEIR, JUN XIAO, CORY VESSA; OFFICERS JEFFREY YARBROUGH, JAMES WILLIBY, DEBORAH GRIFFITH, MILTON POPE, FRANK PONTILLO, RON COLE, CHIEF DENNIS WEINER, and CARLA AMACHER, individually, and ROUND ROCK INDEP. SCHOOL DISTRICT, Defendants.

CIVIL ACTION NO. 1:22-cv-448

---

ORAL DEPOSITION OF

CHIEF JEFFREY DWAYNE YARBROUGH

OCTOBER 29, 2025

(REPORTED REMOTELY)

---

ORAL DEPOSITION of CHIEF JEFFREY DWAYNE YARBROUGH, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and -numbered cause on the 29th day of October, 2025, from 9:03 a.m. to 4:48 p.m., before Kristy Owen, CSR, in and for the State of Texas, reported by machine shorthand

with the witness appearing via Zoom from 401 W. Front Street, in the City of Hutto, County of Williamson, Texas, pursuant to the Federal Rules of Civil Procedure.

APPEARANCES

FOR THE PLAINTIFF (via Zoom):
Mr. Stephen D. Casey
Casey Law Office, P.C.
P.O. Box 2451
Round Rock, Texas 78680
stephen@caseylawoffice.us

FOR THE DEFENDANTS (via Zoom):
Ms. Kathryn E. Long
Ms. Kelsey McKeag
Thompson & Horton LLP
500 North Akard Street
Suite 3150
Dallas, Texas 75201
Phone: (972) 853-5115
Fax: (713) 583-8884
klong@thompsonhorton.com
kmckeag@thompsonhorton.com

ALSO PRESENT (via Zoom):
Ms. Cynthia Hill, General Counsel for Round Rock Independent School District
Mr. Jeremy Story, Plaintiff (Enters page 6.) (Exits page 70.) (Enters page 77.)

INDEX

Appearances.................................. 3
CHIEF JEFFREY DWAYNE YARBROUGH
Examination by Mr. Casey.................... 5
Changes and Signature........................... 235
Reporter's Certificate.......................... 237

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | BE (Legal)................................ | 73 |
| 2 | Third Amended Complaint.................... | 78 |
| 3 | Affidavit for Warrant of Arrest and Detention................................ | 88 |
| 4 | JS-304202 through JS-304203................ | 130 |
| 5 | JS-304204................................ | 156 |
| 6 | BED (Local)............................... | 184 |
| 7 | August 16, 2021 board meeting video........ | 185 |
| 8 | Excerpt from Jeremy Story's speaking time at 8/16/21 board meeting.................. | 195 |
| 9 | September 14, 2021 body cam video from Officer Chavez............................ | 213 |

2 (Pages 5-8)
CHIEF JEFFREY DWAYNE YARBROUGH

CHIEF JEFFREY DWAYNE YARBROUGH,
having been duly sworn, testified as follows:

STOVALL REPORTING & VIDEO, INC. (214) 695-2024
EXHIBIT M
App. 523

29

30

Q. In your -- in your -- in your role there, reporting to the superintendent, you and I would say the police force, who are subordinate to you -- and I want to present two options and have you select one of those. Is their job to enforce Texas law or to enforce school board policy?
A. Some school board policies are a matter of law, and so it depends.
Q. Okay.
A. But basically we support Texas law, but we can enforce board policies.
Q. And to the extent that the board policy conforms with the law, you can enforce it; right? That's a nod.
A. Yes.

31

Q. (By Mr. Casey) If the school superintendent told you to take an action that you believe conflicted with federal law, would you take that action?
A. Absolutely not.

32

Q. Oh, you didn't -- you didn't do anything wrong. So -- so if -- if you -- if you have a certain understanding about certain -- someone's rights, for example an audit -- I'm going to give you a hypothetical situation. Someone comes to do a photographic audit, First Amendment audit, and they're on a public sidewalk just outside the Round Rock ISD campus. Does that make sense, that situation?
A. Yes.
Q. Okay. And the superintendent says, "You know what, I don't like them photographing around here. I want you to make them leave." Would you have the right to do that?
A. No.
Q. Why not?
A. Because as long as they're not violating the law, as long as they're expressing themselves on a public sidewalk and it's not creating a disturbance, it's not in the sense of -- for example, they're not out in traffic, if they're not creating a hazard or danger, then you -- you support them in what they do.

33

34

35

A. Yeah. So throughout my career we have had training. You get training in the basic peace officer's course on constitutional rights and what our duties and responsibilities are as law enforcement.

**Q. Okay. After basic peace officer training, what -- what training do you get and what -- what understanding did you develop from that?**

36

A. So my --

MS. LONG: Same objections.

A. So my understanding of that is in a -- say a limited public forum, a -- the government cannot censure a person's speech simply because they don't like what they're saying. There has to be something else attached to that, is my opinion, that -- that would trigger them to cease that person's opportunity to speak or express themselves.

**Q. (By Mr. Casey) Okay. You -- you used a term there -- you introduced a term there, limited public forum. What does that mean to you?**

MS. LONG: Objection --

A. It means that --

MS. LONG: -- objection to the extent it calls for a legal conclusion. Objection, impermissible legal testimony from a fact witness.

**Q. (By Mr. Casey) Okay. You -- you can go ahead and answer.**

A. Okay. Basically my understanding of that is it's a -- it's an opportunity where individuals can go and speak to the government, or let's say for example elected officials, and it allows those individuals to speak. But it's limited based upon whatever the requirements or the guidelines of that governing body

are.

**Q. Okay. So like a -- I'll give you an example that's relevant here, like a public comment section or a public comment time?**

A. Yes.

**Q. Okay. How many school board meetings have you attended?**

A. Many.

**Q. Okay. So probably -- let's -- I'm just going to give you a range because I'm not looking for a scientific number. More than 200?**

A. It's hard to put an actual number on it. I was required to attend school board meetings when I was Chief of Bastrop and the large majority of the meetings at Round Rock.

**Q. So at least 100?**

A. Yes.

41

42

43

Q. (By Mr. Casey) All right. So after you were hired at Round Rock ISD in 2019, are you ultimately responsible there as chief for the training of the officers?

A. Yes, sir.

Q. Okay. What types of training did you require your officers to take?

A. There was a variety of training above and beyond the state-mandated training, you know, crisis intervention, child abuse, sexual assault. Beyond all of that we had mental health first aid, we had trauma-based informed care. We had a wide range of

44

training, and specifically school-based law enforcement training, the state-mandated trainings as well.

53

55

54

**Q. Okay. So would you describe your role at a school board meeting as passive rather than active?**

A. It would -- I would describe it -- using those two terms, I would say it was more passive than active in the sense of allowing the chain of command to operate the way it was designed. Meaning that I'm the administrator, chief -- Assistant Chief Williby was the manager, so he managed the -- the environment and the individuals involved.

