IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(AUSTIN DIVISION)

| | |
|---|---|
| JEREMY STORY, | |
| *Plaintiff*, | Case No. 1:22-cv-00448-DAE |
| v. | |
| SUPERINTENDENT HAFEDH AZAIEZ, et al., | |
| *Defendants.* | |

## PLAINTIFF JEREMY STORY'S MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Plaintiff Jeremy Story now moves for summary judgment under Federal Rule of Civil Procedure 56, and would show in support the following:

### SUMMARY JUDGMENT EVIDENCE

The relevant summary judgment evidence is included in the Appendix attached to this Motion and contemporaneously filed. All factual statements relied upon are presented in Movant's Appendix per Local rule CV-7.C.1. *See* LOC. R. CV-7.C.1.

### SUMMARY OF THE ARGUMENT

Plaintiff Jeremy Story seeks summary judgment on his three surviving § 1983 claims: (1) First Amendment viewpoint discrimination at the August 16, 2021 RRISD board meeting; (2) First Amendment retaliatory arrest; and (3) Fourth Amendment unreasonable seizure. The material facts are not genuinely disputed and are confirmed by the Board's own video, the Third Amended Complaint, and the depositions of Superintendent Azaiez, Chief Yarbrough, Det. Sgt. Griffith, and Sgt. Pope.

*First*, the August 16 meeting was at least a limited public forum. The Board opened public comment on COVID-19 leave and health-and-safety protocols and applied its BED(Local) rule limiting speakers to agenda topics. Yet the record shows that multiple speakers were allowed to roam far beyond the literal agenda—invoking Frederick Douglass, Senator Cruz, and Jesus of Nazareth, and accusing "government… down to the school board" of "hypocrisy"— without being cut off or removed. All four deponents acknowledged that these speakers used analogies and criticism as part of their comments, and Pope and Yarbrough admitted they were not silenced. Story did the same thing: he read directly from the Board's own resolution on "health and safety" and "supervision of the Superintendent," then pointed to the protective order against Superintendent Azaiez as evidence the Board's professed concern for safety was hypocritical. The video shows he was calm and on-topic until that moment. Only then did President Weir declare his comments "off topic," cut off his microphone, and order Pope and Pontillo to seize and remove him. On these facts, and in light of *Rosenberger* and *Good News Club*, the only constitutionally relevant distinction between Story and the other speakers is the viewpoint of his criticism. That is per se unconstitutional viewpoint discrimination.

*Second*, the subsequent criminal charge and arrest were retaliatory as a matter of law. After the August 16 removal, Story filed complaints with the Williamson County Attorney, RRISD Police, and TEA, and he continued speaking publicly about the Board's handling of Azaiez. Chief Yarbrough admitted that, because officers had "put their hands on" Story at the meeting, he chose—for the first time in his tenure—to "staff" a school-board incident with County Attorney Hobbs. Det. Sgt. Griffith testified she was directed by Yarbrough or Assistant Chief Williby to "start working on these cases," reviewed Pope's report and some video, and drafted an Affidavit for Warrant of Arrest and Detention for "Hindering Proceedings by

Disorderly Conduct." That affidavit, she conceded, recites information "provided… from Pope, a credible person," and Pope admitted it is "pretty close to word for word" his own incident report. Yet both officers acknowledged that many other speakers went off-topic, used analogies, and engaged in harsh criticism without being charged, and Yarbrough conceded that "just going off topic alone is not" an arrestable offense. In *Nieves* and *Gonzalez*, the Supreme Court held that selective enforcement of flexible, low-level offenses like this—used only against a vocal critic while others go uncharged—supports a First Amendment retaliatory-arrest claim notwithstanding arguable probable cause. The record here fits squarely within that pattern.

*Third*, the August 16 removal was an unreasonable seizure under the Fourth Amendment. Pope and Griffith both described physically taking hold of Story and escorting him from the room at Weir's direction. Yarbrough confirmed this was the first time RRISD officers had to "put their hands on" a board-meeting attendee and that he saw no physical disruption or safety threat from Story when he approached the podium. Azaiez admitted Story never posed a physical threat, and no deponent identified any conduct beyond continued speaking and objection after the mic was cut as the basis for force. Under *Hodari D.* and *Terry*, that is a completed seizure without reasonable suspicion of a genuine offense or any safety-based justification. Given the undisputed video and Defendants' own admissions, no reasonable jury could find that Story was seized for anything other than his protected speech. The Court should therefore grant summary judgment for Story on liability for all three claims.

