**SERGEANT MILTON NAMON POPE, JR.**

1        IN THE UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF TEXAS
2                   AUSTIN DIVISION

3   JEREMY STORY,                    *
         Plaintiff,                  *
4                                    *
    v.                               *   CIVIL ACTION NO.
5                                    *   1:22-cv-448
                                     *
6   SUPERINTENDENT HAFEDH            *
    AZAIEZ, TRUSTEES AMBER           *
7   FELLER, TIFFANIE HARRISON,       *
    AMY WEIR, JUN XIAO, CORY         *
8   VESSA; OFFICERS JEFFREY          *
    YARBROUGH, JAMES WILLIBY,        *
9   DEBORAH GRIFFITH, MILTON         *
    POPE, FRANK PONTILLO, RON        *
10  COLE, CHIEF DENNIS WEINER,       *
    and CARLA AMACHER,               *
11  individually, and ROUND          *
    ROCK INDEP. SCHOOL               *
12  DISTRICT,                        *
         Defendants.                 *
13

14  ----------------------------------------------------------
                    ORAL DEPOSITION OF
15
              SERGEANT MILTON NAMON POPE, JR.
16
                    OCTOBER 30, 2025
17
                  (REPORTED REMOTELY)
18  ----------------------------------------------------------

19

20       ORAL DEPOSITION of SERGEANT MILTON NAMON POPE, JR.,

21  produced as a witness at the instance of the Plaintiff,

22  and duly sworn, was taken in the above-styled and

23  -numbered cause on the 30th day of October, 2025, from

24  9:04 a.m. to  2:54 p.m., before Kristy Owen, CSR, in and

25  for the State of Texas, reported by machine shorthand

**SERGEANT MILTON NAMON POPE, JR.**

1  with the witness appearing via Zoom in the City of

2  Austin, County of Travis, Texas, pursuant to the Federal

3  Rules of Civil Procedure.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SERGEANT MILTON NAMON POPE, JR.

```
1               A P P E A R A N C E S

2    FOR THE PLAINTIFF (via Zoom):
          Mr. Stephen D. Casey
3         Casey Law Office, P.C.
          P.O. Box 2451
4         Round Rock, Texas 78680
          Phone: (512) 257-1324
5         Fax: (512) 853-4098
          stephen@caseylawoffice.us
6
     FOR THE DEFENDANTS (via Zoom):
7         Ms. Kathryn E. Long
          Ms. Kelsey McKeag (Exits page 165.)
8         Thompson & Horton LLP
          500 North Akard Street
9         Suite 3150
          Dallas, Texas 75201
10        Phone: (972) 853-5115
          Fax:  (713) 583-8884
11        klong@thompsonhorton.com
          kmckeag@thompsonhorton.com
12

13

14   ALSO PRESENT (via Zoom):
          Ms. Cynthia Hill, General Counsel for Round Rock
15        Independent School District

16        Mr. Jeremy Story, Plaintiff (Enters page 30.)
          (Exits page 153.) (Enters page 156.) (Exits page
17        173.)(Enters page 175.)

18

19

20

21

22

23

24

25
```

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

4

**SERGEANT MILTON NAMON POPE, JR.**

1                              I N D E X

2    Appearances.....................................    3

3    SERGEANT MILTON NAMON POPE JR.

4          Examination by Mr. Casey...................    5

5    Changes and Signature.......................... 197

6    Reporter's Certificate......................... 199

7

                               EXHIBITS

8
     NO.  DESCRIPTION                                  PAGE
9
     1    Agenda for August 16th, 2021 board meeting.   54
10
     2    Affidavit for Warrant of Arrest and
11        Detention.................................    82

12   3    RRISD 06311 through 06314.................   107

13   4    Case Supplemental Report
          (Exhibit identified on page 85)...........    --
14
     5    Use-of-Force Report.......................   132
15
     6    Plaintiff's Third Amended Complaint........   137
16
     7    RRISD 02124 through 02125
17        (Exhibit identified on page 144)..........    --

18   8    RRISD 02114 through 02166.................   154

19

20

21

22

23

24

25

**SERGEANT MILTON NAMON POPE, JR.**

```
 1                    P R O C E E D I N G S
 2                    THE REPORTER:  Sergeant Pope, I'm going to
 3   put you under oath.  Will you raise your right hand,
 4   please?
 5                    (Witness sworn.)
 6                    THE REPORTER:  Thank you.  And, Counsel,
 7   did you have any agreements that you want to state on
 8   record?
 9                    MR. CASEY:  No, I just -- no.  I mean,
10   we're --
11                    MS. LONG:  By the rules.
12                    MR. CASEY:  By the rules.  Yeah.
13                    THE REPORTER:  All right.  Thank you.  You
14   may proceed.
15                    SERGEANT MILTON NAMON POPE JR.,
16   having been duly sworn, testified as follows:
17                         EXAMINATION
18   BY MR. CASEY:
19       Q.  Good morning.  Thank you for coming this
20   morning, Sergeant Pope.  We'll get started.  Can you
21   state your full legal name for the court reporter?
22       A.  Yes.  Milton Namon Pope, Jr.
23       Q.  Okay.  Is that Namon with N-a-m-a-a-n or -- or
24   one a?
25       A.  M-o-n.
```

SERGEANT MILTON NAMON POPE, JR.

1      Q.  Namon.  N-a-m-o-n.  Okay.  So recognize you're

2  under oath.  Have you ever testified in court before?

3      A.  Yes, I have.

4      Q.  Okay.  Have you ever testified in a deposition

5  before?

6      A.  No.  This will be the first one.

7      Q.  Okay.  So because there's a court reporter

8  here, I'm going to do my best to make an intentional

9  inflection in my voice at the end of a question, and

10  then -- and then my request to you would be, let there

11  be a little pause and I might -- I might pause

12  unintentionally and add something in my question.  I'll

13  try not to do that.  And then -- and then you give me

14  the answer so that there's only one voice talking at a

15  time for the court reporter.  Okay?

16      A.  Okay.

17      Q.  All right.  And if you don't understand a

18  question, because sometimes my questions become lengthy,

19  just let me know and I can clarify it.  Okay?

20      A.  Okay.

21      Q.  All right.  If you need a break and there's a

22  question pending, I have no problem with breaks whenever

23  you need it.  My only request is that we finish the --

24  if there's a question on the table, that we finish that

25  question before we -- before the break starts.  Okay,

SERGEANT MILTON NAMON POPE, JR.

1  sir?

2      A.  Yes.

3      Q.  All right.  Last, it can become, because we're

4  face to face, a -- a unintended habit in front of a

5  court reporter to do nods or shake our head when we're

6  answering a question and not do a verbal, but the court

7  reporter needs to have a verbal.  So can we agree to --

8  to answer verbally either a yes or no or whatever the

9  question requires?

10     A.  Yes.  No problem.

11     Q.  Okay.  All right.  Thank you.  And if you don't

12  recall something, you don't know, it's fine to say I

13  don't recall or I don't know.  Does that make sense?

14     A.  Yes, it does.

15     Q.  All right.  And because your attorney is here

16  -- and you've got a great attorney -- and she may object

17  to preserve your rights.  If she objects, my request is

18  that you would -- you would -- if you're starting to

19  answer or if it's in that tail end of my question, if

20  you would not talk and let her complete her objection so

21  that your rights are preserved on the record.  Okay?

22     A.  (Inaudible.)

23     Q.  All right.  Did anyone hear that?

24     A.  Yes.  I said okay.  I'm sorry.

25     Q.  Okay.  All right.  Yeah.  And it may be that

SERGEANT MILTON NAMON POPE, JR.

1  your microphone or you need to scoot your microphone

2  closer to your face because I didn't -- I didn't hear

3  any -- I saw your mouth move, but I didn't hear -- I

4  didn't hear a response.

5          All right.  Have you taken -- you know,

6  regarding your testimony, have you taken any medication

7  or ingested anything within the past 24 hours that could

8  affect your ability to think or recall events clearly?

9      A.  No.

10     Q.  Okay.  Are you suffering from any injury or

11 illness or condition that could affect your ability to

12 recall or think about the events of the time period?

13     A.  No.

14     Q.  All right.  Okay.  Let's get started on that.

15 What's your current job title and rank?

16     A.  I am the McNeil Learning Community sergeant,

17 and I'm a sergeant -- patrol sergeant basically for

18 Round Rock ISD Police Department.

19     Q.  Okay.  All right.  And with respect to the rank

20 structure in Round Rock ISD Police Department, what are

21 the -- what are the levels?  Like, for example, what are

22 the subordinate rank levels to your rank?

23     A.  Subordinate rank levels would be just officer.

24     Q.  And based on my understanding from the

25 depositions we've done this week, above that would be

**SERGEANT MILTON NAMON POPE, JR.**

1   like a detective?

2       A.   Not necessarily.   That's a specialized unit.

3   Above me would be an assistant chief, and then a chief.

4       Q.   Okay.   Thank you.   So during the -- during the

5   time period in question, would be the year of 2021, who

6   was your immediate supervisor?

7       A.   Jim Williby.   Assistant Chief Williby.

8       Q.   Okay.   And how long have you been employed by

9   Round Rock ISD Police Department?

10      A.   I want to say a little over five years now.

11      Q.   Okay.   So your starting time would have been

12  right around sometime in 2020?

13      A.   Yes.   I want to say -- yeah, 2020.

14      Q.   All right.   In depositions we ask general

15  background questions.   Where -- where -- where did you

16  grow up?

17      A.   I was born in New London, Connecticut.   I

18  attended high school and college in Alabama.

19      Q.   New London, that's a Navy town; right?

20      A.   Yeah, my father was Navy.

21      Q.   Okay.   I have a lot of -- I had a lot of

22  friends/co-workers stationed there when I was in.

23           All right.   What degree did you seek when you

24  were in college?

25      A.   I have a Bachelor's in Criminal Justice, and I

**SERGEANT MILTON NAMON POPE, JR.**

1  also have a Master's in Criminal Justice.

2      Q.  Okay.  Did you get that master's in Alabama

3  also?

4      A.  No.  Master's online.

5      Q.  Okay.  All right.  Was your college immediately

6  after high school?

7      A.  That's correct.  College and military.

8      Q.  Okay.  What did you do in the military?

9      A.  I was air defense, artillery.

10     Q.  All right.  Thank you for your service.

11     A.  Thank you.

12     Q.  After -- after you left the military, where did

13  you go?

14     A.  I started working for a military contracting

15  company by the name of Brown & Root.

16     Q.  Okay.  And -- and what years were that?

17     A.  '95 and -- '95 to 2005 just off and on, but I

18  -- I did have 10 years of service with them.

19     Q.  Okay.  After Brown & Root, where were you

20  employed, sir?

21     A.  After Brown & Root, I manned a little trucking

22  company for -- for a brief -- maybe like three years,

23  and then I went back to Brown & Root.  The years kind of

24  -- I kind of lose the years.  But after that, I started

25  working for a security company.

SERGEANT MILTON NAMON POPE, JR.

1    Q.   At what point would that security company work
2    have been?
3    A.   I -- it's been so long, I would have to look at
4    my résumé.  I cannot recall.
5    Q.   Okay.  Were -- at Brown & Root, were you
6    working in a security capacity?
7    A.   No.  I was working as a -- at several jobs:
8    MWR coordinator, operations coordinator, operations
9    manager, site manager.
10   Q.   Okay.  When did you attend the police academy?
11   A.   I want to say it was 2000- -- 2014, I think.
12   Q.   Okay.  After the police academy, what was your
13   next position?
14   A.   My next position was -- because I was still
15   working as a security officer, my next position after
16   that was a police officer.  That's when I started
17   working for Austin Community College Police Department.
18   Q.   Okay.  At various campuses?
19   A.   Yes.
20   Q.   Okay.  And then after at ACCPD, where did you
21   go next and what year?
22   A.   I went to -- I went to Round Rock PD -- Round
23   Rock ISD PD.  And I'm -- I'm sorry, let me just re- --
24   rewind there.  I also worked for UTPD as a security
25   guard.  So I was working security -- a security guard at

**SERGEANT MILTON NAMON POPE, JR.**

1 UTPD as well as private security.

2        Q.   Okay.

3        A.   And I would have to look at dates.  I do not

4 recall the dates, it's been so long ago.

5        Q.   That's no problem.  During the times when you

6 were with ACCPD or UTPD, did you ever have to arrest

7 anyone?

8        A.   Yes.  At UT -- I'm sorry.  At ACC, yes.

9        Q.   Okay.  More than five times?

10        A.   I would say yes.

11        Q.   Okay.  More than -- more than 20?

12        A.   I would say no.

13        Q.   Okay.  Were your arrests mainly students?

14        A.   It varied.  Students and nonstudents.

15        Q.   Okay.  Do you recall the general -- general

16 situations when you arrested nonstudents?

17        A.   Without getting too personal with their

18 situations, yes.

19        Q.   Okay.  What year did you receive your TCOLE

20 license?

21        A.   I want to say it was 2014.  I would have to

22 look.  I can't remember.

23        Q.   Okay.

24        A.   I mean, I could look that up, but I can't

25 recall.

SERGEANT MILTON NAMON POPE, JR.

1  Q.  No problem.  All right.  Did you speak with
2  anyone to prepare for today's deposition?
3      A.  Yes, my attorney.
4      Q.  Okay.  Did you review any -- any documents to
5  prepare for today's deposition?
6      A.  My -- my original police report and some video.
7      Q.  So this -- you're saying the police report and
8  then you reviewed videos.  Which videos did you review?
9      A.  The one with Mr. Story in it and myself.
10     Q.  Okay.  To be a little more specific because
11 there's -- my -- my recollection of the videos is there
12 are multiple videos with you and Mr. Story in the same
13 screen.  Which -- which days in particular did you
14 review?
15     A.  I didn't really monitor -- I didn't really
16 notice the days.  It would be the day of him being
17 escorted out of the meeting, that particular.
18     Q.  Okay.  Okay.  So that would be August 16th,
19 2021 as you recall?
20     A.  If that's what the video stamp says, then
21 that's what it is.
22     Q.  Okay.  He was wearing an orange shirt on that
23 day.  Do you recall that?
24     A.  I believe it was orange.
25     Q.  Okay.  Did you watch a video with you

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  encountering Mr. Story at the doors to the board meeting

2  room?

3      A.  I did not watch that one.

4      Q.  Okay.  Okay.  And so the only document you

5  looked at was your police report?

6      A.  That's correct.  Police report and the

7  use-of-force report.

8      Q.  Okay.  All right.  And do you understand today

9  that there's only three remaining claims that Mr. Story

10  has in the lawsuit?  Do you understand that?

11      A.  Yes, I do.

12      Q.  Okay.  Did you have a chance to discuss, prior

13  to this deposition, your testimony with Chief Yarbrough?

14      A.  No.

15      Q.  Did you discuss it with Sergeant Griffith?

16      A.  Sergeant Griffith and I had a discussion, and

17  it was referring -- it was referencing coverage because

18  we're already shorthanded, and since I have to be in

19  this deposition she has to watch my area.

20      Q.  Okay.  Did you-all discuss your testimony at

21  all?

22      A.  No, not at all.

23      Q.  Okay.  Did you speak with the Superintendent

24  Azaiez about this at all?

25      A.  No.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  Okay.

2    A.  Nothing.

3    Q.  All right.  Have you ever been subject to an

4  internal affairs investigation?

5    A.  No.

6    Q.  Okay.  And I know I asked you if you'd ever

7  done a deposition before, but I didn't ask if you'd ever

8  been a defendant in a lawsuit before.

9    A.  This is the only one.

10   Q.  Okay.  All right.  What types of continued

11 education courses or training do you understand your --

12 that you have to take to maintain your TCOLE license?

13   A.  You have to -- yearly you have to do the

14 legislative updates, basically leg- -- legislative

15 updates, whatever requirements TCOLE actually imposes on

16 the -- on the officers.  But the main one is -- there's

17 like a -- every year the requirement changes.

18   Q.  Okay.  How many hours per year do you recall?

19   A.  I'm sorry?

20   Q.  How many hours per year?

21   A.  Roughly around anywhere between 24 to 40.

22   Q.  Okay.  Yeah, I encounter that too.  This is my

23 birth month and the bar bases our continued education on

24 our birth month, so...

25        All right.  Have you ever taken training --

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1  continued training or education or had education courses

2  as a police officer on the First Amendment?

3      A.  Yes.  That training basically is in the

4  academy.

5      Q.  Okay.

6      A.  So there is an event that comes up, then, yeah,

7  you know, we may discuss it as well.

8      Q.  Okay.  And what event are you referencing?  I

9  may have misheard you.

10     A.  Yeah.  It's whatever -- whatever happens on TV.

11  Whatever the latest -- the latest issues on -- on TV.

12     Q.  Okay.

13     A.  Like on the news.  Nothing that pertains to the

14  department.

15     Q.  Okay.

16     A.  Just if there's an issue on TV or on the news,

17  and if we think that we might need to, you know, bring

18  officers in, that's what we do for continued education.

19     Q.  Okay.  So let's -- let's refer to this current

20  event.  Did you ever do any -- any training at Round

21  Rock ISD Police Department because of the -- you know,

22  the event, this lawsuit, being in the news?

23     A.  No.

24     Q.  Okay.  Did you-all have ever -- ever have any

25  Round Rock ISD Police Department meetings over this

SERGEANT MILTON NAMON POPE, JR.

1  lawsuit?

2      A.  No, not that I -- not that I can recall.

3      Q.  Okay.  Since the academy, where you said you

4  got -- received constitutional training, what other

5  instances do you recall that you've had training on the

6  First Amendment?

7      A.  College, probably, if you want to call it that.

8  But other than that, that's about it.  I mean, it's, you

9  know, law classes in college.

10     Q.  Okay.  And so -- because as I understand your

11 testimony to be that you haven't done constitutional --

12 excuse me -- First Amendment training since college or

13 the academy, have you done your own -- own

14 investigation, own training on constitutional law since

15 then?

16     A.  Maybe articles in news -- in magazines

17 probably, but I wouldn't say I've just sat down and just

18 studied constitution laws.  There's an array of laws out

19 there that I need to be familiar with, so it's just one

20 of them.

21     Q.  So nothing formal would be what you're saying

22 today; correct?

23     A.  No more than the academy and what I've learned

24 in, you know, taking my college courses.

25     Q.  And I apologize.  I didn't mean to

SERGEANT MILTON NAMON POPE, JR.

1  mischaracterize that never anything formal.  But since

2  the formal training in the academy and college, you

3  haven't had any other formal training?

4      A.  Give me a -- give me one second here.  Let me

5  just think about this.

6      Q.  Sure.

7      A.  So we have a course we have to take and it

8  refers to the Sandra Bland Act.  So that right there

9  could be considered part of constitutional law training.

10  And that --

11      Q.  What's -- what's the Sandra Bland Act, if you

12  don't mind?

13      A.  Yeah.  That was a case that occurred down in

14  Houston whereas a trooper stopped a female, and as a

15  result she was arrested.  However, she ended up

16  committing suicide in jail.  And the stop was a good

17  stop, but it -- it went -- went bad real quick.  So we

18  did -- that right there was a mandate.  Let's see here.

19  I had that one.  I feel like I'm taking a test.  That's

20  all I can remember, but it --

21      Q.  Yes --

22      A.  Yeah.  But that was a big one that the state

23  legislature's came out with.

24      Q.  Okay.  And I appreciate that.  It makes sense.

25  Okay.  What courses have you taken since the academy on

SERGEANT MILTON NAMON POPE, JR.

1  use of force?

2      A.  Mental health, de-escalation, de-escalation

3  training the trainer, mental health first aid, SBLE --

4  that's school based law enforcement.  You know,

5  school-based law enforcement; there's a lot of

6  de-escalation in there, so...

7      Q.  Okay.  Thank you.  Regarding Round Rock Board

8  of Trustees meeting, is that a standard assignment that

9  you've had since you've been at Round Rock ISD Police

10  Department?

11      A.  Yes, it was a standard assignment.

12      Q.  Okay.  And what I mean standard, were there any

13  significant instances in time where you were not

14  providing security at a trustees meeting?

15      A.  It -- so the way it works is we call those

16  extra jobs.  So if the extra job comes up, if you want

17  it, you can take it; if you don't, you don't have to.

18  So it's not like a requirement.  At that time we had a

19  surplus of officers, so if you wanted to work it you

20  can.  It wasn't like a permanent assigned job.  It was

21  permanent to the department, but not to any officer.  If

22  that makes any sense.

23      Q.  It does.  It does.  So what was -- because it

24  wasn't mandatory -- and I imagine it's, hey, it's -- you

25  know, it's -- it's work.  What was your frequency of

**SERGEANT MILTON NAMON POPE, JR.**

1  attendance at the Round Rock ISD School Board meetings

2  per -- I guess they have about at least one a month;

3  right?

4      A.  I would imagine so.  Yes.

5      Q.  Okay.  Across the course of the year, would you

6  estimate you attended probably -- I'm going to just give

7  a number, you can agree or disagree with it -- 75

8  percent of them?

9      A.  I would say --

10          MS. LONG:  Objection.  Vague.  Sergeant

11  Pope, just because I object, you just -- you answer

12  after I object.

13          THE WITNESS:  Oh, okay.  Yes, ma'am.

14      Q.  (By Mr. Casey)  So how many meetings out of the

15  total year would you estimate you attend?

16          MS. LONG:  Objection.  Vague.

17      Q.  (By Mr. Casey)  You can go ahead and answer my

18  question, sir.  It's just your attorney is preserving

19  your rights for the record.

20      A.  Okay.  It's kind of hard to say.  I don't know,

21  maybe 10, 15 percent I would say.  Again, 10 or 15

22  percent.

23      Q.  So you didn't -- you didn't attend the vast

24  majority of them as I understand your testimony?

25      A.  I would say -- I would say with the amount of

**SERGEANT MILTON NAMON POPE, JR.**

1  officers we had, I would say it was probably equal

2  throughout the department.  I just couldn't hog all the

3  extra jobs.

4      Q.  Okay.  And that's fair.  That makes sense.  All

5  right.  Are you familiar with the -- the lawsuit at

6  issue in this case, the actual -- the actual physical

7  lawsuit, the text of it?  The -- have you reviewed that

8  with your attorney?

9      A.  Yes.

10     Q.  Okay.  And -- and you're familiar with the --

11  the claim, yes or no, that Mr. Story is alleging that

12  yourself and others discriminated against him on the

13  basis of his viewpoint?

14     A.  Yes, I've been aware of it -- informed of it.

15     Q.  Okay.  Are you familiar with the claim that

16  Mr. Story's making that he was unlawfully seized under

17  the Fourth Amendment based on the actions of you and

18  others?

19     A.  Yes.

20     Q.  Okay.  And are you familiar with his claim that

21  this arrest was made in retaliation?

22     A.  Yes.

23     Q.  Okay.  When's the last training that you

24  received on the Fourth Amendment?  I know we talked

25  about the First Amendment, but I'd like to focus on the

**SERGEANT MILTON NAMON POPE, JR.**

1   Fourth Amendment from a moment.

2       A.  We have online courses through PoliceOne, OSS.

3   So I know we've taken some.  I can't give you the exact

4   date.

5       Q.  Okay.  All right.  When -- when you started

6   with Round Rock ISD Police Department, you understand

7   that was after the shift from them utilizing school

8   resource officers to having a standalone police

9   department; correct?

10      A.  That's correct.

11      Q.  What is the difference to your mind between a

12  school resource officer and a school police department

13  as far as the duties of the officer?

14      A.  The -- both have the same duties; however, it's

15  just who actually controls the department.  So if you

16  look at trying to rehabilitate kids, school-based law

17  enforcement officers are a lot better as opposed to

18  contract officers.

19      Q.  Why -- why would that be?

20      A.  Because with contract officers you have -- you

21  may not have the same officer who's building rapport

22  with the kids.  With the school-based law enforcement

23  officer, he's assigned a -- he or she is assigned a

24  campus and they build those rapports, thus preventing

25  crimes, being another mentor, preventing suicides,

SERGEANT MILTON NAMON POPE, JR.

1  things of that nature.  So they -- you know, kids are
2  more in tune to, you know, build a relationship with a
3  school-based law enforcement officer as opposed to a
4  contract guy who's probably switching in and out.
5      Q.  Yeah, that's fair.  It makes sense.  All right.
6  So as a -- as a school-based law enforcement officer,
7  what is the distinction -- excuse me.  Are you there to
8  enforce school policies?
9      A.  I'm here to cover what's in the education code
10  and penal code.
11     Q.  So if a school policy need enforcement, is that
12  -- is that within your purview?
13     A.  It depends.
14     Q.  Why does it depend?
15     A.  If you can -- if you can give me an example to
16  understand your question.
17     Q.  So the school policy -- say, for example, the
18  school policy tells -- says that in a particular room a
19  student has to have long pants on instead of shorts.
20     A.  We don't do that.  We don't enforce that.
21     Q.  Okay.  Do you take direction from school board
22  of trustees members?
23     A.  No.
24     Q.  So a school board --
25     A.  Now, if I may, because I --

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

```
1        Q.  Well, hold on a second, sir.  Real quick --
2              MS. LONG:  Actually, he wasn't finished
3   with his answer.  So --
4              MR. CASEY:  Well, there was a significant
5   pause.  But I want to go over the protocols again.  So
6   I'm going to ask questions.
7              MS. LONG:  Did you not finish your answer,
8   Sergeant Pope?
9              THE WITNESS:  Sorry, ma'am?
10             MS. LONG:  Were you allowed to finish your
11  answers?
12             THE WITNESS:  I would -- I was trying to,
13  but I mean...
14             MR. CASEY:  Okay.  Well, let's -- let's run
15  this -- run this out.  Most of my questions today are
16  going to be yes/no.  If there's information you want to
17  add, your attorney -- at the very end of the day, I'll
18  pass the witness and your attorney can follow up on
19  questions or they can ask you questions at trial.  But
20  the way the structure of the deposition is, your
21  attorney has the right to protect your rights, but I'm
22  the deposing attorney, so --
23             MS. LONG:  Well, I just --
24             MR. CASEY:  Well, no.  Let me just finish.
25             MS. LONG:  -- he can answer the question
```

SERGEANT MILTON NAMON POPE, JR.

1  and I can object as nonresponsive.  But if you don't

2  want his answer to the questions, I don't have to ask at

3  the end of the deposition.  It means you haven't asked

4  that question.

5              MR. CASEY:  I understand.

6      Q.  (By Mr. Casey)  For the purposes of the record,

7  unless I tell you otherwise, unless I probe deeper, I'm

8  just going to ask yes-or-no questions so that it makes

9  it clear.  So the only -- only response I'm looking for,

10  unless I ask to explain, is going to be yes or no.  Is

11  that fair?  Do you understand that, Sergeant Pope?

12      A.  Fair enough.

13      Q.  Okay.  If the board of trustee's president gave

14  you direction to remove someone from the room, is that a

15  policy order, yes or no?

16      A.  I don't understand the question because the

17  question -- I don't understand the question.

18      Q.  Okay.  If the board of trustee's president

19  directs you to remove someone from a room, are you

20  supposed to do that, yes or no?

21              MS. LONG:  Objection.  Vague.

22      Q.  (By Mr. Casey)  You can answer the question.

23      A.  That -- it depends.

24      Q.  Okay.

25      A.  I understand yes or no, but it depends.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  All right.

2    A.  It depends.

3         MR. CASEY:  Okay.  I'm going to object to

4  nonresponsive.

5    Q.  (By Mr. Casey)  I'm looking for yes-or-no

6  answers, sir.  If the board of trustee's president at

7  the time, Amy Weir, says, "Sergeant Pope, I want you to

8  remove this person from the room right now," are you

9  obligated to follow her command, yes or no?

10        MS. LONG:  Objection.  Asked and answered.

11        MR. CASEY:  He said he did not understand.

12        MS. LONG:  No, he said it depends.  And you

13 didn't ask him on what.  You asked him to say yes-or-no

14 question when he already answered, it depends.

15        MR. CASEY:  Well, when I limit my response

16 to yes or no and he doesn't say that, that's

17 nonresponsive.

