**LAUREN MARIE GRIFFITH**

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF TEXAS
2                 AUSTIN DIVISION

3
JEREMY STORY,                      *
4                                  *
      Plaintiff,                   *
5                                  * CIVIL ACTION NO.
VS.                                * 1:22-CV-448
6                                  *
SUPERINTENDENT HAFEDH AZAIEZ,      *
7 TRUSTEES AMBER FELLER, TIFFANIE  *
HARRISON, AMY WEIR, JUN XIAO,      *
8 CORY VESSA; OFFICERS JEFFREY     *
YARBROUGH, JAMES WILLIBY,          *
9 LAUREN GRIFFITH, MILTON POPE,    *
FRANK PONTILLO, RON COLE, CHIEF    *
10 DENNIS WEINER, AND CARLA         *
AMACHER, Individually, and ROUND   *
11 ROCK INDEP. SCHOOL DISTRICT,     *
                                   *
12      Defendants.                 *

13

14         --------------------------------

15              ORAL DEPOSITION OF

16           LAUREN MARIE GRIFFITH

17              OCTOBER 24, 2025

18            (Reported Remotely)
           --------------------------------

19

20

21      ANSWERS AND DEPOSITION of LAUREN MARIE GRIFFITH,

22 taken at the instance of the Plaintiff, on the 24th day

23 of October, 2025, from 9:07 a.m. to 2:23 p.m., with all

24 parties present via Zoom, in the above-styled and

25 -numbered cause in Georgetown, Texas, before Rachel D.

2

**LAUREN MARIE GRIFFITH**

1  Chavez, RPR, a Certified Shorthand Reporter in and for

2  the State of Texas, pursuant to the Federal Rules of

3  Civil Procedure and the provisions stated on the record.

4          Pursuant to information made a part of the

5  record at the time said testimony was taken, the

6  following includes all parties present.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**LAUREN MARIE GRIFFITH**

```
1                    A P P E A R A N C E S

2

COUNSEL FOR THE PLAINTIFF: (via Zoom)
3        Mr. Stephen D. Casey
         Casey Law Office, P.C.
4        P.O. Box 2451
         Round Rock, Texas  78680
5        Phone: (512) 257-1324
         Fax:   (512) 853-4098
6        stephen@caseylawoffice.us

7        Mr. David Rogers
         Law Office of David Rogers
8        821 Grand Avenue Parkway, Suite 401-B
         Pflugerville, Texas 78660
9        Phone:  (512) 923-1836
         firm@darogerslaw.com

10

11  COUNSEL FOR THE DEFENDANTS: (via Zoom)
         Ms. Kathryn E. Long
12       Ms. Kelsey R. McKeag
         Mr. Kenneth Adam Rothey
13       Thompson & Horton, LLP
         500 North Akard, Suite 3150
14       Dallas, Texas  75201
         Phone:  (972) 853-5115
15       Fax:    (972) 692-8334
         klong@thompsonhorton.com
16       kmckeag@thompsonhorton.com
         arothey@thompsonhorton.com

17

18  COUNSEL FOR THE DEFENDANT ROUND ROCK INDEPENDENT SCHOOL
    DISTRICT:  (via Zoom)
19       Ms. Cynthia L. Hill
         Round Rock Independent School District
20       General Counsel
         1311 Round Rock Avenue
21       Round Rock, TX 78681
         Phone:  (512) 464-5054
22       cindy_hill@roundrockisd.org

23

    ALSO APPEARING: (via Zoom)
24       Mr. Jeremy Story

25
```

**LAUREN MARIE GRIFFITH**

1                          I N D E X

2

3    Appearances.......................................  3

4    The Witness:   LAUREN MARIE GRIFFITH

5         Examination by Mr. Casey.....................  6

6    Reporter's Certificate...........................  160

7

8

9                      E X H I B I T S

10

11   NUMBER              DESCRIPTION                  PAGE

12       1    Email from Dee Hobbs......................  35

13       2    Affidavit for Warrant of Arrest and
             Detention.................................  42
14
         3    Monday, August 16, 2021, Round Rock
15            Independent School District Board of
              Trustees called Board Meeting agenda.......  84
16

17

18

19

20

21

22

23

24

25

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**LAUREN MARIE GRIFFITH**

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | (The reading of the Federal Rule into the |
| 3 | record was waived by all parties present.) |
| 4 | THE REPORTER:  Today's date is |
| 5 | October the 24th, 2025.  The time is 9:07 a.m.  This is |
| 6 | the oral deposition of Lauren Griffith, and it is being |
| 7 | conducted remotely.  The witness is located in |
| 8 | Georgetown, Texas. |
| 9 | Let me swear you in, Ms. Griffith.  Would |
| 10 | you raise your right hand, please? |
| 11 | (Witness sworn.) |
| 12 | Thank you.  And can y'all please state your |
| 13 | appearances so I can have that on the record? |
| 14 | MR. CASEY:  Yes.  Good morning.  Stephen |
| 15 | Casey, attorney for Plaintiff Jeremy Story.  And seated |
| 16 | next to me is co-counsel. |
| 17 | MR. ROGERS:  David Rogers, attorney for |
| 18 | Jeremy Story. |
| 19 | MS. LONG:  Katie Long from Thompson & |
| 20 | Horton.  I'm the attorney for all the defendants. |
| 21 | MS. HILL:  I'm Cynthia Hill.  I am the |
| 22 | general counsel for Round Rock ISD.  I am here as the |
| 23 | client representative. |
| 24 | MS. LONG:  And the other two people are |
| 25 | Adam Rothey and Kelsey McKeag, they're from my office |

**LAUREN MARIE GRIFFITH**

1  representing defendants.

2         THE REPORTER:  All right.  If there are no

3  agreements to state on the record, we can begin.

4               LAUREN MARIE GRIFFITH,

5  having been first duly sworn, testified as follows:

6                    EXAMINATION

7  BY MR. CASEY:

8     Q.  Good morning, Ms. Griffith.  Thank you for your

9  time here.  And is it okay if I say, "Ms. Griffith"?  I

10  don't know what your exact rank is right now.

11     A.  So my -- my title is deputy sergeant for the

12  Round Rock ISD Police Department.

13     Q.  Okay.

14     A.  But "Ms. -- Ms. Griffith" will be absolutely

15  fine.

16     Q.  It sounds kind of British, like, you know,

17  inspector, detective, everything, like off Sherlock

18  Holmes or something.  That's kind of a cool title,

19  though.

20              All right.  Thank you for your time this

21  morning.  Just some basic background things first for

22  depositions.  Have you had a deposition before?

23     A.  No, sir.  This is my first one.

24     Q.  Okay.  So let's do some stuff to kind of lay

25  out the landscape so that it flows pretty smoothly.

**LAUREN MARIE GRIFFITH**

1  I'm -- I'm sure that my esteemed colleague Ms. Long has

2  talked with you about this, but I just want to go

3  over -- go over that for the purposes of the record.

4            This is being taken by Ms. Chavez, the

5  court reporter.  Court reporters are recording what we

6  say verbally, so they cannot get on the record, unless

7  they type out "nodded her head" or "shook his head" or

8  something, what we're doing as far as nonverbal.  So if

9  I ask a question, please make sure that you give me a

10 verbal response.  Even "I don't know" is okay.  "Yes,"

11 "no," "I don't know" or an extended response.  Can we

12 agree to that?

13     A.  Understood.

14     Q.  Okay.  Great.  And the next thing you're doing,

15 that we're doing pretty well right now, is letting each

16 other complete responses so that we don't talk over each

17 other, because she can only take one person's comments

18 at a time.  Okay?

19     A.  Not a problem.

20     Q.  Outstanding.  You've got those excellent

21 investigator question/answer skills, so this should be

22 pretty good.

23            Some other questions.  Is there anything

24 that you believe would affect your ability or capacity

25 to testify on this deposition today, in the way of are

**LAUREN MARIE GRIFFITH**

1  you on any medication or anything that would affect your

2  memory or recall?

3      A.  No, sir.

4      Q.  Okay.  Fantastic.  Great.  All right.  So we've

5  got that out of the way.  So we're going to start --

6  Nearly all depositions start with some general

7  background information about the person, your -- your

8  place in the community.  So could you for the record,

9  please, tell the jury -- And I'm going to say that a

10  lot.  You'll hear me say, "Tell the jury," because this

11  is your testimony that will be -- It's being transcribed

12  now, and it'll be presented later.

13          Could you tell the jury your full name,

14  rank.  Let's just do those first.

15      A.  My full name is Lauren Marie Griffith.  And my

16  current rank at Round Rock ISD Police Department is

17  detective sergeant.

18      Q.  Okay.  And what's your badge number and your

19  current assignment, if that's different from detective

20  sergeant?

21      A.  My current badge number is 509.  And my current

22  assignment is the supervisor over the Westwood Learning

23  Community.

24      Q.  Okay.  And what is that -- what's that -- As

25  far as supervisor over Westwood Learning Community, what

**LAUREN MARIE GRIFFITH**

1   does that entail?  What's the scope of that?  I'm not

2   familiar with how Round Rock ISD is structured.

3       A.  So we have five major high schools, and there

4   is a supervisor over each learning community, so each

5   high school.  So I oversee every school that feeds into

6   Westwood High School, including the elementaries, middle

7   school, and then the high school itself.

8       Q.  Okay.  That makes sense.  Just by way of

9   background, so you've got context from me and where my

10  questions were coming from.  I was public schooled, and

11  so I understand the feeder type system.  We didn't --

12  we -- My wife home-schooled all of our kids that have

13  all actually graduated since March.  So I get that.

14            All right.  Where -- Where were you born?

15      A.  Houston, Texas.

16      Q.  Okay.  Houston proper or -- or outlier, like

17  Spring or Conroe or something?

18      A.  I believe Houston proper.  Yeah.

19      Q.  Okay.  And where did you go to high school?

20      A.  Cyprus Creek High School in Houston, Texas.

21      Q.  I know where that is.  I went to Spring High

22  School, and we played y'all in football, which is about

23  the sport that matters in Texas, right?  Do you have any

24  college education?

25      A.  Yes, I do.

LAUREN MARIE GRIFFITH

1    Q.  Okay.  Where did you go to college?

2    A.  I went to -- I started my college education at

3  St. Edward's University in Austin, Texas.  And then I

4  finished and graduated from Texas State University in

5  San Marcos, Texas, with a bachelor's of fine art.

6    Q.  Oh, excellent. BFA is awesome.  That's what my

7  youngest son is going for.  What year did you graduate?

8    A.  2005.

9    Q.  Okay.  And that was after you started your

10  career in law enforcement, I'm guessing?

11    A.  No, sir.

12          MS. LONG:  I apologize.  Who is

13  "lodorange"?

14          MR. CASEY:  (Indicating.)

15          MS. LONG:  Okay.

16    Q.  (BY MR. CASEY)  So -- So in 2005 you finished

17  with a BFA, and you said you did -- Do you have

18  coursework in criminal justice at all in that, like

19  electives or anything?

20    A.  No, sir.

21    Q.  Okay.  Why did you get into law enforcement?

22    A.  I had an -- I have an uncle who's a retired

23  Texas Ranger, and he pushed me to get into law

24  enforcement.

25    Q.  Okay.  All right.  Where -- Where did you go to

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**LAUREN MARIE GRIFFITH**

1   the police academy.

2       A.   The Gus George Law Enforcement Academy, through

3   the Fort Bend County Sheriff's Office in Richmond,

4   Texas.

5       Q.   Okay.

6            (Zoom noise.)

7            MR. CASEY:   I've got this muted.   Are you

8   going to mute --

9            MR. ROGERS:   I've got that muted also.   I'm

10  not sure what's going on.

11           MS. LONG:   "Lodorange" is not muted.   One

12  of you will have to figure out which computer to mute

13  and which one not to mute.

14           Now you're both muted.

15           MR. CASEY:   Yeah.   Yeah, we're trying --

16  trying to work that out.   I apologize.

17      Q.   (BY MR. CASEY)   So what year did you graduate

18  the academy?

19      A.   2010.

20      Q.   Okay.   All right.   And I've never been to the

21  academy.   Do they have like a set course of things?   Are

22  there different tracks you can take, as far as what

23  subjects are emphasized?   Or is it everyone takes the

24  same classes?

25      A.   Everyone takes the same classes.

LAUREN MARIE GRIFFITH

1    Q.  Okay.  What certifications do you have -- do
2  you maintain right now?
3    A.  In regards to my TCOLE license or...
4    Q.  Sure.  Let's -- Let's start there, your TCOLE
5  license.  Is it current?
6    A.  It is, yes.
7    Q.  All right.  When were you first licensed?
8    A.  In June of 2010.
9    Q.  All right.  And do you have any other
10 certifications?  And by -- What I mean by that is, you
11 know, something like an EMT might get something, or a
12 diver might have, like, you know, regular free ocean
13 diver, and then cave driver, and then master diver.  Are
14 there any other types of grades of certifications as
15 a -- as a police officer that you have?
16    A.  Yes, sir.  I have a master peace officer
17 license with the State of Texas.
18    Q.  Okay.  All right.  Did you work for any other
19 agencies before Round Rock ISD?
20    A.  Yes, sir.
21    Q.  Okay.  Going back from 2010 when you graduated
22 from the academy, could you give me those, and
23 approximate dates?
24    A.  So after I graduated the academy, I -- I was
25 employed by the Fort Bend County Sheriff's Office, while

**LAUREN MARIE GRIFFITH**

1  I was in the academy.  And I immediately went to work

2  for them, or stayed, continued working for them until

3  2018.  And that's when I moved to the Williamson County

4  Sheriff's Office.  I worked for the Williamson County

5  Sheriff's Office roughly 2018 to 2021.  And that's where

6  I moved over to the Round Rock ISD Police Department.

7       Q.  Okay.  So now you're about -- about, I guess,

8  15 years in to your -- to your --

9       A.  Yes, sir.

10      Q.  -- to your career?  What -- What was your --

11  Why did you -- Why did you come over to Round Rock ISD

12  instead of staying with Williamson County Sheriff?

13      A.  So while I was assigned with Williamson County

14  Sheriff's Office I was actually assigned as a SRO,

15  school resource officer, for McNeil High School within

16  Round Rock ISD, and I enjoyed working in the schools.

17  It was very rewarding.  And I wanted to continue that in

18  my career, so when Round Rock ISD created their own

19  department, I came over.

20      Q.  All right.  You mentioned school resource

21  officer.  Is that, from your perspective, different than

22  being a Round Rock ISD police officer?

23      A.  So it's my understanding that a school resource

24  officer works for like Williamson County Sheriff's

25  Office, and you're assigned to a high school as a school

**LAUREN MARIE GRIFFITH**

1  resource officer.  And those officers that work for

2  districts themselves are called school-based law

3  enforcement officers, SBLE officers.

4      Q.  And do they -- are there any distinctions, that

5  you're aware of, between the duties or scope of

6  authority that both of those have, the school-based law

7  enforcement officer versus a student -- school resource

8  officer?

9      A.  So it's my understanding that, like a school

10 resource officer, your boss is still the sheriff of that

11 agency or the head of that agency, if it's a city

12 department.  And then as school-based law enforcement,

13 the head of that agency is the chief of police, who also

14 answers to the superintendent.

15     Q.  So -- So what I'm understanding, and correct me

16 if my understanding is wrong, as an SRO, your -- you

17 have an outside authority chain, or chain of authority

18 inside the ISD, your -- your chief is the ISD chief of

19 police, but as far as -- So that would be an authority

20 structure reporting, but as far as duties, your duties

21 would be the same.  Is that an accurate representation

22 of what you just said?

23     A.  Yes, your duties are the same as the officer on

24 the campus.

25     Q.  Okay.  Are -- So when it comes to a -- like a

**LAUREN MARIE GRIFFITH**

 1  school policy, like say a board policy, does the

 2  school -- does the school resource officer enforce Round

 3  Rock ISD board policies?

 4      A.  As -- As an SRO for an outside agency?

 5      Q.  Yeah.

 6      A.  I'm not sure.

 7      Q.  Okay.  What about as an SBLE?

 8      A.  A school-based law enforcement, then, yes, we

 9  abide by the District's policies.

10      Q.  Okay.  So as I understand, you're saying that

11  SBLE, because they're -- they report up through the

12  School District, with the superintendent being in

13  charge, then they are incorporated into the policy

14  enforcement arm of the school.  Is that -- Am I

15  understanding what you're saying?  Is -- Is that -- Is

16  that accurate?

17      A.  I believe so, yes.  We abide by the District's

18  policies, and then we have our own police policies as

19  well.

20      Q.  Okay.  And so, as school resource officer then,

21  and I -- this -- kind of wrap up this type of questions.

22  A school resource officer is not there for policy

23  enforcement, right?

24      A.  Not to my knowledge, no, sir.

25      Q.  Okay.  All right.  In 2021 and in the late --

**LAUREN MARIE GRIFFITH**

1  let's say the summer, starting around June, through the

2  end of 2021, what was the chain of command for you at

3  Round Rock ISD?

4      A.  So at that time, we had -- I don't believe

5  we -- I didn't promote to sergeant until July, but at

6  that time we had an assistant Chief of Police Jim

7  Williby, and then we had our Chief of Police Jeffrey

8  Yarbrough.

9      Q.  And at that time, what was your -- what was

10  your rank?

11      A.  Before -- I was just an officer at that point.

12      Q.  And when did you get promoted?  What was the

13  next subsequent promotion?  You said sergeant in July of

14  that year?

15      A.  Yes.  We tested at the end of July.

16      Q.  Okay.

17      A.  In early August.

18      Q.  All right.  And this is a -- I guess it's a

19  small department.  Pass the test, you get promoted?  Or

20  is there -- is there a, like when I was in the military,

21  is there a type of quota across the -- all departments

22  in the state?  I'm not sure how that works.

23      A.  A quota -- I'm sorry, I don't understand the

24  question.  A quota for -- for what, exactly?

25      Q.  When you -- When you pass the test -- pass the

LAUREN MARIE GRIFFITH

1  test, you get promoted?

2      A.  There was written tests, and then there was an

3  oral board and -- and a presentation.  And then, yes,

4  after that you were promoted.

5      Q.  Okay.  In the promotion process, do you -- so

6  they put out a -- Let me back up for a second.  So they

7  put out a list of who all gets promoted?  Are there

8  promotion lists, I guess?

9      A.  Lists are not as common in school-based law

10 enforcement as they are in a traditional agency.  I

11 don't know that we ever had a list at Round Rock ISD.

12     Q.  All right.  And I'm guessing that's because

13 it's a small department, or smaller department?

14     A.  Yes, sir.

15     Q.  Okay.  In your promotion to sergeant, did you

16 have to do any other specialized training?

17     A.  Yes, sir.  You have to take a new supervisor's

18 course within so many days of being promoted.

19     Q.  Okay.  And, generally, what do you cover in

20 that course?

21     A.  Just, you know, supervising, how to deal with

22 different pers- -- you know, supervising different

23 personalities of individuals and leadership skills.

24     Q.  Okay.  Do you do any type of -- any type of

25 training on -- on -- on interaction with the public?

**LAUREN MARIE GRIFFITH**

1    A.  I can't recall in that course, but there are

2  other TCOLE courses where we do that.

3    Q.  Okay.  So with respect to TCOLE courses, have

4  you taken courses on constitutional law at TCOLE?

5    A.  I would have to refer back to my training

6  records.  I've had several hundred hours, so I'd have to

7  look at those.

8    Q.  What do you recall?  Let's just say right now,

9  do you recall any -- any training courses you've taken

10  on -- on constitutional law enforcement -- or

11  constitutional rights?  Let me clarify that.  I'm sorry.

12  Constitutional rights as you're going through law

13  enforcement.

14    A.  As I recall right --

15         MS. LONG:  Objection -- Objection, vague.

16         MR. CASEY:  Okay.  I can clarify.

17    Q.  (BY MR. CASEY)  Have you taken any courses on

18  dealing with the constitutional rights of the citizens

19  who you are -- who you're dealing with, as far as law

20  enforcement?

21         MS. LONG:  Objection, vague, and lacks

22  specificity.

23         MR. CASEY:  Okay.  I can -- I can clarify

24  some more.  Thank you.

25    Q.  (BY MR. CASEY)  When you interact with citizens

**LAUREN MARIE GRIFFITH**

 1  out in the public, and I'll lay this foundation, do you

 2  engage with their -- with the boundaries, based on your

 3  law enforcement interaction, do you engage with them on

 4  the boundaries of their constitutional rights, what they

 5  can say, what they can't say, what their rights are, and

 6  your ability to enforce, you know, government --

 7  government policies and rules that may affect those

 8  rights?

 9          MS. LONG:  Same objection.  Vague and lacks

10  specificity.

11          MR. CASEY:  Okay.

12          MS. LONG:  Stephen, there's a million

13  constitutional rights.  Do you have a specific right

14  you're asking her if she received training on?

15          MR. CASEY:  Sure.  That's fine.

16     Q.  (BY MR. CASEY)  First Amendment rights.  Do you

17  get any training on dealing with individual's First

18  Amendment rights?

19     A.  I do not recall.  I'd have refer to my training

20  records.

21     Q.  Okay.  Did you get any training on public

22  meeting protocols?

23     A.  I do not recall.  I'd have to refer to my

24  training records.

25     Q.  Okay.  Have you ever been -- Have you ever

LAUREN MARIE GRIFFITH

1  received reprimands or disciplines during your 15-year

2  tenure as a police officer?

3       A.  No, sir.

4       Q.  Okay.  Have you ever received any direction on

5  training on how to handle a disruptive speaker at a

6  public meeting?

7       A.  Are you -- Are you referring to like official

8  TCOLE training?

9       Q.  Yes.  Uh-huh.

10      A.  Not that I recall.

11      Q.  Okay.  What about any -- any other training,

12  other than TCOLE training?

13      A.  No official training, no, sir.

14      Q.  Okay.  All right.  I'm going to shift gears for

15  a second.  You know, the -- the -- Did you review any

16  documents prior to your deposition today with --

17  regarding this lawsuit?

18      A.  Yes.

19      Q.  Okay.  What did you review?

20      A.  I reviewed officer's Incident Reports.  I

21  reviewed the Use of Force forms, and some of the

22  miscellaneous documents in evidence.

23      Q.  Okay.  Other than your -- your very capable

24  attorneys, did you talk to anyone else about your

25  deposition today?

**LAUREN MARIE GRIFFITH**

1        A.   No, sir.

2        Q.   Okay.  Did you review the video of the

3   August 16th board meeting from Round Rock ISD?

4        A.   Yes, sir.

5        Q.   Okay.  In preparation?

6        A.   Correct.

7        Q.   Okay.  Prior to August 16th, 2021, had you ever

8   met or encountered in public, Jeremy Story?

9        A.   Yes, sir.

10       Q.   Okay.  If you could describe to me when you

11  first encountered him.

12       A.   So I believe the date was July 26th, because

13  that was the date we tested for sergeant.  I left the

14  Stony Point Performing Arts Center where we were holding

15  the testing.  And there was a call through dispatch that

16  an individual was at the administration building for

17  Round Rock ISD, Lillie Delgado Administration Building.

18  And it was just that they were up there filming.  This

19  is all -- You know, dispatch only had so much

20  information.  So the individual was up there filming.

