**CHIEF JEFFREY DWAYNE YARBROUGH**

```
1              IN THE UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF TEXAS
2                      AUSTIN DIVISION

3   JEREMY STORY,                    *
         Plaintiff,                  *
4                                    *
    v.                               *   CIVIL ACTION NO.
5                                    *   1:22-cv-448
                                     *
6   SUPERINTENDENT HAFEDH            *
    AZAIEZ, TRUSTEES AMBER           *
7   FELLER, TIFFANIE HARRISON,       *
    AMY WEIR, JUN XIAO, CORY         *
8   VESSA; OFFICERS JEFFREY          *
    YARBROUGH, JAMES WILLIBY,        *
9   DEBORAH GRIFFITH, MILTON         *
    POPE, FRANK PONTILLO, RON        *
10  COLE, CHIEF DENNIS WEINER,       *
    and CARLA AMACHER,               *
11  individually, and ROUND          *
    ROCK INDEP. SCHOOL               *
12  DISTRICT,                        *
         Defendants.                 *

13

14  ------------------------------------------------------

15                     ORAL DEPOSITION OF

16             CHIEF JEFFREY DWAYNE YARBROUGH

                     OCTOBER 29, 2025

17                   (REPORTED REMOTELY)

18  ------------------------------------------------------

19

20       ORAL DEPOSITION of CHIEF JEFFREY DWAYNE YARBROUGH,

21  produced as a witness at the instance of the Plaintiff,

22  and duly sworn, was taken in the above-styled and

23  -numbered cause on the 29th day of October, 2025, from

24  9:03 a.m. to 4:48 p.m., before Kristy Owen, CSR, in and

25  for the State of Texas, reported by machine shorthand
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  with the witness appearing via Zoom from 401 W. Front

2  Street, in the City of Hutto, County of Williamson,

3  Texas, pursuant to the Federal Rules of Civil Procedure.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1              A P P E A R A N C E S

 2  FOR THE PLAINTIFF (via Zoom):
         Mr. Stephen D. Casey
 3       Casey Law Office, P.C.
         P.O. Box 2451
 4       Round Rock, Texas 78680
         stephen@caseylawoffice.us
 5
    FOR THE DEFENDANTS (via Zoom):
 6       Ms. Kathryn E. Long
         Ms. Kelsey McKeag
 7       Thompson & Horton LLP
         500 North Akard Street
 8       Suite 3150
         Dallas, Texas 75201
 9       Phone: (972) 853-5115
         Fax:  (713) 583-8884
10       klong@thompsonhorton.com
         kmckeag@thompsonhorton.com
11

12

13  ALSO PRESENT (via Zoom):
         Ms. Cynthia Hill, General Counsel for Round Rock
14       Independent School District

15       Mr. Jeremy Story, Plaintiff (Enters page 6.) (Exits
         page 70.) (Enters page 77.)
16

17

18

19

20

21

22

23

24

25
```

CHIEF JEFFREY DWAYNE YARBROUGH

I N D E X

Appearances.....................................    3

CHIEF JEFFREY DWAYNE YARBROUGH

    Examination by Mr. Casey...................    5

Changes and Signature..........................  235

Reporter's Certificate.........................  237


EXHIBITS

NO.  DESCRIPTION                                PAGE

1    BE (Legal)................................   73

2    Third Amended Complaint...................   78

3    Affidavit for Warrant of Arrest and
     Detention.................................   88

4    JS-304202 through JS-304203...............  130

5    JS-304204.................................  156

6    BED (Local)...............................  184

7    August 16, 2021 board meeting video.......  185

8    Excerpt from Jeremy Story's speaking time
     at 8/16/21 board meeting..................  195

9    September 14, 2021 body cam video from
     Officer Chavez............................  213

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
1              P R O C E E D I N G S
2              THE REPORTER:  Mr. Yarbrough, I'm going to
3  put you under oath.  Will you raise your right hand,
4  please?
5              (Witness sworn.)
6              THE REPORTER:  Thank you so much.  And,
7  Counsel, did you have any agreements that you want to
8  state on record?
9              MS. LONG:  By the rules.
10             MR. CASEY:  Yep.
11             THE REPORTER:  All right.  Thank you.  You
12 may proceed.
13             CHIEF JEFFREY DWAYNE YARBROUGH,
14 having been duly sworn, testified as follows:
15             EXAMINATION
16 BY MR. CASEY:
17    Q.  Okay.  Good morning.  Good morning.  In the --
18 well, actually, would you please state your full legal
19 name for the record?
20    A.  Jeffrey Dwayne Yarbrough.
21    Q.  Okay.  And so that the court -- the court
22 reporter --
23             MR. CASEY:  You have an accurate spelling
24 of that, Ms. Owen?
25             THE REPORTER:  No.  If you want to clarify
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   on the record.  There's just a couple ways you can spell

2   Dwayne.

3       A.  D-w-a-y-n-e.

4       Q.  (By Mr. Casey)  Okay.  Excellent.  And do you

5   currently hold a position of employment that has a

6   title, sir?

7                   (Mr. Story enters.)

8       A.  Yes, sir, I do.

9       Q.  What is that title?

10      A.  Chief of Police.

11      Q.  For -- for what entity?

12      A.  The City of Hutto.  Hutto Police Department.

13      Q.  Hutto Police Department.  Okay.  So in that

14  regard, I'll just call you -- when I refer to you, I'll

15  say Chief Yarbrough.  Is that -- is that good?

16      A.  I'm fine with that.

17      Q.  Okay.

18      A.  You can call me Jeff, that's perfectly fine.

19      Q.  All right.  And something that we'll do in a

20  deposition to make sure that the court reporter is able

21  to get an accurate transcript is I will try and make

22  verbally through my tone and my statements a definitive

23  end of my question, and if I'm seeking only a yes-or-no

24  response, then I'll -- I'll let you know.  And then when

25  you're answering a question, if you have something to

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  add, then when there's a pause say, "Can I add

2  something" if that becomes necessary so that we don't

3  talk over each other.  Is that okay?

4      A.  Absolutely.

5      Q.  All right.  And have you ever been deposed

6  before, Chief Yarbrough?

7      A.  No, sir.

8      Q.  Okay.  So you understand today -- and the court

9  reporter swore you in -- that you're under oath; right?

10     A.  Yes, sir.

11     Q.  Okay.  Are you currently taking any medications

12  that could affect your memory, your concentration or

13  your ability to testify truthfully?

14     A.  No, sir.

15     Q.  Okay.  Do you have any conditions, any -- any

16  mental conditions that could affect your memory or your

17  concentration or your ability to testify truthfully?

18     A.  No, sir.

19     Q.  Okay.  And because we have a court reporter, do

20  you understand all your responses have to be verbal, not

21  gestures or nods, so that the record's clear?

22     A.  Yes, sir.

23     Q.  Okay.  If you don't understand a question, it's

24  okay to ask me to clarify the question; and if you don't

25  recall an answer, it's okay to say "I don't know" or "I

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  don't remember."  Do you understand that?

2      A.  I do.

3      Q.  Okay.  And if you need to take a break, if

4  there's a question that's there, my request is that you

5  would just answer the question.  And if you need to take

6  a break for any reason, just let us know.  Okay?

7      A.  Okay.

8      Q.  All right.  So can you describe -- well,

9  actually, let me back up for a second.  Has anyone --

10  have -- who have you talked to about your deposition

11  before just now?

12      A.  I talked to my attorney.

13      Q.  Okay.  Have you talked to any other persons

14  about your deposition?

15      A.  No, I have not.

16      Q.  Do you speak with doctor -- and I want to be

17  real specific, go from the general to the specific.

18  Have you spoken with the Superintendent -- former --

19  excuse me -- the Superintendent of Round Rock ISD who is

20  your former boss, have you talked with him today?

21      A.  No.  No, I have not.

22      Q.  Okay.  Did you review any documents in

23  preparation for today's deposition?

24      A.  With my attorney I did.

25      Q.  Okay.  And what documents were those that you

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  reviewed?

2      A.  There were several documents.  The case report.

3  We reviewed the arrest warrant, the affidavit.  And

4  there may have been some other documents that I do not

5  recall at this point.

6      Q.  Okay.  Did you -- did you watch any media of

7  any kind?

8      A.  Media?  When you mean media, can you be

9  specific on that?

10     Q.  Excuse me.  Videos.

11     A.  Uh-huh.  Yes.

12     Q.  What videos did you watch?

13     A.  I watched videos from the council -- the school

14  board meetings for this specific case.

15     Q.  And which meetings would you believe covered

16  this case?

17     A.  I watched a meeting where Mr. Story spoke, and

18  then I also watched a video that Mr. Story collected

19  with a communication between he and I and other officers

20  the following day, I believe it was, in the hallway.

21     Q.  Do you recall the dates of those two meetings?

22     A.  I recall them being in September.  The specific

23  date, I do not.

24     Q.  Okay.  Do you recall a meeting in August of

25  2021?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1        A.  Yes, I do.

2        Q.  Okay.  And so would it be fair to characterize

3    what you're saying is you reviewed the August 16th

4    school board meeting and the September 14th school board

5    meeting?

6        A.  Putting the dates on it makes it a little

7    difficult for me to be completely accurate, so I'm not

8    really sure on that.

9        Q.  Okay.  Thank you.  Thank you for that.  And do

10   you understand today that you're expected to answer

11   questions based on your own personal knowledge and not

12   what other people have told you?

13       A.  Yes.

14       Q.  Okay.  All right.  Generally in a deposition we

15   ask questions about people's background to get their

16   place in the community and to establish general

17   connections.  Where were you born?

18       A.  I was born in East Texas, Nacogdoches.

19       Q.  Okay.  I went to college in East Texas, not --

20   not that far.  I guess that's southern East Texas, I

21   guess.  I went to college in Longview.

22       A.  Okay.

23       Q.  All right.  Did you -- do you have any

24   post-high school education?

25       A.  Yes, I do.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Where did you go for that?

2    A.  I went to undergrad at the University of Texas

3  at Brownsville.

4    Q.  Okay.

5    A.  And I went to grad school, got my master's at

6  Texas A&M University at College Station.

7    Q.  And your degree in Brownsville was what?

8    A.  Criminal justice.

9    Q.  Okay.  And at A&M, what did you earn?

10    A.  Educational Human Resource Development.

11    Q.  Okay.  Okay.  After your graduation from UT

12  Brownsville, where did you go next?

13    A.  I got my degree there while I was working at

14  the Texas Attorney General's office.

15    Q.  What did you do at the AG's office, sir?

16    A.  I was -- I was a sergeant investigator.  I

17  handled capital murder murder cases primarily around the

18  state.

19    Q.  Okay.  So -- so there's -- I guess there's a

20  time between when you started in law enforcement and you

21  were at the AG's office, so when did you first start in

22  law enforcement?

23    A.  I started in law enforcement in 1994.

24    Q.  And did you have any adult occupations from '94

25  back to when you graduated high school?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.  Yes.  From high school, I went into the U.S.
2  Army.
3      Q.  And what did you do there?
4      A.  I was a Signal Corps and served with the 101st
5  Airborne Division in Operation Desert Storm.
6      Q.  Okay.  And what year was that?
7      A.  I went -- I arrived in -- in the Gulf in
8  October of 1990 and left in March 1991 after the war was
9  over.
10      Q.  Okay.  Okay.  And so you -- you're saying you
11  exited the military in '91?
12      A.  No.  I returned from the war in '91 and I
13  exited the military in '92.
14      Q.  Okay.  Okay.  Where did you go -- what did you
15  do after the Army?
16      A.  After the Army I worked some -- some work for
17  my -- a family member that had landscaping until I could
18  get into the academy.
19      Q.  Okay.  Where -- by the way, thank you for your
20  service.  Where did you go to the police academy?
21      A.  In Houston.
22      Q.  Okay.  All right.  After you graduated the
23  police academy, where was your first law enforcement
24  job?
25      A.  The City of Giddings.

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1        Q.   Giddings?

 2        A.   Yeah.

 3        Q.   Okay.  And what was -- what were your -- what

 4   were your roles and ranks in Giddings?

 5        A.   I was a patrol officer the entire time there.

 6        Q.   Okay.  How long were you in Giddings?

 7        A.   I was with Giddings Police Department from '94

 8   to '96.

 9        Q.   When you left Giddings in '96, where did you go

10   next, sir?

11        A.   I went to the Lee County Sheriff's Department.

12        Q.   Okay.  So after, you went to -- you said, Lee

13   County?

14        A.   Yes.

15        Q.   After you were in Lee County Sheriff's

16   Department -- how long were you there?

17        A.   I was there about six years.

18        Q.   And what were -- what were your ranks while you

19   were at -- you said Lee County?

20        A.   Yes.  I was a deputy, then -- then

21   investigator, then captain.

22        Q.   And when you got to the point of captain, was

23   that a position fairly high up in that -- in the county

24   sheriff?

25        A.   Yes, sir, it was.
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  How many ranks above captain would have

2   been the -- I guess the county sheriff?

3    A.  So you have captain, then you have the chief

4   deputy, then the sheriff.

5    Q.  Okay.  All right.  After the county sheriff,

6   where did you -- where did you serve?

7    A.  I served with Bastrop County Sheriff's

8   Department.

9    Q.  Was that a lateral transfer in your rank?

10    A.  No.  It was an investigator position.

11    Q.  How long were you in Bastrop, sir?

12    A.  Three years.

13    Q.  And did you remain an investigator the whole

14   time?

15    A.  I transitioned from general investigations to

16   narcotics.

17    Q.  All right.  But your rank remained that of

18   investigator?

19    A.  Yes, the entire time.

20    Q.  Okay.  What happened after Bastrop?

21    A.  I was hired by the Texas Attorney General's

22   Office.

23    Q.  And when you were hired by the Texas Attorney

24   General's Office -- and this is a -- pardon my ignorance

25   on this.  Is there a separate kind of internal ranking

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  structure that the Texas law enforcement officers

2  generally hold as far as their -- their pay or their

3  rank?  Kind of like the military, you might be like an

4  E-5 or E-6 or something, but you might have a different

5  title wherever you're going.  Is there some sort of

6  generalized internal ranking?

7       A.  We didn't have that at the Attorney General's

8  Office.  Like your -- you may be referring to what DPS

9  has, Trooper 1 through 5.  The Attorney General's Office

10 didn't have that type of designation.

11      Q.  Okay.  All right.  And how long did you serve

12 at the Texas Attorney General's Office?

13      A.  For six years.

14      Q.  And what would be the approximate date you left

15 the AG's office?

16      A.  It would have been December -- or -- or January

17 2011 possibly.  I don't recall right off specifically.

18      Q.  Okay.  Okay.  And were you an investigator

19 there?

20      A.  Yes.

21      Q.  The entire time?

22      A.  Yes.

23      Q.  Okay.  Where did you go after the AG's office?

24      A.  I went to the State Bar of Texas.

25      Q.  And what did you do at the State Bar of Texas?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.   I was the senior investigator for the criminal

2   prosecutions division and I investigated allegations of

3   professional misconduct filed -- filed -- filed by

4   individuals against licensed attorneys in the state.

5      Q.   Ooh, bet that made you a lot of friends.

6      A.   Yeah.

7      Q.   All right.  When did you leave the State Bar of

8   Texas?

9      A.   January 24th -- or January 2014.

10      Q.   Okay.  After the State Bar, where did you

11   serve, sir?

12      A.   I served as the chief of police for the City of

13   Tulia.

14      Q.   I apologize.  There's -- you have a very strong

15   bassed voice, but I'm not picking up the -- the -- the

16   vowels in that.  The city of what?

17      A.   Tulia.  T-u-l-i-a.  Tulia.

18      Q.   Okay.  And that was, you said, chief?

19      A.   Yes.

20      Q.   Okay.  And when did you leave Tulia?

21      A.   I left the same year.  I was there a year.

22      Q.   Okay.  Was -- is that standard to be there for

23   only a year?

24      A.   Not -- not -- not standard.

25      Q.   What -- what brought about the change?

CHIEF JEFFREY DWAYNE YARBROUGH

1      A.   There was some internal things going on with
2  the city during my tenure there and I felt that it was
3  best for me to move from there to another agency.
4      Q.   Okay.  Could you elaborate on that, please?
5      A.   Yes.  There was some allegations that an
6  individual who worked for me was involved in taking the
7  electric copper that we had, the copper lines, and was
8  selling that -- that for profit and not turning the
9  money in.  When we brought that information to the
10 attorneys, the -- the -- the County District Attorney's
11 Office and we brought it to the City, because this
12 individual had ties to the City, there was not much
13 response that was appropriate to addressing that issue.
14 It -- it basically, from my perspective, was swept under
15 the rug.  And there were other employees who came out
16 and provided information that was valuable to that and
17 the City didn't -- didn't -- decided they didn't want to
18 take action on that.  And what end up happening, I
19 became the assistant city manager, and when the city
20 manager left, the individual said, "I've gotten rid of
21 one person who was behind this, now I've just got to get
22 rid of the chief."  Started created what I believe to be
23 dissension throughout the city, and I felt that it just
24 wasn't worth trying to blow against the wind so to
25 speak.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.   Okay.  So if I can kind of frame it in my -- my

2    terms, which -- which might shift it a little bit.

3    We're different people.  You -- you found someone who

4    was really getting away with something and there was a

5    conflict in you being able to follow what you believe

6    your responsibility to be versus this person who was,

7    seems like, making -- making at least at a minimum a

8    professional threat against you; right?

9    A.   That -- that -- generally that sizes it -- that

10   -- that summarizes it.

11   Q.   Okay.  And did it bother you that they were

12   trying to sweep everything under the rug?

13   A.   It bothered me.

14   Q.   Okay.  And you've been in law enforcement a

15   long time.  You've -- would you describe yourself as a

16   very justice-oriented person?

17   A.   I am that, sir.

18   Q.   Okay.  Yeah.  Yeah, I have -- I have five kids

19   and some of them are very justice oriented and others

20   are not and that causes conflict in my house sometimes.

21        Okay.  So after that year as the chief of

22   police in Tulia -- and you said you were the city

23   manager too; correct?

24   A.   Assistant city manager.

25   Q.   Assistant city manager.  Where did you go after

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Tulia, sir?

2      A.  To the Travis County District Attorney's

3  Office.

4      Q.  Okay.  And what did you do there?

5      A.  I initially handled general investigations, and

6  then I was assigned to the Public Integrity Unit where I

7  investigated allegations of criminal misconduct against

8  elected officials.

9      Q.  Okay.  And what years were that?

10     A.  That was 2015 -- 2014 to 2015.

11     Q.  Yeah, okay.  Was -- was Ms. Lehmberg there at

12  that time?

13     A.  Yes.  She's actually the district attorney who

14  hired me.

15     Q.  Oh, okay.  Yeah, because I remember them doing

16  a lot of interesting things.  Good -- good -- good unit

17  by the way.  That was -- that was good that they were

18  doing that.

19          All right.  And so at that -- in that

20  instance, very similar to almost like what you -- what

21  you stepped out of in Tulia where you're identifying, I

22  guess in the Public Integrity Unit, people who are in

23  positions of authority trying to sweep stuff under the

24  rug?

25     A.  Absolutely.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  Did you get -- did you enjoy that job?

2    A.  I really did.  They -- the challenges, but the

3  success of recognizing that justice applies to all is

4  something that I found to be an opportunity to -- to

5  bring to fruition so to speak.

6    Q.  Yeah, I like that.  I'm -- I'm -- myself, in my

7  personal readings, I'm in the Old Testament right now

8  and I'm about to finish up Jeremiah.  And, yeah, it's

9  tough whenever it goes unaddressed.

10    A.  Yeah.

11    Q.  All right.  So after -- so how long did you

12  serve in the PIU?

13    A.  I was there for probably nine of the -- nine

14  months of the 12 months I was there.

15    Q.  Okay.  And your tenure there seems to be short.

16    A.  It was a great job.  I loved it.  But there was

17  an opportunity that came up that I just simply felt led

18  by God to take, and that was the Bastrop ISD Police

19  Chief, which was my next position.

20    Q.  Okay.  So then you went to Bastrop ISD and

21  police chief.  And how long were you there?

22    A.  I was there for four years.

23    Q.  Okay.  And was your -- how would you describe

24  your tenure there?

25    A.  Very successful.  It was very rewarding.  Every

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   place I've been, including there, created lifelong

2   friends that I trust and value and -- and they feel

3   likewise.

4       Q.  Okay.  And when did you -- when did you leave

5   as chief of Bastrop?

6       A.  2019.

7       Q.  Okay.  And I'm going to -- I'm going to assume

8   right after that you came to Round Rock ISD?

9       A.  Yes.

10      Q.  Okay.  Who hired you?

11      A.  Dr. Steve Flores.

12      Q.  Okay.  And that would have been the

13  Superintendent prior to Dr. Azaiez?

14      A.  That's correct.

15      Q.  Okay.  All right.  Well, you've got a beautiful

16  -- a beautiful past.  What is your -- what is your

17  license level for -- from TCOLE?

18      A.  Master Peace Officer.

19      Q.  Okay.  And I guess over -- so -- so you've got

20  quite a while, like 30-plus years of -- of -- well, 33

21  years of --

22      A.  Yep.  31 next month.

23      Q.  31 next month of -- of police experience.  Is

24  there a minimum amount of continued education you're

25  required to take per year?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  Yes.  Texas requires 40 hours a cycle.

2    Q.  Uh-huh.

3    A.  And that's, you know, the two years.  So you're

4   getting about 80 hours.  That's a minimum that many

5   places hit, and every place I've been we've worked to

6   exceed that.

7    Q.  Okay.  So -- and you say per cycle?

8    A.  Uh-huh.

9    Q.  That was -- and so as we stand, I may have

10  misheard you.  That's annually?

11   A.  So a cycle is -- is two years.

12   Q.  Two years.  Oh, I'm sorry.  Okay.  And so over

13  the course of your career, you -- if you've exceeded

14  that, you know, that's -- that's probably 2,400 hours of

15  training?

16   A.  That I have?

17   Q.  Yeah, that you've had?

18   A.  Just I've got about 11,000 -- when you combine

19  it all, about 11,000 training hours, but that includes

20  what TCOLE gives you.  About 2,400 with -- with that.

21  They give you hours for your military service they also

22  give you that are -- that are relevant.  They also give

23  you hours for relevant college.

24   Q.  Okay.  All right.  How -- is there a point at

25  which in your -- in your law enforcement career

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  background that -- actually, let me back up for a
 2  second.
 3            When you're going through the military, I'm
 4  -- I'm guessing it's pretty similar to when I went
 5  through.  I was in the Navy for eight years at a certain
 6  point and I went from E-3 to E-4, so I became an NCO.
 7  And I'm guessing because you didn't mention -- you said
 8  Army Signal Corps and you didn't mention college until
 9  after that, so you were enlisted; right?
10       A.  Yes.
11       Q.  Okay.  So when you went, you had to have NCO
12  training; correct?
13       A.  I did -- I did not.  When -- not -- I was an
14  E-4 when I ETS'd, when I got out of the military.
15       Q.  Okay.  Is there -- is there a point at which
16  your training requirements shift in the police, I guess,
17  career pipeline where you received more supervisory or
18  command training as opposed to training for like a --
19  someone fresh out of the academy?
20       A.  So TCOLE has certain requirements that are
21  mandated training that officers must achieve and
22  complete when they're a basic or an intermediate
23  licensed officer.  So they have those mandates.  And
24  once you pass that, there -- there are certain -- the
25  mandate requirements are not as -- as stringent.  You

CHIEF JEFFREY DWAYNE YARBROUGH

1  can typically explore into other areas of training.

2      Q.  Okay.  Are there any required courses, for

3  example -- for example, I have a -- I have a dear friend

4  who -- who left the Navy as an executive officer, and

5  before he took command as executive officer he had to

6  see -- have what's called PXO training, prospective

7  executive officer training.  Did you have to have any

8  specialized training before you became a chief?

9      A.  There's -- it depends on the agencies, but I've

10  had -- I had it before I became a chief.  Some agencies

11  require it, some agencies may not.  But I've had

12  extensive executive training.

13      Q.  What are the types of courses that you would

14  take in that regard?

15      A.  The Northwestern University Center for Public

16  Safety, I went through their senior lead -- senior

17  leadership command program, and that was Northwestern

18  University Center of Public Safety.  And that was a -- I

19  think it was an eight, nine-month course.

20      Q.  And you do that -- you do that remotely or do

21  you take just time off and go do that and then come

22  back?

23      A.  You -- so I did that one back in, I think it

24  was 2011, 20 -- somewhere way back where you -- you went

25  to -- that wasn't -- it wasn't really remote, so you had

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  to go and serve and go for about three weeks --

2       Q.  Okay.

3       A.  -- each month or every other month.

4       Q.  Okay.  So in these, I guess, 11,000 hours, do

5  you receive any training on the US Constitution?

6       A.  When we have, like, the chief -- police chief's

7  trainings, when you have -- there's a very -- there's a

8  wide range of trainings that you can have, and many of

9  those trainings are because of legislative updates.  We

10  talk about training -- not only our law changes at the

11  state level, but we also talk about the impact of -- of

12  changes at the federal level.  So we're required to have

13  legislative update after each legislative session.

14       Q.  Okay.  You mentioned federal level of training

15  -- federal-level training.  So when you take

16  federal-level training about the First Amendment, what

17  do you generally recall that you've covered in that type

18  of training?

19       A.  We've -- we've talked about the right for

20  people to videotape, the right for people to take

21  pictures, the right for people to protest, the right for

22  people to come and ask officers questions while they're

23  -- they're doing the audits -- the First Amendment

24  audits.  We've had training on those types of First

25  Amendment issues.

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1    Q.  Okay.  Yeah, I've seen those audits.  They're

 2  kind of interesting.  There's a guy who grades

 3  everybody.  And I really like it when the officers get

 4  A's on that because it's tough, it's tough.

 5          So you mentioned in that that you get trained,

 6  that whenever someone asks officers -- and I may -- I

 7  don't want to put words in your mouth.  But if someone

 8  asks an officer to identify themselves or to give them

 9  information, that that's something they teach you that

10  you -- it's okay to go ahead and do?

11    A.  It -- it's based upon the department's policy.

12  If the policy suggests that the officers identify

13  themselves, then you do so.

14    Q.  Okay.  All right.  And I don't want to assume,

15  but generally if a citizen is engaging an officer and

16  asking the questions, then they would be -- your

17  background, your training would suggest that they need

18  to be engaged with the citizens so that they can kind of

19  smooth over what's going on?

20    A.  Absolutely.

21    Q.  Okay.  So you would -- you wouldn't expect them

22  to -- to refuse to answer any questions?

23    A.  It depends on the circumstances.  It depends on

24  what's being asked.  If they're asking questions about

25  an investigation, you're not going to give them that

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1  information.  If they're asking general questions or --
 2  it depends on the -- it depends on the type of questions
 3  they're asking --
 4       Q.  Sure.
 5       A.  -- as to whether or not an officer can or
 6  cannot tell them.
 7       Q.  Well, yeah.  I was talking about an audit.
 8  Right?  You mentioned the audits.  I've watched probably
 9  -- probably 40 or 50 of those videos.  And, you know,
10  it's -- it's interacting on the fringes of, you know,
11  what -- what is someone allowed to do, what is someone
12  not allowed to do.  Would you agree with me that if --
13  if an officer in that situation were just kind of
14  remaining silent, just standing and remaining silent,
15  that that would not be a good thing to do if -- if it
16  was just a general routine question that they were being
17  asked in that audit situation?
18       A.  I see no benefit not to be transparent to tell
19  a citizen who you are or what your badge number is and
20  answer any questions that you can.  That's what --
21  that's what we're hired to do --
22       Q.  Yeah.  Yeah, I -- I'm sorry.  I apologize.  I
23  talked over you.  I've seen somewhere there at the --
24  this hypothetical -- well, actually, I saw it, but I
25  want to ask you questions about it.  I saw someone at --
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  down by the ship channel and they were doing a photo --

2  photographic audit and officers were called out and they

3  were actually very specific as to where the boundaries

4  of the public property were and where someone can take

5  photographs with, and that person was asking a lot of

6  questions, they were engaging.  That -- that type of

7  situation is what you would expect an officer to do if

8  someone was asking them what the contours of the law was

9  on that situation; correct?

10      A.  I would.

11      Q.  Okay.  And that's how you train your -- that's

12  how you would train your staff and your officers?

13      A.  Training them for that specific issue is, I

14  think, a little bit narrow, but we do train them to

15  provide information to the public as that information is

16  deemed appropriate and necessary.

17      Q.  Well, and I would agree with you.  Active

18  engaged investigations -- yes or no, active

19  investigations would be off limits, but general

20  information about why that officer is performing a

21  particular function, that would be on limits; correct?

22      A.  Yes.

23      Q.  All right.  All right.  Did you receive any

24  training on the distinction between a school resource

25  officer and a school police department officer?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1     A.  Yes, sir.

2     Q.  What do you -- what do you believe to be the

3  distinction between those two?

4     A.  The distinction is a school resource officer is

5  an officer who's hired from another agency to provide

6  the school-based law enforcement services for an

7  organization.  They're not employees of the school;

8  they're employees of the agency that has overlapping

9  jurisdiction that's providing that service to the school

10  district; whereas a -- what the education code

11  identifies as a district police officer, is a police

12  officer specifically hired by the school district.

13     Q.  Okay.  Let's see.  So in a situation with a

14  resource officer, they would report to, for example,

15  City of Round Rock, if you were outside city limits in

16  our -- where we live, Williamson County Sheriff.  And

17  then a -- the Round Rock ISD Police Officer, ultimately

18  chain of command goes to the chief, but then highest

19  official in that would be the superintendent; correct?

20     A.  That's correct.

21     Q.  All right.  So you report then directly --

22  reported, sorry -- directly to the superintendent then

23  of Round Rock ISD?

24     A.  Yes, sir.

25     Q.  Okay.

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  I did.

2    Q.  In your -- in your -- in your role there,

3  reporting to the superintendent, you and I would say the

4  police force, who are subordinate to you -- and I want

5  to present two options and have you select one of those.

6  Is their job to enforce Texas law or to enforce school

7  board policy?

8    A.  Some school board policies are a matter of law,

9  and so it depends.

10    Q.  Okay.

11    A.  But basically we support Texas law, but we can

12  enforce board policies.

13    Q.  And to the extent that the board policy

14  conforms with the law, you can enforce it; right?

15  That's a nod.

16    A.  Yes.

17    Q.  Yes, sir.  Thank you.

18    A.  Sorry.  I was thinking as -- as I was

19  processing what you said.

20    Q.  Oh, no -- no problem.  I've -- I've crossed

21  over and talked over you in this past.  I mean, I don't

22  -- I don't want to -- if that -- someone could list up

23  all my strikes, I'd be -- I would have a tough time.

24          Okay.  If you came into a situation where

25  -- let me back up for a second.  Who sets the school

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  policy to your understanding?

2      A.  My understanding is it's the school board.

3      Q.  Okay.  Does the superintendent by verbal

4  command set school policy based on your understanding?

5      A.  Based on my under- --

6           MS. LONG:  Objection.  Objection.  Calls

7  for a legal conclusion.

8      Q.  (By Mr. Casey)  If the school superintendent

9  told you to take an action that you believe conflicted

10  with federal law, would you take that action?

11      A.  Absolutely not.

12           MS. LONG:  Objection.  Objection.  Vague.

13      Q.  (By Mr. Casey)  I -- and I -- you can -- you

14  can --

15           MS. LONG:  He answered.

16           MR. CASEY:  Oh, I understand.  But your

17  objection was during his answer so I want to kind of

18  walk through that.

19      Q.  (By Mr. Casey)  I -- I apologize.  I didn't do

20  that at the beginning when I was talking about

21  protocols.  After asking a question, if you hear your

22  attorney say something, then I'm going to need you to

23  pause so that the record is clean.  And then unless your

24  attorney tells you, don't answer it, then you go ahead

25  and answer.  Because what your attorney is doing is

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    preserving your rights to -- to this when this comes to

2    trial.  Does that make sense?

3        A.  It makes sense.  Yes.  My apologies.

4        Q.  Oh, you didn't -- you didn't do anything wrong.

5            So -- so if -- if you -- if you have a certain

6    understanding about certain -- someone's rights, for

7    example an audit -- I'm going to give you a hypothetical

8    situation.  Someone comes to do a photographic audit,

9    First Amendment audit, and they're on a public sidewalk

10   just outside the Round Rock ISD campus.  Does that make

11   sense, that situation?

