IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS − AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY,<br><br>        *Plaintiffs*,<br><br>v.<br><br>SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES AMBER FELLER, TIFFANIE HARRISON, AMY WEIR, JUN XIAO, CORY VESSA; OFFICERS JEFFREY YARBROUGH, JAMES WILLIBY, DEBORAH GRIFFITH, MILTON POPE, FRANK PONTILLO, RON COLE, CHIEF DENNIS WEINER, and CARLA AMACHER, individually, and ROUND ROCK INDEP. SCHOOL DISTRICT,<br><br>        *Defendants*. | § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>1:22-cv-00448-DAE |

**THE ROUND ROCK INDEPENDENT SCHOOL DISTRICT DEFENDANTS'
RESPONSE TO PLAINTIFF JEREMY STORY'S
MOTION FOR SUMMARY JUDGMENT**

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**

500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for the Round Rock ISD Defendants*

## INTRODUCTION

Plaintiff Jeremy Story seeks summary judgment on three claims under 42 U.S.C. § 1983:

(1)    "First Amendment viewpoint discrimination" against Weir, Pope, and Pontillo regarding how BED (Local) was applied to him at the August 16th Meeting;

(2)    "Fourth Amendment unreasonable seizure" against Pope and Pontillo; and

(3)    "First Amendment retaliatory arrest" against Azaiez, Yarbrough, Pope, and Griffith.

Dkt. 133, p. 1. Story's Motion does not establish his entitlement to summary judgment on any of these claims. The RRISD Defendants' evidence raises genuine issues of material fact to defeat summary judgment as to each claim. Moreover, Story does not adequately address Defendants' qualified immunity defense. Therefore, even if he could overcome the other fatal flaws in his Motion, discussed below, his request for summary judgment should be denied.

## SUMMARY JUDGMENT EVIDENCE

The RRISD Defendants incorporate the *Amended Appendix in Support of Their Motions for Summary Judgment*, Dkt. 132, and the evidence included therein—in support of this Response.

## STATEMENT OF FACTS[1]

RRISD Board policy BED (Local) addresses public participation at Board Meetings. App. 188, ¶ 3; App. 208–11. BED (Local) states that at all Board meetings, other than a regular meeting, "public comment shall be limited to items on the agenda posted with notice of the meeting." App. 208. BED (Local) also addresses disruptions at Board meetings and, generally, allows the presiding officer to request law enforcement assistance to remove a disruptive audience member from the meeting. App. 208–09; App. 210 (citing TEX PENAL CODE § 42.05); App. 171, ¶ 22; App. 406 at 107:24–108:22.

On August 12, 2021, the District posted a notice that the Board would hold a *special* meeting on August 16, 2021. App. 196, ¶¶ 29–30; App. 226–28. There were two items on the Agenda: D.1—

---

[1]    Defendants' motions for summary judgment contain a more detailed Statement of Facts. *See* Dkt. 130, 131.

"Adoption of Resolution for Employee COVID-19 Positive Extended Leave During COVID-19 Pandemic"; and D.2–"Fall 2021 COVID-19 Health and Safety Protocols." App. 226–28. Because the August 16th Meeting was a special meeting, public comment was limited to the two agenda items.

Before the Meeting, Story and then-Trustee Danielle Weston, had the following exchange:

> Hey Jeremy,
>
> Our board policy allows for public comments on items both on and off the agenda only at the monthly "Regular" board meeting. For called meetings (like tonight), public comments are limited to items that are on the agenda.
>
> Thursday of this week is a "Regular" board meeting.

App. 353. Story responded:

> It seems to me that the public complaints GF legal policy would allow for otherwise since a "called" meeting is still a public meeting. Can you point me to the policy you are describing? Is it some edict from the Board President or a particular policy? Willing to challenge kindly by simply speaking on a different subject if there is no policy.

*Id.* Story signed up to speak at the August 16th Meeting and wrote that he would be speaking on topic "2" related to COVID-19 health and safety protocols, "or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 199, ¶ 37; App. 102.

When Weir opened the August 16th Meeting, she reminded attendees that the Board allowed for public comment "on items on the agenda." App. 279 at 1:54–2:12. Generally, during the first hour of public comment, the speakers addressed only agenda items. *Id.* at 1:05:40–2:07:25. However, two speakers *ended* their testimony by referencing "criminal allegations" and "assault charges" against Azaiez. *Id.* at 1:35:00–1:35:50, 2:09:08–2:09:28. Weir responded to each by reminding the audience to speak only on agenda items, but both speakers had already ended their testimony by that point. *Id.* Then, Jennifer White, after voicing opposition to a mask mandate, veered off the topic of COVID-19 protocols and onto the topic of the protective order against Azaiez, attempting to group the two topics together into a broader one on "student safety." *Id.* at 2:26:19–2:26:41. Weir used her gavel to halt White and Board Vice President Amber Feller Landrum stated, "I'm sorry, you're not allowed to

2

talk about items not on the agenda." *Id.* When White continued, Weir asked for White to be escorted out. But by then, White had stopped speaking and left. *Id.* Therefore, Pope and Pontillo did not remove White from the room. App. 7, ¶ 23; App. 114, ¶ 32.

Story can be heard yelling "it's germane" and "it's on the agenda." App. 7, ¶ 23; App. 279 at 2:26:37–2:27:07; App. 112, ¶ 23; App. 145, ¶ 25; App. 161 at 1:18:28. Weir responded that the agenda was limited to COVID-19 health and safety protocols and the employee resolution, ending with "You have to stop. You will be asked to leave." App. 279 at 2:26:39–2:27:07. Shortly thereafter, the Board took a break. *Id.* at 2:27:08–2:33:40. Yarbrough walked over to warn Story regarding his outbursts and warn that he could not disrupt the meeting. *Id.* at 2:33:50–2:34:05; App. 145–46, ¶¶ 25–27; App. 161.

