IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(AUSTIN DIVISION)

| | | |
|---|---|---|
| JEREMY STORY, | | |
| | *Plaintiff*, | Case No. 1:22-cv-00448-DAE |
| v. | | |
| SUPERINTENDENT HAFEDH AZAIEZ, et al., | | |
| | *Defendants.* | |

**PLAINTIFF JEREMY STORY'S RESPONSE TO DEFENDANTS DR. HAFEDH AZAIEZ'S, JEFFREY YARBROUGH'S, AND LAUREN GRIFFITH'S MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56**

Plaintiff Jeremy Story ("Plaintiff") files this Response to the Motion for Summary Judgment filed by Defendants Dr. Hafedh Azaiez, Jeffrey Yarbrough, and Lauren Griffith. For the reasons set forth below, the Defendants' motion should be denied in its entirety.

## I.    Introduction

This case arises from the unconstitutional silencing and retaliatory arrest of a citizen for speaking at public school board meetings. The Defendants seek summary judgment by presenting a version of events that is "blatantly contradicted" by the objective video recordings of the August 16, 2021, and September 14, 2021, meetings. Under the standard set by the Supreme Court in *Scott v. Harris*, this Court must view the facts in the light depicted by the video evidence and cannot accept the Defendants' characterization of Plaintiff's conduct as "disruptive" when the recordings show he was peaceful even after the Board cut off his microphone. 550 U.S. 372, 380-81 (2007). Furthermore, under the recent Supreme Court decision in *Gonzalez v. Trevino*, Plaintiff has met his burden of proof because he has provided objective evidence that other individuals who engaged in similar conduct were not arrested.

*Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).

## II.    Statement of Facts

Plaintiff's Statement of Fact aligns with the objective video evidence.

On August 16, the RRISD Board of Trustees held a board meeting. The agenda items thus included employee sick leave regarding COVID-19 and Exec. Order GA-38.[1] When allowed, Story stated:

> "Today I speak on the rule of law, I don't envy your choice today. I trust that most people value each other even though they are on different sides of the issue, I also understand the seriousness of the COVID epidemic. I understand the rule of law, yet several members of this board and Superintendent have another utter disregard for the rule of law. Today you are considering thwarting the Governor's order and the legislature and the Supreme Court of Texas. This will result in tremendous fines to the district. Even today, you violated the rule of law by putting officers in the back of this room in the difficult position of being asked to illegally enforce a last-minute violation of the Open Meetings Act. An agenda item today includes a resolution which includes 80% of the text concerning itself with the safety of public employees and students. The resolutions being considered today include statements like, "the Board of trustees has a substantial public interest in protecting the health and safety of students and community." It talks about "supervision of the Superintendent" and even other things related to public health and public safety. Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our Superintendent has a protective order filed against him. . . ."[2]

But as soon as Story mentioned this protective order, he was interrupted again by Weir and then by RRISD Police Officers Milton Pope and Frank Pontillo, who, in conjunction with Weir, approached Story from behind, grabbed his arms, and dragged him out of the meeting. *Id.*

Other speakers spoke on the same theme prior to Story but used different examples. These speakers were treated unequally and with more latitude on the boundaries of their

---

[1] Exh. 2.

[2] Exh. 5, Time 2:47:18.

commentary than Story. For example:

Elaine Lee stated: "I'm here to remind you that Senator Cruz who poses as a freedom fighter in front of the camera chooses to send his children to a private school that has a mask mandate. A public health measure that he would ridicule as communism or tyranny.  These politicians tell us that refusing masks and vaccines is what freedom looks like in the middle of a deadly pandemic. Why should anyone trust their stage rhetoric over advice from registered health care professionals? The rich and powerful protect their children with private schools while playing political games abusing their power to prevent our children from getting that same protection in public schools" Ms. Lee was not chastised nor cut-off while speaking.[3]

