IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(AUSTIN DIVISION)

| | | |
|---|---|---|
| JEREMY STORY, | | |
| | *Plaintiff*, | Case No. 1:22-cv-00448-DAE |
| v. | | |
| SUPERINTENDENT HAFEDH AZAIEZ, et al., | | |
| | *Defendants.* | |

### PLAINTIFF JEREMY STORY'S RESPONSE TO DEFENDANTS AMY WIER'S, MILTON POPE'S, AND FRANK PONTILLO'S AMENDED MOTION FOR SUMMARY JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 56

Plaintiff Jeremy Story ("Plaintiff") files this Response to the Motion for Summary Judgment filed by Defendants Amy Weir, Milton Pope, and Frank Pontillo. For the reasons set forth below, the Defendants' motion should be denied in its entirety.

### I.      Introduction

This case arises from the unconstitutional silencing and retaliatory arrest of a citizen for speaking at public school board meetings. The Defendants seek summary judgment by presenting a version of events that is "blatantly contradicted" by the objective video recordings of the August 16, 2021, and September 14, 2021, meetings. Under the standard set by the Supreme Court in *Scott v. Harris*, this Court must view the facts in the light depicted by the video evidence and cannot accept the Defendants' characterization of Plaintiff's conduct as "disruptive" when the recordings show he was peaceful even after the Board cut off his microphone. 550 U.S. 372, 380-81 (2007). Furthermore, under the recent Supreme Court decision in *Gonzalez v. Trevino*, Plaintiff has met his burden of proof because he has provided objective evidence that other individuals who engaged in similar conduct were not arrested.

*Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024).

## II.    Statement of Facts

Plaintiff's Statement of Fact aligns with the objective video evidence.

On August 16, the RRISD Board of Trustees held a board meeting. The agenda items thus included employee sick leave regarding COVID-19 and Exec. Order GA-38.[1] When allowed, Story stated:

> "Today I speak on the rule of law, I don't envy your choice today. I trust that most people value each other even though they are on different sides of the issue, I also understand the seriousness of the COVID epidemic. I understand the rule of law, yet several members of this board and Superintendent have another utter disregard for the rule of law. Today you are considering thwarting the Governor's order and the legislature and the Supreme Court of Texas. This will result in tremendous fines to the district. Even today, you violated the rule of law by putting officers in the back of this room in the difficult position of being asked to illegally enforce a last-minute violation of the Open Meetings Act. An agenda item today includes a resolution which includes 80% of the text concerning itself with the safety of public employees and students. The resolutions being considered today include statements like, "the Board of trustees has a substantial public interest in protecting the health and safety of students and community." It talks about "supervision of the Superintendent" and even other things related to public health and public safety. Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our Superintendent has a protective order filed against him. . . ."[2]

But as soon as Story mentioned this protective order, he was interrupted again by Weir and then by RRISD Police Officers Milton Pope and Frank Pontillo, who, in conjunction with Weir, approached Story from behind, grabbed his arms, and dragged him out of the meeting. *Id.*

Other speakers spoke on the same theme prior to Story but used different examples. These speakers were treated unequally and with more latitude on the boundaries of their

---

[1] Exh. 2.
[2] Exh. 5, Time 2:47:18.

commentary than Story. For example:

Elaine Lee stated: "I'm here to remind you that Senator Cruz who poses as a freedom fighter in front of the camera chooses to send his children to a private school that has a mask mandate. A public health measure that he would ridicule as communism or tyranny.  These politicians tell us that refusing masks and vaccines is what freedom looks like in the middle of a deadly pandemic. Why should anyone trust their stage rhetoric over advice from registered health care professionals? The rich and powerful protect their children with private schools while playing political games abusing their power to prevent our children from getting that same protection in public schools" Ms. Lee was not chastised nor cut-off while speaking.[3]

