IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS − AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY,<br><br>    *Plaintiffs*,<br><br>v.<br><br>SUPERINTENDENT HAFEDH AZAIEZ, TRUSTEES AMBER FELLER, TIFFANIE HARRISON, AMY WEIR, JUN XIAO, CORY VESSA; OFFICERS JEFFREY YARBROUGH, JAMES WILLIBY, DEBORAH GRIFFITH, MILTON POPE, FRANK PONTILLO, RON COLE, CHIEF DENNIS WEINER, and CARLA AMACHER, individually, and ROUND ROCK INDEP. SCHOOL DISTRICT,<br><br>    *Defendants*. | § § § § § § § § § § § § § § § § § | CIVIL ACTION NO.<br>1:22-cv-00448-DAE |

**DEFENDANTS DR. HAFEDH AZAIEZ, JEFFREY YARBROUGH, AND LAUREN GRIFFITH'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for the Round Rock ISD Defendants*

Story's Response (Dkt. 139) does not raise a material fact issue that Story engaged in protected speech, that there was an absence of probable cause for his arrest, or that an exception applies to disallow the independent intermediary doctrine or existence of probable cause to bar his retaliatory and false arrest claims. Even if Story did raise a fact issue, he has not shown that Azaiez's, Yarbrough's, or Griffith's conduct was objectively unreasonable in light of clearly established law to overcome their qualified immunity. Accordingly, the Court should grant summary judgment on all Story's claims.

## I.    There is no evidence that Azaiez had any role in Story's arrest to maintain a claim.

Story provides no objective evidence that Azaiez was involved, in any way, in Story's arrest or the decision to pursue his arrest. Story argues that a jury could conclude, based on Azaiez's general supervision of Yarbrough, that Azaiez was involved in Story's arrest. Dkt. 139 at 8-10. But Story is required to submit *evidence* to defeat summary judgment; his subjective belief or surmise is insufficient. *See Peavy v. Dall. Indep. Sch. Dist.*, 57 F. Supp. 2d 382, 389 (N.D. Tex. 1999). His entire argument in support of a claim against Azaiez is nothing more than guesswork or speculation.

Moreover, the undisputed evidence is that Yarbrough never told Azaiez that they were preparing an arrest affidavit, and Azaiez was not involved in any way in the Warrant Affidavit or Story's arrest. App. 173, ¶¶ 33–36; App. 387–88, 391–94 at 90:17–91:23, 92:13–93:2, 105:5–8, 105;17–106:3, 112:13–16, 117:8–16. Indeed, Story ignores Yarbrough, Griffith, and others' testimony that Azaiez had no involvement in Story's arrest. App. 149–50, 152, ¶¶ 40, 52; App. 48–50, ¶¶ 40, 45. When weighed against this undisputed sworn testimony from Azaiez, Yarbrough, and Griffith, Story's unsupported assumption about what Azaiez and Yarbrough *may* have discussed is insufficient to raise a material fact issue to defeat summary judgment. The Court should, therefore, grant summary judgment on Story's First Amendment retaliation claim against Azaiez.[1]

---

[1]    The Response suggests that Azaiez is liable "as a supervisor," Dkt. 139 at 9, but there is no supervisor liability claim asserted against Azaiez. Dkt. 49.

**II.    The video evidence supports Defendants' characterization of Story's behavior.**

Story claims that *Scott v. Harris* requires that Defendants' motion be denied. 550 U.S. 372, 280–81 (2007); Dkt. 139 at 7. It does no such thing. Applying the rule from *Scott* regarding video evidence actually leads to judgment against Story, whose position is unsupported and conclusory. Defendants' Motion pointed to specific time stamps in the videos that show Story:

- Shouted out across the room when a Trustee asked Weir if people were not being allowed in the meeting (Dkt. 130 at 4 (citing App. 93));

- Yelled out "it's germane" more than once, and "it's on the agenda," when Weir directed Jennifer White to stop speaking off-topic, arguing for long enough that Weir told him "You have to stop. You will be asked to leave" (*Id.* at 5 (citing App. 279 at 2:26:37–2:27:07; App. 161 at 1:18–1:18:28));

- Repeatedly interrupted Weir when she warned him about speaking on off-topic matters (*Id.* (citing 2:47:31–2:47:58));

- Refused to stop speaking when told he was off-topic, raising his voice to be heard over the microphone (*Id.* at 11 (citing App. 279 at 2:48:49–2:49:09));

- Attempted to stand his ground when asked to leave, yelled, and resisted as Pope and Pontillo had to physically move him to the exit (*Id.* at 6 (citing App. 279 at 2:49:00–2:49:35; App. 94 at 0:40–1:02)); and,

- Continued to argue with Pope and Pontillo in the hallway and raised his voice as they walked through the overflow room while citizens were watching the video feed (*Id.* (citing App. 94 at 01:41–02:49)).

