IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JEREMY STORY, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | No. 1:22-cv-448-DAE |
| HAFEDH AZAIEZ, *et al.* | § | |
| | § | |
| *Defendants*. | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

ORDER

Before the Court are (1) Defendants Hazfedh Azaiez, Lauren Griffith, and Jeffrey Yarbrough's Motion for Summary Judgment (Dkt. # 130), (2) Defendants Frank Pontillo, Milton Pope, and Amy Weir's Motion for Summary Judgment (Dkt. # 131), and (3) Plaintiff Jeremy Story's Motion for Summary Judgment (Dkt. # 133), all filed on December 30, 2025. All motions have timely responses and replies. Also before the Court are two Notices of Supplemental Authority filed by Plaintiff Story, (Dkt. # 146, 147), and two opposed Motions to Strike those Notices. (Dkt. ## 148, 149.)

The Court finds this matter suitable for disposition without a hearing. After careful consideration of the parties' briefs and the relevant law, the Court:

(1) **GRANTS** Defendants Azaiez, Griffith, and Yarbrough's Motion for Summary Judgment (Dkt. # 130); (2) **GRANTS** Defendants Pontillo, Pope, and Weir's Motion for Summary Judgment (Dkt. # 131); (3) **DENIES** Plaintiff Story's Motion for Summary Judgment (Dkt. # 133); and **GRANTS** Defendants' Opposed Motions to Strike (Dkt. ## 148, 149) for the reasons that follow.

## BACKGROUND

This case arises from the August 16, 2026, Board Meeting of the Round Rock Independent School District's ("RRISD") Board of Trustees ("the Board"). The Court finds the following facts supported by the record before it.

### I. Factual Background

#### A. General Background and Pre-Meeting Events

In June of 2021, RRISD hired a new superintendent, Defendant Hafedh Azaiez. (Dkt. # 132-6 at 2–5.) In July of 2021, an individual came forward with accusations that Azaiez had threatened and assaulted her. (Dkt. # 132-5 at 5; Dkt. # 132-6 at 6.) The situation resulted in an ex parte protective order being entered against Azaiez. (Dkt. # 132-5 at 5; Dkt. # 133-1.) The Board was informed of the allegations on July 13, 2021. (Dkt. # 132-6 at 6.) Plaintiff Jeremy Story, a concerned citizen, contacted the Board about the protective order on July 23, 2021, via email. (Id. at 7, 36–39.) He identified himself in the email as a

"Father to 7 Children, Pastor, National Faith Community Leader, Businessman, and very concerned Citizen of Round Rock." (Id. at 36–39.)

Simultaneously, RRISD was considering impacts to its school policies and health precautions because of the Delta variant of the COVID-19 disease which was becoming more prevalent in the summer of 2021. (Id. at 9.) To address these concerns, the Board scheduled a special meeting for August 16, 2021, at which the Board planned to discuss a potential mask mandate for the upcoming fall semester. (Id. at 10.)

Round Rock ISD has outlined limitations on public participation in its Board Meetings through the RRISD Board Policy BED (Local), which was issued on March 3, 2021. (Dkt. # 132-6 at 22–23.) The BED (Local) policy distinguishes between Regular and Special Meetings. (Id.) At Regular Meetings, "the Board shall permit public comment, regardless of whether the topic is an item on the agenda posted with notice of the meeting." (Id. at 22.) At Special Meetings, however, "public comment shall be limited to items on the agenda posted with notice of the meeting." (Id.) The BED (Local) policy also limits each speaker's time to three minutes per meeting and requires that speakers who wish to participate in public comment sign up before the meeting. (Id.) For Special Meetings, the rules require that a speaker "indicate the agenda item or topic on

which he or she wishes to address the Board" with their sign-up form. (Id.) For both types of meetings, the policy provides:

> Audience participation at a Board meeting is limited to the portion of the meeting designated to receive public comment in accordance with this policy. At all other times during a Board meeting, the audience shall not enter into discussion or debate on matters being considered by the Board, unless requested by the presiding officer.

(Id.)

On August 12, 2021, the Agenda for the August 16, 2021, Board meeting was posted on the Round Rock ISD website. (Dkt. # 132-6 at 42; Dkt. # 133-3 at 3.) The posting showed two items on the Agenda: (1) "Adoption of Resolution for Employee Covid-19 Positive Extended Leave During Covid-19 Pandemic," and (2) "Fall 2021 COVID-19 Health and Safety Protocols." (Dkt. # 132-6 at 41; Dkt. # 133-3 at 2.) The notice had a bolded note concerning public comments in Part C, which stated that "The Board will afford members of the public an opportunity to speak *on items listed* on the Board agenda." (Dkt. # 132-6 at 40; Dkt. # 133-3 at 1) (emphasis added). In contrast, the Board held a separately scheduled and noticed Regular Session Board Meeting on August 19, 2021. (Dkt. # 132-6 at 94.) The Public Comments section of that Agenda stated: "The Board will afford members of the public an opportunity to speak *on items listed and not listed* on the Board agenda." (Id. at 95) (emphasis added).

Plaintiff Story signed up to speak at the August 16th meeting. (Dkt. # 132-2 at 64.) In response to the form question asking on which agenda item he intended to speak, he indicated agenda item 2—the Fall 2021 COVID-19 Health and Safety Protocols—then continuing: "or something else—unlike the board, citizens are not required to speak on items only on the agenda." (Id.) After receiving Story's response, then-trustee Danielle Weston sent a text message to Story, clarifying the Board's policies on the topic of public comments. (Dkt. # 132-7 at 55.) She informed Story: ""Our board policy allows for public comments on items both on and off the agenda only at the monthly 'Regular' board meeting. For called meetings (like tonight), public comments are limited to items that are on the agenda." (Id.) Story then responded:

> It seems to me that the public complaints GF legal policy would allow for otherwise since a 'called' meeting is still a public meeting. Can you point me to the policy you are describing? Is it some edict from the Board President or a particular policy? Willing to challenge kindly by simply speaking on a different subject if there is no policy.

(Id.) Weston then informed Story that she could not pull up the policy at that time since she was in a noisy hair salon. (Id.)

B. August 16, 2026 Meeting

The August 16th meeting was held as scheduled. (Dkt. # 132, App. 279.) One-hundred eighty individuals had signed up to testify, and Defendant Amy Weir, the Chair of the Board of Trustees, noted at the outset of the meeting that at

two minutes per speaker, the meeting could continue for six hours of public comment. (Id. at 1:15–1:30.) At the beginning of the meeting, Weir went over the ground rules for all speakers, including that "specific concerns about employees, or former employees, should be considered separately according to applicable board policy," that comments were limited to two minutes, and that "no audience member will be permitted to engage in any conduct that is disruptive or threatening to any speaker or other person." (Id. at 1:54–2:50.)

Once public comment began, two other speakers brought up concerns about Superintendent Azaiez during their remarks, both of whom spoke before Story: Ms. White and Ms. Sims. (Dkt. # 132, App. 279 at 1:34:50–1:35:08; 2:25:09–2:26:31.) When White mentioned the protective order against Azaiez, she was interrupted by Board members and informed that she was not allowed to speak on items not on the agenda. (Id. at 2:26:31–38.) White continued to speak for approximately three seconds before her microphone was cut off, then stayed at the microphone for approximately four seconds before leaving the room without police intervention. (Id.) The crowd was thereafter reminded that remarks were limited to items on the agenda. (Id. at 2:26:50–53.) Ms. Sims also brought up the protective order during her remarks. (Id. at 1:34:50–1:35:08.) In response, it appears that Sims's microphone was cut off and board members reminded her to speak only on items on the agenda. (Id. at 1:35:08–17.) Sims then walked away

from the microphone without further intervention. (Id.) Story was seated in the audience and heard Weir instruct both speakers to remain on-topic. (Id.)