56

57

58

Q. Okay. Did the superintendent give Mr. Pope and Mr. Pontillo any specific verbal or physical commands like nods or anything like that regarding Mr. Story?
A. Not to my knowledge.

Q. Okay. Based on your understanding of the way the -- your -- your department worked when you were the chief, did the superintendent have the right -- not whether he did frequently or infrequently -- did he have the right to command them to do something?
A. Not to take law enforcement action. No.
Q. Okay. So -- okay. So not to -- I'm just -- I'm just jotting a note to myself. And what -- how do you define law enforcement action? You just used that term. We haven't talked about -- we haven't -- I haven't used that phrase before. But what do you mean

59

by that?
A. Say, for example, if the superintendent wanted an officer to go and search a person that they found to be suspicious or believed to be suspicious, that's not an action that he would give to the law enforcement officer. If he felt that a person should be arrested for wearing a green hat, that's not something that he could -- that he would -- a directive he would be able to give the law enforcement officer and the officer wouldn't comply with a directive like that.
Q. So what I understand you saying is he couldn't -- he couldn't tell an officer to, based on his judgment, to do something like a Terry stop? He couldn't do that?
A. No.

60

Q. Okay. Did you ever talk with the superintendent about Jeremy Story prior to August --

61

**Q. from -- from June 1st of August -- excuse me. June of August. June 1st of 2021 up to August 16th of 2021, before that board meeting, had you ever talked to the superintendent about Jeremy Story?**

A. I don't recall talking to him about Jeremy Story.

**Q. Okay. To your recollection, describe to me what you recall about that incident that you learned.**

A. It was very general and my knowledge of it today is still the same. I recall there being a -- a situation where Mr. Story went into the admin building.

62

I don't recall what reason, but I recall Sergeant Griffith going out -- or I recall being told about Sergeant Griffith going out and speaking with Mr. Story who was parked in the parking lot before he left. And that was information that was conveyed to me generally later because it just at the time, in my opinion, didn't seem like a major issue.

63

64

**Q. Okay. I may have asked this, correct me if I'm wrong, because I didn't check it down. I think I asked it on the fly. Did a -- did a call from dispatch go out over the radio that there were process servers at the admin building?**

A. I don't recall that. And it could have. The difference here that I think you may be missing is I generally didn't monitor the radio as the chief of police. If there were major issues, then they would typically -- Assistant Chief Williby or someone would reach out to me. So I generally didn't monitor the radio unless I was in my vehicle and the radio was on -- the -- the mobile radio was on.

65

Q. Now, how Round Rock board meetings are conducted are based on policy decisions; correct?
A. I would say generally, yes.
Q. Okay. Who maintains order over a local school board -- school board meeting?
A. The president of the school board.
Q. Okay. Okay. When -- when -- on the August 16th meeting, and that was a long one, do you recall who was school board president at the time?
A. I believe it was Amy Weir.
Q. Okay. All right. And do you recall if the public comment session -- public comment session at that time was particularly long or relatively short?
A. I recall it being really long.

66

Q. Okay. A lot of -- a lot of individual speakers?
A. Yes.
Q. Okay. Do you -- and this is a long time ago, so I'm not expecting you to, but do you recall what -- what generally people were talking about at that time during the public comment session?
A. Yes, I do.
Q. What -- what generally were people talking about?
A. The mask mandate.
Q. Mask mandate. Okay. Anything else?
A. I don't recall other than that.
Q. Okay. Do you recall what the actual stated agenda topics were?
A. I don't recall.
Q. Okay. All right. For the sake of argument, I -- well, let's assume the Board -- Board Policy BE (Local) is, you know, corresponds to Texas law. If a board chair, say the -- Ms. Weir, the Board President, directed a police officer to remove someone from the meeting, does she have that authority?
A. Generally she does, depending on the circumstances, in my opinion.

67

68

Q. All right. If a -- if a speaker -- excuse me. Does school board policy limit comments during certain meetings to agenda items?
A. Yes, from my understanding.

Q. Well, my -- my question is -- let's drill down on that a little bit. I want to be on this topic I guess until -- we got about two more minutes and we'll pick up after -- after the break.
When you -- you said that there's a -- there's a distinction, school board policy on one hand, state law on the other hand. And if something doesn't violate state law and it's just a policy violation, then you would direct the officer not to enforce it.
Is speaking on topic for an agenda item, is that a state law -- excuse me, speaking off topic. I apologize. Speaking off topic on an agenda item, is that a state law violation?
MS. LONG: Objection. Asked -- objection,

asked and answered; and objection, foundation.

A. That would be a policy violation, but there are things that can accompany that that trigger law enforcement intervention.

**Q. (By Mr. Casey) You just said it could be accompanied by something else that would, so I'm trying to make a clear distinction between the two. Someone -- someone's behavior then must -- must occur in addition to their words to make it rise to a state law violation?**

MS. LONG: Objection, asked and answered. Objection, mischaracterizes the testimony. Objection, to the extent it calls for a legal conclusion.

MR. CASEY: Okay.

**Q. (By Mr. Casey) You can go ahead and answer, Chief Yarbrough.**

A. A person's words alone -- for example, if they said "and" instead of "the," that is not a violation of -- of state law.

77

79

78

80

Q. (By Mr. Casey) Okay. So our lawsuit -- my client's lawsuit -- sorry, it's his lawsuit -- alleges that these defendants infringed upon Jeremy Story's right to petition of free speech by ejecting him from the August meeting and treating him unequally. Did you have a chance to listen to Mr. Story's speech during the August meeting?

A. Yes, I have.

Q. Okay. In your opinion, was he treated unequally?

A. No. In my opinion, he was not.

**Q. (By Mr. Casey) Just based on your experience as -- as a law enforcement officer, how would you tell that?**
A. How would I tell if someone was treated unequally?
**Q. That's right.**
A. If I had two people that did identical -- comitted identical actions, they were before the Council -- or the School Board, they took identical actions, both took the posture of continuing when they were asked to stop, both refused to leave and were forcibly -- forcing -- used physical force to be removed from a

room. If you had identical actions and one person had a different outcome, that would be unequal in my opinion.
**Q. Okay.**
A. Identical actions and -- and -- and different outcomes.
**Q. Okay. That's a fair definition. And when you say "identical actions," I mean, there's multiple individuals, so you would agree with me that people are probably going to come up and not say the exact, you know, digitally same words; right? You would agree with me?**
A. Yes. And I -- less words, more actions and behavior. I think those are the catalyst for the delineation, in my opinion.

**Q. Okay. Hold on a second. And I'm sorry. You were -- you were giving me a good answer. I apologize for cutting you off, but I want to -- I want to drill down on this a little bit tighter.**
**If a some -- someone is speaking and they've got prepared remarks, in order to judge whether they're completely talking about a topic, isn't it true that you probably have to hear the entirety of what they're going to say because they may close it up at the very end?**
A. I -- from my -- in my professional opinion, once a person reaches a point to where their actions or behavior or words are inconsistent with what the requirements are, then that's different. It -- it's no different than someone starting out singing a song in a -- in a theater, then all of a sudden talk about committing a violent act. I'm not going to let them finish before they go back to the song.