LEGAL STANDARDS

## I.    Summary Judgment Standard

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242, 248–52 (1986). Where video evidence "blatantly contradicts" a party's account, courts must view the facts in the light depicted by the video. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). That principle controls here: the RRISD video recordings of the August 16 meeting and subsequent encounters are dispositive when they conflict with later characterizations or testimony.

## II.    Free Speech – Viewpoint Discrimination

Government entities may regulate speech in limited public fora with reasonable, viewpoint-neutral time, place, and manner rules; they may not suppress speech because of disagreement with the speaker's viewpoint. *Good News Club v. Milford Cent. Sch*., 533 U.S. 98, 106–07 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va*., 515 U.S. 819, 829–31 (1995); *Fairchild v. Liberty Indep. Sch. Dist*., 597 F.3d 747, 758–59 (5th Cir. 2010). Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829–31; *see Iancu v. Brunetti*, 588 U.S. 388, 401 (2019).

## III.    Retaliatory Arrest

"[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Gonzalez v. Trevino*, 602 U.S. 653, 664 (2024) (*quoting Hartman* v. *Moore*, 547 U. S. 250, 256 (2006)). These types of claims are analyzed under the two-step framework set out in *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 287 (1977). To carry these burdens, parties operating within the *Mt. Healthy* framework may present a wide range of evidence—both objective and subjective. *See, e.g*., *id*., at 282–283 (discussing the plaintiff 's behavioral history in the years leading up to the litigation); *Texas* v. *Lesage*, 528 U. S. 18, 19 (1999) (*per curiam*)

(the defendants produced an affidavit to explain that the plaintiff 's application to graduate school was rejected because of his poor personal statement).

In *Nieves v. Bartlett*, 587 U.S. 391 (2019) , there exists a narrow exception to the no-probable-cause rule. The requirement for a showing of probable cause is relaxed through *Nieves* "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U. S. at 406. "A plaintiff [must] present[] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*, at 407; cf. *United States* v. *Armstrong*, 517 U. S. 456, 470 (1996).

Under *Gonzalez*, 602 U.S. at 658, the inquiry focuses on differential treatment and causation, not on post hoc characterizations of conduct. This includes the "timing of and events leading up to a plaintiff's arrest," including "if officers falsely document the arrest . . . ." *Id.* at 676 (Jackson, J., and Sotomayor, J., concurring).

## IV.    Unreasonable Seizure

The Fourth Amendment prohibits unreasonable searches and seizures. A seizure occurs when an officer, by means of physical force or show of authority, restrains the liberty of a person. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Absent probable cause or reasonable suspicion of a criminal offense, law enforcement officers may not physically seize or restrain an individual. *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968).  When a seizure is effected in response to protected speech, the Fourth Amendment inquiry overlaps with the First Amendment analysis. A seizure motivated by viewpoint discrimination or retaliation for speech is unreasonable as a matter of law. *See, generally*, *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018). And probable cause need not be proven. *Id*. at 101.

ARGUMENT AND AUTHORITIES

**I.    Count I – First and Fourteenth Amendments: Viewpoint Discrimination (Weir, Pope, Pontillo)**

School board meetings are at least limited public fora. The Board may enforce reasonable, viewpoint-neutral rules but cannot suppress speech because of the speaker's perspective. *Good News Club*, 533 U.S. at 106–07; *Fairchild*, 597 F.3d at 758–59; *Rosenberger*, 515 U.S. at 829–31; *Iancu*, 588 U.S. at 401.

### A.    *Defendants enforced content- and viewpoint-based restrictions on August 16.*

#### 1.    The August 16 meeting was at least a limited public forum.

The August 16 meeting was a called board meeting governed by RRISD's Limited Public Comment Rule (BED(Local)), allowing public comment on the posted agenda concerning COVID-19 leave and health and safety protocols. *Third Am. Compl.* ¶¶ 20, 28–29; Decl. Story at 13-28. The superintendent acknowledged that citizens were there to speak on COVID-related issues and that public comment was invited. (Azaiez at 71:3–10 (agenda; Exh. 2 – August 16 agenda)).