18        MS. LONG:  No.  There are questions that

19 are not a yes-or-no question, and he says it depends on

20 the circumstance.  It would -- so he answered the

21 question.  You can ask him what it depends on, but you

22 can't force him to make a -- ask the question over and

23 over again until he says yes or no if he says the answer

24 is, it depends.

25        MR. CASEY:  All right.  Well, we can agree

**SERGEANT MILTON NAMON POPE, JR.**

1   to disagree about that.

2       Q.  (By Mr. Casey)  If the superintendent tells you

3   to remove someone from a board meeting room, is that a

4   command you're obligated to follow?

5               MS. LONG:  Objection.  Vague.

6       A.  It depends.

7       Q.  (By Mr. Casey)  With respect to the school

8   board trustee -- we're not talking about the board

9   president.  With respect to an individual school board

10  trustee, if they gave you a command to remove a

11  particular person from a school board meeting, would you

12  be obligated to do that?

13              MS. LONG:  Objection.  Vague.

14      A.  It depends.

15      Q.  (By Mr. Casey)  All right.  So I'm going to

16  break those down a little bit.  As a -- to a trustee

17  only, not the board president, what would it depend on?

18      A.  A trustee member or as opposed to a board -- as

19  the -- as opposed to the president?  What are you --

20  what are you asking again?  Can you repeat that, please?

21      Q.  A -- just a pure trustee member, not the board

22  president.

23      A.  I would say also it depends.

24      Q.  What would it depend on?

25      A.  Well, if -- for example, if you're not allowed

SERGEANT MILTON NAMON POPE, JR.

1    to have weapons inside or a weapon on a school ground

2    and as board member, the superintendent, someone says,

3    "Hey, I see this individual with a weapon," then, yes, I

4    can go ahead on and escort that individual out for the

5    safety of the -- of the meeting as well as the members.

6        Q.  So what I understand you to be saying, yes or

7    no, is that when you've identified a penal code

8    violation, meaning you have a weapon on campus, then

9    that would allow you to do it; correct?

10       A.  That or if it's in the education code, that's

11   correct.

12       Q.  So the two instances of -- I've heard you say,

13   yes or no, are penal code violations or education code

14   violations?

15       A.  Yes.

16       Q.  All right.  When you escorted Mr. Story out of

17   the August 16th board meeting, was that a penal code

18   violation?

19       A.  Yes.

20       Q.  Okay.  Was it an education code violation?

21       A.  Yes, I want to say so.  I know it's a penal

22   code violation.

23       Q.  What penal code was the violation?

24       A.  38.13, I believe.

25       Q.  What education --

**SERGEANT MILTON NAMON POPE, JR.**

| | |
|---|---|
| 1 | A.  Disruption of a meeting. |
| 2 | Q.  Okay.  I just noticed you looked down.  Are -- |
| 3 | you have notes in front of you? |
| 4 | A.  Hold on a second. |
| 5 | (Door knock interruption.) |
| 6 | THE WITNESS:  I'm busy. |
| 7 | A.  I have -- I have my phone.  I'm receiving |
| 8 | texts. |
| 9 | Q.  Oh, I'm sorry.  So that was -- |
| 10 | A.  I'm -- I'm still on -- I'm still on call to -- |
| 11 | I'm at a high school.  Okay?  And if something happens, |
| 12 | I may have to go out.  So, yes, I have individuals, you |
| 13 | know, texting me. |
| 14 | Q.  Okay. |
| 15 | A.  So I have someone also knocking on my door. |
| 16 | Q.  Totally understand. |
| 17 | A.  Apologize for that. |
| 18 | Q.  Totally understand.  I was just -- when you |
| 19 | were referencing, it was during the question so I didn't |
| 20 | know if it was material from the lawsuit.  I totally |
| 21 | understand you having received a text.  And if you need |
| 22 | to leave for an emergency, I completely understand that |
| 23 | situation. |
| 24 | A.  Yes, sir.  Thank you. |
| 25 | Q.  What education code would he have violated? |

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

1    A.  I cannot recall that right now, sir.

2    Q.  Okay.  Thank you.  So in the instance I was

3 talking about an individual trustee member and you said

4 education code or penal code, would that same standard

5 apply to the board president?

6    A.  Yes.

7    Q.  Okay.  Would that same standard apply to the

8 superintendent's command?

9    A.  I -- to be honest, I don't know.

10    Q.  Why when it applies to the superintendent do

11 you not know?

12    A.  I've understood that the board president is in

13 charge of the meeting, so that's the person that is in

14 charge of the meeting, that's the person that can give

15 out directives.  And I've given an example of when a

16 secondary person could ask -- request that a person's

17 being removed from the meeting.

18    Q.  Okay.  I understand the response.  Is the

19 superintendent in your chain of command?

20         (Mr. Story enters.)

21    A.  I would say so.  Yes.

22    Q.  Okay.

23    A.  He's my boss's boss, so he's in the chain of

24 command.

25    Q.  Okay.  And I'm going to pull off of my military

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1  days, your military days.  If the commanding officer of

2  the base was present and gave you a command, would you

3  have to comply with that?

4       A.  In the military?

5       Q.  Yes, sir.

6       A.  Yes.  In the military, that's correct.

7       Q.  Okay.  With respect to the police force, does

8  that same protocol apply?

9       A.  It depends on the circ- -- it depends on the

10 situation.

11      Q.  What about the -- what about the situation --

12 on what about the situation does it depend?

13      A.  Again, if he views someone violating the law,

14 then yes.

15      Q.  Okay.  So I understand that to be similar to

16 your testimony about the -- a board of trustees member

17 or the board president, it would be either a -- some

18 sort of penal code or education code violation; correct?

19      A.  I would say also for the safety of the

20 community.

21      Q.  So --

22      A.  Things of that -- things of that nature.

23      Q.  So I -- now I understand three categories.

24 Correct me if I'm mischaracterizing your testimony.  An

25 education code violation, a penal code violation, and

SERGEANT MILTON NAMON POPE, JR.

```
1   for the sake of argument, is it -- is it safe to say
2   some sort of statutory violation that's in Texas law
3   that allows you to remove them?
4       A.  Yes, I'll agree.
5       Q.  Okay.  And would you consider the last thing
6   you introduced of a safety issue, is that something that
7   you consider a different category?
8       A.  I would also categorize all of them the same,
9   my personal opinion.
10      Q.  So you categorize all those as the same thing;
11  right?
12      A.  Yes.
13      Q.  Are there violations -- safety violations that
14  would fall outside of that that would give you authority
15  to do that?
16      A.  Can you repeat the question?  I'm sorry.  My
17  phone was going off.  Can you repeat your question,
18  please?
19      Q.  No problem.  Are there safety violations --
20  because you said that and it seemed to be distinct and
21  different.  Are there safety violations outside of the
22  penal code or some sort of Texas statute where you would
23  -- they could authorize you to remove someone from the
24  room?
25      A.  That's -- no, I wouldn't -- I would say no.
```

SERGEANT MILTON NAMON POPE, JR.

```
 1      Q.  Okay.

 2      A.  Can you give me one second, please?  If you --

 3      Q.  Yes, sir.  Go ahead.

 4           MS. LONG:  Let's take a 10-minute break

 5   because I'm also going to make sure that people stop

 6   bothering Sergeant Pope.  Okay?

 7           MR. CASEY:  No, no problem.  God bless you.

 8   We'll take a break.

 9           (Ten-minute break was taken.)

10      Q.  (By Mr. Casey)  So before we took a break we

11   were talking about law versus policy.  So would your

12   understanding be that if policy corresponds to law, then

13   that's when you would enforce policy?

14      A.  Agree.

15      Q.  All right.  And if policy and law diverge,

16   which did you have to follow?

17      A.  The law.

18      Q.  Okay.  Are you familiar with the policies

19   governing board meetings?

20      A.  No.

21      Q.  I'm sorry?

22      A.  I said not -- not -- not in towards -- not some

23   of it, but not all of it.  Yeah.

24      Q.  Okay.

25      A.  Some -- some of it I'm familiar with.
```

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.  Which -- which -- which policies are you

2  familiar with governing board meetings?

3    A.  I would say just disruption of the meeting

4  because that's what we deal with.

5    Q.  Okay.  And for you, based on your understanding

6  as a law enforcement officer -- in fact, a school-based

7  law enforcement officer, what is your -- how do you

8  categorize disruption?

9    A.  Speaking out of turn, causing havoc.  Things of

10  that nature.  Causing a disturbance.

11    Q.  Okay.  When you say speaking out of turn, and I

12  know that in this instance I've -- I've accidently

13  talked over you in this deposition.  Is that what you

14  would call speaking out of turn, by talking over

15  someone?

16    A.  I would say it depends.

17    Q.  On what does it depend?

18    A.  If -- if you're in charge of the meeting and

19  I'm constantly over-talking you, then that right there

20  could be considered a disruption if you're in charge of

21  the meeting.

22    Q.  And so your position would be when the person

23  who's in charge of the meeting tells someone who's

24  speaking to be quiet, by law they have to immediately

25  stop talking?

SERGEANT MILTON NAMON POPE, JR.

1    A.  Again, it depends.  I mean, this is not a

2  yes-or-no question.  It depends.

3    Q.  Okay.  On -- in that instance, the -- the

4  situation I presented, the hypothetical I presented,

5  what does that depend on?

6    A.  If -- if there's a violation of the law.

7    Q.  Could you be more specific about that?

8    A.  Yeah.  If it violates a law.  If -- if -- if --

9  if there are rules and the rules say we're going to do

10 this, this, this and this, and I continue to talk and

11 you tell me, "Hey, listen, those" -- "that's not on the

12 meeting agenda," and I keep talking, now I'm -- I'm

13 creating a disruption.

14   Q.  Okay.  So is the meeting agenda state law?

15   A.  I'm not for sure.

16   Q.  Okay.  In the instances where you've been --

17 took training about constitutional law, have you covered

18 the topic viewpoint discrimination?

19   A.  I'm familiar with it.

20   Q.  Okay.  To your understanding, as a school-based

21 law enforcement officer who's required to be familiar

22 with the First Amendment, what does viewpoint

23 discrimination mean to you?

24   A.  If, for instance, you and I are car guys and

25 you like Camaros and I like Mustangs, and every time you

SERGEANT MILTON NAMON POPE, JR.

1  bring up a Camaro I may try to hold that against you.

2      Q.  Okay.  Okay.  And that's fair.  So you're

3  saying that -- that preferences over topics -- excuse

4  me, not topics because that would be content.  But

5  preferences over someone's -- preferences over someone's

6  topic would be viewpoint discrimination; is that what I

7  understand you to be saying?

8              MS. LONG:  Objection.  Calls for a legal

9  opinion or a legal conclusion.  You may answer.

10      A.  Yeah, if you can kind of break it down for me,

11  please.  I'm not quite understanding that.

12      Q.  (By Mr. Casey)  So for example, if the

13  opportunity is to talk about cars and my -- my son's a

14  big Mustang guy, right, and my -- my best friend's a

15  Camaro guy, if -- if the person in charge of the meeting

16  says, "Hey," to my best friend, "get out of here, I

17  don't want to hear about Camaros."  That -- is that --

18  is that -- am I reflecting the situation you just

19  described fairly?

20              MS. LONG:  Objection to the extent it calls

21  for a legal conclusion or a legal opinion.

22      Q.  (By Mr. Casey)  I'm just trying to get --

23  understand your -- your statement.  You -- you brought

24  up a comparison between Mustangs and Camaros.  I'm

25  trying to understand how that is viewpoint

SERGEANT MILTON NAMON POPE, JR.

1  discrimination.

2      A.   I just gave you an example.  That's the best I

3  can do.

4      Q.   Okay.  So is it -- I'm going to try and reword

5  that.  Tell me if my rewording is fair based on your

6  understanding.  And if you can't point to discrimination

7  based on your training as a school-based law enforcement

8  officer and having to be familiar with the First

9  Amendment, there can't be any protected topics.  Like,

10  you can't have a protected brand of car or a protected

11  person; is that fair?

12          MS. LONG:   Objection to the extent it calls

13  for a legal conclusion or a legal opinion.  You can

14  answer the question.

15      A.   Yeah, can you re- -- can you repeat the

16  question?

17          MS. LONG:   So can I -- let me just -- I

18  just want to say this for the record because Mr. Casey

19  told you this.  When I object, that doesn't mean you

20  don't answer.  I'm just objecting to preserve the record

21  so that if this were to go before a judge, the judge

22  could rule on my objection.  So let me object.  And

23  unless I tell you -- instruct you not to answer the

24  question, you just need to answer the question.  I'm

25  just objecting to preserve the record, Sergeant Pope.

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  So I just wanted to clarify that, so -- and so everybody

2  on here knows.  Okay?

3         THE WITNESS:  Yes, ma'am.  I understand.

4  I'm waiting for the pause and everything else.  But

5  again, I didn't understand the question.

6     Q.  (By Mr. Casey)  All right.  So could you repeat

7  your Mustang/Camaro example to make sure I'm

8  understanding you accurately?

9     A.  Yes.  You like Mustangs; I like Camaros.  And

10  you're in a meeting and I'm talking about Camaros.  And

11  you say, "Listen, I don't want to talk about Camaros."

12  That could be considered that.

13    Q.  Okay.  So that would mean there would -- there

14  would be no particular some -- someone's preference of

15  explaining the general topic would have to be allowed;

16  right?

17         MS. LONG:  Objection --

18    Q.  (By Mr. Casey)  Meaning about cars.

19         MR. CASEY:  I'm sorry.  Go ahead, Katie.

20         MS. LONG:  I apologize.  You had clarified

21  your question.  Finish that.

22    Q.  (By Mr. Casey)  All right.  So it's a meeting

23  about cars and the speaker allows everybody talking

24  about Camaros to talk.  But once I bring up Mustangs,

25  that's a different viewpoint.  If that got silenced,

SERGEANT MILTON NAMON POPE, JR.

1  based on your training on the constitution, that would

2  be discriminating against my viewpoint?

3       A.  In an informal conversation, I would say yes.

4       Q.  Well, okay.  What about in a formal

5  conversation?

6       A.  Then we have to look at the law, I would

7  imagine.

8       Q.  Okay.  Does the -- does the law, as you're

9  aware of the education code and the penal code, say that

10  certain topics are not allowed to be spoken about at a

11  school board meeting?

12       A.  I'm not for sure about that.

13       Q.  Okay.  Does the agenda -- the posted agenda for

14  a school board meeting say what's allowed to be talked

15  about and not allowed to be talked about?

16       A.  Yes.

17       Q.  Okay.  Does the school board meeting agenda

18  have the equivalent authority of state law over your

19  actions?

20       A.  It depends.

21       Q.  Okay.  What does it depend upon?

22       A.  If you're causing a disruption.

23       Q.  I'm sorry?

24       A.  If there's a disruption caused.

25       Q.  So I don't understand how the agenda determines

SERGEANT MILTON NAMON POPE, JR.

1  whether there is a disruption caused.  Please explain
2  that to me.
3        A.  If -- if whatever you're speaking of, and I
4  object, and I keep continuing to object and I cause
5  alarm, that right there could constitute that in my
6  personal opinion.
7        Q.  Okay.  I'm trying to understand what you're
8  saying.  Who's the person doing the objecting at that
9  point?
10       A.  I'd be the one.
11       Q.  So in your --
12       A.  You're in charge.  Yes.  Go ahead.  I'm sorry.
13  Go ahead.
14       Q.  In your role, you would be the person running
15  the meeting?
16       A.  No, you would be the person running the
17  meeting.
18       Q.  Okay.  So in the meeting where I'd have an
19  agenda item -- and let's just use for sake of ease of
20  our understanding -- we've already got this car analogy.
21  Let's just stick with that.  So I'm running the meeting
22  and the meeting's about cars.  It doesn't say on the
23  agenda types of cars or anything like that.  And
24  everybody -- 99 percent of people in the room are like,
25  Camaros, Camaros, Camaros.  And then if I'm running the

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  meeting and you get up and you start talking about

2  Mustangs and I say, "Stop.  I object.  I object to that.

3  You need to stop talking about Mustangs."  Is that right

4  there the disturbance you're talking about?

5       A.  I'm not sure.  It depends.

6       Q.  What does it depend upon?

7       A.  How formal the meeting is.

8       Q.  So what would determine how formal the meeting

9  is?

10      A.  If it relates to the law.

11      Q.  Could you explain that, please?

12      A.  If we're having a meeting and whatever I say in

13 your meeting -- and it's a formal meeting -- caused

14 disruption or causes alarm, yes.

15      Q.  So --

16      A.  In regard to, you know, talking about cars and

17 this situation --

18      Q.  So if I say something, are you saying the words

19 themselves are causing the disruption because the

20 meeting's formal and I'm saying something off topic?

21      A.  It -- it depends.

22      Q.  What does that depend upon?

23      A.  It depends on the word, the verbiage.  It also

24 depends on if what I'm saying in your meeting,

25 formal-type, is causing alarm or it's causing people to

SERGEANT MILTON NAMON POPE, JR.

```
 1  get excited.
 2      Q.  So by the words I speak, the disruption, as I'm
 3  understanding you, can be caused by another person's
 4  reactions to the words that I speak?
 5      A.  Could be.
 6      Q.  Okay.  And so in that instance, the other -- if
 7  I speak words someone disagrees with and that causes
 8  them alarm, does that qualify as me causing a
 9  disruption?
10      A.  Can you repeat that?
11      Q.  If I speak words that someone else disagrees
12  with and it causes them alarm --
13          MS. LONG:  Objection.
14      Q.  (By Mr. Casey)  -- and I'm not talking about --
15  I'm not talking about the rule that just about everybody
16  knows, you can't yell fire in a crowded theatre; right?
17  I'm talking about the words that I'm speaking.  So you
18  define disruption --
19      A.  Excuse me.
20      Q.  -- as -- as in a formal meeting.  You said it
21  could be caused by the words or verbiage I speak if it
22  causes another person to be alarmed.  Is that -- did I
23  understand you?
24          MS. LONG:  Objection.  Vague.
25      A.  Possibility.
```

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  (By Mr. Casey)  There's a possibility.  How

2  would it be possible?  How would that be possible that

3  if I say words that causes another person alarm and it's

4  not that -- you know, that crowded theatre category, but

5  if I say something that the other person disagrees with

6  and they get alarmed, how is it that I've caused a

7  disruption?

8         MS. LONG:  Objection.  Vague.

9    A.  If it's a formal meeting on the subject of

10  Mustangs, then we should stay on the topic of Mustangs.

11   Q.  (By Mr. Casey)  Okay.  So would the alarming

12  words in that instance be when I started mentioning

13  Camaros?  This is your example, sir.  I'm just trying to

14  -- trying to use --

15         MS. LONG:  So --

16         MR. CASEY:  -- the situation you described.

17         MS. LONG:  We have gotten so far field

18  because you initially started your question saying you

19  were the presiding person, you were holding the meeting,

20  and now you're talking about how you're speaking on the

21  topic of the meeting.  So you've changed roles in your

22  questions and I think it's causing an immense amount of

23  confusion.  And are you talking about just a regular

24  meeting?  Are you talking about a public open meeting?

25  You haven't -- I think you guys are talking past each

SERGEANT MILTON NAMON POPE, JR.

1   other.

2          MR. CASEY:  And that's possible.

3      Q.  (By Mr. Casey)  I just -- as I understood,

4   Sergeant Pope, you said there's a difference between an

5   informal meeting and a formal meeting.  And then you

6   were talking about someone saying "I object.  I object."

7   And then I thought I was in the role of speaker.  And

8   then as I understood it, you said, "No, I'm in charge of

9   the meeting."  So that's why I swapped.  So let's --

10  let's define them clearly as -- as -- as your able

11  counsel's identified.

12          MS. LONG:  And are you talking about a

13  public counsel or board meeting or are you just talking

14  about any meeting because --

15          MR. CASEY:  Yeah.

16          MS. LONG:  -- this is not clear from the

17  record.

18          MR. CASEY:  You're exactly correct.  I --

19      Q.  (By Mr. Casey)  So, Sergeant Pope, let's --

20  let's get some parameters defined and we'll do a couple

21  questions to define those.  Let's do a school board

22  meeting at Round Rock ISD that has specific items on the

23  agenda.  This -- are we -- do we understand that that's

24  the setting?

25      A.  Okay.  I understand that.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  All right.  And let's have -- let's have me
2  being the speaker.  Okay?
3    A.  Okay.
4    Q.  All right.  And the agenda on the -- the agenda
5  topic says we're going to talk about muscle cars.  Is
6  that -- I'm just doing a hypothetical to keep this --
7  because I think it's easier when we take it on a
8  different subject.  Muscle cars, is that -- do you
9  understand that?
10    A.  Okay.
11    Q.  Okay.  And if I say the word -- and everybody
12  in there likes Camaros, but if I say -- I'm like the one
13  or two people there that likes Mustangs, and I get to
14  the microphone and I start talking about Mustangs and it
15  causes the other 25 people in the room to be alarmed,
16  have I caused the disturbance?
17    A.  If -- okay.  If -- if the subject is Mustangs,
18  if I understand, and you're presiding over the meeting
19  and it's a formal meeting and you mention Camaros, and
20  then you tell yourself again, "Hey, we're not talking
21  about Camaros, we're talking about Mustangs," then yes.
22  You know, and not only that, if you have to tell
23  yourself several times, that -- that could be
24  considered, you know, a disruption.
25    Q.  Okay.  Well, so in that instance we slightly