21  And the ladies -- the receptionists inside the

22  administration building were startled, and they called

23  law enforcement for assistance.

24            So I headed over to the administration

25  building.  I was the first one there.  When I arrived, I

**LAUREN MARIE GRIFFITH**

1  don't even know if I had a description at that point.  I

2  think -- I think it only said there was potentially a

3  white male in a van.

4          So I went inside, I talked to the

5  receptionist, and they told me there was a man filming

6  them and that they were scared.  They didn't know what

7  he wanted.  So I didn't see anyone in the -- in the room

8  at the time.  I walked back outside, and at the time

9  Mr. Story was -- was pulling out.  He did have his video

10 camera out and was -- and appeared to be filming.  He

11 told me if I got any closer, he was going to leave.  I

12 told him that would be great, that's -- that's what we

13 all wanted, was for him to exit the premises.  At that

14 point, he left and he went across the street to, I

15 believe, the Sonic at the time, and he parked there.

16 And that was the end of that interaction.

17     Q.  Okay.  Was that the day that the superintendent

18 was being served with a restraining order?

19     A.  I am not sure of that date that he was served,

20 but I believe that's what Mr. Story was potentially

21 alleging.

22     Q.  Did -- Did dispatch indicate at any time -- Let

23 me back up for a second.  Did dispatch call you

24 directly?  Or was that put out across the general air

25 waves?

**LAUREN MARIE GRIFFITH**

1      A.  It was put out on the air waves, yes, sir.

2      Q.  Okay.  Did dispatch make a previous call when

3  the process servers came by the admin building to serve

4  the superintendent?

5              MS. LONG:  Objection, assumes facts not in

6  evidence.

7      Q.  (BY MR. CASEY)  Was there any broadcast over

8  dispatch about process servers at the admin office?

9      A.  Not to my knowledge.

10      Q.  Okay.  When the person said they were scared,

11  did they -- did they indicate what they were scared of?

12      A.  No.  They just told me they were startled and

13  they didn't know why this individual was filming them

14  and questioning them.

15      Q.  And did you ever ask Mr. Story why he was

16  filming?

17      A.  No, sir.  He left the area.

18      Q.  Okay.  So his only comment to you that day, as

19  I understand you to say, is that if you came closer, he

20  would leave?

21      A.  Yes.  He also said, "Who sent you here?"  And I

22  advised him, dispatch.  And that was our only other

23  interaction, to my recollection.

24      Q.  Okay.  Okay.  So after that -- after that

25  encounter in July, then when did you next encounter

LAUREN MARIE GRIFFITH

1  Mr. Story?

2      A.  Not until the August 16th board meeting.

3      Q.  Okay.  And on August 16th, where were you

4  assigned?

5      A.  I was in the parking lot.

6      Q.  Okay.  All right.  And, actually, a brief

7  question prior.  Did Mr. Story identify himself to you

8  on -- back in July?

9      A.  No, he did not.

10     Q.  Okay.  I'm sorry, I -- I strike against me

11  because I talked over you.  I apologize.

12              When did you then know Mr. Story's name?

13     A.  So I had a phone call with Chief Yarbrough

14  shortly after the July incident, I don't recall whether

15  it was the day of or the next day, and advised him about

16  the situation, and he told me, "Oh, that individual's

17  name is Jeremy Story."

18     Q.  Okay.  What else did you and Chief Yarbrough

19  cover in that conversation?

20     A.  That was it.

21     Q.  So as I understand you to say, the sum total of

22  the conversation was, "There was this gentleman at the

23  admin building yesterday.  He was filming, he left.  And

24  I don't know who he is."  And then Detective -- or Chief

25  Yarbrough says, "That's Jeremy Story."  And that was the

LAUREN MARIE GRIFFITH

 1  entire, as best as you can recall, exchange between you
 2  and Chief Yarbrough?
 3      A.  That's correct.
 4      Q.  All right.  And then after that, the
 5  conversation was over?
 6      A.  Yes, sir.
 7      Q.  Okay.  All right.  So on -- Did you have any
 8  other interactions with anyone from July 26th through
 9  August 16th about Jeremy Story?
10      A.  No, sir.
11      Q.  Okay.  Did his name come up at all in any, what
12  I'll call office conversation or department
13  conversations?
14      A.  No, sir.
15      Q.  Okay.  So in August 16th, you said you were
16  assigned to the parking lot?
17      A.  Correct.
18      Q.  Okay.  Did you encounter Mr. Story at that
19  time?
20      A.  I observed Mr. Story at that time.
21      Q.  How?  Describe that, please.
22      A.  I observed that he parked in the parking lot
23  and then walked inside the building.
24      Q.  Okay.  Okay.  Was there -- Was there any
25  information transmitted over dispatch about him at that

**LAUREN MARIE GRIFFITH**

1  time?

2      A.  No, sir.

3          THE REPORTER:  Mr. Jeremy Story is trying

4  to get in.  Go ahead and admit him, right?

5          MR. CASEY:  Please.

6          (Mr. Story joins proceedings.)

7      Q.  (BY MR. CASEY)  Okay.  So you were in the

8  parking lot.  Did you have any other assignments that

9  night?

10     A.  No, sir, just parking lot security.

11     Q.  And were you there for the entire meeting in

12  the parking lot?

13     A.  I don't recall if we were there for the entire

14  meeting.  They might have cut us loose.  Maybe -- I

15  think after the public comment, we potentially might

16  have been cut loose.

17     Q.  Okay.

18     A.  Some of us.  Sorry.

19     Q.  All right.  And obviously we're getting to the

20  incidents that are the crux of the lawsuit.  So let's --

21  I want to talk briefly about after the meeting.  So

22  after the meeting happened, what was the first

23  interaction you had with anybody about Jeremy Story?

24     A.  After the meeting, I -- maybe in passing, just

25  about what happened, but there was no official meeting

LAUREN MARIE GRIFFITH

1  with me of any kind.

2      Q.  Okay.  When you say y'all spoke in passing

3  about what happened, who did you speak with?

4      A.  Again, if -- if I spoke, it was in passing, and

5  it probably would've been with, you know, Assistant

6  Chief Williby or Chief Yarbrough.  But I don't

7  specifically recall an incident where that happened.

8      Q.  Okay.  Were there any comments over -- I guess,

9  let me back up for a second.  Do you have like a common

10 radio ear piece with other officers that are in your

11 area?

12     A.  Yes.

13     Q.  Okay.  Were there any comments relayed over

14 that common communication system about Mr. Story while

15 you were outside in the parking lot?

16     A.  No, sir.

17     Q.  Okay.  So aside from any passing comments with

18 Assistant Chief Williby or Chief Yarbrough after the

19 meeting, what would've been the next time that anything

20 about Jeremy Story came to your attention or was said to

21 you?

22     A.  That would've been in September when I was

23 assigned to begin my investigation.

24     Q.  Okay.  What day was that assignment?

25     A.  I want to say September.  Potentially

**LAUREN MARIE GRIFFITH**

1  September 16th, give or take a couple of days.  I'm not

2  sure.

3      Q.  Okay.  And how did you receive that assignment?

4  What was the -- What was the process by which that

5  assignment was given to you?

6      A.  I received a phone call from either -- I can't

7  remember if it was Assistant Chief Williby or Chief

8  Yarbrough that said, "You need to start working on these

9  cases and begin investigating them."

10      Q.  Okay.  All right.  So let's talk about your

11  investigation.  And thank you, by the way.  You're

12  doing -- You're being, like, an excellent witness.

13              So let's talk about your investigation.

14  Walk me through step by step as -- as to the best level

15  of detail you can remember of how you proceeded forth

16  with your investigation.

17      A.  Okay.  So I began my investigation by reviewing

18  the Incident Reports that were written by the officers

19  shortly after the incident occurred.  From there, I

20  reviewed video, including public video and body-worn

21  cam- -- body-worn cameras.  And I looked up the penal

22  code and the elements of the offense.  And from there I

23  felt that the elements for hindering proceedings by

24  disorderly conduct were met, and I drafted an affidavit.

25  And that affidavit was reviewed by Chief Yarbrough.  And

**LAUREN MARIE GRIFFITH**

```
 1  then I took that affidavit to the courthouse to be

 2  reviewed by a magistrate, and that magistrate signed off

 3  on it.

 4      Q.  Okay.  So I want to make sure I understood this

 5  sequence correctly.  You reviewed the Incident Reports.

 6  You compared that to the Texas Penal Code.  You drafted

 7  the affidavit, and you took the affidavit to the

 8  courthouse.  Did I understand that sequence accurately?

 9  Did I repeat that back accurately?

10          MS. LONG:  Objection, mischaracterizes the

11  testimony -- the answer.

12          MR. CASEY:  Yeah.  That's what I'm trying

13  to make sure, that I understand it properly.

14      Q.  (BY MR. CASEY)  So, you reviewed the Incident

15  Reports, correct?  That was the first step?

16      A.  Correct.

17      Q.  Okay.  Second step is you -- you had an

18  affidavit that you -- or you watched the body cams and

19  the -- and the public cameras?

20      A.  Correct.

21      Q.  Okay.  All right.  Then next you checked the

22  Texas Penal Code?

23      A.  Correct.

24      Q.  All right.  And then you have your affidavit

25  draft, and so you meet up with the assistant chief and
```

**LAUREN MARIE GRIFFITH**

1  the chief, and say, "Hey, does this -- is this up to

2  muster," right?

3     A.  At that point the only person who reviewed the

4  affidavit was the chief of police.

5     Q.  Oh, okay.  So just Chief Yarbrough.  Okay.  And

6  after that, you took the affidavit to the magistrate.

7  That's what you're saying?

8     A.  Correct.

9     Q.  Okay.  Did you ever meet with -- Let me back up

10  for a second.  How long did that take you, start to

11  finish, that process?

12     A.  What -- I'd have to refer to what day the

13  affidavit was signed by the -- by the magistrate.

14     Q.  Okay.  All right.  Let's -- I'm going to -- I'm

15  going to say September 17th.  We can talk about that

16  exact date later, but let's say it's on the 17th.

17     A.  Okay.  Then it would be one full day --

18     Q.  Okay.

19     A.  -- from the -- two -- one to two days,

20  depending on my reports, when I started my

21  investigation, when I was assigned it.

22     Q.  Okay.

23     A.  I'd have to refer to my reports.

24     Q.  All right.  Did you ever speak to -- Before you

25  went to the magistrate, did you ever speak to any

LAUREN MARIE GRIFFITH

1  outside law enforcement agency?

2      A.  No, I did not.

3      Q.  Did you ever meet with the county attorney's

4  office?

5      A.  Yes, we did.

6      Q.  Okay.  So the sequence -- When did -- Did you

7  meet with a county attorney before or after getting the

8  affidavit signed?

9      A.  Before.

10      Q.  Okay.  So the sequence of events that you

11  conveyed to me, I don't recall -- as I repeated them

12  back, I don't recall you saying that you met with the

13  county attorney.  So I want to figure out where that

14  fits into that sequence of events that I repeated back

15  to you.

16          So was it -- So the first step was, and

17  I'll go through these and kind of do it answer --

18  question/answer.  Did you meet with the county

19  attorney's office before the Incident Reports?

20      A.  No, sir.

21      Q.  Okay.  Did you meet with the county attorney

22  before you reviewed the Texas Penal Code?

23      A.  No, sir.

24      Q.  Did you meet with the county attorney before

25  you went to Chief Yarbrough?

LAUREN MARIE GRIFFITH

```
 1      A.  No, sir.
 2      Q.  Okay.  Did you meet with the county attorney
 3  before you talked to the magistrate?
 4      A.  Yes, sir.
 5      Q.  Okay.  So there's a step in there of meeting
 6  with the county attorney.  And so, with whom did you
 7  meet at the county attorney's office?
 8      A.  We -- It was myself, Assistant Chief Williby,
 9  Chief Yarbrough, Dee Hobbs, his Number 1 and his
10  Number 2.  And we were there to discuss disruptions in
11  general.  And we did not use any names, so we didn't --
12  we didn't discuss any specific cases with them.
13      Q.  So what I'm understanding you to say is this
14  was a -- And I don't want us to use the word "random" in
15  the wrong way.  This was just a -- a generalized
16  meeting.  I'm guessing, you know, characteristically
17  there was a lot of unrest going on because of COVID.
18  But this was just a generalized meeting of "How do we
19  handle this?"  Is that what I'm understanding you to
20  say?
21      A.  Correct.  It was a generalized meeting how to
22  handle the unrest regarding board meetings in -- in
23  Texas during that time.
24      Q.  Okay.  All right.  All right.  And why was that
25  meeting there -- Why was that meeting there at that
```

LAUREN MARIE GRIFFITH

1  time?  Was it -- Was it necessary to have that meeting?

2  Excuse me.  Strike that.

3           Was it necessary to have that meeting

4  before you went to the magistrate?

5      A.  I did not schedule that meeting.

6      Q.  Okay.  I'm going to -- I don't think that's

7  necessarily what I'm getting at.

8           Even if you didn't schedule the meeting,

9  was that meeting necessary for you to have before you

10 went to the magistrate?

11     A.  No, sir.  My affidavit was printed already for

12 review before I attended that meeting.

13     Q.  Okay.  And so, you're saying at no time did you

14 discuss your -- your evidence or affidavit or anything

15 about Jeremy Story's case in that meeting?

16     A.  That's correct.

17     Q.  Could you -- Talk with me, then, in that

18 meeting, so I understand why it was there, because it

19 seems very, very -- very unique in the sequence of

20 events, the entire scope of what y'all talked about.

21 Because your statement before was kind of a summary

22 statement, but I'd like to know specifically in that

23 meeting what y'all discussed.

24     A.  We discussed -- What I remember mostly is they

25 provided us a handout with potential criminal offenses,

LAUREN MARIE GRIFFITH

1  as well as some reference to the Code of Criminal

2  Procedures.  And for us to use that as a tool in the

3  future, should we continue to have issues at board

4  meetings.

5       Q.  Okay.  Okay.  So you didn't present any --

6  you -- what you're saying is you didn't present any case

7  to the -- case to them saying, "Hey, we've got -- got

8  these elements about Jeremy Story, and we'd like to --

9  we'd like you to, you know, create a case"?  You didn't

10  say that?

11      A.  No, sir.

12      Q.  All right.  And you didn't discuss staffing a

13  case with any amount of evidence?

14      A.  No, we did not staff the case with them, or

15  discuss --

16      Q.  Okay.

17      A.  -- the case with them.

18      Q.  All right.  Did you discuss Mr. Dustin Clark

19  with them at all in that meeting?

20      A.  No, sir.

21      Q.  Okay.  I'm going to keep track of what I'm --

22  what I am about to admit.  Bear with me for a moment.

23          MR. CASEY:  And, Ms. Chavez, do you want me

24  to stamp these right now?  I'm going to keep them in

25  sequence and title and then I can put stamps on them at

LAUREN MARIE GRIFFITH

```
 1  the end.
 2              THE REPORTER:  Yes, if you could.  It
 3  probably would be better, just to keep a record.
 4              MR. CASEY:  Yeah, I've got the record right
 5  now and I've got the titles of them in a folder, and so
 6  I'll do that.
 7     Q.  (BY MR. CASEY)  I'm going to share my screen
 8  with you and show you what's -- what's going to be
 9  Exhibit 1, so Plaintiff's Exhibit 1.
10              All right.  And let's see.  Let me go to
11  "sharing."  Okay.  This is a -- I'll represent to you,
12  this is a -- was received under a Public Information
13  Request from the county attorney's office.  And it's an
14  email to the Attorney General's office from Dee Hobbs.
15  And in this --
16              (Deposition Exhibit 1 marked.)
17              MS. LONG:  Have you produced this to us?
18  Because I don't see any Bates labels on this.
19              MR. CASEY:  No.  Actually, this was just
20  released.  I got this from my client just recently.  I'm
21  going to -- This will be supplemented.  We -- This
22  wasn't available.  I -- Like this week, I think it just
23  came in this week, because Mr. Story -- just as a
24  housekeeping matter, Mr. Story has a -- had a Fifth
25  Circuit Appeal going on with the City of Round Rock,
```

**LAUREN MARIE GRIFFITH**

1  and -- or Williamson County, and it was never produced

2  in that.  And then a PIR came back with this in it.  So

3  I will -- I will immediately give that over.

4              MS. LONG:  Well, I would note, just for the

5  record, that we haven't been provided a folder or copies

6  of the exhibits.  And in all of the other depositions

7  we've provided folders of all the exhibits so the

8  attorneys would have a copy.  So this is the first time

9  I'm seeing this email.  And we aren't even being

10 produced a copy of it or provided a copy of it in the

11 deposition, except to see it on the screen.  So I can't

12 even see the full document or the full context of the

13 document.  Just -- Just for the record.

14              MR. CASEY:  Absolutely.

15              MS. LONG:  I have no issues with the

16 document.  I just wanted to clarify where it came from

17 and the fact that I, as I sit here and our witness is

18 being questioned about it, I still don't have a copy of

19 this document.

20              MR. CASEY:  I got it -- I got it last

21 night, but we -- it'll need to get over to you.  And

22 while we're on that, because I'm -- I'm the, I'm going

23 to say last person to complain about late discovery, I

24 noticed when I was reviewing the discovery responses

25 yesterday in preparation for this, that we received all

**LAUREN MARIE GRIFFITH**

1  the cover pages for production, but we didn't get a link

2  to the documents.  And so, I was preparing yesterday,

3  but we can resolve that during the lunch break or off

4  the record.

5          MS. LONG:  Received -- To what documents?

6  We've sent --

7          MR. CASEY:  The link.  The production link.

8  We got the cover pages for Ms. -- for Detective --

9  Sergeant Griffith's production, but the document link

10  wasn't in the email for --

11          MS. LONG:  I sent links to all the

12  documents twice, actually.

13          MR. CASEY:  Oh, oh, to what y'all requested

14  from us, no question about that.  But to what I -- we

15  received responsively, we got the production cover page,

16  but not a link to the document -- the document link

17  itself.  I -- I had both my paralegal and myself look

18  through it.  And it may be that we missed it, we're

19  human, but I didn't see it yesterday when I was

20  reviewing.

21          MS. LONG:  I sent the links on the day

22  everything was produced personally.

23          MR. CASEY:  Okay.

24          MS. LONG:  My secretary didn't send it.  I

25  sent the link.

**LAUREN MARIE GRIFFITH**

```
 1              MR. CASEY:  Okay.  All right.  I'll -- I'll
 2  double check that.  Thank you.
 3              MS. LONG:  I'll forward them out to you
 4  again.
 5              MR. CASEY:  Okay.  I appreciate that.  For
 6  the record, y'all are really good about discovery, so
 7  I -- I'm assuming the mistake is on my part.
 8              MS. LONG:  And is there -- is there a
 9  records affidavit that this goes behind?  Or was
10  there -- We haven't even received if there was a Public
11  Information Act Request that was sent, or a Subpoena
12  that was sent.  We haven't seen copies of any of those,
13  and those were all responsive to our discovery request.
14  So it's not just that these are the documents received,
15  we haven't received copies of any of the actual request
16  to which this was responsive throughout the litigation.
17              MR. CASEY:  Yeah.  This was produced --
18  This was found on a website of someone who -- It wasn't
19  our PIR.  It was a PIR from a gentleman, I believe, that
20  took a website called Elect Danielle Weston.  And as I
21  understand it, she let that registration lapse and he
22  got the website to kind of, you know, zing her.  And it
23  was his PIR, and we found it on that website.  So it
24  wasn't our PIR.  We don't have -- This wasn't like
25  something that we had that was sitting in a folder
```

**LAUREN MARIE GRIFFITH**

 1  somewhere that we just said, "We're not going to give

 2  that."  It was somebody else's PIR sitting out there in

 3  a public domain and we just found it.

 4             So this is a communication from Dee Hobbs.

 5  And in this middle paragraph -- I'd like to go over this

 6  with you, because his report of the meeting says that,

 7  "We had a meeting with folks from Round Rock ISD Police

 8  Department.  Myself, Corby -- Corby Holcomb, Laura

 9  Gorman," which I think is -- he's talking about Dee

10  Hobbs, and you're talking about their one and their two

11  person, Holcomb and Gorman.  And one of the sergeant

12  investigators were there.  "We discussed possible

13  criminal offenses, depending on behavior of individuals

14  who showed up to the upcoming scheduled council

15  meeting."  And he's relating what happened at that

16  meeting.  How they staffed the cases with this, and they

17  would review the cases.  He said, "I do remember

18  mentioning it sounded like both men had violated the

19  law.  However, we said," and this is his statement about

20  that meeting that you're referencing.  "We could not

21  officially give that opinion until we had reviewed the

22  entire file.  Given the safety concerns, the PD

23  presented the warrants to the judge and the justice

24  center when they left our office."  Which that sentence

25  conforms to your sequence of events.

LAUREN MARIE GRIFFITH

1            And so, it -- it talks about the suspects.

2  It talks about both suspects.  And it's very evident

3  from this contextually that's Mr. Clark and Mr. Story.

4      Q.  (BY MR. CASEY)  So do you believe that your

5  recollection of that meeting is still correct, that

6  y'all didn't discuss Mr. Story?

7      A.  I do not recall discussing Mr. Story or

8  Mr. Clark in that meeting.

9      Q.  Okay.  Do you -- Do you recall Dee Hobbs saying

10 he could not give you an official opinion until he had

11 reviewed the entire file?

12     A.  He did not -- Any -- I honestly did not speak

13 in that meeting.  So if he was talking to anyone, it

14 would've been Chief Yarbrough in that meeting.

15     Q.  Did you bring your arrest affidavit with you to

16 that meeting?

17     A.  Yes, I did.

18     Q.  Did you show that arrest affidavit to Dee

19 Hobbs?

20     A.  I do not recall showing that to him.

21     Q.  Did Chief Yarbrough show it to Dee Hobbs?

22     A.  I do not recall.

23     Q.  Did Assistant Chief -- Let me make sure I'm

24 identifying the people that were there.  Did Assistant

25 Chief Williby show it to Dee Hobbs?

LAUREN MARIE GRIFFITH

1    A.  I do not recall.

2    Q.  Okay.  When you left that meeting, did you go

3 straight to the magistrate?

4    A.  To the best of my recollection, yes, I did.

5    Q.  Okay.  Were you already planning to go to the

6 magistrate that day when you found out you had to go to

7 this meeting?

8    A.  Yes.  That's why I had printed the affidavit

9 and had it with me.

10   Q.  Okay.  Is it reasonable -- Not necessary

11 whether you agree with it, but is it reasonable that you

12 would've brought up the fact that you've got this

13 affidavit already signed and notarized, ready to go to

14 the magistrate?  Is it reasonable to believe you would

15 bring that up at that meeting?

16       MS. LONG:  Objection, calls for

17 speculation, and foundation.  Lack of foundation.  You

18 can answer, Detective Griffith.