12       A.  Yes.

13       Q.  Okay.  And the superintendent says, "You know

14   what, I don't like them photographing around here.  I

15   want you to make them leave."  Would you have the right

16   to do that?

17       A.  No.

18       Q.  Why not?

19       A.  Because as long as they're not violating the

20   law, as long as they're expressing themselves on a

21   public sidewalk and it's not creating a disturbance,

22   it's not in the sense of -- for example, they're not out

23   in traffic, if they're not creating a hazard or danger,

24   then you -- you support them in what they do.

25       Q.  Okay.  I referenced First Amendment rights

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  earlier.  Do you recall the -- the -- the areas that the

2  First Amendment covers?

3      A.  Freedom of speech, freedom of the press,

4  freedom of expression.

5      Q.  You said expression?

6      A.  Yes.

7      Q.  Okay.  Do you recall -- and I'm not trying to

8  be a history and con law teacher -- the right to

9  petition?

10     A.  Yes.

11     Q.  Okay.  And do you know if it covers freedom --

12  let me back up for a second.  When you said expression,

13  did you mean speech?

14     A.  Yes.

15     Q.  Okay.  And --

16     A.  Or -- or standing and holding signs.

17     Q.  Okay.  And religious freedom; right?

18     A.  Yes.

19     Q.  And -- and also in that the -- what's called

20  the Establishment Clause?

21     A.  Correct.

22     Q.  Okay.  When you took training on the First

23  Amendment, did you ever take training on -- on the --

24  the government's ability to allow different viewpoints

25  and when someone's speaking, for example, at a school

CHIEF JEFFREY DWAYNE YARBROUGH

1   board meeting?

2       A.  I have knowledge of it, but I don't recall a

3   specific training that provided that.  So I don't know.

4   I can't speak to whether I've had training on that or

5   not.

6       Q.  Okay.  So your knowledge of it ex- -- explained

7   -- and I'm going to use this phrase, a couple of times

8   you'll hear it today, this deposition is -- is done with

9   the understanding that this testimony would be presented

10  in court at a later time and you would be asked about

11  it.  So I'm going to say, "Explain to the jury."

12  Explain to the jury what you understand is the

13  government's ability to -- to distinguish between the

14  viewpoints of particular speakers?

15      A.  So the government's -- repeat the question so I

16  can make sure I'm answering it appropriately.

17      Q.  Yeah.  Sometimes my questions are long.  I

18  apologize.

19          What do you understand, based on your First

20  Amendment training, is the ability that a government,

21  meaning law enforcement, any government officials, to --

22  to distinguish between speakers who have different

23  viewpoints?

24          MS. LONG:  Objection to the extent it calls

25  for a legal conclusion and to the extent it asks a fact

CHIEF JEFFREY DWAYNE YARBROUGH

1  witness to testify to the jury as to what the law is.

2  That is the judge's role, not the counsel or a witness.

3          MR. CASEY:  Completely understand.

4      Q.  (By Mr. Casey)  Based on your training, sir,

5  what -- what training did you receive on the government

6  and it's -- it's -- it's -- the rights of citizens and

7  expressing their different viewpoints?

8          MS. LONG:  I'm going to express the same

9  objections.  Chief Yarbrough, just because I object

10 doesn't mean you don't answer.  So I'm just objecting.

11 So you answer the question, but I'm going to object.

12 Same objections.

13         MR. CASEY:  Okay.

14     A.  Throughout my career -- now, we're speaking

15 just about school boards -- are we speaking about school

16 boards or are we talking generally the government?

17     Q.  (By Mr. Casey)  Let's talk about generally

18 first and then we can narrow it down.  Thanks for that.

19     A.  Yeah.  So throughout my career we have had

20 training.  You get training in the basic peace officer's

21 course on constitutional rights and what our duties and

22 responsibilities are as law enforcement.

23     Q.  Okay.  After basic peace officer training, what

24 -- what training do you get and what -- what

25 understanding did you develop from that?

CHIEF JEFFREY DWAYNE YARBROUGH

1      A.  So my --

2             MS. LONG:  Same objections.

3      A.  So my understanding of that is in a -- say a

4  limited public forum, a -- the government cannot censure

5  a person's speech simply because they don't like what

6  they're saying.  There has to be something else attached

7  to that, is my opinion, that -- that would trigger them

8  to cease that person's opportunity to speak or express

9  themselves.

10     Q.  (By Mr. Casey)  Okay.  You -- you used a term

11 there -- you introduced a term there, limited public

12 forum.  What does that mean to you?

13            MS. LONG:  Objection --

14     A.  It means that --

15            MS. LONG:  -- objection to the extent it

16 calls for a legal conclusion.  Objection, impermissible

17 legal testimony from a fact witness.

18     Q.  (By Mr. Casey)  Okay.  You -- you can go ahead

19 and answer.

20     A.  Okay.  Basically my understanding of that is

21 it's a -- it's an opportunity where individuals can go

22 and speak to the government, or let's say for example

23 elected officials, and it allows those individuals to

24 speak.  But it's limited based upon whatever the

25 requirements or the guidelines of that governing body

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  are.

2      Q.  Okay.  So like a -- I'll give you an example

3  that's relevant here, like a public comment section or a

4  public comment time?

5      A.  Yes.

6      Q.  Okay.  How many school board meetings have you

7  attended?

8      A.  Many.

9      Q.  Okay.  So probably -- let's -- I'm just going

10  to give you a range because I'm not looking for a

11  scientific number.  More than 200?

12      A.  It's hard to put an actual number on it.  I was

13  required to attend school board meetings when I was

14  Chief of Bastrop and the large majority of the meetings

15  at Round Rock.

16      Q.  So at least 100?

17      A.  Yes.

18      Q.  Okay.  And how many of those meetings had

19  agenda items on which people could speak

20  percentage-wise?

21      A.  I would say the large majority of them.

22  Putting it at a percentage is -- I think I would be

23  inaccurate because it may be 98 percent, maybe 99

24  percent.  So it's kind of hard.  But I would say the

25  large majority.  Very rarely did we had a meeting where

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1  someone wasn't able to speak.
 2       Q.  Okay.  And -- and for the rest of this, I know
 3  it's tough, I'm not looking for scientific accuracy.
 4  And if I need to get a more distinct number, I'll let
 5  you know.
 6       A.  Okay.
 7       Q.  All right.  So in -- in your -- did you ever
 8  take any training on -- from OSS Academy?
 9       A.  I believe I have.
10       Q.  Okay.  Did you ever take any training on
11  implicit bias?
12       A.  I recall -- I recall taking implicit bias
13  training.
14       Q.  All right.  Did you take any training on social
15  justice?
16       A.  Yes.
17       Q.  Okay.  What -- what did you -- what would you
18  characterize what you gathered from the implicit bias
19  class?
20       A.  In what context?
21       Q.  Well, I mean, what was the class about?  What
22  do you think you gathered from that?  Like a takeaway.
23       A.  So what I gathered from that was related to an
24  individual's, say, like the stereotypes that a person
25  may have ingrained in them and -- or it's kind of --
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  it's kind of like the concepts or ideas that a person

2  may have about a certain person, individual, group,

3  culture, and those things are -- their actions or

4  responses are largely motivated by those biases.

5      Q.  Okay.  And -- and so based on your training,

6  that implicit bias, is that limited to people or can it

7  show up anywhere?

8      A.  I think it can show up anywhere.

9      Q.  Okay.  Do you think at times law enforcement

10 officers can carry implicit bias against people who are

11 exercising the boundaries of their First Amendment

12 rights?

13          MS. LONG:  Objection.  Foundation, vague,

14 calls for speculation.

15     Q.  (By Mr. Casey)  You can go ahead and answer.

16     A.  I would be speculating, but I would say that

17 anything's possible.

18     Q.  Okay.  All right.  Well, I mean, after being a

19 law enforcement officer for so long, and I -- let me

20 back up for a second.

21          After being a law enforcement officer for

22 so long, do you think that there becomes any type of

23 implicit bias on -- on order, what you perceive to be

24 orderly?

25          MS. LONG:  Objection.  Vague.

CHIEF JEFFREY DWAYNE YARBROUGH

1          MR. CASEY:  Okay.

2      A.  I don't understand that question.

3      Q.  (By Mr. Casey)  Okay.  I'll rephrase it.  Do

4  you believe it becomes implicit bias on citizens

5  following what they're being told to do by people that

6  have positions or titles or ranks?

7          MS. LONG:  Objection.  Vague and calls for

8  speculation.

9      Q.  (By Mr. Casey)  Okay.  You can answer.

10      A.  I don't -- I don't understand that question.

11      Q.  All right.  Do you think your rank, like

12  officer, being a police officer, having some rank, you

13  know, in a -- in a setting, do you think that can

14  contribute to implicit bias that people are

15  automatically supposed to do what you tell them to do?

16          MS. LONG:  Objection.  Vague, calls for

17  speculation.

18      A.  I wouldn't say automatically.  And it would

19  depend on the environment, it would depend on the

20  circumstances, it would depend on the rank.  So there's

21  so many variables that it makes it difficult for me to

22  give you a truly accurate answer to that question.

23      Q.  (By Mr. Casey)  Okay.  Well, I'll give you a

24  hypothetical.  Your -- your -- let's use the example we

25  talked about before, right, the audit -- the audit

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  scenarios.  Have you watched any of those audit videos

2  in your training?

3      A.  Yes.

4      Q.  Okay.  Have you seen audit videos where the --

5  where the law enforcement folks don't act like they're

6  supposed to?

7      A.  Yes.

8      Q.  Have you seen audit videos where the officers

9  -- and pardon the slang -- they'll use -- kind of have a

10  power trip?  Like they're an officer, so the person

11  that's exercising their First Amendment rights should

12  automatically listen to them?

13      A.  Yes.

14      Q.  Okay.  Would you consider that implicit bias?

15      A.  In some circumstances it could be implicit

16  bias, some circumstances it could be ignorance of the

17  law.  So there are a variety of contributing actions

18  that could lead to that.  So it's hard for me to say

19  just that one.

20      Q.  Okay.  And that's fair.  That's fair.

21  Ignorance of the law could be a reason.  But -- and

22  sometimes you would agree that that implicit bias could

23  be them thinking, "I'm a law enforcement officer.  They

24  should automatically do what I say because I'm in

25  charge"?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  Sometimes.

2    Q.  Okay.  After you left the academy, did you

3  cover any training that dealt with First Amendment

4  protections?

5    A.  I can't recall a specific training cycle or

6  training program that covered that, but it's not

7  unfamiliar to me.

8    Q.  Okay.  So did you take it upon yourself to

9  review First Amendment law and protections for peace

10  officers after the academy?

11    A.  Ask the question again.  I apologize.

12    Q.  Did you take it upon yourself to schedule in,

13  in your own time, any First Amendment -- First Amendment

14  training as it relates to peace officers?

15    A.  As far as a formal training, I don't remember.

16  I can't recall.  But I do recall early on in my career

17  when the audits became more popular and more frequent,

18  attending trainings where we discussed that or staff

19  meetings where we discussed that or meeting with DPS in

20  trainings where they come to speak about the audits and

21  what we can and cannot do when it comes to the First

22  Amendment.  And many of those trainings that are

23  experiences that we are exposed to on the street, it

24  causes me and many others to inquire more, to learn

25  more, to want to know more so you can appropriately

CHIEF JEFFREY DWAYNE YARBROUGH

1  apply the law.

2      Q.  Totally understand.  And I guess that was the

3  nature of it.  Did you yourself dive into your role as a

4  peace officer regarding the First Amendment?  And -- and

5  if you did, when's the last time you did that?

6      A.  I can't say when the last time was, but, yes, I

7  have.

8      Q.  Okay.

9          MS. LONG:  Stephen, can we take a

10  five-minute break?

11          MR. CASEY:  Yeah.  That's fine.  Yeah.

12  Okay.  Thanks.

13          (Eight-minute break was taken.)

14      Q.  (By Mr. Casey)  All right.  So after you were

15  hired at Round Rock ISD in 2019, are you ultimately

16  responsible there as chief for the training of the

17  officers?

18      A.  Yes, sir.

19      Q.  Okay.  What types of training did you require

20  your officers to take?

21      A.  There was a variety of training above and

22  beyond the state-mandated training, you know, crisis

23  intervention, child abuse, sexual assault.  Beyond all

24  of that we had mental health first aid, we had

25  trauma-based informed care.  We had a wide range of

CHIEF JEFFREY DWAYNE YARBROUGH

1   training, and specifically school-based law enforcement

2   training, the state-mandated trainings as well.

3        Q.  Okay.  Thank you.  Did you have any specific

4   training on the First Amendment?

5        A.  I don't recall, not specifically.

6        Q.  Okay.  And so on those officers' TCOLE records,

7   the -- it would be listed there; correct?

8        A.  Not necessarily.  If the training was solely a

9   TCOLE authorized training where it was a First Amendment

10  training only, then yes.  If it was department training

11  or -- or professional development training, it doesn't

12  necessarily get reported to TCOLE.  So you could have

13  department training that doesn't get reported to TCOLE

14  or you could have a -- a certain training that may be

15  general training that may have a variety of modules

16  included.  So it depends.

17       Q.  Did you have a departmental training log?

18       A.  I don't recall.  I wasn't over training

19  specifically, so it's been a while.  I don't remember it

20  all.

21       Q.  Okay.  Who was the training officer?

22       A.  Chief Williby oversaw training.

23       Q.  And so there -- there should be in the

24  documents that Round Rock ISD has, some sort of training

25  log that Chief Williby maintained?

CHIEF JEFFREY DWAYNE YARBROUGH

1          MS. LONG:  Objection.  Calls for
2    speculation, foundation.
3          A.  And I have to be careful because a training
4    log, that -- that's a little different because you have
5    different officers that may go to different trainings.
6    So their training files will have the type of training
7    that they went to, but as far as a log saying that this
8    person went to this training on this date, this person
9    went, and having the names and the training, that --
10   that's a little unique.
11         Q.  (By Mr. Casey)  Well, I -- I -- based on as it
12   relates to you -- and kind of ask my question a
13   different way.  You know, I had a -- I was a senior
14   enlisted in charge of a division in the Navy, 36 -- 36
15   nuclear operators, and we had a training petty officer,
16   and that petty officer maintained a training log.  But
17   as the -- as the leading petty officer of the division,
18   the senior NCO, I was responsible for making sure at
19   least, you know, once a month, once every other month
20   that I put eyes in that training log to make sure that
21   my troops, my sailors were getting the right training.
22   Do you ever do that?
23         A.  Yeah.  So we have -- Texas Commission on Law
24   Enforcement comes and they will -- they will do audits
25   and they will check your training, and they will go

CHIEF JEFFREY DWAYNE YARBROUGH

 1  through each individual file to see if -- and the

 2  digital file to make sure that that person meets the

 3  minimum standards and the number of hours that are

 4  required for the training.  So when it comes to that, we

 5  kept the information on what training every officer

 6  received.  But as far as it being reduced to a simple

 7  log, I don't remember.

 8      Q.  And I --

 9      A.  If we -- I will add this.  If we -- say, for

10  example, we had firearms training, we kept a log of who

11  went to the train -- to the range that day.  But if we

12  had officers going to the intermediate-school-based law

13  enforcement training, we didn't keep a log on that.  We

14  knew that this person went on that date, we knew that

15  this one was going on the following date, but we didn't

16  keep a log that was solely for school-based law

17  enforcement.

18      Q.  Okay.  So you would have no document that --

19  let me back up for a second.  As I understand what

20  you're saying, each officer might have an individual

21  training log and it would -- that records TCOLE

22  training, but there's nothing that's a

23  Round-Rock-ISD-type log of the training that officers

24  received while under your tenure?

25      A.  I can't speak to that.  I don't know if Chief

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   Williby maintained a log.  I don't recall.

2        Q.  Okay.  Did Chief Williby have to report to you

3   about how he was maintaining that system?

4        A.  Chief Williby reported to me on ensuring that

5   the basic training requirements were being met, those

6   trainings were being scheduled, any additional training

7   that we were offered, which officers were going to those

8   trainings.  He would provide those -- that information

9   to me.  But as far as a log like you're referring to, I

10  don't recall.

11       Q.  Okay.  And let's -- so that's -- there's two

12  parts to that.  Thank you for clarifying that.  So what

13  you're -- I understand you're telling me, you may not

14  have seen a log, but Chief -- Assistant Chief Williby

15  who became the chief would say, "Hey, all our training's

16  good."  Is that -- would that be the -- how he would

17  report to you?

18            MS. LONG:  Objection.  Mischaracterizes the

19  testimony.  We -- he -- I just want to clarify, and you

20  can ask this again.  There's no testimony and no

21  evidence that Assistant Chief Williby ever became the

22  chief.

23            MR. CASEY:  Oh, I'm sorry.  I apologize.

24  That's -- that's -- thank you for that clarification.

25       Q.  (By Mr. Casey)  I'm really seeking to clarify,

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Chief Yarbrough, what was the nature of Assistant Chief

2  Williby's report to you about the training of the

3  officers for whom you were responsible?

4      A.  Chief Williby would provide information to me

5  on upcoming training.  We would know what training -- he

6  would provide information to me on what training hours

7  were needed by certain officers, where that training

8  could be attained, who was going to be out for that

9  training, and who we needed to put in to cover a campus

10  when they're out.  He would give me the generals like

11  that.

12      And then when TCOLE would come and do our

13  audits and they would audit our training and our

14  personnel files, we would all -- we would both in

15  addition to TCOLE go through those to make sure that all

16  of the information was -- was compiled in that training

17  -- in that personnel folder where all training records

18  are kept.  So that's -- that's the best I can answer

19  that question absent of -- now, again, I keep going back

20  to, if we had a mandatory training in the department

21  like firearms, which is required by TCOLE, we would have

22  a log of who went to the range on Thursday or who went

23  to the range on Monday.  We'd have a log of that.  But

24  to keep a log of saying that -- that an officer's going

25  to San Marcus for school-based law enforcement and then

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1   nine months later another officer is going to San
 2   Antonio for that same training, we didn't keep a log
 3   like that.  That information was compiled because that
 4   wasn't -- that wasn't the minimum standards that were
 5   required for us.  The minimum standards we made -- we
 6   made sure we met those, but then there was additional
 7   training that we provide to officers that weren't
 8   necessarily kept in a log.
 9        Q.  And so that would just be ad hoc, I guess?
10        A.  What do you mean?
11        Q.  Oh, I'm sorry.  It would just be as the time
12   came up.  If you said, "Hey, today we're going to do
13   some" -- "we're going to have a department-wide
14   hour-long meeting and we're going to train on" you know,
15   a particular topic, that just would be -- I don't want
16   to use this in a negative sense of random, but it would
17   just be kind of unpredictable, but you-all would do that
18   training but you wouldn't log it anywhere?
19        A.  No, it -- it was -- it was predictable.  So in
20   school districts or the -- at least the school districts
21   I've worked, when you have professional development days
22   where teachers -- where students are out and teachers
23   are having their training, that gives law enforcement an
24   opportunity to do their training.  And then on those
25   days, if an officer -- if officers are required to be in
```

CHIEF JEFFREY DWAYNE YARBROUGH

1  a training, you have them sign into that training on

2  that day.  Meaning that if we're going to do mental

3  health first aid youth, officers sign in and you keep a

4  roster of who's been to that training.

5      Q.  Okay.  So that -- I guess, then, I'm using the

6  word "log," you would be using the word "roster."  You

7  would have those rosters and -- and -- and retain those

8  records; correct?

9      A.  Yes.

10     Q.  Okay.  Now -- now -- so we've -- sometimes it's

11 tough because we're -- we're using different words.  And

12 you would -- so there would be a -- I'm asking rosters

13 that would show if you did any First Amendment or -- or

14 legal training as it relates to peace officers?

15     A.  That would be a roster if it was done in-house.

16     Q.  That's right.

17     A.  Yeah, if it was in-house.

18     Q.  Okay.  That's what I'm getting at.  So you

19 would have a roster.  If, for example, at basic officer

20 training there wasn't kind of like a First Amendment

21 module, does that promote a risk of violating someone's

22 constitutional rights?  I mean it -- let me back up.

23 That's a bad question.

24          Do you believe it essential for a peace

25 officer to have training on free speech rights?

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  I do.

2    Q.  Okay.  Why do you think that?

3    A.  Because it's our core responsibility to protect

4  the constitutional rights of those we serve, protect the

5  communities that we serve, and make sure that the law is

6  appropriately applied when necessary, and those that

7  have the right to express are afforded within the

8  parameters of the law to do so.

9    Q.  Okay.  Okay.  Let's go --

10           MR. CASEY:  We're about 10:14.  I don't

11  want to parse minutes like that, Katie.  You said we had

12  a hard stop at 10:15.  I want to honor that.  This is a

13  good time for us to break until we come back.

14           MS. LONG:  No, at 10:45 or 10:50.

15           MR. CASEY:  Oh, I'm sorry.  I completely

16  misheard that.  Thank you.  So 10:45.  Okay.  Let me

17  type that.  All right.

18    Q.  (By Mr. Casey)  In 2021, who reported to you

19  directly from the Round Rock ISD Police Department?  Who

20  were your direct -- who were your direct subordinates?

21    A.  Assistant Chief Williby was the direct report

22  to me in the police department.

23    Q.  And -- and then everybody else would directly

24  report to him?

25    A.  Yes, or their sergeants.  Well, the sergeants

CHIEF JEFFREY DWAYNE YARBROUGH

1   would report to Assistant Chief Williby, and then those
2   under each of those sergeants would report to the
3   sergeants.
4       Q.  Okay.  How many -- how many officers strong was
5   your force at that time?
6       A.  Approximately 30, 31.
7       Q.  Okay.  So to whom did Sergeant Pope report?
8       A.  Sergeant Pope reported to Assistant Chief
9   Williby.
10      Q.  Okay.  And what was Mr. Pontillo, what was his
11  -- what was his title at the time?  Do you recall?
12      A.  He was an officer to my best recollection.
13      Q.  And to whom did he report?
14      A.  I'm not sure which sergeant, but it would have
15  been a sergeant.
16      Q.  All right.  And do you recall to whom Officer
17  Griffith reported?
18      A.  She direct-reported to Assistant Chief Williby.
19      Q.  Okay.  When -- when you're at a school board
20  meeting -- back up for a second.
21          When I was in the military, when the
22  commanding officer of the ship came into a room
23  everybody would shout, "Attention on deck," and that was
24  acknowledgement that the CO of the ship was there and
25  they would carry on their duties.  Is there any other

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  similar -- let me back up.

2        Because you were the chief of police at Round

3  Rock ISD, when you reported in a room, was there a sort

4  of similar acknowledgement by the officers there that

5  the chief of police is in the place?

6        A.  Not at all.

7        Q.  Okay.  So when you showed up, were you supposed

8  to almost be like a fly on the wall in a sense?

9        A.  That's a bit broad, and I can narrow it if I

10  need to.

11        Q.  Please, yeah.  So when -- when -- so say a

12  school board meeting's going on and you show up, what --

13  how would that affect the immediate reporting on site?

14        A.  It would not.  Because when I show up, Chief

15  Williby is there and he communicates and -- and

16  generally directs officers' positions, gathers the

17  information from them on any concerns, any positivities,

18  status updates.  He handles those things -- or he

19  handled those things.

20        Q.  So to use this term loosely, not as a term of

21  art, but he would be the on-site supervisor?

22        A.  Yes, he would be the on-site supervisor or the

23  commander on scene.  Yeah.

24        Q.  Okay.  When you show up to school board

25  meetings, are you there in uniform or in plain clothes?

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  It depends.  There wasn't a fixed uniform for
2  me so sometimes I would be in a suit, sometimes I would
3  be in uniform.
4    Q.  Okay.  So would you describe your role at a
5  school board meeting as passive rather than active?
6    A.  It would -- I would describe it -- using those
7  two terms, I would say it was more passive than active
8  in the sense of allowing the chain of command to operate
9  the way it was designed.  Meaning that I'm the
10  administrator, chief -- Assistant Chief Williby was the
11  manager, so he managed the -- the environment and the
12  individuals involved.
13    Q.  So -- so during the -- during a school board
14  meeting with the superintendent there, if the
15  superintendent wanted things to happen in a certain way,
16  who would he correspond or communicate with?
17    A.  Generally he would respond to me as the
18  department head.
19    Q.  All right.  How would that then play out in a
20  school board meeting if Chief Williby is the on-site
21  supervisor?
22    A.  In what context?
23    Q.  Well, in a school board meeting, if the
24  officers are coordinating or -- or are maintaining
25  decorum and Chief Williby is the on-site supervisor and

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  something happens, do you engage between Chief --

2  Assistant Chief Williby and the superintendant or are

3  you, like, the -- the gateway of information between the

4  two or do they talk directly?

5          MS. LONG:  Objection.  Vague.

6      A.  If the superintendent or the deputy

7  superintendent or the assistant superintendent came and

8  told me that there was a vehicle unattended with all the

9  doors open in the parking lot that may have been broken

10  into, I'm going to report that to Chief Williby so that

11  he can direct officers to that.  So that response and

12  process at hierarchy exists regardless of -- generally

13  regardless of what situation or circumstances occur.

14      Q.  Okay.  So you not -- you would not be

15  coordinating kind of like on-site response; it would be

16  Chief -- Assistant Chief Williby who's kind of managing

17  everything?

18      A.  That's correct.

19      Q.  Okay.  And would you be coordinating messaging,

20  like if a news crew was there?

21      A.  No.  If a news crew was there, that would

22  typically be our communications department handling

23  that, the School District's communications department.

24      Q.  Okay.  So did the superintendent ever engage

25  directly with Assistant Chief Williby?

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.   I wouldn't doubt that there were times he did.

2    Q.   Okay.  Would -- would there be times when --

3  when you were in a -- where you were in a huddle with

4  the superintendent and Assistant Chief Williby?

5    A.   I don't recall.  What -- I -- that -- that's a

6  bit vague for me.  I don't understand what that means.

7    Q.   Well, you would coordinate like with you and

8  Assistant Chief Williby and the superintendent all --

9  all, you know, conferencing together about how you-all

10  are going to handle a situation?

11    A.   I don't recall anything like that.  I do recall

12  there were times when I would be in my office and the

13  superintendent would be there and Chief Williby would be

14  there.  I don't recall what we talked about.  But this

15  was early on, this was during, this was after.  I don't

16  recall anything specific related to a school board

17  meeting.

18    Q.   Okay.

19            MR. CASEY:  All right.  I need about a

20  two-minute -- two-minute break, Katie, if we can?

21            MS. LONG:  Okay.

22            MR. CASEY:  I apologize.  I'm in a remote

23  location right now, I'm not in an office, and something

24  came up.  I just got to -- two minutes.  All right?

25            THE REPORTER:  Okay.  Off the record.

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1              (Four-minute break was taken.)

 2              MR. CASEY:  Thank you for that.  I

 3   appreciate it.

 4       Q.  (By Mr. Casey)  So we were talking about school

 5   board meetings, Chief Yarbrough.  So in the school board

 6   meeting, if the superintendent gave some sort of

 7   direction to the officers, would that be something that

 8   they would -- they would communicate -- that they would

 9   carry out?

10              MS. LONG:  Objection.  Vague, calls for

11   speculation.

12       A.  Depending on the directive, they would either

13   carry it out or confer with Chief Williby about the

14   directive.  But either way -- say for example, if they

15   say, "Hey, there's" -- that there's -- there's toilet

16   paper not in the bathroom, then the officer would reach

17   out to who's responsible.  But if he gives a directive

18   that's not something that the officer thinks is

19   appropriate, the officer would confer with Chief

20   Williby.

21       Q.  (By Mr. Casey)  Okay.  So -- so then there's no

22   -- there wouldn't be a direct -- direct -- direct role

23   of the superintendent commanding officers outside of

24   Chief Williby's guidance to -- to take any specific

25   actions during a school board meeting?
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.   Say that one more time, please.

2      Q.   Well, let's -- let's talk about the August 6th

3  -- August 16th school board meeting.  Did the

4  superintendent, based on your recollection -- oh, let me

5  back up for a second.

6           Were you there on August 16th?

7      A.   That was -- yes, I was there on August 16th.

8      Q.   Okay.  Did the superintendent give Mr. Pope and

9  Mr. Pontillo any specific verbal or physical commands

10 like nods or anything like that regarding Mr. Story?

11     A.   Not to my knowledge.

12     Q.   Okay.  Would that have been -- and if he did,

13 that have been typical or not typical?

14     A.   That would have been nontypical.

15     Q.   Okay.  Based on your understanding of the way

16 the -- your -- your department worked when you were the

17 chief, did the superintendent have the right -- not

18 whether he did frequently or infrequently -- did he have

19 the right to command them to do something?

20     A.   Not to take law enforcement action.  No.

21     Q.   Okay.  So -- okay.  So not to -- I'm just --

22 I'm just jotting a note to myself.  And what -- how do

23 you define law enforcement action?  You just used that

24 term.  We haven't talked about -- we haven't -- I

25 haven't used that phrase before.  But what do you mean

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  by that?

2       A.  Say, for example, if the superintendent wanted

3  an officer to go and search a person that they found to

4  be suspicious or believed to be suspicious, that's not

5  an action that he would give to the law enforcement

6  officer.  If he felt that a person should be arrested

7  for wearing a green hat, that's not something that he

8  could -- that he would -- a directive he would be able

9  to give the law enforcement officer and the officer

10  wouldn't comply with a directive like that.

11       Q.  So what I understand you saying is he couldn't

12  -- he couldn't tell an officer to, based on his

13  judgment, to do something like a Terry stop?  He

14  couldn't do that?

15       A.  No.

16       Q.  Okay.  So the officer then, as I understand it,

17  has an independent kind of mental process that's

18  required where they have to use their own law

19  enforcement judgment in order to take action; right?

20            MS. LONG:  Objection.  Speculative, vague,

21  calls for a legal conclusion.

22       A.  Yeah, that's -- that's a bit general for me,

23  too -- too broad rather.

24       Q.  (By Mr. Casey)  Okay.  Well, let's be real

25  specific.  You -- you said -- you said a suspicious

CHIEF JEFFREY DWAYNE YARBROUGH

1  person for example, and I used the phrase Terry stop.

2  What's a Terry stop?

3      A.  That's what we call a top -- a stop and frisk.

4      Q.  Okay.  And -- and -- and we talked about these

5  audits before and they always -- they're very -- very

6  keen on saying reasonable articulable suspicion; right?

7      A.  Uh-huh.

8      Q.  So an officer, as I understand your testimony,

9  and correct me where I -- where I may be off.  An

10  officer would have to develop his or her own reasonable

11  articulable suspicion before they frisk someone and not

12  at the command of the superintendent?

13      A.  Absolutely.

14      Q.  Okay.  So if -- if -- if a person then -- an

15  officer believed a person was violating the law, then

16  that would be from their own judgment and not because

17  the superintendent gave them a command?

18      A.  Absolutely.

19      Q.  Okay.  And as I understand it, that means

20  that's maintaining the distinction between their role as

21  a law enforcement officer of Texas laws versus enforcing

22  school policy; right?

23      A.  That is correct.

24      Q.  Okay.  Did you ever talk with the

25  superintendent about Jeremy Story prior to August --

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  from -- from June 1st of August -- excuse me.  June of

2  August.  June 1st of 2021 up to August 16th of 2021,

3  before that board meeting, had you ever talked to the

4  superintendent about Jeremy Story?

5      A.  I don't recall talking to him about Jeremy

6  Story.

7      Q.  Okay.  Do you recall Jeremy Story engaging with

8  Officer Griffith in June and July of 2021?

9           MS. LONG:  Objection.  Mischaracterizes the

10  evidence.  And objection, foundation.

11      Q.  (By Mr. Casey)  Do -- do you know if there

12  was --

13      A.  It occurred on August 1st.

14           MR. CASEY:  Oh, okay.  Well then, he can

15  say no.

16      Q.  (By Mr. Casey)  Do you -- do you -- do you

17  recall whether on August 1st Jeremy Story engaged with

18  Officer Griffith on the Round Rock ISD campus?

19      A.  I'm not familiar with the date, but I'm

20  familiar with that incident.

21      Q.  Okay.  To your recollection, describe to me

22  what you recall about that incident that you learned.

23      A.  It was very general and my knowledge of it

24  today is still the same.  I recall there being a -- a

25  situation where Mr. Story went into the admin building.

CHIEF JEFFREY DWAYNE YARBROUGH

1  I don't recall what reason, but I recall Sergeant
2  Griffith going out -- or I recall being told about
3  Sergeant Griffith going out and speaking with Mr. Story
4  who was parked in the parking lot before he left.  And
5  that was information that was conveyed to me generally
6  later because it just at the time, in my opinion, didn't
7  seem like a major issue.
8      Q.  Well, just to kind of lay some background for
9  the next couple of questions I want to ask.  I guess
10 you-all have as a -- as a big campus, you-all usually --
11 you-all have vendors that come visit your campus to work
12 on items; right?
13     A.  That's correct.
14     Q.  And in the administration building, which I
15 guess is obviously smaller than the whole campus, you
16 might have outside visitors for particular meetings;
17 correct?
18     A.  That's correct.
19     Q.  Was it unusual to have Mr. Story there filming?
20     A.  That's hard for me to say whether it's unusual
21 or not because I didn't work up front and I wasn't there
22 up front a lot to see the interactions of the visitors
23 or individuals come in or out of the building, so it's
24 hard for me to say if that was unusual or not.
25     Q.  Was it common to have people doing even First

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Amendment audits on the Round Rock ISD campus?

2      A.  That's hard -- again, that's hard for me to

3  know because it -- say for example, it could have

4  happened at another school and another officer was

5  informed of it, but there was no violation so that

6  information didn't escalate up.  So it's hard for me to

7  say.  I mean, someone could have done it every day.

8      Q.  And that's fair.  That's fair.  You're not

9  omnipresent so I'm not expecting you to know that.  Did

10  you at the time you were chief, because I guess various

11  departments work different ways, did you have like a

12  speaker or an earpiece letting you know what was going

13  on with any type of dispatch announcements?

14      A.  I had a radio -- a handheld radio that I

15  carried generally.

16      Q.  And was that generally tuned to the dispatch?

17      A.  Yes.

18      Q.  Okay.  Did you receive the dispatch notice

19  whenever that went over the -- went over the radio when

20  -- when Detective -- or Sergeant Griffith was called to

21  the admin building?

22      A.  No, I don't recall that.

23      Q.  Okay.  Did you recall -- do you recall that's

24  the day that Dr. Azaiez was served with process servers

25  for a protective order?

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1        A.   I don't recall that.
 2        Q.   Are -- are -- are you aware that he was served
 3   with a protective order?
 4        A.   What I recall is that a person went to the
 5   administration building looking for him.  I don't recall
 6   whether he was served or not.
 7        Q.   Okay.  How did you find out a person went to
 8   the administration building looking for him?
 9        A.   I don't recall who told me that.
10        Q.   Okay.  Do you recall what day he was served?
11        A.   I do not.
12        Q.   Okay.  I may have asked this, correct me if I'm
13   wrong, because I didn't check it down.  I think I asked
14   it on the fly.  Did a -- did a call from dispatch go out
15   over the radio that there were process servers at the
16   admin building?
17        A.   I don't recall that.  And it could have.  The
18   difference here that I think you may be missing is I
19   generally didn't monitor the radio as the chief of
20   police.  If there were major issues, then they would
21   typically -- Assistant Chief Williby or someone would
22   reach out to me.  So I generally didn't monitor the
23   radio unless I was in my vehicle and the radio was on --
24   the -- the mobile radio was on.
25        Q.   Okay.  All right.  Are you familiar with --
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

CHIEF JEFFREY DWAYNE YARBROUGH

 1  with the way the school board policies are organized by

 2  topic?

 3       A.  Somewhat.

 4       Q.  Okay.

 5       A.  Somewhat familiar.

 6       Q.  All right.  I'm going to -- I'm going to quote

 7  you part of what pol- -- are you familiar with policy BE

 8  (Local)?

 9       A.  I would have to see it.

10       Q.  Okay.

11       A.  Yeah.

12       Q.  Now, how Round Rock board meetings are

13  conducted are based on policy decisions; correct?

14       A.  I would say generally, yes.

15       Q.  Okay.  Who maintains order over a local school

16  board -- school board meeting?

17       A.  The president of the school board.

18       Q.  Okay.  Okay.  When -- when -- on the August

19  16th meeting, and that was a long one, do you recall who

20  was school board president at the time?

21       A.  I believe it was Amy Weir.

22       Q.  Okay.  All right.  And do you recall if the

23  public comment session -- public comment session at that

24  time was particularly long or relatively short?

25       A.  I recall it being really long.

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.   Okay.  A lot of -- a lot of individual

2  speakers?

3    A.   Yes.

4    Q.   Okay.  Do you -- and this is a long time ago,

5  so I'm not expecting you to, but do you recall what --

6  what generally people were talking about at that time

7  during the public comment session?

8    A.   Yes, I do.

9    Q.   What -- what generally were people talking

10  about?

11    A.   The mask mandate.

12    Q.   Mask mandate.  Okay.  Anything else?

13    A.   I don't recall other than that.

14    Q.   Okay.  Do you recall what the actual stated

15  agenda topics were?

16    A.   I don't recall.

17    Q.   Okay.  All right.  For the sake of argument, I

18  -- well, let's assume the Board -- Board Policy BE

19  (Local) is, you know, corresponds to Texas law.  If a

20  board chair, say the -- Ms. Weir, the Board President,

21  directed a police officer to remove someone from the

22  meeting, does she have that authority?

23    A.   Generally she does, depending on the

24  circumstances, in my opinion.

25    Q.   Okay.  If that person is violating school board

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  policy, does she have the authority to tell on officer

 2  to remove someone?

 3       A.  It would depend on the policy.

 4       Q.  Okay.  When you say it would depend on the

 5  policy, what do you mean by that?

 6       A.  If the policy, for example, said that a --

 7  let's just say a policy said that a student couldn't

 8  wear shorts into the room.  Directing the officer to do

 9  that would be something that she would have the right to

10  do, but now the question becomes what -- what other

11  ancillary things exist for the officer to determine

12  whether or not they can -- that's appropriate or not.

13       Q.  Well -- well, okay.  So that -- that's --

14  that's -- I can understand you saying that.  So no

15  shorts in the room, as I understand you telling me,

16  would be -- could be up -- let's assume that in the

17  school policy is no shorts in the room.  That would be a

18  policy violation, but there's nothing under state law

19  that says you can't wear shorts in the room; right?

20       A.  Exactly.

21       Q.  So in that instance, what would the officer --

22  what would you direct your officer to do in that

23  circumstance?

24       A.  That would be something that a

25  non-law-enforcement officer would be responsible for

CHIEF JEFFREY DWAYNE YARBROUGH

1  handling.

2      Q.  So there can be, as I understand it, actions

3  that violate policy that do not violate state law?

4      A.  Yes.

5      Q.  All right.  If a -- if a speaker -- excuse me.

6  Does school board policy limit comments during certain

7  meetings to agenda items?

8      A.  Yes, from my understanding.

9      Q.  Does state law limit comments during school

10 board meetings to agenda items?

11     A.  I can't speak to that.

12     Q.  Well, my -- my question is -- let's drill down

13 on that a little bit.  I want to be on this topic I

14 guess until -- we got about two more minutes and we'll

15 pick up after -- after the break.

16          When you -- you said that there's a -- there's

17 a distinction, school board policy on one hand, state

18 law on the other hand.  And if something doesn't violate

19 state law and it's just a policy violation, then you

20 would direct the officer not to enforce it.

21          Is speaking on topic for an agenda item, is

22 that a state law -- excuse me, speaking off topic.  I

23 apologize.  Speaking off topic on an agenda item, is

24 that a state law violation?

25          MS. LONG:  Objection.  Asked -- objection,

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  asked and answered; and objection, foundation.

2      A.  That would be a policy violation, but there are

3  things that can accompany that that trigger law

4  enforcement intervention.

5      Q.  (By Mr. Casey)  Okay.  So the mere speech, as I

6  understand it -- and this will probably be the -- my

7  last question before we break.

8          So the mere speaking off topic of what you're

9  saying is not a state law violation?

10          MS. LONG:  Objection, mischaracterizes the

11  testimony.  Objection, asked and answered.

12          MR. CASEY:  I'm just asking for

13  clarification.  So it's going to be a little redundant.

14          MS. LONG:  It's -- I mean, he's testified.

15  He said he doesn't know.  He -- he -- your -- he's

16  answered the question twice, and now you're asking him a

17  question that mischaracterizes both of the clear answers

18  he provided.

19          MR. CASEY:  I'm -- I'm seeking more

20  clarity, but I want him to go ahead and answer.

21      A.  Okay.  Could you ask the question again?

22      Q.  (By Mr. Casey)  The mere -- the mere words

23  someone says, if it's off topic, you're saying that

24  that's not a state law violation?

25          MS. LONG:  Objection --

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  (By Mr. Casey)  You just said it could be

2  accompanied by something else that would, so I'm trying

3  to make a clear distinction between the two.  Someone --

4  someone's behavior then must -- must occur in addition

5  to their words to make it rise to a state law violation?

6          MS. LONG:  Objection, asked and answered.

7  Objection, mischaracterizes the testimony.  Objection,

8  to the extent it calls for a legal conclusion.

9          MR. CASEY:  Okay.

10    Q.  (By Mr. Casey)  You can go ahead and answer,

11  Chief Yarbrough.

12    A.  A person's words alone -- for example, if they

13  said "and" instead of "the," that is not a violation of

14  -- of state law.

15          MR. CASEY:  Okay.  That -- that's -- we --

16  we went to 10:46.  I'm sorry.  I thought I'd get it done

17  by 10:45.  We'll break.  And what time -- what time can

18  we reconvene, Katie?

19          MS. LONG:  Can we -- can we do 12:20, just

20  to be careful?

21          MR. CASEY:  Yeah.  Yeah.  That's safe.

22  Take whatever cushion you need.  12:20.  Okay.  You-all

23  have a blessed lunch.

24          (Thirty-eight-minute lunch was taken.)

25          (Mr. Story exits.)

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      Q.  (By Mr. Casey)  All right.  Is there any

2  questions that I asked before the -- before we went and

3  took a lunch break, Chief Yarbrough, that you would want

4  to address?  I just want to make sure we get any of that

5  done before we continue on.

6      A.  I can't think of any.

7      Q.  Okay.  All right.  Excellent.  Are you familiar

8  with, I think we asked earlier, the school board policy

9  BE (Local)?

10     A.  Not by title.

11     Q.  Okay.  So during discovery you-all's -- you-all

12  provided official copies of the school board policy BE

13  (Local).  I'm going to show you what has been produced.

14  It's Bates No. RRISD 0187.  I'm going to share my screen

15  right now.  Or is it Acrobat?  There we go.  Share.

16  Okay.  And like I said, just saying it, there's tons of

17  acronyms there and I totally understand there's a lot of

18  them.

19            MS. LONG:  Stephen, that's BE (Legal).  I

20  think you mentioned BED (Local).

21            MR. CASEY:  Oh, yeah.  Yeah.  Sorry.

22  Local's after that.  I was --

23            MS. LONG:  And -- and just to let you know,

24  this is not the one that was in effect at the time.

25  Jeremy used -- I'm sorry.  Mr. Story used the one in

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  effect in the time as an exhibit to his complaint.

 2              MR. CASEY:  Okay.  Well, let's -- let's --

 3  are there any -- are there portions of this -- so that

 4  we can streamline this, are there portions of this that

 5  you know were -- were revised or amended afterward?

 6              MS. LONG:  BE (Legal) or BED (Local)?

 7              MR. CASEY:  I'm sorry.  Either one because

 8  I'm going to do both of them.

 9              MS. LONG:  I haven't looked at BE (Legal).

10  BED (Local), yes.

11              MR. CASEY:  Okay.  Okay.  So for purposes

12  of the record, I want to stipulate if there's anything

13  different -- maybe this'll help.  If there's anything

14  different, that we're going off the policy as it existed

15  at the time.  I was trying to -- I was trying to get

16  exactly -- exactly the one that -- that you-all had.

17  And I understand the time difference.  I'm -- I'm not --

18  I don't have a problem with that.  And I don't want to

19  hold you-all accountable to hold -- you know, put your

20  clients up against a policy that wasn't in place at the

21  time.

22          Okay.  I had it written down and I think I

23  just -- I just went off the page where I had -- where I

24  was going to start.  Okay.  So this is BE (Legal).  And

25  this portion of BE (Legal) -- and I'm going to give it

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1   to the court reporter afterward.  I'm going to introduce
 2   it as Plaintiff's Exhibit 1 right now.
 3                  (Exhibit 1 marked for identification.)
 4        Q.  (By Mr. Casey)  Now that you've seen it, Chief
 5   Yarbrough, do you -- do you have some general
 6   familiarity with it?  I mean, you've probably looked at
 7   it one time before; right?  Let me -- and I can enlarge
 8   it.
 9        A.  I have a general familiarity with it.
10        Q.  Okay.  Let's go to the second paragraph.  It
11   says, "Every regular, special or called meeting of the
12   Board shall be open to the public except as provided by
13   the Open Meetings Act," and then it looks like it has an
14   exception for closed meetings.  When it says "open to
15   the public," how -- how do you understand that as the
16   chief of -- chief of police as you were at the time for
17   Round Rock ISD?
18        A.  Well, I interpret that, not as an attorney or
19   as a person that wrote this, but as a -- just as a
20   layman.  When I think of open to the public, it means,
21   to me, that a member of the public has access to their
22   elected body where they can speak to them when the time
23   is appropriate, they can watch the proceedings take
24   place.
25        Q.  Okay.  And that's fair.  I'm not asking you to
```