After a few more speakers, Story was called to speak. Weir warned him, "you did write that you felt like you could speak about something other than D1 or D2. I would like to remind you . . . [w]e are only taking comments on these two items." App. 279 at 2:47:12–2:47:30; Dkt. 133–12 at 95:8–95:10; Dkt. 133–14 at 99:23–100:9. Story stated that he could "demonstrate" how what he wanted to discuss is "related to that," and "show how your resolution that you're debating today has absolute germanity [*sic*] to what I'm going to speak on." App. 279 at 2:47:31–2:47:51. He repeatedly interrupted Weir before cutting her off with "good, then I will begin." *Id.* at 2:47:31–2:47:58; App. 146, ¶ 28.

Story characterized his testimony as being on the "rule of law," and the resolution regarding COVID-19 protocols as being about "public health and public safety." *Id.* at 2:47:59–2:48:48. He then began to speak louder, stating, "Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our superintendent has a protective order filed against him." *Id.* at 2:48:49–2:48:59. When Story raised the protective order, Weir told him he could not speak on that issue because it was not on the agenda, but Story ignored her and continued his off-topic comments, so Weir asked that he be removed. *Id.* at 2:48:59–2:49-09; App. 94; Dkt. 133:12 at 95:19–96:5, 98:12–98:18; Dkt. 133:14 at 101:5–103:13.

Pope, Pontillo, and Yarbrough all heard Weir warn Story multiple times that he was off-topic and should not continue discussing off-topic items before asking for his removal. App. 7–9, ¶¶ 24–28; App. 113, ¶¶ 24–25; App. 146, ¶ 29; Dkt. 133-12 at 59:19–60:2, 99:17–101:10. Because Story would not adhere to the presiding officer's directives, Pope and Pontillo complied with Weir's request, approached Story, and directed him to leave. App. 7–11, ¶¶ 24–33; App. 113, ¶¶ 24–25; App. 94 at 0:40–0:48. Rather than leave, Story attempted to stand his ground, yelling to be heard without a microphone, and resisting as Pope and Pontillo physically moved him across the room to the exit. App. 279 at 2:49:00–2:49:35; App. 94 at 0:40–1:02.[2] Story continued to argue with Pope and Pontillo in the hallway. App. 11, ¶¶ 34–35; App. 113, ¶¶ 27–28; App. 94 at 01:41–01:50. As they approached and walked through the overflow room, Story again raised his voice to yell over the testimony on the video feed, continuing until he was outside the building. App. 7–12, 113–15; App. 94 at 1:50–2:49.[3]

Following Story's comment, two speakers discussed non-agenda items unrelated to the Superintendent; they were also directed to stick to agenda items. *See* App. 279 at 3:02:22-3:02-27, 3:25:40-3:26:09; App. 203, ¶ 52. None continued to speak after Weir's warning. *Id.* Pope, Pontillo, and Yarbrough testified that Story was the only speaker they recall continuing to speak off-topic in a disruptive manner. App. 9, ¶¶ 28, 37–38; App. 114, ¶ 31; App. 147, ¶¶ 37, 39.[4] No community members attempted or were allowed to speak in support of Azaiez. App. 279.

On August 19, 2021, the Board met for its regular meeting, and the public was allowed to "speak on items listed or not listed on the agenda." App. 205, ¶¶ 56–57; App. 208; App. 280–81;

---

[2]    *See also* App. 11, ¶ 33–34; App. 113–14, ¶¶ 26–28; Dkt. 133–12 at 104:15–105:7, 131:18–132:13; Dkt. 133-14 at 121:22–122:6.

[3]    While the officers had probable cause to arrest Story at the August 16th Meeting, they did not do so because there would not be enough officers at the meeting to continue to provide security. App. 148, ¶ 34; App. 116, ¶ 39.

[4]    Only two individuals continued speaking after Weir advised they were off-topic: White and Story. App. 279; App. 9, ¶ 28. Weir asked that both be escorted out of the room. *Id.* at 2:26:19–2:26:41, 2:48:59–2:49–09; App. 9, ¶ 28. White left voluntarily. App. 9, ¶ 28. Story was the only speaker who continued to speak off-topic despite Weir's request that he be removed, and had to be physically removed from the meeting. App. 9, ¶¶ 28, 38; App. 114, ¶¶ 31, 34.

App. 298. Story and several other commenters discussed the allegations against Azaiez. *See, e.g.*, App. 298 at 6:40–8:55, 12:58–15:10, 15:10–17:37, 31:21. Story spent the entirety of his allotted two minutes, without interruption, on this topic. *Id.* at 15:10–17:37.

After the August 16th Meeting, Pope prepared an Incident Report, a Reporting Officer's Narrative, and a Use of Force Form and Pontillo prepared a Case Supplemental Report and Use of Force form. App. 12–13, ¶¶ 39–40; App. 33–38. App. 115–16, ¶¶ 35–37; App. 134–136. Yarbrough reached out to the Williamson County Attorney regarding Story's misconduct. App. 149, ¶ 41; App. 552 at 153:11–155:1; App. 562. The County Attorney was about to be out of town and indicated upon his return, he could meet to staff the case. App. 149, ¶ 41; App. 552 at 153:11–155:1; App. 562.

The RRISD Police Department assigned Griffith to investigate. App. 44. ¶ 27. Griffith reviewed the reports submitted by Pope and Pontillo, portions of the recording of the August 16th Meeting, and Pontillo's body camera footage. App. 44–46, ¶¶ 27–32; App. 84–94; App. 436–37, 441, 443 at 28:10–29:3, 29:14–23, 50:5–17, 57:1–10. She also spoke with Pope to confirm the information in his Reporting Narrative and reviewed Penal Code § 38.13. App. 46, ¶¶ 33–34; App. 442, 449 at 54:8–19, 81:16–21. Griffith believed Story's conduct met the elements for the crime "Hindering Proceedings by Disorderly Conduct" and prepared an Affidavit for Warrant of Arrest (the "Warrant Affidavit"). App. 46–48, ¶¶ 34–41; App. 448 at 77:11–78:9, 78:24–79:9, 79:24–80:4; App. 95–97.