Catherine Wrightmire stated, after speaking briefly on masks: "And I just want to say that there's also a psychological component to all of this. Pertaining to the fear and the effect of the pandemic as it's portrayed in the media. And also, data that's presented to us. and I just want to encourage the audience and the board as homework to consider taking a look at a very famous book. Perhaps you've read it, Frederick Douglass talking of my bondage and my freedom, he was a slave. There's a slave mentality, there's a slaveholder's mentality. And this was prior, he wrote this prior to the Civil War and was an abolition abolitionist [sic] prior to the Civil War. But there's psychological things to think about if you take a look at this book. Thank you very much." Ms. Wrightmire was not chastised nor cut-off.[4]

Don Zimmerman stated: "I'm going to jump to the point here 'cause, all of you know as adults, lots of times when you have arguments and fights, you're really not arguing about the thing you're arguing about.  You're arguing about something much, much bigger. This mask

---

[3] Exh. 5, Time 1:07:38.
[4] Exh. 5, Time 1:05:40.

mandate is not about safety, It's not about health, It's about a crazed monopoly. Government school that thinks that it's God, and it can save us from disease and death. So let me make something really very clear to you. There's one perfect man who ever lived on this earth. His name was Jesus of Nazareth. This man. Healed the sick. He roused people from the dead. He walked on water, even when it was not sufficiently frozen. He's a miracle worker, and he is mankind's only hope to be saved. From probable disease and from absolutely certain death. So what I'm going to say to this school district - stop trying to play God. You are not God. You cannot save anyone from disease and death. You can't add one hour to anybody's life. No matter what kind of draconian rules and laws that you pass in the name of safety and public health. I'm really fed up with the self-righteousness and hypocrisy of government all over this country, from Washington DC right down to the school board. If somebody needs to wear a mask, that's a decision between them and their physician, and they're capable of making that decision. They have every right to wear a mask, and some people need to. For the rest of us, stop playing God, and get over your power trip." Mr. Zimmerman was not chastised or cut-off. [5]

Jennifer White stated: "But while we're talking about child safety 'cause a lot of people did, let's talk safety. I'm in fear for my daughters. Because the Superintendent, he assaulted a pregnant girl." Ms. White was prevented from speaking further, and other board members spoke over her, but she was not assaulted by RRISD police or removed, though she attempted to keep speaking after she was told to cease speaking.[6]

Jason Schklar stated: "And finally, this is hard to say, but I feel like it's important. As we came to order, we had a trustee protest that she couldn't pack the meeting room with her riotous,

---

[5] Exh. 5, Time 1:36:18.
[6] Exh. 5, Time 2:25:18.

unmasked posse of supporters. I want to respect the decorum of this meeting and the diversity of opinions expressed here, but I've got to say that it's frightening. It's frightening to see how a couple of members of Q Anon have infiltrated our school board. Either that, or they see it as politically expedient to align with them. You are content. You are content to let the country burn as you laugh at how fun it is to….”[7] Mr. Schklar was interrupted only long after his verbal assault on specific board members had been launched.

Renata Sims stated: “I would like for this board to show equal regard to all safety concerns parents bring to them, including the one I voiced to you repeatedly regarding the current protective order filed against our Superintendent for alleged family violence mask. Related concerns deserve a hearing, but so do criminal allegations against the only employee. This board is in charge of supervising. Please address all....” Ms. Sims was interrupted and cut-off but was not removed from the room.[8]

At other times in the meeting, other speakers disrupt the proceeding but were not addressed.[9]

On September 17, 2021, a warrant was issued charging Story with Hindering Proceedings by Disorderly Conduct under Texas Penal Code § 38.13.[10] The warrant affidavit, signed by Officer Lauren Griffith, described Story as having engaged in “several outbursts,” continued verbal outbursts after warnings, and yelling and screaming that caused a major disruption.[11] The August 16 recording captures the interaction described in the affidavit.