Catherine Wrightmire stated, after speaking briefly on masks: "And I just want to say that there's also a psychological component to all of this. Pertaining to the fear and the effect of the pandemic as it's portrayed in the media. And also, data that's presented to us. and I just want to encourage the audience and the board as homework to consider taking a look at a very famous book. Perhaps you've read it, Frederick Douglass talking of my bondage and my freedom, he was a slave. There's a slave mentality, there's a slaveholder's mentality. And this was prior, he wrote this prior to the Civil War and was an abolition abolitionist [sic] prior to the Civil War. But there's psychological things to think about if you take a look at this book. Thank you very much." Ms. Wrightmire was not chastised nor cut-off.[4]

Don Zimmerman stated: "I'm going to jump to the point here 'cause, all of you know as adults, lots of times when you have arguments and fights, you're really not arguing about the thing you're arguing about.  You're arguing about something much, much bigger. This mask

---

[3] Exh. 5, Time 1:07:38.
[4] Exh. 5, Time 1:05:40.

mandate is not about safety, It's not about health, It's about a crazed monopoly. Government school that thinks that it's God, and it can save us from disease and death. So let me make something really very clear to you. There's one perfect man who ever lived on this earth. His name was Jesus of Nazareth. This man. Healed the sick. He roused people from the dead. He walked on water, even when it was not sufficiently frozen. He's a miracle worker, and he is mankind's only hope to be saved. From probable disease and from absolutely certain death. So what I'm going to say to this school district - stop trying to play God. You are not God. You cannot save anyone from disease and death. You can't add one hour to anybody's life. No matter what kind of draconian rules and laws that you pass in the name of safety and public health. I'm really fed up with the self-righteousness and hypocrisy of government all over this country, from Washington DC right down to the school board. If somebody needs to wear a mask, that's a decision between them and their physician, and they're capable of making that decision. They have every right to wear a mask, and some people need to. For the rest of us, stop playing God, and get over your power trip." Mr. Zimmerman was not chastised or cut-off. [5]

Jennifer White stated: "But while we're talking about child safety 'cause a lot of people did, let's talk safety. I'm in fear for my daughters. Because the Superintendent, he assaulted a pregnant girl." Ms. White was prevented from speaking further, and other board members spoke over her, but she was not assaulted by RRISD police or removed, though she attempted to keep speaking after she was told to cease speaking.[6]

Jason Schklar stated: "And finally, this is hard to say, but I feel like it's important. As we came to order, we had a trustee protest that she couldn't pack the meeting room with her riotous,

---

[5] Exh. 5, Time 1:36:18.
[6] Exh. 5, Time 2:25:18.

unmasked posse of supporters. I want to respect the decorum of this meeting and the diversity of opinions expressed here, but I've got to say that it's frightening. It's frightening to see how a couple of members of Q Anon have infiltrated our school board. Either that, or they see it as politically expedient to align with them. You are content. You are content to let the country burn as you laugh at how fun it is to…."[7] Mr. Schklar was interrupted only long after his verbal assault on specific board members had been launched.

Renata Sims stated: "I would like for this board to show equal regard to all safety concerns parents bring to them, including the one I voiced to you repeatedly regarding the current protective order filed against our Superintendent for alleged family violence mask. Related concerns deserve a hearing, but so do criminal allegations against the only employee. This board is in charge of supervising. Please address all...." Ms. Sims was interrupted and cut-off but was not removed from the room.[8]

At other times in the meeting, other speakers disrupt the proceeding but were not addressed.[9]

On September 17, 2021, a warrant was issued charging Story with Hindering Proceedings by Disorderly Conduct under Texas Penal Code § 38.13.[10] The warrant affidavit, signed by Officer Lauren Griffith, described Story as having engaged in "several outbursts," continued verbal outbursts after warnings, and yelling and screaming that caused a major disruption.[11] The August 16 recording captures the interaction described in the affidavit.

Superintendent Hafedh Azaiez was the direct supervisor of Chief Jeffrey Yarbrough, who

---

[7] Exh. 5, Time 3:01:52.
[8] Exh. 5, Time 1:33:55.
[9] Exh. 5, Time 1:29:27.
[10] Exh. 11.
[11] Exh. 11.

testified he oversaw the RRISD Police Department.[12] Azaiez testified that he held regular one-on-one meetings with the Chief and that the Chief reported directly to him.[13] Story's remarks at the August 16 meeting included criticism directed at Azaiez.[14] Azaiez denies directing or discussing Story's arrest with the Chief.[15]

Story was the only speaker from the August 16 meeting who was physically removed and later charged with a criminal offense.