Story does not actually dispute that he did *any* of these things. And *his actions* and the *actions* of other people are the only thing that the videos are conclusive regarding. It is *not* conclusive as to whether his speech was off-topic and protected, whether his interpretation of the Texas Penal Code is accurate, whether any of his identified comparators are similarly situated under Fifth Circuit case law, or whether Defendants are entitled to qualified immunity.

Further, *Scott* is inapposite. *Scott*, 550 U.S. at 380–81. Here, Story is the one ignoring what the videos show and making conclusory statements without reference to any timestamps in the video of the Meeting, and without ever citing or acknowledging Pontillo's body camera footage. *See, e.g.* Dkt. 139 at 10–11. In sum, *Scott* and the video evidence do nothing to defeat summary judgment.

2

**III.    Story fails to show that he was engaged in protected speech or that Defendants' actions were viewpoint-based, which is essential to maintain all his claims.**

Story's arguments presume his speech was on-topic and, therefore, protected. But he cites no authority that the Court should credit his interpretation of the August 16th Meeting's second agenda item over the presiding officer's. By its plain terms, the agenda item was limited to "Fall 2021 COVID-19 Health and Safety Protocols." App. 227. Story wants this to mean that *any* comments related to public safety are allowed under the rules of the limited public forum. But he makes no attempt to support his broad interpretation.[2] Moreover, despite having access to the full recording of the August 16th Meeting, Story points to no other speaker who spoke on a non-COVID-19-related "public safety" issue and was allowed to continue speaking. Furthermore, Story does not even attempt to establish that Weir's narrower interpretation of the agenda item was viewpoint-based. To the contrary, he admits that she allowed speakers to criticize District leadership if they were doing so in the context of COVID-19 health and safety protocols. Dkt. 139 at 13. Story also fails to dispute or distinguish the legal authorities in Defendants' Motion (Dkt. 130) showing that, once he moved beyond the topic of COVID-19-related health and safety protocols, his speech was not protected and his removal was lawful. These failures are fatal to all his claims.[3]

Because Story does not raise a fact issue that his speech—both immediately before and after Weir cut him off—was protected, all his claims fail. And because reasonable officials could disagree on whether Story's speech was constitutionally-protected, Defendants enjoy qualified immunity.

---

[2]    Story points to no Board policy or other legal authority for the proposition that agenda items must be interpreted so broadly or that limiting modifiers are irrelevant to whether someone is speaking on an agenda item. He also does not point to any facts to suggest that RRISD Board meeting agenda items are normally interpreted in this manner.

[3]    Story argues that there was not probable cause for his arrest because "[t]alking over a chair after being silenced for viewpoint-based discrimination does not constitute criminal hindering." Dkt. 139 at 18. He alleges that Griffith's affidavit contained false statements because it did not reflect his characterization of the video evidence as showing "Story (1) talking on a topic he alleged was germane, (2) being unconstitutionally silenced when he began to give an analogy, (3) not being permitted to speak further, and (4) having his rights violated." *Id.* at 15. And his qualified immunity argument rests on the fact that "[t]he alleged 'outburst' occurred only after his microphone was cut and after he was told to cease speaking based on the content of his remarks." *Id.* at 18.

3

**IV.    Story's attempt to show a lack of probable cause ignores his actions and the law.**

    **A.    There is no support for Story's interpretation of Penal Code § 38.13.**

The existence of probable cause generally bars Story's claims. In an effort to overcome this bar, Story asserts that the "video evidence contradicts that he had several outbursts," but he does not address the outbursts shown in the video evidence cited in Defendants' Motion. *See supra*, p. 2. Story also claims that "no evidence exists of Story committing to speak off-topic" (Dkt. 139, p. 10), completely ignoring the evidence of his text messages with Trustee Weston (App. 353) and his speaker sign-in sheet (App. 102). Story cannot create a material fact issue by simply ignoring the evidence.