When Story was called to speak, and as Story approached the microphone, Weir told him: "Mr. Story, you did write that you felt like you could speak about something other than [the agenda items]. I would like to remind you that this is a special called meeting. It is not a regular board meeting. We are only taking comments on these two items." (Dkt. # 152, P-6, at 0:01–0:17.) He responded: "I will show you how what I am about to comment on is germane to that." (Id. at 0:17–20.) Weir then asked, "Mr. Story, are you able to—" and was interrupted by Story saying "to demonstrate that? Yes I will." (Id. at 0:20–50.) Weir responded: "No, I do not want you to demonstrate—" and Story interrupted again, "So you're not willing for me to demonstrate, Mrs. Weir?" (Id.) When he paused, she then said, "I am asking you—" and was cut off again by Story saying, "I can show you how the resolution that you are debating today has absolute germanity to what I'm going to speak on. Are you saying you don't want to hear me?" (Id.) Weir then attempted to reply, saying "The resolution on extended—" and Story interrupted by asking once more, "Are you saying you don't want to hear me?" (Id.) Weir responded, "No, sir, I am absolutely willing to hear you on [the agenda items]—" and then was cut off by Story speaking over her, saying "okay good, then I will begin" and launching into his prepared comment. (Id.)

Story's remarks went uninterrupted for approximately one minute. (Id. at 0:50–1:45.) His full remarks are included below:

> Today I speak on the rule of law, I don't envy your choice today. I trust that most people value each other even though they are on different sides of the issue, I also understand the seriousness of the COVID epidemic. I understand the rule of law, yet several members of this board and Superintendent have another utter disregard for the rule of law. Today you are considering thwarting the Governor's order and the legislature and the Supreme Court of Texas. This will result in tremendous fines to the district. Even today, you violated the rule of law by putting officers in the back of this room in the difficult position of being asked to illegally enforce a last-minute violation of the Open Meetings Act. An agenda item today includes a resolution which includes 80% of the text concerning itself with the safety of public employees and students. The resolutions being considered today include statements like, "the Board of trustees has a substantial public interest in protecting the health and safety of students and community." It talks about "supervision of the Superintendent" and even other things related to public health and public safety. Several of you have demonstrated strong disregard for the rule of law. You consider public safety today by violating the Supreme Court of Texas. Still more, our Superintendent has a protective order filed against him.—

(Id.) After Story mentioned the Superintendent, Weir interrupted and said "Excuse me, that is not part of [either agenda item]. You may not speak on that. You may only speak—" while Story continued speaking over her and another Board member provided similar reminders about staying on-topic. (Id. at 1:45–1:55.)

Story then continued to speak over her for approximately ten seconds while an officer approached him. (Dkt. # 132, App. 279, at 2:49:59–09.) He continued speaking, raising his voice after his microphone was cut off, while he stood with officers beside him for another approximately ten seconds. (Id. at

2:49:09–19; App. 94 at 0:39–0:49.) Story then continued to yell to the Board members while Defendants Sergeant Milton Pope and Officer Frank Pontillo escorted him out. (App. 94 at 0:49–1:00.)

Pope and Pontillo became involved in Story's removal after Weir requested assistance by saying "We need to have this gentleman removed, please." (App. 279 at 2:49:05–10.) Pope arrived at Story's side first, grabbing both of his arms. (App. 94 at 0:40–0:50.) After Story refused to move and continued speaking over the cut-off microphone, Pope wrapped one arm around Story's torso, Pontillo held the other arm, and all then walked toward the room's exit. (Id. at 0:50–1:01.) The officers released Story once they were out of the meeting room. (Id. at 1:01–1:07.) Pope then clarified that Story needed to leave the building and directed him to walk with him down the hallway. (Id. at 1:08–1:18.) Pope and Pontillo both accompanied Story through the halls, and Story is observed on the body camera footage shouting about his removal to a group of people watching the meeting on a screen in the overflow room. (Id. at 1:37–2:30.) As the officers walked Story out of the building, Pope's hand rested on Story's back. (Id.)

After the incident, Sergeant Pope prepared an Investigation Report and Reporting Officer Narrative to detail the events from his perspective. (Dkt. # 132-1 at 12–13, 33–36). RRISD's Police Chief, Jeffrey Yarbrough, was also in attendance at the August 16th meeting and is a named defendant in this case. (Dkt.

# 133-10.) Yarbrough observed the meeting from a separate room behind the school board members, watching through one-way glass. (Id.)

C. Later Investigation & Story's Arrest

Approximately one month following the incident, Defendant Sergeant Lauren Griffith was assigned to further investigate Story's removal from the August 16th meeting. (Dkt. # 133-13 at 27–28.) She testified that she reviewed the Incident Reports written by the officers on the scene, reviewed public video and body-camera footage, and researched the penal code and elements of the offense. (Id. at 28.) Her investigation led her to conclude that the elements of Texas Penal Code § 38.13, Hindering Proceedings by Disorderly Conduct, were violated. (Id.)

Griffith then prepared an affidavit to the warrant application. (Dkt. # 133-6.) A magistrate judge signed the warrant, finding probable cause for the arrest of Story. (Id.)

II. Procedural Background

After the incidents on August 16, 2021, Plaintiff filed suit in this Court on May 11, 2022. (Dkt. # 1.) The case was originally assigned to Judge Robert Pitman but was transferred to the undersigned on October 28, 2022. (Dkt. # 37.) On July 26, 2023, the Court granted and denied in part Defendants' Motions to Dismiss Plaintiff's First Amended Complaint. (Dkt. # 43.) Thereafter, Plaintiff filed a Second Amended Complaint, and then a Third Amended Complaint upon

agreement of the parties. (Dkt. ## 44, 49.) The Defendants once again sought dismissal of the Third Amended Complaint, which the Court again granted in part and denied in part on July 19, 2024. (Dkt. # 92.) This Court's Order narrowed the scope of Plaintiff's original claims and the active defendants in this case. (Id.) On November 5, 2025, Plaintiff further narrowed the scope by nonsuiting with prejudice all claims except those relating to the August 16th meeting against Defendants Amy Weir, Hafedh Azaiez, Jeffrey Yarbrough, Lauren Griffith, Milton Pope, and Frank Pontillo. (Dkt. # 121.) The remaining claims include viewpoint discrimination and retaliatory arrest claims under the First and Fourteenth Amendments, and Fourth Amendment unlawful seizure claims. (Id.)

On December 30, 2025, the parties filed three cross-motions for summary judgment: one motion by Plaintiff Story, (Dkt. # 133), one motion by Defendants Azaiez, Griffith, and Yarbrough, (Dkt. # 130), and one by Defendants Weir, Pope, and Pontillo, (Dkt. # 131). After the motions were fully briefed, Plaintiff filed two separate Notices of Supplemental Authority. (Dkt. ## 146, 147.) Defendants responded by filing motions to strike these notices. (Dkt. ## 148, 149.)

## LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52. The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." Jones v. Anderson, 721 F. App'x 333, 335 (5th Cir. 2018) (quoting Duffie v. United States, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. Infante v. Law Office of Joseph Onwuteaka, P.C., 735 F. App'x 839, 843 (5th Cir. 2018) (quoting Willis v. Cleco Corp., 749 F.3d 314, 317 (5th Cir. 2014)). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" McCarty v.

Hillstone Rest. Grp., Inc., 864 F.3d 354, 357 (5th Cir. 2017) (quoting Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005)). Further, "unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." United States v. Renda Marine, Inc., 667 F.3d 651, 655 (5th Cir. 2012). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. Wease v. Ocwen Loan Servicing, LLC, 915 F.3d 987, 992 (5th Cir. 2019).

## DISCUSSION

### I. Motions to Strike Notices of Supplemental Authority

As an initial matter, the Court finds it appropriate to first address the two Notices of Supplemental Authority filed by Plaintiff Story in March after briefing on the summary judgment motions was complete. The Notices purport to inform the Court of two recently issued Supreme Court decisions: Zorn v. Linton, 607 U.S. 568 (2026), and Chiles v. Salazar, 607 U.S. 627 (2026). However, the notices then describe the cases and explain their application to Plaintiff's case, reading more like a supplemental brief. (Dkt. ## 146, 147.) Thereafter, Defendants filed motions to strike the notices of supplemental authority, arguing that Story seeks to circumvent the Court's local rules against filing supplemental briefing without leave of the Court by including case-specific arguments styled as a Notice of Supplemental Authority. (Dkt. ## 148, 149.) Although these motions

were titled as opposed, Plaintiff never filed a response indicating opposition to the motion to strike.

The Court finds that granting the motion to strike is appropriate for two reasons. First, Local Rule 7(D)(2) authorizes the Court to grant motions as unopposed when a party fails to file a response indicating their opposition. Second, Plaintiff has not sought leave of the Court, either in his Notices of Supplemental Authority, or in six months since they were filed, to file supplemental briefing. Thus, while it is appropriate for Plaintiff to inform the Court of supplemental authority in a notice, interpreting that caselaw and arguing on behalf of his position in this case is beyond the scope of a Notice of Supplemental Authority. The Court will not consider these arguments but will permit Plaintiff's filings to stand to the extent they notify the Court of new authority since the filing of his Motion for Summary Judgment and responses to Defendants' motions. Accordingly, the Court **GRANTS** Defendants' Motions to Strike. (Dkt. ## 148, 149.) Plaintiff's Notices of Supplemental Authority are **STRICKEN IN PART**—specifically, the first two sentences of each notice, and the attached slip opinions, are not stricken; the remainder of the Notices are **STRICKEN**. (Dkt. ## 146, 147.)

## II. Weir, Pope, and Pontillo's Motion for Summary Judgment

Defendants Amy Weir, Milton Pope, and Frank Pontillo file their motion seeking summary judgment on Plaintiff's (1) First and Fourteenth Amendment viewpoint discrimination claims against Weir, Pope, and Pontillo; (2) Fourth Amendment unreasonable seizure claims against Pontillo and Pope; and (3) false arrest claim against Pope. (Dkt. # 131 at 1.) Defendants argue that Story's speech was not protected, and in the alternative, he was not removed because of his viewpoint. (Id.) They further contend that the Fourth Amendment claims fail because Story's removal was not unreasonable in light of his disruption to the rules of the forum. (Id.) Finally, they argue his false arrest claim fails because there was probable cause for his arrest. (Id.)

### A. Viewpoint Discrimination

On Plaintiff's viewpoint discrimination claims, Defendants first argue that while Story's remarks may have begun as protected speech, his speech became unprotected when he violated reasonable topic restrictions. (Dkt. # 131 at 9–11.) Alternatively, they seek summary judgment on these claims on the basis that there is no evidence of discriminatory animus. (Id. at 11–14.) Finally, they contend that Weir, Pontillo, and Pope are all entitled to qualified immunity on the viewpoint discrimination claims. (Id. at 15–17.) The Court will address each basis in turn.

i. *Protected Speech*

The Fifth Circuit has acknowledged that for the purpose of a First Amendment analysis, school board meetings are limited public forums. Fairchild v. Liberty Indep. Sch. Dist., 597 F.3d 747, 759 (5th Cir. 2010) ("The Board meeting here—and the comment session in particular—is a limited public forum 'for the limited time and topic of the meeting.'" (quoting Chiu v. Plano Indep. Sch. Dist., 260 F.3d 330, 348 (5th Cir. 2001)). A school board may restrict speech in a limited public forum provided that the restriction "(1) does 'not discriminate against speech on the basis of viewpoint' and (2) is 'reasonable in light of the purpose served by the forum.'" Chiu, 260 F.3d at 346 (quoting Good News Club v. Milford Cent. Sch., 533 U.S. 98 (2001)). In a limited public forum, restrictions to the subject matter of speech—i.e., content discrimination—"may be permissible if it preserves the purposes of that limited forum," while viewpoint discrimination "is presumed impermissible when directed against speech otherwise within the forum's limitations." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829–30 (1995). Viewpoint discrimination is "an egregious form of content discrimination," which exists "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Id. at 829. However, where a plaintiff "violate[s] a reasonable restriction, such as a topic

or time constraint, there would be no constitutional violation." Heaney v. Roberts, 846 F.3d 795, 802 (5th Cir. 2017).

Here, there was a reasonable topic constraint for speakers providing public comments at the August 16th Special Meeting. (Dkt. # 132-6 at 40; Dkt. # 133-3 at 1.) Aside from the nature of the meeting as a Special Meeting—meaning that by the Board's own rules, public comments were only accepted related to items on the agenda, (Dkt. # 132-6 at 22–23)—the agenda itself, published days in advance of the August 16th Meeting, specified that the Board would hear comments "on items listed on the Board agenda." (Dkt. # 132-6 at 40; Dkt. # 133-3 at 1.) The topic of any public comments provided was thus restricted to the two listed agenda items: "Adoption of Resolution for Employee Covid-19 Positive Extended Leave During Covid-19 Pandemic," and "Fall 2021 COVID-19 Health and Safety Protocols." (Dkt. # 132-6 at 41; Dkt. # 133-3 at 2.) The text of the Board Resolution from the August 16, 2021, meeting, which was linked within and attached to the Agenda, showed that the Board intended to adopt a resolution regarding granting extended leave to employees of RRISD during the pandemic. (Dkt. # 133-4.) This resolution contained language stating that the Board has "a substantial public interest in protecting the health and safety of its students, staff, and community" and "desires to ensure that [RRISD] and school community are

prepared to the fullest extent possible to safeguard and protect the health and safety of its students, staff, and school community in light of COVID-19." (Id. at 1.)