85

86

87

88

(Exhibit 3 marked for identification.)

A. Yes, I do.

**Q. Okay. All right. And what do you know this document to be?**

A. That is the Affidavit for Arrest for Probable Cause Affidavit that is submitted to a magistrate for an

89

arrest -- to review to -- to determine whether probable cause exists for an arrest warrant.

**Q. That's fair. I totally agree with you. You've probably done hundreds of these, seen them hundreds of times at least. And then there at the bottom there's the magistrate's signature; right? Whose signature is that, do you recognize, on the bottom on page two on the affiant? Who's the affiant here?**

A. I don't know the signature, but I would have to assume with the L that it's possibly Sergeant Lauren Griffith.

**Q. Okay. And we would agree with that. All right. Let's -- let's go trough this. We're going to walk through this affidavit. This section right here, this -- this offense, PC 38.13.**

A. Uh-huh.

**Q. That -- that "hindering proceedings by disorderly conduct." You -- based on what you said before where you're making a distinction between words and conduct, you would be -- would it be your opinion that Mr. Story's conduct is solely why he was arrested?**

A. Yes.

90

91

**Q. (By Mr. Casey) What did -- what is your understanding of line -- that line with the four X's in front of it?**

A. What that -- based on what my -- my experience as a -- historically as an investigator, what that means to me is no different than any agency that had a criminal investigator or a criminal investigations division. Cases from school districts -- schools are submitted to the investigator to do follow-up investigation and get the cases prepped to send to the -- to the -- to the district or county attorney's office. The only time an investigator would put personal knowledge is if they had firsthand knowledge; otherwise, they're investigating it based upon the information that's provided to them. Not only are they taking the information that's provided, they're looking at any other evidence that exists related to that.

So with this -- what that means to me is that Sergeant Griffith, based upon the information provided by Sergeant Pope in his initial report and all of the ancillary evidence or individuals that were interviewed, that is what led her to write the affidavit and check that the way she did.

92

**Q. Okay. All right. So in here it -- if she had learned something through review of body camera footage, would it be identified -- or excuse me. Would you expect it to be identified underneath in these numbered fact sections?**

A. Not necessarily.

## CHIEF JEFFREY DWAYNE YARBROUGH

93

[redacted]

**Q. Okay. All right. When the -- well, we'll come back to this in a second. When the -- when the meeting started, where were you positioned during the public comment period?**

A. I was in the room. And when I say "the room," I'm speaking of the room directly behind the school board dais. There's an mirrored glass window, and there's a room directly behind there.

**Q. And were you there for the entire meeting?**

94

A. I don't recall.

**Q. Did you encounter Mr. Story at any time prior to him beginning to speak during the public comment period?**

A. Yes, sir, I did.

**Q. Okay. And I don't want you to -- I'm not imagining you have a time stamp in your head. Was that closer to the beginning of the meeting or closer to right before he spoke?**

A. I don't recall. It was during a break.

**Q. During a beak. Okay. Describe to me that encounter in as much detail as you can remember.**

A. What I recall is when I was sitting in the back room I heard initially an outburst from the audience, and I saw that it was Mr. Story. I didn't know who he was at the time. Once I saw that, I sat there, and then I saw it happen again. And because of the climate that we had, I said, well, I'm going to talk to this gentleman just to -- to let him know that we respect his right to address his elected officials, but you can't disrupt the meeting. It was an attempt to -- to ensure that we maintain order.

So during the break I went out and I walked up to Mr. Story who was speaking to another gentleman that I did not know, and I didn't know Mr. Story at the time,

95

so I asked -- I said, "Hey" -- I said -- I asked him, "Would you mind stepping outside with me so that we can" -- "so I can speak to you?" And the reason behind that was I -- there were people in the room, he was talking to a person that was standing in front of him, and I didn't want to come across with what I perceived to be disrespect and -- and -- and put him on blast in front of people that were in the meeting because I felt that would be counterproductive.

So I said, "Would you mind stepping outside so I can speak with you for a moment?" And he said, "Who are you?" I said, "I'm Jeff Yarbrough, the chief of police." And he said, "No. You can speak to me right here." And I recall telling him, "Sir, I just want you to know that we're here to respect you and support your right to address your elected officials, but you cannot disrupt the meeting." And he went into asking me did I hear other people disrupting the meeting, which I did not. And so I restated again, "You can't disrupt the meeting. If you do, we're going to have to ask you to leave." And when he countered with more questions about other people are doing something, I told him, "Have a good day," and I left and went back to the back of the room.

**Q. Okay.**

96

A. Back behind the council -- the School Board.

**Q. Now, when you say outbursts -- thank you for that narrative. When you say outbursts, describe what you heard, please?**

A. I heard a loud -- what I considered to be a loud yell from Mr. Story.

**Q. Okay. And I don't want to get too nitpicky about this because you're not a -- you're -- you're -- we don't have built-in decibel meters, but -- but do you think it -- was it during a moment of silence or a moment when a discussion was going on on the dais?**

A. I don't recall specifically what was going on at that point.

**Q. And were you able to triangulate that very first outburst?**

A. Yes.

**Q. Okay. And then you said it happened twice more?**

A. I -- I don't remember exactly how many more times, but it was definitely more than the first time I heard.

**Q. Okay. So more than one?**

A. Yes.

**Q. Okay. And -- and those, I mean, those should be picked up on -- on -- on the video -- or I mean, I**



believe. I mean, we'd be -- like if it was a loud yell, right, I mean, you would assume it'd by picked up on the video?
A. It depends on which mic was on. If the -- if the mic near where the public comments are made from was on, then I could see that. If it was a mic where the dais was, I'm not sure because they have to be turned on when they speak.

Q. (By Mr. Casey) Did any administrator warn you beforehand for the August 16th meeting that Jeremy Story might be present?
A. No.
Q. Okay. Did you see Jeremy Story prior to his entry into the meeting room?

A. No.
Q. Were any officers alerted to Jeremy Story's presence or potential presence on campus by your office?
A. I learned that after the fact. I don't know how long after the fact, but I had no knowledge of that prior to that -- that board meeting.
Q. Did the superintendent communicate with you about Mr. Story that day at all prior to the meeting?
A. No.
Q. Did any of the board members communicate with you about Mr. Story prior to that meeting?
A. No.
Q. Did you receive any direction from the superintendent or any trustee or any other person within Round Rock administration to monitor or be ready for a specific speaker?
A. No.
Q. Do you recall from Mr. Story's speech, when he reached the podium, did he shout?
A. When he -- when he approached?
Q. When he approached the podium, was he shouting?
A. No.
Q. Okay. Did you hear Board President Weir tell him to stay on topic?
A. I don't recall what her specific words were.