Once RRISD opened the floor for public comment on these issues, it created at least a limited public forum. In such a forum, it may limit topics to the agenda but may not discriminate based on viewpoint.

#### 2.    Other speakers' analogies and accusations of hypocrisy were allowed.

The undisputed record shows that multiple speakers used analogies and harsh rhetoric—often far afield from the literal agenda text—yet were allowed to finish.

##### a.    *Wrightmire – Frederick Douglass analogy*

Pope admitted that Frederick Douglass is not "COVID health and safety" but recognized

6

that speaker Catherine Wrightmire used him "as an example" and that her comments must be taken in context: (Pope at 159:8–13; 159:16–21; 180:1–11); Appx. at 5 at 1:05:38.

<em>b.    Lee – Senator Cruz analogy</em>

Pope similarly testified that Elaine Lee's comments about Senator Ted Cruz were an analogy about mask mandates and had to be read as a whole. (Pope at 162:14–19; 179:1–10, 14–17, 22–23). Pope also acknowledged that Lee was not cut off when she mentioned Cruz. (Pope at 163:5–12); Appx. 5 at 1:07:38.

<em>c.    Zimmerman – Jesus of Nazareth and "hypocrisy"</em>

Don Zimmerman used Jesus of Nazareth as an analogy, then explicitly called out the Board's hypocrisy. (Zimmerman transcript in Complaint; Exh. 1; Pope at 165:1–7, 16–19 (Exh. 5 at 1:36:18)). Pope agreed Zimmerman was using Jesus "as an example" about the mask mandate. (Pope at 165:7–13 (Exhs. 1, 5, 6). Pope further acknowledged Zimmerman was "calling the school board hypocritical" and that such hypocrisy in leadership "demeans what you're doing." (Pope at 166:15–20 (Exh. 6); 166:1–5); Exhs. 1, 5, 6.

**Zimmerman was not silenced.** "Was Mr. Zimmerman cut off at any time on his microphone? A. Not to my understanding." (Pope at 166:21–25). Yarbrough corroborated and confirmed this in his own review of the video. "He went out to make a comparison; right? A. Yes. Q. …he was not cut off; right? A. Yes." (Yarbrough at 195:1–5 (watching Zimmerman on Exh. 5 / Exh. 6 – Story clip)).

3.    <u>All topics allowed, no "forbidden" analogies</u>

Pope summarized that analogies involving Cruz, Frederick Douglass, and Jesus of Nazareth were used to discuss the mask mandate and were all allowed. "The topics… have involved Senator Cruz… Frederick Douglass… Jesus of Nazareth…? A. Yes." (Pope at 167:7–

7

16). When asked whether any topic was prohibited as a comparative topic, Pope did not identify a single forbidden category. (Pope at 167:17–25).

Azaiez acknowledged that Jennifer White accused him publicly of assaulting a pregnant girl and that such comments were allowed to proceed. White said, "He assaulted a pregnant girl." When asked if that was off topic and whether she was removed, he agreed it was off topic but not his decision to remove her—and she was not escorted out. (Azaiez at 77:14–22 (reading Jennifer White excerpt from Complaint; Exh. 6) ("Is it your opinion… she was off topic? A. Yes… it wasn't my decision to make.")). He also recognized that other speakers criticized him and the Board but were not removed, and that only Story's criticism led to removal. (Azaiez at 72:7–13, 72:19–22 (Appx. at 5).

### 4.    Only Story's analogous criticism of the Superintendent and Board was silenced and punished:

Story's comments (as captured in Exh. 6 / Exh. 7 and summarized in the Complaint) followed the same rhetorical pattern. *First*, he read from the Board's own resolution about "health and safety" and "supervision of the Superintendent" in the context of COVID. *Third Am. Compl.* ¶ 33; Pope at 144:6–15, 18–21 (acknowledging context is "incomplete" without more of his words and that he needed "more… around this" to decide if it related to COVID safety).