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

```
 1  went off of the hypothetical.  And I know it's --
 2  hypotheticals are sometimes tough to stay on, myself
 3  included, remembering them.  But the subject for that
 4  meeting would have just been cars.  We're just talking
 5  about cars.  And there's 30 people in the room and two
 6  of us likes Mustangs and that everybody else likes
 7  Camaros.  So how do those 30 people -- 28 people are
 8  talking about Camaros, everybody on the Board likes
 9  Camaros, the person in charge of the meeting likes
10  Camaros, but I'm a speaker and I just like Mustangs and
11  I want to -- I want to draw a comparison, in fact, of
12  Mustangs to Camaros when I get to the microphone.  Is
13  the fact that I get up there and I say the word Mustang,
14  does that mean that when everybody else, all those other
15  28 people when they become alarmed, is that a
16  disturbance?
17      A.  The example I gave previously, I -- would be my
18  -- my best answer.
19      Q.  Okay.  So to condense that down now, let's take
20  it out of the situation.  Is the rule that you're
21  expressing how you understand it that once a person says
22  a word that causes somebody else alarm -- and that's
23  what I'm trying to get at.  The alarm is happening in a
24  listener.  They're getting emotionally bothered by what
25  I said.  Does that mean that I, the speaker, am causing
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  the disturbance?

2            MS. LONG:  Objection.  Vague.

3      A.  It depends.

4      Q.  (By Mr. Casey)  What does it depend on, sir?

5      A.  It depends on what's said.  It depends on the

6  setting.  It depends on the rules.

7      Q.  Okay.  Well, we tried to do all that and -- and

8  you said I revert back to it.  But I'm trying to get

9  clarity because out of these things, do you understand,

10 yes or no, that the rules that we have to apply have to

11 apply across the board, no matter what the topics are --

12     A.  So that's --

13     Q.  -- whether it's COVID safety or Mustangs and

14 Camaros, we have to have some rules so that people can

15 understand where the boundaries of behavior are; does

16 that -- is that fair?

17     A.  Fair enough.

18     Q.  Okay.  So in your First Amendment training, do

19 you understand that the First Amendment protects the

20 right of -- the right of someone to speak even if their

21 speech may offend the other person?

22            MS. LONG:  Objection, vague.  Objection,

23 calls for a legal conclusion, calls for a legal opinion

24 testimony.

25     A.  Yes, it -- it really depends.

**SERGEANT MILTON NAMON POPE, JR.**

1     Q.  (By Mr. Casey)  Okay.  Can people say things to

2  you as an officer without -- without being arrested that

3  you don't like?

4     A.  Yes.

5     Q.  All right.  Can people say things to other

6  people outside of, you know, the kind of the JP offenses

7  of cussing them out and stuff, that they don't like and

8  not be arrested?

9     A.  As long as it doesn't -- I'd say yes, as long

10  as it doesn't incite violence.  Yes.

11     Q.  Okay.  And -- and I -- you know, outside of me,

12  all of my male cousins are either police officers or

13  game wardens or -- actually, one right now is the -- is

14  a prison warden in Florida.  Most of my family lives

15  there.  So I -- with this next example, I just want to

16  let you know where my family is in law enforcement.  So

17  there's --

18          MS. LONG:  I'm going to object to the

19  sidebar.  I'm going to -- I'm going to object to the

20  sidebar.

21          MR. CASEY:  Okay.  That's fine.

22     Q.  (By Mr. Casey)  I -- I just -- I value law

23  enforcement.  So in the case where people say, "F the

24  police," right, that -- and that it's just been said,

25  look -- look, that's an offensive statement; wouldn't

**SERGEANT MILTON NAMON POPE, JR.**

1  you agree to that?

2      A.  Yes.

3      Q.  Okay.  And it's true that they have a

4  constitutional right to say that; right?

5      A.  Yes.

6      Q.  Okay.  So even though it might upset the

7  listener, there's things people can say they make people

8  upset, but they still have a right to say; would you

9  agree?

10      A.  Yes.

11      Q.  All right.  Does the law allow the board chair

12  to silence a citizen at a school board meeting that has

13  a specific agenda simply because the board chair

14  disagrees with the viewpoint of the speaker?

15      A.  Can you repeat that?

16      Q.  If the -- if the board chair -- at the board

17  meeting when there are specific agenda items on the

18  agenda, can the board chair simply silence a speaker

19  because they disagree -- the board chair disagrees with

20  what they're saying?

21      A.  And I guess the question is, if what the

22  speaker is speaking of is not on the agenda?  That's

23  what you're referring to.

24      Q.  No.  If -- if that person believes they're

25  speaking on the agenda and the board chair simply

SERGEANT MILTON NAMON POPE, JR.

1  disagrees and says, "Well, I don't think that's on the
2  agenda."
3       A.  If the board member believes that's not on the
4  agenda, then I would say yes.
5       Q.  Okay.  Are you familiar with the idea of people
6  speaking by analogy?
7       A.  Can you go into detail?
8       Q.  Okay.  I'll give you an example.  I used an
9  example yesterday, it's probably famous, but it may --
10 it may fall flat if you're not familiar with the story.
11 Are you familiar with King David and Solomon?
12      A.  Yes.
13      Q.  Okay.  This -- this may -- this may be an
14 example that carries.  Are you familiar with how King
15 David -- King David murdered Bathsheba's husband, Uriah?
16      A.  Not that deep, but...
17      Q.  Okay.  So he -- he had King Solomon with --
18 with Bathsheba; right?  And he had Bathsheba's husband
19 sent out to die on the battlefield.  Do you remember
20 that?
21             MS. LONG:  Objection.  Foundation.
22      Q.  (By Mr. Casey)  Okay.  So are you familiar with
23 when -- when David was confronted by -- by God's
24 prophet, his name was Nathan, about -- about his
25 behavior?

SERGEANT MILTON NAMON POPE, JR.

1   A.  I can't say I am.

2   Q.  Okay.  Well, let's -- we'll have to use another

3   example.  All right.  Let's -- let's do this.  So you've

4   been on the police officer force, I guess, right now

5   about -- about 11 years; right?

6   A.  Give or take.

7   Q.  Okay.  Do you have to have firearms training?

8   A.  Yes.

9   Q.  Okay.  Do they teach about muzzle control and

10  weapons control?

11  A.  Yes.

12  Q.  All right.  Okay.  Let's say -- I'm going to

13  give you a situation and ask you about your opinion

14  about it.  Say you have a police chief, so you're --

15  you're -- you're -- you're working in a -- in a -- in a

16  department -- police department and you have a police

17  chief who has completely poor weapon safety.  And I'll

18  give you some examples:  Leaving the weapon unholstered

19  on -- on -- on his or her desk, leaving the weapon, you

20  know, on a -- on a counter in the restroom.  They've got

21  a revolver and they leave the -- the hammer back and

22  it's unattended.  Would that be poor weapon safety?

23  A.  Yes, it would be.

24  Q.  Okay.  And let's say that as an officer you

25  pull into the parking lot one day and you may be in a

SERGEANT MILTON NAMON POPE, JR.

1   little bit of a rush and one of your tires is over the

2   -- the parking line, and that -- that police chief comes

3   up to you and says, "Why aren't you following the

4   parking rules.  I, as a chief, follow all the rules."

5   Would -- would you -- would you believe that that police

6   chief was being hypocritical?

7        A.  With him saying he follows the rules, yes.

8        Q.  Okay.  And that's fair.  I mean, how do you

9   define in -- with respect of the police department, how

10  do you define leadership?

11       A.  Leadership is making sacrifices for your

12  people.  Leadership is leading by example.

13       Q.  And when you were in the military, what was

14  your exiting rank in the military?

15       A.  First lieutenant.

16       Q.  First lieutenant.  Awesome.  Did you have to

17  lead troops at all?

18       A.  Yes.

19       Q.  Okay.  And -- and in leading troops, you were

20  expected to lead by example; right?

21       A.  That's correct.

22       Q.  Did you -- did you encourage the troops that

23  you were leading, the -- the -- particularly the senior

24  NCOs to give feedback on your leadership?

25       A.  Yes.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  Okay.  And was that feedback valuable?

2    A.  Yes.

3    Q.  All right.  And if -- and if there was

4    instances where your -- your unit -- and I'm more

5    familiar with Navy units, but I -- you know, your squad

6    or platoon or however it broke down -- if your platoon

7    as a unit was not following the -- not setting a good

8    example, is that something that you would want to know

9    about?

10   A.  Yes.

11   Q.  Okay.  All right.  So let's -- let's see.  All

12   right.  Let's talk about the -- the board meeting.  You

13   know, you said you watched a video on the August 16th

14   board meeting.  Let's -- let's talk about what you

15   recall from that time.  Did the time leading up to the

16   August 16th board meeting -- let's say about midsummer

17   of '21 to August 16th of '21 -- had you ever encountered

18   Jeremy Story during that time?

19   A.  I can't recall.

20   Q.  Okay.  Did you have any discussions with anyone

21   about Jeremy Story during the summer of 2021 leading up

22   to the August 16th board meeting?

23   A.  I can't recall.

24   Q.  Okay.  When the August 16th, 2021 board meeting

25   -- and for the sake of discussion, when I say "board

**SERGEANT MILTON NAMON POPE, JR.**

1  meeting," because there are many, unless I say

2  otherwise, we're talking about the August 16th one; is

3  that fair?

4      A.  That's fair.

5      Q.  Okay.  At the board meeting, where were you --

6  where were you stationed, if you will, in the room when

7  the board meeting started?

8      A.  I want to say to the rear center.

9      Q.  Okay.  And what was your role that night?

10     A.  Provide safety and security.

11     Q.  Okay.  And who was -- who was your on-site

12  supervisor?

13     A.  I want to say it was Assistant Chief Williby.

14     Q.  Okay.  Was Chief Yarbrough there?

15     A.  I can't recall.

16     Q.  Okay.  And so let's talk about the public

17  comment session.  Hold on for a second.  Do you remember

18  what the topics of the agenda items were for that night?

19     A.  That was during COVID, so mask mandates, social

20  distancing.  Things of that nature.

21     Q.  I'll show you what's been marked as Plaintiff's

22  Exhibit 1.  Oh, no.  Wrong share.  I'm going to expand

23  it up.  Do you see Plaintiff's Exhibit 1?

24          (Exhibit 1 marked for identification.)

25     A.  Yes.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  Okay.  And I'll represent to you, this is a

2  agenda for August 16th, 2021 board meeting.  Have you

3  seen these before?

4    A.  Maybe in passing.

5    Q.  Okay.  Let's look at Section D.  What are the

6  agenda items on Section D?

7    A.  Adoption of resolution for employee COVID-19

8  positive extended leave during COVID-19 pandemic and

9  fall 2021 COVID-19 health and safety protocols.

10    Q.  Okay.  And would you agree with me that mask

11  mandates falls somewhere under there?

12    A.  Yes.

13    Q.  Okay.  Is it limited to mask mandates based on

14  Item Number 2?

15    A.  I'm not for sure.  I would say so, but I'm not

16  for sure.

17    Q.  Okay.  This is health and safety protocols.  Do

18  you -- would you determine that as narrow or broad?

19    A.  I would look at that as it being compared to

20  anything that relates to COVID-19.

21    Q.  Okay.

22    A.  I mean, if I'm the -- if I'm interpreting it,

23  that's what -- the way I interpret it.

24    Q.  Okay.  So if someone wanted to talk about

25  safety, would that be related to it?

SERGEANT MILTON NAMON POPE, JR.

1    A.  The way I'm interpreting, it depends on what --
2  what topic of safety.
3    Q.  Okay.
4    A.  Seems like to me everything refers to COVID-19.
5    Q.  Okay.  That's fair.  All right.  I'm going to
6  stop share.  So that's P-1.
7         All right.  So then when that -- when that
8  event happened where -- at the board meeting, do you
9  remember what people talked about during the public
10 comment time?
11   A.  Mask mandate, wearing mask, social distancing,
12 issues with the amount of individuals allowed in the
13 meeting, you know...
14   Q.  Okay.  What was the problem with the amount of
15 people in the meeting room; do you recall?
16   A.  They had limited seating.
17   Q.  And why was there limited seating, if you
18 recall?
19   A.  The social distancing mandate.
20   Q.  When you say "mandate," do you mean a -- a
21 state law mandate?
22   A.  I -- I just -- I just understand it as mandate.
23 You know, we -- that's all I understand.  Just mandate.
24 I don't know which -- if it was state, national.  I
25 don't know.  Just mandate.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.  So what if it was purely a school board
2   policy, you couldn't distinguish between those -- and I
3   don't mean this in a negative way, but you wouldn't --
4   you wouldn't know if it was just by the school board
5   that was ordering it or if that was state law; correct?
6    A.  Back then I probably would have been more
7   refreshed on that; but right now, I can't recall.
8    Q.  Okay.  That's fair.  Yeah, if you -- if there's
9   something that you can't recall because of the --
10  because of the time, just let me know.  So then -- and
11  we're here obviously because of Mr. Story's comments.
12  Do you recall what Mr. Story said?
13   A.  At what time?
14   Q.  When he was doing the public comment period?
15   A.  Yes, he -- yes, I do recall some of what he
16  said.
17   Q.  Okay.  To the best of your recollection -- and
18  we'll get to the, you know, video and other stuff later.
19  To the best of your recollection, what do you recall
20  that Mr. Story said?
21   A.  He had mentioned the situation with that -- the
22  superintendent was involved in.
23   Q.  And do you recall if he talked for a
24  substantial amount of time or a small amount of time?
25   A.  I can't really recall.  I know I reviewed the

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

```
1   video, but I -- it -- I know everyone had two minutes,
2   and I would say that it was pretty close to two minutes.
3       Q.  Did -- so let me unpack that.  When you say it
4   was pretty close to two minutes, do you mean that
5   Mr. Story did speak for approximately two minutes and
6   then mentioned the superintendent, or he mentioned the
7   superintendent at the beginning?
8       A.  He mentioned it, I want to say, maybe halfway
9   through, if I can recall correctly.
10      Q.  So -- so your -- your recollection is that he
11  didn't go the whole two minutes?
12      A.  I mean, I don't -- I don't recall.
13      Q.  Okay.  And I'm not asking you to, you know,
14  have stopwatch accuracy.  I'm just trying to get a
15  general sense.  Did he mention anything else besides the
16  superintendent?
17      A.  I can't recall.
18      Q.  Okay.  And then when he mentioned the
19  superintendent, what happened next?
20      A.  The president instructed him to -- that -- that
21  wasn't on the agenda.
22      Q.  And by "not on the agenda," you mean the
23  mention of the superintendent or the way in which he was
24  using the superintendent's situation?
25      A.  The superintendent's situation, I guess.  I
```

**SERGEANT MILTON NAMON POPE, JR.**

1 don't know.  She said it wasn't on the agenda.

2     Q.  Okay.

3     A.  She said it several times.

4     Q.  Okay.  Did you hear that night anybody else

5 mention things that were not on the agenda?

6     A.  I think there was a lady and a guy also.  Yes.

7     Q.  That what?

8     A.  That mentioned something.  I think a female

9 mentioned something about the superintendent.

10     Q.  Okay.  Other than the superintendent's name,

11 did anyone else to your recollection mention things that

12 were not on the agenda?

13     A.  I cannot recall.

14     Q.  Okay.  So are you -- okay.  Would you say today

15 that it's possible that some did?

16     A.  You're talking four years ago, I can't recall.

17 I can't basically recall what happened yesterday with

18 everything that's going on.

19     Q.  No problem.  That's fair.  All right.  And so

20 then when the board chair gaveled at Mr. Story, what

21 happened next?

22     A.  President Weir instructed Mr. Story to -- don't

23 bring that subject up, don't mention it, don't talk

24 about it.  And Mr. Story kept, you know, speaking on

25 that point.  And she told him several times, and then

SERGEANT MILTON NAMON POPE, JR.

```
 1  after that she said, "Hey, have him removed, please."
 2  Something to that effect.
 3      Q.  Okay.  When Mr. Story mentioned the
 4  superintendent and the board chair, Ms. Weir, gaveled
 5  him, do you recall whether he continued to talk about
 6  the superintendent's situation or he said that his
 7  rights were being interfered with?
 8      A.  I can't --
 9      Q.  Do you recall --
10      A.  I can't -- I can't recall the exact verbiage.
11      Q.  Okay.  So you're unaware whether he continued
12  to mention the superintendent?
13      A.  I know he kept speaking.
14      Q.  Okay.  So you don't know that -- the subject
15  matter of what he kept speaking about?
16      A.  I can't recall.
17      Q.  Okay.  So if he continued to -- that's fine.
18  "I can't recall" I think covers what I was going to ask.
19  In your constitutional training as a law enforcement
20  officer, have you ever dealt with the subject of
21  unlawful arrest?
22      A.  Have I ever dealt with the subject of an
23  unlawful -- what do you mean by that exactly?
24      Q.  In your training where an officer would
25  unlawfully arrest a person as far as physically seize
```

**SERGEANT MILTON NAMON POPE, JR.**

1    them under the Fourth Amendment?

2                    MS. LONG:  Those are two different things.

3                    MR. CASEY:  I'll make a distinction.  Thank

4    you for -- thank you for pointing that out.

5        Q.  (By Mr. Casey)  Have you ever dealt with the

6    unlawful use of force?

7        A.  Me personally, no.  I've never have to -- had

8    to deal with that.

9        Q.  Have you taken training on that?

10       A.  Yes.

11       Q.  Okay.  If an officer uses an unlawful amount of

12   force on a citizen, are they allowed to resist?

13       A.  It depends on the situation.

14       Q.  Okay.  Give me an example, please.

15       A.  If an individual is being placed in custody

16   under arrest, then they've already been notified, "Hey,

17   you are being placed under arrest," and they need to

18   just calm down and let the situation play out.

19       Q.  Are there situations where an officer is

20   attempting to put someone into physical custody where

21   they are allowed to resist?

22       A.  At that time, I would say no.  That's what the

23   courts are for.

24       Q.  So your position, based on your understanding

25   of the law, is that anytime an officer physically

SERGEANT MILTON NAMON POPE, JR.

1  touches a person, they are supposed to 100 percent

2  comply?

3              MS. LONG:  Objection.  Mischaracterizes the

4  testimony.  We're talking about two different things.

5              MR. CASEY:  Let me clarify that.  I

6  appreciate the objection.

7       Q.  (By Mr. Casey)  When an officer is physically

8  contacting a person to place them in physical restraint

9  such as Mr. Story -- I mean, this is the -- kind of the

10 elephant in the room, Mr. Story and the school board

11 meeting that night.  When you put him in physical

12 restraint to escort him out of the room, was he required

13 by law to comply with you at that moment?

14      A.  Okay.  I didn't restrain him; I escorted him

15 out.  He wasn't in handcuffs, and I escorted him out.

16 So he was escorted out of the meeting.

17      Q.  Okay.  Let's -- let's piece this apart because

18 I don't want us to be talking past each other using

19 different terms.  Did Mr. Story go with you willingly

20 out of the room?

21      A.  No.

22      Q.  Okay.  Did you use even the slightest amount of

23 physical force to bring Mr. Story out of the room?

24      A.  Yes.

25      Q.  Okay.  What would be the terminology in -- in

**SERGEANT MILTON NAMON POPE, JR.**

1  police terms that you utilized to escort Mr. Story out

2  of the room?

3      A.  The -- the -- he -- he disrupted a meeting, so

4  the board president said, "Please escort Mr. Story out."

5  So that's what we did.

6          MR. CASEY:  Objection.  Nonresponsive.

7      Q.  (By Mr. Casey)  Okay.  So my question is very

8  specific.  In police terms when you put -- let me back

9  up.  Did you physically contact Mr. Story?

10     A.  Yes.

11     Q.  Okay.  When you physically contacted Mr. Story,

12  did you use any type of compliance hold on Mr. Story?

13     A.  I just grabbed him by his arm gently, and my

14  partner Frank got on one side and we escorted him out.

15     Q.  Okay.  How did you grab him?

16     A.  With one hand, I believe.

17     Q.  What part of the body -- of his arm did you

18  touch?

19     A.  I want to say his midarm.

20     Q.  Above or below the elbow?

21     A.  Above.

22     Q.  Did he resist your contact?

23     A.  He resisted me moving him.

24     Q.  Okay.  So when he resisted your contact, as I

25  understand your testimony today, that that in and of

SERGEANT MILTON NAMON POPE, JR.

1  itself he was required by law to comply with you?

2      A.  Yes.  Because he had violated -- he was asked

3  -- he was asked to leave and he didn't leave.

4      Q.  Okay.  Well, I want to -- I want to parse those

5  because I understand you're saying he was asked to leave

6  and didn't leave.  And you would -- you would say that

7  comes under the education code; right?

8      A.  Penal code as well.

9      Q.  Okay.  I'm simply talking about the physical

10 restraint aspect of it.  Once you placed your hand on

11 the upper arm of Mr. Story with your partner Officer

12 Pontillo on the other side, was Mr. Story required to

13 comply with your physical escort?

14     A.  Yes.

15     Q.  Okay.  Are there instances where a police

16 officer would be physically escorting someone away from

17 a place --

18     A.  Criminal trespass --

19     Q.  -- that --

20     A.  -- criminal trespass, that could do it also.

21     Q.  Okay.  Yeah, I paused there.  I can see why --

22     A.  And if someone's getting into an altercation,

23 you know.  Yeah.

24     Q.  Are there instances where an officer would be

25 -- could physically escort someone away and -- actually,

**SERGEANT MILTON NAMON POPE, JR.**