19   A.  I -- That meeting was a meeting of men a lot

20 higher up than me.  I was the low lady on the totem pole

21 in that meeting.  So, I, you know, sat there quietly.  I

22 really didn't get involved in that meeting.  But there

23 was nothing signed at that point.  It was just a blank

24 affidavit ready for review by a magistrate.

25   Q.  I -- I'm sorry.  Let me -- Let me -- Okay.  So

**LAUREN MARIE GRIFFITH**

1  you're saying at that date, his arrest affidavit was

2  completely blank.  Who -- Who then -- So I'm guessing

3  the -- the magistrate was the one that -- that was the

4  notary, then, for your signature on the affidavit?

5              Who -- Who notarized your signature on the

6  affidavit; do you recall?

7      A.  I would have to refer to the document.

8      Q.  Okay.  Let's go to that document now.  Just a

9  moment.  Let me share the screen.  All right.  I'm going

10  to share Exhibit 2, and represent to you this is a copy

11  of that Affidavit for Warrant of Arrest and Detention

12  for Jeremy Story.  I'll ask you if you recognize it.

13              (Deposition Exhibit 2 marked.)

14      A.  Can you make it larger, please?

15      Q.  Yeah.  Yeah.

16      A.  It's pretty hard to read.

17      Q.  Absolutely.  Absolutely.  This is Page 1, and

18  I'll just kind of generally scroll down kind of slow.

19  And this is Page 2.  I think the third page is, as I

20  recall, just the actual charge page.  Do you recognize

21  this?

22      A.  Yes, sir.

23      Q.  And it has your signature as Affiant, correct?

24      A.  That is correct.

25      Q.  And the -- the magistrate is the one who

**LAUREN MARIE GRIFFITH**

1  notarized it.  Does that look correct?

2      A.  That looks correct.

3      Q.  Okay.  I apologize.  I talked over you.

4          All right.  So what you're saying is you

5  took this, and at this stage this had already been run

6  by the chief and it was sitting blank.  You had it on

7  your person, and you were waiting for that meeting to

8  end so -- so you could get down there and get it signed?

9      A.  Correct.

10     Q.  Okay.  At the time this was done -- I'm looking

11  at this -- this top line with the four X's on it.  And

12  you had -- you had made sergeant, so at that time you

13  and Milton Pope were the same rank; is that correct?

14     A.  That's correct.

15     Q.  Okay.  Did he have more -- Was he senior as far

16  as time and rank to you?

17     A.  He was senior at the agency, as far as he was

18  hired ten days before I was.  But as far as his law

19  enforcement career, I'm not sure how many years he has.

20     Q.  Okay.  All right.  You know, I'm unfamiliar

21  with the goings on and the workings of Round Rock ISD

22  Police Department.  Why would he -- You said you were

23  out in the parking lot.  Why would he not have done the

24  affidavit, if he had direct personal knowledge about

25  what went on?

LAUREN MARIE GRIFFITH

1      A.  At the time, I was assigned as the detective
2  sergeant, and so that case was handed to me.
3      Q.  Okay.  Was that because he was -- he was
4  involved internally to that?  Was there a distance
5  issue?
6      A.  No.
7      Q.  Okay.  All right.  So let's go through your --
8  let's go through your affidavit.  All right.
9      A.  Can you make it just a tad bit bigger, please?
10     Q.  Yeah.  Absolutely.  Does that work?
11     A.  Yes.  Yes.  That's fine.
12     Q.  Okay.  So the first two statements, I don't
13 think there's a lot of dispute about those.  Those are
14 kind of background statements.
15            Let's talk about Paragraph 3.  So you
16 learned at approximately 8:35, Mr. Story was called upon
17 by the Board of Trustees to speak at the podium on the
18 subject of the masked mandate.  Was that the actual --
19 Was that the actual subject on the agency; do you
20 recall?
21     A.  I believe the subject on the agenda was COVID
22 protocols.  However, most of the individuals were
23 speaking on a mask mandate.
24     Q.  Okay.  So let's -- I want to ask you questions
25 about that.  The subject was COVID protocols.  In your

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

LAUREN MARIE GRIFFITH

 1  opinion, as you're writing this affidavit, is that -- is

 2  that -- is the mask mandate related to COVID protocols?

 3      A.  Yes.  In my opinion, it is.

 4      Q.  Okay.  Now, were those COVID protocols for the

 5  state or the school district?

 6      A.  I believe the COVID protocols were for the

 7  school district.  Taking into account the mandates of

 8  the State and the recommendations of the State as well.

 9      Q.  Okay.  At that point in time, was there an

10  active mask mandate in the State?

11      A.  Not to my knowledge.

12      Q.  Okay.  Are you aware, based on your own

13  personal knowledge, of whether Round Rock ISD had a mask

14  mandate at that time?

15      A.  Not to my knowledge.

16      Q.  Okay.  So how -- how narrow of a topic do you

17  understand COVID protocols to be for him, as far as for

18  any speakers there?  What's your understanding of that?

19      A.  Can you repeat the question?

20      Q.  What's your understanding -- Let me back up for

21  a second.  You told me that the topic was COVID

22  protocols.  And we'll get to have a broader expansion of

23  that topic when we look at the agenda.

24              But as I understand it, your recollection

25  is the topic was COVID protocols, and your -- I asked,

LAUREN MARIE GRIFFITH

1  does Round Rock ISD have a mask mandate at that time?

2      A.  And my answer was I do not recall that they

3  did.

4      Q.  So is the COVID protocols then -- Is mask

5  mandate under the umbrella of your understanding of

6  COVID protocols?  Or is it outside of that?

7      A.  It is my understanding that it's under that

8  umbrella, yes, sir.

9      Q.  Okay.  Okay.  And then, your next sentence

10 describes an interaction between the Board of Trustees

11 President Amy Weir.  She informs Mr. Story he was

12 attending a called meeting, and would only be able to

13 speak about the items on the agenda, specifically the

14 mask mandate.  Do you recall her saying, "Hey, you need

15 to limit your comments to the mask mandate"?  Is that --

16 Is that what you recall her saying?

17     A.  I recall her saying it needed to be under that

18 umbrella.

19     Q.  Okay.

20     A.  And in my opinion, how I viewed it is -- was

21 the mask mandate was under that umbrella.

22     Q.  Okay.  All right.  So were there any other

23 speakers that night when you reviewed the video?  Did

24 you listen to any other people's comments?

25     A.  I listened to a few of them, yes, sir.

**LAUREN MARIE GRIFFITH**

1    Q.  Okay.  All right.  The others that you listened

2  to, do you remember their names?

3    A.  No, I do not recall their names.  There was

4  over 180 speakers, I believe.

5    Q.  Okay.  Do you recall whether all of them spoke

6  on the mask mandate?

7    A.  I do not recall.

8    Q.  Do you recall whether all of them spoke about

9  COVID protocols?

10    A.  I do not recall.

11    Q.  Do you recall whether all of them spoke on

12  topic?

13    A.  It's my understanding that there was some,

14  potentially, that were off topic.  However, after

15  redirection from the presiding officer, they ceased

16  discussing non-related items.

17    Q.  So based on your recollection, because you said

18  you watched the video both, I guess, in preparation of

19  your affidavit and prior to today, what I'm

20  understanding you to say is that whenever someone spoke

21  about something that was not COVID protocol, that the

22  speaker -- I mean, excuse me -- the Board chair

23  specifically directed them each time back to the agenda?

24    A.  I don't recall whether it was each time, but I

25  do recall that it was at least -- that it did happen,

LAUREN MARIE GRIFFITH

1   that she redirected other individuals.

2       Q.  But -- But not every one, you would -- you

3   would agree?  Is that what you're agreeing, that not

4   every one was redirected?

5       A.  I'm not agreeing that I -- I just can't speak

6   to that.  I don't know if every one was.

7       Q.  Okay.  Your next sentence, "Affiant learned

8   Story acknowledged President Weir and advised President

9   Weir that he agreed."  So you're saying on the video, he

10  says that he will be talking about the mask mandate,

11  as -- because this -- Let me pause for a second.

12          You wrote this immediately after reviewing

13  the information, within about 24 to 48 hours of watching

14  the video, correct?

15      A.  Correct.

16      Q.  Okay.  So is it safe to say that your

17  recollection, even though you reviewed the video prior

18  to this deposition, that this -- this affidavit is the

19  more accurate representation of what you remember?

20      A.  I would say that I consider, you know, he

21  may -- specifically, I consider the mask mandate under

22  the umbrella of the COVID protocols.

23          MR. CASEY:  I'm sorry, that's -- Objection,

24  nonresponsive.

25      Q.  (BY MR. CASEY)  And it may be that I asked a

**LAUREN MARIE GRIFFITH**

1  poor question.

2          When you wrote this affidavit, it was so

3  close to this, that if your testimony today is less

4  clear, that the testimony you have on this affidavit is

5  the more clear testimony.  Would that be accurate?  Did

6  you remember it better back then because it was so close

7  to the incident?

8      A.  Less time had passed when I wrote this, as

9  opposed to today, that is correct.

10     Q.  Okay.  So it's fair to say that you remember it

11  more accurately whenever you wrote this out then, than

12  later on?

13     A.  You could -- I would say that is a fair

14  statement.  Yes, sir.

15     Q.  Okay.  All right.  And are these -- Are these

16  statements -- How do you -- How do you weight these

17  statements?  And I'll ask that -- I'll give you a

18  preface to it.  You're learning all these statements

19  from Sergeant Pope, correct?

20     A.  Correct.

21     Q.  Okay.  So if there's errors in these

22  statements, do you attribute the -- where would you

23  attribute those errors to?  And I'll give you some

24  choices.  Was it an error in Sergeant Pope's perception?

25  Could it have been there?

**LAUREN MARIE GRIFFITH**

1          MS. LONG:  Objection, foundation.

2          MR. CASEY:  Okay.  Let me back up for a

3   second.  I'll clarify that.  Thank you.  Thank you,

4   Ms. Long.

5      Q.  (BY MR. CASEY)  Did you ever -- And you know

6   what the Telephone Game is, right, that kids play?

7      A.  Sure.

8      Q.  Okay.  So in this sequence, you're sort of

9   doing the Telephone Game with Sergeant Pope here

10  because you -- you identify that -- that, you know,

11  you're getting this information from Pope, because you

12  say at the top, "Information is provided to me by

13  Sergeant Pope," right?  And you don't check personal

14  knowledge.  So all this information is based on Pope's

15  perception that he conveyed to you; is that accurate?

16     A.  I also reviewed the videos and corroborated

17  Sergeant Pope's report, Incident Report.

18     Q.  Okay.  Now, I've got a question.  Why at the

19  top of this, you've got these -- these categories,

20  right?  And you've got a -- And I'm guessing you typed

21  this up.  It -- Maybe it has some template forms or

22  something like that.  But at the top you say, "Personal

23  knowledge," and you've got this category "Information

24  provided to me by Sergeant Pope."  Why is there not a

25  third line with four X's on it that says, "Information I

**LAUREN MARIE GRIFFITH**

1  gathered by watching and reviewing Incident Reports and

2  watching the video"?  Why don't you put that there?

3      A.  It was not written there at the time.  I did

4  not write it.

5      Q.  I understand that.  My question is slightly

6  different, and maybe I'm asking it poorly.  Let me --

7  Let me try and be more direct.

8           You just told me that you used other

9  information, Incident Reports, and video, and Pope's

10  statement.  So that's like a triad of information.

11  Incident Reports, the video, and Pope's statements.

12  That's a triad.

13           Those other two legs, as I look at this,

14  are missing.  The only thing I see on this affidavit is

15  that you got "This information provided to me from Pope,

16  a credible person."  So this is him saying, "Hey,

17  Sergeant Griffith, here's what I saw."  You're going on

18  his credibility.  That -- That's the only evidence that

19  this affidavit says that you reviewed.

20           So my question is, why -- Like, no one --

21  no one -- Let me back up for a second.  This was

22  reviewed by Chief Yarbrough.  You drafted it.  You --

23  You pushed it up the chain.  Why did you not write down

24  on this that you reviewed those other two things?

25      A.  Because at the time, the information I received

**LAUREN MARIE GRIFFITH**

1  from Sergeant Pope was enough information for me to

2  swear to this document and find the elements of the

3  offense.

4      Q.  Okay.  And so, when you reviewed this -- I'm

5  trying to see -- Well, I'll say this a different way.  I

6  think there's diff- -- discrepancies between the

7  affidavit and the video.  So if there are, if we

8  disagree, are you saying -- Well, let me back up a

9  second.  Strike that.

10          This chain of information, would you agree

11  with me, that the incident happened, Pope observed it,

12  Pope conveyed it to you.  And then you wrote it down.

13  Those are the four steps, right?

14          MS. LONG:  Objection, mischaracterizes the

15  testimony.

16      Q.  (BY MR. CASEY)  You don't have personal

17  knowledge, do you, Ms. Griffith?

18      A.  At the time of writing this, no, I did not.

19      Q.  Okay.  And that's true, because you didn't

20  check "personal knowledge."  So this incident happened,

21  and you're several steps removed from it.  So the

22  incident happened out in time and space.  We all have

23  perspectives.  And then, Sergeant Pope observed this.

24  So there's a -- there's a perspective gap, and he could

25  be accurate or slightly off than accurate, slightly less

**LAUREN MARIE GRIFFITH**

1  than accurate, but it's his perception.  Would you

2  agree?

3      A.  I would agree it was his perception and what he

4  articulated in his Incident Report.

5      Q.  Yeah.  And this happens all the time, right?

6  Incident Reports happen all the time.  You know, someone

7  gets pulled over and the officer writes a PCA.  And, you

8  know, I found -- I did criminal defense for a while, so

9  it'd be like, "I found a bag of marijuana hidden under

10  the seat," right.  That's their -- That's what they say.

11          So, the incident happens.  Sergeant Pope

12  perceives it.  So then, you have another step.  Sergeant

13  Pope conveys the information to you, correct?  That's

14  the next step?

15      A.  Correct.  He conveyed the information into his

16  Incident Report, which I reviewed.

17      Q.  Okay.

18      A.  And what he --

19      Q.  Okay.  So when you reviewed the Incident

20  Report, and -- Because I've had -- like last year I had

21  a case that dealt with kind of stuff like this.  Did you

22  sit down with Sergeant Pope and get him to speak to his

23  statements in the Incident Report, or clarify any

24  portions of his -- his Incident Report?

25      A.  No, I did not sit down with him.

**LAUREN MARIE GRIFFITH**

1  Q.  Okay.  Why not?

2  A.  I spoke with him over the phone.

3  Q.  Okay.  And so, I guess -- I guess I should --

4  That's my own fault.  I didn't ask it in a broad enough

5  sense.  So you communicated with Sergeant Pope about his

6  Incident Report?

7  A.  Correct.

8  Q.  And so, any questions that you had about what

9  you were reading on his Incident -- Incident Reports,

10  would have been asked and clarified in that

11  conversation, correct?

12  A.  Correct.

13  Q.  And so then, what -- the gap then, as I'm

14  understanding this transmission gap, you -- what you're

15  doing in that, when you're having this conversation with

16  Sergeant Pope, is you're just narrowing that gap to make

17  sure you're getting an accurate understanding of what

18  Sergeant Pope wrote as possible, right?

19  A.  Correct.

20  Q.  All right.  And so, for example, Paragraph 3

21  where it says, "Affiant learned while Story was

22  discussing the unrelated topics" -- Let me back up for a

23  second.  "Affiant learned during the duration of Story's

24  time to speak, the president instructed him to stop

25  speaking on unrelated topics and to only discuss the

LAUREN MARIE GRIFFITH

1  mask mandate."

2              If -- If a person speaks on unrelated

3  topics, does -- would you, if you were standing there,

4  or did Sergeant Pope, based on your understanding about

5  the roles of a school-based law -- law enforcement,

6  would y'all have an independent responsibility to stop

7  them from speaking?

8      A.  No.  That decision is up to the presiding

9  officer.

10     Q.  Okay.  So if the presiding officer doesn't stop

11 a speaker, y'all are just kind of standing by kind of

12 like -- like the old master-at-arms in the old, like --

13 just in -- in other types of settings, or

14 sergeant-at-arms, it's kind of similar to that function

15 where you're under the command of the Board Chair to do

16 whatever the Board Chair needs, correct?

17     A.  Only when the presiding officer requests law

18 enforcement assistance.

19     Q.  Okay.  So let me understand then, in this

20 meeting, the chain of command.  The superintendent is

21 there, and he's the top in that chain of command.

22 Superintendant, police chief, and then it trickles

23 through to Sergeant Pope at this meeting.  Would

24 Sergeant Pope need the superintendent's permission to

25 take action?

**LAUREN MARIE GRIFFITH**

```
 1        A.  No.  It's my understanding that he only needs
 2   the request of the officer presiding over the official
 3   meeting.
 4        Q.  Okay.
 5             MS. LONG:  Steve, I've been trying to wait
 6   thinking we would get to a stopping point, and so I
 7   waited until after the question is asked, but can we
 8   take a break?  We've been going for about an hour and 23
 9   minutes.
10             MR. CASEY:  Hundred percent.  Hundred
11   percent.  Thank you for asking on that.
12             MS. LONG:  Can we take 15 minutes?
13             MR. CASEY:  That sounds great.
14             MS. LONG:  Okay.  Thank you.
15             MR. CASEY:  All right.
16             THE REPORTER:  Off the record, 10:24.
17             (Recess for 15 minutes.)
18             THE REPORTER:  Back on the record, 10:39.
19        Q.  (BY MR. CASEY)  All right.  And what I ask when
20   we come back from breaks, Ms. Griffith, is there any
21   questions that I've asked previously during a break that
22   you -- sometimes witnesses think about, and they're
23   like, "I'd like to talk about an answer to a previous
24   question you had."  Do you have anything like that?
25        A.  No, sir.
```

**LAUREN MARIE GRIFFITH**

1  Q.  Okay.  I want to -- I want to clarify something

2  that was in my mind on the break.  When we were talking

3  about this, and we were kind of drilling down on this

4  section right here with the X's, but, you know, we're

5  human beings, whenever you ring a bell, you can't unring

6  it.  So talking about the videos and the Incident

7  Reports that aren't identified here, even though they're

8  not identified, did you review those before or after you

9  wrote the affidavit and took it down to the magistrate?

10  A.  Before.

11  Q.  Okay.  All right.  Thank you for that.  All

12  right.  So let's continue to go through this.  So you

13  learned from Sergeant Pope that the Board Chair

14  instructed him in this middle sentence of Paragraph 3 to

15  stop speaking on unrelated topics and to only discuss

16  the mask mandate.  As you recall what he was saying,

17  what -- what was he saying?  What was he talking about?

18  A.  Could you clarify who "he" is, please?

19  Q.  Sorry.  Mr. Story.  I apologize.

20  A.  Okay.  So the question was, what was he talking

21  about at what point?

22  Q.  Yes.  This middle sentence says, "Affiant

23  learned," which would be you, "that during the duration

24  of Story's time to speak, Round Rock ISD Board Trust --

25  Board of Trustee President Amy Weir, instructed Story to

**LAUREN MARIE GRIFFITH**

1  stop speaking on unrelated topics and to only discuss

2  the mask mandate."

3              I'm assuming -- assuming right now for sake

4  of our discussion that the topic was the mask mandate.

5  What did he do that you learned of, what was he saying

6  that was, apparently from this sentence, not on topic?

7      A.  Mr. Story was discussing a Protective Order in

8  regards to the superintendent, --

9      Q.  Okay.

10      A.  -- and a personal matter with the

11  superintendant.

12      Q.  Okay.  And so, when you say, "He was discussing

13  a Protective Order," did he reference it?  Or was that

14  the entire topic he was talking about?

15      A.  I believe that was the entire unrelated topic.

16      Q.  Okay.  Was -- And you acknowledged earlier that

17  other people talked about unrelated items, correct?

18      A.  Correct.

19      Q.  Okay.  When these other people talked about

20  items -- Actually, hold that for a second.

21              When you reviewed the video at this time,

22  did you watch all four hours?

23              MS. LONG:  Objection, asked and answered.

24              MR. CASEY:  I'm -- There was two times that

25  the video was watched, so I want to clarify.  Because as

**LAUREN MARIE GRIFFITH**

1  I understood most recently, she just reviewed snippets

2  of it, but I want to make sure I'm getting an accurate

3  understanding.

4      Q.  (BY MR. CASEY)  How many times have you seen

5  the video?  Let's do that.

6      A.  In its entirety or different -- Which portion

7  of the video are you asking about?

8      Q.  Well, let's -- As a -- As just an entry level,

9  have you watched the video in its entirety ever from

10 start to finish?

11     A.  I do not recall if I watched it in its

12 entirety.  However, I did have the live stream, and I

13 was listening to it in my vehicle the night of.

14     Q.  Okay.  So that's two things.  So you have not

15 watched the video in its entirety.  You have watched

16 portions of it.  How many occasions have you had to

17 watch the video total?

18     A.  Like, potential occasions, is that what the

19 question is?

20     Q.  No.  Let me back up for a second.  How many

21 times have you sat down in any setting and watched the

22 video?

23     A.  The entire four-hour video?

24     Q.  Well, that was my first one, that you already

25 said that you haven't watched it in its entirety.  So

LAUREN MARIE GRIFFITH

1  how many times have you just sat down and said, "Okay.

2  For the next 30 minutes, I'm going to watch some

3  snippets"?  How many times have you done that?

4       A.  Probably at least more than one time.

5       Q.  Okay.  More than five?

6       A.  No, I wouldn't say more than five.  More than

7  one, less than five, I would -- I would say.

8       Q.  Okay.  And -- And I'm just going to assume that

9  it's an odd number, for sake of argument.  Would the

10 majority -- And if that's incorrect, let me know.  Would

11 the majority of the times have been back here closer to

12 when the incident happened, or when you were preparing

13 for this deposition?

14      A.  Closer to when the incident happened.

15      Q.  Okay.  And would all those have been before the

16 affidavit, or were some slightly after the affidavit?

17      A.  Both.

18      Q.  Okay.  That's fair.  All right.  You did say

19 that you heard some other people speak.  Did the other

20 people speak -- I'm going to use this term in a very

21 specific way.  Did they speak by analogy?  And what I

22 mean by that is did they use any type of not immediate

23 situation to kind of relate how they're feeling to the

24 Board?

25      A.  I do not recall.

**LAUREN MARIE GRIFFITH**

1     Q.  Okay.  Does that -- Do you understand that

2 concept, "speaking by analogy"?

3     A.  I do.

4     Q.  Okay.  Did you observe Mr. Story at all

5 speaking by analogy?

6     A.  Not in my opinion, no.

7     Q.  Okay.  All right.  Now, the next sentence

8 says -- Actually, let me pause.  But because all this

9 information in the four -- I'm going to use this

10 statement, "the four corners."  I just mean confined to

11 this affidavit.  Anyone reading this affidavit that's

12 outside of our conversation that hears that you looked

13 at Incident Reports and hears that you heard the video,

14 when they read this, all they're seeing is that you

15 learned from Sergeant Pope that he talked off topic,

16 right?