CHIEF JEFFREY DWAYNE YARBROUGH

1  make legal conclusions.  And -- and you said earlier

2  that you weren't -- that your job is to enforce Texas

3  law first and foremost.

4          When -- the second paragraph, "A parent is

5  entitled to complete access to any meeting in the Board

6  other than a closed meeting."  Was the meeting on August

7  16th, 2021 a closed meeting?

8      A.  I don't recall it being a closed meeting.

9      Q.  Okay.  What about September 14th, 2021, was

10  that a closed meeting?

11     A.  Part of it, to my recollection, was when they

12  went into closed session.

13     Q.  Okay.  And that's fair.  I would completely

14  agree with you.  Was the entrance in the -- on the

15  August 16th, 2021 board meeting, were the amount of

16  seats in the space controlled?

17     A.  To my recollection -- beyond being confused by

18  the actual dates and the specific events, to my

19  recollection it was controlled that day on the -- on the

20  floor.

21     Q.  Okay.  And -- and -- and how would you define

22  -- let me back up because I was the one using the word

23  first.

24          When I say "controlled," I mean the number of

25  the seats in the meeting were spread out and, you know,

CHIEF JEFFREY DWAYNE YARBROUGH

1  distanced from each other.  Is that -- is that how you

2  understand that I used that word?

3      A.  That was an assumption that I made, is that you

4  were referring to the number of seats and the spacing,

5  the social distancing parameters that were put in place

6  and documented by the notice on the entrance to the

7  school board meeting.

8      Q.  Okay.  And was that spacing of seats a school

9  board policy decision?

10     A.  I don't recall if it was a school board policy

11  decision.  I don't recall that.

12     Q.  Okay.  Do you know whether it was Texas law at

13  the time?

14     A.  When we say Texas law, are we talking Texas

15  Penal Code?  I mean, so it wasn't an arrestable offense

16  if that's what you're referring to.

17     Q.  Okay.  So -- so if -- so if someone was

18  violating -- and when I say violate, breaking the rule

19  so to speak.  You know, say there's 10 chairs -- let's

20  just think about it in the sense of the kids playing

21  musical chairs; right?  If there's 10 chairs and 11

22  persons, by that 11th person being in that room, that's

23  not a penal code violation, is it?

24     A.  No.  But it would be -- my understanding that

25  it was a violation of the rules that were put in place

STOVALL REPORTING & VIDEO, INC.  (214) 695-2024

CHIEF JEFFREY DWAYNE YARBROUGH

1  for that specific meeting.

2      Q.  And I think that's fair.  Right?  That's a fair

3  thing.  I'm just trying to get, just, your

4  acknowledgement that that's not a penal code violation.

5          On September 14th, were the chairs similarly

6  socially distanced?

7      A.  I don't recall how the chairs were placed on

8  that day.

9      Q.  Okay.  And we'll look at the video of the

10 meeting later.  If the chairs were distanced and a

11 person attempted to come into the meeting, would one of

12 your officers have the right to stop them from enforcing

13 that policy decision?

14              MS. LONG:  On what date?

15              MR. CASEY:  On the September 14th.

16              MS. LONG:  I'm going to object.  Just for

17 the record, there are no claims.  In fact, one of the

18 stipulations for taking this deposition out of time was

19 that all claims related to the September 14th, 2021

20 board meeting were -- were going -- were non-suited and

21 they were not going to be pursued.  So this is not --

22 I'm going to object and have a running objection to this

23 to the extent there's any effort to make this seem like

24 this issue is being tried by consent.

25              MR. CASEY:  And I completely agree.  We're

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  not trying the September 14th as a legal matter.  It is

2  a -- a factual question that I'm asking.  So I agree

3  with that stipulation.  I -- that was -- that was very

4  solid and I do not want to go against that.

5      Q.  (By Mr. Casey)  Do you -- do you -- at the

6  September 14th meeting, Chief Yarbrough, isn't it true

7  that the superintendent expressly made the decision to

8  socially distance the chairs?

9      A.  I don't recall who specifically made that

10  decision.  I recall the decision being made to socially

11  distance the chairs.

12          (Mr. Story re-enters.)

13      Q.  Okay.  But you would agree with me that at the

14  September 14th meeting that the social distancing of the

15  chairs was not a statute such that it would be a -- an

16  arrestable offense if that was violated?

17      A.  If someone violated the social -- the social

18  distancing protocols that were put in place or the

19  parameters of the seating?

20      Q.  Correct.

21      A.  That in and of itself would not be a criminal

22  offense because if it was, someone walking past one of

23  the chairs would have technically -- technically be

24  considered violating it.

25      Q.  I would completely agree with you.  Okay.  Part

**CHIEF JEFFREY DWAYNE YARBROUGH**

1 of our lawsuit -- let's go to the -- let's go to the

2 Third Amended Complaint.  And so I'll put it like P-1 as

3 BE (Legal).

4                    MR. CASEY:  And I'll give this to the court

5 reporter after the hearing.

6      Q.  (By Mr. Casey)  Let's go to the Third Amended

7 Complaint.  And this will be P-2.  This is the lawsuit

8 -- let's go to page one.  Sorry.  I don't know why I did

9 -- clicked that.  Do you recognize the lawsuit here,

10 Chief Yarbrough?

11                    (Exhibit 2 marked for identification.)

12      A.  Could you zoom in just a little bit?

13      Q.  Oh, yeah.  Sorry about that.

14      A.  No worries.

15      Q.  I just -- I -- I forget -- I put up a screen

16 being close to me.  I apologize.

17      A.  No worries.

18      Q.  Yeah.  The VA gives me free glasses, but I

19 haven't taken advantage of it yet, so I just blow

20 everything up.

21           So do you recognize this?

22      A.  Yes, I recognize it by title.

23      Q.  Okay.  Yeah.  And I'll represent to you this is

24 the live -- what's called the live pleading in lawyer

25 talk.  This the lawsuit right now.  So when -- let me go

**STOVALL REPORTING & VIDEO, INC.   (214) 695-2024**

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  to page 10 and -- actually, I'll just scroll down.

2  Well, I think that's a bit -- okay.  So we're only going

3  to focus on the -- the claims as your -- as your

4  attorney properly stated that there are -- there's --

5  there's very limited claims here.  Okay.  Okay.  So the

6  first -- the first cause of action is for various

7  persons violating Jeremy Story's rights, this Paragraph

8  A, protected by the First Amendment.  And it's kind of a

9  technical tagline enforced through the 14th Amendment in

10  1983, which is the statute that allows us to do that;

11  right?

12      A.  Right.

13      Q.  So when Mr. Story was speaking, it says, you

14  know, the First Amendment.  Let's read that together,

15  "Congress shall make no law respecting an establishment

16  of religion," that's not the claim, "prohibiting the

17  free exercise," we're not talking about that, "abridging

18  the freedom of speech, or of the press," or of assembly

19  and to petition the government.  We talked about those

20  earlier in the deposition; right?

21      A.  Uh-huh.

22      Q.  Okay.

23          MS. LONG:  Chief Yarbrough, you have to

24  verbalize your answer.

25      A.  Yes.

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1              MS. LONG:  Thank you.

 2              THE WITNESS:  Thank you.

 3       Q.  (By Mr. Casey)  Okay.  So our lawsuit -- my

 4  client's lawsuit -- sorry, it's his lawsuit -- alleges

 5  that these defendants infringed upon Jeremy Story's

 6  right to petition of free speech by ejecting him from

 7  the August meeting and treating him unequally.  Did you

 8  have a chance to listen to Mr. Story's speech during the

 9  August meeting?

10       A.  Yes, I have.

11       Q.  Okay.  In your opinion, was he treated

12  unequally?

13       A.  No.  In my opinion, he was not.

14       Q.  Okay.  So that based on your recollection, he

15  was not treated unequally.  Okay.  How would you define

16  unequal treatment on his speech?

17              MS. LONG:  Objection to the extent it calls

18  for a legal conclusion.

19              MR. CASEY:  Fair.  Totally.

20       Q.  (By Mr. Casey)  In your -- in your experience

21  as -- as an officer of the law present at that board

22  meeting and -- and required to enforce the boundaries of

23  the law, how would you make a decision if -- if

24  Mr. Story's rights were -- were being freely expressed

25  versus being violated?
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.  Help me with that question.  I -- I -- I

2   believe I know where you're going, but I don't want to

3   assume.

4      Q.  Sure.  No problem.  So based on what I said,

5   you know, your -- your role as the chief of police and

6   making sure your officers are following the boundaries

7   of the constitution, right, how -- how would -- how

8   would someone be treated unequally if they were

9   speaking, you know, during that -- during the -- during

10  the comment time?

11          MS. LONG:  Objection to the extent it calls

12  for a legal conclusion.

13          MR. CASEY:  Sure.

14      Q.  (By Mr. Casey) Just based on your experience as

15  -- as a law enforcement officer, how would you tell

16  that?

17      A.  How would I tell if someone was treated

18  unequally?

19      Q.  That's right.

20      A.  If I had two people that did identical --

21  comitted identical actions, they were before the Council

22  -- or the School Board, they took identical actions,

23  both took the posture of continuing when they were asked

24  to stop, both refused to leave and were forcibly --

25  forcing -- used physical force to be removed from a

CHIEF JEFFREY DWAYNE YARBROUGH

1  room.  If you had identical actions and one person had a
2  different outcome, that would be unequal in my opinion.
3      Q.  Okay.
4      A.  Identical actions and -- and -- and different
5  outcomes.
6      Q.  Okay.  That's a fair definition.  And when you
7  say "identical actions," I mean, there's multiple
8  individuals, so you would agree with me that people are
9  probably going to come up and not say the exact, you
10  know, digitally same words; right?  You would agree with
11  me?
12      A.  Yes.  And I -- less words, more actions and
13  behavior.  I think those are the catalyst for the
14  delineation, in my opinion.
15      Q.  All right.  So based on your testimony we took
16  before lunch, if -- let's see.  In order to hear, in
17  order to tell whether somebody was being treated
18  unequally, you have to hear what they're saying; right?
19      A.  I would say to a point, not the entirety.
20      Q.  Okay.  So you're saying that you could hear --
21  like, let's see someone had -- I'm going to make a
22  hypothetical.  Someone's got 10 sentences to say about a
23  topic, and you hear the first five, are you saying that
24  you can determine at that point whether they're --
25  whether they're going to prove their point?

### CHIEF JEFFREY DWAYNE YARBROUGH

1      A.   I can say based upon what an individual says

2   and how that information is relevant or irrelevant will

3   determine whether I'll allow them to continue.

4      Q.   When you said --

5      A.   Okay.

6      Q.   Okay.  Hold on a second.  And I'm sorry.  You

7   were -- you were giving me a good answer.  I apologize

8   for cutting you off, but I want to -- I want to drill

9   down on this a little bit tighter.

10          If a some -- someone is speaking and they've

11   got prepared remarks, in order to judge whether they're

12   completely talking about a topic, isn't it true that you

13   probably have to hear the entirety of what they're going

14   to say because they may close it up at the very end?

15      A.   I -- from my -- in my professional opinion,

16   once a person reaches a point to where their actions or

17   behavior or words are inconsistent with what the

18   requirements are, then that's different.  It -- it's no

19   different than someone starting out singing a song in a

20   -- in a theater, then all of a sudden talk about

21   committing a violent act.  I'm not going to let them

22   finish before they go back to the song.

23      Q.   Sure.  Okay.  That's fair.  That's fair.  I'm

24   going to give you a, kind of, hypothetical and have you

25   walk with me through it and -- and see how -- see how

CHIEF JEFFREY DWAYNE YARBROUGH

1   you handle it; right?  I'm going to use a story -- it's
2   a historical story -- it's a historical story.  There's
3   a king written about and -- and by the way of
4   background, I've got a seminary background so a lot of
5   my -- a lot of my kind of stories come out of -- come
6   out of, you know, like Old Testament stuff.  So -- so
7   King David -- you're familiar with King David having
8   Solomon, but he -- he -- he had -- he had Solomon with
9   Bathsheba; right?  You familiar with that story?
10       A.  Uh-huh.
11       Q.  I mean, that's a yes?
12       A.  Yes.
13       Q.  Okay.  So when King David -- you're familiar
14  with the idea that he sent Uriah, Bathsheba's husband,
15  out to the front lines to get killed so he could have
16  Bathsheba to himself?  You're familiar with that?
17       A.  Yes.
18       Q.  Okay.  Do you remember when the prophet Nathan
19  confronted King David?
20       A.  Yes.
21       Q.  Okay.  Do you remember him talking to King
22  David about -- about this story where there was two
23  people.  There's a guy who had tons of sheep and one guy
24  who had one little sheep, and the guy with lots of sheep
25  took the single sheep from the guy who only had one.  Do

CHIEF JEFFREY DWAYNE YARBROUGH

1    you remember that?

2          A.   Uh-huh.

3          Q.   Okay.  And did that have -- did that story up

4    until that point that the prophet Nathan would say --

5    did that have anything to do, from King David's point of

6    view that which we get the advantage of as we're reading

7    the story, did that have anything to do with Bathsheba

8    or Solomon or Uriah at that point?

9          A.   It's hard for me to answer that.

10         Q.   Okay.  Let's -- let me ask you yes or no.

11   Prior to that point in that story, did Nathan the

12   prophet say anything to him using the words Uriah,

13   Bathsheba or Solomon?

14         A.   Based on the parameters of that question, no.

15         Q.   Okay.  And then once -- once he revealed and

16   closed up the story, that context puts it all together;

17   isn't that right?

18         A.   That's hard for me to answer.

19         Q.   Okay.  So when -- when King David says, that

20   man who stole the guy's one sheep, you know, he should

21   pay four times as much and he should be punished, and --

22   and King David said that, didn't he?

23         A.   Uh-huh.  Yes.

24         Q.   Okay.  And so then Nathan comes back to him.

25   And do you recall this where he says, "You, King, are

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  that man"?  Do you remember that?

2      A.  Yes.

3      Q.  Okay.  And so then David, you know -- excuse me

4  -- Nathan the prophet explains, "Uriah had one wife,

5  you've got many.  You stole his wife from him and so

6  you're going to pay four times as much."  Do you

7  remember that?

8      A.  Yes.

9      Q.  Okay.  So -- so Nathan was pointing out how

10 David as the king and the leader of the whole country

11 was being morally hypocritical; right?

12     A.  Yes.

13     Q.  Okay.  And so he had to -- and I think it's

14 fair to understand, wouldn't you agree, he had to

15 introduce that story with the king to get the king to

16 understand a different situation to reveal that

17 principle that he was violating; correct?

18     A.  Specifically talking about King David and --

19 and Nathan, yes.

20     Q.  Yeah.  I mean, it -- you would agree with me,

21 he couldn't just come to the king and say, "Hey, you

22 slept with Bathsheba and you had an illegitimate child

23 and now," you know, "went and had her husband murdered

24 on the front line"?  He couldn't have just done that

25 straight up because then the King wouldn't have agreed

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  with him; correct?

2       A.  I don't know that.

3       Q.  Well --

4       A.  Yeah.

5       Q.  -- is it fair to say that he -- he was talking

6  to the king by analogy?

7       A.  He was.

8       Q.  Okay.

9       A.  In my opinion.

10       Q.  Yeah.  And -- and in order to figure out the

11  story and why it mattered to King David, you hear -- had

12  to hear the part that comes after Nathan said, "King

13  David, you are that man."  You have to hear the whole

14  thing; right?

15       A.  So it's hard for me to answer that question.

16       Q.  Okay.  Well, I'm just looking for a yes or no

17  to that question.  So if your answer's no, then that's

18  fine.  But until King -- Nathan reveals that that story

19  is about Bathsheba, Solomon, and Uriah, King David just

20  thought it was -- he was talking about sheep; correct?

21  Yes or no?

22                 MS. LONG:  He --

23       A.  Based on my reading -- go ahead, Katie.

24                 MS. LONG:  No, I'm sorry.  Continue, Chief

25  Yarbrough.

CHIEF JEFFREY DWAYNE YARBROUGH

1        A.   Based on my readings, that is my understanding.

2        Q.   (By Mr. Casey)  Okay.  And I agree with you.  I

3   agree with you.  Okay.  All right.  So let's go up.  And

4   so right here in this Paragraph 194 is allegations -- or

5   Mr. Story is saying this third -- in this third line

6   that he was treated unequally based on content and

7   viewpoint discrimination; right?  He talked earlier

8   about -- we talked about different people's viewpoints.

9             I'd like to go to the -- I'd like to go to the

10  board meeting, specifically the August -- August 16th

11  board meeting.  The first thing I'd like to reference

12  from that is the affidavit that -- that Detective

13  Griffith produced.  So let me stop the share real quick.

14  Where's my -- my main bar to my other screen?  All

15  right.  Let me zoom in so we can look at this affidavit.

16  All right.  So this will be Plaintiff's 3, so Exhibit

17  P-3.  And this is the Affidavit for Warrant and Arrest

18  and Detention.  Do you recognize this document, Chief

19  Yarbrough?  I'm going to go through it kind of slowly.

20             (Exhibit 3 marked for identification.)

21        A.   Yes, I do.

22        Q.   Okay.  All right.  And what do you know this

23  document to be?