After reviewing the Warrant Affidavit, a Williamson County magistrate judge found that probable cause existed for the issuance of a warrant of arrest for Story. App. 48 ¶¶ 42–44; App. 95–97, 99. Shortly thereafter, Williamson County peace officers arrested Story.

## LEGAL STANDARDS

**Free Speech – Viewpoint Discrimination:** To establish a First Amendment viewpoint discrimination claim in a limited public forum such as a school board meeting, a plaintiff must first show that the speech at issue was protected—*i.e.* that it was within the reasonable limits of the forum.

*See Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017); *cf. Wenthold v. City of Farmers Branch*, No. 3:11-CV0748-B, 2012 WL 467325, at *8–9 (N.D. Tex. Feb. 14, 2012), aff'd sub nom., *Wenthold v. City of Farmers Branch*, 532 F. App'x 474 (5th Cir. 2013); *Gjemre v. Leffingwell*, No. 13-CA-729-SS, 2015 WL 433506, at *6 (W.D. Tex. Feb. 2, 2015). Then, the plaintiff must show that the reason he was silenced or ejected was "to suppress the point of view he espouse[d] on an otherwise includible subject." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985); *cf. Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).

Similarly, a Fourteenth Amendment equal protection claim requires a showing that the plaintiff "received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001).

**Retaliatory Arrest:**    In the context of an alleged retaliatory arrest, the existence of probable cause generally bars the claim. *Spiller v. Harris Cnty., Tex.*, 113 F.4th 573, 579 (5th Cir. 2024). The plaintiff must show the absence of probable cause. *Nieves v. Barlett*, 587 U.S. 391, 402 (2019). The Supreme Court in *Nieves* recognized a "slim" exception to this general bar, *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024), which applies if the plaintiff presents "objective evidence that he was arrested when other similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407. If the plaintiff shows the absence of probable cause or establishes the exception, the plaintiff must show (1) he was engaged in constitutionally protected activity, (2) the defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendant's adverse actions were substantially motivated against the plaintiff's protected conduct. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

**Unreasonable Seizure:**    "A temporary, warrantless detention of an individual constitutes a seizure . . . must be justified by reasonable suspicion that criminal activity has taken or is currently taking place . . . ." *U.S. v. Garza*, 727 F.3d 436, 440 (5th Cir. 2013). Reasonable suspicion

requires more than a hunch, but "obviously less [proof] than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014). A subsequent finding of probable cause generally bars a claim. *See U.S. v. Tarango-Hinojos*, 791 F.2d 1174, at 1176 (5th Cir. 1986).

## ARGUMENT AND AUTHORITIES

**I.      Story is not entitled to summary judgment on his viewpoint discrimination claims.**

Story's request for summary judgment against Weir, Pontillo, and Pope for violations of the First and Fourteenth Amendment based on his removal from the August 16th Meeting fails because his speech is not protected by the First Amendment. Even if it were, there is no evidence that Story was removed when others were not because of his viewpoint. *See* Dkt. 49 at 15–16, 36–37. Further, Story has not overcome Defendants' qualified immunity defenses.

**A.      Story was not expressing protected speech when he was cut off and removed.**

Story acknowledges that Board policy lawfully limited discussion at the meeting to topics on the agenda. Dkt. 133 at 6. As such, the District was allowed to "restrict speakers to the subject at hand . . . and prevent disruptions of the meeting." *Wenthold*, 2012 WL 467325, at *8–9. And when a speaker in a limited public forum violates reasonable restrictions, their speech is no longer protected. *Heaney*, 846 F.3d at 802; *see also Crawford–El v. Britton*, 523 U.S. 574, 593 (1998); *Sousa v. Seekonk Sch. Comm.*, No. 1:22-CV-40120-IT, 2023 WL 349923, at *9 (D. Mass. Jan. 20, 2023).

The unwritten presumption that underlies Story's arguments is that he was speaking on topic when he criticized "the Superintendent and Board over a protective order and hiring process." The argument appears to be that the COVID-19 topic could be read more broadly as a matter of "health and safety" and "supervision of the Superintendent." Dkt. 133 at 8. This reasoning rests on the fact that the resolution being voted on that night discussed these topics, even though he acknowledges that it did so "in the context of COVID." *Id.* But as Weir testified:

> The items on the agenda, however, related to COVID-19 health and safety protocols and COVID-19 leave. The safety focus was limited to preventing the spread of an

7

airborne virus. General matters of safety and security were not on the agenda. For example, if someone wanted to discuss the use of clear bags on campuses to detect weapons, that is a safety and security issue, but it is not on the agenda. Similarly, if someone wanted to call on the Board to double the size of the Police Department, that is a matter of safety and security. Again, that item would be off topic.

App. 201 at ¶ 47.[5] This Court already determined that Story was speaking off-topic. Dkt. 43 at 16.

In addition, the position that Story was speaking "by analogy," and therefore on-topic, appears to be his counsel's post-hoc theory, and not Story's own from the time of his speech. Story presents no declaration that he believed he was on topic—rather than that he believed he did not have to limit himself to the agenda topics. And there is ample evidence to show the opposite. He was warned by Trustee Bone that he had to speak on agenda items—which he was "willing to challenge." App. 353. He indicated awareness that his speech was not related to an agenda item, when he signed up to speak. App. 199, ¶ 37; App. 102. Because he was off-topic, his speech was no longer protected—and that fact alone is sufficient to defeat his Motion. *Cornelius*, 473 U.S. at 797; *Rosenberger*, 515 U.S. at 830.