Superintendent Hafedh Azaiez was the direct supervisor of Chief Jeffrey Yarbrough, who

---

[7] Exh. 5, Time 3:01:52.
[8] Exh. 5, Time 1:33:55.
[9] Exh. 5, Time 1:29:27.
[10] Exh. 11.
[11] Exh. 11.

testified he oversaw the RRISD Police Department.[12] Azaiez testified that he held regular one-on-one meetings with the Chief and that the Chief reported directly to him.[13] Story's remarks at the August 16 meeting included criticism directed at Azaiez.[14] Azaiez denies directing or discussing Story's arrest with the Chief.[15]

Story was the only speaker from the August 16 meeting who was physically removed and later charged with a criminal offense.

### III.    Summary Judgment Standard

Summary judgment is appropriate only if the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The burden rests initially on the moving party to identify the portions of the record that it contends establish the absence of a genuine issue of material fact. Once that burden is met, the nonmovant must designate specific evidence showing that there is a genuine dispute for trial. In evaluating the motion, the Court must view all evidence and draw all reasonable inferences in favor of the nonmovant, and it may not make credibility determinations or weigh competing evidence. However, where objective video evidence exists and "blatantly contradict[s]" a party's version of events such that no reasonable jury could believe it, the Court must view the facts in the light depicted by the recording itself. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Thus, this Court's task is not to credit post hoc characterizations of the events, but to determine whether the undisputed video record creates or forecloses a genuine issue of material

---

[12] Exh. 22 at pg. 37ff.
[13] Exh. 22 at pg. 112-117
[14] *Id.*
[15] *Id.*

fact. That principle controls here: the RRISD video recordings of the August 16 meeting and subsequent encounters are dispositive when they conflict with later characterizations or testimony.

### IV.    Argument

This case presents a circumstance increasingly common in modern constitutional litigation: the dispositive events were recorded. This case is controlled by the Supreme Court's directive in *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Where objective video evidence "blatantly contradict[s]" a party's version of events such that no reasonable jury could believe it, a court may not adopt that version for purposes of summary judgment. *Id*.

The Fifth Circuit consistently applies this rule, instructing district courts to "view the facts in the light depicted by the videotape." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); see also *Hanks v. Rogers*, 853 F.3d 738, 742 (5th Cir. 2017); *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). Even in the qualified immunity context, courts may not credit factual assertions that are "blatantly contradicted" or "utterly discredited" by video evidence. *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015).

Defendants' motion depends on characterizing Story as "disruptive," engaging in "outbursts," and "hindering" the proceedings. Those characterizations are not facts; they are conclusions. The August 16 recording controls. Under *Scott*, the Court must reject narrative embellishments that conflict with what the video depicts. When the recording is viewed in its entirety, it does not establish, as an undisputed fact, that Story engaged in "noise or violent or tumultuous behavior" within the meaning of Texas Penal Code § 38.13. Because Defendants' legal arguments rest on a version of events contradicted by the recording, Rule 56 does not permit summary judgment.

**A.** ***A reasonable jury could conclude, based on Azaiez's deposition response, and common sense, that he was involved in directing Story's arrest.***

    1.    <u>Azaiez's position on the effects of affair and assault allegations are inconsistent.</u>

Dr. Azaiez testified in his deposition to the following ideas, untenable as a matter of common sense:

1.    He denied Story's statements about his alleged affair and assault were even *potentially* damaging; (Pl's Exh. 22 at pg. 112, ll. 17-20ff).

2.    When pressed about whether accusations of a protective order could affect his reputation, he maintained they had "no effect"; (Pl's Exh. 22 at pg. 115, ll. 21-23ff); and

3.    He conceded only that if allegations were proved, as opposed to being stated publicly, they could be problematic; (Pl's Exh. 22 at pg. 115, ll. 13-15ff)

Despite these equivocations, Dr. Azaiez finally admitted that false public statements can hurt people. (Pl's Exh. 22 at pg. 116, ll. 10-14).

This matters because a reasonable jury could find this sequence internally inconsistent and contrary to ordinary human understanding. A jury could find Dr. Azaiez was minimizing the allegations of reputational impact to intentionally avoid a motive inference, ***especially because his contract included a morality clause.*** (Pl's Exh. 22 at pg. 68, ll. 2-6).