### III. Summary Judgment Standard

Summary judgment is appropriate only if the movant demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The burden rests initially on the moving party to identify the portions of the record that it contends establish the absence of a genuine issue of material fact. Once that burden is met, the nonmovant must designate specific evidence showing that there is a genuine dispute for trial. In evaluating the motion, the Court must view all evidence and draw all reasonable inferences in favor of the nonmovant, and it may not make credibility determinations or weigh competing evidence. However, where objective video evidence exists and "blatantly contradict[s]" a party's version of events such that no reasonable jury could believe it, the Court must view the facts in the light depicted by the recording itself. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

Thus, this Court's task is not to credit post hoc characterizations of the events, but to determine whether the undisputed video record creates or forecloses a genuine issue of material

---

[12] Exh. 22 at pg. 37ff.
[13] Exh. 22 at pg. 112-117
[14] *Id.*
[15] *Id.*

fact. That principle controls here: the RRISD video recordings of the August 16 meeting and subsequent encounters are dispositive when they conflict with later characterizations or testimony.

## IV.    Argument

This case presents a circumstance increasingly common in modern constitutional litigation: the dispositive events were recorded. This case is controlled by the Supreme Court's directive in *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Where objective video evidence "blatantly contradict[s]" a party's version of events such that no reasonable jury could believe it, a court may not adopt that version for purposes of summary judgment. *Id*.

The Fifth Circuit consistently applies this rule, instructing district courts to "view the facts in the light depicted by the videotape." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); see also *Hanks v. Rogers*, 853 F.3d 738, 742 (5th Cir. 2017); *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018). Even in the qualified immunity context, courts may not credit factual assertions that are "blatantly contradicted" or "utterly discredited" by video evidence. *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015).

Defendants' motion depends on characterizing Story as "disruptive," engaging in "outbursts," and "hindering" the proceedings. Those characterizations are not facts; they are conclusions. The August 16 recording controls. Under *Scott*, the Court must reject narrative embellishments that conflict with what the video depicts. Because Defendants' legal arguments rest on a version of events contradicted by the recording, Rule 56 does not permit summary judgment.

7

### A.    The Video Record Controls Under Scott v. Harris and Forecloses Defendants' Narrative "Disruption" Facts.

This case is the paradigm *Scott v. Harris* case: the dispositive events were recorded, and the defense motion depends on characterizations—"outbursts," "yelling and screaming," "major disruption"—that are not facts but conclusions. Where objective video "blatantly contradict[s]" a party's version of events such that no reasonable jury could believe it, the Court must view the facts "in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

The Fifth Circuit applies Scott repeatedly, including in qualified immunity cases, directing district courts to reject post hoc narrative embellishments when the recording resolves what occurred. *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011); *Hanks v. Rogers*, 853 F.3d 738, 742 (5th Cir. 2017); *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018); *Curran v. Aleshire*, 800 F.3d 656, 664 (5th Cir. 2015).

Here, Defendants' motion stands or falls on their effort to transform ordinary disagreement with the chair's decision and the content of Story's remarks into "disruption" and "hindering proceedings." But the August 16 video (Exh. 5, Exh. 6) supplies the Court with the best evidence of whether Story was peaceful, whether he physically interfered with meeting operations, and whether there were "several outbursts" and "screaming and yelling" as later claimed.

And the record concessions in Defendants' own depositions—Pope's definition of "outburst" as "talking over the chair," and his admission that Story's louder voice occurred only after the microphone was cut (Exh. 19 at pg. 132, ll. 1–13; pg. 120, ll. 4–13; pg. 172, ll. 10–18)—strip away the defense's attempt to create a "disruption" fact issue by substituting labels for what the video shows. Under *Scott*, the Court is not permitted to adopt an embellished

"disruption" narrative if it conflicts with the objective recording and sworn admissions about what actually occurred.