Story also applies the wrong legal standard. He asserts "nothing in the objective recording shows interruption of a lawful meeting by *unreasonable noise, fighting, violent or tumultuous behavior*, or refusal to comply with a lawful order supported by viewpoint-neutral rules." Dkt. 139 at 11 (emphasis added). But the Texas Penal Code makes it an offense to intentionally "hinder" an official proceeding by "noise"—not unreasonable noise—or "disturbance." TEX. PENAL CODE § 38.13. Applying the Texas Code Construction Act, courts look to the plain meaning of the terms in the statute. TEX. GOV'T CODE § 311.011. Here, the noise[4] was Story's own, admittedly raised, voice. Story's continued interruptions and refusal to leave when instructed to stop speaking interfered with Weir's ability to maintain an orderly meeting dedicated solely to the posted topics and fit squarely within the definition of disturbance.[5] *Cf.* Dkt. 13 (quoting *Lowery v. Jefferson Cnty. Bd. of Educ.*, 586 F.3d 427, 433 (6th Cir. 2009) (citations omitted)) ("Unstructured, chaotic school board meetings not only would be inefficient but also could deny other citizens the chance to make their voices heard."). And to hinder is: (1) "(Of

---

[4]    Noise is "[a] sound that is characteristic of a person, animal, or thing." NOISE, Oxford English Dictionary, https://www.oed.com/dictionary/noise_n?tab=meaning_and_use&tl=true#1368315490 (last visited Mar. 16, 2026).

[5]    A disturbance is an "act causing annoyance or disquiet, or interfering with a person's pursuit of a lawful occupation or the peace and order of a neighborhood, community, or meeting." DISTURBANCE, Black's Law Dictionary (12th ed. 2024); *see also* DISTURBANCE OF A PUBLIC MEETING, Black's Law Dictionary (12th ed. 2024) ("The "unlawful interference with the proceedings of a public assembly.").

progress) to slow or make difficult; to hamper"; (2) "To hold back"; or (3) "(Of action) to impede, delay, or prevent." HINDER, Black's Law Dictionary (12th ed. 2024). Story's behavior certainly hampered Weir's ability to keep order in the Meeting and delayed or held back her ability to move to the next speaker signed up for public comment.

While the case law interpreting Section 38.13 is limited, none of the eleven cases that Westlaw reports as citing the statute support Story's position. That shows that it was not clearly established at the time of the August 16th Meeting or the time of the Warrant Affidavit that Story's behavior did not violate the Penal Code. Further, *Phillips v. State* squarely contradicts Story's interpretation. No. 12-24-00267-CR, 2025 WL 2620379 (Tex. App.—Tyler Sept. 10, 2025). In *Phillips*, the appellant wandered off topic and, after being redirected to focus on the agenda items, he raised his voice and argued with the hearing officer. *Id.* As he returned to his seat, he called out to address the room and complain regarding his treatment. *Id.* at *1. When the chair stated that speakers must speak on an agenda item, Phillips called out to argue with the chair's interpretation of the agenda. Phillips was warned he would be removed if he continued his "outbursts," but he continued his outbursts and was removed, continuing to argue as he was. *Id.* at *2. On appeal from his conviction for hindering proceedings by disorderly conduct, Phillips argued, as Story does, that the chair "unlawfully and unconstitutionally interrupted his comment period," making the termination "void." And since his conduct occurred during his comment period, he argued he did not hinder the meeting. *Id.* at *5. The court rejected his argument and upheld the sufficiency of the evidence supporting his conviction. *Id.* Story's conduct is in a slightly different order. But both Phillips and Story refused to return to the posted topic, and both were removed from the room, arguing the entire time. App. 279 at 2:47:12–2:49:09; App. 94.

Story's conduct at the August 16th Meeting is also like his conduct at a subsequent meeting of the Williamson County Commissioners' Court where he was removed from the meeting. In that case, the Fifth Circuit upheld the dismissal of Story's viewpoint discrimination claim because he had "not

plausibly pleaded that he was treated differently from anyone" who engaged in "a sustained violation of the court's decorum rules." *Story v. Gravell*, No. 24-50646, 2025 WL 2602550, at *3 (5th Cir. Sept. 9, 2025).[6] The same is true here. Story's argument that there was no probable cause to believe he had violated the Texas Penal Code by hindering a meeting cannot survive this contrary authority.[7] And this contrary authority supports Defendants' entitlement to qualified immunity.