Weir, Pope, and Pontillo argue that Story's public comments constituted protected speech insofar as he began his remarks by speaking about the pandemic and the "rule of law," but that his speech ceased to be protected by the First Amendment when he veered off-topic to state that the "Superintendent has a protective order filed against him." (Dkt. # 11; Dkt. # 152, P-6.) It was not until this point that his speech was interrupted, and the Defendants here contend that because he was no longer speaking on-topic, he was in violation of the reasonable topic restriction, thus making his speech unprotected from that point on. (Dkt. # 131 at 11.) Story contests the conclusion that his speech was, indeed, "off-topic." (Dkt. # 140 at 10.) He frames his remarks as merely providing an "analogy," making them no different from other speakers' remarks who also analogized in their public comments. (Id.) Story additionally points to several other speakers who brought up Jesus Christ, Frederick Douglass, and Ted Cruz in their remarks, calling into question exactly what comments should be deemed responsive to the meeting agenda items. (Id.) He urges the Court that the issue of whether his remarks were on-topic involves questions of fact not appropriate for resolution at summary judgment, and that the "health and safety" language of the resolution text

supports the conclusion that his remarks were related to the agenda items. (Dkt. # 140 at 9–10.)

Although the Court is skeptical as to Story's framing of his own remarks as on-topic,[1] it agrees that this appears to be a question of fact more appropriately posed to a jury. The scope of the topic restrictions, and the extent to which Mr. Story's remarks were or were not within the scope of such restrictions, is an issue at the core of his First Amendment claims, and one on which reasonable jurors could differ. If a jury were to find that Story's remarks were non-responsive to the stated agenda items, the latter portions of Story's speech would be unprotected. See Heaney, 846 F.3d at 802 ("If [Plaintiff] were to have violated a reasonable restriction, such as a topic or time constraint, there would be no constitutional violation.") But if the jury found that his speech fell appropriately within the parameters of the reasonable content-based restriction, his speech could have been protected. See id. Because this is a material fact determination which underlies the legal conclusion of whether Story's speech was protected, and

[1] Defendants cite to a line in the Court's prior Order on the Motions to Dismiss in which the Court commented that "The Complaint shows that Story was interrupted by President Weir when he veered off-topic from the posted agenda items." (Dkt. # 43 at 16.) At the motion to dismiss stage, the Court was merely describing the facts, making inferences from the language of Plaintiff's Complaint—not making a legal conclusion as to the permissible scope of the Meeting's topic restrictions.

because reasonable jurors may differ on the outcome, the Court declines to decide this issue as a matter of law at this stage. See Anderson, 477 U.S. at 248.

ii. *Discriminatory Motive*

Defendants next contend that Plaintiff Story was not removed from the meeting *because of his viewpoint*, but rather because of his behavior. (Dkt. # 131 at 11–12.) They seek summary judgment on this point and argue that Story's viewpoint discrimination claims fail as a matter of law because he cannot show that his ejection was motivated by his viewpoint. (Id. at 12.) Indeed, the very definition of viewpoint discrimination encompasses a requirement that the discrimination is that the restriction is imposed because of the "opinion or perspective of the speaker." Rosenberger, 515 U.S. at 829. Defendants assert there is "no direct evidence of animus," and further argue that Story was only treated differently from other speakers who were off-topic because of his behavior when told to stay on topic—not the content of his speech. (Dkt. # 131 at 12–15.)

Story counters that there were multiple comparators that can be used for the purpose of this analysis since several other speakers used analogies or debatably went "off-topic" but were not removed from the meeting. (Dkt. # 140 at 11–12.)

Here, there are questions of fact which prevent summary judgment on the question of Defendants' motive in cutting off Story's speech and removing him

from the meeting. Like in the district court's decision in Heaney, determining the motive of Defendant Weir in stopping Story from speaking would require it to "resolve the subjective question of intent in h[er] favor based on the video evidence." Heaney v. Roberts, 147 F. Supp.3d 600, 606 (E.D. La. Dec. 2, 2015), affirmed and dismissed in part, 846 F.3d 795. This conclusion is rather intertwined with the issue of whether Story's speech was "on-topic," which the Court has already determined involves underlying issues of material fact. See supra Section I(A)(i). Thus, the Court similarly finds that determining the motive or intent of defendants in halting Story's remarks is more appropriately posed to a jury. See Heaney, 147 F. Supp.3d at 606–07 ("In this case, particularly in light of the somewhat unpalatable subject matter that [Plaintiff] was attempting to discuss . . . a jury could reasonably infer that [Defendant] silenced [Plaintiff] and removed him from the meeting because of the content of his speech as opposed to a need to maintain order at the meeting.").

iii. *Qualified Immunity*

Although fact issues prevent summary judgment on the substance of Story's viewpoint discrimination claims, there remains the matter of qualified immunity for each of the three defendants in this motion. Importantly, even assuming that Story has, indeed, established violations of his First and Fourteenth Amendment rights, his claims against Pope and Pontillo would be barred by

qualified immunity. Qualified immunity exists to shield government officials from civil liability "unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S. 658, 664 (2012). Courts follow two steps in a qualified immunity analysis, first asking whether there was a constitutional violation, and second "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Pearson v. Callahan, 555 U.S. 223, 232 (2009). "For a constitutional right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 445 (5th Cir. 1994) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Reasonableness "must be assessed in light of 'the facts available to [the official] at the time of his action.'" Porter v. Ascension Parish Sch. Bd., 393 F.3d 608, 614 (5th Cir. 2004).

On the first question, the Court has identified issues of material fact which prevent a decision as a matter of law that there was or was not a constitutional violation. See supra. Thus, the Court proceeds to the second question: whether the right was clearly established at the time of the August 16th Meeting. Relevant to this motion are three defendants: Weir, a member of the RRISD School Board, and Pope and Pontillo, both law enforcement officers

working in the RRISD School District who removed Story from the meeting. The defendants will be addressed separately.

a. Defendant Weir

Concerning Defendant Weir's qualified immunity as a Trustee on the RRISD Board of Trustees, she argues that she consistently stopped individuals from speaking on topics besides those on the agenda, and that she only ordered Story removed after he violated reasonable content restrictions. (Dkt. # 131 at 15.) Moreover, Weir points to law which suggests a countervailing point: that the schools boards also are entitled to run special meetings in an orderly fashion with reasonable content-based restrictions, particularly where other channels exist for more general, off-topic grievances. See Fairchild, 597 F.3d at 760. The Court has determined supra that it may not decide as a matter of law whether Story's speech was off-topic because that issue implicates questions of fact. But this ambiguity—and the idea that reasonable jurors could differ on whether Story's speech was, indeed, responsive to the agenda items—creates the distinct likelihood that a reasonable official in Weir's shoes would not have known that her actions constituted a violation of a clearly established right.

The Court views Weir's actions in light of the facts available to her at the time of the meeting. Porter, 393 F.3d at 614. Story wrote on the public comment form submitted before the meeting that he intended to speak on matters

outside the agenda when he wrote: "2 or something else—unlike the board, citizens are not required to speak on items only on the agenda." (Dkt. # 132-2 at 64.) Weir acknowledged she knew of his intent when he approached the microphone, communicating to him that he needed to speak on one of the agenda items. (App. 279 at 2:47:12–2:47:30.) And the existing board policies, which she presumably was familiar with as a Trustee of the Board, indicated that for special meetings, public comments were limited to the agenda items. (Dkt. # 132-6 at 22–23.) Of course, "[i]t is beyond debate that the law prohibits viewpoint discrimination in a limited public forum." Heaney, 846 F.3d at 801. But a reasonable official in her position could have concluded that Story's remarks were off-topic and believed it was lawful and not in violation of clearly established law to enforce an established Board policy which imposes a reasonable restriction in a limited public forum. For this reason, Weir is entitled to qualified immunity on Story's viewpoint discrimination claims. See Doe, 15 F.3d at 445.

b. Defendants Pope and Pontillo

Defendants Pope and Pontillo also assert that qualified immunity bars Story's viewpoint discrimination claims against them. The Court agrees, finding Heaney instructive here. 846 F.3d at 798.