Q. Okay. So do you recall any of the words exchanged between at -- between them at their initial interaction before he started his comments?
A. Yes, but I don't know verbatim. But I know what she said was something along the lines that she understood that he wanted to speak on a topic that wasn't on the agenda and she said something about the meeting being a special called meeting or a meeting where they can only speak on the topic on the agenda.
Q. Okay. And if -- if at that point any speaker goes off topic, is that an arrestable violation?
A. Just going off topic alone is not.

101

Q. During that exchange. What was the point for you of the exact beginning of the disruption?

A. The disruption, from my recollection, was when Mr. Story went off topic and he was given direction by the presiding school board member that he couldn't speak on a topic off the agenda. That's where -- that's where things started to move into the point of law enforcement intervention.

Q. Okay. So it became an arrestable offense, as I understand you to say -- I don't want to put words in your mouth. I want to get this specifically from your characterization. When he went off topic and she told him to go back on topic, that -- that moment, not that you necessarily had to, but that moment allowed you to make an arrestable offense?

A. No, that moment was not. That moment was a precursor to the -- the outcome, meaning that she gave him direction to stop.

Q. Uh-huh.

A. Others gave him direction to stop. They asked -- they turned his mic off. I remember her gaveling at

102

some point to try to restore order. She gave direction to the officer. So during those times it became a disturbance. And when the officers went to Mr. Story, they typically follow a pattern of ask you, ask you, ask you, tell you, then they make you leave.

Q. Okay. So when you say she gaveled to restore order, when -- if someone goes off topic, is that a lack -- is that a lack of order if they're speaking in a microphone and the -- the board chair disagrees with the nature of their comments? Is that a lack of order?

A. I can't say that that is a lack of order. I can't speak to that because I don't know. But what I do know is when the microphone was turned off and you -- and any individual projects beyond that to try to be heard despite them no longer being allowed to speak at that moment, that creates a disruption.

Q. Okay. So if the board chair then doesn't like what the speaker's saying and they turn off the mic, are you saying that their -- that that person's right to -- right to speak freely, their right to free speech -- I'm not asking you to be a lawyer -- that they're -- let me back up for a second.

Once that mic goes off, if they continue to speak, is that an arrestable offense?

A. That alone is not. We're talking about a

103

series of events that lead up to officers being requested to intervene, and then they're taking action.

Q. Okay. So when he speaks and the mic goes off, they tell the officers to escort him out of the room. If he doesn't follow their escort, is that an arrestable offense?

A. When they're asking if -- yes, it is an arrestable offense when you're given directive to leave after you've created a disturbance and officers ask you, ask you, ask you, tell you, then they physically remove you from the -- from the facility. Now you've created a situation based upon behavior that -- that triggers officers having the ability to arrest.

Q. Okay. So -- so I want to get the sequence of events down because I think this is very specific. I think this may be where some of the contention is. So Mr. Story, his mic gets turned off because the board chair believes he's off topic. He continues to talk. By the board chair shutting off the mic and telling -- and he continues to talk and then the officer -- her telling the officers to escort him out, are they enforcing board policy?

A. Are they officers enforcing board policy?

Q. Yes.

A. By forcing him to leave?

104

Q. Yes.

A. There -- so there -- there are a variety of things. There --

Q. Hold on. Hold on just a second. I -- it's just a simple -- to me, it's just I'm looking for yes-or-no answer. By them escorting him out, are they enforcing board policy, yes or no?

A. They're enforcing board policy because a criminal offense occurred.

MR. CASEY: Okay. I'm going to object.

105

**Q. (By Mr. Casey) Okay. So before we -- before we took a break, we were -- we were talking about the sequence of events. And like I said just a moment ago or a few minutes before that, I think this is really important to -- to pull these pieces out so we can understand them and I can understand you and your perspective. The decision to turn the mic off, is that a -- is that a law enforcement decision or a policy decision?**

A. That is more of a board president decision or a policy decision than law enforcement.

**Q. Okay. All right. And I'm going to ask probably a series of yes-or-no questions. So when Mr. Story speaks -- and you may have answered this before the break, my brain's a little -- little muddled right now. Mr. Story continued to speak after his mic was off. Did the board president have the authority to tell the officers to escort him out?**

A. Yes.

**Q. Okay. Is that authority an authority that arrives -- that derives itself from board policy or a Texas Penal Code statute violation?**

A. Board policy and also Texas Education Code.

106

**Q. Okay. Do you -- what -- do you know what part of the Texas Education Code authorizes that?**

A. 37.105.

**Q. 37.105. Okay.**

A. For law enforcement.

107

**Q. Okay. Is it true that in order to -- in order to judge people's remarks on -- on -- as -- as we will do in a moment on the video, it's important -- I may have asked this before, I apologize -- is it important to hear them as a whole?**

A. I would say it's not important to hear them as

108

a whole depending on what's in the -- in the comments.

109

[redacted]

110

[redacted]

Q. When we deposed Sergeant Griffith she said this was assigned to her. Do you recall why it was assigned to her?
A. Yes. Because she was the criminal investigator for the department.
Q. Okay. Do you -- did you review this affidavit during its preparation?
A. I did not.
Q. Did you review this affidavit at all prior to being signed by the magistrate?
A. I reviewed it. I recall seeing it at the meeting with the county attorney.
Q. Okay.
A. But I don't know if I read through the entire affidavit --
Q. And so your -- okay. So your testimony today is the first time you were -- you laid eyes on what was going to be in it was at that meeting with the county attorney?
A. That's my recollection. I can assume that I possibly did, but I'm not sure.
Q. Okay. So when you went to the county attorney's office, when was that?

111

A. It would have to be the day the warrant was signed from my recollection.
Q. Okay.
A. I don't know what the date is.
Q. Okay. Why did you meet with the county attorney?
A. Why did I or why did we as a department?
Q. As a -- well, who was there at the meeting that you recall?
A. Sergeant Griffith, Assistant Chief Williby, the county attorney, his first assistant, another attorney, and myself.
Q. And -- and so did this meeting have a -- excuse me. What were the purposes of this meeting?
A. It -- it was a -- it was for two reasons. The one reason was because we were having a large school board meeting at a performing arts center that was partially in Williamson County, partially -- where the campus is partially in Williamson and partially in Travis. We wanted to talk to him, the -- the county attorney's office about that to get some feedback and input and talk about what would be the best approach to addressing and mitigating. And if we had some unfortunate circumstances or situations, how would we best approach those situations. We ran through

112

scenarios on what if something happened in the PAC and the -- the jurisdictional line between Williamson County and Travis County is -- is different, how would we handle those things.
And so those are some of the discussions we had, but we also discussed with Sergeant Griffith, providing them a rundown and giving them the arrest affidavit to review and give a determination on the staffing, whether or not they felt there was enough to proceed with an arrest.
[redacted]
Q. Okay. And then what -- what did -- what did the County Attorney Dee Hobbs indicate to you about -- about whether they would staff this case?
A. What do you mean? I --
Q. What -- what do you -- what do you -- I'm sorry. I'm talking over you. I apologize. What do you



113

**recall Dee Hobbs conveying to you about what -- whether they would staff this case or not?**

A. I recall him stating the date, which was the day that we went to his office for us to come and meet about both of those issues and they would staff it and review it at that time.