*Second*, he referenced the Governor's order on mask mandates and RRISD's use of officers to enforce what he stated was a last-minute Open Meetings Act violation, again questioning the Board's sincerity about safety and lawfulness. *Id.*; Pope at 140:15–25; 141:1–5 (Governor's order discussion; Exh. 7 – Story clip).

*Third*, he then briefly mentioned the protective order against Azaiez to illustrate that the Board was willing to ignore serious safety concerns while invoking "health and safety" for

COVID policy—an analogy structurally identical to the analogies used by Wrightmire, Lee, and Zimmerman. *Third Am. Compl.* ¶¶ 33–34.

At that moment, Weir cut him off as "off topic," had his microphone shut off, and directed Pope and Pontillo to remove him. *Id.* ¶ 34. Pope confirmed that (1) the dispute over "on topic/off topic" occurred before any alleged "outburst" or raised voice. (Pope at 172:10–18), and (2) Story's "outbursts" consisted of sounding louder after the mic was cut, i.e., after his rights were violated, not of physical disruption. (Pope at 120:4–13 (two "loud statements"); 132:1–13 (outburst defined as talking over the chair)).

Yarbrough testified that, while he believed Story was disruptive by talking over Weir, merely going off topic alone is not a state-law violation. "Q. …if at that point any speaker goes off topic, is that an arrestable violation? A. "Just going off topic alone is not." (Yarbrough at 100:11–13).

All three—Pope, Yarbrough, and Azaiez—admitted they did not see other speakers physically disrupt the room or threaten safety when they made their analogies; only Story was seized. (Yarbrough at 100:14–25; 375:19–25 (no physical disruption by Story approaching podium); Pope at 49:1–11 (people can say things you "don't like" and not be arrested); Azaiez at 72:19–22; 77:19–25).

5.  All four deponents concede principles that, applied to these facts, establish viewpoint discrimination.

Despite their wholesale inability to apply constitutional principles, and the glaring lack of understanding the boundaries of their constitutional duties, all four deponents acknowledged core First Amendment principles that, when applied to the August 16 record, incriminate their own conduct.

Pope described viewpoint discrimination using his Mustang/Camaro analogy. (Pope at 35:18–25ff; Pope at 38:9–13; 39:1–4). Chief Yarbrough acknowledged the same principles, and that officers **needed** to make independent decisions, a course of action denied by Sergeant Pope. For example, Chief Yarbrough stated that officers must develop their own reasonable suspicion and probable cause, not simply obey a superintendent's desire to enforce policy. (Yarbrough at 60:1–7, 16–19; *contra* Pope at 167:23-168:17); (Yarbrough at 100:11–13; *contra* Pope at 176:18-177:6). Griffith admitted she understood the concept of speaking by analogy but claimed not to see Story as speaking by analogy in her opinion. (Griffith at 61:1–7). The affidavit's key language—that Story talked off topic and had "several outbursts"—was presented as information "provided… from Pope, a credible person," not as independently verified facts; anyone reading her affidavit would see only Pope as the source. (Griffith at 61:10–17, 19–25; 69:18–25; 51:14–25). *This is problematic, because Griffith, not Pope or Yarbrough, was the one attesting to probable cause when she signed.* (Griffith at 146:19–25; 147:1–3). Then, Azaiez admitted that from Story's perspective, it was at least partly reasonable to raise the protective order as a safety concern in a meeting about COVID "health and safety." (Azaiez at 98:7–18). Azaiez also admitted that applying "different standards" to speakers during board meetings can be perceived as unequal treatment of their constitutional rights. (Azaiez at 110:11–17, 18–23).

Critically, Azaiez further acknowledged that other speakers used his personal conduct and accusations of assault as part of their analogies and were not removed, while Story was. (Azaiez at 77:14–22; 72:7–21).

### B.    Viewed in light of the video, the only rational explanation is viewpoint discrimination.

Under *Scott v. Harris*, the Court must view the facts in the light depicted by the

videotape, not by post hoc characterizations that are "blatantly contradicted" by the record. 550

U.S. 372, 380 (2007). The August 16 video (Exh. 5, Exh. 6), the Complaint's transcripts (Exh. 1

– Appendix), and all four depositions (Exhs. 19, 20, 21, and 22) establish:

a. Other speakers used analogies, invoked historical and religious figures, and called the

Board hypocritical—without being silenced or removed;

b. Story used the same rhetorical tools to criticize the Superintendent and Board over a

protective order and hiring process;

c. Only Story was cut off mid-analogy, physically seized, and later charged.