```
1   that's speculative.  Strike that.
2              In your training when you were discussing
3   use of force, are there instances where police officer's
4   use of force has gone above what was constitutionally
5   allowed?
6       A.  Yes.
7       Q.  Okay.  Could that even occur in a simple police
8   escort like you did with Mr. Story?  Would there be an
9   instance where you wouldn't have the right to touch him
10  because you were in the wrong?
11      A.  He was asked to be removed, so we removed him.
12      Q.  I understand that, but that wasn't my question,
13  sir.  My question was, are there instances where you
14  wouldn't have a right to touch someone because they --
15  they hadn't violated the law?
16      A.  If they hadn't violated the law?
17      Q.  Yes.  Correct.
18      A.  No.  If you hadn't violated the law, then no.
19      Q.  Okay.  When Mr. Story -- and I'm going back
20  through my notes.  When Mr. Story began to talk off the
21  agenda, was that a violation of the law?
22      A.  To my understanding of Meetings Act, yes.
23      Q.  Okay.  And to be clear, there's no meetings act
24  claims right now.
25      A.  Okay.
```

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  And then so when you had Mr. Story and you

2    escorted him out of the room, when did you stop

3    contacting him physically?

4        A.  Once he was outside the building.

5        Q.  So did you -- you -- you actually -- and you

6    and your partner, Officer Pontillo, had physical contact

7    with him until his exit from the outside door?

8        A.  Outside of the building.

9        Q.  Okay.  Which -- which -- what was the path you

10   took on the way out?

11       A.  We exit the meeting hall, made a right turn,

12   went down the hall, made a left turn, through the double

13   doors.

14       Q.  Okay.

15           MS. LONG:  Is now a good time a take a

16   break?

17           MR. CASEY:  Perfect.  No worries.

18           MS. LONG:  Can we take 15 minutes?

19           MR. CASEY:  Sounds good.

20           (Nineteen-minute break was taken.)

21       Q.  (By Mr. Casey)  All right.  So when we -- when

22   we left, we were wrapping up on your recollection of the

23   events of that night.  After you left the room, did

24   Mr. Story continue to speak when you were escorting him

25   from the meeting room through the front doors?

SERGEANT MILTON NAMON POPE, JR.

1    A.  Yes.  There was a lot of yelling.

2    Q.  There was a lot of yelling.  Okay.  Was he --

3 and I'm going to ask some distinction so I understand

4 how you characterize yelling.  Do you characterize

5 yelling as a raised voice or something more?

6    A.  A little more than a raised voice.

7    Q.  Okay.  When you did your firearms training at

8 the academy, did you-all ever talk about the -- the

9 effects of stress on your firearms handling?

10    A.  Yes.

11    Q.  Okay.  When you talked about use of force, did

12 you ever talk about effects of stress on people who you

13 might be arresting?

14    A.  Yes.

15    Q.  Okay.  And is it true, yes or no, that one of

16 the effects of stress on people that you arrest is it

17 can affect the volume of their voice?

18    A.  It depends.

19    Q.  Okay.  Is it a possible effect -- is it a

20 possible effect on someone that you arrest that they

21 could be raising their voice because of the stress?

22    A.  Possibly.

23    Q.  Okay.  Let's go to -- let's talk about the

24 aftermath.  When -- when -- after you escorted Mr. Story

25 out and the meeting was done, did you -- who did you

1   meet with about the meeting at that time?

2      A. What are you -- can you repeat that? I'm not

3   understanding.

4      Q. Yeah, no problem. So the meeting happens. Had

5   you ever had to escort a person out of a school board

6   meeting before?

7      A. No.

8      Q. Okay. So in the scope of your employment, your

9   tenure, this would have been uncommon; right?

10      A. No, not uncommon. People tend to act out, so

11   not uncommon at all. You see it all the time on TV. I

12   didn't -- I wasn't, but at ACC often people would be

13   escorted from the board meetings.

14      Q. Okay. But for Round Rock ISD, had you seen it

15   before?

16      A. Not to my recollection, no.

17      Q. Okay.

18      A. Well, I take it back. I'm sorry. Yes. I'm

19   sorry. Can I answer that or -- because I don't -- I

20   want to make sure we good.

21      Q. Yes, sir.

22      A. Mr. Clark was also escorted out, so that would

23   probably be the second time I saw it.

24      Q. Okay. But prior to Mr. Story's -- Mr. Story

25   and Clark being escorted out, had you seen it before at

**SERGEANT MILTON NAMON POPE, JR.**

1  Round Rock ISD?

2      A.  Not while our department was in existence.  No.

3      Q.  Okay.  In the days and that day after, like

4  after the board meeting was done and in the next few

5  months, did you-all have -- ever have any meetings about

6  what transpired on August 16th?

7      A.  You talking about discussing the case itself or

8  just having just a regular meeting about it?

9      Q.  Yeah, like a debrief.  I mean, let me pause for

10  a second.  In the Navy when something happened we would

11  call it an incident and then we would have an incident

12  report.  But for the incident report we would have a

13  meeting where all the people who were involved would

14  come in and talk about it.  Like an after-action report

15  I think sometimes --

16      A.  Yeah.  Gotcha.

17      Q.  -- they call it.  Did you-all --

18      A.  We -- to my understanding, we didn't.  For the

19  next meeting we just -- for our meetings we have like

20  little briefs in the beginning of the meetings.  But I

21  can't remember -- I can't really recall if we had a

22  after-action briefing on this or not.

23      Q.  Okay.  Is it -- you're saying when you can't

24  recall, is it possible you did?

25      A.  I can't recall.

SERGEANT MILTON NAMON POPE, JR.

1    Q.  Okay.

2    A.  With all the meetings, it's like, I can't

3  recall it.  If I can recall it, I'd say yes.  I can't

4  recall.  I can't recall.  It's been so long.

5    Q.  Okay.  Well, sometimes when someone says I

6  can't recall it because they're -- they're leaning on

7  the side of, "I don't think it happened."  So you're --

8  what you're --

9    A.  I'm saying -- I'm saying I can't recall, sir.

10  That's what I'm saying.  I can't recall.  I'm not

11  leaning neither right of left.  I cannot recall.  It's

12  been a long time.

13    Q.  All right.  I wasn't quite done --

14    A.  I'm sorry.

15    Q.  -- with what I was trying to explain, but we

16  can go -- we can go on from there.

17      All right.  Who was the next person you met

18  with in the Round Rock ISD chain of command or

19  co-workers regarding August 16th after it happened?

20    A.  I want to say chief -- it would have been Chief

21  Williby -- Assistant Chief Williby.

22    Q.  Okay.  So when did you meet with Chief Williby?

23    A.  I know we spoke that night after the event.

24  And I know we spoke -- yeah, that night after it.

25    Q.  Okay.  That night.  Describe what happened when

**SERGEANT MILTON NAMON POPE, JR.**

1  you-all met that night.

2      A.  We just talked about the situation and how we

3  need to ensure that -- I do -- I do remember this.  We

4  need to probably try to keep -- you know, keep control

5  of the meetings, make sure that, you know, everybody's

6  safe.

7      Q.  When you say "keep control of the meetings" and

8  "everybody's safe," was there an unsafe situation?

9      A.  There's -- there's always potential for unsafe

10 situations.  You know, we don't know -- again, we don't

11 have metal detectors, we're not, you know, frisking

12 people, so an individual can come in with a gun, knife,

13 whatever the case is.  So we're talking about overall of

14 the safety and security of the event of the meeting.

15     Q.  Okay.

16     A.  Just like if I was working a football game or a

17 play or something like that, nothing -- the tempo

18 doesn't change.

19     Q.  Okay.  So my -- I want to make my question more

20 specific.  I probably asked it nonspecifically.  That

21 night of August 16th, were any actions that you observed

22 taken by any citizens unsafe?

23     A.  I would -- I would say if you were in a setting

24 and you raised your voice, you have to be escorted out,

25 that right there is causing a safety concern because now

**SERGEANT MILTON NAMON POPE, JR.**

1  whereas we have two individuals in a meeting, now we

2  have to remove those two individuals, which actually

3  basically means that the -- the room as a whole is

4  unsafe.  So we're there for safety and security.  So we

5  have one individual that we have to occupy because of

6  that, and that's not good -- that's never good.

7       Q.  Okay.  So when you say that someone is not

8  following the guidance, as I understand you, your

9  definition of safety -- and I'm not saying -- judging

10  here or there -- your definition of safety is broad;

11  correct?

12      A.  My definition of safety is to ensure that

13  everyone that's in that facility is protected.

14      Q.  Okay.  I hear that as your definition is

15  they're protected.

16      A.  That's what -- that's what --

17      Q.  But --

18      A.  -- yeah, that's what --

19      Q.  Okay.  So was Mr. Story physically unsafe to

20  any person, yes or no?

21      A.  If you look at it from my perspective.

22          MR. CASEY:  Objection.  Nonresponsive.

23      Q.  (By Mr. Casey)  I'm asking you a yes-or-no

24  question, sir.  Was Mr. Story --

25      A.  I can't answer that yes or no.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.   -- physically --

2    A.   I can't -- if I can't --

3    Q.   Sir, I -- I --

4    A.   I can't --

5             MS. LONG:   Sergeant Pope, let Mr. Casey ask

6    his question.  Even if he's not letting you answer his

7    question, let him ask.  And then --

8             THE WITNESS:  Yes, ma'am.  Sorry.

9    Q.   (By Mr. Casey)  Was Mr. Story being physically

10   unsafe?

11   A.   I can't answer that without going into detail.

12   Q.   Tell me one action from Mr. Story that was

13   physically unsafe, and feel free to specifically speak

14   in detail about the one action.

15   A.   That he was physically unsafe?

16   Q.   That -- that's my question.  Tell me with

17   specific detail about one action where Mr. Story was

18   physically unsafe?

19   A.   Well, when he didn't leave, we had to escort

20   him out.  So in the process of escorting him out, he

21   could have slipped, he could have fell, I could have got

22   hurt.  So that's the way I look at it.

23   Q.   Okay.  So I think there's a distinction then

24   that we may be talking past each other.  When you talk

25   about safety, you're speaking of the overall sense, as I

**SERGEANT MILTON NAMON POPE, JR.**

 1  think, the overall environment, but yet there are

 2  smaller things that can make that overall environment

 3  unsafe; is that fair?

 4       A.  Again, what I said previously, that was --

 5  that's my answer, sir.

 6       Q.  Well, I -- I'm asking to summarize your answer.

 7  I'm providing a statement and I'm asking you if my

 8  answer corresponds.  Going back to your prior answer is

 9  not my question because you've -- you've described it

10  several different ways.  And I'm trying to -- because

11  this is the nature of a deposition by the opposing

12  counsel.  We're trying to get concrete answers so we can

13  go to court and have concrete proof.  And if it's

14  squishy, then it kind of leaves us in -- unalert.  So

15  I'm trying to get a concrete answer to your view of

16  safety, and it seems to me your view of safety is a

17  broad definition.  Is that a fair statement?

18       A.  That's a fair statement.  It has to be broad.

19       Q.  Okay.  Okay.  Thank you.  And -- and I'm not

20  trying to prescribe by the way.  I'm not trying to

21  prescribe your answer.  I'm just trying to get a -- get

22  it concrete.  So if we have, you know, back and forth

23  while we're trying to do that, I -- that's fine.

24       A.  I understand.  I deal with it everyday.  If

25  it's not with kids, it's with parents.  So no problem.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  I understand.  All right.  Okay.  So you spoke

2  with Chief Williby that night and you said you have to

3  keep control.  What do you mean by "keep control"?

4    A.  Stay vigilant, just like anything else.  Just

5  like any other game, just like any other event, we have

6  to be vigilant.  We have to provide safety for the

7  individuals.  You know, at any given time -- there's

8  been several instances where individuals walk into a

9  board meeting because their agenda isn't being supported

10  and they start shooting people.  So --

11    Q.  Okay.

12    A.  -- you know, active shooter all over the place.

13  That's what we train for.  So when I say that, I'm

14  talking -- that's what I'm referring to.  You know, it's

15  -- it's the unknown.  You know, I -- we have to be

16  there.  You know, my job is to not go home so everybody

17  like Mr. Story and everyone in this panel can.  So

18  that's my job.

19    Q.  I understand.

20    A.  So when we say safety, that's what we're

21  referring to.

22    Q.  Totally understand.  I totally understand.

23  That helps me understand your point of view.  Thank you

24  for that.  Was anyone else there when you met with Chief

25  Williby that night?

SERGEANT MILTON NAMON POPE, JR.

1        A.   Like I said, it was a quick meeting.  I want to

2   say maybe Frank, I want to say.  But it was just

3   something real -- just real quick.

4        Q.   Okay.  Was -- was Chief Yarbrough there?

5        A.   I -- I honestly cannot recall.

6        Q.   Okay.  It was --

7        A.   I cannot recall.  I honest to God, I cannot.

8   It's been so long ago.  Again, I answer to Chief

9   Williby, so that's who I interact with a lot.  So I -- I

10  know I spoke with him.

11       Q.   All right.  Was -- do you remember if Sergeant

12  Griffith was there?

13       A.   I don't think so.

14       Q.   Okay.  So after the meeting with Chief Williby,

15  what -- who was the next person you met with and when?

16       A.   I don't know if there was a meeting after that

17  or not.  Since we had to escort Mr. Story out, I had to

18  generate a report.  So I generated my report, submitted

19  it with my use of force form and uploaded my videos,

20  which Frank uploaded his.  And after that, it was done,

21  we were out of it.

22       Q.   Okay.  So you generated your report.  When did

23  you speak with -- excuse me.  Who was the next person

24  you spoke with after that night, the very next incident

25  you spoke with someone after this --

SERGEANT MILTON NAMON POPE, JR.

1    A.   I think it would have been Detective Sergeant

2  Griffith to go over my report I want to say because

3  generally we would have a conversation.  She's sort of

4  like the -- I want to say the stop keep, if you will.

5  She -- she reviews reports and stuff like that.

6  Although she and I are equals, again, she's specialized

7  unit.

8    Q.   Okay.  And that makes sense.  As I understood

9  it, you know, Detective Griffith, both -- both Chief

10  Yarbrough and she identified that she was the

11  investigator.  Is that -- is that your understanding?

12    A.   Yes, that's how it generally goes.  I -- you

13  know, we submit the report.  After that, we turn it over

14  to the detective because foot officers, you know, we

15  have other things to worry about.  We present our

16  findings to them, and then they take it on from there.

17    Q.   Okay.  So you type down a report.  When you met

18  with Detective Sergeant Griffith, do you recall -- let

19  me pause for a second.  There's a time frame from August

20  16th to September 18th, I believe, when -- when the --

21  when the warrant was signed.  It was about a month.  Was

22  your meeting with Detective Sergeant Griffith closer on

23  to the August board meeting or was it closer toward that

24  September 18th when that warrant got signed?

25    A.   I think it was closer to after -- after the

**SERGEANT MILTON NAMON POPE, JR.**

1  board meeting because, again, once we generate a report,

2  we turn it over to the detective, and then we go back to

3  our normal duties, i.e. handling kids.

4       Q.   Totally understand.   So you generated a report.

5  Is your -- your report would have been one of the

6  standard ones that has your name at the top, a blank for

7  your to fill stuff out, and then, you know, your name

8  typed at the bottom; right?

9       A.   That's correct.

10      Q.   Okay.   How long was your meeting with Detective

11  Sergeant Griffith?

12      A.   I can't -- maybe five or 10 minutes.   It's not

13  -- it's just going over my report and, you know, I'll

14  maybe have to make some minor changes maybe.   I don't

15  know.   But it's not that -- nothing -- nothing that was

16  that long.

17      Q.   Okay.   And so you made your report.   And then

18  like you said, you go back on to other stuff and then

19  Detective Sergeant Griffith, you know, she continues

20  with her investigation; right?

21      A.   That's correct.

22      Q.   Did you -- did you email her your report?   Did

23  you hand it over?

24      A.   No, we have a database.   So my report is typed,

25  and then she can review it.

**SERGEANT MILTON NAMON POPE, JR.**

1      Q.   Uh-huh.

2      A.   And then from there, she prints it off.

3      Q.   Okay.  Was your -- did you contribute anything

4   else to the database other than your report?

5      A.   So the way our system is set up is we have --

6   we have the database, which is our report writing

7   system, and then we have Axon, which handles all of our

8   evidence, body camera footage, you know, audio, you name

9   it.  So everything was submitted between those two.

10      Q.   So you have -- did you have on a body camera

11   that right?

12      A.   My body camera wasn't working.  Yes.  I had to

13   -- the next day I had to do a -- what we call a soft

14   restart.

15      Q.   So you were wearing one, it's just that footage

16   is not available?

17      A.   I was wearing one, and it wasn't operational.

18   So we -- we -- so just for your information, this right

19   here, what I'm wearing right now is called a Body Camera

20   4; prior to that was a Body Camera 3, prior to that was

21   a Body Camera 2.  We'd just received the Body Camera 3s.

22   Anything that -- as you know, once they put it out,

23   we're the first ones to receive them; we're the test

24   bots.

25      Q.   Military sense --

SERGEANT MILTON NAMON POPE, JR.

1      A.   So whenever you need it the most, it didn't
2   work.  So I was on -- because I am the custodian for
3   Axon videos, I got on the phone, Whitney Cooper's my
4   area rep, and I'm going off.  So, "There was a soft
5   reset there."  I was on hold, and then it worked.
6      Q.   I totally get it.
7      A.   I plug in -- unplug the computer, restarting
8   the computer, whatever.  Same thing.
9      Q.   Yeah.  We call it -- in the Navy we call it
10   using yesterday's technology tomorrow.
11      A.   Yeah, there you go.
12      Q.   Right?  Okay.  So do you recall whether Officer
13   Pontillo was wearing a body cam that night?
14      A.   Yes, he was.
15      Q.   Do you recall whether he had any problems with
16   his?
17      A.   No, he didn't.
18      Q.   So his body camera footage from that night
19   should be available?
20      A.   Yes.
21      Q.   Okay.
22              MS. LONG:  And just for the record, we have
23   produced that in discovery.
24              MR. CASEY:  I -- I was -- I was going from
25   the link.  I didn't see Officer Pontillo's body cam from

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  that night from the escort.  But I'm just kind of

2  generating like a tiny list.  You-all have given us such

3  good -- when I say "good," I don't mean like, woo-hoo.

4  I mean, appropriate stuff per -- per the requests.

5  Stuff gets over -- overlooked sometimes, but you know

6  those -- we'll just handle it.

7        Q.  (By Mr. Casey)  Okay.  So when you do this --

8  when go to the system, would you have been the person to

9  upload the Axon footage?

10       A.  No.  Frank would have been the person to upload

11  that.  I would have uploaded my excessive force report.

12       Q.  Okay.  And would anyone would have -- would

13  anyone be assigned to upload the board meeting video?

14       A.  If so, that would have probably been a

15  detective.

16       Q.  Okay.  So if there's any videos that officer --

17  Detective Sergeant Griffith viewed, it wouldn't have

18  been from you?

19       A.  No.  I -- again, my body camera was inoperable.

20  Frank's was.  And if -- minus his body camera, if any

21  other video that goes up, that's probably coming from

22  the detective.

23       Q.  Okay.  All right.  So let's go -- I'm going to

24  -- let's see.  Just moving exhibits into a different

25  folder so I can keep track of them accurately.  I'm

SERGEANT MILTON NAMON POPE, JR.

1  going to show you what I'm marking as Plaintiff's

2  Exhibit 2.  It's the arrest affidavit.  I'm going to

3  share the screen and then expand the affidavit.  Okay.

4  Let me -- let me move my little Zoom thing because it's

5  covering up the expansion button.  I'm going to -- let

6  me get a little bit larger with it.  Is that a good

7  size?

8                    (Exhibit 2 marked for identification.)

9      A.  Yes, that's a perfect size.

10     Q.  Okay.  Excellent.  So let's walk through this.

11 Do you -- do you recognize this -- this arrest

12 affidavit?

13     A.  No, I do not.

14     Q.  Okay.  So I'm going to go through it just kind

15 of slowly, see if you've seen it before.

16     A.  And, if I may, the reason I don't is because

17 the detectives generally submit this.

18     Q.  Okay.  So you have not seen this arrest

19 affidavit before whenever -- for Mr. Story.  Just --

20 just out of your just general knowledge you know that

21 you've not seen it before?

22     A.  Yes, sir.  I mean, I -- not this one.  No, I

23 don't think I have.

24     Q.  Okay.

25     A.  Because we don't -- we don't generally do

SERGEANT MILTON NAMON POPE, JR.

1  arrest affidavits; the detective does that.

2      Q.  Okay.

3      A.  All I do is submit my report, upload my videos,

4  if available, and any other documentation.  The

5  detective handles all of that.  Again, once we do our

6  part, we go back to trying to protect the kids or, you

7  know, calm parents down.

8      Q.  Okay.  That -- that makes plenty of sense.  You

9  -- have you filled out arrest affidavits before?

10     A.  Yes, I have.

11     Q.  Okay.  And I'm guessing you've filled out

12 plenty; right?

13     A.  I've filled out my share.

14     Q.  Okay.  And that's a fair statement.  So let's

15 walk through this.  This first part obviously talking

16 about the offense.  Pretty standard, isn't it?

17     A.  Correct.

18     Q.  Okay.  This second part, "My belief of the

19 foregoing statement is based on," and you've got a

20 couple lines here.  First one says, "Personal

21 knowledge."  You would -- you would -- you would

22 acknowledge that Detective Sergeant Griffith wasn't in

23 the room that night; right?

24     A.  I can't recall if she was.  I don't think she

25 was.

SERGEANT MILTON NAMON POPE, JR.

1      Q.   Okay.   And I'll represent to you she said she

2   was in her vehicle, I think, listening to it.   But

3   that's neither here nor there.

4           This second line is where your name comes up.

5   There's four X's.   It says, "Information provided to me

6   by Round Rock ISD PD Sergeant Milton Pope, a credible

7   person who," and it gives two things here.   It says,

8   "Who personally observed or gathered such information."

9   Now, as I understood your testimony a moment ago, you

10  said that Officer Pontillo would have uploaded his Axon

11  information onto the database, and your -- your input

12  into this process would have been your -- your report --

13  your incident report; correct?

14     A.   My report, yes.   And also since I was the

15  reason -- I was -- the reason I have a report -- I'm the

16  primary person for the report is because I was the first

17  person to have interactions with Mr. Story.   Frank --

18  Frank during that -- during the time of questioning,

19  Frank on the other hand has a supplement, so he would

20  have had a supplement report.

21     Q.   Okay.   Well, I'm looking at it right here,

22  though, this supplement report because -- I mean, this

23  is -- this is specifically important because we're kind

24  of slicing and dicing the facts.   This section -- this

25  section where it says, "My belief," you know, it has

**SERGEANT MILTON NAMON POPE, JR.**

1   that -- before we get to that "Facts supporting my

2   belief," this section is not limited to just these two

3   lines; correct?

4       A.  That's correct.

5       Q.  I mean, you can put more in here --

6       A.  That's common -- that's common verbiage for

7   affidavits.

8       Q.  Well, what I mean is, there could be Sergeant

9   -- Detective Sergeant Griffith could have put additional

10  lines in here by inputing other person's names;

11  correct?

12      A.  Again, since I was the first person -- primary

13  person on the case, that's why my name is there, and

14  that's common verbiage.

15          MR. CASEY:  Okay.  I'm going to say

16  objection, nonresponsive.

17      Q.  (By Mr. Casey)  I'm asking a very narrow

18  question, and I'm probably not wording it well, so let

19  me be real, real specific.  Is Detective Sergeant

20  Griffith or -- or you, if you're filling out an arrest

21  affidavit, is the person filling out this affidavit

22  limited to those two lines or can they add an additional

23  line?

24      A.  What type of line are you referring to?

25  That's --

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  For example, I'll give you a hypothetical.

2  Since personal knowledge is not checked, but then you

3  got four X's right there on this line, could another

4  line say, "Information provided to me by Round Rock ISD

5  PD Officer Frank Pontillo, a credible person who

6  personally observed or gathered such information"?

7    A.  I think it depends on the -- how a department

8  writes affidavits.  Since, again, I made first contact

9  with Mr. Story, that's why my name was first.

10    Q.  All right.

11    A.  Hopefully we --

12    Q.  What --

13    A.  -- because that's the way I'm understanding

14  your question.

15    Q.  Okay.  Is this -- and just so I understand how

16  these are formatted and made, is this just a generalized

17  Word document or do you have a program that does this?

18    A.  That's a generalized Word document that's

19  generally used throughout the county.

20    Q.  Okay.  That's fair.  I mean, you don't want to

21  redo the wheel.  But -- but there's no -- there's

22  nothing prohibiting her from adding a hard return and

23  typing in another -- more lines underneath there where

24  she got the information from; right?

25    A.  Again, the way we operate is I'm the first

**SERGEANT MILTON NAMON POPE, JR.**

1  person -- if Frank was the first person -- if Frank was

2  the first person that made contact with Mr. Story during

3  this incident, then he would have been listed.  I was

4  the first person.  If that's the case, we would have

5  50,000 letters -- I mean, 50,000 names on an affidavit.

6  That's what supplements are for.  So you submit your

7  affidavit; and then from the affidavit, then you look at

8  your supplements and, "Oh, okay.  Well, Williby was

9  there.  Oh.  Okay.  Frank was there."  I mean, that's

10  part of the evidence process.  If that's the case, we'd

11  have 50,000 names on there.  So remember, the judge has

12  to read this.  I mean, we can't tie him up.  So that's

13  the way it is.

14      Q.  Okay.  And that -- that -- that makes sense.

15  I'm just trying to get what your experience and

16  knowledge is on this.  So -- so regardless of the amount

17  of information that goes into this, what goes right

18  there that Detective Sergeant Griffith is -- is -- is

19  averring and swearing to in front of the magistrate is

20  just your name; correct?

21      A.  That's correct.

22      Q.  All right.  Let's go to the next step.  Okay.

23  All right.  Let's go to number three.  She -- Detective

24  Sergeant Griffith wrote, "Affiant learned that at

25  approximately 8:35 p.m. Story was called upon by the

**SERGEANT MILTON NAMON POPE, JR.**

1   board of trustees to speak at the podium on the subject

2   of the mask mandate." Would you agree with me that that

3   statement, "Subject of the mask mate" [sic] -- "mask

4   mandate" is not the exact wording from the agenda item?

5        A.  The -- I would --

6        Q.  Let me ask -- let me ask that a different way.

7        A.  Please do.

8        Q.  Would you agree with me that the subject of the

9   mask mandate is included in the agenda item, but the

10  agenda item is broader than that?

11       A.  Again, I don't know what -- again, you would

12  have to ask Detective Griffith that because this is her

13  affidavit.  I can't speak on her behalf.

14       Q.  Well, hold on.  Hold on.  Let's pause there.

15  Right here the information she received was from you.

16  Now, you said other things go into this, but I'm just

17  going by the face of this.

18       A.  I understand.

19       Q.  Right?  I'm asking my questions.  It's limited

20  to this document.  So if I was just coming off the

21  street and I saw this document, I'm just looking at what

22  I'd learn from this.

23           So when you provided the information to

24  Detective Sergeant Griffith --

25       A.  It would've been a report when I -- so if we

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

1  could, when you provided the report, that's what I
2  reported.  I -- that's what I provided.  Not
3  information, report.  So the thing that's -- this is
4  from my report.
5      Q.  Okay.  Real quick.  What I'm not trying to seek
6  right now is a perfect answer.  I'm just asking
7  questions to see where they go.  So I want to make sure
8  that -- that when I -- I want to finish my question so
9  that we can get this really, really cleanly.  You're
10 doing a good job as a deponent.  I just want to make
11 sure that you're not trying to assume where I want to
12 go.
13         So when it says this, when you -- when you
14 made the report, as you recall -- I'm just going off
15 your memory right now.  Do you recall saying to
16 Detective Sergeant Griffith in your report, "Hey, he was
17 called to speak about the mask mandate"?  Do you recall
18 that?
19     A.  Whatever's in my report.  I have to review my
20 report.
21     Q.  Okay.  That's fair.  If your report says
22 something other than "subject to the mask mandate" --
23 actually, let me pause there.  Does it make sense that
24 there's kind of a -- there are gaps and transfers of
25 information between you experiencing it and you -- and

SERGEANT MILTON NAMON POPE, JR.

1  then the report being read by Detective Sergeant

2  Griffith, and then her writing her understanding on this

3  affidavit?  Does that make sense?

4       A.  Me reading -- just briefly reading the

5  affidavit, it pretty much mirrors the report.  Remember,

6  the affidavit is not the report.  The affidavit is just

7  a synopsis of the report so we can present it to the

8  judge.  Again, if we end up with an affidavit that

9  mirrored a report -- if a report is five pages, we would

10 not get anything to the -- the judicial system.  That's

11 why an affidavit is a precursor or a introduction to

12 whatever the crime is.  So of course this right here may

13 be a little bit lacking because of the report.  The

14 report is the evidence.  So once you go to court, then

15 the report, all the evidence, all that stuff, as you're

16 aware of, is submitted.  An affidavit is just a

17 synopsis.  You know, again, I've -- I've turned in

18 affidavits that was like, I don't know, crazy verbiage

19 and all kind of -- and the judge is like, "What is this?

20 Summarize it.  Summarize it.  Summarize it."  You know,

21 we already have the elements.  That's what we're looking

22 for.  "We got the elements?"  "Yes, we have the

23 elements."  "Okay.  Why are you telling me the story?

24 We got the elements.  I'm going to see your report

25 during the trial, let's go."  So this --

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.   Okay.

2    A.   -- this right here is -- is -- you're comparing

3  this to my report and -- and you can't.  That's what I'm

4  saying.  I mean, we should have a judge on this panel.

5  They'll tell you the same thing, "No one wants to read

6  50,000 words.  Tell me what's going on because I got 50

7  other cases I got to deal with."  Just like me, I got 50

8  other arrests.  It's the same thing, sir.  So I don't

9  understand what you're trying to say with this affidavit

10  stuff.

11    Q.   Well --

12    A.   It's an affidavit and it's -- it's -- it's a

13  summary.  That's all it is.

14    Q.   And I understand.

15    A.   This verbiage, that sentence, it's an

16  affidavit.  It's a brief.

17    Q.   All right.  You understand that, I'm

18  understanding that.  The federal judge is doing this

19  case, the jury that's going to be listening to your

20  testimony at trial, they have to understand it, so

21  that's why I'm asking questions.  I'm not calling you

22  wrong.  I'm not calling you out.  I'm simply trying to

23  get this on your deposition so it can be accurately

24  characterized.

25    A.   Yes, sir.  Okay.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  You're not doing anything wrong.  Okay?

2    A.  I understand.  I'm just trying to clarify it.

3  I mean, you -- you're trying to compare my report to an

4  affidavit.  There's two different items.  That's all I'm

5  saying.

6    Q.  Yeah.  And so we'll get to your report later.

7  We'll get to your report later.  I'm just going over the

8  affidavit right now.  We'll -- we'll show a distinction.

9          MS. LONG:  And just for the record, there

10  was nothing wrong with his answer.  And, in fact, his

11  answer did exactly what Mr. Casey said he was trying to

12  do, explain the process to Mr. Casey so Mr. Casey can

13  accurately represent it to the judge and jury.

14          MR. CASEY:  Sure.  I completely agree with

15  that.

16    Q.  (By Mr. Casey)  All right.  So I want to

17  compare two things right now.

18    A.  Yes, sir.

19    Q.  I want to compare the agenda item, which is

20  P-1, all 2021 COVID-19 health and safety protocols.

21  It's fair to say that the mask mandate relates to that

22  in a summary form as you've stated; right?  Because this

23  is a summary; right?

24    A.  Yes.

25    Q.  All right.  And your report, we're going to go

**SERGEANT MILTON NAMON POPE, JR.**

1  over that, but as it is right now, this topic is

2  probably and may be written -- because it's an agenda

3  item, probably written broader than that.  Would you

4  agree?

5       A.   It refers to COVID-19 safety protocols.  That's

6  the way I'm interpreting it.  I'm not interpreting it

7  other than anything else.  I'm not interpreting it as

8  drunk driving.  I'm not interpreting it as how many

9  police officers we have.  What I'm interpreting it is,

10 it pertains to COVID-19.

11      Q.   Okay.

12      A.   That's the subject of this sentence, COVID-19.

13      Q.   Okay.  So --

14      A.   That's the way I interpret that.

15      Q.   -- so if someone -- okay.  Is there more things

16 about a mask mandate that I can talk about that relate

17 to COVID-19 health and safety protocols?  Is there other

18 things?  For example, is social distancing related to

19 that?

20      A.   I would say so.

21      Q.   Okay.  But that's not a mask mandate; right?

22      A.   We're looking at COVID-19, that's --

23      Q.   Okay.  That's -- and that's what I'm getting

24 at, sir.  There are more things that fit into number two

25 than just a mask mandate.  For example, shared

SERGEANT MILTON NAMON POPE, JR.

1  distances, social distancing, mask protocols, not just

2  mask mandate, which is a -- which is a mandate that's an

3  order or a law, but mask protocols on how many masks to

4  wear and when you have to change your mask.  All those

5  things fit underneath that umbrella; right?

6       A.  I would say so.

7       Q.  Okay.  That's fair.  All right.  Let's go back.

8  So the next sentence, "Affiant learned Round Rock ISD

9  Board of Trustee President Amy Weir informed Story he

10  was attending a called meeting and would only be able to

11  speak about the items on the agenda, specifically the

12  mask mandate."  Is that -- is that what you recall?  Is

13  that what you recall happening?  I'm going back to your

14  memory of what happened, not your report.  Is that what

15  you recall happened?

16       A.  All I know is we were going -- the -- the

17  meeting was going to be about mask mandates and COVID

18  protocols.

19       Q.  Okay.

20       A.  Again, in affidavits we subject as police

21  officers since we're not, you know, English scholars and

22  we understand who we're dealing with.  When we're

23  dealing with judges, we may summarize something.  So if

24  you tell me it's a mask mandate, I'm under the

25  impression that we're talking about COVID-19 issues.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  All right.  That's fair.  I'm not angry that

2    it's a summary.  I'm not bothered that it's a summary.

3    I'm just trying to see if this affidavit in summary

4    style reflects your memory of the event.  That's the

5    only things I'm comparing.  I'm let you know what I'm

6    comparing.  I'm comparing your memory of the event with

7    this affidavit.  Do you recall Mr. Story -- excuse me.

8    Do you recall the board president saying he's only going

9    to be able to speak about items on the agenda?

10   A.  Yes.

11   Q.  Okay.  Do you recall this next -- what's

12   identified in the next sentence, "Affiant learned Story

13   acknowledged President Weir and advised President Weir

14   that he agreed"?  Do you recall that happening, him

15   saying, "I agree, I can only speak with what's on the

16   agenda"?

17   A.  I remember her making that statement; I cannot

18   recall if he responded or not to be honest.

19   Q.  Okay.  No problem.  So the next one, I'll read

20   this sentence and we'll talk about that.  "Affiant

21   learned during the duration of Story's time to speak

22   Round Rock ISD Board of Trustee President Amy Weir

23   instructed Story to stop speaking on unrelated topics

24   and to only discuss the mask mandate."  Do you remember

25   that taking place?

**SERGEANT MILTON NAMON POPE, JR.**

1        A.  Yes.

2        Q.  Okay.  Next sentence.  "Affiant learned while

3   Story was discussing the unrelated topics Story had

4   several outbursts."  Do you remember that taking place?

5        A.  I remember him elevating his voice.  Yes.

6        Q.  Okay.  So let's pause there.

7        A.  And we can look at the video too.  That's --

8        Q.  There's no question out there right now.

9        A.  Okay.

10       Q.  Let's pause there.  I want to go back to that

11  night.  When Mr. Story started talking, did the board

12  chair do anything to the microphone he was speaking

13  through when he was talking?

14       A.  After she told him to -- after she told him --

15  I want to say it was muted after she told him several

16  times to stay on topic, I think.

17       Q.  Okay.

18       A.  But I mean, it's in --

19       Q.  I just --

20       A.  -- the video camera.  I should have -- I should

21  have just reviewed the -- well, I can't because it's in

22  evidence.  But it's on the -- it's on the video -- it's

23  on the video evidence.

24       Q.  Okay.  We need --

25       A.  I could probably refresh my memory.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.   When you say on the video camera and video in

2  evidence, do you mean a body cam video or a video --

3    A.   Body camera.  Yes.  Body --

4    Q.   Hold on.

5    A.   -- body camera.  Yes.

6    Q.   I'm going to try and finish my question real

7  quick.  Do you -- your -- your -- your -- and because

8  there was back and forth, I didn't quite clearly hear

9  you.  Were you solely referring to body camera evidence

10 or are you talking about the video that the school has

11 on their video system?

12   A.   Body camera evidence.

13   Q.   Okay.  So in the evidence file there's not the

14 school board video that gets put on the public website?

15   A.   I don't know because that's not my

16 responsibility -- my responsibility.  And it's not even

17 -- the body camera video is my responsibility because

18 mine was inoperable.

19   Q.   Okay.

20   A.   So that's Frank's.

21   Q.   Are there -- are there places -- this is about

22 my ignorance of the system that you use.  Are there

23 places where that video could be uploaded?

24   A.   What do you mean by that?  I don't understand.

25   Q.   Yeah.  For example, you've got the Round Rock

**SERGEANT MILTON NAMON POPE, JR.**

1  ISD official, you know, footage that gets posted on the

2  website.  Is there a place where Detective Griffith

3  while she's doing this or some other person could

4  download that video and put it in the evidence file?

5                MS. LONG:  Objection.  Asked and answered.

6                MR. CASEY:  I'm asking for the scope of

7  what can be in the evidence file and if there's a way to

8  do that.

9        A.  Yeah.  So, yes, if there's any type of

10 evidence, that's upload to evidence.com.  That's our

11 program that we use.

12       Q.  (By Mr. Casey)  Okay.  Thank you.  All right.

13 So when -- when the mic -- and I'll represent to you, on

14 the video we're going to talk about the later, the mic

15 gets turned off.  You -- you heard Mr. Story elevate his

16 voice?

17       A.  Yes.  It wasn't at a normal tone.

18       Q.  Okay.

19       A.  And again, normal to me may not be normal to

20 you-all.  But, again, as a police officer, I have to be

21 able to make a determination if in my personal

22 professional opinion for persons elevating their voice

23 or not.

24       Q.  Okay.  That's fine.  That's fine.  Now, the

25 people in the -- when they -- when his mic gets shut

SERGEANT MILTON NAMON POPE, JR.

1  off, did that affect the microphone volumes of the

2  people on the dais?

3      A.  What do you mean by that?  I'm not for sure.

4      Q.  Okay.  So if they shut off Mr. Story's

5  microphone, obviously he can't -- he can't be heard as

6  -- at the same volume --

7      A.  He -- he was --

8      Q.  -- the -- the -- hold on.  Let me finish my

9  question first, sir.  Were -- did they continue to talk

10  at the same volume through their microphones?

11      A.  I cannot recall, but I do recall Mr. Story

12  continuing to speak.

13      Q.  Okay.  So you don't know if they continued to

14  speak at the same time?

15      A.  I cannot recall.

16      Q.  Okay.

17      A.  But I do remember President Weir telling him

18  several times, you know, "You can't" -- You can't

19  discuss this topic.  You can't discuss this topic.  You

20  can't discuss" -- "discuss this topic."  Then she said,

21  "You know what, escort him out.  We told you one time,

22  escort him out."  And that's what we did.

23      Q.  Okay.  Do you recall any of the other board of

24  trustees members speaking up at that time?

25      A.  No.  Because at the end of the time -- again,

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1  when I have a situation and I have an individual that's

2  in front of me, I don't have time to be looking at

3  everyone else.  I have to look at the subject.  Okay?

4  Not knowing Mr. Story's history, he could have a weapon

5  on him.  I don't know.  So I'm looking at hands, I'm

6  looking at him, and then I'm trying to go ahead on and

7  -- and, as you say, de-escalate the situation by getting

8  him out in a -- in a professional manner.

9       Q.  Okay.  So my question's going to be real

10  specific.

11      A.  Okay.

12      Q.  You -- while you were looking at Mr. Story, you

13  continued to hear the Board President Amy Weir telling

14  him to stop speaking; correct?

15      A.  I heard him -- I heard her give him a directive

16  several times --

17      Q.  Okay.

18      A.  -- not to speak --

19      Q.  And was your -- once she started giving him

20  directives, were you already looking at him?

21      A.  Yes.

22      Q.  Okay.  And did she continue to give him

23  directives while you were walking toward him?

24      A.  I start walking towards him when she instructed

25  me to escort him out.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.

2    A.  After that, I did not -- I did not walk to him.

3  I just -- of course I'm looking at him because at the

4  particular time he was the subject at hand.  So by him

5  being the subject at hand, I'm looking at him.  Again,

6  I'm going through safety protocols.  I'm looking at

7  waistbands.  I'm looking at hands.  That's what I'm

8  looking at.  I'm looking at his demeanor.  So I did

9  engage him.  I didn't walk towards him until I received

10  a directive, "Please escort Mr. Story out."

11    Q.  I understand that completely.  I'm asking a

12  slightly different question.  I may be doing a poor --

13  poor wording of it.  If after she says "Escort him out,"

14  and you're -- you're doing your assessment and she says,

15  "Stop.  Never mind," would you have been able to hear

16  that command?

17    A.  Yes, I would have.

18    Q.  Okay.  So you still could hear whether any

19  other board persons were talking through the mics;

20  right?

21    A.  I -- and you brought up a good point, because

22  if she would have told me, "Okay.  Stop.  Don't worry

23  about it," she would have repeated it several times.

24  And, again, she was the subject matter -- she was my

25  other focal point.  So --

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.

2    A.  -- I'm not listening to no one else.  The last

3  directive she gave me was, "Escort him out."  I'm not

4  listening to nobody else.  I'm trying to get him out in

5  a peaceful, professional manner.  Because mind you, not

6  only everyone else in the whole United States looking at

7  this, I mean, we made CNN that night, we made the New

8  York Post.  It was horrible.  It was very, very

9  embarrassing.  But again, we treated him with nothing

10  but respect when we escorted him out.  I did not put him

11  in an armbar.  I did not put pressure points on him.  I

12  was gently saying, "Sir, let's go.  Let's go.  Let's

13  go."  More -- more than most people would have done.  I

14  was very, very professional during this time.

15    Q.  All right.  Did the superintendent give you any

16  direction or physical indication on what to do at that

17  moment in time?

18    A.  No.  So let me just say something real quick.

19  Let me just clear the air up on --

20    Q.  There's no -- I'm just asking narrow questions,

21  sir.

22    A.  Okay.

23    Q.  If that's not responding to that question, then

24  -- then it's not -- this isn't a free-flowing

25  conversation.

SERGEANT MILTON NAMON POPE, JR.

1    A.  Makes sense.  Never did, sir.

2    Q.  And I appreciate the desire to want to fill in.

3 It's a natural desire.  Did the superintendent give you

4 any specific direction --

5    A.  No.

6    Q.  -- at that time regarding Mr. Story?

7    A.  And if I may, please, just say one thing.

8    Q.  I -- sir --

9    A.  If --

10         MS. LONG:  Sergeant, let -- Sergeant Pope,

11 just answer the question.

12         THE WITNESS:  Yes, ma'am.

13         MS. LONG:  And -- and I can ask you

14 questions at the end.  But his question was, did the

15 superintendent give you any directives.

16    A.  Not at all.  Never.  I apologize.

17    Q.  (By Mr. Casey)  Okay.  And when I can't say

18 "directives," did he give you any nonverbals like nod

19 his head or motion toward the door at all?

20    A.  No.  No, sir.  Not at all.

21    Q.  Okay.  All right.  The language in here -- and

22 we -- we kind of had to do something specific -- but the

23 language in here that I was curious about, it says

24 "verbal outbursts."  What -- how do you define, based on

25 where you were there that night, would be a verbal

**SERGEANT MILTON NAMON POPE, JR.**

1   outburst?

2       A.  Well, he elevated his voice.  And as we was

3   escorting him out -- and you can look at the video.

4   He's also -- so the individuals that are watching, you

5   know, the meeting and abiding by the rules as he's

6   passed -- as we're escorting him out, he's screaming.

7   They can't even watch the meeting.  So that was another

8   disruption.  Yes, he was -- he -- he -- voice was super

9   elevated.  As we got out and we were in front of the

10  audience, it got super elevated.  And it's in the video,

11  you can see it.

12      Q.  We will go to the video, sir.  I'm just trying

13  to go through these kind of sequentially.  So thank you

14  for explaining that.

15          Okay.  All right.  So this is the last portion

16  of it.  I'm going to look at the last -- the last

17  sentence, there's two words there.  And because

18  Detective Sergeant Griffith wasn't there and she's

19  getting this secondhand from -- and I'm assuming the

20  supplement was already written by this time.  It says,

21  "Story continued to resist officers, yell and scream,

22  causing a major disruption during the board meeting."

23  Do you make a distinction, do you recall, in your report

24  between yelling and screaming?

25      A.  Again, it depends on your definition.  My

**SERGEANT MILTON NAMON POPE, JR.**

1  definition is his voice was extremely elevated.  So that

2  right there covers all of it, everything -- it --

3      Q.  Okay.

4      A.  It's not -- it's not -- his voice wasn't, like

5  -- like mine right now, like yours.  No, that's normal

6  tone.  So anything other than normal tone if he has an

7  elevated voice.  And that's what --

8      Q.  Okay.  So -- so let's talk about levels of

9  elevation because you would agree with me that you can

10  talk in a normal tone -- well, actually, would you

11  agree, yes or no, that you can talk in a normal tone and

12  you can elevate your voice and still not be yelling?

13      A.  I'd say it depends on the situation.

14      Q.  Okay.  Would you -- would you state then that

15  screaming is a level above yelling?

16      A.  It could be considered the same.

17      Q.  Okay.

18      A.  Because I have kids at -- my kids at home, I

19  tell them to stop screaming or I tell them to stop

20  yelling.  To me, it's the same thing.

21      Q.  Yes, sir.  Thank you.  Let's see.  Next step.

22          MR. CASEY:  Okay.  I was going to jump into

23  the interrogatories, but I won't get through it before

24  lunch.  Do you -- is it okay -- what time you want to

25  take a lunch break, Katie?

SERGEANT MILTON NAMON POPE, JR.

 1                  MS. LONG:  If this is a fine time for you,

 2      this is what you -- it's your deposition.

 3                  MR. CASEY:  Yeah, I know.  I know.  But I

 4      -- I always want to try and accommodate everybody's

 5      schedule.  So if this is a good time for you, I'm fine

 6      with this.

 7                  MS. LONG:  Sergeant Pope, is this a good

 8      time for a lunch break for you?

 9                  THE WITNESS:  To me, I was hoping to keep

10      going because I really have a lot going on today.  So if

11      we --

12                  MS. LONG:  I know, but they do get --

13                  THE WITNESS:  Yes, whatever --

14                  MS. LONG:  -- they do have a lunch break.

15      Is now as good a time as any?

16                  THE WITNESS:  Yeah, we can do that right

17      now.  It's not a problem.

18                  MR. CASEY:  Okay.  30?  30 minutes?  Or do

19      we need more than that?  I'm fine with more than that.

20                  MS. LONG:  No.

21                  THE WITNESS:  30 minutes.

22                  MS. LONG:  30 minutes is plenty.

23                  MR. CASEY:  Okay.  All right.

24                  THE REPORTER:  Okay.  Off the record.

25                  (Thirty-two-minute lunch was taken.)

SERGEANT MILTON NAMON POPE, JR.