17     A.  Correct.

18     Q.  Okay.  Now, this next sentence, "Affiant

19 learned while Story was discussing unrelated topics,

20 Story had several outbursts."  I don't see the word

21 "outburst" very clearly defined in here.  And everybody

22 probably has a different thought about what outbursts

23 means.  So I would like to find out what you mean --

24 pause.  What you received from Sergeant Pope as to what

25 an outburst was.

LAUREN MARIE GRIFFITH

1    A.  As a verbal outburst.  So a sudden verbal

2  statement.

3    Q.  Okay.  Now, when you say, "sudden verbal

4  statement," is it in the context of a back and forth

5  with the Board Chair?  Or -- Or, that's one option.  Or

6  the other option would be, it's completely silent, and

7  he starts talking very, very loudly.

8    A.  Based on my recollection, the outbursts were

9  interrupting and talking over the presiding officer.

10    Q.  Okay.  So your definition, then, of an outburst

11  is any time a speaker talks over the presiding officer,

12  as I'm understanding that accurately?

13    A.  Not in -- I mean, that's a -- an example, yes,

14  sir.

15    Q.  Okay.

16    A.  But that's not my definition.

17    Q.  Okay.  Well, let's -- let's -- I want to be --

18  have the record really be accurate.  So that's an

19  example.  So what would be another example in this

20  context?

21    A.  As far as this -- this case goes, sir?

22    Q.  Well, just an outburst.  So you're in a -- In

23  any -- any Round Rock ISD Board meeting you've been to,

24  what would characterize an outburst?  You said this

25  would be an example.  So I would want to see what other

LAUREN MARIE GRIFFITH

1  types of examples you would have that you would call an

2  outburst.  And the first one --

3      A.  That I would --

4      Q.  I'm sorry.

5      A.  That I would call an outburst, if an individual

6  is being escorted out of the room or escorted out of the

7  building, and they continue to -- to speak loudly.

8      Q.  Okay.  So --

9      A.  Al- -- Almost shouting, I would say.

10     Q.  So your -- your understanding then, is if

11 someone is being escorted -- escorted, and they're

12 shouting, those would be two requirements.  If they're

13 being escorted, and they're talking loudly, that would

14 be an outburst?

15     A.  I would consider that an example of an

16 outburst, yes, sir.

17     Q.  Okay.  At what volume would their voice have to

18 be while they're being escorted out, so it's not an

19 outburst?

20     A.  I would say at a regular talking volume, or a

21 whisper.

22     Q.  Okay.  So -- And we're dealing with real people

23 here.  So when someone is being escorted out, is it

24 reasonable to believe that physiologically, their -- the

25 mood is tense and their heart rate is probably going up?

**LAUREN MARIE GRIFFITH**

1          MS. LONG:  Objection, calls for
2  speculation, foundation.
3      Q.  (BY MR. CASEY)  Have you ever arrested anyone
4  before, Sergeant Griffith?
5      A.  Yes.
6      Q.  Okay.  What's the percentage of people who
7  were -- who spoke at a whisper when they were being
8  arrested, that you experienced in your -- in your time
9  as a law enforcement officer?
10     A.  I would say, as opposed to whispering, they
11  probably just don't say anything at all.
12     Q.  Okay.  When you say --
13     A.  I don't -- I don't know the -- I don't know the
14  percentage.  I'd say maybe -- maybe 40 percent don't --
15  don't really say anything at all.
16     Q.  So then, 60 percent of people actually speak
17  while they're being arrested?
18     A.  Roughly, as far as an estimate.
19     Q.  And so it seems, based on what you just said,
20  that it's reasonable for someone to speak while they're
21  being arrested.
22     A.  Speaking, yes.
23     Q.  Okay.  You mentioned earlier that you've been
24  through levels of forced training in your -- in your
25  time as a police officer?

LAUREN MARIE GRIFFITH

1   A.  Correct.

2   Q.  Have y'all talked about physiological changes

3   whenever someone is in distress or under distress?

4   A.  I would imagine we have, but I can't recall any

5   specifics at this time.

6   Q.  All right.  Is it reasonable to believe that

7   when someone is being arrested, their stress level goes

8   up?

9   A.  That's a reasonable statement.

10  Q.  Okay.  Is it reasonable to believe when

11  someone's stress level goes up, that their -- the pitch

12  of their voice or the volume of their voice

13  unconsciously raises?

14  A.  I would -- I would have to refer to an expert

15  on that.

16  Q.  Okay.  So -- So in all your experience as a

17  peace officer, you're saying that you don't have any

18  experience of the -- like the reasonableness of

19  someone's voice going up when they're under stress?

20  A.  I have observed that before, but not --

21  Q.  Okay.

22  A.  -- not super often.

23  Q.  That's all I'm asking.  Well, you did say they

24  speak 60 percent of the time.  So over 40, and so that's

25  probably mildly indicative of that; would you agree?

**LAUREN MARIE GRIFFITH**

1    A.  I would say I've seen ten percent or less who

2  are speaking to a -- with a -- with a shouting voice of

3  higher than what you and I are talking right now.

4    Q.  Okay.  All right.  So less than ten percent.

5  All right.

6    A.  That's just in my opinion and in my experience.

7    Q.  I understand.  And that -- And that's just not

8  Round Rock ISD, that's during your time with Fort Bend,

9  right, you're including that in there?

10    A.  Yes.  Fort Bend County and Williamson County

11  Sheriff's Office.

12    Q.  Okay.  All right.  So -- So I want to cabin

13  in, so we understand outbursts, what I've understood you

14  to say in summary, is that because when he got removed

15  from the room, he was speaking in a loud manner, that's

16  an outburst?

17    A.  Like I said, he was speaking, interrupting the

18  presiding officer, and speaking over the presiding

19  officer.

20    Q.  Okay.  Did anyone else speak over the presiding

21  officer that night?

22    A.  I do not recall.

23    Q.  And -- And as we've observed here, sometimes

24  it's difficult because people pause at different

25  cadences in their speech to understand when they may be

LAUREN MARIE GRIFFITH

1  ending speaking, and the other one may be starting, do

2  you think some of those overlaps happened just naturally

3  in the context of a public meeting?

4      A.  Not in this instance, no, sir.

5      Q.  When you say, "this instance," you're talking

6  about the August 16th meeting, or Jeremy Story

7  individually?

8      A.  I'm talking about the interaction between

9  Mr. Story and the presiding officer, Board President

10  Weir, during his two minutes of public speaking time.

11      Q.  Okay.  So at any other time that night, are you

12  aware, because you got your information from Sergeant

13  Pope, are you aware of any other time that night that

14  people spoke over the presiding officer, rather than the

15  tiny types of overlaps that happen when people are

16  starting and stopping talking?

17      A.  Not to my knowledge.

18      Q.  Okay.  If -- If that had happened, if you

19  observed that, based on your definition of outbursts,

20  would they be -- would they be subject to the Texas

21  Penal Code for hindering a public meeting?

22      A.  That would be depending on whether the

23  presiding officer determined they were disrupting the

24  meeting or not, and asked law enforcement to remove

25  them.

**LAUREN MARIE GRIFFITH**

1    Q.   Okay.   So I understand you to be saying that

2  the presiding officer then has this, we'll use the term

3  loosely, discretion, that if the person interrupts them

4  too much, that that's disrupting?

5    A.   Not -- I would say whether -- They determine

6  whether or not the individual is disrupting the meeting,

7  as opposed to -- In my opinion, disrupting the meeting,

8  as opposed to disrupting them individually.

9    Q.   Okay.   Explain that difference to me, please.

10    A.   Well, loose -- I mean, the -- the presiding

11  officer, per Board Policy, has the authority to

12  determine whether or not the meeting has been disrupted,

13  and remove any individual that they have determined is

14  disrupting the meeting.   And I would say that's the

15  definition.   And if someone is disrupting them, I would

16  say that like leads up to that.   That's an example of

17  how that individual is disrupting the meeting as a

18  whole.

19    Q.   So as I understand it, for me to understand

20  what you're saying, there's two levels.   The first one

21  is, just kind of speaking loosely, "Hey, you're --

22  you're -- you're interfering with my ability to run this

23  meeting."   That's one level.   And they've got this

24  tolerance band, that's Level 1.   And Level 2 is, "Hey,

25  Sergeant Pope and -- Sergeants Pope and Pontillo, get

**LAUREN MARIE GRIFFITH**

1  this person out of here."  That's Level 2.  And that

2  Level 2 is then what gets them an arrest affidavit, or

3  qualifies for that.  Is that the two levels?

4  　　A.  I would say that's a fair statement.  And

5  there's potentially more levels underneath those, with

6  warnings or something along those lines.

7  　　Q.  Okay.  So at -- where then -- So does an

8  outburst get you immediately to Level 2?

9  　　A.  No.  Ignoring the presiding officer's request,

10  that -- that gets you to the -- the later of the levels.

11  　　Q.  Okay.  So in -- in -- where was it -- Was his

12  voice raised while he was being taken out, or was it

13  raised at the podium?

14  　　A.  I believe his -- his voice was raised in both

15  incidents.  And there was at a point between the podium

16  and the exit where his voice did come to a regular

17  level, and then it escalated again from there.

18  　　Q.  Okay.  Where is that -- Let's look at here.

19  So, as I'm -- as I understand your definition of

20  outbursts, that would be the sentence that "Affiant

21  learned while Story was discussing unrelated topics,

22  Story had several outbursts.  Affiant learned after

23  several verbal warnings from Round Rock ISD Board of

24  Trustee President Amy Weir, Story continued to have

25  verbal outbursts."

**LAUREN MARIE GRIFFITH**

1      So based on your definition, and correct me

2  if I'm wrong, that means he continued to talk over her,

3  correct?

4      A.  Correct.

5      Q.  All right.  So then, next sentence, "Affiant

6  learned Round Rock ISD Board of Trustee President Amy

7  Weir requested for Story to be removed from the board

8  room for hindering and disrupting -- disturbing the

9  Board proceedings."  Let's pause there.

10      Prior to that sentence, that last sentence,

11  had Mr. Story qualified, based on your understanding,

12  because you're the peace officer that wrote this, had

13  he -- had he qualified to be charged under the Texas

14  Penal Code for hindering and disturbing the Board

15  proceeding?

16      A.  Yes.  In my opinion, yes.

17      Q.  Okay.  So this removal from the board room

18  had -- had -- either it only added to it, but it -- but

19  it was sufficient before that, right?

20      A.  Correct.

21      Q.  Okay.  All right.  Then this next one seems

22  like it -- So -- So the request was made, and then

23  Sergeants Pope and Officer Pontillo -- And I apologize,

24  because I'm unfamiliar with the ranking structure.

25  What's the difference between Sergeant Pope and Officer

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

LAUREN MARIE GRIFFITH

1  Pontillo, as far as rank?

2      A.  One is a sergeant and one is an officer.  The

3  sergeant would outrank the officer.

4      Q.  Oh, okay.  All right.  Military would've been

5  completely inverted.  I'm glad I asked that question.

6  So Sergeant Pope then, was he Officer Pontillo's

7  supervisor, or just outranked him?

8      A.  Just outranked him at that time.

9      Q.  Okay.  You say, "They approached Story and made

10  several verbal requests for him to leave the board room.

11  Affiant learned Story refused to leave the board

12  meeting."

13              So then this next paragraph, you learned

14  that they had to forcibly remove him from the board

15  room.  Affiant -- Let me pause for a second.  I remember

16  you said that you had a phone call with -- with Sergeant

17  Pope.  Did Sergeant Pope describe on that phone call how

18  he removed Mr. Story from the board room?

19      A.  I believe he had to place his -- his hands, I

20  think, underneath his armpit.

21      Q.  Okay.  All right.  Is that a -- that a -- By

22  the way of background, I've done security and martial

23  arts for 20 years.  Is that a pain compliance movement?

24      A.  No, it is not, not --

25      Q.  Is --

**LAUREN MARIE GRIFFITH**

1    A.  -- in my opinion.

2    Q.  I'm sorry.  I talked over you.  Is that a joint

3  lock?

4    A.  No, not in my opinion.

5    Q.  Okay.  What -- What is the -- What's the reason

6  for that type of -- of, I guess, control hold?

7    A.  To gain compliance from the individual.

8    Q.  Okay.  If they don't comply with that, is there

9  any pain that results from it, based on the position of

10  their arm?

11    A.  Based on how I believe Sergeant Pope to be

12  holding him, no, not in my opinion.  There was no

13  strikes or pressure points used.

14    Q.  Okay.  But when you say, "He put his hand under

15  his armpit," is his wrist bent?  Is that a wrist lock?

16    A.  I -- I -- You would have to review the -- I'd

17  have to review the video.  I'm not sure at what -- how

18  his wrist was positioned.

19    Q.  Okay.  But you -- Sergeant Pope described it to

20  you, right?  What did he describe?

21    A.  He described having to physically remove

22  Mr. Story from the board room, and that he placed his

23  hands underneath his -- underneath his armpits.

24    Q.  Okay.  So there's -- there's many ways to do

25  that.  You can do that on the front side of the body, on

**LAUREN MARIE GRIFFITH**

1  the back side of the body.  You can do it with a kimura

2  grip or an Americana grip or kind of a chicken wing.

3  Did he describe any specifics on how he placed his hand

4  into his armpit?

5      A.  No, he did not.

6      Q.  Okay.  So you're unaware of whether Mr. Story

7  was in any type of physical compliance pain at this

8  time, correct?

9      A.  Yes.  I mean, that would be up to Mr. Story

10  whether he was in pain or not.

11      Q.  Okay.  Could it be that he was in pain, which

12  caused his voice to elevate?

13      A.  That is a --

14          MS. LONG:  Objection, calls for

15  speculation.  Detective, you can answer.  I'm sorry.

16  Detective, you can always answer after my objections.

17  I'm just objecting for the record.

18      A.  That is a possibility, but talking to Sergeant

19  Pope and reviewing the video, the -- Mr. Story never

20  complained of pain verbally during that incident.

21      Q.  (BY MR. CASEY)  Okay.  And would he have to

22  complain of pain in order for there to be pain?

23      A.  No, that is not a requirement.

24      Q.  Okay.  And in your -- I'm assuming, but I want

25  to ask.  In your past experience as a peace officer,

**LAUREN MARIE GRIFFITH**

1  you've put people in pain compliance positions, correct?

2  In 15 years, I'm assuming you had to have.

3      A.  Honestly -- Honestly, no, I haven't had any use

4  of force issues, besides handcuffing someone, so...

5      Q.  Okay.  That's kind of a -- That's kind of what

6  we call in the Navy an albatross.  That's kind of rare.

7  That's interesting.

8          Okay.  So then, going to Paragraph 5.  You

9  said, "Story continued to resist officers, yell, and

10  scream, causing a major disruption during the Board

11  meeting."  Do you differentiate between "yell" and

12  "scream"?

13      A.  I would describe those as similar nouns.

14      Q.  Okay.  Then, why did you use both of those?

15      A.  It was just my description of the events.

16      Q.  Well, I know it's your description of events,

17  but referencing that it's your description of events

18  doesn't really tell me why you used both words.  Because

19  in -- in common parlance, and I'm going to submit to you

20  that "yelling" and "screaming" -- "yelling" is a loud,

21  like a shout, and a "scream" is in a different vocal

22  register.  Would you agree with that?

23      A.  That's a reasonable statement.

24      Q.  Okay.  So then, I go back to my previous

25  question.  Why did you put "yell and scream"?

LAUREN MARIE GRIFFITH

```
 1     A.  Because I was advised that he yelled, as well
 2 as screamed.
 3     Q.  Okay.  So the statement -- And I want to
 4 clarify.  And this is the tough thing with this
 5 situation.  I mean, it's -- it's not necessarily your
 6 fault.  The -- The -- These are statements that you're
 7 getting from Sergeant Pope, and Pope has "here's the
 8 incident," and Pope has his perception, and here's what
 9 he -- then he conveys it to you, and you're trying to
10 get as close to what Pope said.
11            So you're telling me that the statement
12 "yell and scream" is a statement that came from Sergeant
13 Pope, and you're simply conveying that, and you did not
14 add the words "yell and scream" out of your own
15 volition?
16     A.  Correct.  I learned that from Sergeant Pope.
17     Q.  Okay.  All right.  And so, your -- Am I
18 understanding that out of Paragraphs 1 through 5, this
19 is what you received from Sergeant Pope, as accurate as
20 can be, according to the words he conveyed to you?
21     A.  That's correct.
22     Q.  And you didn't add -- And I'll go through a
23 couple of things.  You didn't add any exaggerations,
24 correct?
25     A.  That's correct.
```

LAUREN MARIE GRIFFITH

1  Q.  You didn't add any, you know, what broadcasters

2  would call "color commentary."  You didn't give it any

3  of your own flavor, so to speak as a writer, correct?

4  A.  No, sir.

5  Q.  Okay.  So any discrepancies between what I'm

6  reading here and what may be on the video or in any

7  other documents, would be a gap that happened on

8  Sergeant Pope's side, and not your side, correct?

9  A.  I'm -- Any -- So any discrepancies, you're

10  saying would be Sergeant Pope's discrepancies, is that

11  what you're -- you're --

12  Q.  Yeah.

13  A.  -- saying?  Okay.

14  Q.  I mean, that's what we agree, that this is

15  accurate to a T about what Sergeant Pope conveyed to

16  you?

17  A.  Correct.

18  Q.  Yeah.  And the reason why I ask that is because

19  we have his deposition, and we're going to go over some

20  of the similar stuff with him, so I'm trying to see if

21  there's any, you know, source of -- source of divergence

22  from my client's perspective, which he has on what

23  happened.  Okay.  Let's stop the share on that.

24          I'm just going to share what -- talk

25  about -- Actually, let's talk about Section 38.13 of the

**LAUREN MARIE GRIFFITH**

1  Texas Penal Code.  This is what you referenced in

2  your -- in your affidavit, correct?

3      A.  Correct.

4      Q.  Okay.  And what parts of Section 38.13, and I

5  want to break it down by kind of sequence from your

6  affidavit, do you believe Mr. Story violated in 38.13?

7  And if you need 38.13, I can pull it up real quick.

8  Would you need to look at it?

9      A.  I'm -- I'm fairly familiar with it, but I'm

10  fine with you pulling it up as well.

11      Q.  Let's -- Let's role with that, based on what

12  you remember, and if we need to, we'll just pull it up.

13  Okay.  So -- Actually, let me do -- go back and -- and

14  actually look at your affidavit, because I want to get

15  that up there.

16          So got your affidavit up here, and that's

17  still the same size, so it should be visible.  Let's

18  talk about 38.13, and see -- see where it goes.  What do

19  you recall, as far as the elements, under 38.13?

20      A.  So I recall in 38.13 Texas Penal Code, an

21  individual commits the offense if intentionally or

22  recklessly they cause a disruption to official

23  proceedings, by noise.  I think there's another one, or

24  violent -- I forgot the word after "violent."  Violent

25  blank, or disturbance, I believe, is the last word.

LAUREN MARIE GRIFFITH

1        Q.   Okay.  All right.  That's pretty good.  Yeah,

2    that's -- So by "noise," the first part of it is

3    "Hinders an official proceeding by noise."  What types

4    of noise then are sufficient to hinder an official

5    proceeding?

6        A.   Any noise that's disruption, whether that be a

7    voice, that could be noise made with your clapping

8    noise, banging something, playing loud music.  I think

9    all those would be examples of -- of noise.

10       Q.   Okay.  Whenever a statute has the word "or" in

11   there, do you understand the difference between a -- a

12   conjunctive or a disjunctive statute, I mean, that

13   you're applying what has "or" versus "and"?  Do you

14   understand the difference in those?

15       A.   Yes.

16       Q.   Okay.  What -- Tell the jury what's the

17   difference whenever it says "or" versus "and."

18       A.   So when it says "or," in my opinion it's more

19   of a list, if they've done anything on this list.  When

20   they say "and," they have to have done all of the

21   above --

22       Q.   Okay.

23       A.   -- as a -- as a collective.

24       Q.   Okay.  All right.  Was Mr. Story -- Did

25   Mr. Story create noise?

**LAUREN MARIE GRIFFITH**

1    A.  Yes.

2    Q.  Okay.  Did anybody else that night create

3    noise?

4    A.  I would imagine there was also noise that

5    night.  However, I don't know that that noise disrupted

6    the meeting.

7    Q.  Okay.  But you -- Would you describe outburst

8    as noise?

9    A.  Yes.

10    Q.  Okay.  So an outburst would be anybody talking

11    over the speaker whenever they were -- the speaker was

12    trying to talk to them, correct?

13    A.  Correct.

14    Q.  Okay.  Was Mr. Story violent?

15    A.  No, he wasn't violent, in my opinion.

16    Q.  Okay.  The other one, the one you were

17    searching for, and by the way again, good job on

18    recalling this, "tumultuous behavior."  Was Mr. Story

19    tumultuous?

20    A.  I'd have to look at the -- look up that

21    definition to determine that.

22    Q.  Yeah, it's kind of -- I agree, it's kind of

23    unclear too.

24            Okay.  Did the Board share -- There's a

25    Part B to it that adds "explicit" -- "after an explicit

LAUREN MARIE GRIFFITH

1  official request to desist."  Did anybody, after the

2  Board Chair redirected them, continue to talk on the

3  same topic without chaining their course of speech?

4      A.  To my knowledge, no.  Only Mr. Story.

5      Q.  Okay.  And admittedly, and I'm not trying to

6  hold your feet to the fire on this, you were out in the

7  parking lot, right, watching it over the -- you know, on

8  video, you said, from your car, right?

9      A.  More like listening, over -- over the video,

10  but, yes.

11      Q.  Okay.  So if anyone else was talking, and the

12  Board Chair said, "Hey, you're off topic," but they

13  continued, they would be liable under 38.13 also, in

14  your opinion?

15      A.  If the presiding officer determined that they

16  were disrupting the meeting, then, yes.

17      Q.  Okay.  All right.  I know we've gone through

18  this a lot, but this is kind of an acute thing.  Did

19  anyone -- Like when you had your first draft of this and

20  you ran it by Chief Yarbrough, the affidavit, did

21  anybody edit it?

22      A.  As far as -- Like, is that including Chief

23  Yarbrough?

24      Q.  Yeah, anybody in the chain.  Like any -- any

25  colleagues, any person from your -- you know, I guess

**LAUREN MARIE GRIFFITH**

1  sergeant.  I guess you get promoted to sergeant, so

2  you're an officer first.  Anybody from the officer

3  level, all the way up through the superintendent, did

4  anybody give any edits to your affidavit?

5      A.  Chief Yarbrough made some suggestions and

6  probably looked over it for grammar.

7      Q.  Okay.  What suggestions did he give?

8      A.  I don't recall.  It's been so long.  But I

9  mean, it would've been probably small ones, like, you

10  know, instead of just putting "Board President," put

11  "Board President Amy Weir."  Little ones like that, just

12  to be more specific.

13      Q.  Okay.  So what I understand you to be saying is

14  no one edited any single fact on that?

15      A.  Correct.

16      Q.  Did Sergeant Pope review it before you turned

17  it in?