24        A.   That is the Affidavit for Arrest for Probable

25  Cause Affidavit that is submitted to a magistrate for an

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1 │ arrest -- to review to -- to determine whether probable
 2 │ cause exists for an arrest warrant.
 3 │     Q.  That's fair.  I totally agree with you.  You've
 4 │ probably done hundreds of these, seen them hundreds of
 5 │ times at least.  And then there at the bottom there's
 6 │ the magistrate's signature; right?  Whose signature is
 7 │ that, do you recognize, on the bottom on page two on the
 8 │ affiant?  Who's the affiant here?
 9 │     A.  I don't know the signature, but I would have to
10 │ assume with the L that it's possibly Sergeant Lauren
11 │ Griffith.
12 │     Q.  Okay.  And we would agree with that.  All
13 │ right.  Let's -- let's go trough this.  We're going to
14 │ walk through this affidavit.  This section right here,
15 │ this -- this offense, PC 38.13.
16 │     A.  Uh-huh.
17 │     Q.  That -- that "hindering proceedings by
18 │ disorderly conduct."  You -- based on what you said
19 │ before where you're making a distinction between words
20 │ and conduct, you would be -- would it be your opinion
21 │ that Mr. Story's conduct is solely why he was arrested?
22 │     A.  Yes.
23 │     Q.  Okay.  All right.  So let's go to this next
24 │ section.  This -- this statement, "My belief on the
25 │ foregoing statement is based on," there's -- is there a
```

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  limitation as to what you can put right underneath "My

 2  belief on the foregoing statement is based on," and then

 3  the colon?  Is there a limitation to the categories you

 4  can put underneath there?

 5      A.  I'm not sure I understand what you're asking.

 6      Q.  Well, for example, there's no X -- and maybe my

 7  question wasn't a good question.  There's no X marks

 8  next to "personal knowledge."  You agree with me?

 9      A.  Yes, I agree.

10      Q.  Okay.  So there's a line that says,

11  "Information provided to me by Round Rock ISD PD

12  Sergeant Milton Pope, a credible person who personally

13  observed or gathered such information."  Could there be

14  an additional line that says, "Review of evidence file,"

15  you know, with some identifying number?

16      A.  There could.

17      Q.  Sure.

18      A.  Uh-huh.

19      Q.  Okay.  So you -- there's no real limit to this.

20  That's just an explanation of this - this affidavit's

21  saying solely based on Sergeant Griffith's communication

22  with Sergeant Milton Pope; is that -- is that how you

23  understand that?

24              MS. LONG:  I'm going to object to the

25  extent it mischaracterizes the evidence.  The document

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   says what it says.

2              MR. CASEY:   Okay.

3       Q.   (By Mr. Casey)   What did -- what is your

4   understanding of line -- that line with the four X's in

5   front of it?

6       A.   What that -- based on what my -- my experience

7   as a -- historically as an investigator, what that means

8   to me is no different than any agency that had a

9   criminal investigator or a criminal investigations

10   division.  Cases from school districts -- schools are

11   submitted to the investigator to do follow-up

12   investigation and get the cases prepped to send to the

13   -- to the -- to the district or county attorney's

14   office.  The only time an investigator would put

15   personal knowledge is if they had firsthand knowledge;

16   otherwise, they're investigating it based upon the

17   information that's provided to them.  Not only are they

18   taking the information that's provided, they're looking

19   at any other evidence that exists related to that.

20              So with this -- what that means to me is that

21   Sergeant Griffith, based upon the information provided

22   by Sergeant Pope in his initial report and all of the

23   ancillary evidence or individuals that were interviewed,

24   that is what led her to write the affidavit and check

25   that the way she did.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.   Okay.  All right.  So in here it -- if she had

2   learned something through review of body camera footage,

3   would it be identified -- or excuse me.  Would you

4   expect it to be identified underneath in these numbered

5   fact sections?

6    A.   Not necessarily.

7    Q.   Okay.  At the August -- August 16th board

8   meeting, did Sergeant Pope have on a body camera that

9   you recall?

10    A.   It is my recollection that he had one on.

11    Q.   Okay.  And if he did not, would that be

12   unusual?

13    A.   If he didn't have a body camera on would that

14   be unusual?

15    Q.   Correct.

16    A.   Not at the time.  It wouldn't -- or at -- well,

17   at the time, it would have been unusual for him not to

18   have a body cam on because it was a department-issued

19   piece of equipment.

20    Q.   All right.  What about Officer -- Officer

21   Pontillo?

22    A.   What about him?

23    Q.   What about Officer Pontillo -- Pontillo having

24   a body camera?

25    A.   Yeah, it's my understanding that he had one on

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  as well.

2      Q.  Okay.  What about Assistant Chief Williby?

3      A.  To my knowledge Assistant Chief Williby did not

4  wear a body cam, but I could be mistaken on that.  I

5  don't remember.

6      Q.  Are there any other officers you recall that

7  were present on August 16th, 2021?

8      A.  I don't recall right off.

9      Q.  Okay.  And -- and were you an off -- in uniform

10  or plain clothes?

11      A.  I don't recall.

12      Q.  Okay.

13      A.  Maybe plain clothes if it's -- if it's the one

14  -- if -- if we're refer -- referencing the date that

15  Mr. Story was removed from the boardroom, I was wearing

16  a suit, I believe.

17      Q.  Okay.  All right.  When the -- well, we'll come

18  back to this in a second.  When the -- when the meeting

19  started, where were you positioned during the public

20  comment period?

21      A.  I was in the room.  And when I say "the room,"

22  I'm speaking of the room directly behind the school

23  board dais.  There's an mirrored glass window, and

24  there's a room directly behind there.

25      Q.  And were you there for the entire meeting?

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

CHIEF JEFFREY DWAYNE YARBROUGH

1        A.  I don't recall.

2        Q.  Did you encounter Mr. Story at any time prior

3    to him beginning to speak during the public comment

4    period?

5        A.  Yes, sir, I did.

6        Q.  Okay.  And I don't want you to -- I'm not

7    imagining you have a time stamp in your head.  Was that

8    closer to the beginning of the meeting or closer to

9    right before he spoke?

10        A.  I don't recall.  It was during a break.

11        Q.  During a beak.  Okay.  Describe to me that

12    encounter in as much detail as you can remember.

13        A.  What I recall is when I was sitting in the back

14    room I heard initially an outburst from the audience,

15    and I saw that it was Mr. Story.  I didn't know who he

16    was at the time.  Once I saw that, I sat there, and then

17    I saw it happen again.  And because of the climate that

18    we had, I said, well, I'm going to talk to this

19    gentleman just to -- to let him know that we respect his

20    right to address his elected officials, but you can't

21    disrupt the meeting.  It was an attempt to -- to ensure

22    that we maintain order.

23            So during the break I went out and I walked up

24    to Mr. Story who was speaking to another gentleman that

25    I did not know, and I didn't know Mr. Story at the time,

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    so I asked -- I said, "Hey" -- I said -- I asked him,

2    "Would you mind stepping outside with me so that we can"

3    -- "so I can speak to you?"  And the reason behind that

4    was I -- there were people in the room, he was talking

5    to a person that was standing in front of him, and I

6    didn't want to come across with what I perceived to be

7    disrespect and -- and -- and put him on blast in front

8    of people that were in the meeting because I felt that

9    would be counterproductive.

10          So I said, "Would you mind stepping outside so

11   I can speak with you for a moment?"  And he said, "Who

12   are you?"  I said, "I'm Jeff Yarbrough, the chief of

13   police."  And he said, "No.  You can speak to me right

14   here."  And I recall telling him, "Sir, I just want you

15   to know that we're here to respect you and support your

16   right to address your elected officials, but you cannot

17   disrupt the meeting."  And he went into asking me did I

18   hear other people disrupting the meeting, which I did

19   not.  And so I restated again, "You can't disrupt the

20   meeting.  If you do, we're going to have to ask you to

21   leave."  And when he countered with more questions about

22   other people are doing something, I told him, "Have a

23   good day," and I left and went back to the back of the

24   room.

25          Q.  Okay.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.  Back behind the council -- the School Board.

2      Q.  Now, when you say outbursts -- thank you for

3  that narrative.  When you say outbursts, describe what

4  you heard, please?

5      A.  I heard a loud -- what I considered to be a

6  loud yell from Mr. Story.

7      Q.  Okay.  And I don't want to get too nitpicky

8  about this because you're not a -- you're -- you're --

9  we don't have built-in decibel meters, but -- but do you

10  think it -- was it during a moment of silence or a

11  moment when a discussion was going on on the dais?

12      A.  I don't recall specifically what was going on

13  at that point.

14      Q.  And were you able to triangulate that very

15  first outburst?

16      A.  Yes.

17      Q.  Okay.  And then you said it happened twice

18  more?

19      A.  I -- I don't remember exactly how many more

20  times, but it was definitely more than the first time I

21  heard.

22      Q.  Okay.  So more than one?

23      A.  Yes.

24      Q.  Okay.  And -- and those, I mean, those should

25  be picked up on -- on -- on the video -- or I mean, I

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  believe.  I mean, we'd be -- like if it was a loud yell,

2  right, I mean, you would assume it'd by picked up on the

3  video?

4      A.  It depends on which mic was on.  If the -- if

5  the mic near where the public comments are made from was

6  on, then I could see that.  If it was a mic where the

7  dais was, I'm not sure because they have to be turned on

8  when they speak.

9      Q.  Okay.  All right.  And when you showed up --

10  and I'll represent you were -- you were in plain

11  clothes.  You said you were in a suit.  The -- were you

12  there to direct the officers in any of their duties?

13      A.  No.

14      Q.  Okay.  On September 14th, were you there to

15  direct the officers in any of their duties?

16      A.  No.

17      Q.  Okay.  And so there was no coordination with

18  the superintendent on either date?

19      A.  No.

20      Q.  Okay.  Okay.  Did you have a briefing with any

21  of your officers before the meeting began on August

22  16th?

23      A.  I don't recall.  I know that usually before

24  every school board meeting Chief Williby and those are

25  that are assigned would meet.  I don't recall if they

**CHIEF JEFFREY DWAYNE YARBROUGH**

1 | met or I met that day.  I just simply don't remember.

2 |    Q.  What about September 14th?  And again, just for

3 | clarity of the record, there's no claims on September

4 | 14th.  I'm just using this as a factual matter.

5 |        On September 14th, did you have a meet -- meet

6 | with the superintendent or your officers before that

7 | meeting began?

8 |    A.  I -- I don't recall meeting with the

9 | superintendent.  I don't recall meeting with my

10 | officers.

11 |    Q.  Okay.  Did any administrator talk to you

12 | beforehand that Jeremy Story might be present that

13 | night?

14 |    A.  Talk to --

15 |        MS. LONG:  August six- -- my -- just for

16 | the record, August 16th or September 14th?  Because

17 | we're skipping back and forth.

18 |        MR. CASEY:  Yeah.  And I apologize.  Thank

19 | you for that clarity, Katie.

20 |    Q.  (By Mr. Casey)  Did any administrator warn you

21 | beforehand for the August 16th meeting that Jeremy Story

22 | might be present?

23 |    A.  No.

24 |    Q.  Okay.  Did you see Jeremy Story prior to his

25 | entry into the meeting room?

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  No.

2    Q.  Were any officers alerted to Jeremy Story's

3  presence or potential presence on campus by your office?

4    A.  I learned that after the fact.  I don't know

5  how long after the fact, but I had no knowledge of that

6  prior to that -- that board meeting.

7    Q.  Did the superintendent communicate with you

8  about Mr. Story that day at all prior to the meeting?

9    A.  No.

10   Q.  Did any of the board members communicate with

11  you about Mr. Story prior to that meeting?

12   A.  No.

13   Q.  Did you receive any direction from the

14  superintendent or any trustee or any other person within

15  Round Rock administration to monitor or be ready for a

16  specific speaker?

17   A.  No.

18   Q.  Do you recall from Mr. Story's speech, when he

19  reached the podium, did he shout?

20   A.  When he -- when he approached?

21   Q.  When he approached the podium, was he shouting?

22   A.  No.

23   Q.  Okay.  Did you hear Board President Weir tell

24  him to stay on topic?

25   A.  I don't recall what her specific words were.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  So do you recall any of the words
2   exchanged between at -- between them at their initial
3   interaction before he started his comments?
4    A.  Yes, but I don't know verbatim.  But I know
5   what she said was something along the lines that she
6   understood that he wanted to speak on a topic that
7   wasn't on the agenda and she said something about the
8   meeting being a special called meeting or a meeting
9   where they can only speak on the topic on the agenda.
10    Q.  Okay.  And if -- if at that point any speaker
11   goes off topic, is that an arrestable violation?
12    A.  Just going off topic alone is not.
13    Q.  Okay.  Did you see any physical disruption in
14   the audience when Mr. Story went up to speak?
15    A.  What do you mean "physical disruption"?
16    Q.  Was there any pushing or bumping into people or
17   any loud noise created when he went up to speak?
18    A.  I don't recall seeing anything like that.
19    Q.  Okay.  So when we're bracketing the time that
20   Mr. Story was speaking, is it your testimony to the jury
21   that the disruption was confined to the dialogue between
22   Mr. Story and the Board?
23    A.  I'm not quite following what you're asking.
24    Q.  Time-wise, any disruption would have been
25   confined to when Mr. Story was talking with the Board

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  during the public comment section, is that what you're

2  saying?

3      A.  I would say the disruption occurred during that

4  exchange.

5      Q.  During that exchange.  What was the point for

6  you of the exact beginning of the disruption?

7      A.  The disruption, from my recollection, was when

8  Mr. Story went off topic and he was given direction by

9  the presiding school board member that he couldn't speak

10 on a topic off the agenda.  That's where -- that's where

11 things started to move into the point of law enforcement

12 intervention.

13     Q.  Okay.  So it became an arrestable offense, as I

14 understand you to say -- I don't want to put words in

15 your mouth.  I want to get this specifically from your

16 characterization.  When he went off topic and she told

17 him to go back on topic, that -- that moment, not that

18 you necessarily had to, but that moment allowed you to

19 make an arrestable offense?

20     A.  No, that moment was not.  That moment was a

21 precursor to the -- the outcome, meaning that she gave

22 him direction to stop.

23     Q.  Uh-huh.

24     A.  Others gave him direction to stop.  They asked

25 -- they turned his mic off.  I remember her gaveling at

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  some point to try to restore order.  She gave direction

2  to the officer.  So during those times it became a

3  disturbance.  And when the officers went to Mr. Story,

4  they typically follow a pattern of ask you, ask you, ask

5  you, tell you, then they make you leave.

6      Q.  Okay.  So when you say she gaveled to restore

7  order, when -- if someone goes off topic, is that a lack

8  -- is that a lack of order if they're speaking in a

9  microphone and the -- the board chair disagrees with the

10  nature of their comments?  Is that a lack of order?

11      A.  I can't say that that is a lack of order.  I

12  can't speak to that because I don't know.  But what I do

13  know is when the microphone was turned off and you --

14  and any individual projects beyond that to try to be

15  heard despite them no longer being allowed to speak at

16  that moment, that creates a disruption.

17      Q.  Okay.  So if the board chair then doesn't like

18  what the speaker's saying and they turn off the mic, are

19  you saying that their -- that that person's right to --

20  right to speak freely, their right to free speech -- I'm

21  not asking you to be a lawyer -- that they're -- let me

22  back up for a second.

23          Once that mic goes off, if they continue to

24  speak, is that an arrestable offense?

25      A.  That alone is not.  We're talking about a

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  series of events that lead up to officers being

2  requested to intervene, and then they're taking action.

3       Q.  Okay.  So when he speaks and the mic goes off,

4  they tell the officers to escort him out of the room.

5  If he doesn't follow their escort, is that an arrestable

6  offense?

7       A.  When they're asking if -- yes, it is an

8  arrestable offense when you're given directive to leave

9  after you've created a disturbance and officers ask you,

10 ask you, ask you, tell you, then they physically remove

11 you from the -- from the facility.  Now you've created a

12 situation based upon behavior that -- that triggers

13 officers having the ability to arrest.

14      Q.  Okay.  So -- so I want to get the sequence of

15 events down because I think this is very specific.  I

16 think this may be where some of the contention is.  So

17 Mr. Story, his mic gets turned off because the board

18 chair believes he's off topic.  He continues to talk.

19 By the board chair shutting off the mic and telling --

20 and he continues to talk and then the officer -- her

21 telling the officers to escort him out, are they

22 enforcing board policy?

23      A.  Are they officers enforcing board policy?

24      Q.  Yes.

25      A.  By forcing him to leave?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Yes.

2    A.  There -- so there -- there are a variety of

3  things.  There --

4    Q.  Hold on.  Hold on just a second.  I -- it's

5  just a simple -- to me, it's just I'm looking for

6  yes-or-no answer.  By them escorting him out, are they

7  enforcing board policy, yes or no?

8    A.  They're enforcing board policy because a

9  criminal offense occurred.

10           MR. CASEY:  Okay.  I'm going to object.

11           MS. LONG:  I'm so sorry.  I just got a --

12  okay.  I didn't mean to talk over you, but I waited

13  until the end of the question.  We had an emergency

14  arise.  I have to make a call really quickly.  Can we

15  take a 10-minute break?

16           MR. CASEY:  100 percent.  No problem.  Take

17  care of what you need to, Katie.

18           MS. LONG:  And just to -- don't go off the

19  record yet because I believe Stephen was about to make

20  an objection when I interrupted, and I apologize for

21  interrupting.  I didn't know.  But you were going to

22  object as nonresponsive, I think.

23           MR. CASEY:  Yeah, after -- after the --

24  yes.  Yeah.  Correct.

25           MS. LONG:  Okay.  I'll be back in 15.

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1          MR. CASEY:  I appreciate you.
 2          (Nine-minute break was taken.)
 3     Q.  (By Mr. Casey)  Okay.  So before we -- before
 4 we took a break, we were -- we were talking about the
 5 sequence of events.  And like I said just a moment ago
 6 or a few minutes before that, I think this is really
 7 important to -- to pull these pieces out so we can
 8 understand them and I can understand you and your
 9 perspective.  The decision to turn the mic off, is that
10 a -- is that a law enforcement decision or a policy
11 decision?
12     A.  That is more of a board president decision or a
13 policy decision than law enforcement.
14     Q.  Okay.  All right.  And I'm going to ask
15 probably a series of yes-or-no questions.  So when
16 Mr. Story speaks -- and you may have answered this
17 before the break, my brain's a little -- little muddled
18 right now.  Mr. Story continued to speak after his mic
19 was off.  Did the board president have the authority to
20 tell the officers to escort him out?
21     A.  Yes.
22     Q.  Okay.  Is that authority an authority that
23 arrives -- that derives itself from board policy or a
24 Texas Penal Code statute violation?
25     A.  Board policy and also Texas Education Code.
```

CHIEF JEFFREY DWAYNE YARBROUGH

1    Q.  Okay.  Do you -- what -- do you know what part

2  of the Texas Education Code authorizes that?

3    A.  37.105.

4    Q.  37.105.  Okay.

5    A.  For law enforcement.

6    Q.  All right.  Texas Education -- you -- you -- so

7  that's law enforcement.  Okay.  If the board president

8  doesn't like what Mr. Story is saying, is that -- does

9  that allow her to make a decision to cut off his mic?

10    A.  No.

11    Q.  Okay.  Did -- did other did people at that

12  board policy -- excuse me.  Board policy.  People at the

13  board meeting, did they ever talk to the Board and speak

14  through analogy?

15          MS. LONG:  The video evidence speaks for

16  itself.  I'm going to object.

17          MR. CASEY:  Well, I'm just -- we're going

18  to go over the video.  I just want based on his

19  recollection right now.

20    Q.  (By Mr. Casey)  Do you recall him speaking by

21  analogy?

22    A.  I vaguely recall someone doing that.

23    Q.  Okay.  Do you know if anybody else who went off

24  topic -- do you recall if anybody else went, what you

25  would define as, off topic that night --

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  Yes.

2    Q.  -- of the 16th?

3    A.  Yes.

4    Q.  Did anybody else continue to speak whenever --

5  whenever the -- let me back up for a second.

6         Did the -- do you recall whether the board

7  chair cut off their microphones?

8    A.  I don't recall.

9    Q.  Okay.  Do you recall whether any of those

10 persons continued to talk over the board chair?  Just

11 yes or --

12   A.  I'd have to say I don't recall.

13   Q.  Okay.  Was Mr. Story -- were Mr. Story's

14 remarks cut off before he completed them; do you recall?

15   A.  Which remark?

16   Q.  His remarks when he was at the microphone.  Did

17 he get to continue to complete what appeared to be his

18 prepared remarks?

19   A.  In total?  No.

20   Q.  Okay.  Is it true that in order to -- in order

21 to judge people's remarks on -- on -- as -- as we will

22 do in a moment on the video, it's important -- I may

23 have asked this before, I apologize -- is it important

24 to hear them as a whole?

25   A.  I would say it's not important to hear them as

CHIEF JEFFREY DWAYNE YARBROUGH

1  a whole depending on what's in the -- in the comments.

2      Q.  Okay.  All right.  All right.  Let's go back to

3  the affidavit.  I'm going to share the screen.  When

4  this -- this affidavit for arrest, how often do you-all

5  do those in Round Rock ISD Police Department?

6      A.  At the time, it -- thankfully the -- or prior

7  to that, the District is fairly safe, so there were

8  arrests made of students that were 17 and older, and

9  those were done.  And that -- the exact number, I would

10 not know.

11     Q.  Well, let's give a range.  More than 50 in a

12 calendar year?

13     A.  No.

14     Q.  More than 10 in a calendar year?

15     A.  I would say yes.  Uh-huh.

16     Q.  So this would --

17     A.  Well --

18     Q.  Would it be fair to characterize this as rare?

19     A.  That's a hard question to say if it's rare, if

20 10 arrests a year in school setting is rare.  That's

21 hard.

22     Q.  Well, when -- in the years that you were there

23 -- two years prior to this -- in the prior two years,

24 can you ballpark how many -- how many arrest affidavits

25 had you-all processed?

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.   So prior to that they were under the school
2    resource officers, so Williamson County, Round Rock
3    Police Department, and also community college.  So with
4    those numbers there were probably close to 50.
5    Q.   And -- and --
6    A.   And those were handled by those agencies and
7    the officers assigned to the campuses.
8    Q.   Okay.  In-house then.  Let's just reduce that
9    number now.  In-house with Round Rock ISD Police
10   Department, would -- let me ask a question that --
11   related to that.  When did you become an official
12   department rather than using SROs?
13   A.   It was August of 2020.
14   Q.   Okay.  So --
15   A.   Or thereabouts.
16   Q.   So that would be about a year.  In that -- in
17   the year prior to that from the moment you-all became a
18   police department and then all the way through to, I
19   guess, September, whenever this one was done, how many
20   do you recall if you had done in that -- in that year
21   just as a police department?
22   A.   That would have been very low because of COVID
23   and the number of students that were not allowed in
24   schools during those times.  So it was very low during
25   that time.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Q.  Okay.  Do you recall why this case -- back up a

2  second.

3      When we deposed Sergeant Griffith she said

4  this was assigned to her.  Do you recall why it was

5  assigned to her?

6  A.  Yes.  Because she was the criminal investigator

7  for the department.

8  Q.  Okay.  Do you -- did you review this affidavit

9  during its preparation?

10  A.  I did not.

11  Q.  Did you review this affidavit at all prior to

12  being signed by the magistrate?

13  A.  I reviewed it.  I recall seeing it at the

14  meeting with the county attorney.

15  Q.  Okay.

16  A.  But I don't know if I read through the entire

17  affidavit --

18  Q.  And so your -- okay.  So your testimony today

19  is the first time you were -- you laid eyes on what was

20  going to be in it was at that meeting with the county

21  attorney?

22  A.  That's my recollection.  I can assume that I

23  possibly did, but I'm not sure.

24  Q.  Okay.  So when you went to the county

25  attorney's office, when was that?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1        A.   It would have to be the day the warrant was

2   signed from my recollection.

3        Q.   Okay.

4        A.   I don't know what the date is.

5        Q.   Okay.  Why did you meet with the county

6   attorney?

7        A.   Why did I or why did we as a department?

8        Q.   As a -- well, who was there at the meeting that

9   you recall?

10        A.   Sergeant Griffith, Assistant Chief Williby, the

11   county attorney, his first assistant, another attorney,

12   and myself.

13        Q.   And -- and so did this meeting have a -- excuse

14   me.  What were the purposes of this meeting?

15        A.   It -- it was a -- it was for two reasons.  The

16   one reason was because we were having a large school

17   board meeting at a performing arts center that was

18   partially in Williamson County, partially -- where the

19   campus is partially in Williamson and partially in

20   Travis.  We wanted to talk to him, the -- the county

21   attorney's office about that to get some feedback and

22   input and talk about what would be the best approach to

23   addressing and mitigating.  And if we had some

24   unfortunate circumstances or situations, how would we

25   best approach those situations.  We ran through

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  scenarios on what if something happened in the PAC and

2  the -- the jurisdictional line between Williamson County

3  and Travis County is -- is different, how would we

4  handle those things.

5          And so those are some of the discussions we

6  had, but we also discussed with Sergeant Griffith,

7  providing them a rundown and giving them the arrest

8  affidavit to review and give a determination on the

9  staffing, whether or not they felt there was enough to

10 proceed with an arrest.

11     Q.  Okay.  And -- and real quick, just a side --

12 side question.  Do you have any reference materials in

13 front of you right now?

14     A.  No.  Other than what you got on the screen,

15 your affidavit for arrest.

16     Q.  Okay.  Cool.  Thank you.  So -- so part of the

17 meeting was expressly dealing with Mr. Story and Clark;

18 right?

19     A.  Part of it.  Yes.

20     Q.  Okay.  And then what -- what did -- what did

21 the County Attorney Dee Hobbs indicate to you about --

22 about whether they would staff this case?

23     A.  What do you mean?  I --

24     Q.  What -- what do you -- what do you -- I'm

25 sorry.  I'm talking over you.  I apologize.  What do you

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  recall Dee Hobbs conveying to you about what -- whether

2  they would staff this case or not?

3       A.  I recall him stating the date, which was the

4  day that we went to his office for us to come and meet

5  about both of those issues and they would staff it and

6  review it at that time.

7       Q.  So at that meeting when you presented -- well,

8  actually, who presented this to them at that meeting?

9  Did you present it or did detective -- or excuse me --

10  excuse me, Sergeant Griffith present it?

11       A.  Sergeant Griffith would have presented it.  I

12  didn't have -- I didn't investigate it.  I didn't have

13  the information.  I didn't have -- I had never reviewed

14  body camera or any of those things, so I couldn't speak

15  to it.  As a -- as a police chief, you don't

16  investigate, and that's why you have the experts to do

17  that.  And so they would be the ones providing that

18  explanation of what we've got.

19       Q.  So then you might have provided feedback to

20  her -- you said you might recall providing feedback to

21  her.  And I don't want to mischaracterize what you said,

22  so I want to be clear on it.  You might have provided

23  feedback to her during the drafting of this, but that

24  was your sole involvement prior to seeing it in its

25  final form at that meeting?

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.    No.    So I don't recall giving any feedback to

2  Sergeant Griffith.    She was not my direct report, so I

3  wouldn't have customarily talked to her and reviewed her

4  -- her affidavits or her cases.    That would have been

5  Assistant Chief Williby's duty and responsibility.

6    Q.    If Sergeant Griffith says that she -- that you

7  gave her feedback, would she be misremembering?

8    A.    I would say that she's -- she's -- she's -- I

9  would say that she's probably not remembering correctly

10  or I could be mistaken.

11    Q.    Okay.

12    A.    I cannot remember.

13    Q.    All right.    No problem.    That's fine.    Okay.

14  In this -- in this -- let's walk through this Paragraph

15  3.    "At 8:35 p.m." -- it says that, "The affiant learned

16  that at approximately 8:35 p.m. Story was called upon by

17  the board of trustees to speak at the podium on the

18  subject of the mask mandate.    Affiant learned Round Rock

19  ISD Board of Trustee President Amy Weir informed Story

20  he was attending a called meeting that would only be

21  able to speak about the items on the agenda,

22  specifically the mask mandate.    Affiant learned Story

23  acknowledged President Weir and advised President Weir

24  he agreed.    Affiant learned during the duration of

25  Story's time to speak, Round Rock ISD Board of Trustee

CHIEF JEFFREY DWAYNE YARBROUGH

1    President Amy Weir instructed Story to stop speaking on

2    unrelated topics and only discuss the mask mandate."

3            So at that point -- so we're about halfway

4    through that Paragraph 3.  At that point, based on your

5    testimony before the break, because we haven't -- we

6    haven't gone through this affidavit to that point yet,

7    Mr. Story's not yet committed an arrestable offense;

8    right?

9        A.  Right.

10       Q.  Okay.  Okay.  It says, "Affiant learned while

11   Story was discussing the unrelated topics Story had

12   several outbursts."  So on that sentence right there,

13   this is while he was discussing.  Does that mean, from

14   your understanding of this affidavit as the law

15   enforcement officer, does that mean while there's back

16   and forth going on between him and the board chair?

17       A.  I'm not sure what Sergeant Griffith meant --

18       Q.  Okay.

19       A.  -- completely.

20       Q.  All right.  And so you -- you wouldn't

21   understand then what several outbursts would mean at the

22   end of that sentence also; correct?

23       A.  Right.  I'm not sure what she meant by that.

24       Q.  Okay.

25       A.  What she was referring to rather.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  And so the next sentence, "Story

2  continued to have several verbal outbursts."  I want to

3  ask you about that.  When you said verbal outbursts, you

4  said earlier when we were talking about your -- you said

5  you heard Jeremy Story make a verbal outburst.  Are you

6  describing that as, based on your definition earlier, is

7  it -- one of -- one of -- I'm -- it might be neither of

8  the two options, and feel free to say that.  Is it

9  talking when you're not supposed to or -- or talking at

10  a high volume or a combination of the two of those?

11    A.  It -- I would say it's yelling above to -- for

12  those on the dais to hear.

13    Q.  Okay.  So microphone goes off.  Here's my

14  situation, hypothetical.  Microphone goes off.  I

15  continue to talk.  In order for my voice to be heard,

16  that's a verbal outburst based on what your definition

17  is?

18    A.  No.

19    Q.  So if the microphone goes off and I can -- and

20  I elevate my voice because I've been -- because the --

21  I've been unmic'd, is that a verbal outburst, yes or no?

22    A.  Ask the question again.  It's kind of hard to

23  package in a yes or no.  Ask it again.

24    Q.  All right.  Well -- and I -- and I appreciate

25  that.  This is your -- this is your first deposition,

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  you said.  And what typically happens is, I -- I'm

2  trying to navigate through this and I'm going to ask

3  yes-or-no questions at times.

4          So when the board chair shuts off Mr. Story's

5  mic, you would agree with me, yes or no, that now his

6  voice isn't being heard at the level it was prior to

7  that; correct?

8      A.  That's correct.  Yes.

9      Q.  Okay.  So in order to communicate to the board

10  chair at the same volume, he must necessarily raise his

11  voice; right?

12      A.  Yes.

13      Q.  Okay.  Is that, to you, a verbal outburst when

14  he raises his voice back up to be able to communicate to

15  the chair who has just turned off his mic?

16      A.  So --

17      Q.  It's yes or no, sir.

18      A.  I would have to say yes.

19      Q.  Okay.  At that point when he raises his voice

20  and does what you've defined as a verbal outburst, is

21  that the point where it's an arrestable offense?

22      A.  You looking for a yes or a no?

23      Q.  Yes, sir.  That's correct.  Yes or no?

24      A.  Sorry, I can't answer that -- that -- not like

25  a yes or no.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  I apologize.  The volume on my phone, I

2  turned it back up after -- during the lunch break.

3           All right.  So we're unsure of whether

4  that's an arrestable offense.  Let's go to the next

5  step.  So I'll go through the sequence again so we're on

6  the right -- at the same point.  The mic goes off,

7  Mr. Story raises his voice to the same level to achieve

8  the same level of volume as when he had the mic.  Quick

9  question in there.  Has that volume changed then for

10  anybody else in the room?

11    A.  I don't know that answer.

12    Q.  Okay.  So then the board chair says stop

13  talking, and he continues.  Is that, yes or no, an

14  arrestable offense at that time?

15    A.  Not at that time.

16    Q.  Okay.  So she says stop talking.  He continues.

17  Then the board chair says -- and we'll watch the video.

18  The board chair says, "Escort him out."  Once the board

19  chair says that, is that at that point of arrest --

20  arrestability [sic]?  I don't know if that's a word.

21  But can they arrest him for that?

22    A.  Not at the point of her saying "escort him

23  out."  No.

24    Q.  Okay.  When the officers then come to Mr. Story

25  and he says, "Don't touch me," is that at a point where

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   they can arrest him?  It's a yes or no.

2        A.  Ask the question again, please.

3        Q.  When the officers come up to Mr. Story -- and

4   we'll watch the video -- do you recall Mr. Story saying,

5   "Don't touch me"?

6        A.  I don't recall that.

7        Q.  Okay.  If Mr. Story pulled -- excuse me.  When

8   the board chair says, "Escort him out," do you recall

9   whether Mr. Pope and Pontillo -- Officers Pope and

10  Pontillo physically touched Mr. Story at that time?

11       A.  I don't recall.

12       Q.  Okay.

13       A.  At this point.

14       Q.  All right.  If they physically touched him at

15  that time and he pulled away, would they have the right

16  to arrest him at that time, yes or no?

17       A.  Yes.

18       Q.  Okay.  What would be the basis for them, based

19  on your experience as a law enforcement officer, for

20  them arresting him when he pulls away from their grasp?

21       A.  Based upon my professional experience, as you

22  stated, when your -- when they -- when it was determined

23  that he was requested to leave, he was given the

24  direction to leave, to stop prior to that, but officers

25  asked him -- and when they -- if they touched him like

CHIEF JEFFREY DWAYNE YARBROUGH

 1  you're saying they did to ask him to leave and he pulls

 2  away, they've used force.  Whether it's physical force

 3  to escort him out and he refused, that is subject to

 4  arrest.