## B.    Story has not established that anyone who expressed a different viewpoint was treated differently.

Story points to two categories of speakers to support his claim: three who spoke "by analogy" and were not cut off from speaking, and one who also criticized the Superintendent and was cut off, but not removed. The three speakers Story claims used "analogies" did so in the context of criticizing or supporting the mask mandate. Wrightmire spoke to "support freedom from mask mandates," because she believed masks "promote fear" and lead to a "slave mentality" like the "bondage" Frederick Douglass wrote about. App. 279 at 1:05:40. Regardless of whether one follows the analogy between slave bonds and mask mandates, it was clearly about a topic on the agenda. *See* Dkt. 133–12 at 159:18–20; App. 202, ¶ 50. Likewise, Lee referenced Senator Ted Cruz in the context of "advocating for a mask mandate," saying: "I'm here to remind you that Senator Cruz, who poses as a freedom

---

[5]    Pope, Pontillo, and Yarbrough understood that testimony was limited to *COVID-19*-related health and safety protocols. App. 004, ¶ 10; App. 109–10, ¶ 12; App. 142–43, ¶ 19; Dkt. 133-12 at 54:16–56:4.

fighter in front of camera, chooses to send his children to a private school with [a] mask mandate . . .

[.]" App. 279 at 1:07:38. Each Defendant understood Lee to be discussing the agenda item regarding

the mask mandate. Dkt. 133–12 at 162:17–19; Dkt. 133-14 at 186:15–186:25; App. 202, ¶ 49. And

Zimmerman likened mask mandates to "playing God" because it was being justified as something that

can "save us from disease and death." He referenced Jesus as someone who "healed the sick," unlike

the school board, which cannot do these things. App. 279 at 1:36:20; Dkt. 133–12 at 164:24–166:20;

Dkt. 133–14 at 194:3–194:6; App. 202–03, ¶ 51. Indeed, Story's choice of comparators highlights that

Defendants were not discriminating based on viewpoint, because even though these speakers took

different positions on the mask mandate, and even though two of the three criticized the District and

the Board, they were all allowed to continue speaking, because they were speaking on topic.[6]

In contrast, Story "began to discuss the protective order against [ ] Azaiez—which [Weir] knew

had nothing to do with employee COVID–19 leave or a mask mandate." App. 200, ¶ 43. Weir averred:

> I told Mr. Story several times that he could not speak on the off-topic item, but he
> continued to speak, even after his microphone was cut off. Because he repeatedly
> defied my directives that he was off topic and continued to speak on the off-topic
> item, despite his microphone being cut off, I stated that Mr. Story needed to be
> removed from the meeting. Even after that, Mr. Story continued to speak and raised
> his voice louder so that he could be heard even with his microphone cut off. . . . The
> content of Mr. Story's speech and the viewpoint he expressed were not the reason I
> requested his removal from the meeting room. It was his actions and conduct that
> were the reason I asked for his removal.

App. 200-01, ¶¶ 43,46; App. 009, ¶ 28 (Pope); App. 113–15, ¶¶ 24–25, 29–31 (Pontillo). Because

Story's chosen comparators abided by the reasonable restrictions of the limited public forum, their

speech was protected in a way that Story's was not. *See Heaney*, 846 F.3d at 802; *see also Biggers v.*

*Massingill*, No. 23-11023, 2025 WL 429974, at *2 (5th Cir. Feb. 7, 2025). Furthermore, because they

---

[6] Story attempts to paint Pope's deposition testimony as agreeing that these analogies make their testimony similar to his own. Dkt. 133 at 6–7. But Pope's testimony shows he understood them to be speaking about the mask mandate. And Pope said in response to whether there is "any topic that they can't use to draw a comparison" (to masks) that it was not his job to interpret that, because he is following the Board President's directives. Dkt. 132–11 at 167:23–168:8.

were speaking on a different topic, they cannot be used to show that it was Story's viewpoint that caused him to be removed. As such, their treatment is irrelevant to his First Amendment claim, which requires a showing that he was removed because of his "particular views taken . . . on a subject." *Rosenberger*, 515 U.S. at 829. It is also irrelevant to his Fourteenth Amendment claim because they were not similarly situated to Story, so they cannot be used to show that any disparate treatment was because of the viewpoint he expressed. *Taylor*, 257 F.3d at 473.

Story has also not pointed to anyone who expressed a different viewpoint than him, on the same topic, and was treated differently. Story notes that he was treated differently from other speakers who spoke about the protective order against Azaiez. Dkt. 133 at 8. But each of these speakers also expressed opposition to Azaiez. It is axiomatic that such speakers cannot demonstrate that Story was targeted "to suppress the point of view he espouse[d] on an otherwise includible subject." *Cornelius*, 473 U.S. at 806; *Vidal*, 602 U.S. at 293. Further, none of these speakers were similarly situated, as none refused to stop speaking even after being warned multiple times and after Weir directed their removal.[7] Even if the Court disagrees that Story's refusal to cease speaking off-topic when directed to do so— instead raising his voice to speak over the Board and be heard without a microphone—justified treating him differently, that does not mean there is evidence that the different treatment was because he expressed the same viewpoint as the other speakers who were not removed from the meeting.

The video evidence is dispositive, but not in Story's favor. It shows that Story was treated differently from others who raised the protective order because Story *behaved differently*. It does not reveal he was treated differently than others who spoke off-topic—about any matter.

---

[7]     In fact, the Fifth Circuit has rejected Story's argument, dismissing another of his cases because "the uncontested video evidence . . . shows that Story engaged in an extended colloquy with Judge Gravell, all while being warned to discontinue the interruption," and he had "not plausibly plead that he was treated differently from anyone who committed a *sustained* violation of the court's decorum rules." *Story v. Gravell*, No. 24-50646, 2025 WL 2602550 (5th Cir. Sept. 9, 2025).