    2.    <u>Azaiez' position as Chief Yarbrough's direct supervisor belies any avoidance of discussion of Story, making his claims untenable.</u>

Dr. Azaiez testified he never discussed Story's arrest or trespass with Chief Yarbrough. Yet, Dr. Azaiez:

1.    Had weekly one-on-one meetings with the Chief. "We have one-on-ones, you

know, because we — he — he reports to me directly, so we would have one-on-one meetings…" (Exh 22 at 90, ll. 21-25).

2. Participated in a highly confrontational board meeting on two separate occasions, including September 14, 2021, where he is visible directing the Chief to control room access;  (Exh 6 (video at ); Exh 22 at 91 (discussing things involving school security)).

3. He denied ever discussing Jeremy Story with him, despite this being the only arrest ever stemming from a school board meeting.

At a bare minimum, the "probably"/"I don't recall" answers in light of this enormously consequential incident creates at a minimum a fact issue for the jury. It strains credulity to think this topic was not a major, or at least a significant part of the conversation between Dr. Azaiez and Chief Yarbrough.

Again, Dr. Azaiez's equivocations and alleged "poor memory" may be disregarded by a reasonable jury. For example:

1. He stated he "doesn't recall the details" of the suit.

2. Agrees that accusations of immorality could threaten his contract, and yet

3. Simultaneously denies any reputational impact from Story's public accusations.

He was the subject of Plaintiff's criticism, presided over the meetings at issue, and maintained regular one-on-one meetings with Chief Yarbrough. (Exh 22 at 90, ll. 21-25). Azaiez is liable not merely as a supervisor, but because a reasonable jury can infer he directed, encouraged, or knowingly ratified the use of district police to silence and retaliate against a critic during and after the board meetings

The arrest of a citizen at a school board meeting—a highly unusual event in the district—

would reasonably be expected to be discussed at the highest administrative level. Azaiez's deposition testimony that he does not recall discussing the incident, despite acknowledging the seriousness of public allegations against him and the contractual implications of such allegations, creates a credibility question that creates a genuine dispute of material fact.

The jury is entitled to infer motive from the temporal proximity between the criticism and the arrest, from his acknowledged control of law enforcement during the September 16, 2021, meeting, and from the selective enforcement. Rule 56 does not permit the Court to credit self-serving denials over circumstantial evidence supporting an inference of retaliatory involvement. Further, Story only need prove that "retaliation was a substantial or motivating factor behind the arrest." *Nieves*, 587 U.S. at 404. Here, a reasonable jury could disbelieve Azaiez's statements that Story's very serious accusations did not cause him to retaliate nor to even remotely discuss it with his Chief of Police who later arrested Story.

### B.    *Retaliatory Arrest and Lack of Probable Cause.*

*First*, as a background matter, Story, per the arrest affidavit and Defendants' motion, was alleged to have several outbursts. The plain video evidence contradicts this. There is no proof of this whatsoever in the entire August 16, 2021, video. *See* Exh. 5. Further, no evidence exists of Story committing to speak off topic.

1.    The *Nieves* exception squarely fits this case.

Defendants contend that the existence of probable cause defeats Plaintiff's retaliatory arrest claim. That argument fails for two independent reasons. *First*, when the video evidence is viewed under *Scott*, no reasonable officer could conclude that Plaintiff violated Texas Penal Code § 38.13 or any other criminal provision prior to being removed from the podium. Section 38.13 Texas Penal Code is an offense if the following happens:

(a) A person commits an offense if he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance.

(b) A person commits an offense if he recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist.

TEX. PEN. CODE §38.13.