Just as importantly, Scott's rule does not merely defeat Defendants' affirmative "no dispute" argument; it also flips the Rule 56 burden: where Defendants claim the "indisputable video" proves Story was disruptive, the Court must test that assertion against what the recording depicts—not against characterizations that assume the legal conclusion (disruption/hindering). Because Defendants' legal arguments depend on those characterizations as predicates (e.g., "unprotected speech," "reasonable seizure," "probable cause," "qualified immunity"), Defendants cannot obtain summary judgment if the recording and admissions show Story did not physically disrupt the meeting and that any louder speech followed the chair's decision to cut his microphone and order removal. This Court's role at summary judgment is not to credit Defendants' preferred adjectives; it is to decide whether the video-controlled record creates a genuine dispute as to material facts and whether Defendants are entitled to judgment as a matter of law. It does not.

**B.      *Story's Speech Was Germane to the Posted "Health and Safety / Supervision" Topics—And At Minimum, the "Off-Topic" Determination Is a Jury Question.***

Defendants' entire "speech became unprotected" argument relies on the premise that Story's remarks were plainly off-topic as a matter of law. The record is more concrete and more nuanced. Story's remarks did not begin with the protective order; they began with the rule of law and the Board's own action items on COVID policy and "health and safety," and they expressly referenced that the agenda included a resolution with extensive text "concerning itself with the safety of public employees and students," public health, public safety, and "supervision of the Superintendent."

On August 16, Story read from, and tied his remarks to, the Board's own resolution framing of health and safety—then used the Superintendent's protective order as his example of why the Board's asserted "health and safety" rationale was political and hypocritical. That is an argument about "safety" and leadership integrity in a meeting devoted to "health and safety protocols" and the Board's supervision function; it is not a topic switch to an unrelated subject.

Indeed, Defendants' own witnesses conceded the relevance of contextual analogies. Dr. Azaiez acknowledged Elaine Lee's Ted Cruz reference had to be heard in full context to understand its relation to COVID (Exh. 22, pg. 75, ll. 14–17ff). Griffith acknowledged Don Zimmerman's statements about Jesus of Nazareth were on topic when heard in context (Exh. 20, pg. 124, ll. 4–24). Pope acknowledged the Frederick Douglass analogy was "fair," even if he believed it "didn't make any sense" (Exh. 19, pg. 159, ll. 10–25). Chief Yarbrough agreed analogies can be used to call out hypocrisy in leadership and that other speakers spoke by analogy on August 16 (Exh. 21, pg. 83, ln. 23 – pg. 87, ln. 7; pg. 193, ln. 7 – pg. 194, ln. 18). And Azaiez admitted that from Story's perspective it was at least partly reasonable to raise the protective order as a safety concern in a meeting about COVID "health and safety" (Exh. 22 at pg. 98, ll. 7–18). These concessions are incompatible with Defendants' attempt to treat Story's analogy as categorically "off-topic" while treating the other analogies as "contextually on topic."

Even if Defendants insist Story's protective-order reference was "off-topic," that does not entitle them to summary judgment because the very act of determining "germaneness" was applied inconsistently across speakers, and the record establishes a factual dispute about whether Story's analogy fit within the same "safety" frame permitted for other speakers. The record is undisputed that multiple speakers used external references—Ted Cruz (Elaine Lee), Frederick Douglass (Catherine Wrightmire), Jesus of Nazareth (Don Zimmerman), Q-Anon infiltration

(Jason Schklar), and accusations about the Superintendent (Jennifer White; Renata Sims)—to advance their views on safety and COVID policy without being physically seized and removed. And Defendants' witnesses repeatedly admitted the necessity of context to determine whether such analogies relate to the meeting's topic. That is fatal to Defendants' "off-topic as a matter of law" position: if "context is required," and the record shows Story was stopped mid-analogy and mid-context, then the "off-topic" conclusion is not a clean legal predicate on summary judgment—it is a jury question intertwined with motive, neutrality, and the real reason for enforcement.