### B.    Story does not show that the *Nieves* exception applies.

The existence of probable cause for Story's arrest bars his retaliatory arrest claim, unless he presents "objective evidence that he was arrested when other similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves v. Barlett*, 587 U.S. 391, 402 (2019). Story has not done so. Story points to two categories of speakers in an attempt to show he was the target of viewpoint discrimination: some who spoke made "analogies" and were not cut off from speaking, and one who also criticized the Superintendent and was cut off, but not removed. Dkt. 139 at 12–13. But none of these speakers are "in all relevant respects alike." *Golden Glow Tanning Salon, Inc. v. City of Columbus, Miss.*, 52 F.4th 974, 978 (5th Cir. 2022).[8] Unlike Story, each of the three speakers that Story says used "analogies" did so to advocate for or against a mask mandate—a COVID-19 health and safety protocol.[9] Story spins his comments regarding the protective order as being an analogy about

---

[6]    Story argued that he "had not violated any rules of decorum," when he "politely told Gravell he had not ever been previously warned in the meeting as being disruptive," and "politely requested to stay" after being directed to leave. Appellant's Brief, *Story*, 2025 WL 2602550 (brief available at 2024 WL 4628218, at *23).

[7]    Story points to *Swartz c Insogna*, 704 F.3d 105 (2d Cir. 2013) for the proposition that "the government cannot manufacture a disorderly conduct charge from protected speech." Dkt. 139 at 17. But this case has no applicability here. There, the officers pulled a car over after a passenger had flashed his middle finger at them, which was protected speech. After that, they spoke to the passenger, who spoke in a normal tone of voice. *Swartz,* 704 F.3d at 110–11. He followed the directives they gave him, and they did not observe "any disruptive conduct, any threatening conduct, any shouting, or anything that risked a public disturbance," but they arrested him anyway. *Id.* at 111. This case might apply if the officers had removed one of the speakers who stopped speaking when directed to do so. Or maybe even if they had forcefully removed White even though she was voluntarily leaving. But it does not apply here, where there *was* disruptive conduct, shouting before and during removal, and a refusal to leave the meeting when directed to do so multiple times.

[8]    The differences between Story and the other speakers are discussed in more detail in Dkt. 138 at 8–10, which is incorporated herein by reference.

[9]    Wrightmire spoke to "support freedom from mask mandates," because she believed masks "promote fear" and lead to a "slave mentality" like the "bondage" Frederick Douglass wrote about. App. 279 at 1:05:40. Lee referenced Senator

6

"health and safety." Dkt. 139 at 15. But he implicitly admits they were not about "Fall 2021 COVID-19 Health and Safety Protocols"—which was the item on the agenda. App. 227. Because he spoke on a different topic, he was not similarly situated to these individuals in this relevant regard. Further, none of the speakers who raised the protective order, argued with Weir from the audience, interrupted her several times, or continued to yell their testimony after being directed to stop speaking off-topic.

Defendants attested to the differences between Story and his alleged comparators.[10] Notably, this testimony was taken after the Defendants were shown clips of the video or an unofficial transcript of it. But there is no evidence that Azaiez, Yarbrough, or Griffith were evaluating whether these speakers were on-topic during the Meeting itself or before pursuing Story's arrest based on his behavior throughout the Meeting. More importantly, neither the three speakers who used analogies to support or oppose the mask mandate, nor White (who, like Story, raised the protective order against Azaiez), spoke out of turn from the gallery, nor did they argue with the chair regarding the topic limits. Notably, White initially continued speaking after being warned to stop, but unlike Story, she walked away voluntarily after Weir directed the officers to remove her. App. 279 at 2:26:19–2:26:41; App. 7, ¶ 23; App. 114, ¶ 32. Story does not address, much less with reference to clearly established law, why his actions in continuing to speak after his microphone was turned off and in refusing to leave when directed to do so make his cited comparators similarly situated to him in all "relevant respects." Rather, just as in *Story v. Gravell*, "the uncontested video evidence . . . shows that Story engaged in an extended colloquy with [the presiding officer], all while being warned to discontinue the interruption," and there

---

Ted Cruz in the context of "advocating for a mask mandate." *Id.* at 1:07:38. And Zimmerman likened mask mandates to "playing God" because it was being justified as something that can "save us from disease and death." *Id.* at 1:36:20.