In that case, the plaintiff was ejected from a city council meeting by police at the direction of a city councilman. Id. at 803–804. The Fifth Circuit

affirmed the district court's conclusion that the officer "was not required to cross-examine and second-guess [the councilman] regarding his First Amendment motives before acting." Id. at 804. In doing so, it distinguished Cozzo v. Tangipahoa Parish Council, 279 F.3d 273 (5th Cir. 2002), a case in which the Fifth Circuit denied qualified immunity to an officer who "was only following the orders" of his superiors when executing an eviction based on a temporary restraining order who did not require eviction. Id. at 284–85.

Like in Heaney, upon receiving the request from Weir to remove Story from the room, Pope and Pontillo were not required to question Weir as to her motives and whether they were discriminatory. 846 F.3d at 804. Although Plaintiff attempts to distinguish Heaney on the basis that the officers admitted they had discretion and could exercise their independent legal judgment in removing him from the room, the Court finds this argument unavailing. The mere existence of discretion does not necessitate the conclusion that an officer should have known their actions violated the law. For similar reasons as stated supra regarding Weir's entitlement to qualified immunity, the record shows ambiguity as to whether or not Story's speech was responsive to the agenda items. Under such a record, the Court cannot say that Pope and Pontillo's actions were "objectively unreasonable in light of clearly established law." Heaney, 846 F.3d at 804. Beyond the issue of whether his speech was off-topic, Story refused to stop speaking after being told to stop,

continued speaking over Weir and repeatedly interrupting her, and yelled over the microphone after it was cut off. In light of these circumstances, it was not objectively unreasonable for the officers to remove him. Thus, these officers are also entitled to qualified immunity on Plaintiff's viewpoint discrimination claims.

B. Fourth Amendment Unreasonable Seizure

Defendants next seek summary judgment on Plaintiff's unreasonable seizure claims. The Fourth Amendment provides: "The right of the people to be secure in their persons, . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the . . . persons or things to be seized." U.S. Const. Amend. IV. "A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave . . . ." United States v. Mendenhall, 446 U.S. 544, 545 (1980). The Fifth Circuit has previously (5th Cir. 2017). However, the Fourth Amendment protects only against *unreasonable* seizures. Terry v. Ohio, 392 U.S. 1, 9, 88 (1968).

Defendants do not challenge that Story's removal from the meeting constituted a seizure. (Dkt. # 131 at 17–18). Indeed, the Court need not address that question where it appears to have been already answered by the Fifth Circuit. Heaney, 846 F.3d at 805 (stating that it was "convinced" that an interaction

between an officer and a speaker at a meeting "was a seizure under the Fourth Amendment" when the speaker was forced to leave the meeting). Rather, Defendants focus on whether such a seizure was unreasonable and whether this claim may overcome Pope and Pontillo's sovereign immunity. (Id.)

Of course, "[t]he right to be free from arrest without probable cause is a clearly established constitutional right." Mangieri v. Clifton, 29 F.3d 1012, 1016 (5th Cir. 1994). However, qualified immunity acts as a shield for "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "[A]n officer is only denied qualified immunity if his or her actions are objectively unreasonable in light of clearly established law." Heaney, 846 F.3d at 804 (citing Blackwell v. Barton, 34 F.3d 298, 303–04 (5th Cir. 1994)).

The parties here dispute whether there was probable cause for Story's arrest. However, here, it is unnecessary to determine whether probable cause is exists because qualified immunity bars the unreasonable seizure claims against Defendants Pope and Pontillo. Heaney is once again dispositive on this point. Like in Heaney, Pope and Pontillo were employed by RRISD and present for safety and security services at the meeting. (Dkt. # 132-1 at 3.) Both reasonably believed that they had the authority to address any concerns implicating safety and security. (Id. at 5.) It is clear at this stage given the evidence presented in the record that it

was "not *objectively unreasonable* for [either Pope or Pontillo] to respond to [Weir's] request and escort [Story] out of the room[.]" Heaney, 846 F.3d at 805; see also Heaney, 147 F.Supp.3d at 611 ("[T]he law is not sufficiently clear that removing a citizen from a public meeting based on the chairman's judgment that the citizen was disrupting the meeting requires probable cause to believe that a crime has been committed."). Thus, Pope and Pontillo are entitled to qualified immunity on these claims.

C. False Arrest

Defendant Pope also seeks summary judgment on Story's false arrest claim against him. (Dkt. # 131 at 20.) Citizens have a right under the Fourth Amendment to be free from arrest unless the arrest is supported by either a properly issued arrest warrant or probable cause. Flores v. City of Palacios, 381 F.3d 391, 402 (5th Cir. 2004). However, under the independent intermediary doctrine, "if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." Wilson v. Stroman, 33 F.4th 202, 208 (5th Cir. 2022) (quoting McLin v. Ard, 866 F.3d 682, 689 (5th Cir. 2017)). Pope argues that here, where there was a valid warrant signed by a Magistrate Judge for Story's arrest, the independent intermediary doctrine applies. (Dkt. # 131 at 20.) Story disagrees, citing key language in Pope's

affidavit which said Story was "off-topic" and had "several outbursts," arguing these statements are contradicted by the available video evidence. (Dkt. # 140 at 15.) He contends that there are factual disputes about whether the information Pope provided in his affidavit was accurate because the video does not depict any repeated disruptions or "yelling and screaming." (Id. at 15–16.) Pope counters that the issues Story identifies with the warrant affidavit boil down to a difference in characterization of the incident, and that Pope made no knowing, intentional, or recklessly false statement. (Dkt. # 144 at 8.)

For the independent intermediary doctrine to apply, "the intermediary must be truly independent." Wilson, 33 F.4th at 208. "[T]he initiating party may be liable for false arrest if the plaintiff shows that 'the deliberations of that [the] intermediary were in some way tainted by the actions of the defendant.'" Deville v. Marcantel, 567 F.3d 156, 170 (5th Cir. 2009) (quoting Hand v. Gary, 838 F.2d 1420, 1428 (5th Cir. 1988)). The Fifth Circuit has also recognized that a Franks claim acts as a functional exception to the independent intermediary doctrine. Wilson, 33 F.4th at 208. "[A]n officer can be liable under Franks for 'deliberately or recklessly' including a material false statement or omission in a warrant application submitted to a magistrate." Wilson, 33 F.4th at 206 (quoting Melton v. Phillips, 875 F.3d 256, 264 (5th Cir. 2017) (en banc)); see Franks v. Delaware, 438 U.S. 154 (1978).

Pope was personally involved in Story's arrest in two ways: (1) he prepared an Investigation Report and Reporting Officer Narrative following the August 16th meeting, (Dkt. # 132-1 at 12–13, 33–36), and (2) he had a "short conversation" with Griffith to confirm that the information in Pope's Reporting Narrative was correct, (Dkt. # 132-2 at 8). Griffith was the officer who prepared the warrant affidavit and attested that it was "largely based on the information contained in Sergeant Pope's Reporting Narrative, which [she] corroborated and confirmed." (Id. at 9.) Because Pope prepared the Reporting Narrative and provided information to Griffith, he is still eligible as a defendant under the Franks exception. Terwilliger v. Reyna, 4 F.4th 270, 283 (5th Cir. 2021) ("If an officer does not present or sign the affidavit, liability attaches only if 'he helped prepare the complaint by providing information for use in it.'" (quoting Melton, 875 F.3d at 264)).