114

115

116

117

Q. Okay. Is that, to you, a verbal outburst when he raises his voice back up to be able to communicate to the chair who has just turned off his mic?
A. So --
Q. It's yes or no, sir.
A. I would have to say yes.

118

119

Q. Okay. If Mr. Story pulled -- excuse me. When the board chair says, "Escort him out," do you recall whether Mr. Pope and Pontillo -- Officers Pope and Pontillo physically touched Mr. Story at that time?
A. I don't recall.
Q. Okay.
A. At this point.
Q. All right. If they physically touched him at that time and he pulled away, would they have the right to arrest him at that time, yes or no?
A. Yes.
Q. Okay. What would be the basis for them, based on your experience as a law enforcement officer, for them arresting him when he pulls away from their grasp?
A. Based upon my professional experience, as you stated, when your -- when they -- when it was determined that he was requested to leave, he was given the direction to leave, to stop prior to that, but officers asked him -- and when they -- if they touched him like

120

you're saying they did to ask him to leave and he pulls away, they've used force. Whether it's physical force to escort him out and he refused, that is subject to arrest.
Q. Okay. So when the officers ask him to leave -- let's rewind just a little bit. When they ask him to leave, are they enforcing a command from the board president?
A. Yes.
Q. Okay. If it's a command from the board president, is that board policy? It's yes or no.
MS. LONG: I'm going to object to the extent it calls for legal conclusion or expert legal testimony.
MR. CASEY: Sure.
Q. (By Mr. Casey) You can go ahead and answer, sir.
A. I would have to see the policy. But if the board president gives the directive after a disturbance has occurred, then the officers have the authority to remove him.
Q. Okay.
A. Based on -- based on board policy.

121

Q. (By Mr. Casey) At what point could you -- your officers arrest him, Chief Yarbrough?
A. Based -- once they removed him and he refused to leave and was physically resisting to be removed

122

after being asked by the school board president, after his mic being silenced, after him yelling above to try to continue to be heard, as he's being escorted out of the room and he's continuing to yell, the disturbance that was created, all of those culminated into the arrestable offense.

Q. Okay. So if it isn't when you cut his mic, because you already said that's not arrestable, if it isn't when he raises his voice, because you said it's not arrestable, if it isn't when the board chair says stay on topic, if it isn't when they say leave, then what is that moment in time that you have crossed the line? Because -- and here's why I'm asking that. You

123

can't go back and reach back 10 minutes ago and say, "Oh, you crossed the line back there." And that seems, to me, what you're doing with the answer to the question. I'm not -- you're not trying to be evasive. I don't think you're being evasive. I just think it's vague. It's murky. At what point do you say, this is the -- this is the moment in time that you've crossed that line? Where was that, Chief Yarbrough?
MS. LONG: Objection, asked -- objection, asked and answered.
MR. CASEY: I -- I -- I don't have a -- I don't have a clear moment in time. That's what I'm asking for.
Q. (By Mr. Casey) What's the clear moment in time, Chief Yarbrough?
MS. LONG: I'm going to object as asked and answered. You can answer the question, Chief Yarbrough.
A. Based on what I observed and what I recall, the moment in time came when law enforcement intervention took place, law enforcement officers asked, asked, asked, told, and had to physically remove him from the facility. Unlike others who may have had similar outbursts of yells and screaming, when they were directed to leave, they complied and law enforcement didn't have to put their hands on them.

124

Q. (By Mr. Casey) No, that's fine. I -- I don't want to -- I don't want to unnecessarily prohibit stuff from being in the record. As I understand you to say, is that when he -- when they asked him to leave and he said no and they had to put his [sic] hands on him, that's the moment in time; is that fair?
A. That's fair.

Q. Okay. All right. Let's go to Paragraph 4. All right. "Affiant learned Sergeant Pope and Round Rock ISD Officer Frank Pontillo approached Story and made several verbal requests for Story to leave the boardroom. Affiant learned Story refused to leave the boardroom." You agree with that statement?

A. Yes.

Q. (By Mr. Casey) Well, and I -- after Paragraph 6 sentence, I guess first clause, did you have -- I guess maybe the evidence. Did you have any evidence of that night that you reviewed after that first clause of Paragraph 6 about Mr. Story and his actions inside Round Rock ISD High School?

A. Are you talking about in the overflow area?

Q. Either there or on the way out the building. Yes, sir.

A. Yes.

MS. LONG: Stephen, are you asking him if he's ever seen anything that documents this? Your

129

question is just -- I don't understand what you're asking.

**Q. (By Mr. Casey) Like any -- any evidence. Not -- not -- not a -- have to be a written statement. Do you see any evidence? Body cam footage, video footage, anything at all concerning Mr. Story from the moment he left the room to the moment he was escorted out of the building?**

A. Yes.

**Q. What was that? What did you --**

A. Body cam footage.

**Q. Body cam footage. Who -- which officer was that?**

A. I believe it was Officer Pontillo.

130

131

132

**Q. Okay. And I heard -- did I hear he or she? I want to make sure we're getting our persons right because the process is unclear about how these things build. So let me -- let me express to you my understanding and -- and have you agree, yes or no, whether my understanding is correct. All the LEOs at that event write a narrative, or they should at least, and those get put independently into the case file. That's step one; correct?**

A. Cor -- step one is Sergeant Pope writing his initial report and all the others like you're saying is correct.

**Q. Okay. And then step two is this gets assigned to Sergeant Griffith to investigate the case based on what's in the case file; correct?**

A. Yes. What's in the case file and what's determined to be missing, to gather those things as well.

**Q. Okay. So when -- so who's managing this case file? And is it Sergeant Pope or Sergeant Griffith?**

A. Sergeant Pope would be until it's referred to the criminal investigations division or the criminal investigator.

133

Q. Okay. So then when Sergeant Griffith is writing this arrest affidavit, she's pulling from, essentially, a case file that is provided to her by, as I read it here, Sergeant Pope.

A. Yes.

ke

134

Q. Okay. So there's two pieces to that that I just heard. She would have referred to everything she got from Sergeant Pope, but she could have gone after other information; right?

A. You would have as an investigator. Everything he provides, he's not the investigator.

Q. Sure. Sure. So he would just be testifying -- so let's kind of clarify. Stuff that he would be telling her about, he would be testifying on his personal knowledge; right?

A. Yes.

Q. Okay. If she went and got out stuff outside of talking to Pope or that -- that last clause, "Gathered such information," you would agree with me it's not listed there correct? Yes or no.