Given the deponents' own concessions about what viewpoint discrimination is, about the

permissibility of analogical criticism, and about the need for neutral enforcement of rules, no

reasonable jury could conclude that Defendants' treatment of Story on August 16 was based on

anything other than disagreement with his viewpoint—his criticism of Azaiez and the Board over

the protective order and alleged hypocrisy on safety.

Summary judgment on Count I is therefore warranted.

## II.    Count II – Retaliatory Arrest (First and Fourteenth Amendments)

### A.    *Story's speech at the August 16 meeting was core political speech on matters of public concern*

Story addressed COVID-19 policy, the Board's professed concern for "health and

safety," and oversight of the Superintendent. *Third Am. Compl.* ¶¶ 28–34. As detailed in Count I,

Story read from the Board's resolution, discussed the Governor's mask order, and analogized

those issues to the protective order against Superintendent Azaiez.

This is confirmed by deposition testimony. Azaiez admitted that on August 16 he was under a **temporary ex parte protective order** sought by Aldrich and that he was aware of it. (Azaiez at 63:8–12 (Exh. 7 – Protective-order materials)).

This was a matter of public concern. Azaiez recognized that some speakers, including Story, "raised the issue of the protective order" at the meeting. (Azaiez at 72:7–12; 72:19–22 (Exh. 1 – Complaint). This is undisputed protected First Amendment activity.

### B. Story experienced adverse action: warrant, charge, and arrest.

On or about September 17, 2021, Griffith swore out an Affidavit for Warrant of Arrest and Detention for Story, charging him with Hindering Proceedings by Disorderly Conduct, a Class A misdemeanor under Tex. Penal Code §§ 38.13 and 42.05. *Third Am. Compl.* ¶ 95. She identified the affidavit in deposition (Griffith at 42:11–23 (Exh. 11 – Arrest Affidavit)).

Griffith testified that, after drafting the affidavit and having it reviewed by Chief Yarbrough, she brought it to a magistrate for signature, then delivered it herself to the Williamson County Sheriff's warrant division. (Griffith at 29:14–25; 30:1–7; 83:13–22 (Exh. 11)).

Story was thereafter arrested on the warrant and prosecuted on the hindering/disorderly-conduct charge. *Third Am. Compl.* ¶¶ 88–96, 193–99. This constitutes adverse action.

### C. The timing, narrative, and selective enforcement show lack of probable cause; ergo, retaliation.

#### 1. Close temporal proximity and Defendants initiated the criminal path

The warrant was obtained roughly one month after the August 16 meeting and in the immediate wake of Story's complaints to the County Attorney, RRISD Police, and TEA. Third

Am. Compl. ¶¶ 38, 40–43, 88–96; Decl. Story at 7. Next, Yarbrough admitted he personally initiated contact with County Attorney Dee Hobbs about potential criminal charges because his officers had put their hands on Story at the meeting. (Yarbrough at 154:14–25; 155:1–3 (Exh. 16 – Hobbs email; Exh. 11 – Affidavit)). He thus made a discretionary decision, not compelled by policy, to escalate Story's removal into a criminal case.

Then, Griffith testified that she was not independently monitoring the August 16 incident but was called and told to work on "these cases." (Griffith at 28:6–10).Griffith did not conduct independent investigative steps despite her statements because they contradict her affidavit and the video evidence. Griffith described her investigation as reviewing incident reports, video, body-cam footage, and the Penal Code elements, then concluding the elements of hindering had been met."(Griffith at 28:17–25; 29:14–23).

But the affidavit itself identifies only Pope as the source. (Griffith at 61:14–17; 61:19–25; 69:18–25 (Exh. 11)). Griffith took all the probable cause ownership for the arrest affidavit (Griffith at 146:19–25; 147:1–3). She further testified that affidavit statements must be "pretty close" to accurate. "In my opinion they need to be pretty close."(Griffith at 138:21–25; 139:1–7). Pope confirmed this. (Pope at 121:10–13 (Exh. 12 – Pope supplemental report; Exh. 11 – Affidavit)). He also characterized affidavits as mere "synopsis" of the report, often "a little bit lacking," while the full report is "the evidence." (Pope at 90:1–10, 12–18).