```
 1              THE REPORTER:  Back on the record.
 2        Q.  (By Mr. Casey)  Okay.  Let's start off with in
 3   this -- this section with your report because we
 4   mentioned it earlier.  I'm going to share the screen,
 5   what I've got identified as Exhibit 3, and I'm going to
 6   expand it on here again.  The Zoom -- Zoom screen focus
 7   is expanding beyond that.  Let me -- let me see if I can
 8   move it back now.  Okay.  Now it's over here.  Okay.
 9   This is -- this was produced in discovery by your
10   attorney.  It starts at Round Rock ISD 06311.  I'm just
11   going to kind of slowly go through it and ask you if you
12   recognize it.  It's got your name at the bottom.
13              (Exhibit 3 marked for identification.)
14        A.  Yes.
15        Q.  And the date on this -- and it's like four
16   pages long, so this is the narrative section of it.  And
17   then that's the end of it.  So you're familiar with
18   this?
19        A.  Yes, I am.
20        Q.  I'm sorry?
21        A.  Yes, I am.
22        Q.  Okay.  Let's go to the narrative.  This right
23   here, IO, what is that?  I see owner, but what does IO
24   mean?
25        A.  Individual other.  So that's a -- could be a
```

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1  witness or someone who's involved with the case.

2      Q.  Okay.  All right.  So this -- is this a short

3  -- I guess a short summary of the offense right there?

4      A.  Yes.

5      Q.  Okay.  All right.  So we're going to go through

6  this.  It says you are assigned in the second paragraph

7  to provide security.  You observed an individual

8  standing up in the room that violated social distancing

9  COVID protocols preestablished for the public seating

10 area in the boardroom.  When you say preestablished, do

11 you know who established those?

12     A.  I do not.

13     Q.  Okay.  We talked about it way back at the

14 beginning of the deposition, but do you recall if that

15 was one of two things, a policy decision or a state law?

16     A.  I am not for sure if it was policy or state

17 law.  All I know is that was a very poplar stance

18 throughout the country at the particular time, so just

19 basic common sense in my personal opinion.

20     Q.  When you say that was a popular stance, what

21 are you referring to with the pronoun "that"?

22     A.  Social distance, taking the COVID shot, mask

23 mandate, stuff like that.  So, you know, again, I'm just

24 a police officer.  I don't get into politics.  There's

25 some things that I have to do because the law says so.

**SERGEANT MILTON NAMON POPE, JR.**

1   I may not agree with the lawmakers; however, if that's

2   the law, then that's what's going to take place.

3       Q.  Okay.  So you said something also in -- in kind

4   of on the tail end of what you said before the most

5   recent comment.  You said it seems common-sense stuff.

6   Is it -- was that your opinion at the time, that the

7   COVID protocols were common sense?

8       A.  Being a veteran and being exposed to a lot of

9   shots, a lot of different diseases and things of that

10  nature, seeing -- you know, going to war to foreign

11  countries and seeing stuff, yeah, I just thought it was

12  just common sense.  Now, does that mean just because a

13  person doesn't want to wear a mask?  Hey, that's on

14  them.  I don't care.  But I was going to wear one.  And

15  if my department said I need to wear one, I'm going to

16  wear one.  So that's what I mean by personal.  I mean, I

17  don't care what a person does.  You know, that's on

18  them.  Just as long as they don't bring it to me, I'm

19  good.

20      Q.  Okay.  All right.  So it said you, "Approached

21  an individual identified as Jeremy Story.  Story was

22  informed of the COVID protocol rules that were initiated

23  by the Round Rock ISD Board of Trustees.  Officer Pope

24  continued to explain" -- let me pause there for a

25  second.  Is it -- is it common in these to speak about

SERGEANT MILTON NAMON POPE, JR.

```
 1   yourself in the third person?
 2                  (Phone alert.)
 3        A.  Excuse me.  Yes.
 4        Q.  Okay.  No problem.
 5        A.  It's --
 6        Q.  All right.  Is this something you have to take?
 7   Is this alert something you have to take, sir?
 8        A.  No.  It's just -- I don't.  No, it's not a big
 9   deal.
10        Q.  Okay.
11        A.  It depend -- it varies from department to
12   department, so...
13        Q.  No problem.  So it says, "Story was informed of
14   the COVID protocols initiated by the Round Rock ISD
15   Board of Trustees.  Officer Pope continued to explain
16   the regulations."  When you say -- and I'm -- we use
17   these terms very specifically in lawsuits.  When you say
18   "explain the regulations," you're just referring to the
19   decision the board of trustees has made?  Is that what
20   you're referring to?
21        A.  What the rules were, yeah, to -- to my
22   understanding.
23        Q.  Okay.  When you say "the rules," this is very
24   specifically important; who made the rules for that
25   night for the board meeting?
```

SERGEANT MILTON NAMON POPE, JR.

```
 1            MS. LONG:  Objection.  Vague.

 2            MR. CASEY:  Sure.  I would do that.

 3       Q.  (By Mr. Casey)  Are there state laws governing

 4  the conduct of the board meeting that you're aware of,

 5  Sergeant Pope?

 6       A.  I would assume so.

 7       Q.  Okay.  Well, I'm asking you if you know.  Like,

 8  my boss at the -- I was a solo attorney for a while, but

 9  now that I have a boss he's asking me --

10       A.  I would -- I would say -- sorry.

11       Q.  It's okay.  I was just making a distinction

12  whether you're assuming or you know for sure.  Are there

13  state law/rules governing the conduct of the board

14  meeting?

15       A.  Right off -- I would have to say I don't know

16  right offhand.  I don't know by this --

17       Q.  And that's a fair response.  I don't want you

18  to -- to put an answer out there that you're unsure

19  about.  You used the word "regulations," and so that's

20  what I'm concerned about.  Because you say in the first

21  -- in the sentence before you say, "Protocol rules," and

22  then right underneath that in the next line under that

23  you say "regulations."  Are you -- are you referring to

24  the same protocol rules when you use the word

25  regulations?
```

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  Yes.

2    Q.  Okay.

3    A.  That's the same meaning, because, yes, we know

4  one -- probably I shouldn't, you know, expand on it.

5  But, yeah, the same meaning, rules/regulations.

6    Q.  Okay.  That's fine.  "Story was informed there

7  was an overflow room outside of the meeting hall with a

8  projector screen so the attendees could watch the board

9  meeting."  Was there limited seating and social

10 distancing and no standing in that overflow room?

11   A.  In the overflow room or in the board meeting

12 room?

13   Q.  In the -- in the overflow room.

14   A.  In the overflow room there was plenty of

15 seating.

16   Q.  Okay.  Were the -- were the seating chairs

17 spread out in the overflow room?

18   A.  Yes, to my understanding.

19   Q.  Okay.  Was there social distancing, to your

20 understanding, even though you were in this room, did

21 your understanding of the situation -- was there social

22 distancing being enforced in that overflow room?

23   A.  No.  Not that I've -- we -- I want to say -- I

24 don't know if we had an officer out there or not because

25 I remember we had -- we had two inside, and I want to

SERGEANT MILTON NAMON POPE, JR.

1  say there was one outside.  But the overflow room wasn't

2  a problem; the board meeting room was the problem.

3      Q.  Okay.  Well, was the board -- if the overflow

4  meeting [sic] wasn't a problem, and apparently you may

5  not have had anybody out there, why was the board

6  meeting room itself a problem?

7      A.  Because that's where everyone wanted to enter.

8  They wanted to be inside the boardroom.  That's why that

9  was the problem.  And we had plenty of chairs, and the

10  video shows that as we was escorting Mr. Story out.

11  There were plenty of chairs in the overflow room.

12      Q.  Okay.  And when you escort -- if the video --

13  we have Officer Pontillo's body cam footage.  Do you

14  recall whether that video shows people standing or

15  socially distancing?

16      A.  I can't recall.

17      Q.  Okay.

18      A.  Again, my main concern was escorting Mr. Story

19  out in a safe and professional manner.

20      Q.  I understand.  I understand that's your

21  focus --

22      A.  And you have to stay -- you know, stay focused

23  on him.  You know, he was my main concern, his safety.

24      Q.  I understand.  I understand.  But I -- we're

25  not there yet.

SERGEANT MILTON NAMON POPE, JR.

1    A.  Okay.

2    Q.  So when we get there, we'll talk about that.

3  But I need to move through this paragraph.

4        "Officer Pope informed Story he cannot remain

5  standing in the boardroom.  Story replied he had a right

6  to stand where he wanted and the Board did not have the

7  authority to have any officer enforce COVID protocols."

8  The sentence right there, the last part of it, "The

9  Board did not have the authority to have any officer

10  enforce COVID protocols," do you agree with that

11  statement that the Board did not have that authority?

12        MS. LONG:  I'm going to object to the

13  extent it calls for a legal opinion testimony or a legal

14  conclusion, but you may answer, Sergeant Pope.

15    A.  Again, that's politics.  I don't get into that.

16  You know, they present us what the rules are and that's

17  what we go with.

18    Q.  (By Mr. Casey)  Well -- well, this is really

19  important here.  And I understand -- I'm not asking you

20  a political question.  I'm asking you this:  We've

21  talked about earlier about the example of a student

22  wearing shorts into a room where he wasn't allowed to

23  because the school board policy says you can't.  And you

24  said you wouldn't, that's not a penal code violation;

25  right?  So you've made a distinction before of policy

**SERGEANT MILTON NAMON POPE, JR.**

1  versus penal code or policy versus some statute in the

2  gov- -- in the -- you know, the education code.  So I'm

3  asking you right here, are the COVID protocols that you

4  say right here that -- that Mr. Story replied to you

5  back, do you have the authority to enforce a COVID

6  protocol?

7              MS. LONG:  Objection to the extent it calls

8  for a legal conclusion or a legal opinion testimony.

9      A.  Mr. Story and I had a conversation.  We went

10  back and forth.  And at that time I decided not to take

11  it any further.  I just let him stand.

12              MR. CASEY:  Okay.  Sir, I'm going to object

13  as nonresponsive.

14      Q.  (By Mr. Casey)  That's not my question.  My

15  question is very narrow.  Because what you -- what you

16  just gave me is a summary of the last couple sentences,

17  but I'm not there yet.

18              Mr. Story says, "You don't have the" -- "The

19  Board doesn't have the authority to enforce protocols by

20  you against me."  That's what he's telling you.  When he

21  told you that, did you agree with that statement or did

22  you disagree?  It's -- it's one of the two.  You either

23  agreed with it or you disagreed with it.

24      A.  I don't know if it's that -- if it's that easy.

25  Like I stated before, you know, he and I had a

**SERGEANT MILTON NAMON POPE, JR.**

1  conversation.  And as -- just like if I look at the law

2  of jaywalking.  Can I arrest somebody on jaywalking?

3  Probably.  Do I use my discretion?  Yes.  So I --

4      Q.  Now --

5      A.  If I may, sir.

6      Q.  Yeah, no, I'm fine.  I was just --

7      A.  To keep confusion down -- okay, to keep

8  confusion down and to show myself as a team player, I

9  used my discretion to let him stand.  So regardless of

10  what he's saying, again, I -- I mean, he's a citizen and

11  he can say what he wants, but I used my discretion to

12  let him stand.

13              MR. CASEY:  Okay.  Object.  Nonresponsive.

14      A.  That's my answer.

15      Q.  (By Mr. Casey)  My question is very, very

16  specific.  And I think that you've kind of in a sideways

17  way led me to what I'm asking.  You used the example of

18  jaywalking.  If someone jaywalks, which I understand is

19  to be crossing the street not at an intersection, not at

20  a -- not at a safe place or not at a designated

21  crosswalk.  That's -- that's what I understand it to be.

22  Correct?

23      A.  Correct.

24      Q.  All right.  You said, "I could arrest somebody

25  for jaywalking."

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  Yes.

2    Q.  "But I use my discretion not to."  So what

3    you've established is the authority to arrest them

4    already exists, but you decide to go, let's say, in a

5    merciful direction, if I can use that term.  And if you

6    disagree with that, let me know.  But you decided to go

7    in a discretionary merciful direction and let him stand

8    -- or excuse me, the jaywalking -- let -- not arrest

9    them?

10    A.  Okay.  At -- again -- once again, he and I had

11    a conversation and I allowed him to stand, so --

12    Q.  Right.  But you could have arrested him right

13    there?

14    A.  That's my answer.  Excuse me?

15    Q.  I'm sorry.  Could you have arrested him right

16    there?  It's a yes or no.

17    A.  I would say -- I'd have to take the time.  I'm

18    not sure.

19    Q.  Okay.  That's fine.  That's fine.  Saying

20    you're not sure is an okay answer.

21         So you've already -- you've already discussed

22    the end of this.  You said, "To prevent creating a scene

23    during the meeting, Officer Pope allowed Story to stand

24    in the rear of the boardroom during the session."  So

25    your view at that time, based on this narrative, not --

**SERGEANT MILTON NAMON POPE, JR.**

 1  not what you're saying right now because you said, "I'm

 2  not sure."  Your view at this time is that you could

 3  have taken him out of that room based on that last

 4  sentence?

 5      A.  Again, when he and I had the conversation, you

 6  know, what -- you know, I'm not trying to cause a scene.

 7  If you want to stand, stand.  Not my issue.

 8      Q.  Okay.

 9      A.  If someone would have directed me to remove

10  him, then that would have probably been something

11  different.  But again --

12      Q.  Okay.  Let's go there.  Okay.  So you got these

13  separated chairs, you have him standing in the back,

14  silent, not saying anything.  The Board President Amy

15  Weir tells you, "That man standing in the back" -- let's

16  assume she didn't even know who he is -- "That man

17  standing in the back needs to leave because he's not

18  sitting in a socially distanced chair and he's standing.

19  Escort him out."  Would you have to follow that command?

20      A.  That's -- that's one of those gray areas.

21      Q.  What's gray about it?

22      A.  We definitely have another person there, Chief

23  -- Chief Williby.  For something like that, again -- let

24  me just say this.  Am I going to just start running and

25  -- running people out because of that?  No.  Obviously,

**SERGEANT MILTON NAMON POPE, JR.**

1  they can -- the answer's no.  Because if it was, then I

2  would have went on and put cuffs on him then.  Okay?  He

3  and I had -- like I said, he and I had a nice

4  conversation.  You know, we were respectful to each

5  other.  And then once a chair was available, I offered

6  the chair to him and he took the chair.  So we both --

7  you know, you -- we always talk about de-escalation.

8  This right here is a prime example of de-escalation.  He

9  has his point of view; I have my point of view.  I'm

10 going to meet him in the middle.  "You know what, have"

11 -- "stand right here, sir.  Not a problem.  Hey, you

12 know what, sir?  There's a seat.  You'll be more

13 comfortable."  And he took the seat.

14             MR. CASEY:  Okay.  I'm go to object to --

15 as nonresponsive generally.  There may be some things in

16 there that were responsive.

17     Q.  (By Mr. Casey)  And, sir, I'm -- I'm not

18 challenging your view of your intentions is good.  I'm

19 just asking, and you responded several times, and it

20 seems that -- that may -- I may be giving that

21 perception.  I just want to, like, let you know right

22 now, I'm not challenging your intentions.  I'm just

23 going by what's in here in the report.

24     A.  I understand.  I'm just --

25     Q.  So --

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

```
1    A.   -- sir.

2    Q.   So -- so you just mentioned the offer of the

3  seat.  He was seated.  Then it said, "He made two

4  outbursts.  I'm not sure what" -- "what was said."  I

5  want to make sure that this term outburst, I'm

6  understanding it to make sure whether you're using it in

7  a general sense or a specific sense and how the outburst

8  was made.  Was this outburst a singular shout?

9    A.   I cannot recall, but there was two times he

10 made -- he made a loud statement.

11   Q.   Okay.

12   A.   I think it was during another individual's time

13 at the podium, so...

14   Q.   Okay.  Thank you.  All right.  All right.  So

15 let's go to this paragraph that's at the top of the

16 screen.  "At approximately 8:35 p.m." -- and this tracks

17 that statement on the affidavit for arrest -- "Story was

18 called by the Board to speak.  Weir instructed Story not

19 to deviate from the subject of the mask mandate.  Weir

20 asked Story if he understood.  Story acknowledged that

21 he did."  This is -- tracks -- tracks the -- tracks the

22 arrest affidavit.

23        When we talked about the arrest affidavit real

24 briefly, you said that was a summary of what you put

25 down.  And I'm -- I'm not trying to split hairs here,
```

SERGEANT MILTON NAMON POPE, JR.

 1  but this is almost a direct copy of what you wrote on

 2  the affidavit; correct?

 3      A.  I didn't write the affidavit, sir.

 4      Q.  No.  That's not what I'm asking, sir.

 5      A.  You asked me, that's what I wrote on the

 6  affidavit.  I did not write the affidavit.  That's what

 7  I'm saying.

 8      Q.  That's what was written.

 9      A.  Okay.

10      Q.  What Detective Sergeant Griffith wrote on the

11  affidavit appears to be almost -- pretty close to word

12  for word what you wrote here; correct?

13      A.  That's not uncommon.  That's correct.

14      Q.  Okay.  And I -- that's what I was getting at

15  because it seemed to be very important to you when we

16  were talking about the affidavit that that was a

17  summary.  And so I'm just making sure that -- that I

18  understand the distinction correctly.

19          So then it says, "Story acknowledged that he

20  did."  Then this next sentence says, "Story spoke on

21  issues concerning the mask mandate, and suddenly

22  transitioned into an unrelated topic about the

23  superintendent and the protective" -- "and the

24  protective order."  So what I understand this to be --

25  because when we talked about -- before we talked about

**SERGEANT MILTON NAMON POPE, JR.**

1  the arrest affidavit, we talked about your memory of it.

2  And you said -- you started speaking about the

3  superintendent.  And I'm going to go back to my notes.

4  And I don't know if you -- I don't recall you saying

5  that there was a gap.  You said he -- hold on.  You said

6  "halfway through."  There you go.  "Situation with the

7  superintendent about halfway through."  Okay.

8       So do you recall when he was -- when he -- he

9  shifted -- when he transitioned into this unrelated

10  topic?  Do you recall anything about this -- this

11  transition?  Was it -- was it abrupt or was it -- do you

12  recall him trying to relate it back to the mask mandate?

13     A.  Two different subjects, that's what I

14  understood.  That's the way I interpreted it.

15     Q.  And I -- I didn't hear the very first phrase of

16  what you said.

17     A.  Yes, I interpreted it as two different

18  subjects.

19     Q.  Okay.

20     A.  He transitioned to two different subjects.  One

21  not relating to the other.

22     Q.  Okay.  And -- and so you don't recall him

23  saying in any way that those two subjects were related?

24     A.  I don't see how they are related.

25     Q.  I -- that's not what I'm asking.  What I'm

**SERGEANT MILTON NAMON POPE, JR.**

1  asking is, in his speech, did he use any words of

2  comparison or anything like that to make a comparison

3  between the superintendent and the protective order and

4  what you have here in the mask mandate?

5       A.  I'd have to review the video or whatever's in

6  my report, sir.

7       Q.  Okay.  But your report -- your report doesn't

8  say that.  That's what I'm asking.

9       A.  Need -- we may need to review the video, sir.

10  I can't --

11       Q.  Okay.  So you're saying that your report may in

12  some sense -- and I'm -- obviously you're recalling this

13  afterwards, you're typing it.  Your report is -- is not

14  like a photo or video in nature, so there may be some

15  stuff that's missing from the report?

16       A.  I'm not saying that at all.  What I am saying

17  is the questions that you're asking me, we need to

18  review the video.  That's what I'm saying, because when

19  -- I'm not going to write a report that detailed.  The

20  courts do not care about that.  They just care about

21  what the -- the offense that -- that occurred.  Was

22  there --

23       Q.  Well --

24       A.  -- probable cause -- I'm sorry?

25       Q.  Well, if there's -- there's --

SERGEANT MILTON NAMON POPE, JR.

```
 1              MS. LONG:  I'm going to object.

 2              MR. CASEY:  Go ahead.

 3              MS. LONG:  Let him finish his answer.  He's

 4   in the middle of the testimony.

 5              MR. CASEY:  He -- I agree.  He paused, and

 6   then I started.  And I stopped.  And he said, "I'm

 7   sorry," which is a general communicative indication that

 8   he's going to give me the opportunity to maybe clarify

 9   my question.

10       Q.  (By Mr. Casey)  If you feel you need to

11   continue your answer, Sergeant Pope, go ahead.

12       A.  Yeah.  The question that you're asking, I'm not

13   going to -- no one upon no one's going to be that

14   detailed.  So when you're wanting to know detailed if he

15   -- if there was a -- did he say "and," "but," or "or," I

16   mean, unless it -- unless it's in quotations, you know,

17   I'm not going to remember that.  I'm not going to write

18   that down.  That's why I'm saying we need to review the

19   video.  Because you're asking me, you know, transitions.

20   Hey, I don't have it in my report, so obviously, we

21   might want to review the video.  I mean, that's what I'm

22   saying.  Because I'm not -- you know, I'm not

23   understanding where this is going.