18      A.  No, he did not.

19      Q.  Okay.  So not a time -- And I'm probably -- I

20  might -- At the risk of drawing an asked and answered,

21  Pope didn't double-check to make sure you accurately

22  conveyed what he said?

23      A.  Only through our conversations over the phone.

24      Q.  Okay.  And that phone conversation, what --

25  what day did that happen?

**LAUREN MARIE GRIFFITH**

1       A.  That would've been on the 16th, I believe.

2       Q.  The 16th.  And just so I get the timeline

3   right, the -- this is a month after -- Well, actually, a

4   month and a day before the August 16th meeting, that you

5   got assigned this, and you sat down and you -- it was

6   like a day to just get it done.  That was your

7   assignment for the next two days or so?

8       A.  Correct.

9       Q.  Okay.  Now, that it's been -- you've had time,

10  you reviewed the video prior to this deposition, is

11  there anything in your affidavit that you would qualify

12  or maybe write differently?

13      A.  No.  Everything in there is true and factual.

14      Q.  Okay.  All right.  All right.  Who else was

15  with you when you went to the magistrate's office?

16      A.  I was walked there by someone from the county

17  attorney's office, but I was the only peace officer

18  there.

19      Q.  Okay.  So I'm trying to go back in my head a

20  little bit to when you talked about the county

21  attorney's office.  Y'all didn't discuss Mr. Story.  Why

22  would the county attorney accompany you to the

23  magistrate?

24      A.  They were advised that I had a warrant that

25  needed to be signed and reviewed -- sorry -- reviewed by

**LAUREN MARIE GRIFFITH**

1  a magistrate, and someone, I do not recall who, was

2  assigned to walk me to an available magistrate.

3      Q.  Okay.  Did -- And when you were walking with

4  him, did you discuss the affidavit at all?

5      A.  No, I did not.

6      Q.  Okay.  And the magistrate was Gau- -- Gauthier,

7  right?  "Gauthier," as they say in Louisiana.

8      A.  I don't know how to pronounce the name

9  properly, but --

10      Q.  G-a-u-t-h-i-e-r, correct?

11      A.  Yes.  Yes.

12      Q.  Okay.  All right.  And -- And based on that

13  notarization, the magistratic signed it right -- right

14  there in front of you, and then you gave it over to, I

15  guess, the local sheriff to -- to do the arrest?

16      A.  So, it's our practice after we have an

17  Affidavit of Arrest that is signed, we walk that -- if

18  it's for an adult, we walk that over to the Williamson

19  County Sheriff's Office warrants division, and they

20  place that warrant into the system.  And I believe they

21  keep the original copy of that, and then we only leave

22  with a copy of it.  They keep the original.

23      Q.  Okay.  All right.  Let's go onto another

24  exhibit.  Let's see.  That's the video.  Just a moment.

25  Okay.  I'm going to retitle this.  Let's see.  I'm going

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**LAUREN MARIE GRIFFITH**

1  to show you what's been -- This is Exhibit 3.  Do you

2  see Exhibit -- Exhibit 3 right there?

3            (Deposition Exhibit 3 marked.)

4       A.  If you can make the print a little bigger,

5  that'd be great.

6       Q.  No problem.  No problem.  I've got to move the

7  Zoom around on my screen because it like -- it just

8  bounces around, so... Yeah.  Move this window.  Just a

9  second.  Why is Zoom --

10            MR. ROGERS:  This is Exhibit 26.

11            MR. CASEY:  Yeah.  But I've got to get to

12  the -- get to the Adobe.  Just a second.

13       Q.  (BY MR. CASEY)  Okay.  How's that?  Is that

14  good?

15       A.  Yes.  Excellent.

16       Q.  Okay.  Sorry.  I had to shrink the screen a

17  little bit because the Zoom thing is taking up part of

18  my screen, I couldn't hit the plus button.

19            All right.  So this is the Board meeting

20  agenda.  It was Exhibit 7 in a -- in a prior issue, but

21  it's actually Exhibit 3 for our purposes.  Do you

22  recognize it?  I'm just scrolling.

23       A.  Yes.

24       Q.  Okay.  And -- And you're in agreement, this is

25  the -- this is the posted agenda on -- for -- for the

LAUREN MARIE GRIFFITH

1  August 16th board meeting?

2      A.  Correct.

3      Q.  Okay.  So -- And, you know, kind of -- it's

4  kind of pro forma.  I imagine they probably -- some of

5  the stuff, they just leave in there, they don't retype,

6  they just retype the lower stuff.  The call to order,

7  Pledge of Allegiance, Texas Pledge, and then the

8  discussion of possible action.

9          So it's -- So items listed on the board

10  agenda.  So from your understanding, like you -- we

11  talked earlier about your affidavit.  And your affidavit

12  says, "mask mandate" on multiple, multiple occasions.

13  Do you see "mask mandate" in Section D at all?

14      A.  In my opinion, I consider that to fall under

15  D2, under the "Fall 2021 COVID-19 Health and Safety

16  Protocols."

17          MR. CASEY:  All right.  So I'm going to

18  object as nonresponsive.

19      Q.  (BY MR. CASEY)  I've got a real narrow

20  question.  Do you see "mask mandate" in Section D at

21  all?

22      A.  No, the words "mask mandate" are not in

23  Section D.

24      Q.  Okay.  So -- And I'm not disagreeing that --

25  that in your opinion you believe that mask mandate, as

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

LAUREN MARIE GRIFFITH

1  we talked earlier, might be under the umbrella, but it's

2  correct that "Fall 2021 COVID-19 Health and Safety

3  Protocols" is the agenda item, right?

4      A.  Correct.

5      Q.  Okay.  Do you re- -- Do you recall what

6  Mr. Story said that night about how the Protective Order

7  related to Agenda Topic D2?

8      A.  I believe he was attempting to relate it to the

9  word "safety protocols" in this sentence.

10     Q.  Okay.  Now, earlier I asked you about the issue

11 of him talking by analogy or trying to reason by

12 analogy.  You said he wasn't.  But as I understand you

13 just now, there's a slight shift, if you will, a tweak

14 to what you're saying, and that he was attempting by

15 analogy to relate the idea of the superintendent having

16 a Protective Order, to point out that it was

17 hypocritical for the school to be concerned about

18 safety, when the lead person in the entire district is

19 not a safe person.  Is that fair to say what he was

20 saying, in your opinion?

21             MS. LONG:  I'm going to object to the

22 question as compound.  The first part mischaracterizes

23 the testimony.  The second part, best evidence.

24             MR. CASEY:  Okay.

25     Q.  (BY MR. CASEY)  We'll -- I think the second

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**LAUREN MARIE GRIFFITH**

 1  one, the best evidence, we'll watch the video.  I'm just

 2  asking for, Detective Sergeant Griffith, your

 3  recollection.

 4          So when we have this idea of health and

 5  safety protocols -- Let me back up for a second.

 6          When you're in a discussion with someone

 7  and you have a disagreement, is it -- is it true that

 8  part of the human response is to point out, if someone

 9  is trying to make a point, where they themselves are

10  hypocritical on that very point they're trying to prove?

11          MS. LONG:  Objection, foundation.

12      Q.  (BY MR. CASEY)  She's objected.  Remember,

13  Ms. -- Detective Sergeant Griffith, you can go ahead and

14  answer.

15      A.  Can you repeat the question, please?

16      Q.  Yeah.  No problem.  No problem.

17          So this -- this entire ball of wax, this

18  whole lawsuit, you know, Mr. Story's perspective is he's

19  at the -- he's at the Board meeting, this August 16th

20  board meeting talking about -- You've got this

21  superintendent who has a Protective Order against him,

22  and he disagrees with the COVID protocols, and on top of

23  that for the School District to be talking about COVID

24  protocols and safety, health and safety protocols, how

25  can the school district be concerned about the safety of

LAUREN MARIE GRIFFITH

1  people from some virus, when they -- their own top apex

2  leader is not a safe person himself?  I mean, that's the

3  gist of this.

4         So is it reasonable?  You have in your

5  earlier statement that, no, he wasn't talking by

6  analogy.  Is it reasonable to think that in Mr. Story's

7  mind, he's simply trying to point out the hypocrisy of

8  what he believes of the Round Rock ISD?

9         MS. LONG:  Objection, calls for

10  speculation.

11     Q.  (BY MR. CASEY)  And -- And I'm not -- That's a

12  reasonable objection.  I'm not asking you to jump in

13  Mr. Story's head.  But is it reasonable to see that

14  point?  Can you see that point of view?  You don't have

15  to speculate about what he's thinking.  Can you see how

16  those connect?  I mean, that's part of what we do, is

17  try and understand another person's point of view.  Can

18  you see how those connect?  Him pointing out the

19  hypocrisy of the School District being concerned with

20  safety, when the superintendent isn't a safe person.

21     A.  In my opinion, that did not relate to the full

22  title, which was "COVID-19 Health and Safety Protocols."

23     Q.  Okay.  So what was the safety protocol?  I

24  mean, what does it mean to be safe in this sentence?

25     A.  Well, in reference to COVID-19, it was whether

**LAUREN MARIE GRIFFITH**

1  or not they wanted to determine any kind of social

2  distancing, class sizes, mask mandates, things along the

3  lines of protecting students and staff from the COVID-19

4  variant.

5      Q.  So they are saying that their overall concern

6  is the safety of the -- of the staff, faculty, and

7  student population, correct?

8      A.  Correct.  In reference to COVID-19.

9      Q.  Oh, I'm -- Yeah, in reference to COVID-19.  In

10  your -- In your -- In your police training, do y'all get

11  training on -- You actually said y'all get training on

12  leadership, right, at TCOLE?

13      A.  Correct.

14      Q.  All right.  Is part of the training on

15  leadership, that leaders should be setting the standard?

16      A.  In my opinion, I think a good leader leads by

17  example.

18      Q.  Okay.  That's -- I hundred percent agree.  So

19  you would agree then, a leader should, by example, set

20  the standard for behavior?

21      A.  In reference to this and COVID-19 protocols,

22  yes.

23          MR. CASEY:  No -- Objection, nonresponsive.

24      Q.  (BY MR. CASEY)  I'm saying in general.  I'm

25  not -- I'm not limiting it to COVID-19.  Do you believe

LAUREN MARIE GRIFFITH

1   leadership should set the standard by their own behavior
2   and their own example?
3        A.   Sure.   Absolutely.
4        Q.   Okay.   I'll give you a hypothetical.   You --
5   Let's say you -- the police chief, and, you know, they
6   are very unsafe with their firearm, they don't practice
7   good muzzle control, they're unsafe all over the place,
8   they leave it laying out, unholstered in a place where
9   it could fall off their desk or all this other stuff.
10  Would you consider that unsafe?
11       A.   Yes, I would.
12       Q.   Okay.   So what if you're -- you're coming back
13  into the -- into the department office and you're
14  pulling up and you happen to park outside the lines in
15  the parking lot, and the police chief, who's unsafe with
16  their gun, comes up to you and says, "You know, by
17  parking outside these parking lines, you're not really
18  demonstrating leadership by example."   Do you think it'd
19  be fair if you said, "Hey, I'd like to ask permission to
20  talk freely," and they said, "Go ahead," for you to say,
21  "Well, I think it's hypocritical for you to tell me that
22  my parking is bad, when you're completely unsafe with
23  you firearm"?   Do you think that'd be a fair statement
24  for you to make to that police chief?
25       A.   It depends on how attached to your job you are,

**LAUREN MARIE GRIFFITH**

1  but --

2      Q.  That's -- That's a funny response, but it's a

3  true response, right?  Because you would be calling them

4  out on hypocrisy, right?

5      A.  Sure.

6      Q.  Okay.  Let's apply that same scenario to

7  Mr. Story's comments.  Mr. Story comments are, "You say

8  you're concerned, this overarching driving concern about

9  the safety, physical health and well being of all the

10 faculty, students, and staff of Round Rock ISD," which

11 is not a bad desire, "But yet at the same time, your

12 apex leader has a Protective Order against him, and the

13 allegations are that he's trying to beat up a woman, a

14 pregnant woman, a woman with -- carrying his child."

15 Isn't that fair, to call them out on that hypocrisy?

16          MS. LONG:  Objection, asked and answered.

17     Q.  (BY MR. CASEY)  We've done the analogy since

18 then.  So you can go ahead and talk -- you can speak,

19 Detective Sergeant Griffith.

20          Isn't it fair to say, "Look, your --

21 your -- your -- your top leader is an unsafe person.

22 How can you seriously say you're concerned about the

23 safety of everybody, when your leader is not safe?"  I

24 mean, that'd be just like the gun situation.  You're

25 telling me that this thing over here, because I think

LAUREN MARIE GRIFFITH

 1  that while it's important, masking and safety -- safety
 2  protocols, to have that conversation is important, it's
 3  a lot more serious if you've got a Protective Order for
 4  beating up a pregnant woman.
 5         So I think the -- it's similar in that,
 6  you've got this parking issue, which parking is
 7  important, but it's not, you know, no one is dying.  And
 8  then you got -- you got this guy who's unsafe with his
 9  gun and his firearm that could kill somebody.  Isn't
10  that -- Isn't that arguing by analogy, what Mr. Story
11  was doing?
12         MS. LONG:  Objection, compound.  Objection,
13  asked and answered.  Objection, argumentative.
14     Q.  (BY MR. CASEY)  You can go ahead and answer.
15     A.  In -- You know, how I view it is if -- if he --
16  if Mr. Story had that concern for that safety, you know,
17  there was other ways to bring that forward in meetings
18  that aren't regarding COVID-19 safety protocols.  You
19  know, at that time, COVID-19, there was people dying at
20  this time, so it was a serious matter.  And I think -- I
21  don't think that the Protective Order against a
22  superintendent was in any way related to COVID-19 health
23  and safety protocols.
24     Q.  Did the Protective Order show that the
25  superintendent was an unsafe person?

**LAUREN MARIE GRIFFITH**

1      A.   I have not viewed the Protective Order.

2      Q.   Okay.  Hypothetically speaking, if you are

3  aware that a person has a Protective Order against them,

4  a permanent one, not a temporary one, but a permanent

5  Protective Order against them from assaulting a pregnant

6  woman who was carrying their child, does that come

7  across to you, as a peace officer, of being an unsafe

8  person?

9      A.   If those facts are corroborated and checked,

10  and I could review those reports to see that that's

11  factual statements, then, yes.

12      Q.   Well, let's back up a second.  It was signed by

13  a Travis County judge.  There was evidence taken.  This

14  wasn't some ex parte thing that was flying down the

15  road, because anybody can get something ex parte for two

16  weeks.  But this was a Protective Order granted, signed,

17  filed with the clerk.  Would that make that person

18  unsafe?

19           MS. LONG:   Objection, foundation.  And

20  objection, argumentative.  And objection, asked and

21  answered.

22      Q.   (BY MR. CASEY)  I'm -- I'm emphasizing the fact

23  that the judge signed it.  Right?  You said you would

24  have to review it, Ms. Griffith.  You said you'd have to

25  review it.  But doesn't the fact that the judge already

LAUREN MARIE GRIFFITH

1  signed it means that a -- an adjudication has happened;
2  isn't that true?
3            MS. LONG:  Objection, foundation.  Do you
4  want to put the Protective Order that was in place in
5  front of her to talk about?  Because I don't even think
6  it reflects what you're representing it reflects, as of
7  this time.
8            MR. CASEY:  Okay.  Wait.  It's fair.  We
9  can go past it.
10           All right.  It's 11:38.  I want to do the
11 video, but I don't want to peruse us into the -- into
12 the -- halfway through that.  Let me review my questions
13 real quick and see if I can get a section that will just
14 bring us into lunch.  What time do y'all want to break,
15 by the way?
16           MS. LONG:  Well, how much longer do you
17 have?
18           MR. CASEY:  I've got, I think, probably
19 about --
20           MR. ROGERS:  Halfway.
21           MR. CASEY:  Halfway, yeah.  I think -- I
22 think halfway, more than halfway, because we've got to
23 talk about the video, and then some -- some stuff about
24 qualified immunity, and then some about the other claim,
25 the retaliation.  So, we're more than halfway.

LAUREN MARIE GRIFFITH

1              MS. LONG:  Well, let's just take a lunch
2   break now.
3              MR. CASEY:  Okay.  That'd be fine.
4   Whatever works best for y'all.  Based on your schedule,
5   because I'm -- I'm -- so I want to assume that your
6   schedule would be the limiting one.  When do you want to
7   reconvene?
8              MS. LONG:  I don't know how long you need.
9   I -- I need 30 minutes.
10             MR. CASEY:  Okay.  Well, I am -- I'm great
11  for pushing it shorter, because I know you and I, we
12  work -- we work by the clock.  So if we start back up,
13  let's say 12 -- 12:15?
14             MS. LONG:  Detective Griffith, does that
15  work for you?
16             THE WITNESS:  Yes, that works for me.
17             MS. LONG:  Yes, 12:15.
18             MR. CASEY:  Okay.  All right.  Thanks for
19  your time.  We'll see you then.
20             THE REPORTER:  Off the record, 11:39.
21             (Lunch recess for 38 minutes.)
22             THE REPORTER:  Back on the record at 12:17.
23     Q.  (BY MR. CASEY)  All right.  Thanks for your
24  time.  I was looking over the break, and right before we
25  jump into the video, I wanted to look at the resolution

**LAUREN MARIE GRIFFITH**

1  on that agenda real quick because I think that's

2  where -- that's where we had kind of get -- I'm trying

3  to find the actual resolution itself.  We'll come back

4  to that.

5            All right.  So I'm going pull up the video.

6  I'm going to share the screen, and we'll -- we'll watch

7  Mr. Story's interaction and we'll kind of talk about

8  some other folks involved in the video.  So let me pull

9  up this segment.  Sorry, I'm just trying to time sync

10 it.  I thought it was queued up, and then I clicked once

11 on the bar and it's completely shifted.  I'm sorry.

12 Okay.  Now I have it.  We'll roll into that like at

13 about 20 --

14           I'm going to share the screen.  I'm going

15 to fast forward it 'til we get to that point.  So just

16 bear with me.

17           (Video played.)

18           Okay.  I'm going to fast forward this.

19 Fast forward it in time and I think about 30 times --

20 30X is when it speeds up.  I want to get to where

21 Mr. Story is.

22           (Video played.)

23           It comes up at about 24-7, I believe.

24           (Video played.)

25           Okay.  So that's right at the very

LAUREN MARIE GRIFFITH

1   beginning.  Can you -- Is that audible, Ms. Griffith,

2   what you're hearing?

3        A.  Yes, I can hear the video.

4        Q.  Okay.  All right.  And is it -- is it sized

5   enough?  Am I -- Do I need to zoom in?  Is there

6   anything you can -- It's got an appropriate viewpoint

7   from your point of view?  I want to make sure it's being

8   accurately displayed.  If we were, you know, in the same

9   room, it'd be on a big TV, so...

10       A.  Yes, sir.

11       Q.  Okay.  So in that portion right there, would

12  you agree that the Round Rock ISD board president, Board

13  Trustee President Amy Weir talked to Mr. Story at the

14  very beginning about items on the agenda, and then he

15  started to respond briefly, that he was going to talk

16  about agenda items, correct?

17       A.  In my opinion, she provided him a verbal

18  warning to make sure that he only spoke to items on the

19  agenda.

20       Q.  A verbal warning.  Do you know if anybody else

21  received a verbal warning?

22       A.  Not to my knowledge.

23       Q.  Okay.  And there may be reasons for that.  I

24  mean, you know, you're not there.  Let's -- Let's -- So

25  I'm going to start it, and we'll pause momentarily

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**LAUREN MARIE GRIFFITH**

```
 1  through it for some questions.
 2                  (Video played.)
 3                  Okay.  We're going to go through there and
 4  just have you acknowledge some various aspects of
 5  Mr. Story's statements.  Did you just hear Mr. Story say
 6  he will -- he will show how what he's going to talk
 7  about is related to that, right?
 8      A.  Correct.
 9      Q.  Okay.  All right.  Let's go to the next step.
10                  (Video played.)
11                  Okay.  So you hear that exchange where the
12  Board president says, "Are you going to talk to the
13  agenda," and he says, "I'm going to demonstrate it," and
14  she says, "No."  Did you hear that exchange?
15      A.  It was hard to follow because, I mean, if -- in
16  my opinion, it felt like he was interrupting her, and
17  she wasn't able to finish a full sentence.
18      Q.  Okay.  We can go back for just a second.  Okay.
19  So let's go -- let's go listen to that whole exchange,
20  and I apologize, I'm probably chopping it too small.
21  Let's go listen to the full exchange.
22                  (Video played.)
23                  Okay.  At that point, Ms. Griffith, is
24  Mr. Story on topic or off topic?
25      A.  At this point, in my opinion, he's still on
```

**LAUREN MARIE GRIFFITH**

1  topic.  And in the video, the presiding officer has not

2  corrected him, so in her opinion, which is the one that

3  matters in this instance, he's still on topic.

4      Q.  Okay.  Well, all I've heard him -- I haven't

5  heard him say anything about COVID.  I haven't heard him

6  say anything about health, or nothing about safety.

7  He's talking about the rule of law.  Is the rule of law

8  anything related to COVID health and safety protocols?

9      A.  I did hear him speak about the pandemic.  So he

10 did mention that.

11     Q.  He did mention that.  Outside of that word, I

12 don't recall that, but I'll concede that to you.  Did he

13 say anything about COVID health and safety protocols?

14     A.  In my opinion, the pandemic is directly related

15 to COVID and safety.

16         MR. CASEY:  I'll object to nonresponsive.

17     Q.  (BY MR. CASEY)  Did he say anything about COVID

18 health and safety protocols?  Did that statement come

19 out of his mouth?

20     A.  No, he did not use those words.

21     Q.  Okay.  All right.

22         (Video played.)

23         Okay.  So at that point, he brings up the

24 Protective Order.  So he's -- he's speaking about the

25 Rule of Law.  And do you see how he's saying that the

**LAUREN MARIE GRIFFITH**

1 Rule of Law matters across the board?

2      A.   I believe he was speaking -- You know, in my

3 opinion, it sounded like he was speaking vaguely on the

4 health and safety of the students.

5      Q.   Yeah.   That's right.   Going back to what we

6 were talking about earlier.   If you have a police chief

7 who has poor gun safety control, and yet talks to you

8 about how you're parking, does it give the police chief

9 credibility?

10     A.   Like I said, I think a good leader leads by

11 example.

12     Q.   Okay.   So then, my question still remains.

13 Does it detract from the leader's credibility if the

14 police chief has poor gun safety, and yet criticizes you

15 about your parking?

16          MS. LONG:   Objection, asked and answered.

17          MR. CASEY:   I want to ask it in the "yes"

18 or "no" sense.

19     Q.   (BY MR. CASEY)   Does it detract from the

20 leader's credibility?   Because you -- you've not given

21 me a "yes" or "no" on that.   And this is really a

22 critical question here, because Mr. Story, I will submit

23 to you, is trying to talk about the credibility of the

24 School Board as a whole, and the superintendent as the

25 leader.   And so, if the police chief says, and this is a

**LAUREN MARIE GRIFFITH**

1  "yes" or "no" question, "You've got terrible parking,"

2  and yet that -- he has horrific gun control on his own

3  firearm, would it detract from that leader's

4  credibility?