 5      Q.  Okay.  So when the officers ask him to leave --

 6  let's rewind just a little bit.  When they ask him to

 7  leave, are they enforcing a command from the board

 8  president?

 9      A.  Yes.

10      Q.  Okay.  If it's a command from the board

11  president, is that board policy?  It's yes or no.

12          MS. LONG:  I'm going to object to the

13  extent it calls for legal conclusion or expert legal

14  testimony.

15          MR. CASEY:  Sure.

16      Q.  (By Mr. Casey)  You can go ahead and answer,

17  sir.

18      A.  I would have to see the policy.  But if the

19  board president gives the directive after a disturbance

20  has occurred, then the officers have the authority to

21  remove him.

22      Q.  Okay.

23      A.  Based on -- based on board policy.

24      Q.  Okay.  Now, and you would define disturbance as

25  in this instance -- and then we'll just confine it to

CHIEF JEFFREY DWAYNE YARBROUGH

 1   that August 16th time.  You would define disturbance as

 2   Mr. Story speaking when the -- during the public comment

 3   two-minute period he was allotted and the board chair

 4   says stop speaking and he continues?  Would that be a --

 5   qualify as a disturbance?

 6        A.  Not alone.

 7        Q.  Not alone.  Would it be when he raised his

 8   voice to achieve the same level of volume before his mic

 9   was dropped?  Would that qualify as a disturbance?

10        A.  Not alone.

11        Q.  Okay.  Would it qualify as disturbance when she

12   said, "Stop talking off topic"?  Would that qualify?

13        A.  Not alone.

14        Q.  So at what -- what is the trigging moment then

15   from the moment the board chair says you're off topic,

16   what -- what is the moment in time after that, the first

17   available time when Mr. Story is committing an

18   arrestable offense?

19            MS. LONG:  Objection to the extent it calls

20   for a legal opinion or legal expert testimony.

21            MR. CASEY:  Sure.

22        Q.  (By Mr. Casey)  At what point could you -- your

23   officers arrest him, Chief Yarbrough?

24        A.  Based -- once they removed him and he refused

25   to leave and was physically resisting to be removed

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  after being asked by the school board president, after

2  his mic being silenced, after him yelling above to try

3  to continue to be heard, as he's being escorted out of

4  the room and he's continuing to yell, the disturbance

5  that was created, all of those culminated into the

6  arrestable offense.

7       Q.  Okay.  So what I'm understanding is that you

8  have to -- and I'm just saying this in kind of common --

9  common terms, you have to put all these things into a

10  bag and look at them as a whole to determine could he be

11  arrested or not?

12      A.  Not necessarily.

13      Q.  Well, because I asked you when in the sequence

14  of this, because at some point -- would you agree with

15  me, yes or no, at some point I've got to, as a -- as a

16  citizen, I've got to know the line that I can't cross in

17  order to not be arrested, yes or no?

18      A.  Yes.

19      Q.  Okay.  So if it isn't when you cut his mic,

20  because you already said that's not arrestable, if it

21  isn't when he raises his voice, because you said it's

22  not arrestable, if it isn't when the board chair says

23  stay on topic, if it isn't when they say leave, then

24  what is that moment in time that you have crossed the

25  line?  Because -- and here's why I'm asking that.  You

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  can't go back and reach back 10 minutes ago and say,

2  "Oh, you crossed the line back there."  And that seems,

3  to me, what you're doing with the answer to the

4  question.  I'm not -- you're not trying to be evasive.

5  I don't think you're being evasive.  I just think it's

6  vague.  It's murky.  At what point do you say, this is

7  the -- this is the moment in time that you've crossed

8  that line?  Where was that, Chief Yarbrough?

9            MS. LONG:  Objection, asked -- objection,

10  asked and answered.

11            MR. CASEY:  I -- I -- I don't have a -- I

12  don't have a clear moment in time.  That's what I'm

13  asking for.

14       Q.  (By Mr. Casey)  What's the clear moment in

15  time, Chief Yarbrough?

16            MS. LONG:  I'm going to object as asked and

17  answered.  You can answer the question, Chief Yarbrough.

18       A.  Based on what I observed and what I recall, the

19  moment in time came when law enforcement intervention

20  took place, law enforcement officers asked, asked,

21  asked, told, and had to physically remove him from the

22  facility.  Unlike others who may have had similar

23  outbursts of yells and screaming, when they were

24  directed to leave, they complied and law enforcement

25  didn't have to put their hands on them.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.

2    A.  So I think --

3    Q.  That's fine.

4    A.  Yeah.

5    Q.  That's fine.  It's -- it's tough because we --

6   we get talking and we get going down a glide scope.  But

7   when -- when the answer is complete, I'll let you know.

8    A.  Uh-huh.

9    Q.  All right.

10       MS. LONG:  I don't think Chief Yarbrough's

11  answer was complete.  I think you interrupted him.  Did

12  you have more to say?  You were -- you were still

13  talking when Mr. Casey started talking over you.

14   A.  Yeah, I was -- I was just finishing up.  But if

15  I need to stop, that's fine.

16   Q.  (By Mr. Casey)  No, that's fine.  I -- I don't

17  want to -- I don't want to unnecessarily prohibit stuff

18  from being in the record.  As I understand you to say,

19  is that when he -- when they asked him to leave and he

20  said no and they had to put his [sic] hands on him,

21  that's the moment in time; is that fair?

22   A.  That's fair.

23   Q.  Okay.  Okay.  And are you -- in the -- you

24  mentioned, you know, you've got a long -- a long law

25  enforcement history.  Have you ever done any training on

CHIEF JEFFREY DWAYNE YARBROUGH

1  peoples -- people resisting arrest?

2      A.  Yes.

3      Q.  Okay.  Have you ever reviewed in your training

4  any of the -- any of the constitutional rights that

5  you're supposed to be aware of of someone's right to

6  resist an arrest?

7      A.  Yes.

8      Q.  Okay.  Are there instances, based on your

9  training as a law enforcement officer, where a person

10  can resist an unlawful arrest?

11      A.  Ask the question again.

12      Q.  Are there instances you've encountered in your

13  training as a law enforcement officer -- let me back up

14  for a second.

15          Are you expected, based on your experience

16  as a law enforcement officer, to be familiar with the

17  boundaries of someone resisting arrest?

18      A.  Yes.

19      Q.  Okay.  And so you've had training over being

20  familiar with peoples' constitutional rights to resist

21  arrest; correct?

22      A.  Yes.

23      Q.  Okay.  And in your training, have you

24  encountered or been trained that people can resist an

25  unlawful arrest?

CHIEF JEFFREY DWAYNE YARBROUGH

1      A.   Can -- if someone -- if you have an officer

2  that is using excessive force, for example, and beating

3  on an individual, that person may be able to use a

4  self-defense claim because of that unjust and unlawful

5  detention or arrest.

6      Q.   Okay.  So as a matter of principle, the answer,

7  will you agree with me, is yes, a person in certain

8  circumstances is entitled to resist an unlawful arrest?

9  Just yes or no.

10     A.   Ask it again because I want to be accurate.

11     Q.   Yeah.   In certain circumstances a person is

12 entitled to resist an unlawful arrest?

13     A.   Certain circumstances, yes.

14     Q.   Okay.  All right.  Let's go to Paragraph 4.

15 All right.  "Affiant learned Sergeant Pope and Round

16 Rock ISD Officer Frank Pontillo approached Story and

17 made several verbal requests for Story to leave the

18 boardroom.  Affiant learned Story refused to leave the

19 boardroom."  You agree with that statement?

20     A.   Yes.

21     Q.   Okay.  Let's go to No. 5.  "Affiant learned

22 Sergeant Pope and Officer Pontillo had to forcibly

23 remove Story from the boardroom.  Affiant learned while

24 being forcibly removed from the boardroom, Story

25 continued to resist officers, yell and scream, causing a

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  major disruption during the board meeting."

2      A.  Okay.

3      Q.  Do you distinguish in this last sentence

4  between yelling and screaming?  It's a yes or no.

5      A.  Yes.

6      Q.  Okay.  Which would you define as the louder of

7  the two, yelling or screaming?

8      A.  It depends.

9      Q.  I -- I'm just -- I'm asking you for your

10  opinion.

11     A.  A scream would probably be louder in some

12  circumstances.

13     Q.  Okay.  All right.  No. 6.  "Affiant learned

14  after Story was removed from the board meeting room

15  Story continued to be disruptive in the lobby where the

16  overflow seating was located."  This overflow seating,

17  what -- was the seating in that overflow room -- did you

18  get a chance to look at it?

19     A.  Yes.

20     Q.  Okay.  What -- where the lobby is, is that --

21  about how -- was that about as big as the -- the room?

22  Is the lobby bigger in Round Rock High School than that

23  room is?

24     A.  I would have to say I believe so.  It's a -- it

25  was on old cafeteria space.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Yeah.  Was there any spacing going on?  Was

2  there -- was there COVID distancing in that space?

3    A.  I don't recall.

4    Q.  Okay.  On the September 14th, was there an

5  overflow room?

6    A.  I don't recall.

7    Q.  Okay.  Do you recall -- well, I guess you

8  wouldn't recall whether there was overflow seating then

9  -- or spacing.  Okay.

10         All right.  Did you have the opportunity to

11  view any evidence in this case that took place after

12  Mr. Story was escorted out of the board meeting room?

13              MS. LONG:  Objection.  Vague.

14    Q.  (By Mr. Casey)  Well, and I -- after Paragraph

15  6 sentence, I guess first clause, did you have -- I

16  guess maybe the evidence.  Did you have any evidence of

17  that night that you reviewed after that first clause of

18  Paragraph 6 about Mr. Story and his actions inside Round

19  Rock ISD High School?

20    A.  Are you talking about in the overflow area?

21    Q.  Either there or on the way out the building.

22  Yes, sir.

23    A.  Yes.

24              MS. LONG:  Stephen, are you asking him if

25  he's ever seen anything that documents this?  Your

CHIEF JEFFREY DWAYNE YARBROUGH

1  question is just -- I don't understand what you're

2  asking.

3      Q.  (By Mr. Casey)  Like any -- any evidence.  Not

4  -- not -- not a -- have to be a written statement.  Do

5  you see any evidence?  Body cam footage, video footage,

6  anything at all concerning Mr. Story from the moment he

7  left the room to the moment he was escorted out of the

8  building?

9      A.  Yes.

10     Q.  What was that?  What did you --

11     A.  Body cam footage.

12     Q.  Body cam footage.  Who -- which officer was

13  that?

14     A.  I believe it was Officer Pontillo.

15     Q.  Okay.  Okay.  All right.  Let me stop the

16  share.  All right.  All right.  I want to go through

17  what has been marked in discovery as JS-304202.  This

18  would be -- I'm tracking the exhibits.  One, two, three.

19  This would be P-4.  Let me share screen.  Let's go to

20  share.  I'll represent to you that this is -- there's

21  the number at the top, JS-304202.  There's a website

22  that some gentleman has, it's not Danielle Weston, and

23  he did a public information request and posted this

24  document on his website.  And it appears to be written

25  in first person by you.  I want to ask you if you

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1   recognize it.
 2                (Exhibit 4 marked for identification.)
 3        A.  Yes.
 4        Q.  Okay.  And what was the occasion of you writing
 5   this narrative?
 6        A.  What was the occasion?
 7        Q.  Yes.  What -- why -- when did you -- were you
 8   called upon to write this narrative?
 9        A.  So this was in response to the investigation
10   being opened.  And whenever there's an investigation
11   that's initiated, anyone that has information, you go to
12   any and all individuals to try to gather their
13   statements of fact, and me giving this supplement was
14   that.
15        Q.  So you wrote this at the request of Sergeant
16   Griffith?
17        A.  No.  I wrote that because anytime you're
18   involved in a situation, every officer involved, you're
19   going to write a supplement.  You're going to write a
20   nar- -- a supplement or you're -- yeah, your supplement.
21   Any officer involved.  And typically we're trained to do
22   that before we're even asked to provide it.  So I know
23   that I was there and I observed, so I documented what I
24   observed and provided that as a part of the case file.
25        Q.  And -- and so this would have been something
```

STOVALL REPORTING & VIDEO, INC.    (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  that -- this would have fallen under the information

2  provided to Sergeant Griffith by Sergeant Pope?

3      A.  No.  That would have been provided to Assistant

4  Chief Williby.

5      Q.  Okay.  So -- so let me -- let me -- let me go

6  back to the arrest warrant.  I want to make sure I'm

7  understanding everything that's kind of going into the

8  -- the mix here.  This four X'd line, "Information

9  provided to me by Sergeant Milton Pope, a credible

10  person who personally observed or gathered such

11  information."  Would this be one of the items that you

12  would say was gathered?

13      A.  If -- -

14      Q.  Does this fall under that?

15      A.  If Sergeant Pope was the reporting officer, the

16  officer that was the initial case agent, then anything

17  provided would have gone to him.  Chief Williby was

18  given my supplement.  As a -- as police chief I did not,

19  as a matter of practice, access the record management

20  system for the case files because that was something

21  that Chief Williby was responsible for.  I simply

22  wasn't.  So I provided him my narrative so he could add

23  it to the report.  And so if -- if the initial case

24  report was initiated by Sergeant Pope, then this would

25  have been what she's considering the additional

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  information or such information.

2      Q.  Okay.  And I heard -- did I hear he or she?  I

3  want to make sure we're getting our persons right

4  because the process is unclear about how these things

5  build.  So let me -- let me express to you my

6  understanding and -- and have you agree, yes or no,

7  whether my understanding is correct.  All the LEOs at

8  that event write a narrative, or they should at least,

9  and those get put independently into the case file.

10  That's step one; correct?

11      A.  Cor -- step one is Sergeant Pope writing his

12  initial report and all the others like you're saying is

13  correct.

14      Q.  Okay.  And then step two is this gets assigned

15  to Sergeant Griffith to investigate the case based on

16  what's in the case file; correct?

17      A.  Yes.  What's in the case file and what's

18  determined to be missing, to gather those things as

19  well.

20      Q.  Okay.  So when -- so who's managing this case

21  file?  And is it Sergeant Pope or Sergeant Griffith?

22      A.  Sergeant Pope would be until it's referred to

23  the criminal investigations division or the criminal

24  investigator.

25      Q.  Yeah.  I mean -- and I'm assuming, you know,

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  criminal investigations division if you're in, like,

2  Fort Bend County or Harris County, it's pretty -- pretty

3  big.  But when you're in a smaller force, it's probably

4  one person; right?

5      A.  Yes.

6      Q.  Okay.  So then when Sergeant Griffith is

7  writing this arrest affidavit, she's pulling from,

8  essentially, a case file that is provided to her by, as

9  I read it here, Sergeant Pope.

10     A.  Yes.

11     Q.  Okay.  So then this is both testimony from

12 Sergeant Pope to her when she says, "A credible person

13 who" -- it says, "Who personally observed."  So he's

14 given his -- his eyewitness testimony because he was the

15 -- one of the escorting officers, and the rest of the

16 case file that he's handed to her; correct?

17         MS. LONG:  Objection.  Foundation, personal

18 knowledge.

19     Q.  (By Mr. Casey)  I mean, is that what you

20 understand that statement to be?

21     A.  It's hard to say yes or no.  What I understand

22 that statement to be is that Sergeant Pope was the

23 initial officer assigned to the case, and once he got

24 whatever information he gathered and collected to

25 Sergeant Griffith, she continued to investigate to make

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  sure she gathered.  So I don't know who gathered what,

2  but apparently she's referring to such information that

3  she's documented in the arrest affidavit that she

4  received from Sergeant Pope.  But there are other things

5  that she would have gathered herself after receiving the

6  case file.  That's how the investigative process occurs.

7      Q.  Okay.  So there's two pieces to that that I

8  just heard.  She would have referred to everything she

9  got from Sergeant Pope, but she could have gone after

10  other information; right?

11      A.  You would have as an investigator.  Everything

12  he provides, he's not the investigator.

13      Q.  Sure.  Sure.  So he would just be testifying --

14  so let's kind of clarify.  Stuff that he would be

15  telling her about, he would be testifying on his

16  personal knowledge; right?

17      A.  Yes.

18      Q.  Okay.  If she went and got out stuff outside of

19  talking to Pope or that -- that last clause, "Gathered

20  such information," you would agree with me it's not

21  listed there correct?  Yes or no.

22      A.  No, it's not.  And it doesn't have to be.

23      Q.  I'm sorry?  That last part?

24      A.  I said it doesn't have to be.

25      Q.  Well, I'm -- I'm -- I'm just saying that I'm

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   just observing that Sergeant Griffith swore to the

2   statement.  She could have checked her own personal

3   knowledge, she didn't, so that means that she's

4   excluding some stuff.  She's including what she talked

5   to Pope about or what he gave her, and there's nothing

6   else in here that says she did an independent

7   investigation.  Would you agree with me?  I -- and

8   before you answer, I'm not saying there's a perfect.

9   I'm just saying, what you read right there does not say

10  she went and did -- gathered any other information

11  except for what she got from Sergeant Pope; correct?

12      A.  It's hard for me to say that because I see it

13  from an investigative lens and I see it different from

14  you.  So it's hard for me to say yes or no to that.

15      Q.  Okay.  Okay.  Well, and I guess my question is,

16  you and I might not know the extent of what she did; we

17  can only go on the extent of what she wrote; correct?

18      A.  Yes.

19      Q.  Okay.  All right.  So let's go back and go

20  through your narrative.  What -- you wrote this

21  narrative right around the time that it happened?

22  Pretty close?

23      A.  I would say it was pretty close.

24      Q.  Was it close to the affidavit or closer to the

25  -- to in September?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1          MS. LONG:  Stephen, because we are virtual,

2  I would really ask that you let him see the entire

3  document before you ask him questions.  You've stuck to

4  just a few paragraphs.  And I would like the chance to

5  be able to read it too and look at the document before

6  you ask him questions about it.

7          MR. CASEY:  Yeah.  My next exhibit is page

8  three, so I'm -- I'm just going to go.  Here's the end

9  of his report.  This is the whole document.  So you --

10  you've got in here August 16th, and then -- and I have

11  no problem with that, Katie.  I'm sorry.  August 17th.

12  September 14th.  September 18th.  Is that -- does that

13  resolve it?

14          MS. LONG:  Yeah.  Chief Yarbrough, have you

15  had a chance to read it?

16          THE WITNESS:  I haven't had a chance to

17  read it, but I see the highlight -- or the areas that

18  he's focusing on, so I can't speak to that.

19      Q.  (By Mr. Casey)  Well, we're -- we're going to

20  go through each -- each paragraph.  I do want you to be

21  able to read it before we talk about it.  I don't want

22  you to be ambushed by this.  So the first paragraph,

23  read through it and let me know when you're done.

24      A.  Okay.  Okay.

25      Q.  Okay.  So next-to-the-last line and then back

CHIEF JEFFREY DWAYNE YARBROUGH

1  up a second, "During the meeting a person yelled out

2  from the audience and I observed the male individual who

3  made the loud outburst."  So during this -- I mean, a

4  video exists we're going to review of the entire

5  meeting.  You're saying that somewhere during that video

6  it's likely if the microphones are on that you're going

7  to catch a person yelling out from the audience?

8       A.  If the microphone is on, yes.

9       Q.  And -- and then that --

10      A.  I can't speak to that to be sure.

11      Q.  Sure.  And if they are on and it doesn't catch

12  anybody yelling, then it -- either your recollection's

13  incorrect or maybe it's a different person; right?

14      A.  I would say it's neither.  I would say -- I

15  would say -- I couldn't say anything other than what I

16  said because that is what occurred.

17      Q.  Okay.  All right.  So it says, "Board went in

18  recess a short time later" -- actually -- well, go and

19  read this second paragraph.  Let me know when you're

20  done.

21      A.  Okay.  Your arrow is over it where I can't read

22  some of it.

23      Q.  Oh, I'm sorry.  Yeah.  I apologize.

24      A.  Okay.

25      Q.  All right.  So here -- your statement here

CHIEF JEFFREY DWAYNE YARBROUGH

1  alleges that Mr. Story told you others yelled out too.

2  Did you -- did hear other people yelling out?

3     A.  I don't recall.

4     Q.  Okay.  So you're saying there were none or

5  there could be and you just wouldn't remember?

6     A.  I just wouldn't remember.  Very well could have

7  been, but the person that I saw and observed was the

8  person I went to.

9     Q.  Okay.  Okay.  Okay.  Go ahead and read this

10 next paragraph, please.

11    A.  Okay.

12    Q.  All right.  I'm going to -- since you can see

13 the arrow, I'm going to come down on this.  This -- this

14 paragraph right here, it says, "Mr. Story" -- oh, sorry.

15 This line.  "Mr. Story refused Sergeant Pope's

16 directives."  Do you see that?

17    A.  Yes.

18    Q.  It says, "And continued to stand and yell."  Do

19 you mean to say right there that he continued to yell or

20 that he continued to stand there and then started to

21 yell?

22    A.  He continued to stand and yell.  Continued --

23    Q.  Okay.

24    A.  -- to talk and yell as he was standing there.

25    Q.  All right.  When did his yelling start based on

CHIEF JEFFREY DWAYNE YARBROUGH

1   your observation?

2       A.  Based on my observation is when they first gave

3   warnings, he started to yell to talk over them.  Then

4   when the mic was off, he continued.

5       Q.  Okay.  So when he talked over them, you're

6   saying that by talking over them he was yelling or he

7   raised his volume?

8       A.  In this context, yelling is raising your volume

9   from my perspective.

10      Q.  Okay.  So anytime someone -- and I'll try to

11  get this definition really, really carefully so we can

12  understand what went -- what happened.  When someone

13  raises their volume above the dais, that by definition

14  is yelling?

15      A.  Sorry.  Ask that question again.

16      Q.  When someone raises their volume above the

17  dais, as I understand you to say, that by definition is

18  yelling?

19      A.  Are you looking for a yes-or-no question?

20      Q.  Yes or no.  Sorry.  I'll -- I'll preface my

21  pre- -- my next questions with that.  I'm sorry.

22      A.  Okay.  I forgot the question.  I'm sorry.

23      Q.  It's no problem.  Yes or no, when someone

24  raises their voice above the dais, as in talking over

25  them, that constitutes yelling?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  Yes.

2    Q.  All right.  All right.  So next sentence,

3  "Sergeant Pope transitioned from giving verbal

4  directives to placing his hands on Mr. Story for a soft

5  escort."  Define soft escort for the jury.

6    A.  Soft escort typically is when you -- an officer

7  places one of his hands on the arm of an individual and

8  a hand maybe on the back, and there's no forceful

9  movement.  It's just a soft escort, meaning that the

10  person's walking with the officer as the officer walks

11  and maintains contact with that individual.

12    Q.  Okay.  Would this -- could this be this -- are

13  -- are they at this point arrest -- seizing him, based

14  on your training as a law enforcement officer under the

15  Fourth Amendment, are they seizing him right here?

16    A.  Yes.

17    Q.  Okay.  All right.

18    A.  Legally.

19    Q.  Yeah.  Yeah.  I understand.  Well, I don't want

20  you to make a legal conclusion.  I want to be fair to

21  you and your counsel, but your understanding as a law

22  enforcement officer.

23        All right.  So when you say, "Continued" --

24  "Mr. Story continued his noncompliance and tumultuous

25  behavior," when you tumultuous, is that because he was

CHIEF JEFFREY DWAYNE YARBROUGH

1  resisting the soft escort?

2      A.  And -- and it was the heightened yelling and

3  disruption of his behavior.

4      Q.  Okay.  All right.  So when people are -- when

5  people are physically restrained -- let me back up for a

6  second.  I've got to -- this -- this is just kind of

7  like prep- -- preparatory language.  I've got a book on

8  my bookcase over here called On Combat written by

9  Lieutenant Colonel Grossman and he talks about, you

10  know, physiological changes whenever you get under

11  stress and everything.  I -- I use that when I teach

12  martial arts.  Isn't it true that whenever someone gets

13  in a stress situation their -- their vocal volume

14  increases?

15              MS. LONG:  Objection.  Calls for

16  speculation and calls for expert opinion.

17      Q.  (By Mr. Casey)  Your law enforcement training,

18  do you go over levels of force?

19      A.  Yes.

20      Q.  Do you go -- in your firearms training, do you

21  go over levels of stress?

22      A.  Yes.

23      Q.  Okay.  What does levels of stress, based on

24  your training -- let me back up.  Let me ask another

25  foundational question.

CHIEF JEFFREY DWAYNE YARBROUGH

1          Do you discuss what physiological levels of

2   stress do to someone's senses like their sight and their

3   hearing and their speech?

4        A.   Yeah, there could be some excited responses.

5        Q.   Yeah.  And -- and -- and you would agree with

6   me, that's -- that's normal.  That's just being a normal

7   person that when you -- if you're in distress your voice

8   can unconsciously go up; right?  I mean it's a yes or

9   no.

10       A.   Depending on the circumstances, yes, and the

11  situation.

12       Q.   Okay.  Okay.  So when Mr. Story is being

13  physically escorted out and he's -- he's -- in his mind

14  he's asserting his constitutional rights, was he

15  reasonable?  Not whether you would agree with it or not

16  because you might say he should just zip his mouth and

17  be, you know, silent as a lamb.  But it's also

18  reasonable that his voice would go up because he's under

19  physical stress because of their -- their physical

20  escort?

21              MS. LONG:   Objection.  Foundation, assumes

22  facts not in evidence.

23       Q.   (By Mr. Casey)  How did Sergeant Pope and

24  Officer Pontillo escort him out of the room, Chief

25  Yarbrough?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  It's me recalling from what I saw in the video

2   only, was -- and -- and as I walked down, they had their

3   hands on him, and I'm not sure on left arm, right arm,

4   which hand, but they -- they had their hands -- had him

5   in semi-care, custody, and control as they were moving

6   him out.

7    Q.  Okay.  So is it reasonable -- not whether you

8   agree he should have done it, but is it reasonable that

9   his voice volume elevated when they were physically

10  removing him from the room, yes or no?

11   A.  To say reasonable, I'd have to say, no, it's

12  not reasonable.

13   Q.  Okay.  So based on your testimony today, the

14  moment a police officer puts their hands on you, you're

15  supposed to be silent as a lamb?

16   A.  No --

17       MS. LONG:  Objection.  Sorry.

18   Q.  (By Mr. Casey)  Okay.  So you -- so you're --

19  you're -- you're not allowed to elevate -- let me back

20  up for a second.  The moment a police officer puts their

21  hands on you, if your voice goes up, that's the -- let

22  me think about that for a second.

23       MS. LONG:  Are you asking generally or in

24  the context of a public board meeting?

25       MR. CASEY:  I'm asking -- let's do both.

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1     Q.  (By Mr. Casey)  Generally when a police officer

 2  put --

 3          MR. CASEY:  Thank you very much.

 4     Q.  (By Mr. Casey)  When a police officer puts

 5  their hands on you generally, are you supposed to

 6  immediately shut your mouth and comply with whatever

 7  they tell you to do?

 8     A.  No.

 9     Q.  Okay.  So when a police officer puts their

10  hands on you, isn't it reasonable at times, yes or no,

11  that your voice is going to go up because the stress

12  level's gone up?

13     A.  See, that's where I'm getting confused.  When

14  you say reasonable, I'm thinking is it reasonable right

15  or is it unreasonable wrong.  And so -- so you may want

16  to use a different word so I can make sure I'm answering

17  that question when you say reasonable.

18     Q.  Well, I -- see, I think you're defining

19  reasonable as whether you agree with him or not.  Is it

20  understandable that it might happen to somebody?

21     A.  It's -- it's understandable.

22     Q.  Okay.  That's where we're -- we're -- we're --

23  sometimes in depositions we're -- it's a disagreement on

24  terminology.  So you're saying it's understandable that

25  his voice would go up because his stress level went up;

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   right?

2       A.  Yes.

3       Q.  Okay.  Yeah, because I'm not -- I'm not trying

4   to get you to agree with my client on everything.  We're

5   just trying to find the contours of the conflict.

6           Okay.  When Mr. Story was escorted out, did

7   you-all ever -- did you-all ever send him a written

8   information explaining -- explaining why he was escorted

9   out in the appeal process; do you recall?

10      A.  I don't recall.  That wouldn't have come from

11  me.

12      Q.  Okay.  All right.  Because you -- you mentioned

13  -- you cited Texas Education Code 37.105 earlier.  Let

14  -- let's -- let's look at 37.105.  Do you -- I mean, I'm

15  going to -- I'm going to pull it up.  Just a moment.

16  Let me stop the share right here.

17          Okay.  So I'm going to share -- actually, I

18  put this in a new window.  All right.  Let's go to

19  Education Code 37.105.  Okay.  We're looking at 37.105.

20  You can see at the top that's off the -- that's off the

21  Texas State Statutes website.  There it is right there.

22  Let's walk through this.  "A school administrator,

23  school resource officer, or school district peace

24  officer of a school district may refuse to allow a

25  person to enter on or may eject a person from property

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  under the District's control if the person refuses to

 2  leave peaceably on a request and," let's pause there for

 3  the "and."  Do you -- in your law enforcement training,

 4  have you been taught the difference between ands and ors

 5  in a statute?

 6      A.  Yes.

 7      Q.  Okay.  And what -- what do you understand the

 8  distinction to be?

 9      A.  That it -- it requires both.

10      Q.  It requires both.  Okay.  And so this one, it

11  has an "and" there, but an "or" between number one and

12  number two.  So as -- would you agree with me that

13  either number one has to be satisfied or number two has

14  to be satisfied in -- in their entirety?

15      A.  Yes.

16      Q.  Okay.  So let's talk number one.  Was Mr. Story

17  posing a substantial risk of harm to any person?

18      A.  No.

19      Q.  Okay.  Let's talk about number two.  Was he

20  behaving in a manner that's inappropriate for a school

21  setting?

22      A.  Yes.

23      Q.  So when you say school setting, under your

24  opinion, this is applying to anytime -- anytime a

25  meeting is taking place on school property?

CHIEF JEFFREY DWAYNE YARBROUGH

1          MS. LONG:  Objection to the extent it calls

2  for a legal conclusion.

3          MR. CASEY:  Well, I'm just trying to see

4  his understanding of school setting.

5      Q.  (By Mr. Casey)  What does that mean to you in

6  your law enforcement experience as a -- as Round Rock

7  ISD's police chief?

8      A.  About a school setting?

9      Q.  Uh-huh.  I mean, is this talking about during

10  the day during instruction or is this talking about

11  school board meetings?

12      A.  From my understanding, it's a -- it's a raw

13  term related to not just a school campus but also a

14  school-sponsored event.  It could be a meeting, it could

15  be a football game.

16      Q.  Okay.  So any -- any setting then, including a

17  school board meeting, you believe -- you believe as a

18  law enforcement officer -- and this is what you

19  referenced -- would entitle you to remove someone?

20      A.  And what I was referencing, it's one of the

21  things that you can remove for, but you can also remove

22  for the others.

23      Q.  Sure.  I mean, there's ton of reasons you can

24  remove someone.  I'm just trying to get your

25  understanding because you raised 37.105.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  Yes.

2    Q.  So that's what I'm referencing.

3    A.  Yes.

4    Q.  And so then --

5    A.  Based on my understanding, a school setting

6  also includes a school board meeting.

7    Q.  Who -- who determines what's inappropriate in

8  that middle -- middle of the Section A(2)?  Who

9  determines what's inappropriate?

10    A.  It can be the officer.  It can be an

11  administrator.  It can be any official or any individual

12  named under 37.105 who can make that determination, a

13  district police officer, school officer, or a school

14  administrator.

15    Q.  All right.  Is it inappropriate to disagree

16  with the board chair?  Is that an inappropriate action?

17    A.  Not at all.

18    Q.  If the board chair turns off your mic and you

19  elevate your voice back to the level it was, is that an

20  inappropriate action?

21    A.  Yes, if it causes a disturbance.

22    Q.  Okay.  I -- well, now you've added something so

23  we got to explore that.  When someone raises -- when

24  someone's mic's cut off, let's say -- let's just pull a

25  number.  I'm not a -- I'm not an audiologist.  I'm not

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   an acoustics expert.  We're just going to pull a random

2   number.  We're just going to say decibel levels like 25.

3   I'm just going to make up a number, but we're just going

4   to hold that.  Let's just say that's normal talking.

5   Right?  They cut your mic off and it goes down to 10.

6   The Board's -- the dais is still mic'd at 25, but you

7   come down to 10.  If you raise your voice back up so

8   that you're at 25 un-mic'd, is that inappropriate?

9       A.  I have no idea how to even answer that

10  question.

11      Q.  Okay.  So raising your voice back up to the

12  level that you were at before, is that inappropriate?

13  And I -- we'll pause for a second.  You're telling me --

14  and I'm not trying to be mean with you -- that it's this

15  totality of the circumstances; right?  Well, I've got to

16  figure out what factors go in there because now you've

17  -- because I don't have an exact trigger.  You've opened

18  a door to this entire kaleidoscope world of what caused

19  -- you know, why was it appropriate to arrest him.  And

20  so I'm trying to find this inappropriate.  So now I'm --

21              MS. LONG:  You've answered your own

22  question because he's repeatedly said it's the totality

23  of the circumstances.  And when there's a totality of

24  the circumstances, there is no triggering event.  It's

25  when you all -- if -- when you consider everything in

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  context.  Your confusion is you're asking him the same

2  question over and over, which he's answered over and

3  over, and then you're coming back and saying, well --

4  putting one little incident in a vacuum when he said

5  specifically totality of the circumstances.  So I've

6  been very patient as you've asked the same question over

7  and over and over again, but he's told you repeatedly

8  and you even said in your question that he's told you

9  repeatedly that it's a totality of the circumstances.

10  That means there's not a trigging event and yet you're

11  keeping parsing things out of context and asking him as

12  if the whole totality didn't exist.

13          MR. CASEY:  Okay.  Well, I appreciate that

14  objection.  I'm trying to -- and it's probably a

15  category that that would come underneath.  But I -- I

16  think that it's -- his answers are very vague and I'm

17  trying to nail his foot down, which cross-examination is

18  for that very purpose.

19          MS. LONG:  Yeah, but decibels?  I mean, do

20  you even know what decibels of 25 are?  I mean --

21          MR. CASEY:  No --

22          MS. LONG:  -- this is getting kind of

23  ridiculous.

24          MR. CASEY:  That's why I said we're just

25  going to -- that's why I removed it.  I'm saying if he

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  raised his voice back up -- if he raised his voice back

2  up to that level.

3      Q.  (By Mr. Casey)  Because that bottom line in

4  this, Officer -- Chief Yarbrough -- well, you know what,

5  the lawsuit says the bottom line.  I'm just going to ask

6  questions.

7          Was Mr. Story raising his voice back up

8  inappropriate?

9      A.  In my opinion, he was.

10     Q.  Okay.  So at that point your testimony to the

11 jury would be 37.105 allowed him to be arrested the

12 moment he -- or allowed him to be ejected by you-all the

13 moment he raised his voice back up, yes or no?

14             MS. LONG:  Objection.  Asked and answered.

15             MR. CASEY:  No.  He just changed his

16 testimony.  He said right there that defined

17 inappropriate.  You had a long running talking

18 objection.  He just went a different direction and so

19 now I'm trying to clarify.

20             MS. LONG:  No, he didn't.  You asked one

21 question.  You're asking what -- at what point can you

22 arrest him.  That's what you asked earlier and he

23 explained it.  This question is what point was it

24 inappropriate.  You're asking two different questions,

25 so you're getting two different answers, and then you're

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   saying he's changing his answer.

2          MR. CASEY:  Well, we -- we have this

3   standard and I'm walking toward it.  I -- I -- this is

4   -- all this is just, you know -- I'm going to continue

5   to ask the questions, but put your objections on the

6   record.

7          MS. LONG:  I haven't told you you can't ask

8   the question.  I'm just --

9          MR. CASEY:  I understand.

10          MS. LONG:  -- telling the --

11          MR. CASEY:  I understand.  But the long

12   running objections are -- you know, taint the witness

13   and it really -- whether it's intent or not, it subtly

14   guides him in his future testimony.  You're not trying

15   to do that, but that's the effect it has, so --

16          MS. LONG:  Well, I objected asked and

17   answered, and a lot of attorneys after saying that

18   multiple times would just tell them not to answer.  I'm

19   letting him answer your question.  I've had two long

20   speaking objections.  I don't normally do that, but

21   that's the reason why.  So I'm letting you proceed.  I'm

22   not telling him not to answer your questions.

23          MR. CASEY:  I understand.  I appreciate

24   that.

25      Q.  (By Mr. Casey)  I -- you brought up 37.105.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  You're saying that allowed you to arrest him.  So is

2  your opinion -- and I'm just doing a summary because

3  apparently that's -- that's what you think is that

4  37.105 tells you to put everything together and -- and

5  just base it on the whole situation?

6      A.  That not what he was charged with.

7      Q.  I understand.  But you raised 37.105 earlier.

8  Okay?  I didn't bring it up.  I'm just trying to

9  understand your -- your view of 37.105.  Okay?

10      A.  Okay.

11      Q.  All right.  Let's go back to the statement in

12  your supplemental production.  All right.  So this is --

13  we -- we've transitioned off of this.  August 17th, you

14  said you contacted Dee Hobbs regarding these actions.

15  Go ahead and read that paragraph, please.

16      A.  On August 17th, 2021, at approximately

17  7:45 a.m., I contacted Williamson County Attorney Dee

18  Hobbs regarding the actions and possible criminal

19  violations committed by Mr. Story that led to Sergeant

20  Pope and Officer Pontillo having to use physical force

21  to remove Mr. Story from the boardroom due to his

22  hindering and disrupting the school board meeting.

23  Mr. Hobbs was informed that the Round Rock ISD Police

24  Department would complete its investigation into the

25  incident and submit the findings to his office for

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  review regarding the filing of criminal charges.

2  Mr. Hobbs stated that he would be out for two weeks in

3  the coming days but would schedule a meeting to discuss

4  the case and the findings.  Mr. Hoff [sic]" --

5  "Mr. Hobbs' office later contacted me and scheduled a

6  meeting for September 18th, 2021 to discuss the case

7  against Mr. Story."

8        Q.  All right.  So the very beginning of that, and

9  maybe I misunderstood your earlier testimony, you -- you

10  -- you said you weren't really involved in this

11  investigation or anything like that.  What prompted you

12  to reach out to the Williamson County Attorney's Office

13  for this meeting?

14        A.  Because that was the first time we had a

15  situation where we had to remove a person from a school

16  board meeting so I wanted to talk to him.  Once our

17  officers had to put their hands on this individual, that

18  was something that I needed to staff with our county

19  attorney to determine what the next steps would be

20  because it did meet the elements of a misdemeanor, which

21  falls under the county attorney's purview.  So I called

22  him as the department head and he being the department

23  head because I didn't know any of the -- really know any

24  of the other attorneys.  And I spoke to him about what

25  took place.  And he gave direction, and I passed that on

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  to Assistant Chief Williby.

2       Q.  Yeah.  And do you -- and the other times where

3  you said -- and I don't want to misrepresent what you're

4  saying -- where it's uncommon or you just didn't have a

5  lot of arrests on campus, did you call Dee Hobbs for any

6  of those other situations?

7       A.  I did not.  No.

8       Q.  Okay.  All right.  September 14th.  And you

9  don't have to read it out loud.  You can just read it

10  quietly.  Let me know when you've read -- read that

11  paragraph.  I'll move this.  Sorry.

12      A.  I've finished.

13      Q.  All right.  Were you there present on September

14  14th?

15      A.  Yes.

16      Q.  Okay.  Were you plain clothes or in uniform?

17      A.  I don't recall.

18      Q.  Okay.  Did you -- were you actively involved in

19  the law enforcement activities that were going on that

20  day?

21      A.  You said actively?

22      Q.  Yeah.  And let me -- that was vague.

23          Were you directing your officers based as to

24  what they should do and how they should act that day?

25      A.  No.  Assistant Chief Williby, that was his --

CHIEF JEFFREY DWAYNE YARBROUGH

1  that was his duty.

2      Q.  Were you coordinating at all with the

3  superintendent on what the officer's standards should be

4  for removing people that day?

5      A.  No.

6      Q.  Okay.  Okay.  Okay.  Let's go to the last

7  paragraph.  Go ahead and read that.

8      A.  Okay.  "On September 18th, 2021" --

9      Q.  Oh, you can do it quietly.  That's fine.

10     A.  Okay.

11     Q.  All right.  So at -- what I take from this

12  paragraph is that when you-all -- you, Sergeant

13  Griffith, and then the other -- the other folks in the

14  meeting -- in attendance at that meeting, when you-all

15  presented this to the county attorney, he gave his

16  rubber stamp that you have all the elements, he's fine

17  with it, go ahead and get it filed?

18     A.  Yes.

19     Q.  Okay.  Now I've got -- so this was Plaintiff's

20  4.  I'm going to go next to Plaintiff's 5.  That same

21  gentleman who's kind of --

22              (Exhibit 5 marked for identification.)

23              MS. LONG:  Since we're going to a new

24  exhibit, would now be a good time to take a break?

25              MR. CASEY:  That's perfect.  Yeah.  How

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  long?

2             MS. LONG:  Can we go off the record?

3             THE REPORTER:  Yes.  Off the record.

4             (Eight-minute break was taken.)

5      Q.  (By Mr. Casey)  Okay.  This document's stamped

6  JS-304204.  Again, you see that "electdanielleweston" at

7  the top?

8             MS. LONG:  You need to share your screen,

9  Mr. Casey.

10            MR. CASEY:  Oh, I'm sorry.  Thanks.  I'm

11 looking at it right in front of me.  I was thinking it

12 was on the share.  I was like, man.  Let's see.

13 Acrobat.  There we go.  Thanks.  All right.  Yeah, it

14 was right in front like it normally is on the share.

15     Q.  (By Mr. Casey)  And so it's actually kind of

16 comical that this guy grabbed her website when she

17 didn't renew it.  I don't care what you think about

18 politics, that's kind of funny.  But he's put this --

19 this document up on -- from a public information request

20 from the Williamson County Attorney's Office.  Go ahead

21 and read the first paragraph, if you would.

22            MS. LONG:  I'm going to object to this

23 exhibit in testimony because it's to the extent it's

24 hearsay and it's not authenticated.

25            MR. CASEY:  Sure.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      A.   Okay.   I've read the first paragraph.

2      Q.   (By Mr. Casey)   Okay.   Does that reflect who

3  you believe -- you recall, was that the meeting with Dee

4  Hobbs, his first assistant, the criminal division chief,

5  and then yourself, and then Officer Griffith?   Right?

6  Do you remember that?

7      A.   It was Dee Hobbs, Mr. Holcomb, I'm assuming the

8  lady -- the female attorney was Ms. Gorman, Assistant

9  Chief Williby, Sergeant Griffith and I.

10      Q.   Okay.   All right.   At that time had you

11  submitted all of your evidence when you met with him?

12  Had you submitted the whole case file to the county

13  attorney?

14      A.   I don't know if she had or not.   I wouldn't --

15  wouldn't have overseen that, so I don't know if the

16  entire file was -- was submitted.

17      Q.   Okay.   Now I understand you earlier -- I don't

18  want to -- I don't want to put words in your mouth.   It

19  sounded like you said that Dee Hobbs gave you the

20  go-ahead to go ahead and file the -- go seek the warrant

21  from the magistrate.   Is that what you said earlier?

22      A.   Yes.

23      Q.   Okay.   I want you to read the second paragraph,

24  please.

25      A.   I've completed.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.   Okay.  That next-to-last sentence that's got

2  the "however" in it, does that -- does that -- do you

3  recall that being the county attorney's position, they

4  could not officially give you the opinion, even though

5  he said, "It sounds like both men have violated the law,

6  but we can't give you an official opinion until they

7  review the entire file"?  Did you recall him saying

8  that?

9    A.   I don't recall that.

10   Q.   So your recollection is he was giving an

11 official opinion for you-all to go ahead and seek the

12 warrant?

13   A.   That is my understanding.

14   Q.   Okay.  Are you required to get their permission

15 before you seek the warrant from the magistrate?

16   A.   No.  But it's a good practice, in my opinion,

17 to -- generally staff faces with the -- the prosecuting

18 attorneys.

19   Q.   Okay.  And did you give them the entire file

20 after you -- after you got the warrant?

21   A.   I wouldn't have had any role or involvement in

22 that.  So -- and -- and here's what I think you're

23 missing to is --

24        MR. CASEY:  Objection.  I'm going to object

25 to no question on the table.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  Okay.

2    Q.  (By Mr. Casey)  All right.  Let's go to --

3    let's talk about your interrogatories.  Share this.  Let

4    me zoom in on these.  Do you -- do you remember getting

5    questions that are written questions called

6    interrogatories from -- from your attorney?

7    A.  I don't recall.

8    Q.  Okay.  Let's scroll down, I think to the bottom

9    probably.  These are questions -- I don't -- actually,

10   I'm scrolling kind of fast.  These are questions that

11   were sent to your attorney which you're responding back

12   to as if you're under oath.  It's -- do you see this,

13   "Chief Yarbrough objects to the definitions and

14   instructions," that's right in the middle of the page?

15   Do you see that?

16   A.  Yes.

17   Q.  Okay.  Do you remember your attorney talking

18   with you about answering these questions?

19   A.  Yes.

20   Q.  Okay.  Okay.  Like, for example, Question No. 1

21   -- and sometimes attorneys, because we have the legal

22   background, we do this.  I mean, you see Question No. 1,

23   you see a list of objections right there on the answer

24   to the first big paragraph.  In this next one you'll see

25   in the bottom of that, "Chief Yarbrough refers Story to

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  RR Independent School District Defendants' Rule 26

2  initial disclosures and any amendments or supplements to

3  Rule 26 initial disclosures."  Do you see that?

4      A.  Yes.

5      Q.  Yeah.  And that's probably something that your

6  attorney would have written.  Well, it actually would

7  have been something your attorney would have written

8  because I don't -- I don't -- are you familiar with

9  Federal Rule 26(a)(1)(A)?

10     A.  Not right off.

11     Q.  All right.  So -- and we do that.  That's just

12  common.  So I want to go through to some of your

13  interrogatory answers.  All right.  So this Question No.

14  2 is if you contend that some other person or entity is

15  whole or in part liable to the plaintiff in this matter

16  that we're talking about, we're talking about the

17  viewpoint discrimination, the illegal search and seizure

18  of Mr. Story, and the retaliatory arrest of Mr. Story,

19  those are the three things that we're suing about right

20  now because everything's been narrowed down.  So those

21  are -- that's what we're talking about.

22          And our question is, identify that person or

23  legal entity and describe in detail the basis of said

24  liability.  And I would qualify this because the

25  narrowing of all those topics happened after this, so

CHIEF JEFFREY DWAYNE YARBROUGH

1  this stuff that's responding to other claims, I'm not --

2  I'm not seeking it from -- I'm not seeking questions

3  about liability on that -- my client isn't.

4        So and it says, like, the tail end of this

5  paragraph on page four, Story's claims against Chief

6  Yarbrough arise from one discreet event:  The 14th, '21

7  board meeting, makes no allegations against you

8  otherwise.  Down here you say, "Chief Yarbrough," in

9  this paragraph at the bottom, "Does not believe there

10  was any violation of Story's constitutional rights with

11  respect to these matters and does not believe that any

12  person or legal entity is liable to Story for the claims

13  regarding the August 16th, 2021 board meeting," the 14th

14  board meeting and then -- "and Story's September 2021

15  arrest."

16        Do you understand that if a -- if a government

17  official allows some people to talk about -- and we

18  talked about this earlier in the deposition.  If -- if

19  at that August 16th board meeting, if Amy Weir allowed

20  some people to talk off topic but then she restricted

21  Mr. Story, that that would -- that would be a

22  constitutional violation based on your law enforcement

23  experience?

24        MS. LONG:  I'm going to object to the

25  extent it asks for a legal conclusion or legal opinion

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
 1  testimony because he is not a lawyer.
 2              MR. CASEY:  Sure.  Sure.  I mean, we talked
 3  about earlier --
 4              MS. LONG:  And I'm going to object because
 5  it's hypothetical.
 6              MR. CASEY:  Okay.  Earlier -- well, I mean,
 7  there's a cross, but okay.
 8      Q.  (By Mr. Casey)  Earlier we talked about and you
 9  made the statement about situations -- if they were
10  identical situations.  I'll go back to my notes.  If you
11  said you -- you would be discriminating against
12  somebody's viewpoint -- we were talking about BE (Local)
13  or BED (Legal), that if they had done identical actions,
14  but there was a different outcome.
15              MS. LONG:  I'm going to object because it
16  mischaracterizes the testimony and the prior question
17  that was answered.
18      Q.  (By Mr. Casey)  Okay.  I said, what would --
19  what would be discriminating against someone's
20  viewpoint, how would you know that happened?  As I
21  recall, that was my question.  How would you know that
22  happened?  And you said, "Well, if they took identical
23  actions, they refused to leave and there was a different
24  outcome."
25              MS. LONG:  I'm going to object because that
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   mischaracterizes the earlier question.

2   　　　　　MR. CASEY:  Okay.  If the board president

3   -- and you're a law enforcement officer and you-all are

4   -- you-all are called to make these decisions, you have

5   to enforce the law as in accordance with the

6   constitution under the school board policies.  If the

7   board president allows some people to go off topic and

8   other people not and she doesn't silence them, based on

9   your law enforcement officer training, not -- not being

10  a lawyer but your law enforcement training, would that

11  be a constitutional violation?

12  　　　　　MS. LONG:  I'm going to object to the

13  extent it calls for a legal conclusion or legal opinion

14  testimony.  Chief Yarbrough, you can answer.

15  　　A.  It's hard to answer that.  I don't have an

16  answer for that.

17  　　Q.  (By Mr. Casey)  Okay.  So what your opinion

18  would be, is that based on your -- yes or no, is that

19  based on lack of understanding of what -- what -- what

20  you're allowed to enforce under the First Amendment?  Is

21  that what it's based on, yes or no?

22  　　A.  No.

23  　　Q.  Is it based on you not understanding the free

24  speech rights under the constitution?

25  　　A.  No.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  What is it based on?

2    A.  My understanding of what you're asking.  I'm

3  not -- I'm not following what you're asking completely.

4    Q.  So -- so if two people speak at the board

5  meeting, that's -- that's -- and both of them say

6  something that's off topic.  All right?  That's --

7  that's the -- that's the hypothetical.  Which, you know,

8  in depositions -- this is your first one, but when

9  you're being asked a deposition by someone else, this is

10  what they do, they give you hypotheticals.

11       If two people go off topic and only one person

12  is silenced or escorted out, are they being treated

13  differently?  It's yes or no?

14    A.  I can't answer yes or no to that.

15    Q.  Okay.  Have you had any -- did you have a

16  common text message thread with the superintendent at

17  that time?  Did you have a text message thread with him?

18    A.  I had the superintendent's cell phone number.

19  Yes.

20    Q.  Did you -- okay.  Well, that's -- that's not

21  directly an answer to my question, but allows it to

22  occur.  Yes or no, do you have a text message thread

23  with the superintendent at that time?

24    A.  At the time -- at what time are we talking

25  about?

CHIEF JEFFREY DWAYNE YARBROUGH