### C.    Story makes no attempt to overcome Defendants' qualified immunity.

Qualified immunity protects government officials acting within their authority from liability "when their actions could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011). This is especially true "where the area of law is as abstruse and complicated as First Amendment jurisprudence." *Id.* at 761 (internal marks omitted). Even though Defendants raised qualified immunity in both their answer and motions to dismiss (Dkt. 26, 53, 54), Story does not address the topic.[8] But it was Story's burden to show in his Motion that Defendants violated a constitutional right *and* that the "right was 'clearly established' at the time of the alleged violation." *Joseph ex. rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 329–30 (5th Cir. 2020). He has not done so.[9]

"It is beyond debate that the law prohibits viewpoint discrimination in a limited public forum." *Heaney*, 846 F.3d at 801. But it is also clear that school boards may limit public comment to agenda items and restrict off-topic speech. *Fairchild, v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 759 (5th Cir. 2010). And courts assess the reasonableness of an official's actions "in light of 'the facts available to him at the time of his action.'" *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 614 (5th Cir. 2004) (citation omitted). Here, at most, Story points to two Supreme Court decisions that refer to viewpoint discrimination as a form of free speech violation. But because "the nearly universal prohibition against viewpoint discrimination does not inform an official as to what, precisely, constitutes viewpoint discrimination," "sweeping statements" about the First Amendment "are not sufficient" as they "simply do[] not provide the official with any sense of what is permissible under a certain set of facts." *Morgan*, 659 F.3d at 761. Story has not pointed to any case that says a presiding officer must allow a speaker to speak off-topic "by analogy" or for any particular length of time in case the speaker

---

[8]    Raising qualified immunity in a motion to dismiss is sufficient to shift the burden to the plaintiff "to 'show that the defense is not available.'" *Ramirez v. Escajeda*, 44 F.4th 287, 290 n.3 (5th Cir. 2022).

[9]    A right is clearly established if "the contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 455 (5th Cir. 1994) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

eventually brings it back around to a topic that is on the agenda. Therefore, Story has not (and cannot) overcome Defendants' qualified immunity from this claim.

Further, the Fifth Circuit's decision in *Heany* is dispositive as to Pope's and Pontillo's immunity. *Compare Heaney*, 846 F.3d at 805 *with* App. at 008–10, ¶¶ 27–30, App. at 112–13, ¶¶ 22–25, *and* App. 491 at 167:23–168:8. The Fifth Circuit found that the *Heany* officer was entitled to qualified immunity because he "had no reason to believe that he was violating Heaney's First Amendment rights by following" the presiding officer's order. *Id.* As such, his actions in responding to the presiding officer's request were not objectively unreasonable in light of clearly established law, *even though* the plaintiff did not violate the limited public forum's reasonable restrictions. *Id..* That conclusion is even more obvious here, where Story clearly violated the restrictions, and Pope and Pontillo personally observed him continue to speak after being warned by Weir to stop speaking off-topic. They each understood that it was Weir's duty to interpret and enforce the agenda. App. 4, ¶¶ 9–11; App. 7, ¶ 21; App. 110, ¶ 13. Therefore, they reasonably believed they should follow the directive to remove him.

Neither Pope nor Pontillo was "required to cross-examine and second-guess [Weir] regarding [her] First Amendment motives before acting." *Heaney*, 846 F.3d at 804 (citation omitted); App. 8–10,¶¶ 27–29; App. 113, ¶ 25. What *is* unreasonable is to expect them, in the moment, to second-guess the Board president on what is or is not off-topic and refuse to remove someone who continued to speak after being warned and having his microphone cut off. By failing to even raise this issue, much less carry his burden to overcome Defendants' qualified immunity, Story has defeated his own Motion.

## II.     Story is not entitled to summary judgment on his retaliatory arrest claim.

The first step in a retaliatory arrest claim is to determine if there was probable cause for the arrest. "If [probable cause] exists, any argument that the arrestee's speech as opposed to [his] criminal conduct was the motivation for [his] arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Westfall v. Luna*, 903 F.3d 534, 550 (5th Cir. 2018) (alteration in

original) (citation omitted). Story attempts to take advantage of the narrow *Nieves* exception, arguing that the "timing, narrative, and selective enforcement" defeat probable cause. Only selective enforcement can defeat probable cause. But this argument fails because the comparators Story cites were not similarly situated. *Nieves*, 587 U.S. at 407. And only if Story shows an absence of probable cause or establishes the *Nieves* exception does the Court reach the *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1977), framework. Under that analysis, Story must demonstrate he was engaged in protected speech and that this speech was a substantial factor in his arrest. *Id.* If he can do so, Defendants must show they would have taken the same action in the absence of the protected speech.

Story's claim fails before reaching the *Mt. Healthy* analysis. Even if it did not, it would fail at the first step because his speech was not protected, and the evidence shows that it was Story's disruptive conduct, not the "timing" or "narrative," that led to his arrest. As to Azaiez, Story provides no evidence he was involved in the arrest. Rather, the evidence conclusively establishes he was not.

### A.    There was probable cause for Story's arrest.

As pointed out in Azaiez, Yarbrough, and Griffith's Motion (Dkt. 130, pp. 10–12), the evidence confirms there was probable cause for Story's arrest for violation of Penal Code § 38.13.[10] Story was advised that he could only speak on topics on the agenda—a position he was "willing to challenge." App. 353.When he signed up to speak, he wrote he would be speaking on topic "2 . . . or something else—unlike the board, citizens are not required to speak on items only on the agenda." App. 102. This evinces knowledge and intent to speak off-topic. At the meeting, Weir advised multiple times that public comment was limited to agenda items, repeatedly advised speakers who spoke about the allegations against Azaiez that this was not a topic on the agenda, and even advised Story when he yelled from the audience that this was not an agenda item. App. 279 at 1:54–2:12, 1:35:00–135:50;

---

[10]    A person commits an offense under this section if "he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance" or "recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist." TEX. PENAL CODE § 38.13.