Nothing in the objective recording shows interruption of a lawful meeting by unreasonable noise, fighting, violent or tumultuous behavior, or refusal to comply with a lawful order supported by viewpoint-neutral rules. Plaintiff was speaking in a public-comment forum, was cut off after attempting to complete an analogy, and did not engage in physical disruption, threats, or obstruction of proceedings. Talking over a chair after being silenced for viewpoint-based discrimination does not constitute criminal hindering. At minimum, the video creates a triable dispute as to whether any probable cause existed.

*Second*, even assuming arguable probable cause, this case falls squarely within the objective evidence exception recognized in *Nieves v. Bartlett* and clarified in *Gonzalez v. Trevino*. The requirement for a showing of probable cause is relaxed through *Nieves* "where officers have probable cause to make arrests, but typically exercise their discretion not to do so." *Nieves*, 587 U. S. at 406. "A plaintiff [must] present[] objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Id.*, at 407; cf. *United States* v. *Armstrong*, 517 U. S. 456, 470 (1996).

Pope even admitted in his deposition that his actions were "discretionary," and unprompted used the exact analogy from controlling law in this case that entirely undercuts his legal position. *See Nieves*, 587 U.S. at 407. Pope analogized enforcement to jaywalking, acknowledging that he could technically arrest for certain violations but usually used discretion (Exh. 19 at 116:1–7, 16–25). This is the paradigm of retaliatory arrest and the *Nieves* exception,

and a key summary judgment fact to the objective evidence exception in *Nieves* and its progeny: no other August 16 speaker was charged with hindering or disrupting, nor was any other person escorted off the podium. It was only Story, a "vocal critic" of the superintendent, who verbally "jaywalked." *Id.* (raising the issue that a vocal critic of the police who was arrested for jaywalking would likely be able to prove animus based on others who jaywalked and were not arrested).

Every single person introducing an analogy, by Pope's standards, was arrestable. Yet only Story was arrested. *See Gonzalez v. Trevino*, 602 U.S. at 658. In *Gonzalez*, the high court expanded and clarified the *Nieves* exception:

> To fall within the exception, a plaintiff must produce evidence to prove that his arrest occurred in such circumstances. The only express limit we placed on the sort of evidence a plaintiff may present for that purpose is that it must be objective in order to avoid "the significant problems that would arise from reviewing police conduct under a purely subjective standard."

*Id.*

Here, the video speaks volumes. It is objective, and it shows speaker after speaker making analogies and referencing myriad topics, yet not having their microphones cut off, being escorted out, nor were any arrested. Indeed, every single defendant, without exception, acknowledged that other speakers (Lee, Wrightmire, and Zimmerman), made analogies that needed to be heard in their entirety.

- Dr. Azaiez deposition at pages 123-129; (Exh. 22)

- Jeffrey Yarbrough at pages 186-195; (Exh. 21)

- Lauren Griffith at pages 113-124; (Exh. 20); and

- Milton Pope at pages 158-167. (Exh. 19).

Also, others made comments about the superintendent. When asked about treating others with different standards could affect constitutional rights (Exh 22 at 110:11–17, 18–23), Azaiez also acknowledged that other speakers accused him of assaulting a pregnant woman and were not removed. (Exh 22 at 77:14–22; 72:7–13 (reading Jennifer White's remarks; Exh. 1). Only Jeremy Story was removed and arrested. This differential treatment provides the "objective evidence" required to overcome the *Nieves* probable-cause bar.

Officers may not selectively enforce discretionary minor offenses against a vocal critic when similarly situated individuals engaged in materially similar conduct without arrest. Here, the undisputed record shows that multiple speakers used analogies, referenced matters arguably beyond the immediate agenda item, and criticized the superintendent without interruption, removal, or arrest. Plaintiff alone was escorted out and charged. That differential treatment constitutes objective evidence that retaliation was a substantial motivating factor, sufficient to overcome the probable cause bar at summary judgment.

> 2. Griffith's affidavit materially omitted relevant facts, misleading the magistrate and satisfying the *Franks* standard.