### C.    The Board and Officers Applied a Speaker-Rule Differentially: Viewpoint Discrimination Is the Best Fit for the Objective Pattern.

Viewpoint discrimination occurs when the government targets not the subject matter, but a particular view taken by speakers on a subject—when "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Because it is the most egregious form of content discrimination, it is presumptively unconstitutional. *Rosenberger*, 515 U.S. at 829–30; *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230–31 (2015). And it is black-letter law that government may not suppress speech simply because some find it offensive. *Matal v. Tam*, 582 U.S. 218, 244 (2017) (*quoting Street v. New York*, 394 U.S. 576, 592 (1969)); *see also Iancu v. Brunetti*, 588 U.S. 388, 401 (2019).

The record here supplies exactly the kind of objective comparator evidence that makes viewpoint discrimination provable without speculation: multiple speakers used analogies and sharp rhetoric; some accused public officials of hypocrisy; some attacked specific public figures; some referenced the Superintendent's alleged misconduct. The record contains examples of

11

speakers who ranged widely and offensively—yet were not physically removed. Elaine Lee invoked Ted Cruz and accused politicians of playing games with children's safety; she was not cut off.[16] Catherine Wrightmire invoked Frederick Douglass, slavery, and a "slaveholder's mentality"; she was not cut off.[17] Don Zimmerman invoked Jesus of Nazareth, accused the board of a "crazed monopoly," told them to "stop trying to play God," and called their rules "draconian"; he was not cut off.[18] Jason Schklar accused board members of being "members of Q Anon" and described their supporters as "riotous"; he was interrupted only "long after" his verbal assault began.[19] Renata Sims referenced the protective order against the Superintendent as a concern that deserved a hearing; she was cut off but not seized.[20] These are not marginal differences. They show that speakers were permitted to use loaded analogies, personal accusations, and inflammatory rhetoric in service of their "safety" arguments—until Story used the Superintendent's protective order as his example of hypocrisy and leadership failure.[21]

The record then supplies further objective proof that Story was singled out not because "off-topic rules exist," but because of his viewpoint and target. Story's fault, as he explained, was that he used the Superintendent as the analogy—arguing the Board's "safety" posture was political and hypocritical because they had an alleged abuser as Superintendent.[22] That viewpoint—directly criticizing the Superintendent and the Board for hypocrisy in leadership and safety—was the specific motivating perspective that triggered the cutoff and physical removal. Defendants' own witnesses provided admissions that reinforce, rather than refute, this

---

[16] Exh. 5, Time 1:07:38.
[17] Exh. 5, Time 1:05:40.
[18] Exh. 5, Time 1:36:18.
[19] Exh. 5, Time 2:25:18.
[20] Exh. 5, Time 3:01:52.
[21] Exh. 5, Time 2:47:18.
[22] Exh. 23, ¶¶ 13-15, 21-39.

conclusion. Azaiez admitted the analogy could be perceived as safety-related (Exh. 22 at pg. 98, ll. 7–18) and admitted applying different standards to different speakers can be perceived as unequal treatment of constitutional rights (Exh. 22 at pg. 110, ll. 11–17, 18–23). He further acknowledged other speakers used his personal conduct and accusations of assault as part of their analogies and were not removed while Story was (Exh. 22 at pg. 77, ll. 14–22; pg. 72, ll. 7–21). When those admissions are paired with the objective comparator evidence, the inference is not conjectural; it is grounded: Story was silenced and seized because his viewpoint—criticizing the Superintendent and Board hypocrisy via the protective order—was treated differently than other similarly pointed analogies.