[10]    *See* App. 161 at 5:10–6:21, 6:55–7:37, 8:50–9:15 (Yarbrough); App. 448 at 77:11–78:9, 78:24–79:9, 79:24–80:4 (Griffith). Yarbrough stated that Lee and Wrightmire were speaking about the mask mandates (Dkt. 133-14 at 188:5–24, 187:25–188:25); Griffith testified she thought all three were speaking about COVID-19, but the presiding officer determined if someone was on-topic (Dkt. 133-13 at 113:17–20, 115:5, 115:15–16, 119:19–14, 122:13–16, 124:15–16); and Azaiez testified only that Lee was not cut-off, that Wrightmire did not immediately connect her analogy to COVID-19, and that Zimmerman was speaking about mask mandates (Dkt. 133-15 at 124:4–8, 125:15–19, 127:20–128:12).

is no evidence that Story "was treated differently from anyone who committed a *sustained* violation of the [Board]'s decorum rules." 2025 WL 2602550 at *3.

Story points to *Gonzales* to support his position that the *Nieves* exception applies here. Dkt. 139 at 11–12 (citing *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024)). But *Gonzalez* provides no guidance regarding when an identified comparator is similarly situated. Furthermore, *Gonzalez* assumes that others mishandled a government record and, therefore, that the absence of an arrest is evidence of selective enforcement. *Id.* Here, in contrast, there is evidence that neither Azaiez, Griffith, nor Yarbrough—nor any RRISD individual involved in Story's removal and arrest—had ever seen anyone previously disrupt an RRISD Board meeting through a sustained violation of the forum's rules of decorum, even after being directed to stop. App. 9 at ¶¶ 28, 38; App. 115, ¶¶ 31, 34; App. 202 at ¶¶ 48–55. And the video evidence shows that none of Story's chosen comparators engaged in such a sustained disruption.[11] In short, *Gonzalez* provides no support for Story's position.

> **C.**     **The arrest warrant did not contain any materially false statements or omissions.**

Story acknowledges that to avoid the independent intermediary doctrine the affiant must include "a false statement" that was (1) made "knowingly and intentionally, or with reckless disregard for the truth" and (2) "necessary to the finding of probable cause." *Franks v. Delaware*, 438 U.S. 154, 155 (1978); *see also United States v. Kendrick*, 980 F.3d 432 (5th Cir. 2020) (extending *Franks* to material omissions). But Story skips the first element. He does not say what statements are false, nor does he attempt to show how they were false. And he certainly doesn't point to any evidence showing that they were knowingly, intentionally, or recklessly false. Story's conclusions are not evidence and cannot raise a material issue of fact. *See United States v. Robinson*, 78 F.3d 172, 174 (5th Cir. 1996).

---

[11]     . *See* App. 279 at 1:05:40 (Wrightmire); *id.* at 1:07:38 (Lee); *id.* at 136:20 (Zimmerman); *id.* at 1:33::00–1:35:55 (Sims); *id.* at 2:26:19–2:26:41 (White leaving the microphone when Weir asked for her removal); *id.* at 1:29:23:–1:29:27 (Mosely raising her voice for the last two sentences of her comments regarding mask mandate);.*id.* at 3:02:09–3:02:27 (Schklar). Weir's undisputed testimony explains that because Schklar was testifying remotely, she could not herself mute his microphone; instead, she had to get the information to the technology personnel who had the ability to do so, which contributed to an approximately 10-second delay in cutting him off. App. 203 at ¶ 52.

Instead, Story jumps straight to the second element, rewriting the affidavit to fit his narrative. Dkt. 139 at 15–16. In doing so, he inserts his own post-hoc characterization of events, and some pf his added "material facts" are simply untrue. For example, he states that the recording does not show repeated verbal outbursts following multiple warnings, even though the videos clearly do. App. 279 at 2:26:37–2:27:07; App. 161 at 1:18–1:18:28; App. 279 at 2:48:49–2:49:35. He also asserts that "[t]he recording does not depict yelling or screaming," but does not address that his behavior, as reflected in the videos, meets the dictionary definitions of those terms. Dkt. 130 at 18. And, again, he tries to confine the video evidence to the public recording of the Meeting, which doesn't pick up his yelling after his microphone was cut off, and ignores Pontillo's body camera footage, which captures all of it. App. 94; App. 453 at 104:1; App. 46 at 109:8