Pope contends that no statements in his written reports were materially false, and that Story's disagreement with the phrasing of Pope's account amounts to a "quibble with the words used or characterization of events." (Dkt. # 131 at 20.) Plaintiff suggests that describing Story as "off topic" and having "several outbursts" were "at minimum exaggerated and at worst materially misleading," pointing to the video evidence to contradict these statements. (Dkt. # 140 at 15.) He further argues that Pope's Reporting Narrative should have

included information about other speakers that made inflammatory accusations but were not removed from the meeting, and that the failure to include these details constitutes an "omission" which brings Pope within the ambit of the Franks exception. (Id. at 15–16.) Pope's reply notes that Story's response was devoid of legal authority which suggests that his claims are not barred by the independent intermediary doctrine. (Dkt. # 144 at 8.) He maintains that none of the statements rise to the level of being deliberate or reckless falsehoods. (Id. at 8–9.)

Here, the Court need not resolve whether the statements or omissions at-issue were materially false. Rather, the necessary mental state of the defendant to satisfy Franks liability is dispositive in this case. The Fifth Circuit has set a relatively high bar for the requisite intent. Nerio v. Evans, 974 F.3d 571, 577 (5th Cir. 2020). "Liability under Franks requires a certain mindset and certain conduct: an officer must intentionally, 'or with reckless disregard for the truth,' include 'a false statement in a warrant application' or omit a material fact from it." Id. (quoting Kohler v. Englade, 470 F.3d 1104, 1113 (5th Cir. 2006)). Pope has met his burden in showing there is no evidence of intent or reckless disregard for the truthfulness of his Reporting Narrative. And in response, Story has not adduced evidence suggesting this is true. Story's response focuses on whether there is an issue of fact regarding the material falsity of certain statements, but does not explain how those statements, even if false, rise to the level that the Franks

exception requires. (See Dkt. # 140 at 15–16.) Thus, the Court finds that the Franks exception does not apply, the independent intermediary doctrine insulates Pope from liability, and summary judgment in favor of Defendant Pope is appropriate on Story's false arrest claim against him.

D. Excessive Force

Finally, Defendants Pope and Pontillo seek summary judgment on Story's excessive force claims. (Dkt. # 131 at 18.) The Fourth Amendment confers a "right to be free from excessive force during a seizure." Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012). To establish that a police officer violated his constitutional right to be free from excessive force, a plaintiff must show "(1) an injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." Id. at 628 (citing Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009)). Defendants argue that Story has not provided any evidence he sustained an injury, acknowledged there was no physical injury from the meeting in his deposition, and that Pontillo's body camera footage shows that any force used was not clearly excessive or unreasonable. (Dkt. # 133 at 18–19.) At minimum, they say, the record does not support that any actions were taken in an objectively unreasonable manner, and thus in the alternative, they are entitled to qualified immunity. (Id. at 19.)

In his response to Weir, Pope, and Pontillo's motion, Plaintiff makes no mention of any excessive force claim against Pope and Pontillo. (See Dkt. # 140.) They urge the Court to consider this claim as abandoned. (Dkt. # 144 at 1 n.1 (citing Vela v. City of Houston, 276 F.3d 659, 678 (5th Cir. 2001) ("We have held that a party "'in his opposition to a motion for summary judgment cannot abandon the issue and then . . . by drawing on the pleadings resurrect the abandoned issue.'").)

The Court finds that Defendants have met their burden to show they are entitled to summary judgment on Plaintiff's excessive force claims. Concerning any potential injury, they cite Story's deposition, in which he was asked "Did you sustain any physical injury on August 16th, 2021?" (Dkt. # 132-7 at 23, 138:24–25.) He responded "I mean, other than them just grabbing me really hard and dragging me out of the room? . . . No, not – not other than that." (Id. at 139:1–4.) Moreover, the Court has carefully reviewed the body camera footage capturing Story's removal from the meeting and concludes there is no point at which there appeared to be any force that would have caused an injury, or any point at which a reasonable jury could find that the force used by either officer was "clearly excessive" or "clearly unreasonable." See Poole, 691 F.3d at 627. When Story initially refused to leave the podium, Pope, as the first officer approaching him, appeared to grab both of Story's arms. (App. 94 at 0:40–0:50.) When Story

continued speaking and did not move, Pope wrapped one arm around Story's torso while the other hand remained on Story's arm and moved toward the door. (Id. at 0:50–1:01.) Pontillo grabbed Story's opposite arm, and both officers released Story after he was outside the doors of the meeting room. (Id. at 1:01–1:07.) The video then depicts Story being escorted out of the building, and Pope grabs Story's arm briefly to direct him to walk out. (Id. at 1:08–1:18.) The remainder of the footage shows Pope walking alongside Story with his hand lightly resting on Story's back as they move through the school and out of the building. (Id. at 1:37–2:30.) The footage itself is strong evidence that there was no excessive force used, and thus Defendants have carried their burden.

Because Plaintiff did not acknowledge his excessive force claim in his response, let alone address Defendants' arguments or raise evidence of his own to create an issue of material fact,[2] the Court finds that Story's excessive force claims must fail.

[2] The Court notes that Plaintiff embeds photographs of an alleged injury in his Complaint, including photos of his bare back with a red mark across his left shoulder. (Dkt. # 49 at 19.) As an initial matter, although the Court has discretion to consider materials contained within the full record, it is only obligated to consider cited materials. Fed. R. Civ. P. 56(c)(3) ("The Court need consider only the cited materials, but it may consider other materials in the record."). Even to the extent the Court were to consider this photograph, Plaintiff has made no attempt to support his allegations that Pope and Pontilloe "use[d] force against Story by bear-hugging him around a pole, cutting his back, and slamming him to the ground." (Dkt. # 49 at 19, ¶ 77.) Bare allegations are insufficient to survive summary

Accordingly, Defendant Weir, Pope, and Pontillo's Motion for Summary Judgment is **GRANTED**. Story's claims against Defendants Weir, Pope, and Pontillo are **DISMISSED WITH PREJUDICE**.

III. Azaiez, Griffith, and Yarbrough's Motion for Summary Judgment

Next, Defendants Azaiez, Griffith, and Yarbrough file a separate motion seeking summary judgment on (1) Story's First Amendment retaliatory arrest claims against Dr. Azaiez, former Chief of Police Jeffrey Yarbrough, and Detective Sergeant Lauren Griffith; and (2) Story's Fourth Amendment false arrest claim against Griffith. (Dkt. # 130 at 1.) On the retaliatory arrest claims, Defendants argue that Plaintiff's claims fail as a matter of law because (a) there is no evidence that Dr. Azaiez was involved in the arrest; (b) there was probable cause for the arrest; (c) Story was not engaging in protected speech at the time of his arrest; and (d) his arrest was not motivated by retaliatory animus. (Id. at 9–15.) Griffith argues the false arrest claim additionally fails because the arrest was based on a valid warrant. (Id. at 16.)