A. No, it's not. And it doesn't have to be.

Q. I'm sorry? That last part?

A. I said it doesn't have to be.

135

136

137

138

Q. All right. I'm going to -- since you can see the arrow, I'm going to come down on this. This -- this paragraph right here, it says, "Mr. Story" -- oh, sorry. This line. "Mr. Story refused Sergeant Pope's directives." Do you see that?
A. Yes.
Q. It says, "And continued to stand and yell." Do you mean to say right there that he continued to yell or that he continued to stand there and then started to yell?
A. He continued to stand and yell. Continued --
Q. Okay.
A. -- to talk and yell as he was standing there.
Q. All right. When did his yelling start based on

139

your observation?
A. Based on my observation is when they first gave warnings, he started to yell to talk over them. Then when the mic was off, he continued.
Q. Okay. So when he talked over them, you're saying that by talking over them he was yelling or he raised his volume?
A. In this context, yelling is raising your volume from my perspective.
Q. Okay. So anytime someone -- and I'll try to get this definition really, really carefully so we can understand what went -- what happened. When someone raises their volume above the dais, that by definition is yelling?
A. Sorry. Ask that question again.
Q. When someone raises their volume above the dais, as I understand you to say, that by definition is yelling?
A. Are you looking for a yes-or-no question?
Q. Yes or no. Sorry. I'll -- I'll preface my pre- -- my next questions with that. I'm sorry.
A. Okay. I forgot the question. I'm sorry.
Q. It's no problem. Yes or no, when someone raises their voice above the dais, as in talking over them, that constitutes yelling?

140

A. Yes.
Q. All right. All right. So next sentence, "Sergeant Pope transitioned from giving verbal directives to placing his hands on Mr. Story for a soft escort." Define soft escort for the jury.
A. Soft escort typically is when you -- an officer places one of his hands on the arm of an individual and a hand maybe on the back, and there's no forceful movement. It's just a soft escort, meaning that the person's walking with the officer as the officer walks and maintains contact with that individual.
Q. Okay. Would this -- could this be this -- are -- are they at this point arrest -- seizing him, based on your training as a law enforcement officer under the Fourth Amendment, are they seizing him right here?
A. Yes.
Q. Okay. All right.
A. Legally.
Q. Yeah. Yeah. I understand. Well, I don't want you to make a legal conclusion. I want to be fair to you and your counsel, but your understanding as a law enforcement officer.
All right. So when you say, "Continued" -- "Mr. Story continued his noncompliance and tumultuous behavior," when you tumultuous, is that because he was



141

**resisting the soft escort?**
A. And -- and it was the heightened yelling and disruption of his behavior.

142

**Q. (By Mr. Casey) How did Sergeant Pope and Officer Pontillo escort him out of the room, Chief Yarbrough?**

143

A. It's me recalling from what I saw in the video only, was -- and -- and as I walked down, they had their hands on him, and I'm not sure on left arm, right arm, which hand, but they -- they had their hands -- had him in semi-care, custody, and control as they were moving him out.
**Q. Okay. So is it reasonable -- not whether you agree he should have done it, but is it reasonable that his voice volume elevated when they were physically removing him from the room, yes or no?**
A. To say reasonable, I'd have to say, no, it's not reasonable.

144

Q. Okay. All right. Because you -- you mentioned -- you cited Texas Education Code 37.105 earlier. Let -- let's -- let's look at 37.105. Do you -- I mean, I'm going to -- I'm going to pull it up. Just a moment. Let me stop the share right here.

Okay. So I'm going to share -- actually, I put this in a new window. All right. Let's go to Education Code 37.105. Okay. We're looking at 37.105. You can see at the top that's off the -- that's off the Texas State Statutes website. There it is right there. Let's walk through this. "A school administrator, school resource officer, or school district peace officer of a school district may refuse to allow a person to enter on or may eject a person from property

under the District's control if the person refuses to leave peaceably on a request and," let's pause there for the "and." Do you -- in your law enforcement training, have you been taught the difference between ands and ors in a statute?

A. Yes.

Q. Okay. And what -- what do you understand the distinction to be?

A. That it -- it requires both.

Q. It requires both. Okay. And so this one, it has an "and" there, but an "or" between number one and number two. So as -- would you agree with me that either number one has to be satisfied or number two has to be satisfied in -- in their entirety?

A. Yes.

Q. Okay. So let's talk number one. Was Mr. Story posing a substantial risk of harm to any person?

A. No.

Q. Okay. Let's talk about number two. Was he behaving in a manner that's inappropriate for a school setting?

A. Yes.

Q. So when you say school setting, under your opinion, this is applying to anytime -- anytime a meeting is taking place on school property?

MS. LONG: Objection to the extent it calls for a legal conclusion.

MR. CASEY: Well, I'm just trying to see his understanding of school setting.

Q. (By Mr. Casey) What does that mean to you in your law enforcement experience as a -- as Round Rock ISD's police chief?

A. About a school setting?

Q. Uh-huh. I mean, is this talking about during the day during instruction or is this talking about school board meetings?

A. From my understanding, it's a -- it's a raw term related to not just a school campus but also a school-sponsored event. It could be a meeting, it could be a football game.

Q. Okay. So any -- any setting then, including a school board meeting, you believe -- you believe as a law enforcement officer -- and this is what you referenced -- would entitle you to remove someone?

A. And what I was referencing, it's one of the things that you can remove for, but you can also remove for the others.

Q. Sure. I mean, there's ton of reasons you can remove someone. I'm just trying to get your understanding because you raised 37.105.

A. Yes.

Q. So that's what I'm referencing.

A. Yes.

Q. And so then --

A. Based on my understanding, a school setting also includes a school board meeting.

Q. Who -- who determines what's inappropriate in that middle -- middle of the Section A(2)? Who determines what's inappropriate?

A. It can be the officer. It can be an administrator. It can be any official or any individual named under 37.105 who can make that determination, a district police officer, school officer, or a school administrator.

Q. If the board chair turns off your mic and you elevate your voice back to the level it was, is that an inappropriate action?

A. Yes, if it causes a disturbance.

38 (Pages 149-152)

CHIEF JEFFREY DWAYNE YARBROUGH

Was Mr. Story raising his voice back up inappropriate?

A. In my opinion, he was.

STOVALL REPORTING & VIDEO, INC. (214) 695-2024

EXHIBIT M

App. 551

**Q. All right. Let's go back to the statement in your supplemental production. All right. So this is -- we -- we've transitioned off of this. August 17th, you said you contacted Dee Hobbs regarding these actions. Go ahead and read that paragraph, please.**

A. On August 17th, 2021, at approximately 7:45 a.m., I contacted Williamson County Attorney Dee Hobbs regarding the actions and possible criminal violations committed by Mr. Story that led to Sergeant Pope and Officer Pontillo having to use physical force to remove Mr. Story from the boardroom due to his hindering and disrupting the school board meeting. Mr. Hobbs was informed that the Round Rock ISD Police Department would complete its investigation into the incident and submit the findings to his office for

review regarding the filing of criminal charges. Mr. Hobbs stated that he would be out for two weeks in the coming days but would schedule a meeting to discuss the case and the findings. Mr. Hoff [sic]" -- "Mr. Hobbs' office later contacted me and scheduled a meeting for September 18th, 2021 to discuss the case against Mr. Story."