2.    The "off-topic, outburst, hindering" narrative is contradicted by video and by Defendants' treatment of other speakers.

As detailed in Count I, Pope and all other deponents conceded that (1) other speakers went "off topic" (Cruz, Douglass, Jesus), used analogies, and accused the Board of hypocrisy,

(2) those speakers were not removed or charged; and (3) only when Story used a similar analogy about the Superintendent and protective order was he cut off and seized.

Yet Griffith's affidavit presents Story as uniquely off topic and disorderly, without disclosing that many others did the same or worse. (Griffith at 69:18–25; 76:18–25; 84:19–25 (defining "outbursts" largely in terms of volume and ignoring analogies used by others)).

3.    <u>Azaiez had a personal stake in suppressing Story's accusations and coordinated with his co-defendants on this matter.</u>

Azaiez admitted not only that a temporary protective order was in place on August 16, but also that he signed an agreed order later. (Azaiez at 194:6–13; 195:1–7 (Exh. 9 – Agreed Permanent Restraining Order)).

Then, Azaiez plainly and reasonably acknowledged Mr. Story's viewpoint. (Azaiez at 98:7–18). When asked about treating others with different standards could affect constitutional (Azaiez at 110:11–17, 18–23). Azaiez also acknowledged that other speakers accused him of assaulting a pregnant woman and were not removed. (Azaiez at 77:14–22; 72:7–13 (reading Jennifer White's remarks; Exh. 6)).

4.    <u>Yarbrough and Pope had no reason to focus on Story except his protected criticism</u>

Yarbrough admitted that, apart from the school-board controversy, he had no other reason to talk with Azaiez about Story in response to questioning (Yarbrough at 168:19–23).

Yarbrough testified he watched media interviews Story gave after the incident and understood that Story was publicly criticizing RRISD and its police (Yarbrough at 177:16–24). This matters because Yarbrough testified that simply going off topic is not an arrestable offense. (Yarbrough at 100:11–13). Pope himself analogized enforcement to jaywalking, acknowledging

14

that he could technically arrest for certain violations but usually used discretion, using the exact analogy from *Nieves*. (Pope at 116:1–7, 16–25).

This is a key summary judgment fact to the objective exception in *Nieves* and its progeny: no other August 16 speaker was charged with hindering or disrupting, nor was any other person escorted off the podium. Pope and Yarbrough did not identify any other community member arrested or prosecuted for similar conduct at that meeting or others. (Pope at 49:1–11; Yarbrough at 98:21–25; 99:1–7).

In essence, the alleged violation of disruption is of Defendants' own making, because by letting others analogically wander, Defendants set the stage for viewpoint discrimination, and then seized and arrested Story when he asserted his constitutional rights.

> 5.   Under Mt. Healthy, Nieves, and Gonzalez, the only reasonable conclusion is retaliatory motive

The temporal proximity between Story's protected criticism and the decision to  (a) staff his case with the county attorney, (b) draft an affidavit that selectively portrays him as uniquely off topic and disorderly in blatant contradiction of the video evidence, and (c) pursue a hindering/disorderly charge that could theoretically be applied to many participants shows his speech was the motivating factor in the arrest.

The selective enforcement is especially telling in light of the Supreme Court's "jaywalking" concern in *Nieves* and *Gonzalez*. The offense (hindering proceedings by disorderly conduct) was never enforced against board-meeting speakers. Many speakers engaged in comparable "off topic" and emotionally charged speech. Yet only the Superintendent's most persistent critic—who raised the protective order—was targeted.

Defendants have not identified, and the record does not support, a non-retaliatory, neutral reason why Story, and only Story, was escalated from board-room discipline to criminal prosecution prior to his rights being violated. All of them agree others used analogies. They agree he was disruptive when he went off topic. None of them could apply the contours of the First Amendment or the Fourteenth Amendment to his speech despite agreeing to those principles in the abstract. Yet only he was arrested. On this record, no reasonable jury could find that Defendants would have pursued the same adverse action in the absence of Story's protected speech.