24       Q.  Okay.  And I a hundred percent agree with you.

25   All right?  I one hundred percent agree that this does
```

**SERGEANT MILTON NAMON POPE, JR.**

1  not capture everything that happened.  And I understand

2  that this does not say verbatim what Mr. Story said.

3  Here's the challenge, sir.  Isn't it true that if there

4  are details that affect his rights and they're not

5  recorded here, then Sergeant -- Detective Sergeant

6  Griffith has -- is lacking facts from your -- your

7  incident report to go on?

8      A.  You talking about for the affidavit or for the

9  report?  What are you -- what are we talking about?  Are

10 we talking about the affidavit?  I'm confused.

11     Q.  So okay.

12     A.  I'm confused.

13     Q.  I'll go -- I'll --

14     A.  One minute we're talking about the affidavit,

15 and then next thing we're referring to the report.

16 Again, the report is submitted to evidence.  Like I

17 explained before, the affidavit is submitted to the

18 judge to see if we have enough probable cause for the

19 arrest.

20     Q.  Yes.  And each one of those gets narrowed by

21 way of summary.  Would you agree?

22     A.  The report is never narrowed.  The report just

23 lists the facts.

24     Q.  Okay.

25     A.  That's what I'm telling --

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  All right.  Let's --

2    A.  Yeah.

3    Q.  -- let's pause there for a second.  You said

4   the report just lists the facts.  But you also agree

5   with me, the report doesn't say everything he said;

6   correct?

7    A.  So --

8    Q.  That's what you just told me, yes or no?  Does

9   the report say every word he said?

10    A.  No, it doesn't.

11    Q.  Okay.  Then we're going to do some yes-or-no

12   questions because we might be talking past each other,

13   and it's probably -- may be my fault.

14        All right.  So if the report doesn't say

15   everything he said, then there may be things he's said

16   that didn't make it in here that are still important; is

17   that -- is that fair?

18    A.  I'm not for sure.  I can't answer that

19   question.

20    Q.  Okay.  That's fine.  So -- because -- and --

21   and I think in all the training you've had as an -- as

22   an officer -- has there been instances where there was

23   an important fact that you found out didn't make it into

24   a police report?

25    A.  That could have been.

**SERGEANT MILTON NAMON POPE, JR.**

 1          Q.  Okay.

 2          A.  I'm not sure.  That could have been.  I'm

 3   not --

 4          Q.  That's fair.

 5          A.  -- going to say a hundred percent no because I

 6   -- again, I would have to go through all my reports that

 7   I've written in my lifetime.  But could have been.

 8          Q.  Okay.  All right.  So then we understand this

 9   next, "While discussing the unrelated topics, Story also

10   made" -- "had several outbursts up to and including

11   yelling and screaming about the law was broken and

12   violated by the Board."  Okay.  So let's talk about this

13   because there seems like there's two parts.  Actually,

14   three.  There's this part about several outbursts.  And

15   then you have the second part about "up to and including

16   yelling and screaming."  And then it said, "About how

17   the law was being broken and violated by the Board."

18   When Mr. Story's mic was cut off, did he transition a --

19   according to you a second time would have been -- into

20   talking about the law violation while he stopped talking

21   about the superintendent?

22          A.  I'm not for sure.  I'd have to look at the

23   video.

24          Q.  Okay.  That's fine.  As I read it here, it

25   seems there are three topics from your report.  The

**SERGEANT MILTON NAMON POPE, JR.**

1  first one is the superintendent protective order, the --

2  which you've described as an unrelated topic.  So there

3  would be the initial part, the transition to the

4  superintendent, and then this third part about the law

5  being broken and violated by the Board; right?

6  Certainly three parts you're talking about?

7       A.  Yes.

8       Q.  Okay.  All right.  So this next section

9  describes what you and I have talked about before.  You

10 say you "grabbed Story around the arm and both Officer

11 Pope and Pontillo forcibly escorted him out of the

12 room."  And when you say "forcibly," that was because he

13 -- he resisted your escort?

14      A.  Yes.

15      Q.  Okay.  In what ways did he resist your escort?

16      A.  He stiffened up.  He didn't move his legs.  He

17 didn't -- he didn't go into a -- as I can recall, he

18 didn't go into a -- like a deadweight move.  Because if

19 he had done that, then he probably would have fell to

20 the ground and we would have had to escort him out by

21 hands and feet.  So he just kind of stiffened up and

22 tried to stand as -- as -- just stand.

23      Q.  Okay.  And so by you-all grabbing him by the

24 arm and moving him, I'm going to -- I'm going to guess

25 -- by the way, I've done -- I don't have the experience

SERGEANT MILTON NAMON POPE, JR.

1  you have in law enforcement, but I have a, you know,

2  fourth-degree black belt in Karate and done security

3  before, so I kind of understand this.

4           When you grabbed him by the arm, he had to

5  move his feet or else he would have fell on his face;

6  right?

7       A.  Again, he did not -- he resisted, so we -- he

8  was -- we -- I would say like a little -- probably a

9  little minor drag, a tug.

10      Q.  Okay.  So were you -- you and Officer Pontillo

11 supporting his bodyweight?

12      A.  We was pulling him and supporting him I would

13 say.

14      Q.  Okay.  But he didn't go deadweight you're

15 saying?

16      A.  Not that I can recall.  It was --

17      Q.  All right.

18      A.  -- resisting.  It was more like we're going

19 forward, he's trying to go backwards.

20      Q.  Okay.

21      A.  Holding -- holding his -- trying to just hold

22 the ground.

23      Q.  Okay.  All right.  So you escort him from the

24 room to the main entrance overflow sitting area.  There

25 were public citizens there.  You continued to reason

**SERGEANT MILTON NAMON POPE, JR.**

1  with Story.  What does that -- that third line on the

2  bottom?  What were you telling him?

3      A.  "Let's go, sir."  Again, it's part

4  de-escalation.  You know, "Let's go, sir.  I understand.

5  Let's go, sir."  You can hear that verbatim on the

6  video.

7      Q.  Okay.

8      A.  Not one time did I use any profanity.  Not at

9  one time did I raise my voice.  I was very, very

10 professional and courteous -- courteous -- courteous

11 with Mr. Story as I --

12     Q.  And -- yeah.

13     A.  -- as I was escorting him out.

14     Q.  Okay.  And I don't think anyone's saying you

15 used profanity.

16     A.  I'm sorry?

17     Q.  No one's saying you used profanity.

18     A.  Oh, no.  I understand that, but I'm -- I'm --

19 what I'm trying to do is draw a picture for you on what

20 I did to help de-escalate the situation and show, you

21 know, although, you know, he may have -- although he may

22 -- he con- -- he committed an offense, okay, per se, I

23 was still giving him that dignity and that

24 professionalism.  That's what I'm trying to --

25     Q.  Okay.

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  -- get you to see.

2    Q.  Well, I appreciate that you tried to say that.

3  The only challenge here is that I had no question on the

4  table about your professionalism or your attempts to

5  de-escalate or anything like that.  So that's the

6  challenge here because it's very -- it's very natural as

7  a human to want to fill in gaps.  But if it doesn't

8  answer my question, it's totally fine --

9    A.  Okay.

10    Q.  -- to just give me what you believe is the bare

11  minimum.  And if I think I need another answer, I'll --

12  I'll ask another question.  But that just kind of

13  prolongs our time here, so...

14        All right.  So I stopped the share.  All

15  right.  Would you agree that Mr. Story's outburst, as

16  you recall when he was talking, happened after the mic

17  was cut off?

18    A.  I think it started once he brought up the

19  subject, and then President Weir and him went back and

20  forth.  She was telling him, "Hey, you can't say this,"

21  and he kept elevating, elevating, elevating, elevating

22  as far as...

23    Q.  Okay.  So the shouting -- the outburst from a

24  -- so I want to understand the timeline from what you

25  just described to make sure I'm receiving what you're

**SERGEANT MILTON NAMON POPE, JR.**

1  saying accurately.  The mic was cut off, and he began to

2  elevate his voice.  And at that point, that -- that

3  constituted what -- after the mic was cut off, of the

4  outburst?

5      A.  I think it probably would -- could have been

6  before the mic was cut off.  Because again, when she

7  told him, "Hey, you're getting off topic.  We're not

8  going to discuss this," then he just kept on trying to

9  get his point across.

10     Q.  So when -- when she said -- when he kept trying

11 to get his point across, if he was talking over her,

12 would that be an outburst?

13     A.  That would be considered one.  Yes.

14     Q.  Okay.  All right.  We'll go to -- you mentioned

15 you had -- when you were describing what you fill out,

16 you mentioned use of force.  Do you remember filling out

17 a use-of-force form?

18     A.  Yes.

19     Q.  Okay.  All right.  All right.  Let's go to

20 what's -- let me show you what's Plaintiff's Exhibit 5.

21 It was produced by your attorney during discovery, Round

22 Rock ISD 06324.  I'll ask if you are familiar with this

23 form.  Let me expand it a little bit.  Do you remember

24 this form?

25                  (Exhibit 5 marked for identification.)

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  Yes.

2    Q.  Okay.  Okay.  So when you talk about -- now,

3  this is the date from the 16th of August; right?

4    A.  Yes.

5    Q.  Okay.  So, "The subject's actions" -- I want to

6  go back to your -- your recollection of the event.  You

7  have, "Refusal to move, dead weight," you checked that

8  box.  You checked, "Dead weight, clinging to objects,

9  preventing custody."  Out of those three, which -- what

10  was -- you said you -- well, you didn't recall him doing

11  deadweight.  This might have refreshed your memory.

12  Does that refresh you memory at all?

13    A.  Yeah, when I mean deadweight, I'm talking about

14  -- I'm talking about dead weight as just dropping down.

15  Deadweight can also apply to just him placing his feet

16  and just resisting.  You know, preventing movement.  So

17  his feet can also cause deadweight as well.  That's what

18  I was referring to there.

19    Q.  Okay.  Was he clinging to any objects?

20    A.  No.  I -- we had both arms.  He had his

21  computer in his hand.

22    Q.  Okay.  And -- and I guess from your

23  perspective -- I don't want to assume -- he was

24  preventing custody?

25    A.  Yes.

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.  It says, "Pulling, pushing, running away

2    to avoid control, not harming an officer."  Is that --

3    is that like a summary sentence or are these separate

4    categories when you're filling this out?

5    A.  It's a summary.  Just, you know, they give you

6    different options.  You know, that way you can

7    articulate to the jury or the judge of how severe the

8    situation was.  You know, did he fight us?  No, he did

9    not fight us.  Did he resist us?  Yes, he did.

10   Q.  Okay.  "Officer's actions."  You -- you

11   mentioned verbal direction.  The soft weapons control,

12   the -- the three -- are -- are these three, muscling,

13   joint lock, pressure points, are those kind of summary

14   actions and there's more underneath soft weapons control

15   than just those three?

16   A.  Yeah.  That right there are the two least

17   options that we have.

18   Q.  When you say the two, there's three things

19   there.

20   A.  I'm looking at -- I'm looking at one, two.  I'm

21   looking at -- I'm looking at verbal de-escalation and

22   soft weaponless.  That's what I'm talking about.

23   Q.  Oh, I'm sorry.  I apologize.  I was -- and I

24   was poor -- that was fault on my part.  I'm referring to

25   this parenthetical right there following the words,

**SERGEANT MILTON NAMON POPE, JR.**

1  "Soft weapon," and it says, "Muscling, joint locks,

2  pressure points."

3      A.  Muscling basically is when you grab someone.

4  You know, basically you're taking -- taking control of

5  them.  That's what I'm saying --

6      Q.  Okay.

7      A.  -- it's -- it's a lesser use of force.  You

8  know, then you have, you know, hard weaponless when, you

9  know, we doing hard strikes, OC spray, ASP/baton, you

10 know, TASER, things of that nature.  So these two right

11 here, if -- if I -- if I just gave him verbal direction

12 and he left, then it would have just been verbal

13 direction.  But we also had to put our hands on him, so

14 I have to articulate that, yes, we did come in contact

15 with Mr. Story to remove him from the -- from the

16 boardroom.

17     Q.  Okay.  And this right here, this officer

18 summary, "Officer Pope grabbed Story around the arm and

19 both Officer Pope and Pontillo forcibly escorted him out

20 of the building" -- "board meeting while Story continued

21 to resist, yell and scream."  Okay.  So it says right

22 here at the top, "Type of force ultimately successful in

23 control of the subject."  So that's asking you to list

24 what you did; right?

25     A.  That's correct.  Yes.

SERGEANT MILTON NAMON POPE, JR.

1      Q.  Okay.  This -- this second -- this second

2  sentence, this may be customary or it may just be an

3  anomaly.  When you write this that, "He continued to

4  resist, yell and scream, causing a major disruption to

5  the board meeting as officers worked to remove him from

6  the room."

7      A.  Yes.

8      Q.  Does that fall under that top --

9      A.  Yeah, what we -- what we --

10     Q.  -- column?  I'm sorry.  My -- my sentence, I

11  didn't finish it.  I apologize.  I was trying to find

12  the words.  This sentence -- this statement up here,

13  "Type of force ultimately successful," how does him --

14  how does this last sentence -- the second sentence there

15  apply to that subject?

16     A.  Because we're telling a story.

17     Q.  Okay.  So --

18     A.  This is a -- if I may, sir.  This right here is

19  a use of force.  Okay?  This a use-of-force form.  Okay?

20  So someone else is going to see this, so this is why we

21  were doing it.  We did this because of this.

22     Q.  All right.

23     A.  And this -- I was doing that.

24     Q.  Okay.

25     A.  So, you know, when you read this, "Oh, I just,

SERGEANT MILTON NAMON POPE, JR.

 1  you know, grabbed him."  Well, okay, you grabbed him.

 2  Why did you grab him?  This is what was going on.  This

 3  is what caused this.  I mean, even if you have a -- a

 4  officer-involved shooting, this form right here may be

 5  even longer because you have to articulate the facts,

 6  what -- what occurred.

 7      Q.  All right.  On this right-hand side, this

 8  little -- down in the middle between the two anatomical

 9  figures, that little letter "m" right there, I guess

10  that -- or that little jagged line denotes a grip.  I --

11  did you -- did you complete that on this form?

12      A.  I did not.  And the reason I didn't complete --

13      Q.  Sir, I don't -- I didn't ask why.  I just

14  asked --

15      A.  No problem.  No, I did not.  I did not.

16      Q.  All right.  Thank you.  Okay.  So let's go to

17  the lawsuit itself.  Let's move it into my exhibits

18  folder and retitle it.  All right.  Let me share with

19  you what's designated as Plaintiff's Exhibit 6, which is

20  the current active lawsuit.  And I'll expand it up.  You

21  -- you -- you've reviewed -- I'm assuming at least once

22  you've reviewed this lawsuit with your attorney?

23              (Exhibit 6 marked for identification.)

24      A.  Yes, initially, I think, maybe.

25      Q.  Okay.  That's fair.  Usually the attorneys

SERGEANT MILTON NAMON POPE, JR.

1  focus on it and they just keep you updated.

2          Let's go down to the board meeting.  There's a

3  lot of preliminary facts.  Okay.  So in accordance with

4  what you were talking about -- and you said in your --

5  in your -- this wasn't present in the arrest affidavit,

6  but it was present in your report, and you -- and you

7  did remember it from your report that Mr. Story spoke

8  for a bit on things.

9          So I want you to go ahead and read through

10 this paragraph that's -- that I'll represent to you is

11 -- was transcribed from the video.  And we'll watch the

12 video in a little bit.  And let me know when you read

13 through it.  You don't have to read through it out loud.

14     A.  Okay.

15     Q.  All right.  At this point, prior to -- prior to

16 this last -- I'm sorry, that keeps on popping up right

17 there.  Prior to this last sentence where it says,

18 "Still more," going all the way back to when he started

19 talking, in your opinion, was that related to COVID

20 health and safety?

21          MS. LONG:  Objection.  Vague and ambiguous.

22          MR. CASEY:  Okay.

23     A.  Yeah.

24          MS. LONG:  Are you -- are you just saying

25 the two words "still more," is that related back?  What

SERGEANT MILTON NAMON POPE, JR.

 1  -- what are you --

 2              MR. CASEY:  No.  I'm sorry.  I probably

 3  asked it -- my question may have not been clear.

 4      Q.  (By Mr. Casey)  So going backwards -- so this

 5  line that ends with, "the Supreme Court of Texas" --

 6      A.  Okay.

 7      Q.  Going back to that first word, "Today," right?

 8  So the first part is -- ignoring this last incomplete

 9  sentence, do you -- is it your opinion that Mr. Story

10  was talking about COVID health and safety?

11      A.  Let me re-read it again.

12      Q.  Okay.

13      A.  I would say no.

14      Q.  Okay.  So in your -- okay.  This fifth line

15  down that starts, "Our considering thwarting the

16  governor's order," do you recall what order Mr. Story's

17  referencing right then?

18      A.  I don't know.  I can't recall it.

19      Q.  All right.  Let's back up a little bit.  This

20  third line.  When Mr. Story says -- actually, the end of

21  the second line, going to the third.  "I also understand

22  the seriousness of the COVID epidemic," are you -- is

23  your testimony today that he's not talking about COVID

24  health and safety right there?

25      A.  He's talking about COVID safety right there

**SERGEANT MILTON NAMON POPE, JR.**

1  where it says COVID epidemic.  Yes.  I would agree.

2      Q.  Okay.  All right.  So do you recall at that

3  time that the governor had issued an order addressing

4  mask mandates?

5      A.  I can't recall.

6      Q.  Okay.  All right.  So in my hypothetical,

7  assuming the governor's order -- had issued an order

8  addressing mask mandates --

9      A.  Okay.

10     Q.  -- is Jeremy Story's reference to the

11  governor's order, does that apply to COVID safety?

12     A.  If he's referring to the mask mandate, yes.

13     Q.  Okay.  All right.  So this sentence on the one,

14  two, three, four, five, sixth line down that starts,

15  "Even today you've violated the rule of law by putting

16  officers in the back of this room in the difficult

17  position of being asked to illegally enforce a

18  last-minute violation of the Open Meetings Act."  Do you

19  understand what he's talking about right there?

20     A.  Yes.  But I disagree with it.

21     Q.  Okay.  And what was your understanding of what

22  he's talking about?

23     A.  He's talking about officers being there to be

24  the mask police.  We weren't there to be the mask

25  police; we're there for public safety.  That was --

SERGEANT MILTON NAMON POPE, JR.

 1  that's why we were there.

 2       Q.  Okay.  That's fine.

 3       A.  And so, if I may --

 4       Q.  Yes.

 5       A.  -- if I may -- you asked a question, if I may.

 6  Now, we -- you know, by us not being there, someone who

 7  may not like Mr. Story could have shot him.  So we're

 8  there for deterrent.  We're not there for politics.

 9  Again, we're there for as a deterrent to make sure

10  everyone goes home when we do not.

11            MR. CASEY:  All right.  I'm going to object

12  to nonresponsive to everything after "if I may."

13       Q.  (By Mr. Casey)  We're running into the same

14  issue, Sergeant Pope.  When you ask the question -- when

15  you answer the question, if I need more detail, I'll ask

16  you.  But you continue to defend what you're doing and

17  that's not the question I'm asking.  I'm not challenging

18  your intent.  I'm not challenging what you believe your

19  good intentions.  I'm just simply asking a very specific

20  question.  Okay?  Let's -- let --

21            MS. LONG:  Sergeant Pope, he's not asking

22  you if you agree or disagree with what he says.  What

23  he's trying to do is explain what Mr. Story was saying

24  and see if you think that that related to -- at that

25  time, before he was interrupted by the board president,

**SERGEANT MILTON NAMON POPE, JR.**

1  if you think that he was talking about mask mandates,

2  COVID health and safety protocols.  He's not asking if

3  you agree or disagree with each sentence, just whether

4  each sentence relates to the COVID man- -- I just want

5  to explain to him because I think he's mis- -- confused.

6              MR. CASEY:  All right.

7       A.  It -- you know, it -- so Mr. Story is saying

8  that, you know, we're putting officers in, you know,

9  jeopardy or whatever by -- by us being in the back of

10 the room.  We're -- my -- my answer to that is we're in

11 the back of the room for a reason.  So I don't

12 understand how we're being put in jeopardy.  I mean --

13      Q.  (By Mr. Casey)  Okay.

14      A.  -- that's -- that's my point right there.

15      Q.  Yes.

16      A.  Because -- because I --

17      Q.  This is -- okay.  So your -- your attorney did

18 a great job, very capable and much more articulate than

19 I am.  I'm going through each sentence, and I'm not

20 asking you to defend yourself against the sentence.  I'm

21 very specifically saying, does this sentence relate to

22 COVID health and safety?

23      A.  Okay.

24      Q.  So when you told me that people thought you

25 were being the mask police, then the answer -- you could

**SERGEANT MILTON NAMON POPE, JR.**

1    -- you could answer that internally and say, "Yes, this

2    relates" -- this -- "because people thought we were

3    being the mask police, yes, this relates to COVID health

4    and safety."  And that would be the simple -- I don't

5    want to put words in your mouth, but that would be a for

6    instance or a for -- or a hypothetical.  Does that make

7    sense?

8        A.  It does.  But again, I --

9        Q.  Okay.

10       A.  -- I just said --

11       Q.  Does that -- so that's it.  I just -- I just

12   want to know, really yes or no now, whether -- do you

13   believe that sentence as expressed by Mr. Story is

14   related to COVID health and safety.

15           All right.  Next -- next sentence.  "An agenda

16   item today includes a resolution which includes 80

17   percent of the text concerning itself with the safety of

18   public employees and students."  Does that sentence

19   relate to COVID health and safety?

20           MS. LONG:  Objection.  Foundation.

21       A.  I -- I don't know because it's just saying

22   safety.  It could be safety against guns, it could be

23   safety against, you know, online porn.  I don't know.

24       Q.  (By Mr. Casey)  Okay.  So in the context of

25   this meeting, after all the previous sentences from the

SERGEANT MILTON NAMON POPE, JR.

1  first word of "today" when Mr. Story started speaking,

2  is it your testimony that he could be talking about

3  handguns?

4       A.  He could be talking about anything.

5       Q.  Okay.  But -- he could be.  But given the

6  context -- isn't context important here?

7       A.  I would say so.

8       Q.  Okay.  And given this context, do you believe

9  that this relates to COVID health and safety?

10      A.  To me, it's incomplete, so I don't -- I

11  couldn't tell you.  I don't know.

12      Q.  Okay.  That's fair.  It's incomplete because

13  you need more statements; right?

14      A.  Yes.

15             MS. LONG:  Objection.  Calls for

16  speculation.

17      Q.  (By Mr. Casey)  You -- you need more of the

18  words around this that Mr. Story said to see if it

19  relates, don't you?

20      A.  Again, if I'm reading it and I'm the untrained

21  eye, yes, I would.

22      Q.  Okay.  That's fair.  Context matters.  So in

23  the next sentence Mr. Story actually quotes the

24  resolution.  "The resolutions being considered today

25  includes statements like the board of trustees has a

**SERGEANT MILTON NAMON POPE, JR.**

1   substantial public interest in protecting the health and

2   safety of students and community."  Being part of the

3   resolution and connected with context to everything

4   that's gone before for the previous one, two, three,

5   four, six, seven, eight, nine, twelve lines, is that

6   related to COVID health and safety?

7                MS. LONG:  Objection.  Foundation.

8        A.  It could.  I can't -- can't interpret what he

9   was -- what he was referring to.

10       Q.  (By Mr. Casey)  Okay.  Sir, we're here because

11  your perspective, as you've testified, all of your

12  observations, your police report, your recollection of

13  it, the arrest affidavit, all say that Mr. Story went

14  off topic.  You're involved in this process of -- of

15  Mr. Story and him staying on topic whether at the front

16  end or his allegations where his viewpoint was

17  discriminated against or subsequent to that where he

18  believes he -- that you seized him unlawfully.

19       A.  Okay.

20       Q.  So -- so whether this is on topic is extremely

21  important.  So I'm asking you in the context of this,

22  that's why I'm asking the question.  From --

23                MS. LONG:  I'm going to object to the

24  sidebar.

25                MR. CASEY:  He doesn't understand.  I'm

**SERGEANT MILTON NAMON POPE, JR.**

1  trying to provide a preparatory comment for

2  understanding.  You objected to lack of foundation.  I'm

3  giving the reason why I'm asking.

4           MS. LONG:  No.  The lack of foundation is

5  you're asking him -- you haven't put the resolution in

6  front of him.  You're asking about the second item on

7  the agenda, not the first item on the agenda.  The

8  resolution was the first item on the agenda, and you

9  haven't established the foundation for that.

10          MR. CASEY:  Okay.  All right.  I appreciate

11  your objection.  I'm going to continue.

12     Q.  (By Mr. Casey)  Does that statement, sir -- is

13  that statement responsive to COVID health and safety?

14     A.  I'm not for sure what he was thinking.

15     Q.  Okay.  I'm not asking you what he was thinking.

16     A.  I'm not for sure.

17     Q.  That night -- that night, as you remember

18  standing there that night, do you -- do you believe it

19  was related to COVID health and safety?

20     A.  What, his whole speech?

21          MS. LONG:  Objection.  Objection.

22  Foundation.

23          MR. CASEY:  Okay.

24     Q.  (By Mr. Casey)  Yeah.  All -- his whole speech.

25  Let's say that.  Because the first time you read through

**SERGEANT MILTON NAMON POPE, JR.**

1   you said it's not related.  And then we went back to

2   sentence number two, and you said, "Well, it says COVID,

3   so it is related."  So I want to get your summary of

4   whether everything beyond that last broken sentence is

5   related to COVID health and safety because it can't be

6   both at the same time.

7        A.  Don't know.

8        Q.  I'm sorry?  You said, no, I don't.  Okay.

9        A.  I'm not understanding.  No.  I'm not

10  understanding.  Like I said --

11       Q.  That's fine.  I don't have a question on the

12  table right now.  We'll move on.

13            All right.  Did -- do you recall any other

14  persons referencing the superintendent?

15       A.  I think there was a female.

16       Q.  Okay.  When the board chair told her to stop,

17  did she stop?

18       A.  I can't remember.  I do remember her leaving.

19       Q.  Okay.  Are you familiar in your law enforcement

20  training on the First Amendment and freedom of

21  expression with the concept of the people's speech being

22  chilled?

23       A.  I'm not familiar with the word "chilled."

24       Q.  Okay.  Let's -- let's take it out of that

25  scenario.  Let's come at it at a different way.  Have

SERGEANT MILTON NAMON POPE, JR.

1  you ever -- you mentioned -- you referenced Officer

2  Pontillo as your partner, I believe, earlier in this

3  deposition.  Have you ever had partners in other -- in

4  other places where you were a law enforcement officer?

5      A.  Yes.

6      Q.  Okay.  And I'm not asking for the particular

7  situation, but yes or no, have you ever heard -- had

8  instances where you gave feedback to your partner that

9  you thought maybe their -- their -- the way they act --

10  acted or handled a situation was excessive?

11     A.  Harsh maybe, but not excessive.

12     Q.  That's fair.  I'm not asking you to be a -- to

13  be a rat or -- so I'm just saying, if they were harsh.

14  If an officer's harsh -- and you've taken a -- I looked

15  at your TCOLE record, and you've taken a lot of -- and

16  it's really cool -- a lot of courses about connecting

17  with the community and being in context and relating to

18  citizens.  If an -- in those courses, do they talk about

19  the effect on citizens if officers are overly harsh with

20  their policing?

21     A.  Yes.

22     Q.  What's the effect on a citizen if an officer is

23  overly harsh in policing?

24     A.  It -- it demeans the force in a sense.  It

25  undermines future police operations in a community.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.   Okay.  Now, I may be misremembering my

2  question, but I asked what was the effect.  You said it

3  undermines, it demeans the force.  I'm guessing you mean

4  it demeans the force in their eyes.  Does it have any

5  effect on the way the citizens behave in the exercise of

6  their rights?

7              MS. LONG:   Objection.  Vague and calls for

8  speculation.

9      A.   You know, knock on wood, I have never, with the

10  exceptions of this, I guess -- I'm -- this is my first

11  one.  But I've never had any incidents whereas I

12  experienced that.  I've seen a lot on TV.  But again,

13  with my training, I've never had that, so...

14              MR. CASEY:   Okay.  Well, I -- I'm going to

15  object as nonresponsive.

16      Q.   (By Mr. Casey)  My question's pretty -- pretty

17  narrow.  You said "demeans the force."  So you're --

18  you're giving me your opinion that in the eyes -- you

19  believe that in the eyes of the citizens, they would

20  have a lower view of the police; right?

21      A.   Yes.

22      Q.   Okay.  Is it also just as likely that within

23  the eyes of the citizen they'd be less inclined to

24  exercise their full rights as citizens?

25              MS. LONG:   Objection.  Vague.

SERGEANT MILTON NAMON POPE, JR.

1        MR. CASEY:  It's the same question.

2     Q.  (By Mr. Casey)  If they're going to -- if you

3  can tell me that'll -- it would demean the police in

4  their eyes, would it also have an effect of them not

5  exercising their full rights as citizens under the

6  constitution?

7        MS. LONG:  I'm going to object as vague,

8  and I'm going to object that it calls for speculation.

9        MR. CASEY:  Okay.

10     Q.  (By Mr. Casey)  You can answer, sir.

11     A.  With everything going on in the world, I think

12  we're one of the very few countries that actually can,

13  in a sense, if you want to call it be violated, and

14  still have your day in court, still express your

15  opinion.  I mean, we can look at, you know, the Ferguson

16  incident.  You know, we can look at the Rolley [sic] --

17  the Rodney King incident.  Yes, individuals of color

18  probably have had their rights violated in the past.

19  But you know what?  They still come forward and they

20  still express themselves.

21     Q.  Totally.  Totally understand.  Let's -- let's

22  use -- use those as an example.  Is it fair to say that

23  if you're in an environment -- let's -- let's use --

24  let's just pull something that probably everybody on

25  this Zoom call would recognize, Orange County/LA; right?

**SERGEANT MILTON NAMON POPE, JR.**

1  In Orange County, a very poor history of how people of

2  color have been treated by the police.  Would you agree

3  with me?

4      A.  I would say so.  Yes.

5      Q.  Okay.  Would it be fair to say that if you're a

6  person of color in Orange County, that you'd -- you'd

7  be, "Man, I'd like to go and do some sort of activity,

8  but I'm not going to because the cops in the past have

9  been really brutal, and so I'm going to" -- "I'm going

10  to choose to change my behavior so I don't avoid" -- "so

11  I can avoid a bad cop"?

12          MS. LONG:  Objection.  Vague.  Calls for

13  speculation.

14      A.  Being a person of color, what I've noticed

15  about my people, if we want to do something, we're going

16  to do it regardless of whoever is there.  Trust me.

17  Again, if I may.  Thank you.  Being born in Connecticut

18  and receiving my secondary education in Alabama, big,

19  big, wake-up call.  So, no, you know, no one's going to

20  say, like, "Well, the police over here.  I'm not going

21  to go over there."  You know, you may not -- my people

22  may not even stand the police, they're still going to

23  walk past them.  They may not speak, but they still

24  going to, you know, handle their business.  They have

25  to.  No one's just going to sit in our house and be

**SERGEANT MILTON NAMON POPE, JR.**

1  like, "Well, the police are here.  We can't go nowhere."

2  No, they going to go out there.  So that's not just for

3  blacks; that's for Hispanics, that's for Arabs, that's

4  for anyone.  This is America.

5      Q.  Okay.

6      A.  You know, we --

7      Q.  This is America.

8      A.  -- we were in -- if I would -- if I may,

9  please.

10     Q.  Well, there -- you're -- you've got these long

11 extended answers.  I'm looking for a narrow response.

12 So when -- I'm going to have to stop you or we'll be

13 here all day.  Okay?

14         So you mentioned it's because we're in

15 America.  So you believe because of the violations of

16 people's rights in other countries, they probably have

17 less freedom?  Yes or no?

18     A.  Being around -- yes, I would say so because

19 traveling around the world, I've seen different

20 countries -- I've visited different countries.  So, yes.

21     Q.  Okay.  That's the concept I'm trying to get at

22 when I say chilling your rights.  In those countries

23 that -- you mentioned in America we're free to do more

24 stuff.  In those countries, those rights are getting

25 violated so people are like, "Hey, I'm not going to go

**SERGEANT MILTON NAMON POPE, JR.**

1 over there," right?  I mean, based on your travels you
2 said, you -- you would see -- would it be reasonable
3 that people would make those decisions to shift their
4 behavior because they're afraid of -- of -- of the
5 repercussions?
6     A.  In overseas, in other countries?  Yes.
7     Q.  Okay.  All right.  All right.  We're going to
8 get to the video.  Let me see if I got that cued up in
9 my -- all right.  We've gone through that.  All right.
10 Let's look at -- let's look at the video.
11         MS. LONG:  Since we're -- you're at a point
12 of shifting, is now a good time for a brief five- to
13 10-minute break?
14         MR. CASEY:  Absolutely.  Absolutely.  I'll
15 go ahead and -- yeah, I'm fine with that.  Let's go 10
16 just to make sure.  Okay.
17         (Eleven-minute break was taken.)
18         (Mr. Story exits.)
19         THE REPORTER:  Back on the record.
20     Q.  (By Mr. Casey)  All right.  I'm going to put --
21 in our lead-up to the video, I'm going to put up
22 Plaintiff's Exhibit 8.  And it was presented in
23 discovery from your attorney.  It is the agenda item in
24 exhibits from presentations on August 16th, and we
25 talked about the resolution.  This is the very detailed

**SERGEANT MILTON NAMON POPE, JR.**

1  one that was during discovery, not the -- I don't think

2  the one from pulled off the public website.  Do you

3  recognize the subject one and subject two right there

4  from the -- the prior agenda that I -- that you and I

5  discussed, sir?

6                    (Exhibit 8 marked for identification.)

7          A.  Yes.

8          Q.  Okay.  I'm going to scroll down.  It's got a

9  list of people for the public comment time.  It's kind

10 of uneventful.  I'm scrolling down because -- and there

11 was an appropriate issue raised by -- by your counsel