5      A.  In your example with the chief of police, yes.

6      Q.  Okay.  So is it reasonable -- You might not

7  agree with it, because -- The span of reasonability,

8  would you agree with me that reasonable people can

9  disagree about something, "yes" or "no"?

10      A.  Yes.

11      Q.  Okay.  So is it in the span of reasonableness,

12  not whether you agree with Mr. Story's take on it,

13  right, not whether you agree that -- because the

14  superintendent is involved with this Protective Order

15  matter, not that you agree with that, but isn't the span

16  of reasonableness that he is calling out the School

17  Board on hypocrisy because they've got a leader who's

18  not leading by example?  Is that reasonable?

19      A.  I think that is reasonable if it goes along

20  with the agenda items on the list.

21      Q.  Okay.  And so, he's arguing by analogy to the

22  agenda item on the list -- agenda item on the list.  So

23  I understand you to say, yes, it's reasonable for his

24  point of view?

25          MS. LONG:  Objection, mischaracterizes the

**LAUREN MARIE GRIFFITH**

1  testimony.

2      Q.  (BY MR. CASEY)  I'm -- That's what I'm asking.

3  Is it reasonable for his point of view that he's saying

4  by analogy, you are hypocritical if you have a leader

5  who's not leading by example?

6      A.  In my opinion, it would be determined on

7  whether or not a person is understanding and following

8  that analogy and able to relate it back to the COVID-19

9  safety and protocols.

10     Q.  Yeah.  Totally.  I a hundred percent agree with

11 you.  That's the whole point of arguing by analogy,

12 right?  We take a situation that's a side situation that

13 has some overarching principle.  And then we take that

14 overarching principle because evidently the person in

15 the immediate situation is not getting it.  And we're

16 trying to relate it to a side situation.  That's what

17 argument by analogy is, right?

18          MS. LONG:  Stephen, I'm going to object.

19 You're not testifying.  And I -- I apologize, but you

20 have been testifying throughout your questions.  You've

21 not been asking questions.  You've been arguing with the

22 witness.

23          Could you ask proper questions for her to

24 answer, instead of arguing with her and asking the same

25 things over and over?

**LAUREN MARIE GRIFFITH**

1           MR. CASEY:  Okay.  I will submit that this

2   is cross-examination.  It's going to be difficult.  I'm

3   trying to pin her down.  She's dancing around the

4   question and she's wanting to allow argument by analogy

5   everywhere else, except for Mr. Story.  And so, that's

6   where I'm trying to tie it down.  And so, I'm giving her

7   hypotheticals, which on cross-examination is quite

8   common, and that's the nature of this.

9           And I receive your objection, it's on the

10  record.

11      Q.  (BY MR. CASEY)  And now, Ms. Griffith, please

12  answer what I'm asking.  Is -- Is arguing by analogy

13  acceptable?

14          MS. LONG:  Objection, calls for

15  speculation.  Objection, foundation.

16      Q.  (BY MR. CASEY)  And you can go ahead and

17  answer.

18      A.  To me, that is determined by the presiding

19  officer.

20      Q.  Okay.

21      A.  They --

22      Q.  All right.  So the presiding officer then has

23  the discretion to determine whether his argument by

24  analogy is okay, is what you're saying?

25      A.  In my opinion, yes.

**LAUREN MARIE GRIFFITH**

1    Q.  Okay.  All right.  Well, let's keep going.
2  We've cleared that hurdle.  We're going to listen to the
3  rest of this.  Just give you a road map, and then we're
4  going to go back to the affidavit.
5                (Video played.)
6                I'm sorry.  I was making sure -- There's
7  some cross talk on here.  I was making sure that that
8  was not -- not on the actual zoom.
9                (Video played.)
10                Okay.  Throughout that bit of garbleness,
11  isn't it true that the only person's voice that's being
12  heard is -- Actually, I don't think it's the Board
13  president.  It's another person on the Board, right?
14    A.  I -- I hear the Board president.  I also
15  believe I hear -- I think it was Feller Landrum.  I
16  hear -- I believe I hear her speaking as well.
17    Q.  That's right.  As a matter of fact, Mr. Story's
18  voice is completely drowned out by theirs.  He's not
19  raising his voice, is he?
20    A.  I believe that's hard to determine because I
21  believe his microphone was muted at that point.
22    Q.  Okay.  Well, I -- I agree.  So if his
23  microphone is muted, and he's continuing to talk and you
24  can't hear him, then it means that all you can hear are
25  their voices, right?

LAUREN MARIE GRIFFITH

1      A.  No, I believe you can still hear his voice if

2  you listen closely in the -- in the back of the video.

3      Q.  That's the point.  His voice is not disruptive

4  over their voices.  Their voices are dominating.  Their

5  voices are blasting, correct.  Right?

6      A.  Only because this video has them on a -- In my

7  opinion, it's because this video has them mic'd up

8  and --

9      Q.  But --

10     A.  -- their voices are -- In this video, the

11 voices are louder due to the microphones of the video.

12     Q.  I a hundred percent agree with you.  And

13 because you weren't there, you don't have any

14 understanding of Mr. Story's volume, right?

15     A.  That's incorrect.

16     Q.  How do you know Mr. Story's volume by not being

17 there?

18     A.  I reviewed the body-worn camera video from

19 Officer Pontillo's body camera.

20     Q.  Okay.  That body camera video that was turned

21 over and produced during discovery?

22     A.  That's correct.

23     Q.  Okay.  And on there you can hear Mr. Story

24 above everybody, is what you're saying?

25     A.  Not above -- above everybody, but you can still

LAUREN MARIE GRIFFITH

1  hear him speaking over and interrupting the presiding

2  officer.

3       Q.  Okay.  We're going to keep going.

4             (Video played.)

5             Well, is it true that was Trustee Feller

6  Landrum that said, "Please remove him" just now?  And

7  not the presiding officer.

8       A.  In this clip, yes, the presiding officer had

9  already said it.

10      Q.  Okay.  I want to go back for a second.

11 Let's -- Let's catch that.  I want to hear where it say,

12 "Remove him."  So rewind for a moment.  Okay.  We'll go

13 through it again, and I'm going to pause it just right

14 after that.  Let me know when you first hear, "Remove

15 him."

16            (Video played.)

17      A.  Right there.

18      Q.  Who said, "We need to have this gentleman

19 removed, please"?

20      A.  In my opinion, that was President Weir's voice.

21      Q.  Okay.  And that was at 2:49.  Okay.

22            (Video played.)

23            Who's talking right there?  The loudest mic

24 right there.

25      A.  I could hear President Weir.  I could hear

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

LAUREN MARIE GRIFFITH

1  Mr. Story.  And I potentially think I might have heard

2  Trustee Harrison as well.

3      Q.  Yeah.  And I think Trustee Feller Landrum.

4  Okay.  Let's keep going.

5                  (Video played.)

6              Okay.  So it's 2:49.  I'm going to let it

7  run for a second, because that was the last I heard of

8  Mr. Story's voice, and it was a couple of seconds of him

9  not there.  Let me let it run for a few seconds.

10                 (Video played.)

11             Okay.  So my question on that is, where was

12  the scream?

13     A.  So the voice that you -- when you -- In this

14  video, you can hear him, and there's no microphone at

15  that point.  He's not near a microphone.  So his voice

16  is being picked up by other microphones, in this clip.

17  Like I said, if you refer to the body-worn camera,

18  you'll see that his voice was elevated in more of a

19  yell, in more of a screaming matter.

20     Q.  So you're saying it goes both -- so the -- And

21  I'm just going to -- These are my characterizations, not

22  yours.  I'm going to present them.  Normal talking,

23  yelling, and then screaming.  Is that fair?  Is that how

24  you're describing it?

25     A.  Not -- I mean, I think it fluctuates in

LAUREN MARIE GRIFFITH

 1  different orders.  But, yes, those are the three.

 2      Q.  Okay.

 3      A.  It doesn't necessarily have to build up.  I

 4  think there's a little bit of staggering.

 5      Q.  Oh, I'm not saying you can't go from normal to

 6  screaming.  I'm not saying --

 7      A.  Right.  Right.

 8      Q.  -- that at all, just to be clear.  But if -- on

 9  all the body camera footage and on this footage, we

10  don't hear the screaming.  And you'd agree screaming is

11  the loudest.  If we don't hear screaming, then it means

12  that that statement conveyed to you by Sergeant Pope

13  would be incorrect?

14      A.  I disagree with that.  I think -- I mean, even

15  on this video, the fact that he was nowhere near a

16  microphone, and you can hear him over people who have

17  active microphones on this recording, I think that

18  demonstrates how loud his voice was at that time.

19      Q.  Okay.  Now, acoustically in this room, you're

20  saying his voice was as loud as theirs, because it

21  sounds like a faint echo, does it not?

22      A.  I don't believe it was as loud as someone who's

23  hooked up to a live microphone, but it was loud enough

24  to where you could hear his voice, even when live

25  microphones were -- were on.

**LAUREN MARIE GRIFFITH**

1    Q.  And those microphones are picking up his voice,

2   right?  I mean, these -- these are sometimes

3   directional, bu there's some condenser mics in there,

4   right?

5    A.  I believe the only microphones are on the dais,

6   and then the public speaker mic that had been muted

7   already.  I think -- I believe those are the only

8   microphones, to my knowledge.

9    Q.  Okay.  All right.  All right.  I want to --

10  When Mr. Story is cut off mid-sentence, are there any --

11  Let me back up for a second.  Are there any protocols

12  that say to the speakers that when the -- when the --

13  when Ms. Weir starts to talk, that they're supposed to

14  immediately be quiet during their two minutes?

15   A.  I think it's just a common courtesy when the

16  presiding officer speaks, to listen to what they have to

17  say.

18   Q.  Okay.  I understand that, but that's not my

19  question.  Are there any rules that are promulgated to

20  the speakers during the time of public comment, because

21  everybody was given two minutes, to tell them during

22  their two-minute time that's assigned to them, that they

23  have to stop talking when the presiding officer starts

24  talking?

25   A.  I'd have to refer to the Board Policy for that.

**LAUREN MARIE GRIFFITH**

1  I know it does mention disruption.  So it'd be up to the

2  presiding officer whether or not that counted as

3  disruption in their eyes.

4      Q.  Okay.  And if the presiding officer shut down

5  some people based on her view that they were -- that

6  their analogy wasn't close enough, and other people she

7  let go, that just means the discretion is completely in

8  the hands of the -- the presiding officer, right?  From

9  what I'm understanding you to say.

10      A.  In my opinion in this case, yes, sir.

11      Q.  Okay.  And so, for hindering the public

12  proceeding, when he starts a sentence, and she starts

13  talking, and there's no instruction to stop -- Let me

14  back up.  I don't want to mischaracterize your

15  testimony.

16              You're saying he immediately is --

17  qualifies as disrupting if she starts talking, and he

18  doesn't stop talking?

19      A.  In my opinion, that would be up to the

20  presiding officer.

21      Q.  Okay.  So other than your -- what you're

22  saying, and I'm not trying to say this in a pejorative

23  sense, but a vague reference to the School Board

24  policies, you can't think of any place where it says

25  when she interrupts him, that -- that he's supposed to

LAUREN MARIE GRIFFITH

1  be quiet?

2       A.  Not to my knowledge, no.

3       Q.  Okay.  So when she interrupts him, isn't she

4  speaking over him and disrupting the proceeding, if it's

5  his two minutes to talk?

6            MS. LONG:  Objection, foundation.

7       Q.  (BY MR. CASEY)  Okay.  Go ahead and answer,

8  please.

9       A.  In my opinion, no.  She was enforcing the rules

10  of the Board meeting at that point.

11       Q.  But -- But you and I would agree, based on what

12  your testimony has been, that there were other people

13  that were off topic that she didn't interrupt, right?

14       A.  That is a possibility.

15       Q.  Yeah.  Okay.  Well, let's -- let's -- let's

16  check those possibilities out.  I'm going to share the

17  live pleading in this case.  And you said you reviewed

18  it, right?  The actual lawsuit.  Did you review the

19  actual lawsuit before today?

20       A.  The -- The one filed by your officer?

21       Q.  Yeah.  By -- By our officer, Mr. Norred, that

22  I'm the attorney on the case now.

23       A.  Pieces of it.  Pieces of it.

24       Q.  Okay.  All right.  So I want to go to some of

25  the other statements.

**LAUREN MARIE GRIFFITH**

1        MR. CASEY:  By the way, Ms. Chavez,

2   Mr. Story is in the waiting room.

3        (Mr. Story rejoins proceedings.)

4        MR. CASEY:  All right.  Thank you so much.

5   Q.  (BY MR. CASEY)  I'm going to see -- I'm going

6   to share this Third -- it's called the Third Amended

7   Complaint.  That just means, you know, they filed more

8   than one.  I'll go to Page 1 so you can see the top of

9   it.  Do you recognize it?

10   A.  Yes.

11   Q.  Now, it's kind of weird being sued.  There's

12   your name right there in that block, bottom block of the

13   defendants.  I'm going to scroll down.

14   A.  That's not my name, actually.

15   Q.  Oh, I'm sorry.  Oh, yeah.  Yeah.  That was -- I

16   apologize.  That -- That -- Yeah, that's scrivener's

17   error on behalf of the other law firm.  I'll -- I'll own

18   that, because it should say your proper name.  I

19   apologize.  Let me get that fixed.  Okay.

20        I'm going to scroll down to some of the

21   other comments that were that -- This is Mr. Story's

22   comment.  I'll represent to you that that's transcribed

23   today.  I speak on the Rule of Law.  You and I just

24   heard it.  Let's go down to Paragraph 30A.

25   A.  Can you -- Can you make that just a smidgen

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

LAUREN MARIE GRIFFITH

1  bigger, please?

2       Q.  Yeah, absolutely.  Let me see if I can -- a

3  little bit more.  How's that?

4       A.  That's much better.  Thank you.

5       Q.  Okay.  All right.  So Elaine Lee, and I'll

6  represent to you that, you know, Elaine Lee's comments

7  occur at around an hour, seven minutes, and 38 seconds.

8  Elaine Lee says, "I'm here to remind you that Senator

9  Cruz, who poses as a Freedom Fighter in front of the

10 camera, chooses to send his children to a private school

11 that has a mask mandate."  Right?  It says, "mask

12 mandate" in there.  So I think that qualifies in your

13 definition.  How does pulling in Senator Cruz in this --

14 first of that sentence, how is that on topic?

15            MS. LONG:  Objection, foundation, best

16 evidence, and optional completeness.  You may answer.

17      A.  In my opinion, she's still referring back and

18 talking about the public health.  She's talking about

19 mask mandates, deadly pandemics, registered healthcare

20 professionals.

21      Q.  (BY MR. CASEY)  Well, see, right -- right

22 now -- And she's saying, "The politician's telling us

23 that refusing masks and vaccines is what freedom looks

24 like in the middle of a deadly pandemic.  Why should

25 anyone trust their stage rhetoric, over advice from

LAUREN MARIE GRIFFITH

1  health professionals?  The rich and powerful protect

2  their children, while playing political games."

3           She's calling out -- It seems to me, she's

4  calling out their hypocrisy, correct?

5       A.  In reference to the mask mandate, yes.

6       Q.  Just say "yes" or "no."  Is she calling out

7  their hypocrisy?

8           MS. LONG:  Objection, asked and answered.

9           MR. CASEY:  She -- I'm going to say

10  nonresponsive to anything she said, but, yes.

11  Objection, nonresponsive.

12       Q.  (BY MR. CASEY)  All right.  Let's go to Kathryn

13  Rightmeyer.  And I understand my colleague might have

14  the same objections here.

15           Ms. Rightmeyer.  So we -- we can go through

16  the video.  I'll represent and submit to you that these

17  are transcribed from the video.  These are their

18  statements, and the -- the time stamps are in

19  Footnotes 9 and 10.  Ms. Rightmeyer says, "Frederick

20  Douglass, perhaps you read it," in the middle of her

21  statement.  "Frederick Douglass talking of my bondage

22  and my freedom, he was a slave.  There's a slave

23  mentality, there's a slave -- mentality."

24           If I just pull those statements, rip those

25  out of that paragraph -- as a matter of fact, you keep

LAUREN MARIE GRIFFITH

1  on going, is there anything that Frederick Douglass has

2  to do with the mask mandate?

3         MR. ROGERS:  Or COVID.

4         MR. CASEY:  Yeah.

5     A.  In Kathryn Rightmeyer's opinion, yes.

6     Q.  (BY MR. CASEY)  Okay.  But it's her opinion.  I

7  a hundred percent agree with you.  But I submit to you,

8  she wasn't cut off.  She wasn't redirected.  So why is

9  Frederick Douglass someone who can be spoken about, and

10  not be cut off, in your opinion?

11         MS. LONG:  Objection, foundation.

12  Objection, best evidence.  And objection, optional

13  completeness.

14     Q.  (BY MR. CASEY)  Okay.  Go ahead and answer.

15     A.  And in my opinion, again, that is entirely up

16  to the presiding officer.

17     Q.  Okay.  No problem.  That's a fair response.

18  Okay.  Let's go to Don Zimmerman's argument.  All right.

19  Let's go -- Let's go read through his statement.  He

20  says -- And his time stamp on this is 1:36:18.

21         You know, and I appreciate -- and I was

22  doing this in the interest of time, but as a -- in

23  deference to my colleague Ms. Long, we're going to go

24  and listen to Don Zimmermann's statement.  That way we

25  don't -- we're not pulling a best evidence objection or

**LAUREN MARIE GRIFFITH**

1  an optional completeness objection.  Let's listen to Don

2  Zimmerman's statement.

3            So I'm going to stop share on this.  We're

4  going to go to the video and listen to his statement.

5  That was about the 1:07.  This is two hours, 409.  Let

6  me go back to Don Zimmermann.  An hour-seven, it looks

7  like.  Let's see.  It was running a little bit over, so

8  I'm going to -- Let me see if I can slide this and get

9  Don Zimmerman up here.  Let me know if you see --

10            MR. ROGERS:  I thought it was at 1:37.

11            MR. CASEY:  1:37?

12            MR. ROGERS:  Maybe I heard it wrong.

13       Q.  (BY MR. CASEY)  Let me catch her name, and then

14  we're going to go to Don Zimmerman.  I apologize.  It

15  should -- should say -- it should be right --

16            (Video played.)

17            Oh, this is Frederick Douglass right there.

18  So he should be right after this.

19            (Video played.)

20            MS. LONG:  Are you going to -- Are you

21  trying to share it?

22            MR. CASEY:  All right.  I apologize.

23  Technical difficulties.  There we go.  So let's do this.

24  This is Ms. Rightmeyer -- This is --

25            (Video played.)

**LAUREN MARIE GRIFFITH**

1           Ms. Rightmeyer.  Okay.  So here's

2   Ms. Rightmeyer.

3           (Video played.)

4           So, did you hear the Board president cut

5   off Ms. Rightmeyer at all?

6       A.  No, sir.

7       Q.  Okay.  And your -- your opinion is that this is

8   still related to COVID?

9       A.  My opinion is that it --

10          MS. LONG:  Objection --

11          THE WITNESS:  Sorry.

12          MS. LONG:  Objection, foundation.

13   Objection, optional completeness.  You've just shown a

14   little snippet of her -- her comment, not the whole

15   thing, but I'll -- I'll --

16          Detective Griffith, you can please answer.

17       A.  My opinion is the same as before, that, you

18   know, it's -- it's up to the presiding officer at this

19   official meeting.

20       Q.  (BY MR. CASEY)  Okay.  And that's fair.

21          (Video played.)

22          We've already -- We'll listen to Elaine

23   Lee.  She's right here, and we talked about that just a

24   second ago.

25          (Video played with no audio.)

**LAUREN MARIE GRIFFITH**

1          MS. LONG:  We're not hearing this.  I don't

2    know if --

3          MR. CASEY:  Yeah, I don't know what's going

4    on.  It's not transferring over to Zoom.  If it drops

5    out again, I'll just restart it.  Sorry about that.

6              (Video played.)

7          MR. CASEY:  Yeah, it's not coming through.

8    So there's going to be a difficulty.

9          MR. ROGERS:  Do you want to restart the

10   video?

11         MR. CASEY:  Yeah.  I'm at 1:07:59.  Let me

12   restart the video, and let's see if that's causing the

13   problems.  I apologize.

14             (Video played.)

15   Q.  (BY MR. CASEY)  Okay.  So that's the full

16   statement from Ms. Lee, and technology was cooperating

17   with us.  So my question would be, are you -- are you

18   maintaining that it's a measure of -- you know, you said

19   before that it's in the discretion of the Board chair,

20   that it's measure of degree of how many non-COVID things

21   a person says that determines whether it's relevant or

22   off topic?

23   A.  Can you -- Can you ask the question again?

24   That's --

25   Q.  Yeah.  I'm sorry.  I'll rephrase it

**LAUREN MARIE GRIFFITH**

1    differently.  Sometimes questions aren't phrased very

2    well.

3                  In essence, at the very beginning, in

4    summary, Ms. Lee beat up on politicians and Senator

5    Cruz, verbally, saying they were -- they were

6    hypocritically sending their kids to private schools,

7    and -- and their rhetoric didn't match what they're

8    saying.  Is that a fair summary of what she said?

9        A.   That's part of it.  I think she had a

10   consistent theme of COVID safety, pandemic issues, you

11   know, the distance learning, and her fear of her

12   student -- you know, her own students not being around

13   others wearing a mask.  So I did feel there was a

14   COVID-19 theme to her entire -- her entire speech.

15       Q.   A hundred percent agree with you.  Isn't it

16   true, then, "yes" or "no," isn't it true then, you have

17   to hear the whole thing they say in order to determine

18   whether there's a consistent theme?  I mean, that's the

19   nature of the word "consistent," theme, right?  I

20   mean --

21       A.   Well, for the whole two minutes, yes.  Yes.

22       Q.   Okay.  Yeah.  So if the moment she said,

23   "Senator Cruz," right -- So let's think about it like

24   this.  If the moment that Ms. Lee said the phrase

25   "Senator Cruz" and "Freedom Fighter," it would've been

**LAUREN MARIE GRIFFITH**

1 | okay, under how the rules were applied to Mr. Story, for

2 | Board President Weir to say, "Stop.  This isn't about

3 | Senator Cruz.  This isn't about Freedom Fighting.  Get

4 | back to COVID."  That would've been fair, right?

5 |              MS. LONG:  Objection, foundation.

6 |     A.  That would've been completely based on the

7 | opinion of President Weir.

8 |     Q.  (BY MR. CASEY)  Yeah.  So isn't it true that

9 | because we don't know today the full two minutes of what

10 | Jeremy Story was going to say, that we can't tell

11 | whether or not there was a consistent theme throughout

12 | the whole thing?

13 |     A.  All I know, based on the video, is that there

14 | was a -- he did divert from the COVID-19 protocols.

15 |              MR. CASEY:  Okay.  Objection,

16 | nonresponsive.