```
1        Q.  Summer of 2021 into the fall of 2021.

2        A.  I don't know.  I don't recall.  I -- I don't

3   recall.

4        Q.  Do you --

5        A.  I just don't.

6        Q.  So you're saying you don't -- you can't --

7   during the entire time that you were at Round Rock ISD,

8   did you ever send a text message with the

9   superintendent?  Let's broaden it.

10       A.  Yes.

11       Q.  Okay.  Is it possible you have text messages

12  from June of 2021 until October of 2021?

13       A.  It's possible, but I'm not sure.

14       Q.  How often did you and the superintendent

15  communicate?  Frequency on a -- on -- during the day?

16       A.  Not very often.  Maybe once every other day or

17  every couple of days.

18       Q.  And you as your -- you directly reported to

19  him; right?

20       A.  Yes.

21       Q.  Okay.  What would you-all communicate about?

22       A.  Unmet needs with the police department.  It's

23  really hard to --

24       Q.  Did it have --

25       A.  What's that?
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  I'm sorry.  I didn't mean to cut you off.  I

2   didn't know if you were pausing to think more or that

3   was the extent of your answer.

4    A.  Yeah.  I simply don't recall.  He was new to

5   the district around that time, so I -- we didn't have

6   that type of communication portal where I would talk to

7   him on a daily or hourly basis.

8    Q.  After the arrest on August 16th, between then

9   and September 14th board meeting, did you talk with him

10  at all about Jeremy Story?

11          MS. LONG:  Object.  I'm going to object to

12  the question because there was not an arrest on August

13  16th.

14    Q.  (By Mr. Casey)  I'm sorry.  The escort.  That's

15  -- that's fair.  I'm sorry.  From the August 16th board

16  meeting were Jeremy Story was escorted out to the

17  September 14th board meeting, did you and the

18  superintendent talk at all about Jeremy Story?

19    A.  Yes, I -- I believe so.

20    Q.  Okay.  I'm going to ask very specific.  Did you

21  communicate by text message regarding Jeremy Story

22  during that time period?

23    A.  I don't recall.

24    Q.  Did you communicate face to face about Jeremy

25  Story during that time period?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  I -- I believe so.

2    Q.  Okay.  Did you communicate via email about

3  Jeremy Story during that time period?

4    A.  I don't recall.

5    Q.  Did you communicate over a phone call at that

6  time during -- during that time period about Jeremy

7  Story?

8    A.  I don't recall.

9    Q.  Okay.  When you communicated face to face, what

10  -- what did you-all discuss about Jeremy Story?

11    A.  I don't recall what we discussed.

12    Q.  Okay.  Let's -- let's unpack that a little bit.

13  Was Jeremy Story an active participant in any -- that

14  you recall in any of the programs going on at Round Rock

15  ISD that involved school parents?

16    A.  I have no idea.

17    Q.  So is it --

18    A.  I don't recall.

19    Q.  So isn't it true you have no other reason to

20  talk about him than what was going on at the school

21  board meetings?

22    A.  I'd say that that's probably a fair statement.

23    Q.  Okay.  That's all I'm looking for.  And when

24  you talked about what was going on at the school board

25  meetings, what was Dr. Azaiez telling you about what was

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  going on?

2      A.  I do not recall what was said in those times.

3  I just simply don't remember.

4      Q.  Okay.  Did you ever discuss with the

5  superintendent any of the -- any of the civil and

6  domestic family code stuff that was going on with him?

7      A.  I remember when I heard about it, telling him

8  that I was aware of that allegation.

9      Q.  Okay.  Did you-all have any other conversations

10  about it?

11      A.  The only other conversation I can recall was

12  probably the last conversation, was -- was the second

13  and the last conversation was when he said that wherever

14  Austin or the town who was investigating it, and he's

15  looking forward to it being investigated fully.

16      Q.  Okay.  When -- later on when the permanent

17  protective order was issued against the superintendent,

18  were you still police chief at that time?

19      A.  I don't know when it was issued.

20      Q.  Okay.  Did that permanent protective order

21  affect your relationship with the superintendent in any

22  way?

23      A.  I don't know when it was issued so I can't

24  speak to -- you said did it or would it?

25      Q.  Would it?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  I don't know what context we're referring to it

2  affecting a relationship.

3    Q.  Well, let's do a hypothetical.  I used this

4  hypothetical with Detective Sergeant Griffith.  I think

5  that's her title right now.  So let me give you a

6  situation.  Say back when you were -- you were not a

7  chief -- and you've been chief for a while so that's

8  pretty cool.  Back when you were an officer, just right

9  getting out, and you had a -- either a police chief or

10  the assistant chief and they -- let's assume for a

11  moment that they had bad gun safety, poor muzzle

12  control, they leave their -- their weapon unholstered

13  all the time, and they happen to leave it -- they carry

14  a revolver and they leave it partially, like, cocked,

15  right, and they leave it on their desk.  Just very

16  unsafe.  You would consider that a significant issue;

17  right?

18    A.  Yes.

19    Q.  Okay.  Would it be the same as if an officer

20  when they pulled into the parking lot at the high school

21  parked over a parking lot line?  Would you consider that

22  quite -- even though it was -- it'd be incorrect, it'd

23  be quite lesser of an offense?

24    A.  Yes.

25    Q.  Okay.  How would it make you feel in that

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  situation if you were the officer that had parked across

2  the line and this -- and this supervisor, maybe even the

3  assistant chief or the chief came to you with all this

4  bad weapons protocols and was scolding you about parking

5  over the line?  How would you feel?  Would you feel --

6  let me give you a potential answer.  Would you feel that

7  they were being a hypocrite?

8      A.  I could see how someone would feel that way,

9  but if I was wrong, I was wrong when --

10      Q.  Sure.

11      A.  -- my vehicle.

12      Q.  I understand.  I get it.  Both situations the

13  person's doing something wrong.  I totally understand.

14  Okay.  So did you take courses in leadership whenever

15  you were doing your training, like just pure, like,

16  leadership principles and ethics?

17      A.  Yes.

18      Q.  All right.  What -- if you could define

19  leadership in a sentence or two, how would you define

20  it?

21      A.  Sorry?  You kind of broke up.

22      Q.  I apologize.  If you were asked to define

23  leadership in one or two sentences, how would you define

24  it?

25      A.  I would consider leadership as the standard and

CHIEF JEFFREY DWAYNE YARBROUGH

1  example set by the head of an organization based upon

2  integrity.  I would say their vision, support and

3  service.  I would say that that would be my definition.

4      Q.  Okay.  And that's a fair definition.  That's

5  pretty good.  Did you -- did you encourage -- when you

6  were in various organizations in a position of

7  leadership, did you encourage those people who you were

8  leading to give you feedback on how you were leading?

9      A.  Yes.

10      Q.  Would it be concerning to you that if you had a

11  blind spot to where you were -- you were leading in a

12  hypocritical way, would that be important to know?

13      A.  Absolutely.

14      Q.  Okay.  All right.  After September -- excuse

15  me.  After August 16th, 2021, did you -- did you meet

16  with -- with your officers as a group afterward to have

17  any type of debrief about what happened?

18      A.  I don't recall.

19      Q.  Okay.  Did you have any additional training

20  after August 16th, 2021 on what your officers should do

21  in these circumstances where they believe that a person

22  needs to be removed from a board meeting?  It's just a

23  yes-or-no question.  Did you have --

24      A.  I was just trying to remember.  I'm trying to

25  recall that moment of time and I don't remember those

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  specifics.

 2      Q.  Okay.  Before August 16th, 2021, were you aware

 3  that Jeremy Story had publicly criticized the

 4  superintendent?

 5      A.  Before which meeting?

 6      Q.  Before the August meeting where Mr. Story was

 7  escorted out, were you aware that Mr. Story had shown up

 8  to the school board meeting to publicly criticize the

 9  superintendent?

10      A.  No.

11      Q.  Were you present at any of the June or July

12  meetings where Mr. Story raised the issue of the

13  superintendent's -- the superintendent's actions with

14  Vanessa Aldrich?

15              MS. LONG:  I'm going to object to

16  foundation, and I'm also going to object to the facts

17  not in evidence.

18              MR. CASEY:  Okay.  All right.

19      Q.  (By Mr. Casey)  Are you aware of whether

20  Mr. Story ever showed up to a -- to any school board

21  meetings prior to August 16th to criticize the

22  superintendent?

23      A.  I don't recall of anything like that.

24      Q.  Did you attend all the school board meetings in

25  summer of 2021?

CHIEF JEFFREY DWAYNE YARBROUGH

1      A.  I don't know if I did or not.  I attended many

2  school board meetings, but not necessarily all.

3      Q.  Okay.

4      A.  You said June 2021?  Yeah, I don't -- I can't

5  recall.

6      Q.  Okay.  Do you -- do you believe that there was

7  a general sense given the allegations against the

8  superintendent and his domestic dispute that his

9  reputation was at stake?  Was that the general sense

10  inside the ISD based on your observations?  I don't want

11  you to think about what everybody was thinking about.

12  Was there an atmosphere of that?

13      A.  I could see how it could be.

14      Q.  Yeah.  Did it in any way, based on your

15  viewpoint -- and this is all your viewpoint.  But did it

16  in any way challenge the image of the superintendent for

17  you whenever the -- whenever you found out that he -- he

18  was bound by a protective order for a physical assault?

19      A.  So you want a yes or no?

20      Q.  Just yes or no, please.

21      A.  No.

22      Q.  Did you ever -- did you ever -- were you ever

23  informed about the allegations of that assault?

24      A.  I was informed by -- I don't remember who,

25  regarding what was put in a post related to those

CHIEF JEFFREY DWAYNE YARBROUGH

1   allegations.  And I don't remember who the post was by

2   at this point.

3       Q.  Okay.

4       A.  A social media post is what I'm referring to.

5       Q.  Whose social media post was that?

6       A.  I have no idea.

7       Q.  Is there any instance where the superintendent

8   advised you to strictly remove anybody who -- who

9   deviated from the agenda?

10      A.  No.

11      Q.  Okay.  If a speaker wants to criticize the

12  school board or anyone else during the public comment

13  time about their hypocrisy, would that be protected

14  speech?

15      A.  In my opinion, yes.

16      Q.  Okay.

17      A.  They have every right to.

18      Q.  Okay.  If the superintendent's going to lead --

19  excuse me.  Would you agree the superintendent is the --

20  is the chief administrative officer for the school

21  district?

22      A.  Yes.

23      Q.  Okay.  Would you agree that he should be

24  leading by example?

25      A.  Yes.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      Q.   Okay.  Would you agree, based on what you and I
2  talked about -- I think this was before lunch -- that --
3  that story about King David, that King David was
4  required to lead by example?
5      A.   Yes.
6      Q.   Okay.  Do we agree that it was appropriate for
7  the prophet Nathan to call out King David to his
8  hypocrisy?
9      A.   Yes.
10      Q.   Okay.  Do you know if Officer Pontillo added --
11  put a supplemental report into the -- into everything
12  that went on?  Do you recall he filed one?
13      A.   I don't recall.
14      Q.   Okay.  We talked about implicit bias earlier.
15  In your training on implicit bias, does that -- does
16  that court [sic] -- course for law enforcement teach you
17  that you must be very alert to your bias when enforcing
18  standards that are -- that are -- that are really
19  discretionary?  Like they ask you to, like -- like that
20  ask you to make a judgment call?
21      A.   Yes.
22      Q.   Okay.  If -- if in the time -- let me back up
23  for a second.  So you said you weren't aware that
24  Mr. Story had been showing up to school board meetings
25  and complaining about the superintendent prior to August

CHIEF JEFFREY DWAYNE YARBROUGH

1  16th?

2      A.  That's correct.

3      Q.  All right.  Did you ever approach Mr. Story in

4  a parking lot before any other school board meetings

5  other than August 16th?

6      A.  No.

7      Q.  This idea of implicit bias, can it affect --

8  actually, I already asked that.  Sorry.  I'm just going

9  through my questions.  Some of these I've already asked

10  so I'm skipping over them.

11          Would you agree that if you don't check

12  your bias that that can lead you to discriminating

13  against people who simply have a different point of

14  view?

15      A.  Yes.

16      Q.  Okay.  Did you review any media coverage about

17  Mr. Story in the days or immediate weeks following his

18  removal from the school board meeting in -- on August

19  16th?

20      A.  Yes.

21      Q.  What did you -- what did notice and see in the

22  media?

23      A.  I saw different interviews that Mr. Story and

24  Mr. Clark gave related to the arrests at Round Rock ISD.

25      Q.  Okay.  And where -- were any Round Rock ISD

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

CHIEF JEFFREY DWAYNE YARBROUGH

1  police officers involved in that, in effectuating the

2  arrest?

3       A.  What do you mean?

4       Q.  In going to his house and actually physically

5  arresting him?

6       A.  Oh, no.

7       Q.  Who -- which department did that?

8       A.  I believe it was Williamson County Sheriff's

9  Department.

10      Q.  Okay.  Why -- did it take -- let me back up for

11  a second.

12            Was the arrest timing correlated to the

13  meeting with the county attorney's office so that

14  you-all could get kind of oversight from the county

15  attorney's office on -- on your probable cause

16  affidavit?

17      A.  No.  Not to my knowledge --

18      Q.  So -- so you -- apologize.  Go ahead.

19      A.  It was -- again, the meeting date was set by

20  the county attorney's office.