2:09:08–2:09:28, 2:26:19–2:27:07.[11] Before Story began his public comment, Weir warned him again of the forum rules. App. 279 at 2:47:12–2:47:30.

Despite multiple warnings, Story raised the protective order against Azaiez. *Id.* at 2:48:49–2:48:59. He continued speaking despite Weir's directive that he was speaking off-topic, spoke over Weir and the other trustees, refused to leave at Weir's direction and Pope's request, resisted physical removal, and yelled as he was being escorted from the room. *Id.* at 2:48:49–2:49:09; App. 94; App. 46–47, ¶ 35; App. 172, ¶¶ 25–27. His disruptive behavior continued as he was escorted from the building, while others were watching the meeting. App. 94; App. 46–47, ¶ 35. This shows there was probable cause that Story intentionally, or recklessly—despite warnings—hindered proceedings by noise or tumultuous behavior. Yarbrough, Griffith, and Pope believed Story's conduct met the elements of Section 38.13. App. 44–47, ¶¶ 27–36; App. 50–51, ¶ 48; App. 146–48, ¶¶ 28–34.

Because Defendants have shown that there was probable cause for Story's arrest, he must establish the *Nieves* exception regarding selective enforcement. To do so, Story must show that others were treated differently even though they (a) were similarly situated, but (b) had "not engaged in the same sort of protected speech." 587 U.S. at 407. Story does not make either showing. Story has not identified anyone who engaged in similar disruptive conduct. In contrast, Defendants' testimony and the video evidence definitively show that Story was the only speaker who repeatedly spoke over Weir, refused to stop speaking off-topic or to leave the podium when directed to do so, and raised his voice to be heard even after his microphone was cut-off, continuing to yell as he was removed from the meeting. App. 279 at 2:47:12–2:49:09, App. 46–47, ¶¶ 34–36; App.93, App. 94.[12] Defendants'

---

[11] On several occasions, Story yelled from the audience in a disruptive manner, which required a warning from Yarbrough. App. 6, ¶ 18; App. 112, ¶ 19; App. 93; App. 279 at 2:26:37–2:27:07, 2:33:50–2:34:05; App. 145–46, ¶¶ 25–27.

[12] *See also* App. 12, ¶ 38 (Pope had never seen anyone behave in similar disruptive conduct); App. 149, ¶ 39 (Yarbrough "had never seen anyone behave or engage in disruptive conduct like Mr. Story did at the August 16th Meeting); App. 52, ¶ 54 (Griffith was unaware of any other speaker at the August 16th Meeting who engaged in similar misconduct); App. 172–73, ¶¶ 29–31 (Azaiez observed that Story continued speaking, while others complied with Weir's directive).

evidence also shows that every other individual who spoke off-topic, whether about Azaiez or something else, stopped speaking without police intervention. App. 7–12, ¶¶ 23–26, 38; App. 46–47, ¶¶ 34–36; App. 93, App. 94, App. 279. Story's bald, unsupported assertions that fail to address conflicting evidence do not entitle him to judgment as a matter of law.

Moreover, Story's chosen comparators do not satisfy *Nieves*. Story points to the individuals who went off-topic by using analogies. Dkt. 133 at 13–14. These comparators fail for the same reason they fail as comparators in the viewpoint discrimination analysis. *See supra*, pp. 8–9. Their speech, including their analogies, was aimed at supporting or opposing a mask mandate.[13] In contrast, at the time Story was stopped, he was speaking about Azaiez, not the mask mandate or other COVID-19 safety measures. App. 9, ¶ 28; App. 52-53, ¶¶ 55-56; App. 149, ¶ 39. Story does not appear to rely on the other speakers who spoke regarding Azaiez, but to the extent he does, they are not similarly situated because they did not engage in the same behavior as he did. App. 52, ¶ 54; App. 149, ¶ 39; App. 172–73, ¶¶ 29–31. Because Story has not established the absence of probable cause or the *Nieves* exception, summary judgment should be denied on his retaliatory arrest claim.

**B.      Story's speech at the August 16th Meeting was not protected.**

Even if Story could get to the first step of the *Mt. Healthy* analysis, he cannot show that his off-topic speech at the August 16th Meeting is protected under the First Amendment. *See supra*, pp. 7–8.[14] The video evidence makes clear that Story continued to speak off-topic about Azaiez and to protest the instruction to have him removed, yelling to be heard over the Board members. App. 279

---

[13]      *See* App. 279 at 1:05:40 (Wrightmire comparing mask requirements to slave bondage); *id.* at 1:07:38 (Lee saying that Senator Cruz sends his children to a private school with a mask mandate, despite his opposition to such measures); *id.* at 1:36:20 (Zimmerman saying that mask mandates cannot save lives, only Jesus can); *see also* Dkt. 133-12 at 159:18–20, 162:17–19, 164:24–166:20 (Pope); Dkt. 133-14 at 186:15–186:25, 194:3–6 (Yarbrough); App. 53, ¶ 57 (Griffith).

[14]      Story argues that his speech was protected because it was on a matter of public concern. Dkt. 133 at 12. That is not the test in a limited public forum "dedicated solely to the discussion of certain subjects." Dkt. 43 at 12 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)). The Court has already ruled that limiting public comment to the topics on the agenda was a reasonable, viewpoint neutral restriction. Dkt. 43 at 13–15. And to be protected, the speech must be within the forum's reasonable limits. *Heaney*, 846 F.3d at 802.

at 2:47:12–2:49:09. Therefore, he was not engaged in protected speech.[15] Story does not even address this issue, much less show that he is entitled to judgment as a matter of law on this element of his claim. And while Story also cites his complaints to the Texas Education Agency, Williamson County, and the District's Police Department as potential protected activity, he does not point to any evidence that the Defendants were even aware of, much less motivated by, these complaints, as discussed below.