The Fourth Amendment prohibits a warrant based on materially false statements or omissions made knowingly or with reckless disregard for the truth. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Under *Franks*, a warrant is invalid where the affiant includes a false statement "knowingly and intentionally, or with reckless disregard for the truth," and the false statement is necessary to the finding of probable cause. Id. at 155–56.

The Fifth Circuit applies *Franks* not only to affirmative misstatements but also to material omissions. See *Arizmendi v. Gabbert*, 919 F.3d 891, 897 (5th Cir. 2019); *United States v. Kendrick*, 980 F.3d 432, 440 (5th Cir. 2020). An omission violates the Fourth Amendment if

the affiant omitted facts with the intent to mislead, or with reckless disregard for whether the omission would mislead, and the omitted information was material to the magistrate's probable cause determination. *Kendrick*, 980 F.3d at 440.

Reckless disregard may be established where the affiant "in fact entertained serious doubts as to the truth" of the statements or had "obvious reasons to doubt the accuracy of the information reported." *Id*. (internal quotation omitted). When the alleged falsity or omission concerns events captured on objective video, the existence of the recording is relevant to whether a materially inaccurate characterization could have been made recklessly.

The materiality inquiry is objective. The Court must excise any false statements and insert any omitted material facts, and then determine whether the "corrected affidavit" would still establish probable cause. *Franks*, 438 U.S. at 171–72; *Arizmendi*, 919 F.3d at 897. If probable cause would not exist after correcting the affidavit, the warrant cannot stand.

Thus, the proper analysis here is not whether the original affidavit, read in isolation, recites the elements of § 38.13. The question is whether, after removing unsupported characterizations and adding omitted contextual facts reflected in the August 16 recording, the reconstructed affidavit would provide a neutral magistrate with probable cause to believe Story intentionally or recklessly hindered an official proceeding by "noise or violent or tumultuous behavior." TEX. PEN. CODE § 38.13.

Imagine an affidavit where the officer avers, "Person A [Accused] struck [Victim] on the face with a closed fist, and it caused pain. The undersigned believes [Accused] knowingly committed the offense of: Assault PC 22.01." But after further review, a video of the alleged assault is provided, and it turns out the alleged Accused and the alleged Victim were in a boxing

ring at the local gym under a sanctioned bout by the state boxing commission. This would plainly show no arrest would be permitted given the context.

Here, Defendant Griffith's affidavit, Exh. 11, misrepresented material facts to the magistrate and runs into the same *Harris* objective evidence bar in her post-hoc characterizations. The video plainly shows Story (1) talking on a topic he alleged was germane, (2) being unconstitutionally silenced when he began to give an analogy, (3) not being permitted to speak further, and (4) having his rights violated.

For purposes of Franks analysis, the affidavit must be evaluated after removing alleged false statements and adding omitted material facts reflected in the video record.

| Original | Omissions/Corrections |
|---|---|
| Affiant learned that at approximately 8:35 p.m., Story was called upon by the Board of Trustees to speak at the podium on the subject of the mask mandate. | Affiant learned that at approximately 8:35 p.m., Story was called upon by the Board of Trustees to speak during the public-comment portion of a meeting addressing COVID-related agenda items, including a resolution referencing public health and safety. |
| Affiant learned RRISD Board of Trustee President Amy Weir informed Story he was attending a called meeting and would only be able to speak about the items on the agenda, specifically the mask mandate. | Affiant learned that President Weir informed Story he was to speak on agenda items. The agenda included language concerning public health and safety. |
| Affiant learned Story acknowledged President Weir and advised President Weir he agreed. | No change |
| Affiant learned during the duration of Story's time to speak, RRISD Board of Trustee President Amy Weir instructed Story to stop speaking on unrelated topic's [sic] and to only discuss the mask mandate. | Affiant learned that during his remarks, Story referenced a protective order involving the Superintendent while discussing the Board's stated safety rationale in the resolution. President Weir instructed him to cease that line of commentary. |
| Affiant learned while Story was discussing the unrelated topics, Story had several outbursts. | The August 16 recording does not reflect multiple verbal outbursts during Story's time at the podium prior to his removal. |
| Affiant learned after several verbal warnings from RRISD Board of Trustee President Amy Weir, Story continued to have verbal outbursts. | The recording reflects that Story was interrupted after referencing the Superintendent and that officers approached shortly thereafter. The recording does not reflect repeated verbal |