> **D.** **_No Reasonable Officer Could Conclude Story Violated Texas Penal Code §_** **_38.13 Based on This Record; Defendants' "Probable Cause / Disruption"_** **_Premise Collapses Under Their Own Admissions._**

Defendants' motion attempts to bootstrap everything—removal, seizure, later warrant— into a single asserted "disruption" and "hindering proceedings" narrative. But the record and admissions undercut the statutory premise. Chief Yarbrough testified that "just going off topic alone is not" an arrestable violation: "Q. …if at that point any speaker goes off topic, is that an arrestable violation? A. Just going off topic alone is not." (Exh. 21 at pg. 100, ll. 11–13). That concession matters because Defendants' theory repeatedly equates "off topic" with "criminal hindering," yet their own police chief draws the opposite line: off-topic speech, standing alone, is not a Penal Code violation. Their own officers likewise framed "outbursts" in a way that does not meet Defendants' later "screaming/yelling major disruption" story. Pope conceded that the dispute over "on topic/off topic" occurred before any alleged raised voice (Exh. 19 at pg. 172, ll. 10–18), and he admitted Story's "outbursts" consisted of sounding louder after the mic was cut—i.e., after the chair had already acted to silence him and order removal (Exh. 19 at pg. 120,

ll. 4–13; pg. 132, ll. 1–13). Pope's own definition of "outburst" as "talking over the chair" (Exh. 19 at pg. 132, ll. 1–13) is particularly damaging to the Defendants' "hindering proceedings" theory because it reveals that the supposed "disruption" is being defined expansively to encompass the very speech disagreement at issue—rather than a physical interference, tumultuous conduct, or sustained noise that actually prevents proceedings from continuing.

The objective record also rebuts the "several outbursts / repeated disruptions" story at its foundation. Plaintiff's position is straightforward: there is no video evidence of "prior disruptions," "repeated disruptions," or "screaming and yelling" by Story during the August 16 meeting; the recording captures the entire meeting audio/video, and Defendants cannot point to the alleged repeated events because they did not occur.

The defense motion's reliance on "several outbursts" thus becomes a credibility play by labeling the conduct rather than showing it. And Rule 56 does not permit that. If Defendants contend the statutory elements were met, they must identify record evidence of actual hindering conduct, not rely on a word like "outburst" that their own officer defines as "talking over the chair." More importantly, even Defendants' witnesses admitted other speakers were not physically disruptive or threatening to safety when making analogies and criticisms, yet only Story was seized (Exh. 21 at pg. 100, ll. 14–25; pg. 375, ll. 19–25; Exh. 19 at pg. 49, ll. 1–11; Exh. 22 at pg. 72, ll. 19–22; pg. 77, ll. 19–25). That destroys any attempt to treat this as a neutral, objective "criminal" enforcement episode. On this record, a reasonable jury could conclude there was no reasonable suspicion—let alone probable cause—of a § 38.13 violation at the moment of seizure, because the "disruption" asserted was either nonexistent (no repeated disruptions on video) or is being defined to swallow protected disagreement (talking over the chair / louder voice after mic cutoff).

### E. The Warrant and "Independent Intermediary" Narrative Do Not Eliminate Fact Issues Because the Affidavit's Core "Disruption" Facts Were Provided by Pope and Are Contradicted by the Video and by the Record.

Defendants rely on a warrant affidavit narrative that described Story as having "several outbursts," continued verbal outbursts after warnings, and yelling and screaming that caused a major disruption, and they attempt to convert those claims into dispositive facts.[23] But this record provides a basis for a jury to conclude that those characterizations were not independently verified and were materially dependent on Pope's framing rather than objective fact.

The affidavit's key language—Story was "off topic" and had "several outbursts"—was presented as information "provided… from Pope, a credible person," not as independently verified facts; Griffith's own testimony confirms the sourcing problem (Exh. 20, at pg. 61, ll. 10–17, 19–25; pg. 69, ll. 18–25; pg. 51, ll. 14–25). That matters because Griffith—not Pope—attested to probable cause when she signed (Exh. 20 at pg. 146, ll. 19–25; pg. 147, ll.1–3). And where the affidavit's "disruption" facts are dependent on a source whose own deposition defines "outburst" as talking over the chair and admits louder speech occurred only after the mic was cut (Exh. 19 at pg. 132, ll. 1–13; pg. 120, ll. 4–13), a reasonable jury can find that the affidavit's dramatic descriptors ("several outbursts," "screaming and yelling," "major disruption") were at minimum exaggerated and at worst materially misleading when compared against the video and admissions.