Story also does not cite a case in which quibbling over "characterizations" was sufficient. Rather, *Franks* requires a showing of "deliberate falsehood or "reckless disregard for the truth." But, at most, Story has shown a dispute over the scope of the agenda topics or how his behavior should be characterized. He points to no evidence that Griffith or any of the other Defendants knew any public health and safety measure was "on topic" or that any characterization was made with reckless disregard for the truth. Indeed, their testimony shows the opposite.[12]

Further, Story provides no authority that all reasonable officers would know Story's interpretation of the agenda item controlled over the presiding officer's or that the use of descriptive terms in line with their dictionary definitions would make their statement knowingly, intentionally, or recklessly false. His failure to do so is fatal to his attempt to overcome qualified immunity. *Clarkston v. White*, 943 F.3d 988, 993 (5th Cir. 2019).

---

[12]   App. 046 at ¶ 35; App. 440 at 46:4–21, 57:22–58:15, 61:18–63:16; 66:12–19, 70:5–20, 74:8–15; 75:17–4, 79:7–9, 82:9–13, 88:11–89:8, 92:14–23 (Griffith); App. 145 at ¶¶ 25, 28–31, 39, 49, App. 536 at 89:17–22, 94:11–22, 123:14–25, 138:12–140:1; 140:23–141:3 (Yarbrough); App. 173 at ¶ 34 (Azaiez); App. 387 at 92:13–93:2 (same); App. 8 at ¶¶ 25-26, App. 470 at 35:7–13, 54:16-20, 55:17–56:13, 93:5–10, 103:20–105:7, 120:3–13, 131:23–132:13, 171:9–21, 176:18–177:18 (Pope).

**V.      Story does not overcome Defendants' qualified immunity.**

Story argues that it is well-settled that government entities "may not suppress speech because of disagreement with the speaker's viewpoint." Dkt. 139 at 18. But this is the exact example given by the Fifth Circuit of "the kind of proposition that will not suffice for the purposes of qualified immunity analysis, as it simply does not provide the official with any sense of what is permissible under a certain set of facts." *Morgan v. Swanson*, 755 F.3d 757, 761 (5th Cir. 2014). Just as it does not "enlighten a teacher as to the permissible extent of content restriction in a classroom setting," *id.*, it does not enlighten officers on who is the final arbiter of the scope of an agenda item. Nor does it enlighten them on when a disruption of a public meeting in violation of forum rules is constitutionally protected and when it is not. Further, Story cites no case law establishing that no reasonable official could believe there was probable cause for his arrest, that the alleged comparators were not similarly situated to him, or that the statements in the Warrant Affidavit were knowingly or recklessly false.

Defendants do not argue that ignorance of the law is a defense. Rather, if reasonable officials could disagree in light of clearly established law, Defendants are entitled to qualified immunity. *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cit. 2001). What Defendants knew about the law is irrelevant. What *is* relevant is what they knew about Story's actions. They observed him: call out from the audience more than once before being called to speak; interrupt and speak over Weir as she warned him to stay on-topic; begin speaking about something other than COVID-19 health and safety protocols; after being told he was off-topic, not stop; yell to be heard without a microphone; refuse to leave when asked to do so; and yelling as he was removed from the meeting room and building. App. 7 at ¶¶ 23–26, 30, 35; App. 46 at ¶ 35; App. 145 at ¶¶ 25-33. Because Story cites no clearly established law that his off-topic speech was constitutionally protected or show that Defendants could not reasonably believe there was probable cause for violating Section 38.13, they are entitled to qualified immunity and summary judgment is warranted on Story's claims against Defendants.

Respectfully submitted,

*/s/      Kathryn E. Long*
KATHRYN E. LONG
State Bar No. 24041679
klong@thompsonhorton.com

K. ADAM ROTHEY
State Bar No. 24051274
arothey@thompsonhorton.com

IBRAHIM YASEEN
State Bar No. 24137674
iyaseen@thompsonhorton.com

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for the Round Rock ISD Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served

upon all parties via the Court's electronic filing system on this 16th day of March, 2026.

| | |
|---|---|
| Stephen D. Casey | Warren V. Norred |
| CASEY LAW OFFICE, P.C. | Solomon G. Norred |
| P.O. Box 2451 | NORRED LAW, PLLC |
| Round Rock, Texas 78680 | 515 E. Border St. |
| stephen@caseylawoffice.us | Arlington, TX 76010 |
| | warren@norredlaw.com |

*/s/      Kathryn E. Long*
Kathryn E. Long

11