A. First Amendment Retaliatory Arrest

"The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for

judgment; the Court cannot infer that specific events occurred that are at best, not supported, and at worst, plainly contradicted by the cited evidence before it.

the exercise of protected speech activities." Bailey v. Iles, 87 F.4th 275, 288 (5th Cir. 2023) (quoting Keenan v. Tejeda, 290 F.3d 252, 258 (5th Cir. 2002)). To establish a First Amendment retaliation claim, a plaintiff must show that "(1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct." Keenan, 290 F.3d at 258.

i. *Defendant Azaiez*

Defendants assert there is no evidence that Azaiez was involved at all in the arrest of Mr. Story. (Dkt. # 130 at 9–10.) Although Plaintiff's Complaint alleges that Azaiez "communicated . . . with the Williamson County Judge and other county officials to encourage the county to arrest Plaintiff[]" and that "Azaiez employed his personal police force to create a false affidavit, secure an arrest warrant, and then encouraged the retaliatory arrest," (Dkt. # 49 at ¶ 96), Defendant says that there is no evidence supporting these allegations at this later stage. (Dkt. # 130 at 9.) In response, Plaintiff asks the Court to rely on inferences from certain statements in Azaiez's depositions to argue that a reasonable jury could conclude that Azaiez was involved in directing Story's arrest. (Dkt. # 139.) He does not cite any direct evidence but rather suggests that the jury could draw inferences

regarding Azaiez's involvement, that certain statements in Azaiez's deposition "strain[] credulity," and argues that his position is based on "common sense." (Id. at 8–10.)

Turning to the record, Azaiez submits a declaration which says he did not direct any police involvement related to the investigation or arrest of Mr. Story; he did not have any conversations with Detective Griffith about the investigations; and did not speak with any Williamson County officials or judge about Mr. Story or the August 16th Meeting. (Dkt. # 132 at App. 173–74.) In his deposition, Azaiez confirmed that he never discussed Jeremy Story with Chief Yarbrough in any verbal or written communications, and that he had no emails or texts with any of the Round Rock ISD board members regarding Story. (Id. at App. 387–88, 90:17–93:2.) He further testified that he never saw the arrest affidavit prepared by Griffith. (Id.) In response to a question about whether he met directly with Yarbrough to discuss the August 16th meeting, he stated "I don't think I did, sir. I don't think I did," and explained that he is "not a criminal law enforcement agent, so I don't get involved with the police matters per se." (Id. at App. 391, 105:5–8, 105:17–106:3); (see also id. at App. 392, 112:13–16.)

Other Defendants' accounts of the surrounding incident match Azaeiz's. Griffith's declaration stated that she "did not speak with Dr. Azaiez regarding Mr. Story, the August 16th Meeting, or my investigation" and that "Dr.

Azaiez did not oversee or provide [her] any direction regarding, and was not involved in any way in, [her] investigation into Mr. Story's conduct at the August 16th Meeting, [her] preparation of the Warrant Affidavit, or any decision made regarding submitting the Warrant Affidavit to a Magistrate Judge for Mr. Story's arrest." (Id. at App. 49, ¶ 45); (id. at App. 460–462 (confirming the same in her deposition)). Former Chief Yarbrough's declaration clarifies that while Dr. Azaiez was officially his direct supervisor as the Superintendent of the District, Azaiez "did not make or direct law enforcement decisions, and he did not command officers to take law enforcement action." (Id. at App. 139–40, ¶ 8.) Yarbrough further declared that "[n]either Dr. Azaiez, Board President Weir, nor any other District official or Trustee gave [him] any directives or instructions regarding Mr. Story or how to proceed regarding Mr. Story's conduct at the August 16th Meeting." (Id. at App. 149, ¶ 40); (see also id. at App. 152, ¶ 52 ("They never gave me any instructions or directives to do so or even spoke to me about the investigation or what the Round Rock ISD Police Department was going to do in response.").)

Finding Defendants have carried their burden for summary judgment, the burden now shifts to Plaintiff to present affirmative evidence creating a genuine issue of material fact. Plaintiff's response primarily calls into question the credibility of Azaiez's testimony. (Dkt. # 139 at 8.) He says that several of

Azaiez's deposition statements were "untenable as a matter of common sense" and suggests that because of this, "a reasonable jury could find [his testimony] internally inconsistent and contrary to ordinary human understanding." (Id.) Because several of the allegedly inconsistent statements were related to the effect Story's statements could have on Azaiez's reputation, Story argues "a jury could find Dr. Aziez was minimizing the allegations of reputational impact to intentionally avoid a motive inference." (Id.) As an initial matter, it is not the Court's role at this stage to make credibility determinations about the evidence before it. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The Court instead limits its inquiry to whether Plaintiff has created a genuine issue suited for trial. See Matsushita Elec. Indus. Co., 475 U.S. at 587.

Plaintiff additionally argues that the fact Azaiez was officially Yarbrough's direct supervisor creates the inference that Azaiez must have discussed Jeremy Story with Yarbrough. (Dkt. # 139 at 9.) He argues that "it strains credulity to think this topic was not a major, or at least a significant part of the conversation between Dr. Azaiez and Chief Yarbrough." (Id.) In reviewing the record, it appears that Story's allegations are based only on his own subjective beliefs—not the objective evidence necessary to create an issue of material fact. See Infante, 735 F. App'x at 843. While the Court draws all inferences in favor of Plaintiff on Defendants' motion, the Court cannot credit Plaintiff's speculative

accusations of Azaiez's involvement in Story's arrest and find them sufficient to survive summary judgment on a retaliatory arrest claim. See Renda Marine, Inc., 667 F.3d at 655 ("[U]nsupported speculation [is] not sufficient to defeat a motion for summary judgment."). Even to the extent Plaintiff argues that there is video footage of Azaiez "visib[ly] directing the Chief to control room access" during a separate meeting on September 14, 2021, (Dkt. # 139 at 9), this evidence does not support the conclusion that Azaiez was involved in or directed and encouraged police to then *investigate and arrest* Story following the August 16th meeting—rather that he could have directed police intervention to a perceived disruption at the time of the meeting. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's retaliatory arrest claim against Dr. Azaiez.

ii. *Defendants Yarbrough and Griffith*

Defendants Yarbrough and Griffith set forth several arguments as to why they are entitled to summary judgment on Story's retaliatory arrest claim. Among them, they argue that (1) Story's comments, which encompassed topics not on the meeting agenda, were not protected speech under the First Amendment; (2) there was probable cause for Story's arrest; (3) the arrest was not motivated by retaliatory animus; or (4) in the alternative, qualified immunity applies. (Dkt. # 130.) The Court addresses these arguments below.

a. Protected Speech

As described supra, the Court finds the matter of whether Plaintiff's speech was protected to be inappropriate for summary judgment where there are underlying issues of material fact underlying the legal determination. Thus, the Court reaches the same conclusion on Defendants Yarbrough and Griffith's motion here.

b. Probable Cause

Next, Defendants argue that there was probable cause for Plaintiff's arrest, barring Plaintiff's success on his retaliatory arrest claims against Yarbrough and Griffith. (Dkt. # 130 at 10.) Generally, a plaintiff alleging a retaliatory arrest claim must show that there was a lack of probable cause for the arrest. Nieves v. Bartlett, 587 U.S. 391, 401 (2019). Arrests must be based on probable cause. See Club Retro, LLC v. Hilton, 568 F.3d 181, 206 (5th Cir. 2009). Probable cause for an arrest exists when the 'facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" Club Retro, LLC v. Hilton, 568 F.3d 181, 206 (5th Cir. 2009) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979) (internal quotations and alterations omitted)).