**Q. All right. So the very beginning of that, and maybe I misunderstood your earlier testimony, you -- you -- you said you weren't really involved in this investigation or anything like that. What prompted you to reach out to the Williamson County Attorney's Office for this meeting?**

A. Because that was the first time we had a situation where we had to remove a person from a school board meeting so I wanted to talk to him. Once our officers had to put their hands on this individual, that was something that I needed to staff with our county attorney to determine what the next steps would be because it did meet the elements of a misdemeanor, which falls under the county attorney's purview. So I called him as the department head and he being the department head because I didn't know any of the -- really know any of the other attorneys. And I spoke to him about what took place. And he gave direction, and I passed that on

to Assistant Chief Williby.

**Q. All right. So at -- what I take from this paragraph is that when you-all -- you, Sergeant Griffith, and then the other -- the other folks in the meeting -- in attendance at that meeting, when you-all presented this to the county attorney, he gave his rubber stamp that you have all the elements, he's fine with it, go ahead and get it filed?**

A. Yes.

157

158

Q. Okay. Now I understand you earlier -- I don't want to -- I don't want to put words in your mouth. It sounded like you said that Dee Hobbs gave you the go-ahead to go ahead and file the -- go seek the warrant from the magistrate. Is that what you said earlier?
A. Yes.
Q. Okay. I want you to read the second paragraph, please.
A. I've completed.

159

Q. Okay. That next-to-last sentence that's got the "however" in it, does that -- does that -- do you recall that being the county attorney's position, they could not officially give you the opinion, even though he said, "It sounds like both men have violated the law, but we can't give you an official opinion until they review the entire file"? Did you recall him saying that?
A. I don't recall that.
Q. So your recollection is he was giving an official opinion for you-all to go ahead and seek the warrant?
A. That is my understanding.
Q. Okay. Are you required to get their permission before you seek the warrant from the magistrate?
A. No. But it's a good practice, in my opinion, to -- generally staff faces with the -- the prosecuting attorneys.

160

173

Q. Okay. Before August 16th, 2021, were you aware that Jeremy Story had publicly criticized the superintendent?
A. Before which meeting?
Q. Before the August meeting where Mr. Story was escorted out, were you aware that Mr. Story had shown up to the school board meeting to publicly criticize the superintendent?
A. No.

Q. (By Mr. Casey) Are you aware of whether Mr. Story ever showed up to a -- to any school board meetings prior to August 16th to criticize the superintendent?
A. I don't recall of anything like that.

174

175

Q. Is there any instance where the superintendent advised you to strictly remove anybody who -- who deviated from the agenda?
A. No.
Q. Okay. If a speaker wants to criticize the school board or anyone else during the public comment time about their hypocrisy, would that be protected speech?
A. In my opinion, yes.
Q. Okay.
A. They have every right to.

176

177

Q. Okay. Did you review any media coverage about Mr. Story in the days or immediate weeks following his removal from the school board meeting in -- on August 16th?
A. Yes.
Q. What did you -- what did notice and see in the media?
A. I saw different interviews that Mr. Story and Mr. Clark gave related to the arrests at Round Rock ISD.
Q. Okay. And where -- were any Round Rock ISD

178

police officers involved in that, in effectuating the arrest?
A. What do you mean?
Q. In going to his house and actually physically arresting him?
A. Oh, no.
Q. Who -- which department did that?
A. I believe it was Williamson County Sheriff's Department.
Q. Okay. Why -- did it take -- let me back up for a second.
Was the arrest timing correlated to the meeting with the county attorney's office so that you-all could get kind of oversight from the county attorney's office on -- on your probable cause affidavit?
A. No. Not to my knowledge --
Q. So -- so you -- apologize. Go ahead.
A. It was -- again, the meeting date was set by the county attorney's office.
Q. Totally understand that. Why -- why the delay then to get that affidavit until the meeting was done?
A. Because we wanted -- they -- the goal and objective was to have them review and give feedback and input on that affidavit.

179

180

Q. Do you agree that removing a speaker who referenced that issue protected him from public embarrassment?
A. I don't.
Q. So any -- so let's think about the board meeting. If any person then said something that wasn't immediately related to the mask mandate, would that be off topic?
A. It depends.
Q. Okay. That's fine. It depends. It probably depends on having to listen to what they're saying in



181

totality; right?

A. I would say no.

182

183

184

CHIEF JEFFREY DWAYNE YARBROUGH

209

210

Q. (By Mr. Casey) In your law enforcement opinion, wouldn't you see him being treated -- treated differently?

A. I would say the circumstances were different.

211

Q. Okay. And by the board chair, as we just agreed, not enforcing the law -- as you said, she could have enforced it against those other three people. By her not enforcing the law against the three of them and enforcing the law against Mr. Story -- according to her, I'm not agreeing, that that's the law -- but her doing that, she selectively enforced it against Mr. Story; agreed?

A. I disagree.

MS. LONG: I'm going to object.

Q. (By Mr. Casey) You don't believe that she selectively enforced it, yes or no?

212

A. No.

Q. After your meeting with Dee Hobbs talking about the upcoming school board meetings, did you give any guidance to your officers about those meetings?

A. Yes.

Q. What was your guidance to your officers at that time?

A. The guidance I recall generally speaking, not knowing -- recalling the specifics was, again, our duty

CHIEF JEFFREY DWAYNE YARBROUGH

213

and role and responsibility is to support any citizen or any parent or person coming to speak, support their right, but we cannot let anyone disrupt our meetings.

215

214

216

229

230

231

Q. Okay. And so she received that sergeant promotion beginning of August; right?

A. I don't recall when she received it.

Q. Okay. Her interrogatories she said she was promoted September 23rd.

A. Okay.

Q. That -- was that in exchange -- I'm asking very

232

pointed questions. I've got to ask them. I just -- you can say yes or no. Was that in response for her filing the -- and -- and -- and committing to the arrest affidavit for Jeremy Story?

A. No, sir.

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

JEREMY STORY, *
Plaintiff, *
*
v. * CIVIL ACTION NO.
* 1:22-cv-448
*
SUPERINTENDENT HAFEDH *
AZAIEZ, TRUSTEES AMBER *
FELLER, TIFFANIE HARRISON, *
AMY WEIR, JUN XIAO, CORY *
VESSA; OFFICERS JEFFREY *
YARBROUGH, JAMES WILLIBY, *
DEBORAH GRIFFITH, MILTON *
POPE, FRANK PONTILLO, RON *
COLE, CHIEF DENNIS WEINER, *
and CARLA AMACHER, *
individually, and ROUND *
ROCK INDEP. SCHOOL *
DISTRICT, *
Defendants. *

REPORTER'S CERTIFICATION
DEPOSITION OF CHIEF JEFFREY DWAYNE YARBROUGH
OCTOBER 29, 2025
(REPORTED REMOTELY)

I, Kristy Owen, Certified Shorthand Reporter, duly qualified in and for the State of Texas, do hereby certify to the following:

That the witness, CHIEF JEFFREY DWAYNE YARBROUGH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

I further certify that pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor:

__ was not requested by the deponent or a party before the completion of the deposition.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 14th day of November, 2025.