Accordingly, Plaintiff is entitled to summary judgment on Count II (Retaliatory Arrest) against Defendants Azaiez, Yarbrough, Griffith, and Pope.

## III.    Count III - Unreasonable Seizure (Fourth Amendment)

### A.    *The August 16 removal was a Fourth Amendment seizure.*

The Third Amended Complaint alleges that after President Weir cut off Story's microphone when he mentioned the protective order, she directed Officers Pope and Pontillo to remove him, and they physically grabbed his arms and escorted him from the room. Third Am. Compl. at ¶ 34.

Pope acknowledged physical contact and escorting Story out of the boardroom. (Pope at 119:3-7, 16-23; 120:4-13; 132:1-13). Griffith testified that Pope told her he had to physically remove Story, placing his hands under Story's armpits. (Griffith at 72:20-23; 87:21-25). Yarbrough testified that officers "had to put their hands" on an individual at the August 16 meeting and that this triggered his decision to consult the county attorney. (Yarbrough at 154:14-25; 155:1-3). Azaiez admitted he was aware Story was escorted out and could not identify any

other member of the public who was similarly removed. (Azaiez at 72:19-22; 111:21-25; 112:1-4).

Under *Hodari D*., this use of physical force to terminate Story's freedom of movement and eject him from the meeting was a seizure.

### B.    *The seizure was objectively unreasonable.*

None of the deponents identified any safety threat posed by Story when he was seized. Yarbrough testified that Story was not shouting when he approached the podium and that he did not recall any physical disruption in the audience. (Yarbrough at 99:18-22; 100:14-19). Pope did not claim Story posed a danger warranting immediate arrest. (Pope at 119:1-7). Azaiez testified he did not recall Story ever posing a physical threat. (Azaiez at 111:21-25; 112:1-4). Griffith described Story's "outbursts" in terms of raised voice, not violence. (Griffith at 69:19-25; 84:19-25).

Yarbrough admitted that merely going off topic at a called meeting is not an arrestable state law violation. (Yarbrough at 100:11-13). Pope analogized the situation to jaywalking, acknowledging that while such technical violations could theoretically result in arrest, officers normally use discretion. (Pope at 116:1-7, 16-25). Pope also admitted that in responding to Weir's directive to escort Story out, he effectively followed the Board President's instruction rather than independently analyzing Story's constitutional rights in that moment. (Pope at 168:3-12, 21-25; 175:3-13).

The deponents were the textbook definition of Keystone Cops, with none agreeing on the constitutional boundaries. Azaiez likewise conceded that he is "not a lawyer," did not know the legal requirements governing when police could remove a citizen from a board meeting, and could only speak in generalities about "administrative decisions" and deferring to legal counsel.

(Azaiez at 71:1–11; 96:3–15; 111:21–25; 112:1–4; 147:11–17). Taken together, their testimony shows that when Pope and Pontillo seized Story, the decision rested not on a deliberate application of clearly established First and Fourth Amendment protections, but on ad hoc, content-driven judgments by officials who did not understand—or did not apply—the constitutional limits on their authority.

## IV.    The wholesale lack of knowledge of the constitutional boundaries of Mr. Story's rights removes the qualified immunity defense.

The boundaries of Mr. Story's affirmative constitutional rights to speech are not new, and this abject lack of knowledge by Defendants of those boundaries evaporates any qualified immunity defense, for this and the other live claims. "Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Trammel v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017). "Existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This is the case when it is "sufficiently clear that a reasonable officer would understand that what she is doing violates that right." *Mack v. City of Abilene*, 461 F.3d 547, 555 (5th Cir. 2006).