12 about the resolution.  So this is the board resolution

13 from that night on the COVID epidemic.  I'm going to ask

14 you to read through what's present on the screen, and

15 let me know when you get to -- when you get to the

16 bottom of what's -- what's shown.

17         A.  Okay.  Okay.

18         Q.  All right.  And so it's a little bit longer

19 than that, so we'll go to the next part.  Just let me

20 know when you get through that.

21         A.  Okay.

22         Q.  And so let's just go down the signature pages,

23 but let me know when you're through with that.

24         A.  Okay.

25         Q.  All right.  So do you recall them going over

**SERGEANT MILTON NAMON POPE, JR.**

1  the resolution while you were there that night?

2       A.  I don't recall.

3       Q.  Okay.  And then afterward, do you recall there

4  being a slide presentation -- and I'm slowly going

5  through it -- about COVID protocols?

6       A.  I don't recall.

7       Q.  Okay.  Do you -- did you ever glance up at the

8  screen while the meeting was going on?

9       A.  Maybe.  But again, my focus was scanning the

10  room, so...

11       Q.  I understand.  I understand.  And I'm not

12  expecting you to see that.  But do you recall there

13  being an extensive slide presentation?

14       A.  I can't really recall.

15       Q.  Okay.  That's fair.  All right.  I think I've

16  gone down like nine pages.  All right.  Let's get to the

17  resolution.  I'd like to direct your attention to this

18  bottom paragraph on the screen.  I'm going to expand it

19  a little more.  All right.  So this bottom paragraph on

20  the screen talks about delegating items to the

21  superintendent that are in -- and I'm looking for the --

22  on the third line at the end.  "In the best interest of

23  the health, safety and well-being of students, staff,

24  school community and the citizenship at large" -- and do

25  you understand that?  They're delegating authorities to

**SERGEANT MILTON NAMON POPE, JR.**

1   the superintendent.

2        A.   I understand.

3        Q.   I'm sorry?

4        A.   I said I understand that.

5        Q.   Okay.  And I probably need to turn the volume

6   up on my computer.  All right.  When an item -- drawing

7   back from your military days, when an item is delegated

8   to someone, does that person have to be in a position of

9   trust?

10       A.   It should be, but not always.

11            (Mr. Story re-enters.)

12       Q.   It should be; right?  That's the ideal is that

13  when you delegate an act -- you delegate -- well, let's

14  pause there.  Are you familiar with the principle that

15  you can delegate -- you can delegate authority but not

16  responsibility?

17       A.   In military we did both.

18       Q.   Okay.  Well...

19       A.   And also in --

20       Q.   Okay.  I -- that was just my question.  You

21  said you did both.  So when something's being delegated

22  to the superintendent, do you consider that a

23  delegation, yes or no, to someone who's in a position of

24  trust?

25       A.   I don't know.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Would you believe something could be delegated

2  to the superintendent if he was untrustworthy?

3    A.  Again, I don't know.

4    Q.  Okay.  All right.  All right.  I'm going to

5  stop sharing.  We'll go to the video.  And I -- I

6  explained yesterday, when this video is being played,

7  for some reason they interact -- I did find a way to --

8  I think to make the audio more clear, and I'll check

9  that at the beginning.  But sometimes it will pause.

10  And so I'll just immediately press the play button right

11  after that.  Let me pull it up.

12         All right.  Oh, you know what?  It didn't give

13  me that choice.  Let me go to share video.

14              MS. LONG:  You're sharing.

15              MR. CASEY:  I'm sharing?  Okay.  Well, it

16  gave me the choice yesterday when I was messing around

17  with it last night to -- to share the audio, and so I'm

18  trying to -- let me see if I can find that right there.

19  Okay.  Screen-share.  Okay.  It may not be visible.  I

20  went to -- I went to share last night and I was like,

21  oh, there's an extra piece.  All right.  Well, we'll go

22  through it as best we can.

23    Q.  (By Mr. Casey)  I want to go to -- well,

24  actually, do you recognize this setup as -- as what you

25  recall from the August 16th meeting, sir?

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  Yes.

2    Q.  Okay.  And this -- this point where the -- the

3  dais tables come to a point, would it be your testimony

4  you're standing opposite of that against the back wall?

5    A.  Yes.  Against the back wall is correct.

6    Q.  Okay.  I'm going to bring you to .106 [sic] on

7  here.  Let's see.  1.06.  That's a little bit far.

8  Okay.  I'm going to rewind it just a little bit.  So

9  that's you, right, on the back?

10    A.  That's correct.

11    Q.  Okay.  All right.  So we're going to talk about

12  the -- the -- the woman who's up to speak,

13  Ms. Wrightmire, but first we're going to go back to the

14  Third Amended Complaint.  Sorry.  I misremembered where

15  I introduced it.

16        Okay.  This is the Third Amended Complaint.

17  Ms. Wrightmire's statement's and summary are here, and

18  then we're going to hear her full statement.  I'd like

19  to talk about some of her statement first, and then

20  we'll go hear her full statement.  Would you read the

21  paragraph that talks about Catherine Wrightmire from --

22  from Exhibit 6 that's on the screen?  Read it to

23  yourself and let me know when you're done.

24        MS. LONG:  Exhibit 6 is not on the screen.

25        MR. CASEY:  I'm sorry.  You're right.  Good

**SERGEANT MILTON NAMON POPE, JR.**

1  point.  Yeah.  Exhibit 6.  There it is.  There we go.

2  Exhibit 6.

3      A.  Okay.

4      Q.  (By Mr. Casey)  All right.  So you know we --

5  we -- we homeschool our kids and require them to read

6  Frederick Douglass because he was a -- I mean, he's a

7  hero.  And but my question is this:  Is Fredric Douglass

8  related to COVID health and safety?

9      A.  Nope.

10     Q.  Okay.  So was Ms. Wrightmire off topic when she

11  started talking about Fredrick Douglass?

12     A.  She was using him as an example.  That's my --

13     Q.  Okay.

14     A.  -- from this passage.

15     Q.  Okay.  That's fair.  So she was using him as an

16  example.  And according -- based on your understanding

17  of her comments, how is she using him as an example?

18     A.  I mean, it doesn't make any sense, but she's

19  using it as an example as far as, you know, comparing

20  what my people went through to wearing a mask.

21     Q.  Okay.  So she's drawing from outside -- outside

22  the current situation and -- and saying here's -- here's

23  something that's external to mask wearing, but there's a

24  related principle; is that fair?

25     A.  Yeah.

SERGEANT MILTON NAMON POPE, JR.

1        Q.   Okay.  And let's listen to Ms. Wrightmire's

2    comments.  Let me share -- share that screen.  Do you --

3    do you see the video now?

4        A.   Yes.

5        Q.   Okay.  We're going to play this and listen to

6    her comments.

7                    (Video playing.)

8              Can you hear her statement clearly?

9        A.   Yes.

10                   (Video playing.)

11       Q.   Sorry.  I'll rewind it a second.

12                   (Video playing.)

13             Okay.  And she actually spoke before Ms. Lee,

14   but in the complaint her statement is second, so we just

15   took them out of order so we can go through the video

16   like that.

17             If we just think about the Fredric Douglass

18   statement, did you notice -- did you notice when she

19   started talking about Frederick Douglass, did the Board

20   President Amy Weir tell her at all she was off topic?

21       A.   I don't know.  Again, I was watching -- and

22   matter of fact, this is my first time even hearing this.

23       Q.   Okay.

24       A.   Not much attention I was paying to the board

25   meeting.  I was scanning the room, as I said before.

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1    Q.  Okay.  And I paused for a second.  My questions
2 are going to be from what you watched on the video.  And
3 if I want you to go into what you're thinking at the
4 time, I'll let you know.

5         So my question is this:  Did you hear on this
6 video Board President Amy Weir stop Ms. Wrightmire from
7 talking?

8    A.  No.

9    Q.  Did you hear the Board President Amy Weir tell
10 her she was off topic?

11    A.  No.

12    Q.  Did she cut her mic?

13    A.  Not that I can tell.

14    Q.  Okay.  And, of course, Ms. Wrightmire was not
15 escorted out of the room; correct?

16    A.  That's correct.

17    Q.  Okay.  Now let's go to -- I'm going to go back
18 to the complaint.  And we're going to go and view Elaine
19 Lee's comments.  Okay.  So I'd like you to read Elaine
20 Lee's comments quietly and let me know when you're done.

21    A.  I'm done.

22    Q.  Okay.  That -- the -- we're going to listen to
23 her fully.  As you look at her comments there, does
24 Senator Cruz have anything to do, just as a person in
25 general, with the agenda items?

SERGEANT MILTON NAMON POPE, JR.

1   A.  Not to my understanding.

2   Q.  Okay.  Her sentence, "Him posing as a freedom

3   fighter in front of the camera," does that have anything

4   to do with the agenda items?

5   A.  Not to my understanding.  I guess not.

6   Q.  Okay.  We'll go -- let's listen to Ms. Lee's

7   comments, which she's right after this.

8              (Audio playing.)

9       Oh, sorry.  Am I sharing a video?  I realize

10  I'm not sharing a video.  I'm very sorry.  This is -- I

11  think it's a Zoom issue.  I was wondering why it was

12  going so smoothly.  Here, let's rewind it.  All right.

13             (Video playing.)

14      All right.  During that time when Ms. Lee was

15  speaking, how was she using that reference from -- about

16  Senator Cruz?

17  A.  She's saying, basically, that he -- his kids

18  are mandated to wear masks when they go to private

19  school, why aren't our kids, basically.

20  Q.  Okay.  All right.  So she's using him and his

21  situation as an example to speak to the broader one

22  that's before the Board; right?

23  A.  Yes.

24  Q.  Okay.  All right.  Let's go back to the

25  complaint, and I'm going to share -- I'm going to share

**SERGEANT MILTON NAMON POPE, JR.**

1 their comments from Don Zimmerman.  Go ahead and read

2 through them silently and let me know when you're done.

3     A.  Okay.

4     Q.  All right.  And to rewind just a little bit,

5 was Ms. Lee ever cut off when she mentioned Senator

6 Cruz?

7     A.  No.

8     Q.  Okay.  Was her -- did the Board -- and when I

9 say cut off, that was the mic.  Did the board chair tell

10 her to stop talking of something off topic when she

11 mentioned Senator Cruz?

12     A.  Not to my understanding.

13     Q.  I'm sorry?

14     A.  Not to my understanding.

15     Q.  Okay.  All right.  So Don Zimmerman's comments,

16 does he talk about any of the agenda items -- either of

17 the agenda items in this -- his comments that you --

18 that you just read?

19     A.  It seemed like he's talking about religion.

20     Q.  Okay.  Now, in the fourth line down he mentions

21 this sentence, it starts on the third line, "This mask

22 mandate is not about safety.  It's not about health."

23 Not that you agree with him, but does that seem that it

24 can -- understandable that might be related to the

25 agenda items?

SERGEANT MILTON NAMON POPE, JR.

 1    A.  Mask mandate, yes.

 2    Q.  All right.  So now that you've read his

 3  comments, let's go ahead and listen to them.  Okay.  I

 4  think we're like five seconds before him.  I'm going

 5  to --

 6              MS. LONG:  You're not sharing the video.

 7              MR. CASEY:  Yeah.  Yeah.  I'm sharing --

 8  I'm just watching -- I wanted to get cued up before I

 9  switched.  Thank you, though.

10    Q.  (By Mr. Casey)  Okay.  Do you see the video,

11  sir?

12    A.  Yes, I can see it.

13    Q.  Okay.

14              (Video playing.)

15         Hold on.

16              (Video playing.)

17         So we're about halfway through his comments.

18  Is he talking about the agenda items, sir?

19    A.  The subject is referring to the mask mandate.

20    Q.  Okay.  But he's talked about religious stuff

21  for several sentences of his time.  Is he off topic at

22  this point?

23              MS. LONG:  Objection.  Asked and answered.

24    Q.  (By Mr. Casey)  I -- you said he's talking

25  about the mask mandate.  That was in line number -- that

**SERGEANT MILTON NAMON POPE, JR.**

1  -- that was at the beginning.  I'm asking at this point

2  where he's talking about Jesus of Nazareth.  He says,

3  "There's one perfect man whoever lived on this earth.

4  His name was Jesus of Nazareth.  This man healed the

5  sick, raised people from the dead, walked on water.

6  He's a miracle worker."  Are those comments on topic,

7  Sergeant Pope?

8      A.  In reference to the mask mandate, he's using

9  examples of --

10     Q.  Okay.  Okay.  That's fair.  He's using Jesus of

11 Nazareth as an example about the point he's making about

12 the mask mandate; correct?

13     A.  Yes.

14     Q.  Okay.  Let's finish his comments.

15             (Video playing.)

16         All right.  That last sentence where he said

17 he's fell [sic] -- "fed up with the self-righteousness

18 and hypocrisy of government all over this country from

19 Washington D.C. right down to the school board."  You

20 had mentioned earlier when you were in the, you know, in

21 the military in the unit, if there was feedback that

22 needed to come to -- to your unit and your unit command

23 about hypocrisy, you would want to know; right?

24     A.  In the military, yes.  Military setting, yes.

25     Q.  That's right.  Because you -- you don't want to

### SERGEANT MILTON NAMON POPE, JR.

1  lead as a hypocrite.  I mean, that leadership

2  undermines -- just like you said, it demeans what you're

3  doing; right?

4      A.  Correct.

5              (Ms. McKeag exits.)

6      Q.  Okay.  So what Mr. Zimmerman -- do you agree

7  with me, that he's calling out the school board's

8  hypocrisy?

9              MS. LONG:  Objection.  Foundation.

10     Q.  (By Mr. Casey)  I mean, his --

11             MS. LONG:  And best evidence.

12     Q.  (By Mr. Casey)  Okay.  I mean, we're -- we're

13  in the video.  I'll rewind it so we can hear that

14  sentence again.  His sentence says, "I'm really fed up

15  with the self-righteousness and hypocrisy of government

16  all over this country from Washington D.C. right down to

17  the school board."  So it's fair to say he's calling the

18  school board hypocritical; right, Sergeant Pope?

19     A.  In reference to the mask mandate, that's my

20  interpretation.

21     Q.  Yes, I agree with you.  Okay.  Let's finish his

22  comments.

23              (Video playing.)

24         Okay.  All right.  Was Mr. Zimmerman cut off

25  at any time on his microphone?

SERGEANT MILTON NAMON POPE, JR.

1    A.  Not to my understanding.

2    Q.  Did you observe in this video the Board

3  President Amy Weir tell him to stop talking at any time

4  about being off topic?

5    A.  No.

6    Q.  Okay.  All right.  So so far would you agree

7  with me that the topics that have been used to relate or

8  used to discuss the mask mandate have involved Senator

9  Cruz, yes or no?

10    A.  Yes.

11    Q.  They have involved Frederick Douglass, yes or

12  no?

13    A.  Yes.

14    Q.  And they have involved Jesus of Nazareth, yes

15  or no?

16    A.  Yes.

17    Q.  Okay.  Is there any topic that you see that is

18  not allowed to be used as a comparative topic?

19             MS. LONG:  Objection.  Mischaracterizes the

20  testimony.

21             MR. CASEY:  I -- I'm not asking about past

22  testimony.

23    Q.  (By Mr. Casey)  I'm asking about in -- in a

24  meeting like that, when someone wants to draw an

25  analogy, is there any topic that they are prohibited, to

SERGEANT MILTON NAMON POPE, JR.

1  your understanding of as a law enforcement officer

2  having to be familiar with the constitution, is there

3  any topic that they can't use to draw a comparison?

4      A.  Let me say this, I follow the directives -- the

5  directives of the board president.  That's it.  So I'm

6  not -- I don't -- I'm not here to interpret that.  My --

7  I'm just scanning the room.  If she says an individual

8  needs to leave, then an individual needs to leave.

9      Q.  Okay.  So you exercise no independent judgment

10  about an individual's constitutional rights when the

11  board president tells you to do something; is that what

12  you're saying?  That you are -- let me characterize it

13  -- and I don't mean this in a negative sense.  I'm

14  trying to define the boundaries of your

15  responsibilities.  If the board president tells you to

16  do something --

17      A.  No.

18      Q.  -- you do -- you're not thinking about

19  constitutional rights; correct?

20      A.  When the board president tells me to do

21  something when there is a violation of the law.  Now, if

22  the board president tells me to go ahead and arrest a

23  person that hasn't done anything, that's something

24  totally different.  But when an individual violates the

25  law, that's a -- that's a total different scenario.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.

2    A.  Especially when the law specifically states

3 that.

4    Q.  Okay.  That's fair.  And so when the board

5 president shuts off Mr. Story's microphone and tells him

6 to stop talking, at that point is she telling him that

7 his speech needs to cease?

8    A.  I don't know what she's thinking.  That's

9 not --

10    Q.  I --

11    A.  -- that's not for me to interpret.  That's --

12    Q.  I didn't say -- I didn't say thinking.  Is she

13 telling him at that time that the speech that he's

14 freely saying needs to stop?

15    A.  Not for sure.  That's -- that's what she -- she

16 did it.  That's what she did.  So I'm not for sure.

17    Q.  So if --

18    A.  She --

19    Q.  -- if -- let's say if -- if at that time, as my

20 client's argument is in the complaint -- my client's

21 argument in the complaint is very specific -- that her

22 interference with his speech rights was when she told

23 him to be quiet.  Anything that happened after that,

24 including you're saying him disturbing a meeting and

25 having to escort him out under the education code or in

**SERGEANT MILTON NAMON POPE, JR.**

1  violation of hindering public meetings, anything after

2  -- anything of that sort would have happened after she

3  told him to be quiet; right?

4      A.  No.  It -- because she had to initiate a

5  request for him to -- to be quiet, so he had to stop

6  before she told him to be quiet.

7      Q.  Okay.  So would you agree with me that if I

8  want to silence your speech rights, the moment I tell

9  you to stop talking, if I'm going to violate your rights

10  to free speech, it would be the moment I silenced you;

11  correct?

12          MS. LONG:  Objection.  Calls for

13  speculation and to the extent it calls for a legal

14  opinion or conclusion.

15      Q.  (By Mr. Casey)  You can answer.

16      A.  Can you repeat the question, please?

17      Q.  Yeah.  We got -- would you say that you have

18  several different types of constitutional rights;

19  correct?

20      A.  Yes.

21      Q.  Okay.  So Mr. Story wasn't praying at that

22  time.  He's not made a claim about religion.  So you

23  would agree with me he's not -- this lawsuit isn't about

24  his religious freedom; correct?

25      A.  I don't know.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Well, it's not in the lawsuit.  You're familiar

2  with the claims against you; right?  He's saying you

3  violated his First Amendment free speech rights, he was

4  arrested in retaliation, and there was an illegal Fourth

5  Amendment seizure.  Those are the three claims.  And

6  none of those are his religious rights -- is he making

7  that claim; correct?

8    A.  Correct.

9    Q.  All right.  So in order to violate someone's

10  free speech rights, isn't it true that when the board

11  president talked, told him to stop speaking -- I'm not

12  asking you to make a legal conclusion -- that he had to

13  stop speaking, according to you, right when she said

14  stop?

15    A.  You know, that's a very -- that's very vague.

16  Because, again, we have rules at the meeting.  So that's

17  what I'm saying.  I'm -- you're confusing me.  We have

18  rules of a meeting.  If I go into a meeting and I'm

19  speaking off topic, yes, I can be told to be quiet.

20  That's no different than me going into a theater and

21  yelling fire.

22    Q.  Okay.

23    A.  We're not allowed to yell that.  Then it's the

24  same thing.

25    Q.  All right.

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  But I mean, I'm not understanding you.  I mean,

2  it's --

3    Q.  Yeah.  That's fine.

4    A.  -- you're asking me to make a broad statement.

5  And what I'm telling you is, these are the rules.  So if

6  those are the rules --

7    Q.  Okay.

8    A.  -- you know, that -- those are the rules.

9    Q.  Okay.  Whether you agree with my client's

10 position or not, you would agree that the argument about

11 whether he's allowed to talk -- talk about a topic

12 happened before the -- him -- him getting loud and

13 having to be escorted out; right?  I mean, they're close

14 in proximity, but --

15    A.  I --

16    Q.  -- to be specific, the issue of him talking on

17 topic or off topic happened before the disruption and

18 him raising his voice.

19         MS. LONG:  Objection to the -- the video

20 speaks for itself.  Go ahead and answer, Sergeant Pope.

21    A.  I have to review the video.

22    Q.  (By Mr. Casey)  Okay.  Well, we'll go to the --

23 we'll go to his speaking.  We'll go to speaking.  Okay.

24 All right.  Let's go to the video.  This is just a clip

25 from Mr. Story.  It's taken directly from there so we

**SERGEANT MILTON NAMON POPE, JR.**

1  don't have to forward all the way across.  I'm going to

2  share-screen and watch Mr. Story speaking.  Am I

3  sharing?  It looks like I'm sharing.  It should be

4  sharing MP4.  Wrong one.  Can you see the video, sir?

5      A.  Yes.

6      Q.  Okay.  And sometimes audio on here is kind of

7  garbled.  I just want to focus on, at this point, the

8  very beginning of it.

9          (Video playing.)

10     Did you hear his comment -- his statement

11  there clearly enough?

12      A.  No, I didn't.

13      Q.  Okay.  I think he's going to get up to the mic

14  sooner.  I might go back to the other video if it's more

15  clear.  Just a moment.

16          (Video playing.)

17     Okay.  Can you hear his voice clear enough?

18      A.  Yes, I can hear his voice.

19      Q.  Okay.  Thank you.  That's -- we'll go on.

20          (Video playing.)

21     It's at this point, as I understand your

22  testimony in the last few minutes, you are not really

23  thinking about whether he's on topic or not?

24          (Mr. Story exits.)

25      A.  No.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Okay.

2    A.  That's not my -- that's not my job.

3    Q.  Okay.  So when the board president gives you an

4  order, do you have to exercise any independent judgment

5  about what's going on at the time?

6    A.  Yes, I do.

7    Q.  Okay.  If the board president tells you to

8  escort someone out, do you have to consider whether that

9  escorting that person out might violate, based on your

10 law enforcement training on the constitution, whether

11 that escort out might be violating their constitutional

12 rights?

13   A.  Yes.

14   Q.  Okay.  Did you make that determination in this

15 instance?

16   A.  Yes.

17   Q.  Okay.  What constitutional rights of Mr. Story

18 did you consider when you made that determination?

19   A.  Of course it's freedom of speech for one.

20   Q.  Okay.  Let's pause there.  Let's break them

21 down.  I appreciate that and I apologize for

22 interrupting you, but I want to get these separately.

23 Well, actually, just go ahead and say which rights you

24 considered.  I'm sorry.

25   A.  I lost my train of thought.  You go ahead, sir.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.   Yeah.   Yeah.   That's my fault.   Which

2   constitutional rights of Mr. Story did you consider at

3   this moment?

4    A.   Obviously, it'd be his First Amendment.   But

5   again, you know, I'll go back to the, you know, you just

6   can't say what you want.   We have rules in place for a

7   reason, and that's to conduct a professional-held

8   meeting.   And if that's the case, everyone would just

9   say whatever they want to say and we wouldn't get

10  anything done in meetings.

11       So -- so if he doesn't abide by the rules of

12  the meeting that was set forth before, then he's causing

13  a disruption -- which at that time he was -- I get the

14  directive.   You know, he could -- again, he could have

15  been just using profanity, whatever the case is.   Not my

16  issue.   Okay?   If the board president says, "Hey, you

17  know what, this is an interruption, she needs to" -- "he

18  needs to be escorted out," I'm going to escort him out.

19   Q.   Okay.   So -- so there -- and what -- and what

20  my concern is that we're skipping over several things

21  right there.   So you said his First Amendment and free

22  speech rights.   Are there any other constitutional

23  rights that -- that you consider?

24            (Mr. Story re-enters.)

25   A.   I'm sorry.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Any other constitutional rights that you

2  believe you would consider at that time?

3    A.  Right now I'm more concerned with the First

4  Amendment, so we haven't even got to that part yet.  So

5  right now -- right now it's First Amendment.

6    Q.  Just his First Amendment.  And what about his

7  First Amendment would you be concerned about with

8  respect to protecting Mr. Story's First Amendment

9  rights?

10    A.  Well, right now he's just, you know, going

11  over, you know, basic stuff that basically is a concern

12  of his, and I have no problem with that.  None at all.

13  That's within the realms of the board rules.

14    Q.  Okay.  And if right now he had followed one of

15  the other speakers and referenced Ted Cruz, would you

16  have a problem with that?

17    A.  No.

18    Q.  If he had followed one of the other speakers

19  and referenced Frederick Douglass, would you have a

20  problem with that?

21    A.  Let me just make this clear, regardless if I

22  have a -- regardless if I have a problem with it or not,

23  it's -- that's not up for me to interpret.  Okay?

24  Again, there's -- there are -- there are rules and

25  there's a law.  So in the law and the rules, it

**SERGEANT MILTON NAMON POPE, JR.**

1  basically says you can't disrupt the meeting.  So if the

2  agenda, is A, B and C, you start talking about Q, we

3  give you a -- well, not we -- they give a verbal, "Hey,

4  listen, we're not talking about that."  You continue to

5  talk about Q, now you're disrupting a meeting.  That's a

6  basic.  It's so simple.

7       Q.  And -- and do you -- well, you say it's simple.

8       A.  It is.

9       Q.  Well, let's -- so does the board chair then

10 have kind of pretty broad discretion, in your mind, to

11 discern what's on topic and what's off topic?

12      A.  I'm not privy to that.  However, if these -- if

13 when I walk in there and -- and again, A, B, and C is on

14 the agenda, you're speaking of Q, just because you're

15 speaking of Q, that doesn't mean I'm going to go ahead

16 and just remove you.  But if I'm directed to remove you

17 because you are creating a disruption to the meeting,

18 then that's what's going to happen.

19      Q.  Okay.  So -- well, I -- it seems to me, though,

20 that as Mr. Story continues -- well, we'll watch this

21 and we'll pause it just a -- in a short bit.

22              (Video playing.)

23          So he's interrupted right then.

24      A.  Yes.

25      Q.  He says superintendent.  So is it -- is it fair

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

**SERGEANT MILTON NAMON POPE, JR.**

1    to say that you can make an analogy about anything not

2    using profanity about any topic and tie it back in like

3    the other speakers, except if you use an analogy about

4    the superintendent?

5                MS. LONG:  Objection to the extent it

6    mischaracterizes his prior testimony.

7        A.  Mr. Story was speaking of the mask mandate up

8    until that point, then he changed topics.

9        Q.  (By Mr. Casey)  Okay.  Okay.  Was -- now when

10   we listen to Elaine Chow -- or excuse me -- so Elaine

11   Lee's statement, she was talking about the mask mandate,

12   and then she shifted to talk about Ted Cruz; right?

13       A.  In reference to his daughter attending a school

14   that man- -- a private school that mandated a mask.

15       Q.  I agree a hundred percent.  But that -- that --

16   you had to listen to her whole sentence to figure that

17   out; isn't it true?

18       A.  I -- I'll -- that's what -- because it's real

19   quick.  I mean, this was straight up, you know.

20       Q.  Well, let's -- let's pause.  We'll go back.

21   Let me stop sharing that video.  We'll go back to the

22   complaint that has her comments on it written out.

23   Let's go back to P-6.  Let's go up to -- or down to

24   Elaine Lee.  She talked for a bit, and then she says

25   this, "I'm here to remind you that Senator Cruz, who

**SERGEANT MILTON NAMON POPE, JR.**

 1 poses as a freedom fighter in front of the camera,"

 2 let's pause right there.  That took her about one to two

 3 seconds to say.  Just about the same amount of time that

 4 Mr. Story referenced the superintendent and the

 5 protective order.  But she wasn't cut off, Sergeant

 6 Pope.  So as you're looking at Elaine Lee's

 7 constitutional rights, isn't it true you have to hear

 8 the second half of the sentence of choosing to send his

 9 children to a private school that has a mask mandate to

10 make sense of the why she's referencing Senator Cruz?

11          MS. LONG:  Objection.  Calls for

12 speculation.

13     Q.  (By Mr. Casey)  As you read that sentence, sir.

14 I'm not asking you to jump into Elaine Lee's head.  I'm

15 asking, as you read that sentence, which is directly

16 quoting her, you have to see the second part to

17 understand how it's related; correct?  Yes or no?

18          MS. LONG:  Objection.  Calls for

19 speculation.

20          MR. CASEY:  Okay.

21     Q.  (By Mr. Casey)  You can answer it, sir.

22     A.  Yes.

23     Q.  Okay.  And I agree with you.  It has to be

24 taken in context.  Chief Yarbrough yesterday, and

25 Detective Sergeant Griffith, they all agree with you.

**SERGEANT MILTON NAMON POPE, JR.**

1   This has to be taken in context.  So let's go to

2   Catherine Wrightmire.  She spoke about the mask mandate,

3   about -- we heard in the video about being able to see

4   people's faces, and then she starts talking about

5   Frederick Douglass.  And you said you're not really

6   understanding what she's saying, but you think she's

7   relating this back to the mask mandate.  But my question

8   to you is, she's asking then for you to take her

9   comments about Fredrick Douglass in context of her

10  entire statement; right?

11          MS. LONG:  Objection.  Calls for

12  speculation.

13      A.  Yes.

14      Q.  (By Mr. Casey)  Okay.  So same thing with Don

15  Zimmerman.  As you read his statements, isn't it true

16  that his total statement -- and this is -- except for

17  his name, this is exactly what he said in total.  Isn't

18  it true that as you read his statement -- I'm not asking

19  you to jump into his head.  As you read his statements,

20  those statements show an attempt to relate Jesus of

21  Nazareth to the mask mandate?

22      A.  Yes.

23      Q.  Okay.  So then let's go think about Jeremy

24  Story.  Is it understandable -- not necessarily whether

25  you agree with it because you didn't agree with

**SERGEANT MILTON NAMON POPE, JR.**

1  Catherine Wrightmire's analogy.  Is it understandable

2  that Jeremy Story appears, based on the words that we

3  read, to be relating the superintendent's protective

4  order back to the mask mandate?

5           MS. LONG:  Objection.  Foundation, best

6  evidence, and speculation.

7      Q.  (By Mr. Casey)  Okay.  You can go ahead and

8  answer, sir.

9      A.  No.  If it's me personally speaking -- if I'm

10  just personally speaking, no, I don't think so, but --

11     Q.  Okay.  That's fine.  I'm just looking for yes

12  or no.  I'm asking a couple of -- a series of yes-or-no

13  questions.

14           MS. LONG:  My apologies, but can we take a

15  brief break?

16           MR. CASEY:  Sure.  No, that's no problem.

17  How long?

18           MS. LONG:  Five minutes.

19           MR. CASEY:  Perfect.  That's no problem.

20           (Seven-minute break was taken.)

21     Q.  (By Mr. Casey)  All right.  You had mentioned

22  -- I'm sharing that.  I don't know -- I need to stop

23  sharing that.

24           You mentioned before the break -- or actually

25  earlier in the deposition that your goal in policing is

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

1    to keep -- I don't want to mischaracterize it, but is it

2    fair to say you want to keep the citizens in dialogue

3    with you about what's going on to kind of de-escalate

4    situations?

5         A.  That's fair to say.

6         Q.  Okay.  Do you -- do you recall the incident

7    that happened on September 14th, 2021 with Jeremy Story?

8         A.  Yes.  Some of it.

9         Q.  Okay.  Is the true that for -- let me back up

10   for a second.

11            On September 14th, 2021, did you encounter

12   Jeremy Story at the entrance to the board meeting room?

13        A.  I want to say so.  I think yeah.  I don't know

14   if it was before or after that date, but, yes, I had two

15   encounters with him.

16        Q.  You said two?

17        A.  Yes.

18        Q.  Okay.  What were those encounters?  Describe

19   the first one?

20        A.  I can't remember if it was the -- if it was

21   before the board meeting or after the board meeting.  It

22   was -- he was trying to gain access to the boardroom.

23        Q.  Okay.  As he was trying to gain access to the

24   boardroom, what happened during that first encounter?

25        A.  Myself and Frank Pontillo told him he couldn't

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1  come in because we were already at -- we were at our max

2  capacity.

3      Q.  Okay.  When you say "max capacity," you're --

4  was that a -- who said that?  Was that a fire marshal

5  capacity you're referencing?

6      A.  I don't know who said it, but they already had

7  chairs -- and this was during the pandemic.  They

8  already had chairs in there and all the chairs were

9  full.  And I explained to Mr. Story, once a person comes

10  out, another person can enter.

11     Q.  Okay.  And I'm going to be real clear for the

12  record.  There's no claims on the September 14th.  I'm

13  just exploring these for -- for facts related to the --

14  the other claims.

15              Now, you said they made rules.  Defined

16  "they."  Who is "they"?

17     A.  It was just explained to us by Chief Williby

18  that this right here is the capacity and that's how it's

19  going to be.  I said, "Copy that."  Overflow room,

20  "Explain to the guests that the overflow room, we have a

21  big, large projector screen and they can watch the

22  meeting from there.  As individuals exit, we will let

23  individuals in."  So they would be referred back to my

24  Assistant Chief Williby.

25     Q.  Okay.  And so Assistant Chief Williby, did you

SERGEANT MILTON NAMON POPE, JR.

1  understand him to be referencing a Texas statute or the
2  board policy for that meeting?
3      A.  I just received a directive from my assistant
4  chief.
5      Q.  Okay.  And -- and no judgment either way.  Did
6  you -- did you ask him why?
7      A.  He said for their -- it was due to the mask
8  mandate and the separation of -- so...
9      Q.  When you say "mask mandate," are you
10  referencing mask mandate for the district or mask
11  mandate for the state?
12      A.  I do not know.  Okay.  He just -- that's what
13  he said, and I said, "Roger that.  Not a problem."  It's
14  not like him telling me to go shoot this guy right here,
15  so...
16      Q.  When he said that, did you at any time in your
17  mind reference your -- your training on the
18  constitutional rights of citizens to petition their
19  government?
20      A.  No.
21      Q.  Okay.  All right.  When you encountered
22  Mr. Story at the entrance to the board meeting room that
23  night, was there any time where he was asking you to
24  explain why you were making the decision, that you
25  stopped responding to him?

SERGEANT MILTON NAMON POPE, JR.