17 |     Q.  (BY MR. CASEY)  My question is very narrow, and

18 | I'll rephrase it.  In order to say whether or not Jeremy

19 | Story had a consistent theme, you have to evaluate it in

20 | the totality of what he was going to say?

21 |              MS. LONG:  Objection, foundation.

22 |     A.  I -- I think it -- I don't know if we would've

23 | been able -- He would've had to tie it back to COVID at

24 | that point.  But in President Weir's opinion, that was

25 | not being done.  That was -- He was diverting from that.

**LAUREN MARIE GRIFFITH**

1      Q.  (BY MR. CASEY)  Okay.  So, yeah, you're -- I

2  think you're exactly correct.  And I think -- I think

3  it's a challenge, because if you don't give him the

4  chance to tie it back, like Ms. Lee was given, then you

5  don't know how it's tying back.  He seemed to be tieing

6  it back on the issue of hypocrisy about safety, but he

7  was cut off mid-sentence before he could tie it back.

8  Is that fair?

9              MS. LONG:  Objection, foundation.

10  Objection, mischaracterizes the evidence.  And I'm going

11  to object to the attorney testifying.

12              MR. CASEY:  I mean, this is

13  cross-examination.  I'm allowed to give hypotheticals.

14  I'm allowed to ask leading sentences.

15              MS. LONG:  You're not asking hypothetical

16  questions.  You're not asking leading sentences.  You're

17  giving your interpretation of a video that we just

18  watched, trying to compare it to other stuff in the

19  past.  You're testifying and being argumentative and not

20  asking questions that actually elicit an answer.

21              MR. CASEY:  That's a cross.  That's

22  cross-examination.  I'm asking her -- I'm comparing two

23  situations.

24      Q.  (BY MR. CASEY)  Ms. Griffith, we've got two

25  situations.  Ms. Lee is talking about -- she says, "mask

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**LAUREN MARIE GRIFFITH**

1   mandate," and then she starts talking about Senator

2   Cruz.  And yet we have the privilege afforded to us of

3   hearing her whole statement, and then you have that

4   privilege of saying, "Yes, she had a consistent theme

5   throughout."  Isn't that fundamentally different than

6   the moment Mr. Story says, "We've got a mask mandate."

7   We're talking about health and safety.  And, "Oh, by the

8   way, the superintendent has a Protective Order."  He's

9   cut off mid-sentence.  You don't get the whole thing.

10  Isn't it true that you can't find a consistent theme,

11  unless you listen to his whole statement?

12          MS. LONG:  Objection, foundation.

13      A.  I believe the presiding officer determined

14  herself that what he was speaking on in reference to the

15  superintendent's Protective Order was not related to the

16  COVID-19 protocols.

17          MR. CASEY:  Objection, nonresponsive.

18      Q.  (BY MR. CASEY)  That's not my question.

19          In order to determine whether a statement

20  is consistent, in order to determine whether that

21  two-minute piece of speech is -- has a consistent theme,

22  you have to hear the whole thing, "yes" or "no"?

23          MS. LONG:  Objection, foundation.

24      Q.  (BY MR. CASEY)  You can answer.

25      A.  In my opinion, I think the rules have to be

**LAUREN MARIE GRIFFITH**

1  followed for you to continue your two minutes.

2      Q.  This is going to extend this out, Ms. Griffith,

3  a while, because I'm asking you a "yes" or "no"

4  question.  There's only two responses to that, "yes" or

5  "no."  And so, I think we're getting to the heart of the

6  matter.  It seems that you're evading saying "yes" or

7  "no," and I just want to very narrow the question.  In

8  order to evaluate Mr. Story's statement, you would have

9  to hear the whole thing, "yes" or "no"?

10             MS. LONG:  Objection, asked and answered.

11      Q.  (BY MR. CASEY)  I disagree, but, Ms. Griffith,

12  go ahead and answer the question, please.

13      A.  I guess if you -- if you wanted to see if he

14  was going to somehow tie that back to COVID-19, you

15  would have to hear the remaining minutes of the -- of

16  the thing, but...

17      Q.  Thank you.  That's -- That's -- That's all I'm

18  seeking.  Thank you for answering that.  All right.

19  Let's continue, going on.

20             (Video played.)

21             Okay.  So I'm going to fast forward between

22  these speakers.

23             (Video played.)

24             I'm forwarding these to get to Don

25  Zimmerman.  There's Mr. Zimmerman.  All right.  Let's

**LAUREN MARIE GRIFFITH**

1  back up this up for a moment.

2          All right.  Let's go ahead and start --

3  I'll turn the volume up.  Let's hear Mr. Zimmerman's

4  comments.  And it looks like that's at 1:26:24.

5          (Video played.)

6          Okay.  It looks like I'm going to have to

7  restart the video, but that's at 1:36:34.  Pardon me for

8  a moment.

9          All right.  I'm going to go ahead and share

10 that again.  I've got to queue it up.  All right.  Let's

11 go.

12         (Video played.)

13         Let's pause right there.  Does that sound

14 like it's on point, Ms. Griffith?

15     A.  In my opinion, yes.  He's referring to mask

16 mandate and COVID protocols.

17     Q.  Okay.  So let's continue.  Oh, my gosh.

18         (Video played.)

19         All right.  In the context of that

20 discussion, was Mr. Zimmerman on topic?

21     A.  In my opinion, yes, he was.

22     Q.  Okay.  And you hear -- had to hear his entire

23 comments to make sense of that, correct?

24     A.  Correct.  It was a common theme throughout.

25     Q.  Okay.  All right.  All right.  Let's talk about

**LAUREN MARIE GRIFFITH**

1  Mr. Story and his -- your awareness of who he was in

2  public.  Have you ever talked about -- let's stop the

3  share -- talked about Mr. Story in a -- in a public

4  forum, like on the news or chat rooms or anything like

5  that?

6      A.  No.

7      Q.  Have you ever labeled him publically as a

8  troublemaker or an agitator?

9      A.  No.

10     Q.  Have you ever described his views publically as

11  hateful?

12     A.  No.

13     Q.  Okay.  Do you know -- Do you know what his

14  world view -- world views are?  Do you have any

15  disagreements you think with -- with how he presents

16  himself?

17     A.  Not to my knowledge, no.

18     Q.  Do you have any problem with him being a

19  pastor?

20     A.  No.

21     Q.  Okay.  Are you aware of any instances where

22  Mr. Story was identified as a person of interest prior

23  to August 16th?

24     A.  A person of trust in what capacity?

25     Q.  The school district, just a person to be -- be

**LAUREN MARIE GRIFFITH**

1  aware of.

2      A.  Only to the incident at the -- in July.  That

3  was the only incident I was aware of, regarding him and

4  the School District.

5      Q.  Okay.  So after the August 16th incident, were

6  you aware of Mr. Story speaking out about the

7  superintendent in a public manner?

8      A.  Yes.

9      Q.  Okay.  How?  How did you become aware of him

10  after -- excuse me.  And I did say August 16th.  I'm

11  sorry.  July.  After he was there in July, were you

12  aware of him speaking out about the superintendent in a

13  public manner before August?

14      A.  Only on the video that I saw he recorded while

15  he was in the administration building.

16      Q.  Okay.  And when did you see that video?

17      A.  It was shortly after making contact with him in

18  July.

19      Q.  Okay.  So -- So as I'm playing back your prior

20  testimony in my head, and I may -- I don't want to

21  mischaracterize it.  After you encountered him at the

22  admin building, you came across the video of him being

23  there.  Was that on social media?

24      A.  Correct.

25      Q.  Okay.  And what did -- what did you think about

LAUREN MARIE GRIFFITH

1  that video when you saw it?

2      A.  I -- That was the -- I was more confused when I

3  saw it, because I had no idea about anything regarding

4  Protective Orders, anything like that.

5      Q.  Okay.  And by the way, I want to correct

6  something I said that was incorrect.  The Protective

7  Order is permanent right now, but back then it was

8  actually -- they extended it.  It was ex parte at the

9  time.  So I don't want the record to reflect that I said

10  that incorrectly.  It was ex parte at the time.

11          When did you become aware of the Protective

12  Order, ex parte or permanent?

13      A.  I believe during that video when he was asking

14  the receptionist if they had been served or if someone

15  had served the superintendent.

16      Q.  Okay.  All right.  And then, is it normal for

17  the superintendent -- or is that common, as you've seen,

18  and maybe it is because a superintendent is like the

19  primary person of the school district.  Have you seen

20  the superintendent get served with any other lawsuits?

21      A.  Just this one is -- to my knowledge.

22      Q.  Okay.  And you're aware, and we may have

23  covered this already.  I apologize before I forget.

24  You're aware he was being served that day, and that's

25  what Mr. Story was there filming?

LAUREN MARIE GRIFFITH

1      A.  I was only aware because of Mr. Story's video
2  that I watched after the fact.
3      Q.  Okay.  And so, you're not aware of whether the
4  process servers had entered into the admin building to
5  serve the superintendent?
6      A.  I had no idea.
7      Q.  Okay.  Okay.  Did you ever -- Did you ever talk
8  purely about -- on a -- on the Round Rock ISD website
9  about how you've been treated by conservatives or
10  Christians?
11      A.  No, I have not talked about how I was treated
12  poorly.
13      Q.  Have you talked on Facebook or any posts?  Have
14  you made any videos or any posts, or excuse me, any
15  articles where you're quoted or you posted about how bad
16  you've been treated by Christians or conservatives?
17      A.  No.  My -- The article you're referencing was
18  not speaking about how I was treated bad, about -- from
19  a Christian or a conservative.
20      Q.  Okay.  So you've not -- You didn't say in any
21  article -- in that article that you're referencing that
22  you realize not all Christians are that way?  You don't
23  recall stating that?
24      A.  It's my recollection for that article, that I
25  was referencing a former supervisor that I had that said

LAUREN MARIE GRIFFITH

1  prior to meeting me, it was his belief that all gay

2  people would go to hell, and that after meeting me, that

3  changed his mind.

4      Q.  Okay.  What was the -- What was the -- the

5  cause of that article?  Did you just happen to be

6  interviewed by someone because of this lawsuit?  Or what

7  was the -- what was the -- the motivating factor for the

8  article?

9      A.  No, I was asked to write that article prior to,

10  I believe, any -- I mean, it was -- would've been in

11  Pride month.  And I was asked to help Dr. Street and

12  Dr. Grosso with that Pride article.

13      Q.  Okay.  And what was the year of the article?

14      A.  I do not recall at this time.  I'd have to look

15  it up.

16      Q.  Was it before or after this incident?

17      A.  I do not recall.

18      Q.  Okay.  And do you -- did Mr. Story, being a

19  professed pastor and Christian, did that affect in any

20  way how -- how you treated him or did your job?

21      A.  Absolutely not.

22      Q.  Okay.  Were you speaking -- When you did that

23  article, were you speaking in your individual capacity?

24      A.  I was speaking, yes, for myself.  Not for the

25  District.

**LAUREN MARIE GRIFFITH**

1    Q.  Okay.  Okay.  That article date was June 18th
2  of 2021.  So that would've been -- that would've been
3  before this.

4             Okay.  After the arrest -- Let's talk about
5  Mr. Story's arrest.  After his arrest, did you have any
6  interaction with him or his attorney before the lawsuit
7  was filed?

8    A.  No.

9    Q.  Did you --

10    A.  Oh, no, I did not.  No.

11    Q.  Did you not encounter Mr. Story ever again on
12  Round Rock ISD campus?

13    A.  If I did, it would've been if I was working a
14  Board meeting, and he was an attendee.  That would've
15  been the only time I could think of.

16    Q.  Did you file any internal reports or
17  supplements to your arrest affidavit?

18    A.  After my affidavit.

19    Q.  After your affidavit -- After your affidavit,
20  did you file any other documents in that case?

21    A.  Yes.

22    Q.  What else --

23             THE WITNESS:  Sorry.  Let me -- Let me shut
24  the door real quick.  My dogs are going crazy.  Okay.  I
25  apologize.

**LAUREN MARIE GRIFFITH**

1              MS. LONG:  I think your dogs have been very

2    well behaved.

3              MR. CASEY:  Outstanding.

4              THE WITNESS:  That time is over.

5              MR. CASEY:  Right.  Not knowing they're

6    there is probably the -- like the best statement of how

7    well they were behaved.

8         Q.  (BY MR. CASEY)  Okay.  So what -- what

9    supplements are you aware of that you filed in this

10   case?

11        A.  There were some supplements regarding videos

12   that were located and posted on social media, interviews

13   that were done.  And then supplements regarding

14   obtaining the sign-up sheet for the Board meeting.

15   as well as going through each meeting.  I did a

16   supplement -- I went through each meeting and documented

17   the times where Mr. Story was allowed his full-time

18   allotment.

19        Q.  Did you do that at the req- -- on your own

20   initiative, or was that requested by someone else?

21        A.  It was a little bit of both.  So it was -- I

22   took it upon myself for some of those, and then Chief

23   Yarbrough was also helping me in the investigation.

24        Q.  Okay.  So -- So some of those requests would've

25   come from Chief Yarbrough then?

LAUREN MARIE GRIFFITH

1    A.  Yes.  Yes.

2    Q.  Chief Williby, any requests come from him?

3    A.  No.  I only worked with Chief Yarbrough --

4    Q.  Okay.

5    A.  -- on this particular case.

6    Q.  Okay.  Going back to the video with Mr. Story.

7  Was that video forwarded to you?  How did you encounter

8  the video that Mr. Story filmed at the admin building?

9    A.  Oh, the one that he filmed?  I -- Once I

10 learned his name from Chief Yarbrough, I did a Google

11 search, essentially that was on my own, and found the

12 video on social media.

13   Q.  Okay.  And so, that would've been, I'm

14 guessing, on his Facebook page or his -- his social

15 media blog?

16   A.  It was, I believe, one of his Facebook page --

17 pages.  I think he has multiple.

18   Q.  Okay.  While you were on there, did you look at

19 any other item on his social media page?

20   A.  The only other thing I looked at, I think

21 maybe, was the cover photo, and I noticed he had, you

22 know, multiple children, and that was the only other

23 thing I looked at.

24   Q.  So you didn't scan it for any other articles or

25 anything he had ever written about other topics?

LAUREN MARIE GRIFFITH

1        A.  Not at that time, after the July administration

2    encounter.

3        Q.  So when you say, "not at that time," am I

4    understanding that later on you did look at the rest of

5    his social media?

6        A.  Yes, after the arrest there were other times

7    where I was looking at social media and located, like I

8    said, the interview that I believe he did.  I don't know

9    if that was on his page, or I think it was on someone

10   else's page.

11       Q.  What interview?  What other interview are you

12   talking about?

13       A.  I believe it was called Front Porch Live.  I

14   believe he did an interview on there.

15       Q.  What was the topic he discussed?

16       A.  I believe he -- the main topic was his arrest.

17       Q.  Okay.  What do you recall, if anything, from

18   that discussion that he had, that post he had?

19       A.  I have not reviewed that video in a while.  I

20   mean, the gist of it is that he obviously was -- was not

21   happy with the arrest, and wanted to -- I don't know.  I

22   don't even -- I even -- can't even say that he wanted to

23   discuss a lawsuit, because I don't even remember that.

24   I just remember the theme was he wasn't happy with his

25   arrest.

LAUREN MARIE GRIFFITH

1    Q.  All right.  I'm going to shift topics now.

2    Regarding -- I asked this in a more general sense

3    earlier, so I don't want to double up on that.  But

4    specifically with respect to the Freedom of Speech, what

5    training do you recall that you've received, and in

6    particular, I'd like you to identify the courses that

7    you've taken?

8    A.  I know we cover the Constitutional Rights in

9    the academy, but after that I would not -- I would not

10   be able to recall specific training.

11   Q.  Okay.  What is your understanding of the --

12   your role as a law enforcement officer for enforcing the

13   boundaries of Freedom of Speech as it pertains to a

14   School Board meeting?

15   A.  So, it's my understanding that, you know, each

16   individual has the right to their Freedom of Speech.

17   However, while you're at an official meeting, and an

18   example at a School Board meeting, there are rules

19   to be followed to continue that Freedom of Speech.  And

20   once those rules have been broken, then the Freedom of

21   Speech -- your Freedom of Speech changes.

22   Q.  Okay.  Do you think in the realm of

23   possibility, I'm not asking you to talk about, you know,

24   legal knowledge, but in your roles of enforcing the law,

25   as you just referenced, do you think it's possible

LAUREN MARIE GRIFFITH

```
 1  for government officials to infringe upon someone's
 2  Freedom of Speech?  Not whether it happened here, but
 3  does that happen from time to time?
 4       A.  I'm sure it has happened before, yes.
 5       Q.  All right.  Are you aware that -- that in the
 6  context of Freedom of Speech, that government officials
 7  have to be neutral with respect to someone else's point
 8  of view?  Like, you can't have -- you can't let, you
 9  know, 15 people speak about their point of view, and
10  then say, "no," to the 16th person.  Are you aware of
11  that?  Do you get -- Do you cover that in your training?
12       A.  Yes, I'm aware of that.
13       Q.  Okay.  If -- Let's see.
14            MS. LONG:  I am so sorry to have to do
15  this, but I really don't think it's permissible to have
16  other people attending these depositions in a car, and I
17  just noticed that.
18            MR. CASEY:  Okay.  Yeah.  Yeah, I think
19  that's a -- that's a fair thing.  Jeremy, we -- we --
20            MS. LONG:  Do you have headphones, Jeremy?
21  I have no problem with you doing this with headphones.
22  It's just not permissible otherwise.
23            MR. STORY:  Those are my children.
24            MR. CASEY:  Well, yeah, that's -- that's --
25  that's going to be --
```

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

LAUREN MARIE GRIFFITH

```
 1              Can we go off the record and I can -- Oh,
 2   you got headphones, Jeremy?
 3              MR. STORY:  I do have headphones, but those
 4   are my children.
 5              MR. CASEY:  I understand.  They -- They've
 6   got to be outside of this.
 7              MR. STORY:  Sure.  I will put on
 8   headphones.
 9              MR. CASEY:  Okay.  Thank you.
10              MR. STORY:  It's going to take me a moment
11   to get these on.
12              MR. CASEY:  Okay.  Just give us a thumbs up
13   whenever it's isolated to your headphones.
14              MS. LONG:  Can we go off the record,
15   please?
16              MR. CASEY:  Yeah.
17              THE REPORTER:  Off the record, 1:25.
18              (Recess for 16 minutes.)
19              THE REPORTER:  Back on the record, 1:41.
20     Q.  (BY MR. CASEY)  All right.  I've got to
21   reorient my mind.  So we were talking about, I think
22   before we left of constitutional protections.  All
23   right.  Does -- Does the constitution protect the right
24   to criticize the government?
25     A.  I know the First Amendment, you have the right
```

**LAUREN MARIE GRIFFITH**

1  to petition the government.

2      Q.  Okay.  That's not my question.  Does the First

3  Amendment protect the right to criticize the government?

4      A.  I would assume that falls under free speech.

5      Q.  Okay.  So I -- I'm taking that's a "yes."  All

6  right.  In criticizing the government, it's understood,

7  "yes" or "no," that the government officials are

8  probably not going to like what you're saying, "yes" or

9  "no"?

10     A.  Yes.

11     Q.  Okay.  Is it -- Is it -- Is it possible that by

12 removing a speaker and cutting off what they're saying,

13 in this situation, I'm not talking about speculating,

14 about all the other possible situations, but in this

15 situation, by cutting off a speaker and not hearing

16 everything they're going to say, does that implicate or

17 could that affect their First Amendment rights?

18         MS. LONG:  Objection, calls for a legal

19 conclusion.

20     Q.  (BY MR. CASEY)  From your perspective as a law

21 enforcement officer -- I'm going to try and clean that

22 question up.

23         From your perspective as a law enforcement

24 officer, if you stop someone from speaking, could you be

25 infringing on their First Amendment rights?

LAUREN MARIE GRIFFITH

```
 1        A.  You could be, yes.

 2        Q.  All right.  Yeah.  And I apologize if -- Most

 3   of the time I'm going to be seeking "yes" or "no"

 4   questions.  If I ask a longer one or if I poorly word my

 5   question that may seem otherwise, but that's generally

 6   what I'm going for.

 7                  Okay.  All right.  What is your

 8   understanding when you go to -- as a law enforcement

 9   officer, when you go to arrest someone, for what you

10   need to have probable cause?

11        A.  I need to have probable cause that they've

12   violated a criminal offense.

13        Q.  Okay.  What does -- What does that -- You kind

14   of defined -- defined it when you answered.  So without

15   saying, this is kind of circular, "I need to have

16   probable cause," what does probable cause mean to you,

17   as a law enforcement officer?

18        A.  It means you have -- You know a reasonable

19   officer would believe that the elements of a particular

20   crime have been met and are present.

21        Q.  Okay.  All right.  All right.  So with respect

22   to your affi- -- the affidavit, how accurate do your

23   statements have to be in the affidavit to warrant -- to

24   support the -- the arrest?  I mean, do they have to be

25   pretty close?  Or do they got to be exacting?
```

**LAUREN MARIE GRIFFITH**

1          MS. LONG:  Objection to the extent it calls

2    for a legal conclusion.

3          Q.  (BY MR. CASEY)  Okay.  As a law enforcement

4    officer, in your training and your experience, do your

5    statements in the affidavit have to be exacting, or

6    pretty close?

7          A.  In my opinion they need to be pretty close.

8          Q.  All right.  All right.  If you've put facts in

9    your affidavit that you've not verified, could that

10   infringe in somebody's Freedom of Speech?  Sorry.

11   Apologize.  Could that offend someone's Fourth Amendment

12   Rights under the constitution?

13          MS. LONG:  Objection to the extent it calls

14   for a legal conclusion.

15          MR. CASEY:  Yeah.  And I'll rephrase that.

16   Thank you.  Thank you, Katie.

17          Q.  (BY MR. CASEY)  In your experience as a law

18   enforcement officer, did you receive training for --

19   about the Fourth Amendment?

20          A.  Yes.  Like I said, in the police academy we go

21   over all of them.

22          Q.  Okay.  What is the Fourth Amendment?

23          A.  I don't know it off the top of my head.  I'd

24   have to -- to look it up.

25          Q.  Okay.  I submit to you that the Fourth

LAUREN MARIE GRIFFITH

1  Amendment is a protection from unlawful search and

2  seizure.  Do you recall it now?

3      A.  Yes, that's familiar.  I'm familiar with that.

4      Q.  Okay.  That -- And that's probably the front

5  edge of your job you do every day by interacting with

6  the public and making sure that if you have to interact

7  with them, that any interaction that you do when you

8  arrest them is lawful, right?

9      A.  Correct.

10     Q.  Okay.  When is the last time you received

11 training on the Fourth Amendment?  You mentioned the

12 academy.  Have you had training since then?

13     A.  I would have to refer to my records.  I want to

14 say we have policies as well that cover Fourth Amendment

15 Rights of search and seizure.  Our police department

16 policies.

17     Q.  Okay.  Are there School Board policies that

18 cover those?

19     A.  I'd have to look it up.

20     Q.  Okay.  When is the last time you had training

21 on the Round Rock ISD School Board policies?