21      Q.  Totally understand that.  Why -- why the delay

22  then to get that affidavit until the meeting was done?

23      A.  Because we wanted -- they -- the goal and

24  objective was to have them review and give feedback and

25  input on that affidavit.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  I -- and maybe I misunderstood your
2    prior answer.  The meeting was already set, why'd you
3    wait that long?
4    A.  When you say "wait that long," what are you
5    referring to?
6    Q.  Well, okay.  So August 16th the violations
7    happened, but he doesn't get arrested until a month
8    later.  But why did it, to your knowledge -- you may not
9    have any knowledge about it.  Why did it take that long?
10    A.  To my knowledge, it was based upon the
11    investigation process.  Sergeant Pope and others getting
12    their information together, gathering and collecting all
13    the information, compiling that.  And so that's what --
14    and then the time that the county attorney was going to
15    be out all contributed to the -- the delay is what my
16    best recollection is.
17    Q.  Okay.  So -- so to make sure I'm understanding
18    you right, information gathering going, their county
19    attorney is going to be out for a couple of weeks, they
20    set the appointment, and that appointment then is to
21    make sure that you-all gathered everything and you've
22    got your ducks in a row before you get the arrest
23    warrant?
24    A.  So I'm speaking outside the scope, so I can't
25    say because I don't know what conversations Sergeant

CHIEF JEFFREY DWAYNE YARBROUGH

1  Griffith had with the county attorney's office prior to

2  that.  So I can't really say.  All I can speak to is the

3  day that we met with them.

4       Q.  Okay.  So he might have just been convening --

5  you-all had that meeting at that day, and then she's

6  like, "I'm just going to bring the affidavit because

7  we're going to be up there in Georgetown anyway"?

8  That's reasonable.  I mean, I'm not asking you to jump

9  into her head.  It just happened to be coincidental?

10      A.  Yes.

11      Q.  Okay.  All right.  Do you agree that the

12  superintendent's reputation was a sensitive issue at

13  that time?

14      A.  I believe it was.

15      Q.  Do you agree that removing a speaker who

16  referenced that issue protected him from public

17  embarrassment?

18      A.  I don't.

19      Q.  So any -- so let's think about the board

20  meeting.  If any person then said something that wasn't

21  immediately related to the mask mandate, would that be

22  off topic?

23      A.  It depends.

24      Q.  Okay.  That's fine.  It depends.  It probably

25  depends on having to listen to what they're saying in

CHIEF JEFFREY DWAYNE YARBROUGH

1  totality; right?

2      A.  I would say no.

3      Q.  Okay.  So if someone's going to argue by

4  analogy that the superintendent's unsafe, therefore they

5  believe the school district's being hypocritical, is

6  that a fair argument by analogy?

7      A.  I can't speak to that.  I didn't make the

8  argument.  I can't speak to that.

9      Q.  Well, I'm not asking you to make the argument.

10 Is it understandable to say, look, you -- you believe

11 that -- you believe that safety is important as it

12 relates to COVID, we believe safety's important too, but

13 your top leader is inherently unsafe?  Is that -- is it

14 understandable to call someone out and call them

15 hypocritical in that regard?

16     A.  It could be.  It could be.

17     Q.  Yeah.  Okay.  That's fair.  But would you agree

18 with me you'd have to have -- they would have to tie it

19 together; right?  Would you agree with me on that?

20             MS. LONG:  I'm going to object.  I'm going

21 to object that it's vague.

22             MR. CASEY:  Okay.

23     A.  Yeah, I didn't know what you mean by that.

24     Q.  (By Mr. Casey)  Okay.  If other people went off

25 topic and weren't silenced, but people who referenced

CHIEF JEFFREY DWAYNE YARBROUGH

1   the superintendent were, is it understandable that you

2   could look at that in hindsight and say, "Look, that

3   looks like they're protecting the superintendent"?

4       A.   I can't speak to what someone else would see.

5   That's not what I saw.  I wasn't there for that, to --

6   to see those things.  I can't speak to that.

7       Q.   All right.  So if we -- when we watch the video

8   and it happens, then we'll -- I guess we'll cross that

9   bridge when it comes.  All right.

10          All right.  BED (Local).  I just got to go

11  back to my notes.  00206.  All right.  Where's the

12  cursor?  I'm going to share Acrobat.  I'm going to

13  scroll down to BED (Local) 207.  Okay.

14          MS. LONG:  Stephen, and I'm going to be a

15  little unconventional here.

16          MR. CASEY:  Go ahead.

17          MS. LONG:  I didn't go back and produce the

18  prior version of the BED (Local) because it was already

19  attached to the complaint.  I can either share the

20  version that was in effect on my screen and we can add

21  that as an exhibit or I can email it to you right now

22  from my -- I've got it open and I can email it right to

23  you now.  But we didn't produce it again because it was

24  already attached to the complaint.

25          MR. CASEY:  No, no judgment.  I'll go to

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   the complaint and I'll just produce.  It's probably

2   quoted in here.  And I think I've got the appendix.

3   Because I think 56 pages are there.  But let me pull up

4   the appendix.

5           MS. LONG:  Just to let you know, it's ECF

6   11.

7           MR. CASEY:  Okay.

8           MS. LONG:  Page five, which was Exhibit 2.

9           MR. CASEY:  Okay.  There's BED (Local),

10  Exhibit 2.  There you go.  It's on page four.  And

11  there's that -- yeah.  Okay.  I'm at page four of that,

12  page four of the appendix.  Exhibit 4.  Okay.  BED

13  (Local).  There we go.  This is the one that was

14  attached to the complaint.  Okay.

15      Q.  (By Mr. Casey)  Now, this was a called board

16  meeting; right?  Individuals get to sign up.  Let's go

17  to the bottom one, "Disruption."  So this -- this bottom

18  paragraph, "Disruption."  And I'll enlarge it.  Sorry,

19  it's kind of big on my screen.  At this point now you

20  said that Mr. Story was removed from hindering --

21  hindering a public meeting.  Would you be referencing

22  also this -- this -- this policy when you're making that

23  conclusion?

24      A.  That's appropriate.

25      Q.  Okay.

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  Under the circumstances we discussed.

2    Q.  Okay.  Yeah.  All right.  All right.  Let me

3    stop sharing.

4             MS. LONG:  For the record, just to help,

5    that's Docket 49-1, Exhibit 2.

6             MR. CASEY:  Exhibit 2.  Yeah.  And that --

7    I think we're at -- four, five -- is that -- I believe

8    that's six right now?  Am I -- am I correct on that,

9    Ms. Owen?

10            THE REPORTER:  Yes.  The next exhibit to be

11   marked is 6.

12            MR. CASEY:  Okay.  6 is BED (Local).  All

13   right.  I'm just keeping -- I've got them in the

14   margins, but I've got these pages.  So 6, BED (Local).

15   All right.  All right.

16            (Exhibit 6 marked for identification.)

17   Q.  (By Mr. Casey)  All right.  So let's go to the

18   video.  I'm going to be moving some stuff around in my

19   screen to make sure that we can get this because I've

20   got it downloaded.  I'll just go -- I need to get that

21   exhibit number.  Okay.  Okay.  So I've just got multiple

22   screens I'm trying to pull stuff up on.  68.  Let's see.

23   This is August 16th board meeting.  I think that's the

24   one we're looking at.  And I noticed that the technology

25   -- technology issue that sometimes when I start and stop

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  it the volume drops.  I'm going to share it real quick

2  and we'll go through this.  And if the volume drops,

3  you'll notice I'm just going to pause it and start it

4  again because sometimes it hangs in there for minutes,

5  hours at a time, other times it drops within a few

6  seconds.

7           So first things first, Chief Yarbrough, does

8  that look like the -- the room at the time that -- on

9  August 16th?

10          (Exhibit 7 marked for identification.)

11     A.  Based on my memory, it does.

12     Q.  Okay.  And so you would have been standing

13  somewhere back over here where my cursor is on the

14  bottom right; correct?

15     A.  No.

16     Q.  Where were you standing?

17     A.  I was behind the -- the -- right there in

18  that --

19     Q.  Oh, yeah.  That mirror.  I'm sorry.  Yeah,

20  thank you for reminding me of that.  Yeah, you were

21  behind the mirror.  Okay.  Let's -- I want to go to -- I

22  think -- let's talk about Elaine Lee, her comments.  I'm

23  going to pull up the -- let's just go to Elaine Lee's

24  comments.  She appears at 1:07.  Let's go to that.  I

25  have not found a way yet to get this really, really

CHIEF JEFFREY DWAYNE YARBROUGH

1  good.  That's her, but I'm going to rewind kind of fast

2  to 1:07.  And it might freeze or the video might go down

3  because you can't hear her.  I'm at 1:07:30.  Okay.  So

4  we're going to listen Elaine Lee talk.  Okay?

5       A.  Okay.

6       Q.  First thing, though, before we do that, we're

7  going to review a portion of her and then we're going to

8  listen to what she says.  I'm going to share the Third

9  Amended Complaint so we're cued up for her, but I'm

10  going to share the Third Amended Complaint and we're

11  going to look at a portion of what she says and then

12  we're going to hear all of it.  All right?  Because I --

13  I know that we got to be fair and bring all the evidence

14  in.

15            So this is her complaint, and we're on page

16  nine.  Ms. Lee states in port [sic] -- in part, "I'm

17  here to remind you that Senator Cruz who poses as a

18  freedom fighter in front of the camera chooses to send

19  his children to a private school that has a mask

20  mandate."  Is that -- is that an on-topic statement

21  based on -- based on your presence there and what you

22  understand the meeting to be about?

23       A.  What I remember the meeting about, it had a lot

24  to do with mask mandate.  So it's got mask mandate, I

25  would have to say yes.

CHIEF JEFFREY DWAYNE YARBROUGH

1    Q.  Okay.  But if -- if right here -- and this is a

2  yes-or-no question.  If right here the board chair were

3  to cut off Elaine Lee after she says, "I'm here to

4  remind you that Senator Cruz who poses as a freedom

5  fighter in front of the camera," you would agree that

6  until you see the last portion of that sentence, that

7  has nothing to do with -- with safety; correct?

8    A.  Correct.

9    Q.  All right.  All right.  So you have to listen

10  to their statements in their entirety to get what

11  they're talking about; right?

12    A.  That sentence that you just referred to, yes.

13    Q.  Yeah.  Okay.  So we're going to play Ms. Lee's

14  comments.

15            (Video playing.)

16        Oh, I'm sorry.  I'm going to share it.  Sorry.

17  I got to -- I didn't -- I didn't do the technical side

18  of this right.  I got to share this.  There we go.  So

19  I'm going to share.  I'm going to back it up for a few

20  seconds.  Okay.  This is Ms. Lee.

21  (Video playing.)

22    Q.  Each time the volume drops I'm just going to

23  pause and start it again.

24            (Video playing.)

25        So what we talked about a moment ago, you

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

CHIEF JEFFREY DWAYNE YARBROUGH

1  referenced that you have to hear this statement -- like

2  if I chopped that sentence off and don't get a mask

3  mandate, it could sound out of context; right?

4      A.  The sentence, yes, that you referred to.

5      Q.  Yeah.  And so by hearing -- oh, I didn't know

6  you could scroll by just pushing up on this.  That's

7  weird.

8            So let's go to Catherine Wrightmire.  And

9  she's at -- right before this at 1:06.  I'm going to

10  just fast-forward it to 1:06.  I think when it goes to

11  1:06 then -- there we go.  There we go.

12            (Video playing.)

13      All right.  So up until that, would you say

14  that Ms. Wrightmire is talking about on-topic stuff

15  regarding the mask mandate?

16      A.  No.

17      Q.  I'm sorry?

18      A.  No.

19      Q.  She's not?  Okay.

20      A.  Up until this point where she's talking about

21  the book?

22      Q.  No.  I'm saying up until this point she's

23  talked about masks; right?

24      A.  Yes.  Yes.

25      Q.  Okay.  All right.  Now she's shifting gears and

**CHIEF JEFFREY DWAYNE YARBROUGH**

 1  she's talking about Fred- -- Frederick Douglass.  Is

 2  that related to the mask mandate?

 3      A.  No.

 4      Q.  Okay.

 5      A.  Not the -- not the fraction of what I've seen

 6  her say.

 7      Q.  Okay.  And we're going to listen to the rest of

 8  her comments.

 9              (Video playing.)

10          So far up to that point is she talking about

11  anything related -- from which the time she introduced

12  Frederick Douglass about the mask mandate?

13      A.  No.

14      Q.  Okay.  Do you hear at any time so far the board

15  chair telling her that she's off topic?

16      A.  No.

17      Q.  Okay.  Do you -- do you believe that the board

18  chair had a right at that time, based on your knowledge

19  of the school policies and what we've talked about in

20  this case, for the board chair to say, "You're off

21  topic"?

22      A.  Yes.

23      Q.  Okay.  Is -- at that time, is she being treated

24  differently than Jeremy Story?

25      A.  Too different.

**STOVALL REPORTING & VIDEO, INC.    (214) 695-2024**

**CHIEF JEFFREY DWAYNE YARBROUGH**

1     Q.  Okay.  So let's get -- let's go to a yes-or-no

2  question.  She was off topic, yes?

3     A.  Yes.

4     Q.  Okay.  The board chair did not do anything to

5  her; yes?

6     A.  That's correct.

7     Q.  Okay.  And when Mr. Story went off topic, he

8  was stopped right away, yes?

9     A.  Yes.

10     Q.  Okay.  So that's being treated differently,

11  yes?

12     A.  In that narrow scope, yes.

13     Q.  Okay.  All right.  We'll continue with

14  Ms. Wrightmire.

15           (Video playing.)

16      Did she -- did she -- did she circle back to

17  the mask mandate at all, sir?

18     A.  No.

19     Q.  Okay.  And was she cut off at all in any way?

20     A.  No.

21     Q.  Okay.  Let's go to Don Zimmerman.  He is at

22  1:36:20.  Let me drag it over and get it as close as I

23  can.  I just realized I can fast-forward it by scrolling

24  my hands up.  I learn something new every day.  Okay.  I

25  think she just called Don Zimmerman.  We're going to

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  listen to Don Zimmerman in his -- in his entirety.  And

2  he talks for -- well, so we're marking at -- he starts

3  at -- if you can see that 1:36:18, and we're going to

4  listen to his total comments.

5                    (Video playing.)

6            At that point -- and I'm going to stop this

7  and pause this a couple times during it.  Is he talking

8  anything about the mask mandate, sir?

9        A.  No, not so far.

10       Q.  Okay.  Did he get stopped by the chair?

11       A.  No.

12       Q.  Okay.

13                   (Video playing.)

14           At that point is he still -- is he talking

15  about the mask mandate, sir?

16       A.  It could be argued as a loose -- as a

17  connection to it, so...

18       Q.  And -- and you would agree with me that he's

19  going to progress and you're going to hear him tie it

20  back in or you expect to?

21       A.  I don't know.

22       Q.  Okay.  So at this time -- I mean, that's fair

23  to say you don't know if he's going to tie it back in

24  because he hasn't finished his comments; correct?

25       A.  Yes.

CHIEF JEFFREY DWAYNE YARBROUGH

1   Q.  All right.

2           (Video playing.)

3        And at this point has he tied it back in yet,

4   sir?

5   A.  Not yet.

6   Q.  Is he off topic, sir?

7   A.  Yes.  It sounds like it's on the heels of what

8   he was speaking on previously.

9   Q.  Okay.  And he has not been cut off; correct?

10  A.  Correct.

11          (Video playing.)

12        Sorry.

13          (Video playing.)

14        At this point we started, he was at 1:36:20.

15  So he's spoken just 200ths of a second less than a

16  hundredths of a minute less than a full minute.  So

17  roughly a full minute.  Is he on topic at all at this

18  point, Chief?  Not that he's saying stuff you might

19  agree or disagree, but is he on topic about COVID-19

20  health and safety?

21  A.  He has aspects in there about those things.

22  Q.  So when he -- so let's pull his sentences

23  because those are in the complaint.  I've got it paused.

24  I'm going to stop the share.  We're going to go back to

25  the complaint.  So let's go through -- I want you to

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  read through Paragraph C that's on page 10 of the

2  complaint.  Let me know when you're done.

3      A.  Okay.

4      Q.  All right.  So go down on the left-hand side,

5  about six sentences -- six lines down, the line that

6  starts with, "So let me."  Do you see that?

7      A.  Yes.

8      Q.  All right.  So let's start reading right there

9  and I'm going to ask a very specific question.  We're

10  going to talk about the whole thing.  If you start right

11  there, "So let me make something really very clear to

12  you, there's only one perfect man that ever lived on

13  this earth.  His name was Jesus of Nazareth.  This man

14  healed the sick, roused people from the dead, walked on

15  water, even was a" -- "sufficiently frozen." [Sic]

16  Taken in isolation, that has nothing to do with the mask

17  mandate; correct?

18      A.  That's correct.

19      Q.  All right.  And it's only because initially he

20  referenced it, and then he's kind of going out on a

21  limb, would you agree to -- to -- and hopefully you're

22  going to, as listening to it, I guess you're expecting

23  him to bring it back around; right?

24      A.  Yes.

25      Q.  Okay.  So he's arguing by analogy here; isn't

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  he?

2      A.  Loosely, yes.

3      Q.  And his point seems to be, when you read

4  through this, that the mask can't save you, only God can

5  save you; right?

6      A.  Yes.

7      Q.  Okay.  And so he's trying to tell the school

8  district not to play God right there in the kind of

9  bottom middle right here where my cursor is; right?  It

10 says, "You are not God."  Right?

11     A.  Yes.

12     Q.  All right.  And then he goes down a couple

13 lines lower and he says, "I am really fed up with the

14 self-righteousness and hypocrisy of government right all

15 over this country right down to the school board.  So

16 he's calling the school board as being hypocritical;

17 right?

18     A.  Yes.

19     Q.  All right.  Let's finish up his comments.  I'm

20 going to stop sharing that.  Let's go back over to the

21 video.

22             (Video playing.)

23         All right.  So he did bring it back to masks

24 at the end; right?

25     A.  Yes.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  In the middle he went out to make a

2  comparison; right?

3    A.  Yes.

4    Q.  Okay.  And, correct, he was not cut off; right?

5    A.  Yes.

6    Q.  Okay.  All right.  So let's go and listen to

7  Jeremy Story talk.  I think he's got a separate video

8  all together, and so we can just watch that without me

9  having to fumble with technology.  I'm going to close

10  this other one.  Share the screen.  All right.  What am

11  I sharing?  Stop that.  I want to -- shared the wrong

12  thing.  Quick time.

13        All right.  So this is Jeremy Story that

14  night.  This was Round Rock ISD 02168.  I'm going to

15  play these comments.  We're going to listen to them.

16  It's two minutes and 27 seconds long, and I'll be

17  pausing through it, sir.

18              (Exhibit 8 marked for identification.)

19              (Video playing.)

20        At that point you're still standing in the

21  back behind a mirror, sir?

22    A.  I'm seated in the back behind the mirror.

23    Q.  You're seated in the back behind a mirror;

24  right?

25    A.  Yes.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  I've got another question.  You started

2  in the back behind the mirror.  Where did you go to the

3  point where you said you heard a couple of outbursts?

4    A.  What do you mean?

5    Q.  Well, so you said at this meeting at the very

6  beginning of the meeting, "I heard a couple" -- "I heard

7  an outburst."  And you know it was at least once, maybe

8  more than once from somebody.  Where were you standing

9  when you heard those?

10    A.  I was in the back.  There's a mic -- there's a

11  speaker where you can hear really well in the back room,

12  so I could hear the Board, I could hear the people at

13  the podium, I could hear people when they were -- during

14  break I could hear people talking as well, so...

15    Q.  Okay.  And so that -- those microphones, you're

16  -- you're -- you're listening to either directional or

17  condenser microphones, those are all coming out of one

18  individual speaker; right?

19    A.  I don't know if it was one speaker or more.

20    Q.  Well, in the back room you're saying?  You

21  don't know if like a -- I'll pause for a second.  I need

22  to make a real specific question.  Are the speakers

23  like, hey, here's my phone right here and I can -- I can

24  understand the sounds coming out of that or is it

25  overhead speakers?

CHIEF JEFFREY DWAYNE YARBROUGH

 1      A.  I don't remember exactly where the speakers

 2 were placed in that room.

 3      Q.  But you would agree with me that the speakers

 4 are taking the sound from the room, collapsing it,

 5 sending it into the room, and then just broadcasting it

 6 indiscriminately; right?

 7      A.  I don't remember how that was, how the setup

 8 was back there.

 9      Q.  Well, were you looking right at Mr. Story the

10 whole time?

11      A.  No.

12      Q.  Okay.  And did any of the people -- were there

13 any other outbursts by any other persons in the

14 beginning of the meeting before he spoke right now?

15      A.  I don't recall at this point.

16      Q.  Okay.  Did he announce his name before he made

17 that first outburst?

18      A.  I don't recall him announcing his name.

19      Q.  Okay.  If there were multiple people making

20 outbursts -- let me back up.  Were you staring at him --

21 I may have asked this.  Were you staring at him the

22 whole time when you were in that room?

23      A.  No, sir.  I didn't even --

24      Q.  Okay.

25      A.  -- know who he was.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  Okay.  So how do you know the sound came from
2    him?
3    A.  Because I saw him when he did that.
4    Q.  Well, but -- okay.  So you were looking right
5    at him the very instant he made this alleged outburst
6    before his public comment time?
7    A.  No.  So, sir, when you're sitting in a -- and
8    when you're --  as a law enforcement officer, you're
9    scanning your sector and you're scanning the areas in
10   front, you're watching the school board members, you're
11   watching movement out in the -- in the audience area.
12   Q.  Okay.  So --
13   A.  So as he yelled, I saw him and my eyes went to
14   him at that point.
15   Q.  Okay.  So you were back here behind -- behind
16   Trustee Feller-Landrum at the time?
17   A.  Yes.
18   Q.  And you're -- you're behind that -- where were
19   you positioned -- I've got my cursor over this.  Were
20   you -- were you directly sitting right there in the
21   center of the window?
22   A.  I don't remember exactly where --
23   Q.  I'm just trying --
24   A.  -- back there.
25   Q.  I'm just trying to get your -- your vantage

### CHIEF JEFFREY DWAYNE YARBROUGH

1  point of where Mr. Story was.  Where was he prior to him
2  coming up when you heard him do the outbursts?  Where
3  was he in the room?
4      A.  I don't recall.  If I had to remember, it was
5  somewhere from my vantage point slightly to the right.
6      Q.  Okay.  On the -- so let's -- let's assume that
7  his back is --
8      A.  To the left.
9      Q.  -- sitting --
10     A.  To his left.
11     Q.  Just a second.
12     A.  Somewhere around there.  And that's my best
13  recollection.
14     Q.  All right.  And so you -- did you hear anybody
15  else talking pre-meeting?
16     A.  What do you mean?
17     Q.  Like over those speakers, did you hear anybody
18  else on the mics over those speakers pre-meeting?
19     A.  I don't recall.  I don't even remember if I was
20  back there pre-meeting.  I don't -- that's four years
21  ago.  I don't recall.
22     Q.  So you're saying while the meeting was started,
23  subsequent to Board President Amy Weir starting the
24  meeting, the outburst was after that?
25     A.  Yes.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Q.  And so where the -- where the jury will listen

2    to this -- which the mics coming back there, would be

3    the mics on in here, I believe, because that's -- all

4    that stuff is being recorded and the sound put in on the

5    video, that his outburst is going to be on there; right?

6    A.  It should be.  Yes.

7    Q.  Okay.  All right.  Let's go ahead and listen to

8    the rest of his comments.

9                (Video playing.)

10        Okay.  Quick question.  You hear the volume

11    that they're speaking at in this -- in this video?

12    A.  Yes.

13    Q.  Is that the same -- is that the same type of

14    volume that would have been coming across the speakers

15    in that room?

16    A.  I don't recall.

17        Can I ask for us to take a quick five-minute

18    bathroom break?