### C.      Timing does not show retaliatory motive or defeat probable cause.

Story notes that the warrant was obtained roughly one month after the August 16th Meeting, "and in the immediate wake of Story's complaints to the County Attorney, RRISD Police, and TEA." Dkt. 133 at 12. He does not explain how this defeats probable cause, nor point to any case law suggesting that it does. Story also does not cite any evidence showing that Defendants were motivated by his complaints to the County Attorney, RRISD Police, or TEA. Indeed, there is no evidence that Griffith or Pope were even aware of these complaints. App. 15, ¶ 48; App. 53, ¶ 58. There is also no evidence that Yarbrough was aware of anything but the complaint to the RRISD Police Department. App. 152–53, ¶ 53. And his undisputed testimony is that this complaint played no role in his decisionmaking. *Id.* Story does not even address this testimony. Nor does he address Griffith's, Pope's, and Yarbrough's testimony that Story's conduct, not his viewpoint, was the only motivating factor for his arrest (App. 12–15, ¶¶ 37–46, App. 50–51, ¶ 48; App. 151, ¶ 50), much less point to evidence that would show that, despite this testimony, there is no material issue of fact on this question.

Further, Defendants' evidence explains the timing. Yarbrough and Pontillo attested that there was probable cause to arrest Story the evening of August 16, but did not do so because if they had, there would not have been enough security coverage for the meeting. App. 9, ¶ 30; App. 147-48, ¶¶ 32, 39. Yarbrough reached out to Williamson County Attorney Dee Hobbs the next day—before any

---

[15]      *Startzell v. City of Philadelphia, Penn.*, 533 F.3d 183, 198 (3d Cir. 2008); *San Antonio Firefighters' Ass'n, Loc. 624 v. City of San Antonio*, 404 F. Supp. 3d 1045, 1063 (W.D. Tex. 2019); *Cf.* Dkt. 43 at 22. ("If Clark was not a recognized speaker when he was making these comments, he was not engaged in constitutionally protected activity.").

complaint was filed—but Hobbs was going to be on vacation and asked to wait until his return to schedule a meeting. App. 149, ¶ 41. While Hobbs was out, Yarbrough asked Griffith to investigate Story's conduct. *Id.*, ¶¶ 42–46. After Griffith had completed her investigation and Hobbs returned, they met with the County Attorney's office to discuss this issue, among others. *Id.*, ¶ 46.[16]

Story also argues that there is no probable cause because Griffith "did not conduct independent investigative steps despite her statements because they contradict her affidavit and the video evidence." Dkt. 133 at 13. Even if true, which it is not, this does not show a lack of probable cause. Moreover, the only evidence Story cites is that "the [warrant] affidavit itself identifies only Pope as the source." *Id.* None of the cited testimony—which is largely Griffith confirming what the affidavit said—contradicts Griffith's testimony regarding her investigation, discussed *supra*, p. 5. *See* Dkt. 133–13 at 28:17–28:24; App. 45–47, ¶¶ 28–35. Further, Griffith testified that, while the affidavit "was largely based on the information contained in Pope's Reporting Narrative," she independently "corroborated and confirmed" that the facts "were truthful and accurate based on [her] investigation and review of information during [her] investigation." App. 47, ¶ 36. She also explained that the template RRISD uses for warrant affidavits "does not contain space to list all the evidence reviewed or relied upon," and that "[I]t is not general practice to list all the evidence." App. 47–48, ¶ 37–38.[17]

### D.     Story has not shown that Azaiez was involved in the arrest.

Story does not cite any evidence, or make any attempt to support the assertion in his briefing, that Azaiez "coordinated with his co-defendants." *See* Dkt. 133. In contrast, Defendants present ample

---

[16]     According to Yarbrough, the date was set by the County Attorney's office, and any "delay" was caused by Hobbs's absence and the investigatory process. Dkt. 133–14 at 178:19–180:10.

[17]     Yarbrough confirmed that standard practice is to only list personal knowledge as a source if you observed the behavior firsthand, and not if you are "taking the information that's provided" and "looking at any other evidence that exists related to that," as Griffith had. Dkt. 133–14 at 91:6–25. He and Pope also indicated that listing the primary source and not all other individuals interviewed or documentary evidence, such as body camera footage, reviewed is common practice and that such evidence "doesn't have to be" listed *Id.* at 92:1–6, 134:18–24; Dkt. 133–12 at 83:18–87:21. Pope also testified that officers keep in mind that the judge has to read the affidavit and it needs to be brief so as to not "tie him up." Dkt. 133–12 at 86:25–87:13.

evidence that Azaiez had no involvement in the decision to seek Story's arrest. App. 15, ¶ 47; App. 49–50, ¶ 45; App. 139–40, ¶ 8; App. 149–50, ¶ 40; App. 152, ¶ 52; App. 173–74, ¶¶ 33–36; App. 387–88, App. 391–94 at 90:17–91:23, 92:13–93:2, 105:5–8, 105;17–106:3, 112:13–16, 117:8–16; pp.460, 462 at 148:7–25, 155:16–156:25. Because Story has no evidence that Azaiez was involved, in any way, in the arrest, his request for summary judgment against Azaiez must fail.