|  | outbursts following multiple warnings prior to officer intervention. |
|---|---|
| Affiant learned RRISD Board of Trustee President Amy Weir requested for Story to be removed from the board room for hindering and disturbing the board proceedings. | Affiant learned that President Weir requested Story be removed following the exchange regarding his reference to the Superintendent. |
| Affiant learned Sgt. Pope and RRISD Officer Frank Pontillo approached Story and made several verbal requests for Story to leave the board room. | Affiant learned Sgt. Pope and Officer Pontillo approached Story and directed him to leave the board room. |
| Affiant learned Story refused to leave the board meeting. | No change |
| Affiant learned Sgt. Pope and Officer Pontillo had to forcibly remove Story from the board room. | No change |
| Affiant learned while being forcibly removed from the board meeting, Story continued to resist Officers, yell, and scream causing a major disruption during the board meeting. | The recording reflects that Story was physically removed from the board room. The recording does not depict yelling or screaming that caused a major disruption during the removal. |

After excising the unsupported characterizations and inserting the omitted contextual facts reflected in the August 16, 2021, recording, the reconstructed affidavit does not establish probable cause under Texas Penal Code § 38.13.

Section 38.13 provides that a person commits an offense if he intentionally hinders an official proceeding "by noise or violent or tumultuous behavior or disturbance," or recklessly does so and continues after an explicit official request to desist. TEX. PEN. CODE § 38.13(a)–(b). It does not punish protected speech that officials deem off-topic.

When the affidavit is corrected to reflect what the video shows, it establishes only the following: Story was called to speak during public comment; he referenced the Superintendent while discussing the Board's safety rationale; he was interrupted; officers approached; he refused to leave; and he was physically removed. The corrected affidavit does not establish repeated verbal outbursts, yelling, screaming, violent behavior, or tumultuous disturbance prior to

16

removal. Nor does it establish that Story's speech, standing alone, created noise or conduct that actually prevented the Board from continuing its proceeding within the meaning of § 38.13.

At most, the reconstructed affidavit reflects a dispute over whether a speaker's comments were sufficiently related to the agenda. Because the corrected affidavit lacks facts showing the statutory mode of hindrance required by § 38.13, probable cause does not exist once the unsupported characterizations are removed.

Under *Franks* and its Fifth Circuit progeny, the inclusion of unsupported characterizations and the omission of contextual facts were material to the magistrate's probable cause determination. *Id*. at 442. When evaluated in that form, the warrant application fails to establish a fair probability that Story committed an offense under § 38.13. The alleged misstatements and omissions were therefore material, and the warrant cannot sustain summary judgment.

### C.   Defendants Cannot "Bootstrap" Disruption from Illegal Silencing

Defendants argue that Plaintiff's continued speaking after being told to stop constituted a disruption. This is an impermissible "bootstrapping" argument. The government cannot manufacture a disorderly conduct charge from protected speech. *See, generally*, *Swartz v. Insogna*, 704 F.3d 105 (2d Cir. 2013) (reversing the district court's dismissal of Plaintiff's §1983 lawsuit where his free speech was punished in retaliation by a "disorderly conduct" charge).

The Board's initial act of silencing Plaintiff was unconstitutional because it was based on the content and viewpoint of his speech regarding the Superintendent's legal issues. Defendants cannot violate a citizen's civil rights by illegally silencing them and then use the citizen's peaceful protest of that violation as the "disruption" necessary to justify an arrest.