Equally important for Rule 56: even if Defendants invoke an "independent intermediary" theory, that does not erase factual disputes about what information was provided and whether it was accurate in substance. Plaintiff's record position is that there is no recording evidence of repeated disruptions or "screaming and yelling," and that Defendants cannot point to them

---

[23] Exh. 11.

because the video depicts otherwise. That dispute alone precludes summary judgment on a theory that assumes the affidavit's characterizations are unquestionably true.

Moreover, the record evidence shows that the only physically seized speaker on August 16 was Story and that other speakers made similarly charged and even more inflammatory accusations without arrest or removal. That context—objective comparator evidence of differential enforcement—directly bears on whether the affidavit narrative (and later warrant) arose from neutral enforcement or viewpoint-based escalation. Rule 56 does not allow Defendants to use the existence of a warrant to resolve contested factual predicates where the affidavit's core factual claims ("repeated outbursts," "major disruption") are controverted by video and admissions and where the record supplies a basis to find that the narrative was sourced from Pope rather than independently grounded.

> **F.    Heaney Does Not Immunize Pope and Pontillo Here; Their Own Testimony Shows Discretion, Knowledge of the Need for Independent Judgment, and That the Alleged "Disruption" Post-Dated the Unconstitutional Cutoff.**

Defendants invoke *Heaney v. Roberts* to argue officers are immune when they remove a speaker at the presiding officer's direction. But Defendants' attempt to make *Heaney* dispositive fails on this record for three separate reasons: (1) Pope's and Pontillo's own testimony shows the removal was not purely ministerial; it was discretionary and required independent legal judgment; (2) the alleged "outbursts" or loud speech post-dated the cutoff, meaning the seizure flowed from an unconstitutional silencing rather than a neutral response to disruption; and (3) the record includes admissions that other similarly analogical speakers were not seized, supporting a viewpoint discrimination inference that takes this case outside *Heaney*'s shelter.

First, Pope admitted the decision-making was not robotic. He testified he does not take direction from school board members (Exh. 19 at pg. 23, ll. 21–23). He acknowledged that if the

16

board president told him to remove a person, "it would depend" (Exh. 19 at pg. 26, ln. 25). That is an admission of discretion—precisely what triggers constitutional duty to think independently rather than blindly follow unconstitutional directives. And Chief Yarbrough reinforced that duty: officers must develop their own reasonable suspicion and probable cause, not simply obey a superintendent's desire to enforce policy (Exh. 21 at pg. 60, ll. 1–7, 16–19; contra Exh. 19 at pg. 167, ln. 23 – pg. 168, ln. 17; Exh. 21 at pg. 100, ll. 11–13; contra Exh. 19 at pg. 176, ln. 18 – 177, ln. 6). *Heaney* does not create a constitutional "free pass" for officers to execute unconstitutional removals whenever a chair requests it; qualified immunity protects reasonable mistakes, not the abandonment of independent judgment where the law is clearly established and the conduct is plainly viewpoint-discriminatory.

Second, the record undercuts Defendants' attempt to treat "disruption" as the reason for removal. Pope confirmed that the "on topic/off topic" dispute occurred before any alleged raised voice (Exh. 19 at pg. 172, ll. 10–18) and admitted Story's "outbursts" consisted of sounding louder after the mic was cut—after the chair had already acted to silence him and direct removal (Exh. 19 at pg. 120, ll. 4–13; pg. 132, ll. 1–13). That is crucial: if the supposed "outburst" is merely a louder voice after being cut off, it cannot retroactively justify the initial unconstitutional cutoff and seizure. *Heaney* does not immunize officers who seize a speaker in the very act of implementing viewpoint discrimination and then point to the speaker's post-cutoff reaction as the "disruption" basis.