For the same reasons described supra in the Court's analysis of Story's false arrest claims against Pope, the independent intermediary doctrine likely also shields Yarbrough and Griffith from liability where an independent magistrate determined there was probable cause for Story's arrest. However, even absent the application of that doctrine,[3] Defendants have otherwise carried their burden to show that there was probable cause for the arrest.

Plaintiff was arrested under Texas Penal Code § 38.13, a Class A Misdemeanor for Hindering Proceedings by Disorderly Conduct. (Dkt. # 132-2 at 57–58, 61.) Under this section,

> (a) A person commits an offense if he intentionally hinders an official proceeding by noise or violent or tumultuous behavior or disturbance.
> (b) A person commits an offense if he recklessly hinders an official proceeding by noise or violent or tumultuous behavior or disturbance and continues after explicit official request to desist.

Tex. Pen. Code § 38.13. Defendants point to Plaintiff's communications with Trustee Weston before the meeting, in which Story said that he was "[w]illing to challenge kindly by simply speaking on a different subject" during his remarks after being told that specially called meetings only allowed on-agenda public comments. (Dkt. # 132-7 at 55.) When registering to provide his comments, he wrote that he would be speaking on either topic 2 "or something else—unlike the

[3] Because the Court does not rely on the independent intermediary doctrine to reach this conclusion, it also does not reach the application of the Franks exception to Defendants Yarbrough and Griffith.

board, citizens are not required to speak on items only on the agenda." (Dkt. # 132-2 at 64.) Moreover, the recording shows that during the meeting, Weir gave several reminders that public comments were limited to the special meeting agenda. These facts, known to the officers at the time of Story's arrest, were at least sufficient to demonstrate that the officers had probable cause on the intent element of § 38.13.

The remainder of the statute requires a relatively low bar—a person can be convicted under § 38.13 by "hinder[ing] an official proceeding by noise" alone. Story's response suggests that the recording itself prevents a finding of probable cause because it does not show "interruption of a lawful meeting by unreasonable noise, fighting, violent or tumultuous behavior, or refusal to comply with a lawful order supported by viewpoint-neutral rules." (Dkt. # 139 at 11.) But under the statute, merely "noise" which "hinders an official proceeding" is enough. Tex. Pen. Code § 38.13. Upon review of the recording, Story does continue making noise by raising his voice after his microphone is turned off and refusing to leave the room, and the proceedings are paused while he is escorted from the meeting room. (Dkt. # 152, P-6.) At this stage, the Court need not determine whether Plaintiff, as a matter of law, committed the offense for which he was arrested. But given the information available to the officers at the time of the

arrest, these facts were sufficient at least to find probable cause for his arrest under Texas Penal Code § 38.13.

Although probable cause ordinarily defeats a retaliatory arrest claim, Nieves identified a narrow exception to this general rule in "circumstances where officers have probable cause to make arrests but typically exercise their discretion not to do so." Id. at 406. To invoke the Nieves exception, a plaintiff must produce "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." Id. at 407; see also Gonzalez v. Trevino, 602 U.S. 653, 658 (2024) (emphasizing that the "only express limit" on the type of evidence presented is that it must be objective "in order to avoid 'the significant problems that would arise from reviewing [defendants'] conduct under a purely subjective standard.'" (quoting Nieves, 587 U.S. at 407)). Story argues that even if the Court concludes there was probable cause for his arrest, it should nonetheless find that the Nieves exception applies.

Once again, the Court need not decide as a matter of law whether the Nieves exception applies where qualified immunity ultimately bars the claims Plaintiff brings. As explained above, Defendants have met their burden of demonstrating probable cause for Story's arrest. Even if the Nieves exception applied and this finding of probable cause was insufficient to defend against Story's retaliatory arrest claim, the law in this area is not so clearly established so

that no reasonable official would have found probable cause here. See Morgan v. Swanson, 659 F.3d 359, 371 (5th Cir. 2011) ("When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].'" (internal quotations omitted) (emphasis and alterations in original)). Of course, as Story argues, it is well-settled law that government officials may not suppress speech because they disagree with a speaker's viewpoint. (Dkt. # 139 at 18) (collecting cases). However, the Fifth Circuit and Supreme Court have both emphasized that "generalizations and abstract propositions are not capable of clearly establishing the law" and that courts should not "define clearly established law at a high level of generality." Morgan, 659 F.3d at 372; Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011). The issue here is whether every reasonable official objectively would have known that there was no probable cause for Story's arrest. The Court has concluded there was probable cause, or at minimum, arguable probable cause, and thus Defendants are entitled to qualified immunity.[4]

Thus, Defendants Yarbrough and Griffith are granted summary judgment on Story's retaliatory arrest claims.

[4] In concluding that defendants are entitled to qualified immunity, the Court need not reach the remaining arguments regarding the issue of retaliatory animus.

B. False Arrest

Finally, Defendant Griffith seeks summary judgment on Story's false arrest claim against her. (Dkt. # 130 at 15.) The Court has already discussed at length Plaintiff's false arrest claim against Defendant Pope, and because much of the same analysis applies to his claims against Griffith, it incorporates that discussion here. The dispositive question is whether the magistrate judge's decision, by signing the warrant and finding probable cause for Story's arrest, insulates Griffith from liability.

Once again, the key issue in Story's false arrest claim against Griffith is that he has not shown the necessary mental state of Griffith to demonstrate the effective Franks exception applies: that Griffith intentionally, or with reckless disregard for the truth, included false statements in the warrant affidavit that she prepared. Nerio, 974 F.3d at 577. Even without determining the falsity or truth of the statements as a matter of law, and upon careful review of the record, Plaintiff has not adduced any evidence which suggests that Griffith included any of the statements intentionally or with reckless disregard for the truth. Rather, the record appears to support that she relied on Pope's account of events, reviewed video evidence of the meeting, and had a brief conversation with Pope to confirm his account while writing the warrant affidavit. (Dkt. # 133-13 at 27–29.) Finding Story has not rebutted this absence of evidence with his own, the Court similarly

finds that Griffith is also entitled to summary judgment on the false arrest claim under the independent intermediary doctrine.

Accordingly, Defendants Azaiez, Yarbrough, and Griffith's Motion for Summary Judgment should also be **GRANTED**, and Story's claims against these Defendants are **DISMISSED WITH PREJUDICE**.

IV. Story's Motion for Summary Judgment

Finally, Plaintiff Jeremy Story moves for summary judgment on his viewpoint discrimination, retaliatory arrest, and Fourth Amendment unreasonable seizure claims. (Dkt. # 133.) However, as analyzed supra, the Court has already determined summary judgment is appropriate on each of these claims in favor of the named defendants. Accordingly, Story's motion should be **DENIED**. (Dkt. # 133.)

## CONCLUSION

For the reasons stated above, Defendants' Motions for Summary Judgment (Dkt. ## 130, 131) are **GRANTED** and Plaintiff's Motion for Summary Judgment (Dkt. # 133) is **DENIED**. Finally, Defendants' Motions to Strike are **GRANTED**. (Dkt. ## 148, 149.) The Clerk is **DIRECTED** to **ENTER JUDGMENT** and **CLOSE THE CASE**.

**IT IS SO ORDERED.**
**SIGNED:** Austin, Texas, September 17, 2026.

David A. Ezra
Sr. United States District Judge