[signature]
_______________________________
KRISTY OWEN, RPR, Texas CSR 10790
RPR Expiration Date: 9-30-2026
CSR Expiration Date: 7-31-2026
STOVALL REPORTING & VIDEO, INC.
Firm Registration No. 10259
1414 Creekview Drive
Lewisville, Texas 75067
Phone: (214) 695-2024

 6:14  5G UC 43

 electdanielleweston.com

On August 16, 2021, I Jeffrey Yarbrough, in my role as Police Chief of the Round Rock ISD Police Department, attended a special called meeting of the Round Rock ISD Board of Trustees. The board meeting was held in the 100 building of Round Rock High School starting at 5:30 PM. During the meeting, I was seated in a room behind the school board members where I was able to see and hear individuals in the board room through a one-way glass. During the meeting, a person yelled out from the audience, and I observed the male individual who made the loud outburst. The person repeated the tumultuous noise and behavior in a manner that disrupted the meeting.

The Board went into recess a short time later, and I approached the individual in the audience who had caused the interruptions, later identified as Jeremy Story. Mr. Story was talking to another person when I contacted him. I asked to speak to Mr. Story outside in private so as to avoid making him feel uncomfortable by warning him in the presence of others to desist with his tumultuous outbursts during the meeting. Mr. Story asked who I was, at which time, I identified myself as Jeffrey Yarbrough, the Round Rock ISD Police Chief. He responded, "I'm not going outside, and you can speak to me right here." I informed Mr. Story that we were there to support his right to address his elected officials, but he needed to do it respectfully and he could not continue to interrupt or disrupt the meeting. Mr. Story became argumentative and stated that there were others yelling in addition to him and asked me if I was going to speak to them. I informed him that he was the person I heard and observed yelling out in a manner that disturbed the meeting. I informed Mr. Story that if his behavior continued, he would be asked to leave the meeting. Mr. Story continued to be argumentative with me, and I restated that we were there to support his right to address his elected officials but if he continued to disturb the meeting, he would be asked to leave. Mr. Story restated that others were yelling out too, at which time, I disengaged from the conversation.

The meeting resumed and Mr. Story was eventually called to the microphone to speak during public comments. School Board President Amy Weir informed Mr. Story before he began to speak that the current meeting was a special called meeting and not a regular board meeting. She added that he could only speak on the items that were listed on the agenda. Mr. Story spoke during public comments and while speaking, it was determined by President Weir and other members of the school board that Mr. Story had deviated from the items listed on the agenda. President Weir and other board members repeatedly informed Mr. Story that he was not allowed to speak regarding any non-agenda item. Mr. Story continued to ignore the directives from the dais which hindered the proceedings. In response to his non-compliance which delayed the proceedings, Sgt. Milton Pope, who was working security in the board meeting room, was given a directive by President Weir to remove Mr. Story from the meeting room. I observed Sgt. Pope approach Mr. Story, who continued to stand at the microphone and refuse to comply with board directives to discontinue his behavior and leave the meeting room. Sgt. Pope approached Mr. Story and gave him verbal directives to leave. Mr. Story refused Sgt. Pope's directives and continued to stand and yell at the board members. Sgt. Pope transitioned from giving verbal directives to placing his hand on Mr. Story's arm for a soft escort of Mr. Story from the room. Mr. Story's continued his non-compliance and tumultuous behavior. In response to Mr. Story's conduct, Sgt. Pope and Officer Frank Pontillo transitioned to using the minimum amount of physical force necessary to escort Mr. Story out of the room and restore peace so that the school board meeting could resume. Mr. Story resisted the physical escort and continued to yell during the entire time Sgt. Pope physically escorted him from the room.

**EXHIBIT M**

**App.**

**EXHIBIT**

**Yarbrough Ex. 4**

On August 17, 2021, at approximately 7:45 AM, I contact Williamson County Attorney Dee Hobbs regarding the actions and possible criminal violations committed by Mr. Story that led to Sgt. Pope and Officer Pontillo having to use physical force to remove Mr. Story from the board room due to him hindering and disrupting the school board meeting. Mr. Hobbs was informed that the Round Rock ISD Police Department would complete its investigation into the incident and submit the findings to his office for review regarding the filing of criminal charges. Mr. Hobbs stated that he would be out for two weeks in the coming days but would schedule a meeting date to discuss the case and findings. Mr. Hobbs' office later contacted me and scheduled a meeting for September 18, 2021, to discuss the case against Mr. Story.

On September 14, 2021, another incident occurred at a school board meeting where an individual identified as Dustin Clark was present in the board meeting room and hindered the official proceedings through repeated verbal outbursts and tumultuous behavior. Mr. Clark was warned by members of the school board from the dais and by Round Rock ISD PD officers to stop his repeated outbursts during the meeting. Mr. Clark continued the disruptive behavior which resulted in him being directed to leave the meeting. Mr. Clark ignored these verbal requests to leave the meeting. At that point, after Sgt. Sam Chavez and Assistant Chief Jim Williby had verbally requested for Mr. Clark to leave multiple times, the officers physically escorted him from the room. Mr. Clark was escorted out the rear door of the board room. After being removed, Mr. Clark re-entered the building and stood outside of the board room where he was captured on video speaking about the events that had just occurred inside the board room. He stated, "That's why I caused a disruption, that's why I tried to stop it."

On or about September 14, 2021, shortly after Mr. Clark was removed from the board meeting, I contacted County Attorney Dee Hobbs and informed him of what had transpired. I informed him that the case would be investigated, and Round Rock ISD PD would like to discuss the possibility of filing criminal charges due to Mr. Clark's hindering the meeting with his tumultuous behavior and repeated outbursts that led to officers using physical force to remove him from the meeting. Mr. Hobbs stated that Mr. Clark's case could be reviewed on September 18, 2021, when Mr. Story's case was scheduled for review.

On September 18, 2021, Assistant Chief Williby, Sgt. Lauren Griffith, and I met with Mr. Dee Hobbs at his office. The meeting was also attended by Williamson County Attorney First Assistant Corby Holcomb and another attorney from the County Attorney's Office. Sgt. Griffith provided the investigative reports, criminal complaints, and criminal charge options were discussed with those in attendance. At the conclusion of the meeting, the County Attorney's Office supported the filing of criminal charges against Mr. Story and Mr. Clark for hindering proceedings. Sgt. Griffith was accompanied by a member of the Williamson County Attorney's Office to a District Judge to review the complaint and issue arrest warrants for Mr. Story and Mr. Clark.

End of Report