### A.    All four deponents ultimately agree on the basic principles behind viewpoint discrimination.

All four key deponents ultimately agreed with the **basic principles** of viewpoint discrimination when those principles were presented in simple, concrete terms. Pope acknowledged, for example, that if a meeting is about cars and the presiding officer allows everyone to talk about Camaros but silences a speaker who wants to talk about Mustangs, that would be "discriminating against [the] viewpoint," and that citizens have a right to say things

officials "don't like" so long as they do not incite violence. (Pope at 35:18–25; 36:1–7, 10–11; 38:9–13; 39:1–4; 48:1–10). Yarbrough agreed that officers must develop their own reasonable suspicion and probable cause rather than simply enforce a superintendent's preferences and conceded that off-topic speech alone is not an arrestable offense, implicitly recognizing that content alone cannot be criminalized. (Yarbrough at 60:1–7, 16–19; 100:11–13). Griffith testified that she understood what it means to "speak by analogy" and had been exposed to First Amendment concepts, and Azaiez agreed that applying "different standards" to speakers during a board meeting can be perceived as unequal treatment of their constitutional rights. (Griffith at 61:1–7; 17:11–25; 18:1–9; Azaiez at 98:7–18; 110:11–17, 18–23). In the abstract, then, each of them accepted the core idea that the government may not treat speakers differently simply because of what they are saying.

### B.    Despite this abstract belief, no deponent could coherently apply these principles despite clearly established law.

At the same time, none of the deponents could coherently apply these principles as constitutional law, despite decades of clearly established Supreme Court authority in *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995), *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001), and related cases. Pope's understanding of "viewpoint discrimination" never progressed beyond his Mustang/Camaro analogy; he expressly stated he did not "quite understand" the concept and defaulted to following the Board President's orders rather than independently considering Story's First Amendment rights. (Pope at 35:18–25; 36:1–7, 10–11; 168:3–12, 21–25). Yarbrough could not articulate when content-based enforcement at a school-board meeting crosses the constitutional line, even as he admitted that off-topic speech alone is not a crime. (Yarbrough at 100:11–13). Griffith conceded she had no recent, focused

First Amendment training beyond academy classes, could not recite the Fourth Amendment without prompting, and drafted her arrest affidavit by largely adopting Pope's narrative rather than testing it against constitutional standards. (Griffith at 17:11–25; 18:1–9; 51:14–25; 139:8–25; 146:19–25; 147:1–3). Azaiez repeatedly emphasized that he is "not a lawyer" and could only speak in vague terms about "administrative decisions," even as he admitted that applying different standards to critics can be unequal. (Azaiez at 71:1–11; 96:3–15; 110:11–17, 18–23). In short, while they accepted the lay intuition behind viewpoint discrimination when pressed, none could recognize or apply it as clearly established constitutional law at the time they silenced and seized Story

## CONCLUSION

Jeremy Story presented thoughtful critique to his local government, like Nathan the prophet confronting King David over the murder of Uriah the Hittite. Unlike Nathan, whose words brought King David conviction and contrition, Story's words brought him retaliation. This Court should correct this situation. Therefore, Plaintiff Jeremy Story, by and through the undersigned counsel, respectfully moves this Court for summary judgment as to liability for the following respective claims, with a hearing on damages to be held later.

    a.    Free speech (viewpoint discrimination) under the 1st and 14th Amendment against Defendants A. Weir, M. Pope, and F. Pontillo;

    b.    Retaliatory arrest under the 1st and 14th Amendment against Defendants H. Azaiez, J. Yarbrough, and L. Griffith, and M. Pope;

    c.    4th Amendment search and seizure violation associated with the August 16th board meeting against M. Pope and F. Pontillo.

RESPECTFULLY SUBMITTED, this day, December 30, 2025.

CASEY LAW OFFICE, P.C.
P.O. Box 2451
Round Rock, Texas 78680
Telephone: (512) 257-1324
Fax: (512) 853-4098


By ___/s/ Stephen Casey_____
   Stephen Casey, Esq.
   Texas Bar No. 24065015
   stephen@caseylawoffice.us


## CERTIFICATE OF SERVICE

I hereby certify that on the December 30, 2025, a true and correct copy of the above and foregoing *Motion for Summary Judgment* was served via electronic means to counsel for Defendants:

THOMPSON & HORTON LLP
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

Kathryn E. Long
State Bar No. 24041679
klong@thompsonhorton.com
K. Adam Rothey
State Bar No. 24051274
arothey@thompsonhorton.com
Ibrahim Yaseen
State Bar No. 24137674
iyaseen@thompsonhorton.com

By:___/s/ Stephen Casey_____
   Stephen Casey, Esq.
   Texas Bar No. 24065015
   stephen@caseylawoffice.us