```
 1        A.   I'm sorry?  Say it again.
 2        Q.   When you encountered Mr. Story at the entrance
 3   to the board meeting room on September 14th.
 4        A.   Okay.
 5        Q.   Was Mr. Story asking you why you were violating
 6   the law?
 7        A.   I can't recall, but it should be on the video.
 8        Q.   I understand.  I'm just asking on your
 9   recollection.
10        A.   Okay.
11        Q.   Do you recall speaking and telling Mr. Story
12   any reasons why he couldn't come in?
13        A.   I don't know the exact verbiage, but it would
14   have to be pertaining to "We're already at full
15   capacity.  Once one person exits, then you can enter."
16        Q.   All right.  And you were enforcing that rule;
17   right?
18        A.   Yes.
19        Q.   And that was a school policy rule; right?
20        A.   I'm not for sure.  You -- it come down from my
21   assistant chief.
22        Q.   Okay.  So -- all right.  At what point does a
23   command from your assistant chief have to pass through
24   your own law enforcement officer filter to determine
25   whether it's constitutional?  What -- what's the -- what
```

SERGEANT MILTON NAMON POPE, JR.

1   -- what's your framework for doing that?

2         A.  If it's lawful or not.

3         Q.  I -- that's -- okay.  If it's lawful.

4         A.  Lawful or not.  Yes.

5         Q.  Unpack that a little bit for me.

6         A.  Again, if he tells me to go ahead on and shoot

7   this guy, "Why am I shooting him?"

8         Q.  Okay.

9         A.  And if there's an issue -- if there's an issue

10  with someone entering the board room or with me,

11  whatever the case is, then use a different process.

12  It's like a complaint process.  So if I can't go into a

13  store because they're at full capacity, then instead of

14  me trying to force my way through the store, I just need

15  to go ahead on and say, "You know what, I don't think

16  this is fair."

17        Q.  Okay.

18        A.  Instead of, you know, making a spectacle.  So

19  it's called keeping -- keeping control.

20        Q.  Okay.  So your position -- well, this is really

21  important because you've mentioned several times -- and

22  I appreciate it -- you talking about civil rights

23  incidences.

24             Isn't it true that when Rosa Parks' rights

25  were violated -- let me back up.  Are you familiar with

**SERGEANT MILTON NAMON POPE, JR.**

1  Rosa Parks and her story where she refused to get off
2  the bus seat; right?
3      A.  Yes.
4      Q.  Okay.  Isn't it true that Rosa Parks' actions
5  weren't driven by a complaint, but were specifically
6  driven by civil disobedience?
7      A.  During that time a lot of things were driven by
8  civil disobedience.  I mean, trying to enter a board
9  meeting, I don't see how that compares to, you know,
10  individuals beating, lynching or killing.  So I really
11  find this question very, very offensive.
12      Q.  Okay.  Well, my --
13              MS. LONG:  As do I.
14      Q.  (BY Mr. Casey)  -- but you can't --
15              MS. LONG:  As do I.  Can you pick another
16  analogy?
17      Q.  (By Mr. Casey)  Let's talk about a sit-in.
18  Let's talk about a sit-in.  Because we're talking about
19  -- the context of this suit is government -- by a
20  citizen suing the government saying, "You're oppressing
21  my civil right."  All the extraneous stuff -- like you
22  said, you've traveled around the world, you've seen
23  oppressive governments.  Those people and those citizens
24  needs to speak up.  And so when people engage in civil
25  disobedience, there are ramifications.  And we're on the

**SERGEANT MILTON NAMON POPE, JR.**

1  cusp of that is Mr. Story's point with his lawsuit.

2              MS. LONG:  I'm going to object to the

3  sidebar.  If you can ask him a question without --

4              MR. CASEY:  I --

5              MS. LONG:  -- referring to one of the most

6  significant civil rights incidents in our country's

7  history that is a pretty offensive comparison, but stop

8  with the sidebar.

9              MR. CASEY:  I'm not here to -- I'm not here

10 to be pretty.  I think what she did was beautiful.  What

11 she did was amazing.  And she was civilly disobedient.

12     Q.  (By Mr. Casey)  What about the sit-ins, sir?

13 Mr. Story, in essence, was attempting to engage in a

14 sit-in; isn't that true?

15     A.  A sit-in?  What you mean?  What about a sit-in?

16     Q.  Well --

17     A.  Which one --

18     Q.  -- as -- as wildly --

19     A.  I don't think -- because if I may, I don't

20 think nobody --

21              MS. LONG:  Okay --

22     A.  -- is confusing Mr. Story.

23              MS. LONG:  -- stop.

24     A.  And that's why --

25     Q.  (By Mr. Casey)  You --

**SERGEANT MILTON NAMON POPE, JR.**

| | |
|---|---|
| 1 | MS. LONG:  No. |
| 2 | A.  -- you need to use -- |
| 3 | MS. LONG:  Time out. |
| 4 | A.  -- another example -- |
| 5 | MS. LONG:  Stop.  Everybody stop. |
| 6 | A.  -- as a lawyer. |
| 7 | MR. CASEY:  The -- |
| 8 | A.  Totally -- |
| 9 | MS. LONG:  Let's go off the record, please. |
| 10 | THE REPORTER:  Off the record. |
| 11 | (Ten-minute break was taken.) |
| 12 | Q.  (By Mr. Casey)  I'm going to be very |
| 13 | plain-voiced.  Is it a citizen's right to engage in |
| 14 | civil disobedience? |
| 15 | MS. LONG:  Objection.  Vague. |
| 16 | Q.  (By Mr. Casey)  Under your understanding of the |
| 17 | constitution as a law enforcement officer, does a |
| 18 | citizen -- in the history of our country, have citizens |
| 19 | engaged in civil disobedience to change the law? |
| 20 | A.  They can also be arrested as well.  So it's a |
| 21 | yes-or-no question. |
| 22 | Q.  Okay.  I don't disagree that you can be |
| 23 | arrested.  That wasn't my question.  I want to be very |
| 24 | narrow.  Have citizens engaged in civil disobedience -- |
| 25 | I'm not asking whether arrested or not -- in the history |

**SERGEANT MILTON NAMON POPE, JR.**

1  of the country that changed the law?

2       A.  Yes.

3       Q.  Okay.  At times in the history of our country,

4  are you aware based on your studying of the law as a law

5  enforcement officer, that that civil disobedience had

6  resulted in the changes in the law?

7       A.  Yes.

8       Q.  Did those changes in the law at times result

9  because of lawsuits?

10      A.  Yes.

11      Q.  Okay.  Were those lawsuits against government

12  entities and employees?

13      A.  Yes.

14      Q.  Were many of those lawsuits successful to

15  provide recognized rights for people?

16                MS. LONG:  Objection, vague.  Objection,

17  foundation.

18      A.  I don't have the numbers for that, so I don't

19  know.

20      Q.  (By Mr. Casey)  I don't want you to ask [sic]

21  numbers.  But do you recall in your studies in

22  constitutional law as a law enforcement officer that

23  law's been changed because people succeeded in their

24  lawsuits against the government when their rights were

25  violated?

SERGEANT MILTON NAMON POPE, JR.

1    A.  Yes.

2    Q.  Okay.  Between August 16th, 2021 and September

3  14th, 2021, yes or no, did you speak with anybody about

4  Jeremy Story?

5              MS. LONG:  Objection.  Asked and answered.

6    Q.  (By Mr. Casey)  After you spoke with Detective

7  Sergeant Griffith about your report, did you speak with

8  anyone else subsequent to that?

9    A.  I can't recall.

10   Q.  Did you encounter Jeremy Story -- excuse me.

11  Let's talk about your second encounter with Jeremy Story

12  on September 14th.  Where was that?

13   A.  I would have to review my -- my report.  I

14  can't recall.  I know I had two interactions with him.

15   Q.  You know you had two, but you don't remember

16  generally about the second one?

17   A.  I do not know.  No.  It was four years ago.

18   Q.  Okay.  Some notes.  In any of your law

19  enforcement training, did you take any courses about

20  implicit bias?

21   A.  Yes.

22   Q.  Tell the jury what your understanding is of

23  implicit bias.

24   A.  I've -- I've taken a class on just biasness on

25  -- for instance, there's a -- there's a -- there could

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

SERGEANT MILTON NAMON POPE, JR.

1  be a big problem with racial profiling.  So things of

2  that nature.  That's -- that's the bias in this class

3  that we've taken.  How to -- how to communicate with

4  individuals from different cultures, different

5  countries, different -- yeah, different --

6      Q.  Can you -- can you -- do you believe based on

7  your understanding of that law enforcement training that

8  there can be implicit bias between a police officer and

9  a citizen?

10      A.  Yes.

11      Q.  What type of bias would that be?

12      A.  Well, I'm a police officer myself, and if I'm

13  not in my uniform, if someone of fair skin complexion

14  stops me, they automatically think I'm a gangbanger or

15  something.  So that could be a bias.  Until I show my

16  badge.

17      Q.  All right.  So my -- my question is a little

18  bit more narrow and I'll clarify it.  Could a police

19  officer have bias against an ordinary citizen simply

20  because they're not law enforcement?

21      A.  Yes.

22      Q.  All right.  And could a police officer -- in

23  that training, did you become aware that a police

24  officer could have a tendency to prefer orderliness even

25  though someone might be exercising their rights?

**SERGEANT MILTON NAMON POPE, JR.**

1    A.  Say it again, please.

2    Q.  Yes.  A police officer might prefor [sic] --

3 prefer someone to be more orderly even though that

4 person is simply exercising their rights?

5    A.  That could happen.

6    Q.  Yeah.  Are you familiar with the concept of a

7 First Amendment audit?

8    A.  Yes.

9    Q.  Okay.  Explain to the jury what a First

10 Amendment audit is.

11    A.  It's when individuals -- for example, they may

12 approach public property and start videotaping, filming

13 or just being present.

14    Q.  Okay.  Have you -- have you watched any videos

15 of -- on social media or anywhere else during that

16 training of -- of First Amendment audits happening?

17    A.  Yes.

18    Q.  Okay.  In those First Amendment audits, did you

19 observe any incidents where the citizen was in the

20 wrong?

21    A.  Maybe, but I can't recall.

22    Q.  Did you observe any videos in those First

23 Amendment audits where the officer was in the wrong?

24    A.  Yes.

25    Q.  Okay.  And in those instances, isn't it true,

SERGEANT MILTON NAMON POPE, JR.

1  yes or no, that the officer was -- was unaware of the
2  constitutional rights of that citizen?
3      A.  Could be.  I'm not for sure.
4      Q.  In those instances, did you watch maybe the
5  officer was aware of the rights, but they just simply
6  wanted to person to become -- behave more orderly?
7      A.  I'm not for sure.
8      Q.  Okay.  I think I'm almost done.
9          Did you have any communication after the
10  September 14th board meeting with anyone regarding
11  Jeremy Story?
12      A.  I can't recall.  Other than -- other than
13  Griffith, I can't recall.  I know she and I had to have
14  a conversation because of my report.
15      Q.  Do you mean --
16      A.  If I -- if I may say, he wasn't -- he wasn't a
17  primary subject of mine.  Okay?  I submitted my report.
18  I have other things to do.  I have to protect kids.  I
19  have to mentor kids.  That's my job.  Okay?
20      Q.  And --
21      A.  You asked me -- if I may --
22      Q.  No.  No.  Because I don't have a question out,
23  sir.  I think you misunderstand --
24      A.  Go ahead, sir.  Go ahead, sir.  Go ahead.  Go
25  ahead.

**SERGEANT MILTON NAMON POPE, JR.**

1    Q.  Regarding Jeremy Story, is it possible that

2  after your two engagements with him that you carry any

3  type of implicit bias?

4    A.  If I can answer the question without being

5  interrupted, may I do that?

6    Q.  It's a yes-or-no question.  Is it a possible --

7  do you think it's possible that you carry, yes or no --

8    A.  No.

9    Q.  -- any implicit bias?

10    A.  No.  No.

11    Q.  All right.  Isn't it a hallmark, yes or no, of

12  implicit bias that it may be there and you're not sure

13  of it?

14    A.  No.

15    Q.  What does the word implicit mean in implicit

16  bias?

17    A.  As if it's there but I'm not realizing it's

18  there.

19    Q.  Okay.  So you're telling me that the very

20  definition of implicit bias means you don't realize it's

21  there.  So isn't it possible you carry implicit bias

22  against Jeremy Story?

23    A.  No, it's not.  And again, I can't explain, so

24  not a problem.  The answer is no.

25              MR. CASEY:  Okay.  I pass the witness.

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

SERGEANT MILTON NAMON POPE, JR.

1              MS. LONG:  I'll reserve for the time of

2    trial.  Read and sign rights.

3              THE REPORTER:  Okay.  Off the record.

4              (Proceedings concluded at 2:53 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SERGEANT MILTON NAMON POPE, JR.**

```
 1                    CHANGES AND SIGNATURE

 2   WITNESS NAME:  SERGEANT MILTON NAMON POPE, JR.

 3   DATE OF DEPOSITION:  OCTOBER 30, 2025

 4   PAGE      LINE           CHANGE               REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**SERGEANT MILTON NAMON POPE, JR.**

1  I, MILTON NAMON POPE, JR., have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct except as noted herein.

4

5

6                          _____

7                          MILTON NAMON POPE, JR.

8  STATE OF _____)

9  COUNTY OF _____)

10      Before me,_____, on this day

11  personally appeared MILTON NAMON POPE, JR.,

12  known to me (or proved to me under oath or through

13  _____) (description of identity card or other

14  document) to be the person whose name is subscribed to

15  the foregoing instrument and acknowledged to me that

16  they executed the same for the purposes and

17  consideration therein expressed.

18

19      Given under my hand and seal of office this _____

20  day of _____, _____.

21

22            Notary Public in and for

23            the State of _____

23            My Commission Expires:_____

24

25

SERGEANT MILTON NAMON POPE, JR.

```
1              IN THE UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF TEXAS
2                       AUSTIN DIVISION
   JEREMY STORY,                 *
3        Plaintiff,              *
                                 *
4  v.                            *    CIVIL ACTION NO.
                                 *    1:22-cv-448
5                                *
   SUPERINTENDENT HAFEDH         *
6  AZAIEZ, TRUSTEES AMBER        *
   FELLER, TIFFANIE HARRISON,    *
7  AMY WEIR, JUN XIAO, CORY      *
   VESSA; OFFICERS JEFFREY       *
8  YARBROUGH, JAMES WILLIBY,     *
   DEBORAH GRIFFITH, MILTON      *
9  POPE, FRANK PONTILLO, RON     *
   COLE, CHIEF DENNIS WEINER,    *
10 and CARLA AMACHER,            *
   individually, and ROUND       *
11 ROCK INDEP. SCHOOL            *
   DISTRICT,                     *
12       Defendants.             *

13

14                   REPORTER'S CERTIFICATION
          DEPOSITION OF SERGEANT MILTON NAMON POPE, JR.
15                     OCTOBER 30, 2025
                     (REPORTED REMOTELY)
16

17       I, Kristy Owen, Certified Shorthand Reporter, duly

18  qualified in and for the State of Texas, do hereby

19  certify to the following:

20       That the witness, SERGEANT MILTON NAMON POPE, JR.,

21  was duly sworn by the officer and that the transcript of

22  the oral deposition is a true record of the testimony

23  given by the witness;

24       I further certify that pursuant to FRCP Rule

25  30(f)(1) that the signature of the deponent:
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**SERGEANT MILTON NAMON POPE, JR.**

1    _X_ was requested by the deponent or a party before

2   the completion of the deposition and that the signature

3   is to be before any notary public and returned within 30

4   days from date of receipt of the transcript.  If

5   returned, the attached Changes and Signature Page

6   contains any changes and the reasons therefor:

7    __ was not requested by the deponent or a party

8   before the completion of the deposition.

9    I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties or

11  attorneys in the action in which this proceeding was

12  taken, and further that I am not financially or

13  otherwise interested in the outcome of the action.

14

15    Certified to by me this 18th day of November, 2025.

16

17

18

19  _____
    KRISTY OWEN, RPR, Texas CSR 10790
20  RPR Expiration Date:  9-30-2026
    CSR Expiration Date:  7-31-2026

21  STOVALL REPORTING & VIDEO, INC.
    Firm Registration No. 10259
22  1414 Creekview Drive
    Lewisville, Texas  75067
23  Phone:  (214) 695-2024

24

25