22         MS. LONG:  Objection, vague.

23     Q.  (BY MR. CASEY)  Let me -- Let me rephrase this

24 and go at it a different way.

25         Do you receive training, as a Round Rock

LAUREN MARIE GRIFFITH

1   ISD police officer, on Round Rock ISD School Board

2   policies?

3       A.  Not that I can recall, as far as specific

4   official training.

5       Q.  Are you expected to familiarize yourself with

6   Round Rock ISD School Board policies?

7       A.  Yes.

8       Q.  Okay.  How do you accomplish that?  As a -- As

9   a law enforcement officer in Round Rock ISD, what is

10  your -- Since it's not official, as I just understood

11  you to say, how do you familiarize yourself,

12  Ms. Griffith, with the Round Rock ISD School Board

13  policies?

14      A.  I believe they're located on-line.

15      Q.  Okay.  I understand they're located on-line,

16  but that's not my question.  My question is how do you,

17  having not received any formal training through Round

18  Rock ISD Police Department, how do you make sure you're

19  familiar with them?  How would -- Like what is your

20  process?

21      A.  I would review them.

22      Q.  Okay.  How did you?  So I asked -- I asked, how

23  would you, but now I'm asking, how did you familiarize

24  yourself with them?

25      A.  I reviewed them on my computer.

LAUREN MARIE GRIFFITH

1    Q.  Okay.  On what occasions did you review them on
2  your computer?
3    A.  I can't recall at this time.  It was, again,
4  more than one, less than five.
5    Q.  Okay.  So let's quantify that, drill down on
6  that a little bit more.  And I'll give you an example
7  and so that you can compare yourself against an example.
8  Here's my example, from my life, and then I'll ask --
9  ask you to bring it over to yours.
10           Just bought a new house in May, and so I
11  got this big packet from the guy that sold it to me, and
12  it's got like the policy -- it's got the Owner's Manuals
13  for all the different appliances in the house.  And
14  being the former nuclear engineering enlisted guy that I
15  am in the Navy, I reviewed all of those manuals to
16  familiarize myself.
17           When was the first time you remember
18  reviewing the school -- the Round Rock ISD School Board
19  policies as it pertains to the First and Fourth
20  Amendment?
21    A.  It would've been sometime, probably, in the
22  hiring orientation, is when I was first exposed to the
23  District's policies.
24    Q.  Okay.  So that's once in 2018.  You said, "More
25  one, less than five."  The incident we talked about was

**LAUREN MARIE GRIFFITH**

1  in 2021.

2            MS. LONG:  Objection, mischaracterizes the

3  evidence.

4      Q.  (BY MR. CASEY)  Okay.  Let's -- Let's review

5  this.

6            MS. LONG:  She started her employment in

7  2020, not 2018.

8            MR. CASEY:  Oh, I'm sorry.  I thought in

9  2018 is when you went to Round Rock ISD.

10           MS. LONG:  That's when she went to Wilco.

11           MR. CASEY:  Wilco.  I apologize.  Thank you

12  for catching that.

13     Q.  (BY MR. CASEY)  So in 2021 you reviewed them.

14  During 2020 you reviewed them during the hiring process,

15  I'm sorry.  I've got to get that date right.  In -- I'm

16  sorry.  2021.  Okay.  Looking at the notes.  I

17  apologize.

18           In 2021 you reviewed them when you were

19  hired.  Remind me, what -- what was the day of your hire

20  in 2021?

21     A.  That was -- It was 2020, actually.

22     Q.  Yeah.  Okay.

23     A.  It was September 21st, 2020.

24     Q.  Okay.  All right.  That's the equinox.  All

25  right.

LAUREN MARIE GRIFFITH

1          MS. LONG:  It's my birthday.  That's how I

2     remember her hire date.

3          MR. CASEY:  That's good.  That's good.

4     Q.  (BY MR. CASEY)  So -- So about a year, roughly,

5     before all this stuff went down, you reviewed them.

6     Between that date of September 21st, 2020, and the

7     August 16th Board meeting, had you reviewed them again a

8     second time?

9     A.  Not to my recollection.

10    Q.  Okay.  And do you have a scheduled frequency

11    that you review them on your own?  Like, I've got a

12    reminder on my phone every three months to check out the

13    Board policies?

14    A.  No, I would say when I encounter something,

15    whether it be an employee issue or something like that,

16    that's when I'll refer back to our police policies and

17    the District's policies.

18    Q.  That's fair.  That makes sense.  Did you review

19    them between August 16th and September 17th of 2021?

20    A.  Yes.

21    Q.  Okay.  During that time, when?  Was it right

22    after August 16th?  Or was it during that 16th, 17th,

23    when you were writing the arrest affidavit?

24    A.  It would've been between September 16th and

25    17th.

LAUREN MARIE GRIFFITH

1    Q.  Okay.  And that is not indicated on your arrest
2  affidavit, correct?

3    A.  Correct.

4    Q.  Okay.  And then when we talked about earlier,
5  when you said you reviewed the Incident Reports, the
6  Penal Code, had your draft reviewed by Yarbrough, and
7  then took it to the magistrate, you did not bring that
8  up either, right?

9    A.  Correct.

10    Q.  All right.  How -- What policies -- When you
11  reviewed it on September 16th, 17th time frame, do you
12  recall which policies you looked at in particular?

13    A.  It would've been the Board policies in
14  reference to, you know, the public comment and what the
15  public comment can be, what they can speak about, as
16  well as what happens when there's a disruption.

17    Q.  Okay.  Okay.  I'm going to show you what was
18  submitted as the appendix to the Third Amended
19  Complaint.  By the way, when you reviewed the lawsuit
20  that we talked about earlier, you know, it's filed with
21  this document called an appendix.  Did you review the
22  appendix also, in addition to reviewing the lawsuit?

23    A.  I do not recall.  I kind of entrusted our
24  attorneys at that point.

25    Q.  Okay.  All right.  I'm going to, let's see,

**LAUREN MARIE GRIFFITH**

 1  share what was part of the appendix to this Third

 2  Amended Complaint.  I'm going to expand it to zoom in a

 3  little bit.  Let me see if I can zoom in.  Sorry.  I

 4  need to stop that sharing.  I just need to get in Adobe.

 5  I apologize.  Let's pass this -- pass that up.

 6              Katie, I think I'm getting close to being

 7  wrapped up with all my questions.  If we could go off

 8  the record so I can speak with my co-counsel for about

 9  five minutes.

10              MS. LONG:  Okay.  Can we give you ten

11  minutes?

12              MR. CASEY:  Ten is great.  Thank you for

13  your graciousness.

14              THE REPORTER:  Off the record, 1:57.

15              (Recess for 8 minutes.)

16              THE REPORTER:  Back on the record at 2:05.

17     Q.  (BY MR. CASEY)  We're almost wrapped up,

18  Detective Sergeant Griffith, if I said that right.

19              And so on the arrest affidavit, when you're

20  signing your name to the bottom of that, your

21  understanding is that you are making the determination

22  once the judge signs off.  You're presenting the

23  evidence that you've made an independent judgment call

24  that these things amount to probable cause, and so

25  you're asking the -- asking the magistrate to sign off

LAUREN MARIE GRIFFITH

1  on your independent determination.  Is that an accurate

2  statement?

3       A.  Yes.

4       Q.  Okay.  And so, to make sure that there's

5  nothing -- make sure that's clean, make sure there's

6  nothing added to that, what you're not saying is that

7  Pope has made that judgment, and you're just -- I don't

8  mean this in a diminishing way, you're repeating -- I

9  was going to say the word "parroting."  But you're

10 repeating what Pope has said.  Like, for example, Pope

11 comes to you and says, "Hey, I got all these facts.  I

12 think there's probable cause.  I need you to take my

13 facts down, get the affidavit and go get the magistrate

14 to sign it because I've made a judgment that there's

15 probable cause."  That's not what you're saying,

16 correct?

17      A.  Correct.

18      Q.  Okay.  And same thing for Chief Yarbrough, who

19 I guess did suggestions and edits for you, or suggested

20 some edits for you.  What you're not saying is to --

21 that Chief Yarbrough had made the decision there was

22 probable cause, and then pushed you forward into getting

23 it done?

24      A.  Correct.

25      Q.  And as the same thing -- I don't think I've

**LAUREN MARIE GRIFFITH**

1  asked this before, but I want to make sure I understand

2  the scope.  You're not even saying that about the

3  superintendent, that the superintendent had any

4  influence in any of the facts, edits, or the shape of

5  the affidavit in any way?

6      A.  Correct.

7      Q.  Okay.  Did you ever talk with the

8  superintendent about your affidavit?

9      A.  I did not.

10      Q.  Did you ever meet with him about your

11  affidavit?

12      A.  I did not.

13      Q.  Okay.  All right.  Did you ever -- ever talk

14  with the president of the Board, Amy Weir, about your

15  affidavit?

16      A.  I did not.

17      Q.  Okay.  All right.  Did you ever talk -- After

18  the arrest in the course of this, did you ever talk with

19  the superintendent about the -- about the situation?

20      A.  The only thing I would ask him would be in

21  passing, if he had any update on this civil lawsuit.

22      Q.  Okay.  Did you -- Did you ever discuss Jeremy

23  Story with the superintendant?

24      A.  No.  I would only ask for updates on this

25  lawsuit.

LAUREN MARIE GRIFFITH

1    Q.  How about -- How about the Board president,

2    whether it was Amy Weir or -- I apologize, I forget her

3    name.  Feller Landrum.

4    A.  No, I never spoke with him about it.

5    Q.  Okay.  After the -- After the affidavit was

6    done post arrest, did you ever speak with Chief

7    Yarbrough about it?

8    A.  Yes.

9    Q.  Okay.  What was that conversation like?

10   A.  After the arrest we, you know, spoke about my

11   supplements that I had written.

12   Q.  Okay.

13   A.  And then once the lawsuit was filed, I think,

14   you know, again, I asked him updates on that.

15   Q.  What in particular did you -- Let me back up

16   for a second.  How many times did you speak with the

17   chief about it on a, kind of like what we did earlier,

18   more than one, less than five type of frequency?

19   A.  I'd say closer to, like, between five and ten.

20   I'd say closer to that in all in reference to the

21   investigation in general.

22   Q.  Okay.  Did Chief Yarbrough ever -- What did

23   Chief Yarbrough ever say about Jeremy Story individually

24   to you?

25   A.  Nothing about him individually.

LAUREN MARIE GRIFFITH

1    Q.  Did he ever say he disagreed with his politics?

2    A.  No.

3    Q.  Did he ever say he disagreed with his

4  personality?

5    A.  No.

6    Q.  Okay.  What did he say?

7    A.  We only discussed the case and, you know, the

8  inter- -- the video of the Front Porch.  But we only

9  discussed, you know, its content.  We didn't really

10  discuss our personal opinions on any -- anything.

11    Q.  Okay.  So you talked about the Front Porch

12  video.  And when -- So when you conveyed to him the idea

13  of the Front Porch video, was there -- Just an

14  interesting question.  Why did that come up?

15    A.  I believe he told me about it.

16    Q.  And so, when he told you about it, you out of

17  curiosity searched it out?

18    A.  Yes.

19    Q.  Okay.  What did he convey about it?  That it

20  existed?  I mean, did y'all talk about its content?

21    A.  He conveyed that it existed and it could

22  potentially be evidence in our investigation due to the

23  fact that Mr. Story was discussing his arrest.

24    Q.  Okay.  That makes sense.  All right.  Last -- I

25  think the last piece.  So that was, like, the two

LAUREN MARIE GRIFFITH

1    topics, and let's go to the last one.

2              So after the arrest happened, Chief

3    Yarbrough retired shortly after that, correct?

4         A.  I don't know when his final day was.

5         Q.  All right.  Who was the next chief after that?

6         A.  I was the interim chief after that.

7         Q.  Okay.  Is that -- How many tiers of promotion

8    does that entail, to go to be the interim chief from

9    being a sergeant?  Is that one step?

10        A.  At our agency at the time, it's two steps.  You

11   have sergeant, assistant chief, chief.  And we still

12   do -- That's the same to this day.

13        Q.  And from my understanding, because I don't have

14   the -- the breadth of law enforcement experience you do,

15   is that pretty standard in other -- in other -- like

16   Fort Bend when you worked there, is it -- is it

17   sergeants, and then you have the assistant chief over

18   them, and then the chief?

19        A.  It's depends on the size of the agency.  At

20   Fort Bend there's quite a few more people.  So you're

21   going to have sergeants, lieutenants, captains, major,

22   slash, commander, and then assistant chief.  So there's

23   quite a few more steps with larger agencies.

24        Q.  Okay.  But by the way of comparison, when I was

25   in the military, I was termed like a hot runner.  So I

**LAUREN MARIE GRIFFITH**

1  got -- got promoted really quick.  This would've been

2  ten years -- ten or eleven years for you on the force,

3  right?

4      A.  Correct.

5      Q.  Would that have been like what I would term

6  like a hot runner promotion?  Like -- They're like,

7  "She's at the top of her game.  We're going to make her

8  the interim chief."

9      A.  I think at that time, our assistant chief was

10  also retiring, and so they decided I was the best

11  candidate, as far as out of the remaining ser- -- I

12  think at the time we only had three other sergeants, and

13  myself.

14      Q.  Okay.  And that -- the assistant chief, that

15  would've been Williby, or was he before?  Was there

16  another assistant chief?

17      A.  It was Williby, yes, sir.

18      Q.  Okay.  And then, so you were interim chief, and

19  did you roll straight into being the permanent chief

20  after that?

21      A.  No, sir.  They hired an individual named Dennis

22  Weiner.

23      Q.  Okay.  So when Dennis Weiner came in, you --

24  you went back to being sergeant at that point?

25      A.  Correct.

LAUREN MARIE GRIFFITH

1     Q.  Okay.  And did you interact with Dennis Weiner
2  about the case at all?
3     A.  No.
4     Q.  Okay.  No questions about updates or talk with
5  him about Mr. Story in any way?
6     A.  No.
7     Q.  Okay.  And then, who was assistant chief when
8  Dennis Weiner was made chief?
9     A.  That was Rose White.
10    Q.  Rose White.  Talk with Rose White about it at
11 all?
12    A.  No.
13    Q.  Okay.  All right.  And then, where did Rose
14 White go?
15    A.  I believe she left and went back to Florida, as
16 a -- from what I hear, a consultant.
17    Q.  Okay.  And then Rose White left.  Who replaced
18 her as assistant?
19    A.  Letricia Grandy.
20    Q.  Okay.  And is she still there?
21    A.  She is.
22    Q.  Okay.  And then Dennis Weiner, what happened to
23 him?
24    A.  He also left.
25    Q.  He also left.  Okay.  And who replaced Dennis

LAUREN MARIE GRIFFITH

1  Weiner?

2       A.   Chief Ryan Urritia.

3       Q.   U-r-r- -- I'm guessing that's U-r-r-i-t-i-a?

4       A.   Correct.  Yes, sir.

5       Q.   All right.  That's a cool name.  I have a

6  friend with that last name.

7              All right.  So -- And after Urritia, who

8  was next as chief?

9       A.   He's the -- He's the current chief.

10      Q.   Current chief.  Okay.  And -- Urritia.  Where

11 did Weiner go; do you know?

12      A.   It's -- The last I heard, I believe he went

13 back to Florida.

14      Q.   Okay.  When he left the department, was that an

15 amicable departure, from your point of view?

16      A.   No.

17      Q.   Okay.  What is your understanding, based on

18 your experience and observations, about what happened

19 when he left?

20      A.   It's my understanding that the District was not

21 happy with his performance.

22      Q.   Okay.  Did -- Did he ever -- Are you aware

23 whether he ever complained to the -- to the State of

24 Texas, any outside agency, about how -- how things were

25 managed in the department?

LAUREN MARIE GRIFFITH

```
 1        A.  I believe he wrote a letter, I think, to the
 2  Attorney General.  I think he wrote a letter to the
 3  Attorney General.
 4        Q.  Did you ever see that letter?
 5        A.  If I did, I -- I browsed it once.  I haven't --
 6  I've never had possession of that letter to, like, sit
 7  down and read it.
 8        Q.  Totally understand.  I think it's good to stay
 9  out of kind of, like, gossipy stuff that's not...
10            Did -- Do you recall just generally, and
11  answer "yes" or "no," whether that letter accused the
12  superintendent of being too heavily handed and involved
13  in the independent decisions of the police department?
14        A.  I think that was one of his themes of the
15  letter, yes, sir.
16        Q.  Okay.  During the time that this was going on,
17  until today, did you observe in any way at any time the
18  superintendent being involved in the inner workings of
19  the police department?
20        A.  No.
21        Q.  Okay.  How many times did you -- When you were
22  interim chief, how often did you meet with the
23  superintendent?
24        A.  The first time I was interim chief, I don't
25  know that we met very often at all.  The second time I
```

LAUREN MARIE GRIFFITH

 1 | was interim chief, between Weiner and Urritia, I met
 2 | with him probably once every two weeks, I believe.
 3 |     Q.  Okay.  So the first time, you said didn't meet
 4 | with him that often.  The second time, you say once
 5 | every two weeks.  Please define "not that often" to me.
 6 | Or let me back up.  How long was the first interim chief
 7 | period in number of weeks or months?
 8 |     A.  I'd have to go back and look at -- and look at
 9 | that.  I'm not sure.  At best guess, June, July -- like
10 | three months or so, for the first one.
11 |     Q.  Okay.  And over the course of those three
12 | months, more than five?
13 |     A.  Less than five.
14 |     Q.  Okay.  So three months.  So I'm guessing, two
15 | or three times?
16 |     A.  If that.  It wasn't -- You know, I was kind
17 | of -- I think Williby was still there as a consultant at
18 | the time.  So I was kind of just running things and
19 | making sure the department was functioning.  And then I
20 | think Williby was still potentially meeting with the
21 | high-ups of the District at that point.
22 |     Q.  So during those meetings, with -- on the first
23 | gap, was this case ever a topic of conversation between
24 | you and the superintendent?
25 |     A.  No.

LAUREN MARIE GRIFFITH

1    Q.  Okay.  And the question I have, and I'm not

2  trying to go back.  Well, I guess I'm trying to go back

3  underneath that to jog your memory.  This lawsuit was

4  going at the time, right?

5    A.  Correct.

6    Q.  And y'all were both named defendants.  And

7  you're saying that in that meeting where y'all are both

8  named defendants in this lawsuit, that y'all didn't have

9  even the slightest sidebar about it?

10    A.  No.  The only thing I would ask him, and again,

11  if I talked to him, was for updates on what the status

12  was.

13    Q.  Okay.  And I think for clarity purposes, that

14  scope of detail is what I'm looking for, even if you had

15  side conversations, even if you had updates, any of

16  that.

17        So then the second time where you were

18  meeting every other week, what conversations did you

19  have?  And feel free to be detailed.

20    A.  Those we were discussing making changes to

21  where our employees were happier, adding different

22  shifts, our hiring.  And I think there was a bond in the

23  works, so talking about equipment that was needed for

24  the department.  Hiring a new chief.  And then just

25  basically the safety and security of the District.

**LAUREN MARIE GRIFFITH**

1          MR. CASEY:  Okay.  Ms. Chavez, Mr. Story is

2    there.  We're just going to be a few minutes, but he's

3    in the waiting room right now.

4          (Mr. Story rejoins proceedings.)

5          MR. CASEY:  And he's apparently still on

6    his headphones, so we're still good.

7      Q.  (BY MR. CASEY)  All right.  And so during that

8    period of time, y'all have these other discussions,

9    which seems understandable.  And all you're doing is

10   discussing updates and the lawsuit with him?

11     A.  Correct.  If I'm mentioning the lawsuit or

12   anything about, Mr. Story, it was only asking for

13   updates on the lawsuit.

14     Q.  Okay.  Did y'all ever discuss the -- the basis

15   of the lawsuit at any time?

16     A.  No.

17     Q.  Okay.  Like, "Why did he sue me?"  Or "Why did

18   he sue you?"  Any -- Any conversation like that?

19     A.  No, sir.

20     Q.  Okay.

21          MR. CASEY:  Pass the witness.

22          MS. LONG:  We'll reserve for the time of

23   trial.

24          THE REPORTER:  Before we go off the record,

25   Ms. Long, are you going to want to purchase a copy?

**LAUREN MARIE GRIFFITH**

1              MS. LONG:  Yes.

2              THE REPORTER:  Okay.  Send you a copy then.

3  All right.  Off the record at 2:23.

4              (Deposition concluded at 2:23 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LAUREN MARIE GRIFFITH

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                     AUSTIN DIVISION

 3
     JEREMY STORY,                      *
 4                                      *
          Plaintiff,                    *
 5                                      * CIVIL ACTION NO.
     VS.                                * 1:22-CV-448
 6                                      *
     SUPERINTENDENT HAFEDH AZAIEZ,      *
 7   TRUSTEES AMBER FELLER, TIFFANIE    *
     HARRISON, AMY WEIR, JUN XIAO,      *
 8   CORY VESSA; OFFICERS JEFFREY       *
     YARBROUGH, JAMES WILLIBY,          *
 9   LAUREN GRIFFITH, MILTON POPE,      *
     FRANK PONTILLO, RON COLE, CHIEF    *
10   DENNIS WEINER, AND CARLA           *
     AMACHER, Individually, and ROUND   *
11   ROCK INDEP. SCHOOL DISTRICT,       *
                                        *
12        Defendants.                   *

13

14              REPORTER'S CERTIFICATION

15         DEPOSITION OF LAUREN MARIE GRIFFITH

16                  OCTOBER 24, 2025

17                (REPORTED REMOTELY)

18

19

20       I, Rachel D. Chavez, Certified Shorthand Reporter,

21   duly qualified in and for the State of Texas, do hereby

22   certify to the following:

23       That the witness, LAUREN MARIE GRIFFITH, was by me

24   duly sworn to testify the truth, the whole truth and

25   nothing but the truth, and that the transcript of the
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**LAUREN MARIE GRIFFITH**

1  oral deposition is a true record of the testimony given

2  by the witness;

3      I further certify that pursuant to FRCP Rule

4  30(f)(1) that the signature of the deponent:

5      ___ was requested by the deponent or a party before

6  the completion of the deposition and that the signature

7  is to be before any notary public and returned within 30

8  days from date of receipt of the transcript.  If

9  returned, the attached Changes and Signature Page

10  contains any changes and the reasons therefore:

11      X  was not requested by the deponent or a party

12  before the completion of the deposition.

13      I further certify that I am neither counsel for,

14  related to, nor employed by any of the parties or

15  attorneys in the action in which this proceeding was

16  taken, and further that I am not financially or

17  otherwise interested in the outcome of the action.

18      Certified to by me this 10th day of November, 2025.

19

20

21      RACHEL D. CHAVEZ, Texas CSR 2610
        Expiration Date:  4-30-26
22
        STOVALL REPORTING & VIDEO, INC.
23      Firm Registration No. 10259
        1414 Creekview Drive
24      Lewisville, Texas  75067
        Phone:  (214) 695-2024
25