19    Q.  Absolutely.

20    A.  Thank you.

21            MR. CASEY:  I'm fine.  I'm sorry.  I didn't

22    get permission from your attorney.  I'm sorry.  And I

23    spoke to you in that regard.  But is that fine with you,

24    Katie?

25            MS. LONG:  Yes.

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1              (Five-minute break was taken.)
 2      Q.  (By Mr. Casey) So let's finish -- finish with
 3  Mr. Story's -- let's go further into it.
 4              (Video playing.)
 5          So at this point has he referenced something
 6  that's germane, Chief Yarbrough?
 7      A.  Not quite.
 8      Q.  Well, he said "the COVID epidemic."  Right?
 9      A.  Right, but that was about -- yeah, that was it.
10      Q.  Right.  And we were talking about Don -- excuse
11  me.  When we were talking about the Third Amended
12  Complaint, and then Ms. Lee said, "I'm here to remind
13  you that Senator Cruz who poses as a freedom fighter in
14  front of the camera," right?  But then she says, "To
15  send his children to a private school that has a mask
16  mandate."  Her referencing that word mask mandate or
17  that phrase makes it germane; right?
18      A.  Yes.
19      Q.  Okay.  So when he says -- Mr. Story starts
20  talking about COVID, that in and of itself is germane;
21  right?
22      A.  Yes.
23      Q.  Okay.
24              (Video playing.)
25          When he references the wording -- the -- the
```

CHIEF JEFFREY DWAYNE YARBROUGH

1  wording "the governor's order" and "the legislate from

2  Supreme Court of Texas," do you recall what that was

3  about?

4      A.  I don't recall.

5      Q.  Do you -- do you -- do you remember the

6  governor issuing an order saying that the school

7  districts could not have a mask mandate?

8      A.  I remember that.  I just don't remember the

9  timeline sequence of when that occurred.

10     Q.  Okay.  But -- but that would be pretty

11  significant, wouldn't you think?  Yes?

12     A.  Yes.

13     Q.  Okay.  And so that would be -- that would be

14  COVID related because of the governor's order; right?

15     A.  Yes, I agree.

16     Q.  Okay.  So we're -- we're -- I don't think he

17  started right at --

18             (Video playing.)

19         Sorry.  He didn't start at right at the

20  beginning of this.  There was a couple seconds.  But

21  he's been talking for about 30 seconds, he's -- he's

22  germane; wouldn't you agree?

23     A.  I would say it's appropriate.

24             (Video playing.)

25     Q.  What's he referencing there, "putting officers

**CHIEF JEFFREY DWAYNE YARBROUGH**

1   in the back of the room to enforce a last-minute

2   violation of the Open Meetings Act"?  Do you know what

3   he's referencing there?

4       A.  I don't know what he's referencing.

5       Q.  Okay.  And to be clear, there's not any claims

6   that are live, just -- just so the record's clear about

7   Open Meetings Act violations.

8               (Video playing.)

9           So when Mr. Story says, "80 percent of the

10  Texas resolution concerns itself with the safety of

11  public employees and students," is that germane?

12      A.  I can see how that is germane.

13              MS. LONG:  Objection.

14      Q.  (By Mr. Casey)  Okay.  Because he's talking

15  about safety; right?

16      A.  Yes.

17              MS. LONG:  Objection.  Foundation.

18      Q.  (By Mr. Casey)  Okay.

19              (Video playing.)

20              All right.  He's still talking.  I mean,

21  he's quoting a resolution right now.  Would you consider

22  that on topic?

23      A.  Yes.

24      Q.  Okay.

25              (Video playing.)

**CHIEF JEFFREY DWAYNE YARBROUGH**

1              When he references Supreme Court of Texas, do

2    you recall the Supreme Court of Texas upholding the

3    governor's order saying that school districts couldn't

4    issue mask mandates during that time?

5    MS. LONG:  Objection.  Foundation.

6        A.  I don't recall at this point in time.

7        Q.  (By Mr. Casey)  Okay.  So so far the gist of

8    Mr. Story's issue, would it be fair to say, is about the

9    school district and its -- its resolution and being

10   related to safety?

11       A.  I would agree so far.

12       Q.  Okay.  And this is in the context of COVID;

13   right?

14       A.  That's my recollection.

15       Q.  Okay.  Let's continue on.

16              (Video playing.)

17              So that is either -- I think -- I think that's

18   the board chair.  It might be Ms. Feller-Landrum.  Their

19   voices seem pretty close to me, but I'm not that

20   familiar with them.  Do you recall who that is?

21       A.  I don't recall.

22       Q.  Okay.  But he was stopped right away; correct?

23       A.  It looks like they intervened fairly quick.

24       Q.  Okay.  Did any type of interventions come to

25   any of those other speakers we looked at when they said

CHIEF JEFFREY DWAYNE YARBROUGH

1  something that -- that you and I both agree in and of

2  itself was off topic?

3      A.  No.

4      Q.  Okay.  Let's go ahead and watch the rest of it.

5          (Video playing.)

6          That person that keeps saying, "You're not

7  allowed to be speaking to anything that's not on the

8  agenda," is that Trustee Feller-Landrum?

9      A.  I don't know if it's her or if it's at the time

10 President Weir.

11     Q.  Okay.  I -- I just didn't see Board President

12 Weir's kind of jaw moving.  I know there's masking so it

13 kind of makes it a little bit more difficult, but it

14 didn't even seem like her mouth was like directed --

15 those are directional mics.  It didn't seem like her --

16 her face was directed to the microphone with that amount

17 of volume.  But is it possible it was Trustee

18 Feller-Landrum?

19     A.  It's possible.  I don't know for certain.

20     Q.  Okay.  All right.  So what we've identified so

21 far and it -- let me know if this is fair what you've

22 observed and I've observed from this video and the --

23 the previous video, is that multiple people talked about

24 something that taken in isolation was off topic, but

25 they could come back around and connect it to COVID and

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  the mask mandate; correct?

2      A.  In the two examples we watched, I would agree.

3      Q.  Yeah.  And when we saw -- we saw Don Zimmerman,

4  we saw Ms. Wrightmire, and we saw -- and Ms. Wrightmire

5  didn't seem like she came around except at the end she

6  talked about psychology.  And then we saw Elaine Lee.

7  So there were three people; right?

8      A.  Yes.

9      Q.  Okay.  And for those three people, in order to

10  evaluate whether their isolated off-topic comment was

11  germane, you have to hear the whole thing they're going

12  to say; right?

13      A.  Repeat that question.  I'm sorry.

14      Q.  In a -- okay.  No problem.  In order to figure

15  out if what they're saying is germane, you have to hear

16  the entirety of their comments; correct?

17      A.  You don't have to.  I can't -- I can't speak

18  for her.  So that's kind of hard for me, the question

19  you're asking me.

20      Q.  Okay.  Well, let's -- let's break it down a

21  little bit.  Maybe it'll make it a little bit easier.

22  If I pulled out the comments -- the negative comments

23  about Ted Cruz from Elaine Lee's statement, "Ted Cruz

24  views himself as a freedom fighter," I think that's what

25  she said.  I don't want to misquote her.  Let me go

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  down.  She says, "Ted" -- "Senator Cruz" -- "I'm here to
2  remind you that Senator Cruz who poses as a freedom
3  fighter in front of the camera."  If at that point the
4  board chair said, "Ted Cruz" -- "Senator Ted Cruz is not
5  on the agenda," if she said that at that point and
6  started talking over Elaine Lee, we wouldn't be able to
7  hear that "chooses to send his children to a private
8  school that has a mask mandate."  Wouldn't you agree
9  with me?
10      A.  I agree.
11          MS. LONG:  Objection.  Calls for
12  speculation.
13      Q.  (By Mr. Casey)  Yeah.  I mean, you have to hear
14  the second half of the sentence to see how it's related;
15  don't you?  It's yes or no.
16          MS. LONG:  Objection.  Calls for
17  speculation.
18      Q.  (By Mr. Casey)  I mean, really on the first
19  sentence, and I think there's an aspect of this where I
20  -- I understand your attorney's objection.  If you just
21  hear the first end of the sentence, you don't know where
22  it's going; correct?
23          MS. LONG:  Objection.  Calls for
24  speculation.
25      Q.  (By Mr. Casey)  You can still answer.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.   It's hard to give a yes or no because of what
2  we're looking at in the context.
3    Q.   Okay.  So -- so very -- that's important.  You
4  just said it.  You have to have context; don't you?
5         MS. LONG:  Objection.  Calls for
6  speculation.
7    Q.   (By Mr. Casey)  Well, now I -- it -- see, we're
8  running into the same wall, Chief Yarbrough, both ways.
9  Either you can decide the statements based on the
10  totality of the circumstances and the context of what
11  they're saying, which we've done with Elaine Lee and
12  Catherine Wrightmire and Don Zimmerman.  Either you have
13  to hear the whole thing -- you can't have it both ways.
14  You either got to hear the whole thing to make sure it's
15  all related to COVID and safety or you can make this
16  isolated decision because the only other option is
17  you've got broad discretion, I can shut anybody down
18  when I don't agree with them.  Wouldn't you agree with
19  that?  Would you agree with that, yes or no?
20         MS. LONG:  I'm going to object.  It calls
21  for speculation and you're mis -- you're misinterpreting
22  what I'm objecting to.  You're asking him to speculate
23  what Amy Weir knew based upon what these individuals
24  were saying.  That's what I'm objecting to calls for
25  speculation.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1             MR. CASEY:  All right.

2       Q.   (By Mr. Casey)  I don't want you to think about

3  what Amy Weir knew.  I want you, as a reasonable person,

4  a law enforcement officer, a law enforcement officer who

5  was there, who's on scene, and these people are speaking

6  and we're identifying -- our claim is Mr. Story, his

7  viewpoint was discriminated against.  Our claim is this:

8  Based on the Third Amended Complaint that you've seen --

9  and you may not be, you know, chapter verse familiar

10  with it, but you've seen it.  And his point of view is,

11  "Look, I wanted to point out the hypocrisy of the school

12  board to care about safety when the leader who should be

13  leading by example on safety, the superintendent, has

14  credible allegations of being" -- "of assaulting his

15  pregnant paramour.  So it's hypocritical for them to say

16  they care about safety."  Does that make sense, yes or

17  no?

18       A.   Yes.

19       Q.   Okay.  So his -- his claim is, look, you're

20  hypocrites when it comes to safety.  And the moment he

21  starts to make his analogy, which worked with King

22  David, worked with Elaine Lee, worked with Catherine

23  Wrightmire, worked with Don Zimmerman, the moment he

24  makes his analogy, that becomes some instance where he's

25  shut down and can't talk.  Wouldn't you say he was

CHIEF JEFFREY DWAYNE YARBROUGH

1  treated differently?

2          MS. LONG:  Objection.  Calls for

3  speculation, calls for a legal conclusion.

4      Q.  (By Mr. Casey)  In your law enforcement

5  opinion, wouldn't you see him being treated -- treated

6  differently?

7      A.  I would say the circumstances were different.

8      Q.  Okay.  So -- so then because the circumstances

9  were different, are you saying, yes or no, that he went

10  too far off afield, yes or no?  Either he did or he

11  didn't.  Did he go too far afield?

12     A.  That's her interpretation, not mine.

13     Q.  I want yours.  I'm not asking for you to tell

14  me Amy Weir's interpretation.  I want yours.

15     A.  I can't speak to what Mr. Story did because

16  it's outside the scope of my -- my -- my role,

17  responsibilities, or considerations.  I can't speak to

18  him going and talking about something, neither can I

19  with any of the other people.  I can say she could have

20  stopped the others just like she stopped him.  She could

21  have.

22     Q.  Yeah.  Okay.  She could have stopped the others

23  like she did him, but she didn't.  Agreed?

24     A.  Agreed.

25     Q.  If you see a school official violating

CHIEF JEFFREY DWAYNE YARBROUGH

 1  someone's constitutional rights, as the chief of police

 2  do you have an obligation to speak up about that?

 3      A.  Yes.

 4      Q.  Do you believe you're familiar enough with your

 5  law enforcement obligations under the First Amendment to

 6  protect the free speech rights of citizens speaking at a

 7  school board meeting?

 8      A.  Yes.

 9      Q.  So you would have an obligation then to protect

10  a citizen whose viewpoint was being discriminated

11  against; right?

12      A.  If a viewpoint was being discriminated against,

13  I have an opportunity to intervene.

14      Q.  Okay.  And by the board chair, as we just

15  agreed, not enforcing the law -- as you said, she could

16  have enforced it against those other three people.  By

17  her not enforcing the law against the three of them and

18  enforcing the law against Mr. Story -- according to her,

19  I'm not agreeing, that that's the law -- but her doing

20  that, she selectively enforced it against Mr. Story;

21  agreed?

22      A.  I disagree.

23          MS. LONG:  I'm going to object.

24      Q.  (By Mr. Casey)  You don't believe that she

25  selectively enforced it, yes or no?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  No.

2    Q.  Okay.  As a result of this, as a result of the

3    school board interactions with citizens, the arrest, did

4    you -- were there any policy changes that you were aware

5    of that happened before you left Round Rock ISD?

6    A.  I don't recall.

7    Q.  Subsequent to that, did you take -- do any

8    in-house training that not might -- might not be

9    documented in the officers' records?

10    A.  Related to?

11    Q.  I'm sorry.  That's a good -- that's a good

12    clarifier.  I apologize.  Related to free speech or the

13    First Amendment.

14    A.  I don't recall.

15    Q.  Anything related to school board meeting

16    policies and procedures?

17    A.  I don't recall.

18    Q.  After your meeting with Dee Hobbs talking about

19    the upcoming school board meetings, did you give any

20    guidance to your officers about those meetings?

21    A.  Yes.

22    Q.  What was your guidance to your officers at that

23    time?

24    A.  The guidance I recall generally speaking, not

25    knowing -- recalling the specifics was, again, our duty

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  and role and responsibility is to support any citizen or

2  any parent or person coming to speak, support their

3  right, but we cannot let anyone disrupt our meetings.

4      Q.  Okay.  Right.  I'm going to stop the share.

5  I'm going to go to one more -- one more video.  I think

6  we're almost done.  Let's see.  All right.  It's pulling

7  it up.  Okay.  All right.  So I'm pulling up a body cam

8  video.  Hold on just a second.  Let me mute it for just

9  a second.  I'm getting some background noise.  Sorry.

10  There's a loud talker in the hallway passing by.  I'm

11  going to show you and share-screen what's been produced

12  in discovery.  It's Round Rock ISD 06563.  It's a body

13  cam video.  It's not identified as to who the owner is,

14  but the -- in here he talks about -- I'm going to share

15  it.  In here he talks about on September 14th, recently

16  having a baby.  So maybe you can identify who that is

17  from that.  And he'll say it a couple -- do -- do you

18  recall who that was, one of your officers?

19          (Exhibit 9 marked for identification.)

20      A.  No.

21      Q.  Okay.  Let's go -- because you talk with him at

22  length in here.  So we're going to go ahead and watch

23  this video.  It's 15 minutes long.  I think this about

24  wraps up.  I don't think I have much more of anything

25  else.  I've got some -- some administrative questions

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  about you and Chief Williby.  So let's -- let's talk

2  about -- let's watch this video.  And I know it's 15

3  minutes long, but I'm just going to let it play out and

4  ask some questions during that -- a couple of specific

5  points I'll pause it.

6                    (Video playing.)

7              Do you recognize that voice?

8       A.   I do not at this point.

9       Q.   Okay.

10                    (Video playing.)

11              MR. CASEY:  Sorry for a second.  And,

12  Katie, coming up on this, I'll be real specific.  It

13  appeared when I reviewed this last night -- and I -- and

14  I muted it, I didn't listen to it -- it appeared that

15  there's -- and this, albeit from Ms. Hill too also, that

16  there was a portion of this video where it might be the

17  Board's legal counsel talking to them.  So if you-all

18  can identify right when he comes on screen.  I think

19  he's got like salt-and-pepper hair, kind of wavy.  Do

20  you -- do you -- can you recall who that was?  Because I

21  didn't -- I didn't -- I didn't listen to his comments.

22  When he was -- when he was talking, I -- I silenced it

23  and just passed by it.  So I'll just let you-all know

24  that's coming up because I don't want to go past any

25  privilege.  Okay?

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1              MS. HILL:  Okay.
 2              (Video playing.)
 3        Q.  (By Mr. Casey)  So what Officer Sam; do you
 4   know?
 5        A.  Sam Chavez.
 6        Q.  Sam Chavez.  Okay.  All right.  Some of this is
 7   uneventful and so I'm going to -- I'm going to
 8   fast-forward this because he's walking around.  It
 9   doesn't seem like there's any -- any material facts to
10   this.  Okay.  I think he comes back down the hallway and
11   he's waiting right here.  What is this table right here
12   for?  Is that --
13        A.  I'm assuming it's sign-in.  I don't know.  I
14   know used to they would have one inside, so maybe
15   they've got it outside because of the changes in the
16   protocol.
17        Q.  Okay.  When you said "changes in protocol,"
18   what do you mean by that?
19        A.  From my understanding of the -- based on the
20   date, this is around the time that they set controls on
21   the number of people that would come in and the seating
22   spacing, and typically the two individuals at the table
23   are the ones that get those who want to speak signed up.
24        Q.  Okay.  And this September 14th, that's well
25   after the -- the governor -- the governor and the Texas
```

STOVALL REPORTING & VIDEO, INC.   (214) 695-2024

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    Supreme Court said no mask mandates by the school

2    districts; right?

3         A.  I don't remember.

4         Q.  Okay.  If they had, would the school district

5    be in contradiction to the governor's executive order?

6         A.  I don't even recall the -- the information

7    related to that -- that --

8              MS. LONG:  Mr. Casey.  Mr. Casey, just look

9    at the screen, the people.

10             MR. CASEY:  The people on the screen?  I

11   don't --

12             MS. LONG:  The partic- -- okay.

13             MR. CASEY:  I'll go ahead and hit play.

14             MS. LONG:  You can continue.

15             (Video playing.)

16        Q.  (By Mr. Casey)  So he's going through.  He's

17   talking.  There's Mr. Story right there; right?  Okay.

18             (Video playing.)

19             So there's conversation going on; right?  And

20   so he's talking.  This is Officer Chavez.  So we're

21   going to go back and he's going to enter into the room

22   in a little bit.  So right now he's walking over to this

23   door.  He spends some time here.  What was the role of

24   -- and that's which -- is that Officer Pope or Pontillo

25   right there?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.  That's Officer Pontillo.

2    Q.  Pontillo.  What -- what do you -- can you

3  gather what he's doing right there at that time?

4    A.  From what I see, standing there.

5    Q.  Okay.  Is he prohibiting people from coming in?

6    A.  Officer Pontillo?

7    Q.  Yes.

8    A.  That's what it appears to me.

9    Q.  Okay.  Was -- was there a -- was there a

10  restriction on the total number of people in the room at

11  that time?

12    A.  Could have been.  I don't remember.

13    Q.  Okay.  All right.  So this is Officer Chavez.

14  You see Mr. Story there filming.  Again, this is

15  September 14th.  There's no claims on that, but -- so he

16  walks by and that's -- that's Sergeant Pope; right?

17    A.  Yes.

18    Q.  Okay.  So he comes in.  All right.  And then

19  he's going to head back to this room.  I'll ask you some

20  questions about this.

21        (Video playing.)

22      So who's that right there?  Do you know?

23    A.  That's Dr. Presley.  He was the deputy

24  superintendent.

25    Q.  Okay.  Deputy superintendent.  Okay.  So that's

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Dr. Bone?

2     A.  Yes.

3     Q.  Okay.  All right.

4          (Video playing.)

5          And that's you right there.  So you're in

6  uniform that night?

7     A.  Yes.

8     Q.  And -- and do you recall this situation now

9  that you're seeing it in video?  You remember what's

10 going on?

11    A.  Nothing -- I don't -- I don't remember anything

12 outstanding about that.

13    Q.  Okay.  So I -- would it be fair to say

14 uneventful?  Would that be fair?

15    A.  Yes.

16    Q.  Okay.

17          (Video playing.)

18          So you're asking him -- did you catch that

19 you're ask -- you-all are talking about the front door;

20 right?

21    A.  I --

22          MS. LONG:  Even -- we cannot hear anything

23 on that video.  It is so garbled.

24    Q.  (By Mr. Casey)  Okay.  And I'm looking at your

25 hand motions.  You-all said front door and you're

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  talking about this.  Let's go back up a little bit so we

2  can catch that.

3        I remember you telling me earlier in this

4  deposition that when you're there, you're just in a

5  supervisory capacity and Chief Williby's running the

6  show.  Is that -- was that fair about what you said

7  earlier?

8        A.  Yes.

9        Q.  Okay.  Would you think that your behavior right

10  here in engaging with Officer Chavez contradicts that?

11        A.  I don't even know what we were saying.

12        Q.  Okay.

13        A.  It looks like he was going in when I was coming

14  out and we ran into each other.

15        Q.  I'm sorry?

16        A.  I said it looks like he was going into the room

17  and I was coming out and we met there.

18        Q.  Yeah.  Okay.  And I'm just trying to see what

19  this dialogue's about.  All right.  Let me back up.  Let

20  me just back up for a second and see if we can capture

21  that.

22              (Video playing.)

23        So after he shut the door and the volume went

24  down, it's very understandable you all are talking about

25  the front door and he said people are trying to push

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  past; right?

2      A.   I couldn't hear what was said there, so I don't

3  know.   I can't -- and I don't recall what was -- what

4  was said at the moment.

5      Q.   Okay.   Who's coming out of the door?

6      A.   That's Dr. Azaiez.

7      Q.   Okay.

8              (Video playing.)

9          Do you recall what you discussed with

10  Dr. Azaiez right there?

11      A.   I do not.

12      Q.   Okay.

13              (Video playing.)

14          Okay.   So I'm going to scroll forward on this.

15  We're walking around, and then he comes back.

16              (Video playing.)

17          Who's that on the right, sir?

18      A.   That's Assistant Chief Williby.

19      Q.   Okay.

20              (Video playing.)

21          Am I correct that you said, "If we could just

22  get an officer to stand here like that," with your

23  hands, that's what you just said; correct?

24      A.   It sounded close to that.   I don't remember --

25  I don't -- I couldn't hear really well, but it's not

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  something that I think is inappropriate because it was

2  -- you got Dr. Bone walking right past there with me

3  saying it.

4      Q.  Well, since you're talking about the front door

5  with your hands; right?  I mean, that's what you're

6  talking about, having an officer standing at the front

7  door.  What -- what I'm trying to understand here is you

8  said your role is kind of --

9              MS. LONG:  I don't know if you're hearing

10  something that we can't, but we cannot hear any words.

11  Can the court reporter hear any words on this video

12  because we can't?  And I'm afraid that you're asking him

13  questions based on what you can hear at your computer

14  that we're not able to hear in this deposition.  Can the

15  court reporter hear what's going on?

16              THE REPORTER:  I can't make out any

17  discernible words.

18              MR. CASEY:  Is -- is it silent coming out

19  of there?

20              THE REPORTER:  Are you asking me?

21              MR. CASEY:  Yeah.  I'm sorry.  Apologies.

22  Yes, Ms. Owen, is it silent coming out of there -- or

23  anybody, can you all hear speech and dialogue going on?

24              MS. LONG:  It sounds like the Peanuts, wah,

25  wah, wah, wah essentially.

**CHIEF JEFFREY DWAYNE YARBROUGH**

1              MR. CASEY:  Oh, gotcha.  Okay.  Well, we'll

2  -- we'll walk through.  I'll -- I'll -- unless the -- on

3  my end, I can pick up people's dialogue between each

4  other.  So let's do this.  I'm going to hold off asking

5  you questions if there's multiple people talking.  And

6  if there's only individuals talking exclusively, then

7  I'll ask about that and I'll ask about observations

8  because I don't want you to be unfairly having to answer

9  questions or me asking questions about something that's

10 not coming out clearly.  But this was produced and so

11 this will be an exhibit for summary judgment should we

12 go to trial.  So that -- that's -- that's just what I'm

13 -- I'm letting you know.

14              All right.  So let's go forward.  We'll play

15 it.  It's only -- it's only got eight minutes left, and

16 I might pause throughout it.

17              (Video playing.)

18     Q.  (By Mr. Casey)  Okay.  So did you hear that?

19 The -- it was Officer Chavez saying, "So what's our plan

20 with our folks out there?"

21     A.  I didn't hear it.  It's muffled on my end.

22     Q.  Okay.  I wish I had an equalizer.  So I'll

23 represent to you, and should -- should the video bear

24 the sound differently, I'm saying I hear it very

25 clearly, Officer Chavez says, "So what's our plan with

CHIEF JEFFREY DWAYNE YARBROUGH

1  our folks out there?"  And then you start talking.
2  We'll play.
3              (Video playing.)
4         Did you hear yourself talking right there?
5      A.  Yes, I heard a lot of that.
6      Q.  Okay.  So you said, "If people try and force
7  through, that's a different ball game."  What do you
8  mean by people forcing through?  Was there some sort of
9  capacity limit for the building on that -- or for the
10  room on that day?
11     A.  No.  From my recollection, Sergeant Chavez had
12  reported that -- reported hearing some -- someone say
13  that they ought to just rush the Board, and so that
14  caused us to take that action.
15     Q.  Okay.  Was there limited seating in the room
16  that day?
17     A.  Yes.
18     Q.  Was that a --
19     A.  Based upon what I saw from the video as a
20  recollection.
21     Q.  Okay.  Do you know if that was a Board
22  decision?
23     A.  I don't recall.  I'm assuming it was, but I
24  don't -- don't recall specifically.
25     Q.  Okay.  If that would be a Board decision and

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  someone violated it, say there's 10 chairs and the 11th

2  person comes in -- I think we touched about this way

3  back at the beginning, but now we're watching the video.

4  If someone came in -- or let's say someone came in and

5  brought their own chair, would that be an arrestable

6  offense?

7      A.  Not that --

8          MS. LONG:  I'm going to the -- I'm going to

9  object to this.  That, first of all, everything about

10 this board meeting has been dismissed.

11         MR. CASEY:  Sure.

12         MS. LONG:  It has no bearing whatsoever on

13 any of the remaining claims.  I'm also going to object

14 to the extent it calls for a legal conclusion or legal

15 opinion testimony.

16         MR. CASEY:  Okay.  I'm -- I'm not using it

17 to prove a legal claim.  It's a -- it's a factual matter

18 right now.  Right now Chief Yarbrough said his role in

19 there isn't a supervisory capacity, he doesn't engage,

20 that -- that Chief Williby is the manager of the people

21 on the ground, and so I'm evaluating his actions based

22 on his testimony.  Let's continue to watch.

23             (Video playing.)

24     Q.  (By Mr. Casey)  So he said "limited numbers."

25 And then you said, "We do have the authority to deny

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    someone entrance."  That's related to the spacing of the

2    chairs; right?

3        A.  Yes.

4        Q.  Okay.  And in this video, which seems to

5    contradict your prior testimony, you're actively engaged

6    in managing things on the ground during this meeting;

7    correct?

8        A.  During this particular encounter of a meeting

9    that's hours long.

10        Q.  I -- I'm not --

11        A.  Yeah.

12        Q.  -- yeah.  Those things I understand.  Right?

13    I'm just referring back to you saying, "When I was at

14    this meeting" -- we talked about meetings.  You said, "I

15    was just the supervisor.  Chief Williby" --

16        A.  Generally.

17        Q.  Okay.  Let me back up for a second.  I get

18    you're saying generally and I get it's difficult because

19    we're taking your prior testimony, we're observing an

20    example where it doesn't seem to be the case, and so

21    there may be tension there.  There shouldn't be any

22    tension.  We're just examining what happened on this

23    video.  So in this video you would agree with me that

24    you're actively involved in supervising your -- your

25    officers?

**CHIEF JEFFREY DWAYNE YARBROUGH**

1    A.   I'm actively involved in a conversation with
2    Sergeant Chavez.
3    Q.   Okay.  So are you supervising the scene?
4    A.   Not necessarily.  There's so many other
5    components to the scene.
6    Q.   Okay.
7    A.   I was directly in a conversation with him.
8    Q.   Yeah.  After you said "yes," that's fine.
9         (Video playing.)
10        Who was that?
11   A.   That's Council Member Cory Vessa.
12   Q.   Okay.
13        (Video playing.)
14        Do you recall while this body cam is going
15   what you're talking with Assistant Chief Williby about?
16   A.   I have no clue.
17   Q.   Okay.
18        (Video playing.)
19        And observing your behavior right there, I
20   continue to see you put your hands up like this as
21   you're referencing the doors over and over again.  Is it
22   safe to say, fair to say, or reasonable that you're
23   talking about access control to that room?
24   A.   No.
25   Q.   Okay.  So you were using your hands this way on

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  multiple occasions to talk about the doors.  What did

2  you use those for on the other occasions, if you can

3  remember?

4      A.  I can't recall.  I'm a -- I'm a minister and I

5  talk with my hands.

6      Q.  Okay.  I -- I do that too.  That's fair.

7          (Video playing.)

8          I have to admit I felt uplifted by -- by

9  Officer Chavez.  Who's that in the video right there?

10     A.  That's Board Member Landrum.

11     Q.  Okay.  All right.  Since you're not in this

12  we're going to fast-forward it.  Although, you know, it

13  was very cheerful to hear his talk.  I'm going to keep

14  on going until you come back in the picture.

15          (Video playing.)

16          All right.  Let's see.  Okay.  So who's that

17  right there in the -- coming into the room?

18     A.  That's Annette Vierra the former HR director.

19     Q.  Okay.  All right.  All right.  All right.  So

20  walking back, who's that right there in the suit?

21     A.  That's Doug Poneck, the -- he was the counsel

22  for the school district at that time.

23     Q.  All right.  So I'm not going to put any audio

24  on.  He's going in right there.  I don't want to -- I

25  don't want to break any attorney-client privilege that

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  exists.  So he's right there -- there -- he's in the

2  present.  He's talking.  It looks like he's still there

3  talking.  Were you receiving advice from Doug Poneck at

4  the time?

5       A.  I have no clue.

6       Q.  All right.

7            MR. CASEY:  Ms. Hill, are you aware whether

8  they were receiving guidance and advice from Mr. Poneck

9  at the time?

10            MS. HILL:  I am not sure.  I'm sorry.  I

11  wasn't here.  I wasn't employed by the District at that

12  time.  I would imagine that he probably is.  Doug Poneck

13  was outside counsel for the Board and was advising on

14  that meeting.

15       Q.  Okay.  And I can see it's -- I don't see him

16  talking at all, and it looks like this communication is

17  between Chief Yarbrough and Ms. Weir.  I want to utilize

18  this except at the point where he starts talking if at

19  all.  And if he starts talking --

20            MS. LONG:  I'm just --

21            MR. CASEY:  -- I'll silence it.  Go ahead.

22            MS. LONG:  I'm going to object as

23  privileged just to preserve my objection and so you

24  don't argue waiver because I haven't heard this video --

25            MR. CASEY:  Okay.

CHIEF JEFFREY DWAYNE YARBROUGH

 1              MS. LONG:  -- and so I just want to
 2  preserve that because I --
 3              MR. CASEY:  Okay.
 4              MS. LONG:  -- could argue for snapback and
 5  privilege after hearing it.
 6              MR. CASEY:  Hundred percent.  A hundred
 7  percent.  And -- and I -- anything that the -- that
 8  Mr. Poneck would say would be a hundred percent
 9  privileged.  I don't -- none of his comments would be
10  able to come in.  But it looks like Chief Yarbrough's
11  talking to Board President Weir, so...
12              (Video playing.)
13              MS. LONG:  Yes, but conveying legal advice
14  that was obtained from counsel to a board member does
15  not break that privilege --
16              MR. CASEY:  Sure.  I think --
17              MS. LONG:  -- so I just want to object
18  preliminarily to the extent to this as privileged.  And
19  you can play it, but I want to listen to it and see if
20  I'll withdraw the objection.
21              MR. CASEY:  Do you want to do this, can you
22  put us briefly into a breakout room?  So, Ms. --
23              MS. LONG:  No.  Chief Yarbrough has to
24  leave.  We've spent a ton of time now on this September
25  14th meeting that has nothing to do with the claims of

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  the lawsuit, so I would just rather hold my privilege

2  without it being waived and you proceed with your

3  questions.

4          MR. CASEY:  Okay.  All right.  We'll do

5  that.

6          (Video playing.)

7      Q.  (By Mr. Casey)  All right.  So you heard

8  yourself say, "If they try to come past the officers,

9  we're going to eject them out."  You heard him -- you

10  hear yourself say that?

11     A.  Yes.

12     Q.  Okay.  And this is just -- goes to your ability

13  to accurately remember what went on, what happened.

14  That's the only reason I'm bringing it up.  It's factual

15  stuff.  I'm not -- we don't have any claims about the

16  September 14th meeting.  And it looks like Mr. Poneck's

17  about to speak so I'm not going to do that.  Yeah, he's

18  talking.  He's giving advice.  Don't want you-all to

19  waive that.  So we'll just keep going like that.  Okay.

20  Where is he going?  He's still there.  So he's left.  It

21  looks like he's gone out of the room.  Let's make sure.

22  I don't see him in the room at all.  All right.

23          (Video playing.)

24          At that point are you talking to the

25  superintendent about 37.105?

CHIEF JEFFREY DWAYNE YARBROUGH

1    A.  I have no clue.

2    Q.  Okay.  All right.  I think I'm almost done.  I

3  think I'm -- okay.

4          Detective Sergeant Griffith was promoted to

5  detective a week after that meeting; correct?

6    A.  I don't recall when she was promoted.

7    Q.  Okay.  Is detective a higher rank than

8  sergeant?

9    A.  No.  She's a detective -- she was a detective

10  sergeant.

11    Q.  The whole time?

12    A.  What do you mean the whole time?

13    Q.  Well, I guess my unfamiliar -- my lack of

14  familiarity with the ranking structure, is sergeant

15  automatically a detective?

16    A.  In some agencies.

17    Q.  Is it -- was it in Round Rock ISD?

18    A.  Yes.

19    Q.  Okay.  And so she received that sergeant

20  promotion beginning of August; right?

21    A.  I don't recall when she received it.

22    Q.  Okay.  Her interrogatories she said she was

23  promoted September 23rd.

24    A.  Okay.

25    Q.  That -- was that in exchange -- I'm asking very

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  pointed questions.  I've got to ask them.  I just -- you

2  can say yes or no.  Was that in response for her filing

3  the -- and -- and -- and committing to the arrest

4  affidavit for Jeremy Story?

5        A.  No, sir.

6        Q.  Okay.  You said you're in -- you're Hutto Chief

7  of Police right now?

8        A.  Yes, sir.

9        Q.  Okay.  When you were in Bastrop ISD, did you

10  ever have to arrest citizens for disrupting board

11  meetings?

12        A.  No.

13        Q.  All right.  Didn't you tell Mr. Story that

14  you-all were going to do an internal investigation on

15  this?

16        A.  I didn't.  I never had a conversation with

17  Mr. Story beyond that day --

18        Q.  Okay.

19        A.  -- in the hallway.

20        Q.  All right.

21        A.  Or I don't recall.

22        Q.  Are you aware of whether Chief Williby said

23  there was going to be an internal investigation?

24        A.  That is my recollection.

25        Q.  Did you ever receive an official complaint from

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  Jeremy Story via email?

2      A.  I don't remember.

3      Q.  Okay.  Did Chief Williby ever come to you with

4  questions about Mr. Story's complaint?

5      A.  I can't remember if he did or not.

6      Q.  Did you ever -- did you ever dialogue with

7  Mr. Story in the hallway?

8      A.  Yes, sir.

9      Q.  Okay.  When you dialogued with Mr. Story in the

10  hallway, what did you talk about?

11      A.  Mr. Story asked me many questions from

12  different vantage -- from different vantage points about

13  him being removed from the meeting, his conversations

14  and whether they were germane.  He asked me about some

15  other things I simply can't remember.

16              MR. CASEY:  Okay.  Let me take about a

17  two-minute break and I think I'm wrapped up.  Okay?  If

18  that's okay, I'll take about a two-minute break.

19              (Three-minute break was taken.)

20              MR. CASEY:  All right.  That's all the

21  questions I have, Chief Yarbrough.  Thanks for your time

22  today.  Katie, as always, thanks for your time.  And,

23  Ms. Owen and Ms. Hill and -- I guess Ms. McKeag works

24  for you, Katie?

25              MS. LONG:  McKeag, yes.  Kelsey.

CHIEF JEFFREY DWAYNE YARBROUGH

1          MR. CASEY:  McKeag.  Okay.  Thanks,

2   Ms. McKeag, I appreciate your time.

3          MS. LONG:  Pass -- you going to pass the

4   witness?

5          MR. CASEY:  Yes.  Pass the witness.

6          MS. LONG:  I'm going to reserve for the

7   time of trial, but I'm going to request read and sign

8   rights.

9          MR. CASEY:  Absolutely.

10          THE REPORTER:  All right.  Off the record.

11          (Proceedings concluded at 4:48 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CHIEF JEFFREY DWAYNE YARBROUGH**

```
1                    CHANGES AND SIGNATURE

2   WITNESS NAME:  CHIEF JEFFREY DWAYNE YARBROUGH

3   DATE OF DEPOSITION:  OCTOBER 29, 2025

4   PAGE      LINE          CHANGE                REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1  I, JEFFREY DWAYNE YARBROUGH, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct except as noted herein.

4

5

6                          _____

                              JEFFREY DWAYNE YARBROUGH

7

8  STATE OF   _____)

9  COUNTY OF   _____)

10      Before me,_____, on this day

11  personally appeared JEFFREY DWAYNE YARBROUGH,

12  known to me (or proved to me under oath or through

13  _____) (description of identity card or other

14  document) to be the person whose name is subscribed to

15  the foregoing instrument and acknowledged to me that

16  they executed the same for the purposes and

17  consideration therein expressed.

18

19      Given under my hand and seal of office this _____

20  day of _____, _____.

21

22                  Notary Public in and for
                    the State of _____
23
                    My Commission Expires:_____
24

25

CHIEF JEFFREY DWAYNE YARBROUGH

```
 1              IN THE UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                        AUSTIN DIVISION
       JEREMY STORY,                   *
 3          Plaintiff,                 *
                                       *
 4     v.                              *   CIVIL ACTION NO.
                                       *   1:22-cv-448
 5                                     *
       SUPERINTENDENT HAFEDH           *
 6     AZAIEZ, TRUSTEES AMBER          *
       FELLER, TIFFANIE HARRISON,      *
 7     AMY WEIR, JUN XIAO, CORY        *
       VESSA; OFFICERS JEFFREY         *
 8     YARBROUGH, JAMES WILLIBY,       *
       DEBORAH GRIFFITH, MILTON        *
 9     POPE, FRANK PONTILLO, RON       *
       COLE, CHIEF DENNIS WEINER,      *
10     and CARLA AMACHER,              *
       individually, and ROUND         *
11     ROCK INDEP. SCHOOL              *
       DISTRICT,                       *
12          Defendants.                *

13

14                   REPORTER'S CERTIFICATION
             DEPOSITION OF CHIEF JEFFREY DWAYNE YARBROUGH
15                      OCTOBER 29, 2025
                      (REPORTED REMOTELY)
16

17         I, Kristy Owen, Certified Shorthand Reporter, duly

18     qualified in and for the State of Texas, do hereby

19     certify to the following:

20         That the witness, CHIEF JEFFREY DWAYNE YARBROUGH,

21     was duly sworn by the officer and that the transcript of

22     the oral deposition is a true record of the testimony

23     given by the witness;

24         I further certify that pursuant to FRCP Rule

25     30(f)(1) that the signature of the deponent:
```

**CHIEF JEFFREY DWAYNE YARBROUGH**

1      _X_ was requested by the deponent or a party before

2   the completion of the deposition and that the signature

3   is to be before any notary public and returned within 30

4   days from date of receipt of the transcript.  If

5   returned, the attached Changes and Signature Page

6   contains any changes and the reasons therefor:

7      __ was not requested by the deponent or a party

8   before the completion of the deposition.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties or

11  attorneys in the action in which this proceeding was

12  taken, and further that I am not financially or

13  otherwise interested in the outcome of the action.

14

15      Certified to by me this 14th day of November, 2025.

16

17

18

19  _____
    KRISTY OWEN, RPR, Texas CSR 10790
    RPR Expiration Date:  9-30-2026
20  CSR Expiration Date:  7-31-2026

21  STOVALL REPORTING & VIDEO, INC.
    Firm Registration No. 10259
22  1414 Creekview Drive
    Lewisville, Texas  75067
23  Phone:  (214) 695-2024

24

25