E.    **Story has not shown that he can overcome Defendants' qualified immunity.**

Here again, Story has made no attempt to show that any Defendant violated a right that was "clearly established," or that their actions were objectively reasonable under clearly-established law *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Story points to no evidence or case law suggesting that Defendants' actions violated clearly established rights or were objectively unreasonable. And they certainly are not unreasonable on their face. In accordance with department protocol, Pope completed a report and "Reporting Officer Narrative" describing his interactions with Story. App. 12, ¶ 39; App. 33–35. He briefly spoke with Griffith during her investigation and confirmed the accuracy of his narrative. App. 13, ¶ 40. And Story does not point to any statement in the narrative that is inaccurate. Further, the video confirms that Pope's narrative and Griffith's prepared Warrant Affidavit accurately describes Story's conduct. Compare App.94, App. 279 *with* App. 35; App. 95–97.

Similarly, the Motion points to no evidence that Pope's or Griffith's characterizations of Story's behavior were objectively unreasonable in light of clearly established law. He points to no case in which an officer was found to have violated a person's clearly established rights based on quibbles with whether a raised voice should have been described as something other than yelling or an outburst. Nor does he point to any case in which an attendee's decision to speak out of turn, speak over the presiding officer, refuse to stop speaking off-topic when directed to do so, and raising their voice to be heard over a cut-off microphone as they are being physically removed from the room was determined to not be disruptive and in violation of Penal Code § 33.18. As such, he has not established

that Pope's, Griffith's, or Yarbrough's determination that he violated the statute and Griffith's preparation of the Warrant Affidavit, or Yarbrough's actions related to the arrest, were unreasonable. Without making such a showing, he cannot obtain summary judgment.

### III. Story is not entitled to summary judgment on his Fourth Amendment unreasonable seizure claim because his seizure was reasonable.

Story argues that his seizure at the August 16th Meeting was not an arrestable violation because no deponents identified a "safety" or "physical" threat. Dkt. 133 at 17. But that is not the standard for a violation of Section 38.13. Rather, a person commits an offense if "he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance" or "recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist." TEX. PENAL CODE § 38.13.

While Story is correct that merely going off-topic is not a criminal violation, the evidence shows Story did more than that as discussed *supra*, pp. 13–14. Moreover, Pope and Pontillo understood that, as presiding officer, Weir could request that law enforcement personnel remove the disruptive individual from the meeting. App. 4–5, ¶ 11; App. 110, ¶ 13. They personally observed Story's disruptive behavior when he was called to the podium—talking over Weir, continuing to speak off-topic, raising his voice, and refusing to leave when directed to do so. App. 8, ¶ 26; App. 113, ¶¶ 24–25. As such, they believed Weir's directive was reasonable and followed it. App. 8, ¶ 27; App. 113–14, ¶¶ 24–25, 29–31. When they approached Story they requested that he leave, and only resorted to physically removing Story when he physically resisted moving. App. 8, ¶ 27; App 113, ¶ 26. The video confirms their accounts and shows they had reasonable suspicion that Story was hindering proceedings by noise or tumultuous behavior. App. 10, ¶ 30; App. 33–35; App. 116, ¶ 39; App. 279.

Story does not acknowledge—much less counter—the evidence supporting reasonable suspicion for his removal. And while Story claims that a "hindering/disorderly charge . . . could theoretically be applied to many participants," he does not identify any such participant. Dkt. 133 at

15. He also ignores that an independent intermediary later found that there was probable cause that Story disrupted the meeting. Because his arrest was supported by probable cause as determined by an independent intermediary, his removal for the same misconduct based on the less demanding reasonable suspicion standard was likewise not unreasonable. *See Tarango-Hinojos*, at 1176.[18]

Furthermore, the Motion does nothing to overcome Pope's and Pontillo's qualified immunity. Story seems to criticize Defendants for not being constitutional scholars with deep knowledge of all the contours of difficult First Amendment law. But he cites no case establishing this as the standard. Rather, Defendants are simply required to have reasonable suspicion of an arrestable offense, which they did, and not to respond in a clearly unreasonable manner that violates an individual's clearly established rights. And while the right to free speech and the right to be free from unreasonable seizure are clearly established, Story points to no case law that when he erroneously believes he can speak off-topic (or that his speech is on-topic "by analogy"), he has a clearly established right to refuse to follow the presiding officer's directives or abide by the reasonable viewpoint neutral restrictions of the forum. Further, any such position is contradicted by the case law, which clearly shows the opposite. *See Biggs-Leavy v. Lewis*, No. 24-1317, 2025 WL 451369, at *3 (6th Cir. Feb. 10, 2025).

In addition, Pope and Pontillo are entitled to qualified immunity under *Heany*. As with that officer, Pope and Pontillo reasonably believed it was their duty to prevent disruptions to the Board's meeting. *Compare Heaney*, 846 F.3d at 805 *with* App. 8–10 *and* App. 113–14. Therefore, as in *Heany*, it was "not objectively unreasonable for [Pope and Pontillo] to respond to [Weir's] request and escort [Story] out of the room . . . ." *Heaney*, 846 F.3d at 805; *see also Von Derhaar v. Watson*, 109 F.4th 817, 830 (5th Cir. 2024). And without clear case law requiring officers to second-guess a presiding officer's judgment as to whether a procedural rule has been violated—and whether a person's continued violation of that rule justifies removal—Story cannot overcome Defendants' qualified immunity.

---

[18]     Story cannot show that determination was tainted. *See* Dkt. 130, pp. 16–20.

Respectfully submitted,

/s/      Kathryn E. Long
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of this document has been served

upon all parties via the Court's electronic filing system on this 17th day of February, 2026.

| | |
|---|---|
| Stephen D. Casey<br>CASEY LAW OFFICE, P.C.<br>P.O. Box 2451<br>Round Rock, Texas 78680<br>stephen@caseylawoffice.us | Warren V. Norred<br>Solomon G. Norred<br>NORRED LAW, PLLC<br>515 E. Border St.<br>Arlington, TX 76010<br>warren@norredlaw.com |

/s/      Kathryn E. Long
Kathryn E. Long

21