### *D.*    **Qualified Immunity Does Not Apply**

Qualified immunity does not shield an officer who lacks even arguable probable cause. Arguable probable cause exists only when reasonable officers could disagree about whether the conduct at issue constituted a crime. When the August 16, 2021, video is viewed in its entirety, Plaintiff's conduct—standing at the podium, speaking within his allotted time, and attempting to complete a rhetorical analogy—cannot reasonably be characterized as criminal hindering. The alleged "outburst" occurred only after his microphone was cut and after he was told to cease speaking based on the content of his remarks. An officer may not manufacture probable cause by first imposing an unconstitutional restriction on speech and then criminalizing the speaker's objection to that restriction. No precedent authorizes such circular reasoning. Because clearly established First Amendment law prohibits viewpoint discrimination in limited public fora and prohibits arresting a citizen for protected speech absent genuine disruption, no reasonable officer could have believed this arrest was lawful.

Accordingly, qualified immunity must be denied.

### 1.    Qualified immunity law on free speech has been settled for decades.

This has been settled law for decades. Government entities may regulate speech in limited public fora with reasonable, viewpoint-neutral time, place, and manner rules; they may not suppress speech because of disagreement with the speaker's viewpoint. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–31 (1995); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758–59 (5th Cir. 2010). Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829–31; *see Iancu v. Brunetti*, 588 U.S. 388, 401 (2019).

2.      <u>None of the officials in this case had a reasonable understanding of the law.</u>

Even if Defendants misunderstood the doctrine, the law was clearly established such that any reasonable official would have known Story's rights. Yet, Pope's understanding of "viewpoint discrimination" never progressed beyond his Mustang/Camaro analogy; he expressly stated he did not "quite understand" the concept and defaulted to following the Board President's orders rather than independently considering Story's First Amendment rights. (Exh. 19 at 35:18–25; 36:1–7, 10–11; 168:3–12, 21–25). Yarbrough could not articulate when viewpoint-based enforcement at a school-board meeting crosses the constitutional line, even as he admitted that off-topic speech alone is not a crime. (Exh. 21 at 100:11–13). Griffith conceded she had no recent, focused First Amendment training beyond academy classes, could not recall the Fourth Amendment without prompting, and drafted her arrest affidavit by largely adopting Pope's narrative rather than testing it against constitutional standards. (Exh. 20 at 17:11–25; 18:1–9; 51:14–25; 139:8–25; 146:19–25; 147:1–3). Azaiez repeatedly emphasized that he is "not a lawyer" and could only speak in vague terms about "administrative decisions," even as he admitted that applying different standards to critics can be unequal. (Exh. 22 at 71:1–11; 96:3–15; 110:11–17, 18–23).

Defendants' ignorance of the constitutional standards is no defense. The reasonable official would have known the law. Combined with the violation of Story's rights, the evidence does not entitle Defendants to qualified immunity.

### V.  Conclusion

Because the video evidence contradicts the Defendants' claims of disruption, and because Plaintiff has provided objective evidence of a retaliatory arrest, the Defendants' Motion for Summary Judgment must be denied.

RESPECTFULLY SUBMITTED, this day, February 17, 2026.

CASEY LAW OFFICE, P.C.
P.O. Box 2451
Round Rock, Texas 78680
Telephone: (512) 257-1324
Fax: (512) 853-4098


By    /s/ Stephen Casey
      Stephen Casey, Esq.
      Texas Bar No. 24065015
      stephen@caseylawoffice.us


## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, a true and correct copy of the above and foregoing *Response to Defendants Dr. Hafedh Azaiez's, Jeffrey Yarbrough's, and Lauren Griffith's Motion for Summary Judgment* was served via electronic means to counsel for Defendants:

THOMPSON & HORTON LLP
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

Kathryn E. Long
State Bar No. 24041679
klong@thompsonhorton.com
K. Adam Rothey
State Bar No. 24051274
arothey@thompsonhorton.com
Ibrahim Yaseen
State Bar No. 24137674
iyaseen@thompsonhorton.com


By:    /s/ Stephen Casey
       Stephen Casey, Esq.
       Texas Bar No. 24065015
       stephen@caseylawoffice.us

20