Third, Defendants' own witnesses conceded the permissibility and commonality of analogies and sharp rhetoric by other speakers—without seizure. Azaiez admitted other speakers used accusations about him and were not removed while Story was (Exh. 22 at pg. 77, ll. 14–22; pg. 72, ll. 7–21). Pope acknowledged analogy use was fair (Exh. 19 at pg. 159, ll. 10–25) and

17

recognized that people can say things you "don't like" and not be arrested (Exh. 19 at pg. 49, ll. 1–11). Those admissions are inconsistent with a *Heaney*-like scenario in which officers reasonably respond to objective disruption. Here, the record supports a conclusion that the "trigger" was Story's viewpoint—criticism of the Superintendent and Board hypocrisy— followed by the chair's cutoff and directive to remove. That takes this case outside the narrow space where officers can claim they had "no reason to believe" they were violating a speaker's First Amendment rights.

> ### G.     *Clearly Established Law and Objective Comparator Evidence (Including Gonzalez v. Trevino) Defeat Qualified Immunity; This Record Does Not Require "Trust"—It Supplies Proof.*

Qualified immunity is not an evidentiary presumption in favor of the government; it is a legal doctrine that protects officials who make reasonable mistakes in the face of unclear law. It does not protect "the plainly incompetent" or those who knowingly violate the law. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The core right at issue—freedom from viewpoint discrimination in a limited public forum—has been clearly established for decades. *Rosenberger*, 515 U.S. at 829–31; *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001); *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 758–59 (5th Cir. 2010). The principle that the government may not suppress speech because it finds it offensive is likewise long-settled. *Matal*, 582 U.S. at 244; *Street*, 394 U.S. at 592. And the principle that a court may not credit a factual narrative "utterly discredited" by video evidence at summary judgment is also clearly established. *Scott*, 550 U.S. at 380–81; *Carnaby*, 636 F.3d at 187; *Curran*, 800 F.3d at 664.

Under those authorities, Defendants cannot convert a disputed "germaneness" call into a categorical "unprotected speech" holding, cannot justify a seizure by labeling disagreement as

"disruption," and cannot obtain qualified immunity where the objective record supports an inference of viewpoint discrimination.

Defendant Weir should know the law. She has chaired multiple board meetings in Round Rock ISD and is charged with knowing the law. The video evidence is clear. She permitted multiple speakers to range wide and free but silenced Story and directed his removal. This was unlawful viewpoint discrimination and an unlawful seizure at her direction.

Defendant Pope should know the law. He admits (1) he had to put thought into his actions, but (2) at the same time he did not know the law. Pope confirmed he had to independently think about constitutional rights in his deposition. He stated he does not take direction from school board members. Exh. 19 at pg. 23, ll. 21-23. He then stated if the board president told him to remove a person, it would depend. *Id.* at pg. 26, ln. 25. In other words, it's not robotic, but discretionary.

Pontillo's actions land in the same space. He is a public official charged with knowing the law. His actions were alongside Pope's actions were solely *after* Story's viewpoint protected speech was violated.

This may have seemed unusual or unique to these persons, but it is not when compared to the long-standing law against viewpoint discrimination.

None of the Defendants coherently applied these principles as constitutional law, despite decades of clearly established Supreme Court authority. Qualified immunity should be denied, and Defendants' summary judgment motion should be denied.

CONCLUSION

Because the video evidence contradicts the Defendants' claims of disruption, and because Plaintiff has provided objective evidence of viewpoint discrimination, the Defendants' Motion

for Summary Judgment must be denied.

CASEY LAW OFFICE, P.C.
P.O. Box 2451
Round Rock, Texas 78680
Telephone: (512) 257-1324
Fax: (512) 853-4098


By   /s/ Stephen Casey
     Stephen Casey, Esq.
     Texas Bar No. 24065015
     stephen@caseylawoffice.us

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2026, a true and correct copy of the above and foregoing *Motion for Summary Judgment* was served via electronic means to counsel for Defendants:

THOMPSON & HORTON LLP
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

Kathryn E. Long
State Bar No. 24041679
klong@thompsonhorton.com
K. Adam Rothey
State Bar No. 24051274
arothey@thompsonhorton.com
Ibrahim Yaseen
State Bar No. 24137674
iyaseen@thompsonhorton.com

By:   /s/ Stephen Casey
      Stephen Casey, Esq.
      Texas Bar No. 24065015
      stephen@caseylawoffice.us